# 24-767-cr

## United States Court of Appeals

*for the*

## Second Circuit

---

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

MUSTAFA GOKLU, AKA Mustangy,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## APPENDIX
### Volume 1 of 5 (Pages A-1 to A-255)

MATTHEW BRISSENDEN
MATTHEW W. BRISSENDEN, P.C.
*Attorneys for Defendant-Appellant*
666 Old Country Road, Suite 501
Garden City, New York 11530
(516) 683-8500

CP COUNSEL PRESS    (800) 4-APPEAL • (333855)

**i**

## TABLE OF CONTENTS

|  | Page |
|---|---|
| District Court Docket Entries | A-1 |
| Complaint, dated May 5, 2019 | A-19 |
| Superseding Indictment, Filed on October 28, 2020 | A-33 |
| The Government's Requests to Charge, dated September 12, 2022, with Proposed Verdict Sheet Attached | A-38 |
| Defendant's Requests to Charge, dated September 12, 2022 | A-70 |
| Transcript of Jury Selection Held before of the Honorable Pamela K. Chen, dated October 3, 2022 | A-76 |
| Excerpts from Trial combined Opening through Verdict, Filed on December 1, 2022 | A-264 |
| Government Exhibit 501 | A-753 |
| Government Exhibit 502 | A-761 |
| Government Exhibit 503 | A-765 |
| Government Exhibit 504 | A-770 |
| Government Exhibit 505 | A-776 |
| Government Exhibit 506 | A-786 |
| Government Exhibit 507 | A-792 |
| Government Exhibit 901 | A-799 |

ii

|  | Page |
|---|---|
| Government Exhibit 902 | A-812 |
| Government Exhibit 903 | A-814 |
| Government Exhibit 904 | A-849 |
| Government Exhibit 906 | A-864 |
| Government Exhibit 907 | A-895 |
| Government Exhibit 909 | A-916 |
| Government Exhibit 1101 | A-928 |
| Jury Instructions, Filed on October 11, 2022 | A-929 |
| Verdict Form, dated October 11, 2022 | A-958 |
| Notice of Motion, by Defendant, for Judgment of Acquittal, dated November 10, 2022 | A-960 |
| Affirmation of Murray E. Singer, for Defendant, in Support of Motion, dated November 10, 2022 | A-961 |
| Government Memorandum of Law in Opposition to Defendant's Post-Trial Motion, dated December 5, 2022 | A-965 |
| Reply Affirmation of Murray E. Singer, for Defendant, in Further Support of Motion, dated December 12, 2022 | A-988 |
| Memorandum and Order, dated January 13, 2023 | A-990 |
| Sentencing Memorandum from Sabrina P. Shroff to the Honorable Pamela K. Chen, dated January 15, 2024 | A-999 |
| Transcript of First Sentencing Day held before the Honorable Pamela K. Chen, dated January 29, 2024 | A-1008 |

iii

**Page**

Excerpt from the Continued Sentencing Hearing
   held before the Honorable Pamela K. Chen, dated
   March 14, 2024 .................................................... A-1054

Notice of Appeal, Filed on March 22, 2024 .............. A-1117

A-1

APPEAL

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CRIMINAL DOCKET FOR CASE #: 1:19-cr-00386-PKC All Defendants

Case title: USA v. Goklu

Magistrate judge case number: 1:19-mj-00419-SMG

Date Filed: 08/22/2019

Date Terminated: 03/21/2024

---

Assigned to: Judge Pamela K. Chen

### Defendant (1)

**Mustafa Goklu**
*TERMINATED: 03/21/2024*
*also known as*
Mustangy
*TERMINATED: 03/21/2024*

represented by **Emilee Ann Sahli**
Sahli Law, PLLC
195 Broadway, 4th Floor
Brooklyn, NY 11211
347-378-8132
Email: emilee@sahlilaw.com
*TERMINATED: 03/16/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: CJA Appointment

**Murray Singer**
Murray E. Singer, ESQ.
14 Vanderventer Avenue
Suite 147
Port Washington, NY 11050
516-869-4207
Fax: 516-706-7085
Email: msingerlaw@gmail.com
*TERMINATED: 03/16/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: CJA Appointment

**Sabrina P. Shroff**
Sabrina Shroff
Attorney
80 Broad Street
19th Street
20004
New York, NY 20004
646-763-1490
Email: sabrinashroff@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: CJA Appointment

A-2

**James Darrow**
Federal Defenders of New York
One Pierrepont Plaza
16th floor
Brooklyn, NY 11201
718-407-7419
Fax: 718-855-0760
Email: james_darrow@fd.org
*TERMINATED: 08/30/2019*
*Designation: Public Defender or*
*Community Defender Appointment*

**Michael H. Gold**
Michael H. Gold
33 Hunting Ridge Road
Chappaqua, NY 10514
917-922-1917
Email: michaelhgold@aol.com
*TERMINATED: 09/28/2021*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18, Sections 1956(a)(3)(B), 2 and 3551 et seq. - MONEY LAUNDERING (1s) | Imprisonment for a period of sixteen (16) months on counts 1 and 2 of the Superseding Indictment (S-1) to run concurrently with each other. Two (2) years supervised release, with conditions, on counts 1 and 2 of the Superseding Indictment (S-1) to run concurrently with each other. $100 special assessment fee for each count for a total of $200. |
| 18, 1960(a), 2 and 3551 et seq. - OPERATION OF AN UNLICENSED MONETARY LAUNDERING BUSINESS (2s) | Imprisonment for a period of sixteen (16) months on counts 1 and 2 of the Superseding Indictment (S-1) to run concurrently with each other. Two (2) years supervised release, with conditions, on counts 1 and 2 of the Superseding Indictment (S-1) to run concurrently with each other. $100 special assessment fee for each count for a total of $200. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| Title 18, United States Code, Sections 1956(a)(3), 2 and 3551 et seq.- MONEY LAUNDERING (1) | Dismissed on Government's motion. |

A-3

10/14/24, 3:42 PM                 Eastern District of New York - LIVE Database 1.8 (Revision 1.8.1)

**Highest Offense Level (Terminated)**
Felony

**Complaints**                                        **Disposition**
18 USC 1956

---

**Plaintiff**
**USA**                              represented by  **Francisco J Navarro**
                                                     United States Attorney's Office
                                                     271 Cadman Plaza East
                                                     Brooklyn, NY 11201
                                                     718-254-6007
                                                     Fax: 718-254-6076
                                                     Email: francisco.navarro@usdoj.gov
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*
                                                     *Designation: Government Attorney*

                                                     **Temidayo Aganga-Williams**
                                                     Selendy Gay PLLC
                                                     Eastern District of New York
                                                     1290 Avenue of the Americas
                                                     New York, NY 10104
                                                     212-390-9014
                                                     Email: tagangawilliams@selendygay.com
                                                     *TERMINATED: 01/26/2022*
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*
                                                     *Designation: Government Attorney*

                                                     **Gillian Kassner**
                                                     DOJ-USAO
                                                     EDNY - Criminal Division
                                                     271A Cadman Plaza East
                                                     Brooklyn, NY 11201
                                                     718-254-6224
                                                     Email: gillian.kassner@usdoj.gov
                                                     *ATTORNEY TO BE NOTICED*
                                                     *Designation: Government Attorney*

                                                     **Jonathan Powell Lax**
                                                     United States Attorney's Office
                                                     271 Cadman Plaza East
                                                     Brooklyn, NY 11201
                                                     718-254-6139
                                                     Fax: 718-254-7499
                                                     Email: jonathan.lax@usdoj.gov
                                                     *ATTORNEY TO BE NOTICED*
                                                     *Designation: Government Attorney*

A-4

10/14/24, 3:42 PM    Eastern District of New York - LIVE Database 1.8 (Revision 1.8.1)

**Marietou Diouf**
1221 Avenue of the Americas
New York, NY 10020
212-819-2693
Email: marietou.diouf@whitecase.com
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/03/2019 | 1 | SEALED COMPLAINT as to Mustafa Goklu (1). (Attachments: # 1 Sealing Cover Sheet) (Yuen, Sui-May) [1:19-mj-00419-SMG] (Entered: 05/06/2019) |
| 05/06/2019 | 3 | Minute Entry for proceedings held before Magistrate Judge Peggy Kuo:Arraignment as to Mustafa Goklu on Complaint held on 5/6/2019, Initial Appearance as to Mustafa Goklu held on 5/6/2019, Attorney Appointment of federal defender James Darrow for the defendant present. AUSA Francisco Navarro present. Clerk F Chin - " Bond set at $50,000 bond on consent of both parties. Defendant given bail warnings and signed bond. 1 surety to cosign bond by 5/10/19. Defendant waived preliminary hearing" (FTR Log #418-436.) (Yuen, Sui-May) [1:19-mj-00419-SMG] (Entered: 05/07/2019) |
| 05/06/2019 | 4 | ORDER Setting Conditions of Release as to Mustafa Goklu (1) $50,000 bond. Ordered by Magistrate Judge Peggy Kuo on 5/6/2019. (Yuen, Sui-May) [1:19-mj-00419-SMG] (Entered: 05/07/2019) |
| 05/06/2019 | 5 | CJA 23 Financial Affidavit by Mustafa Goklu (Yuen, Sui-May) [1:19-mj-00419-SMG] (Entered: 05/07/2019) |
| 05/06/2019 | | Attorney update in case as to Mustafa Goklu. Attorney James Darrow for Mustafa Goklu added. (Yuen, Sui-May) [1:19-mj-00419-SMG] (Entered: 05/07/2019) |
| 05/07/2019 | 6 | (ELECTRONIC COPY) Order to Unseal Case as to Mustafa Goklu.. Ordered by Magistrate Judge Peggy Kuo on 5/7/2019. (Yuen, Sui-May) [1:19-mj-00419-SMG] (Entered: 05/08/2019) |
| 05/10/2019 | 7 | Minute Entry for proceedings held before Magistrate Judge Peggy Kuo:Bond Hearing as to Mustafa Goklu held on 5/10/2019. AUSA & dfse counsel not present. 1 surety sworn, advised of the bond obligations and signed the bond. (Log # 5/10/19 11:42-11:49.) (Chin, Felix) [1:19-mj-00419-SMG] (Entered: 05/13/2019) |
| 05/24/2019 | 8 | ORDER TO CONTINUE - Ends of Justice as to Mustafa Goklu Time excluded from 5/24/19 until 6/23/19.. Ordered by Magistrate Judge Sanket J. Bulsara on 5/24/2019. (Sica, Michele) [1:19-mj-00419-SMG] (Entered: 05/24/2019) |
| 06/19/2019 | 9 | Minute Entry for proceedings held before Chief Mag. Judge Roanne L. Mann:Docket Call as to Mustafa Goklu held on 6/19/2019 (FTR Log #2;36-2;46.) AUSA Francisco Navarro present. Defendant present w/ counsel James Darrow. Clerk F Chin - "Order of excludable delay from 6/19 to 7/23/19 entered. Bond modified curfew as directed by PTS." (Yuen, Sui-May) [1:19-mj-00419-SMG] (Entered: 06/20/2019) |
| 06/19/2019 | 10 | ORDER TO CONTINUE - Ends of Justice as to Mustafa Goklu Time excluded from 6/19/19 until 7/23/19.. Ordered by Chief Mag. Judge Roanne L. Mann on 6/19/2019. (Yuen, Sui-May) [1:19-mj-00419-SMG] (Entered: 06/20/2019) |
| 07/19/2019 | 11 | Minute Entry for proceedings held before Magistrate Judge Steven M. Gold: Status Conference as to Mustafa Goklu held on 7/19/2019. AUSA Francisco Navarro present. Federal Defender James Darrow present on behalf of the defendant. Order of Excludable |

A-5

|            |      |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                      |
|------------|------|------|
|            |      | delay entered from 7/24/2019 until 8/23/2019. (FTR Log #2:18-2:20pm.) (Williams, Erica) [1:19-mj-00419-SMG] (Entered: 07/19/2019)                                                                                                                                                                                                                                                                                                                                            |
| 07/19/2019 | 12   | ORDER TO CONTINUE - Ends of Justice as to Mustafa Goklu. Time excluded from 7/24/2019 until 8/23/2019. Ordered by Magistrate Judge Steven M. Gold on 7/19/2019. (Williams, Erica) [1:19-mj-00419-SMG] (Entered: 07/19/2019)                                                                                                                                                                                                                                                   |
| 07/22/2019 | 13   | Consent MOTION to Modify Conditions of Release by Mustafa Goklu. (Darrow, James) [1:19-mj-00419-SMG] (Entered: 07/22/2019)                                                                                                                                                                                                                                                                                                                                                   |
| 07/22/2019 | 14   | ORDER granting 13 Motion to Modify Conditions of Release as to Mustafa Goklu (1)Ordered by Magistrate Judge Ramon E. Reyes, Jr on 7/22/2019. (Chin, Felix) [1:19-mj-00419-SMG] (Entered: 07/22/2019)                                                                                                                                                                                                                                                                         |
| 08/22/2019 | 15   | INDICTMENT as to Mustafa Goklu (1) count(s) 1. (Attachments: # 1 Criminal Information Sheet) (Marziliano, August) (Entered: 08/29/2019)                                                                                                                                                                                                                                                                                                                                      |
| 08/29/2019 | 16   | Minute Entry for proceedings held before Magistrate Judge James Orenstein: Arraignment as to Mustafa Goklu (1) Count 1 held on August 29,2019. Appearances: Assistant U.S. Attorney Andrew Grubin for Francisco J. Navarro appeared on behalf of the Government. Sam Jacobson (Federal Defender) for James Darrow appeared on behalf of the Defendant Mustafa Goklu (present and on bail). Turkish interpreter M. Tekin Esendal also present. Defendant arraigned on the indictment. Defendant pleads NOT GUILTY to ALL COUNTS. Order of Excludable Delay/ Speedy Trial entered from August 29, 2019 to September 12, 2019. Fedeal Defenders are relieved, CJA counsel Michael Gold appointed. Status Conference set for September 12, 2019 at 11:00 AM in Courtroom 4F North before Judge Pamela K. Chen. (FTR Log #11:25-11:29.) (Love, Alexis) (Entered: 08/30/2019) |
| 08/29/2019 | 17   | ORDER TO CONTINUE - Ends of Justice as to Mustafa Goklu. Time excluded from August 29, 2019 until September 12, 2019. So Ordered by Magistrate Judge James Orenstein on August 29, 2019. (Love, Alexis) (Entered: 08/30/2019)                                                                                                                                                                                                                                                 |
| 08/29/2019 | 18   | CJA 20 as to Mustafa Goklu: Appointment of Attorney Michael H. Gold for Mustafa Goklu. So Ordered by Magistrate Judge James Orenstein on August 29,2019. (Love, Alexis) (Entered: 08/30/2019)                                                                                                                                                                                                                                                                                |
| 08/30/2019 |      | Attorney update in case as to Mustafa Goklu. Attorney James Darrow terminated. (Love, Alexis) (Entered: 08/30/2019)                                                                                                                                                                                                                                                                                                                                                         |
| 09/12/2019 |      | Minute Entry for proceedings held before Judge Pamela K. Chen: Status Conference as to Mustafa Goklu held on 9/12/2019. Appearances by AUSA Francisco Navarro and Michael Gold, CJA, for defendant (on bond). Turkish interpreter Ecegul (AJ) Elterman, sworn. Case called. Interpreter sworn. Discussion held. AUSA to move to dismiss docket number 1:19-cr-00354-PKC, as duplicative. Next conference set for 10/10/2019, at 11:15 a.m. Time excluded in the interest of justice in the 1:19-cr-00386-PKC action from 9/12/2019 to 10/10/2019. (Court Reporter Linda Marino.) (Abdallah, Fida) (Entered: 09/12/2019) |
| 09/18/2019 | 19   | Letter re duplicative docket numbers as to Mustafa Goklu (Navarro, Francisco) (Entered: 09/18/2019)                                                                                                                                                                                                                                                                                                                                                                          |
| 09/19/2019 | 20   | ORDER as to Mustafa Goklu: The Court grants the 19 request to terminate docket 1:19-cr-00354-PKC as duplicative to 1:19-cr-00386-PKC. Ordered by Judge Pamela K. Chen on 9/19/2019. (Abdallah, Fida) (Entered: 09/19/2019)                                                                                                                                                                                                                                                    |
| 09/19/2019 | 21   | Letter re Government rule 16 production as to Mustafa Goklu (Navarro, Francisco) (Entered: 09/19/2019)                                                                                                                                                                                                                                                                                                                                                                        |

A-6

| | | |
|---|---|---|
| 10/10/2019 | | Minute Entry for proceedings held before Judge Pamela K. Chen: Status Conference as to Mustafa Goklu held on 10/10/2019. Appearances by AUSA Temidayo Aganga-Williams and Michael Gold, CJA, for defendant (on bond). Turkish interpreter Ecegul (AJ) Elterman, sworn. Case called. Interpreter sworn. Discussion held. Next conference set for 11/25/2019, at 3:00 p.m. Time excluded in the interest of justice from 10/10/2019 to 11/25/2019. (Court Reporter Linda Danelczyk.) (Abdallah, Fida) (Entered: 10/10/2019) |
| 11/21/2019 | | SCHEDULING ORDER as to Mustafa Goklu: At the request of the Government, and with consent of the defense, the status conference set for 11/25/2019 will be held at 2:00 p.m., in Courtroom 4F North. Ordered by Judge Pamela K. Chen on 11/21/2019. Typographical error corrected. (Abdallah, Fida) (Entered: 11/21/2019) |
| 11/25/2019 | | Minute Entry for proceedings held before Judge Pamela K. Chen: Status Conference and Bail Application as to Mustafa Goklu held on 11/25/2019. Appearances by AUSA Francisco Navarro and Michael Gold, CJA, for defendant (on bond). Turkish interpreter Ecegul (AJ) Elterman, sworn. Case called. Discussion held. Bail application made. Application denied with leave to renew. Next conference set for 1/8/2020, at 12:45 p.m. Time excluded in the interest of justice from 11/25/2019 to 1/8/2020. (Court Reporter David Roy.) (Abdallah, Fida) (Entered: 11/25/2019) |
| 01/08/2020 | | Minute Entry for proceedings held before Judge Pamela K. Chen: Status Conference as to Mustafa Goklu held on 1/8/2020.. Appearances by AUSA Francisco Navarro and Michael Gold, CJA, for defendant (on bond). Turkish interpreter Ecegul (AJ) Elterman, sworn. Case called. Discussion held. Next conference set for 2/10/2020, at 12:00 noon. Time excluded in the interest of justice from 1/8/2020 to 2/10/2020. (Court Reporter Lisa Schmid.) (Abdallah, Fida) (Entered: 01/08/2020) |
| 01/08/2020 | 22 | NOTICE *regarding Bill of Particulars* as to Mustafa Goklu (Navarro, Francisco) (Entered: 01/08/2020) |
| 02/06/2020 | | SCHEDULING ORDER as to Mustafa Goklu: Due to a change with the Court's calendar, the status conference set for 2/10/2020 will be held on 2/11/2020, at 10:15 a.m. Ordered by Judge Pamela K. Chen on 2/6/2020. (Abdallah, Fida) (Entered: 02/06/2020) |
| 02/07/2020 | | SCHEDULING ORDER as to Mustafa Goklu: The status conference set for 2/11/2020 will be held at 11:45 a.m. Ordered by Judge Pamela K. Chen on 2/7/2020. (Abdallah, Fida) (Entered: 02/07/2020) |
| 02/11/2020 | | Minute Entry for proceedings held before Judge Pamela K. Chen: Status Conference as to Mustafa Goklu held on 2/11/2020. Appearances by AUSA Francisco Navarro and Micheal Gold, CJA, for defendant (on bond). Turkish interpreter Ecegul (AJ) Elterman, sworn. Case called. Discussion held. The Court set the following deadlines and schedule: 1) the government is to produce 3500 material by 6/1/2020; (2) pretrial motions and motions *in limine* shall be filed by 4/21/2020; responses due by 5/5/2020; replies, if any, due by 5/19/2020 (3) proposed jury instructions, proposed *voir dire*, and a list of names, places, terms, and acronyms the parties expect to refer to at trial, shall be filed by 5/19/2020; 4) government to provide defense with a copy of their exhibits by 6/1/2020; 5)a final pre-trial conference and/or oral argument is scheduled for 5/26/2020, at 11:00 a.m., in Courtroom 4F North; 6) Jury selection (12 jurors, 2 alternates) and trial (5 business days) shall be held on 6/8/2020 at 9:00 a.m. Time is excluded in the interest of justice from 2/11/2020 to 5/26/2020. (Court Reporter Denise Parisi.) (Abdallah, Fida) (Entered: 02/11/2020) |
| 02/11/2020 | 23 | NOTICE TO COUNSEL: On the first day of trial, the parties should come prepared with five (5) copies of their respective exhibits. All exhibits must be pre-marked and in binders, separated with labeled tabs. Each of the binders must include an exhibit list and a witness list. The exhibit list should list every exhibit in the binder(s) and contain a brief |

A-7

| | | |
|---|---|---|
| | | description, no longer than one sentence, of each exhibit. Attached here is a list of general questions the Court will ask prospective jurors and <u>should not be included</u> in the proposed *voir dire*. (Abdallah, Fida) (Entered: 02/11/2020) |
| 05/04/2020 | | SCHEDULING ORDER as to Mustafa Goklu: In light of the Eastern District of New York's Administrative Order 2020-15, continuing, pending further order of the Court, all criminal jury selections and trials scheduled to occur between April 27, 2020 and June 15, 2020, trial in this matter is adjourned from June 8, 2020 to July 13, 2020. The following revised pretrial schedule is set: 1) the government is to produce 3500 material by 7/6/2020; (2) proposed jury instructions, proposed *voir dire,* and a list of names, places, terms, and acronyms the parties expect to refer to at trial, shall be filed by 6/23/2020; (3) government to provide defense with a copy of their exhibits by 7/6/2020; and (4) a final pre-trial is scheduled for 7/2/2020, at 11:00 a.m., in Courtroom 4F North. The parties should note that because neither party filed any pretrial or in limine motions by the previously set deadline of 4/21/2020 (*see* 2/11/2020 Minute Entry), the revised schedule does not include another such deadline. However, if either side, in fact, intends to file a pretrial or *in limine* motion, they must advise the Court by 5/1/2020, so that the scheduled can be adjusted accordingly. Finally, jury selection (12 jurors, 2 alternates) and trial (5 business days) shall be held on 7/13/2020 at 9:00 a.m. in Courtroom 4F North. Time is excluded in the interest of justice from 6/8/2020 to 7/13/2020. Ordered by Judge Pamela K. Chen on 5/4/2020. (Abdallah, Fida) (Entered: 05/04/2020) |
| 05/07/2020 | [24](#) | Letter *re trial date* as to Mustafa Goklu (Gold, Michael) (Entered: 05/07/2020) |
| 05/12/2020 | | AMENDED SCHEDULING ORDER as to Mustafa Goklu: In light of [24](#) the unavailability of defense counsel, the Court adjourns the trial schedule as follows: 1) the government is to produce 3500 material by 7/27/2020; (2) proposed jury instructions, proposed *voir dire,* and a list of names, places, terms, and acronyms the parties expect to refer to at trial, shall be filed by 7/22/2020; (3) government to provide defense with a copy of their exhibits by 7/27/2020; and (4) a final pre-trial is scheduled for 7/29/2020, at 10:00 a.m., in Courtroom 4F North. Jury selection (12 jurors, 2 alternates) and trial (5 business days) shall be held on 8/3/2020 at 9:00 a.m. in Courtroom 4F North. Time is excluded in the interest of justice from 7/13/2020 to 8/3/2020. Ordered by Judge Pamela K. Chen on 5/12/2020. (Abdallah, Fida) (Entered: 05/12/2020) |
| 06/11/2020 | [25](#) | NOTICE OF ATTORNEY APPEARANCE Jonathan Powell Lax appearing for USA. (Lax, Jonathan) (Entered: 06/11/2020) |
| 06/11/2020 | [26](#) | Letter *requesting an adjournment of the trial* as to Mustafa Goklu (Gold, Michael) (Entered: 06/11/2020) |
| 06/22/2020 | | ORDER as to Mustafa Goklu: The Court grants the motion to adjourn trial and sets the following schedule: (1) the government is to produce 3500 material by 11/16/2020; (2) government to provide defense with a copy of their exhibits by 11/16/2020; (3) proposed jury instructions, proposed *voir dire,* and a list of names, places, terms, and acronyms the parties expect to refer to at trial, shall be filed by 11/23/2020; and (4) a final pre-trial is scheduled for 12/2/2020, at 11:30 a.m., in Courtroom 4F North. Jury selection (12 jurors, 2 alternates) and trial (5 business days) shall be held on 12/7/2020 at 9:00 a.m. in Courtroom 4F North. Time is excluded in the interest of justice from 8/3/2020 to 12/7/2020. Ordered by Judge Pamela K. Chen on 6/22/2020. (Abdallah, Fida) (Entered: 06/22/2020) |
| 10/07/2020 | [27](#) | NOTICE OF ATTORNEY APPEARANCE Gillian Kassner appearing for USA. (Kassner, Gillian) (Entered: 10/07/2020) |
| 10/28/2020 | [28](#) | SUPERSEDING INDICTMENT(S-1) as to Mustafa Goklu (1) count(s) 1s, 2s. (Layne, Monique) (Entered: 10/29/2020) |

A-8

10/14/24, 3:42 PM                           Eastern District of New York - LIVE Database 1.8 (Revision 1.8.1)

| 11/04/2020 | | SCHEDULING ORDER as to Mustafa Goklu: Arraignment on the Superseding Indictment will be held on 11/12/2020 at 10:00 a.m., via video. The public may access the audio of the hearing by calling the conference number 571-353-2300 and using access code 038106492. Ordered by Judge Pamela K. Chen on 11/4/2020. (Abdallah, Fida) (Entered: 11/04/2020) |
|---|---|---|
| 11/10/2020 | 29 | Letter *Disclosing Supplemental Rule 16 Discovery* as to Mustafa Goklu (Kassner, Gillian) (Entered: 11/10/2020) |
| 11/12/2020 | | Minute Entry for proceedings held before Judge Pamela K. Chen: Arraignment as to Mustafa Goklu held on 11/12/2020, via video. Appearances by AUSA Gillian Kassner and Michael Gold, CJA, for defendant (on bond). Ecegul (AJ) Elterman, Turkish interpreter. Case called. Interpreter sworn. Defendant arraigned on the Superseding Indictment (S-1) and enters a not guilty plea to all counts. The Court explained that due to the limited number of jury trials that can be conducted in the courthouse during the COVID pandemic, the trial in this matter has to be adjourned to a new date. Both parties indicated that the new trial date of June 1, 2021 is acceptable. Application to modify bond conditions made. For the reasons stated on the record, the application is denied with leave to renew. A hearing to discuss bond modification will be held via video (571-353-2300, access code 038106492) on 11/30/2020, at 11:00 a.m. (Court Reporter Victoria Torres-Butler.) (Abdallah, Fida) (Entered: 11/16/2020) |
| 11/16/2020 | | SCHEDULING ORDER as to Mustafa Goklu: For the reasons stated at the video conference held on 11/12/2020, the Court adjourns trial and amends the schedule as follows: (1) the government is to produce 3500 material by 5/10/2021; (2) government to provide defense with a copy of their exhibits by 5/10/2021; (3) proposed jury instructions, proposed *voir dire,* and a list of names, places, terms, and acronyms the parties expect to refer to at trial, shall be filed by 5/17/2021; and (4) a final pre-trial is scheduled for 5/24/2021, at 11:00 a.m., in Courtroom 4F North. Jury selection (12 jurors, 2 alternates) and trial (5 business days) shall be held on 6/1/2021 at 9:00 a.m. in Courtroom 4F North. Time is excluded in the interest of justice from 12/7/2020 to 6/1/2021. Ordered by Judge Pamela K. Chen on 11/16/2020. (Abdallah, Fida) (Entered: 11/16/2020) |
| 11/30/2020 | | Minute Entry for proceedings held before Judge Pamela K. Chen: Bond modification hearing as to Mustafa Goklu held on 11/30/2020, via video. Appearances by AUSA Gillian Kassner and Michael Gold, CJA, for defendant (on bond). Ecegul (AJ) Elterman, Turkish interpreter. Case called. Interpreter sworn. Discussion regarding bail modification heard. Defendant shall file a letter by the close of business on 12/2/2020, outlining the requested modification. Bond modification hearing continued to 12/4/2020, at 12 noon, via video (571-353-2300, access code 038106492). (Court Reporter Anthony Mancuso.) (Abdallah, Fida) (Entered: 11/30/2020) |
| 12/02/2020 | 30 | Letter *responding to Court inquiries and withdrawing bail modification application* as to Mustafa Goklu (Gold, Michael) (Entered: 12/02/2020) |
| 12/03/2020 | | ORDER as to Mustafa Goklu: The 30 request to cancel the conference scheduled for 12/4/2020 is granted. Given the trial and pretrial schedule that has been set with the 11/16/2020 Scheduling Order, no additional conferences will be scheduled, unless Defendant renews his request to modify his pretrial release conditions. Ordered by Judge Pamela K. Chen on 12/3/2020. (Abdallah, Fida) (Entered: 12/03/2020) |
| 12/17/2020 | 31 | ORDER as to Mustafa Goklu: This order is entered pursuant to Federal Rule of Criminal Procedure 5(f) to confirm the prosecution's disclosure obligations under *Brady v. Maryland,* 373 U.S. 83 (1963), and its progeny, and to summarize the possible consequences of violating those obligations. Ordered by Judge Pamela K. Chen on 12/17/2020. (Abdallah, Fida) (Entered: 12/17/2020) |

A-9

| | | |
|---|---|---|
| 02/12/2021 | 32 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Mustafa Goklu held on November 25, 2019, before Judge Pamela K. Chen. Court Reporter/Transcriber David R. Roy, Telephone number (718) 613-2609. Email address: drroyofcr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 3/5/2021. Redacted Transcript Deadline set for 3/15/2021. Release of Transcript Restriction set for 5/13/2021. (Roy, David) (Entered: 02/12/2021) |
| 03/22/2021 | | ORDER as to Mustafa Goklu: Due to a potential conflict between the current trial date of June 1, 2021 and the courthouse trial calendar, the parties will confer and advise the Court by April 2, 2021 of all dates from June 8, 2021 through the end of the year when they are mutually available to try this case. Ordered by Judge Pamela K. Chen on 3/22/2021. (Abdallah, Fida) (Entered: 03/22/2021) |
| 03/25/2021 | 33 | NOTICE OF ATTORNEY APPEARANCE Temidayo Aganga-Williams appearing for USA. (Aganga-Williams, Temidayo) (Entered: 03/25/2021) |
| 04/01/2021 | 34 | Letter *re trial dates* as to Mustafa Goklu (Navarro, Francisco) (Entered: 04/01/2021) |
| 04/15/2021 | | SCHEDULING ORDER as to Mustafa Goklu: The Court adjourns the trial schedule as follows: (1) the government is to produce 3500 material by 11/29/2021; (2) government to provide defense with a copy of their exhibits by 11/29/2021; (3) proposed jury instructions, proposed *voir dire,* and a list of names, places, terms, and acronyms the parties expect to refer to at trial, shall be filed by 12/6/2021; and (4) a final pre-trial is scheduled for 12/13/2021, at 2 p.m., in a courtroom to be announced. Jury selection (12 jurors, 2 alternates) and trial (5 business days) shall be held on 12/20/2021 at 9:00 a.m. in a courtroom to be announced. Time is excluded in the interest of justice from 6/1/2021 to 12/20/2021. Ordered by Judge Pamela K. Chen on 4/15/2021. (Abdallah, Fida) (Entered: 04/15/2021) |
| 05/28/2021 | | AMENDED SCHEDULING ORDER as to Mustafa Goklu: The government having informed the Court's deputy that the trial was scheduled for a date which the parties indicated that they are not available, the Court amends the schedule as follows: (1) the government is to produce 3500 material by 12/27/2021; (2) government to provide defense with a copy of their exhibits by 12/27/2021; (3) proposed jury instructions, proposed *voir dire,* and a list of names, places, terms, and acronyms the parties expect to refer to at trial, shall be filed by 1/5/2022; and (4) a final pre-trial is scheduled for 1/6/2022, at 10:00 a.m., in a courtroom to be announced. Jury selection (12 jurors, 2 alternates) and trial (5 business days) shall be held on 1/18/2022 at 9:00 a.m. in a courtroom to be announced. Time is excluded in the interest of justice from 12/20/2021 to 1/18/2022. (Abdallah, Fida) (Entered: 05/28/2021) |
| 07/16/2021 | 35 | Letter *re interim voucher* as to Mustafa Goklu (Gold, Michael) (Entered: 07/16/2021) |
| 09/24/2021 | 37 | Letter *requesting to be relieved* as to Mustafa Goklu (Gold, Michael) (Entered: 09/24/2021) |
| 09/28/2021 | | ORDER as to Mustafa Goklu: The 37 request to be relieved is granted, with the thanks of the Court. Ordered by Judge Pamela K. Chen on 9/27/2021. (Gonzalez, Fida) (Entered: 09/28/2021) |
| 09/28/2021 | 38 | CJA 20 as to Mustafa Goklu: Appointment of Attorney Murray Singer for Mustafa Goklu. Ordered by Judge Pamela K. Chen on 9/27/2021. (Gonzalez, Fida) (Entered: 09/28/2021) |
| 10/28/2021 | | SCHEDULING ORDER as to Mustafa Goklu: A status conference will be held, via video, on 11/4/2021 at 12 noon to discuss the January 18, 2021 trial schedule. The public |

A-10

|  |  | may access the audio of the conference by calling the conference number 1-650-479-3207, and using access code 2308 020 8382. Ordered by Judge Pamela K. Chen on 10/28/2021. (Gonzalez, Fida) (Entered: 10/28/2021) |
|---|---|---|
| 11/04/2021 |  | Minute Entry for proceedings held before Judge Pamela K. Chen: Status Conference as to Mustafa Goklu held on 11/4/2021, via video. Appearances by AUSA Francisco Navarro and Murray Singer, CJA, for defendant (on bond). Turkish interpreter AJ Elterman. Case called. Interpreter sworn. Discussion regarding trial held. Mr. Singer is directed to file a letter by 11/19/2021 informing the Court of the status of his February 2022 trial. The trial in this matter scheduled for 1/18/2022 remains unchanged. (Court Reporter Avery Armstrong.) (Gonzalez, Fida) (Entered: 11/04/2021) |
| 11/16/2021 | 39 | Letter *regarding trial date* as to Mustafa Goklu (Singer, Murray) (Entered: 11/16/2021) |
| 11/17/2021 |  | SCHEDULING ORDER as to Mustafa Goklu: In light of the letter filed by defense counsel, the final pretrial conference scheduled for 1/6/2022 at 10 a.m. is converted to an in person status conference, in a courtroom to be announced, and the trial scheduled is stayed. Ordered by Judge Pamela K. Chen on 11/17/2021. (Gonzalez, Fida) (Entered: 11/17/2021) |
| 12/23/2021 | 40 | Letter *regarding trial date* as to Mustafa Goklu (Singer, Murray) (Entered: 12/23/2021) |
| 12/27/2021 |  | SCHEDULING ORDER as to Mustafa Goklu: The parties are directed to confer with each other and inform the Court by 1/4/2022 if they are able to proceed with trial on 2/28/2022. The status conference set for 1/6/2022 will be held in person at 12:30 p.m. in Courtroom 6A South. Ordered by Judge Pamela K. Chen on 12/27/2021. (Gonzalez, Fida) (Entered: 12/27/2021) |
| 12/29/2021 |  | NOTICE as to Mustafa Goklu: The conference set for 1/6/2022 will be held at 10 a.m. via telephone. The parties are directed to call the conference number 888-684-8852 and use access code 7245547. (Gonzalez, Fida) (Entered: 12/29/2021) |
| 01/04/2022 | 42 | Letter *Regarding Trial Date* as to Mustafa Goklu (Kassner, Gillian) (Entered: 01/04/2022) |
| 01/06/2022 |  | Minute Entry for proceedings held before Judge Pamela K. Chen: Status Conference as to Mustafa Goklu held on 1/6/2022, via telephone. Appearances by AUSA Gillian Kassner, AUSA Francisco Navarro; Murray Singer and Emilee Shali, CJA, for defendant (on bond). Turkish interpreter Mayda Lyon. Case called. Interpreter sworn. Discussion regarding trial held. The following schedule is set: (1) the government is to produce 3500 material and copies of marked exhibits by 2/7/2022; (2) proposed jury instructions, proposed *voir dire,* and a list of names, places, terms, and acronyms the parties expect to refer to at trial, shall be filed by 2/14/2022; (3) any motions *in limine* to be filed by 2/14/2022; responses, if any, due by 2/21/2022; and (4) a final pre-trial is scheduled for 2/23/2022, at 10:00 a.m., in a courtroom to be announced. Jury selection (12 jurors, 2 alternates) and trial (5 business days) shall be held on 2/28/2022 at 9:00 a.m. in a courtroom to be announced. Time is excluded in the interest of justice from 1/18/2022 to 2/28/2022. (Court Reporter Sophie Nolan.) (Gonzalez, Fida) (Entered: 01/12/2022) |
| 01/07/2022 | 43 | Letter *Disclosing Supplemental Rule 16 Discovery* as to Mustafa Goklu (Kassner, Gillian) (Entered: 01/07/2022) |
| 01/20/2022 | 44 | Letter *Disclosing Supplemental Rule 16 Discovery and Identifying Specified Anticipated Trial Exhibits* as to Mustafa Goklu (Kassner, Gillian) (Entered: 01/20/2022) |
| 01/21/2022 | 45 | Letter *Providing Notice of Expert* as to Mustafa Goklu (Kassner, Gillian) (Entered: 01/21/2022) |

A-11

| 01/26/2022 | 46 | MOTION to Continue *and Reschedule Trial* by Mustafa Goklu. (Singer, Murray) (Entered: 01/26/2022) |
| 01/26/2022 | 47 | NOTICE OF ATTORNEY APPEARANCE Marietou Diouf appearing for USA. (Diouf, Marietou) (Entered: 01/26/2022) |
| 01/27/2022 | | ORDER granting 46 Motion to Continue as to Mustafa Goklu: The trial schedule following schedule is set: (1) the government is to produce 3500 material and copies of marked exhibits by 9/6/2022; (2) proposed jury instructions, proposed *voir dire,* and a list of names, places, terms, and acronyms the parties expect to refer to at trial, shall be filed by 9/12/2022; (3) any motions *in limine* to be filed by 9/8/2022; responses, if any, due by 9/15/2022; and (4) a final pre-trial is scheduled for 9/23/2022, at 10:00 a.m., in a courtroom to be announced. Jury selection (12 jurors, 2 alternates) and trial (5 business days) shall be held on 10/3/2022 at 9:00 a.m. in a courtroom to be announced.<br><br>Time is excluded between **February 28 to October 3, 2022,** as being in the interests of justice. 18 U.S.C. § 3167(h)(7). Courts across the country have found such continuances, necessitated by the ongoing effects of the COVID pandemic, outweigh the interests of the parties and the public in a speedy trial, and that they serve the "ends of justice," 18 U.S.C. § 3161(h)(7). *See, e.g., Carrilllo-Villa,* 451 F. Supp. 3d 257, 261 (S.D.N.Y. 2020); *United States v. Rosales-Corria,* No. 20 CR-46, 2020 WL 2476169 (D. Utah May 13, 2020); *United States v. Morrissey,* No. 19-CR-190, 2020 WL 2082929 (D. Maine April 30, 2020); *United States v. Garza-Guzman,* No. 20-MJ-905, 2020 WL 1433359 (S.D. Cal. March 20, 2020); *see also United States,* 644 F.2d 764, 767-68 (9th Cir.1981) (upholding ends-of-justice continuance to exclude a month-long delay following the eruption of Mt. St. Helens, which had a "paralyzing impact on... the location of the court."); *United States v. Correa,* 182 F. Supp. 2d 326, 327330 (S.D.N.Y. 2001) (retroactively excluding time in the larger interests of justice following the September 11, 2001 terror attacks, an "extraordinary event[]" which closed many government offices); *United States v. Scott,* 245 F. App'x 391, 394 (5th Cir. 2007) (affirming ends-of-justice continuance following Hurricane Katrina). Here, the ongoing effects of the COVID pandemic "continue to constrain the court's ability to conduct all criminal proceedings in-person." Administrative Order No. 2022-2. These constraints include severely limiting the number of jury trials that can conducted in the courthouse each week and preventing judges from unilaterally scheduling their trials. Accordingly, the Court finds that the continuance of trial in this matter serves the ends of justice. Ordered by Judge Pamela K. Chen on 1/27/2022. (Gonzalez, Fida) (Entered: 01/27/2022) |
| 02/01/2022 | 48 | Letter *Disclosing Supplemental Rule 16 Discovery* as to Mustafa Goklu (Kassner, Gillian) (Entered: 02/01/2022) |
| 04/01/2022 | 49 | Letter *Identifying Items Located on Devices Previously Disclosed in Discovery* as to Mustafa Goklu (Kassner, Gillian) (Entered: 04/01/2022) |
| 04/04/2022 | 50 | MOTION to Appoint Counsel *and authorize additional hours for associate counsel* by Mustafa Goklu. (Singer, Murray) (Entered: 04/04/2022) |
| 08/29/2022 | 52 | Letter *re Rule 16 Discovery* as to Mustafa Goklu (Diouf, Marietou) (Entered: 08/29/2022) |
| 09/08/2022 | 53 | MOTION in Limine by USA as to Mustafa Goklu. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Diouf, Marietou) (Entered: 09/08/2022) |
| 09/08/2022 | 54 | MOTION for Extension of Time to File *Motions in Limine* by Mustafa Goklu. (Singer, Murray) (Entered: 09/08/2022) |
| 09/09/2022 | | ORDER granting 54 Motion for Extension of Time to File motions *in limine* as to Mustafa Goklu until 9/12/2022 is granted *nunc pro tunc* as of 9/8/2022. Ordered by Judge |

A-12

| | | Pamela K. Chen on 9/9/2022. (Gonzalez, Fida) (Entered: 09/09/2022) |
|---|---|---|
| 09/12/2022 | 55 | Proposed Voir Dire by USA as to Mustafa Goklu (Kassner, Gillian) (Entered: 09/12/2022) |
| 09/12/2022 | 56 | Proposed Jury Instructions/Verdict Form by USA as to Mustafa Goklu (Kassner, Gillian) (Entered: 09/12/2022) |
| 09/12/2022 | 57 | Proposed Voir Dire by Mustafa Goklu (Singer, Murray) (Entered: 09/12/2022) |
| 09/12/2022 | 58 | Proposed Jury Instructions/Verdict Form by Mustafa Goklu (Singer, Murray) (Entered: 09/12/2022) |
| 09/14/2022 | 59 | Letter *Disclosing Supplemental Rule 16 Discovery* as to Mustafa Goklu (Kassner, Gillian) (Entered: 09/14/2022) |
| 09/15/2022 | 60 | Letter *Response in Opposition to Government's Proposed Voir Dire* as to Mustafa Goklu (Singer, Murray) (Entered: 09/15/2022) |
| 09/15/2022 | 61 | Letter *Response in Opposition to Government's proposed jury instructions* as to Mustafa Goklu (Singer, Murray) (Entered: 09/15/2022) |
| 09/15/2022 | 62 | RESPONSE in Opposition re 53 MOTION in Limine (Singer, Murray) (Entered: 09/15/2022) |
| 09/22/2022 | | NOTICE OF TO COUNSEL as to Mustafa Goklu: In light of the District's return to pre-COVID trial scheduling protocols in 2023, the final pretrial conference, jury selection and trial in this matter will be held in Courtroom 4F North. (Gonzalez, Fida) (Entered: 09/22/2022) |
| 09/23/2022 | 65 | WITNESS LIST by USA as to Mustafa Goklu (Kassner, Gillian) (Entered: 09/23/2022) |
| 09/23/2022 | | Minute Entry for proceedings held before Judge Pamela K. Chen: Pretrial Conference as to Mustafa Goklu held on 9/23/2022. Appearances by AUSA Gillian Kassner, AUSA Marietou Diouf, AUSA Francisco Navarro, with Paralegal Specialist Bridget Donovan; Murray Singer and Emilee Sahli, CJA, for Defendant (on bond). Turkish interpreter George Esyan, on stand-by. Case called. Interpreter sworn. Discussion held. For the reasons stated on the record, the Court granted in part and denied in part the Government's motions *in limine* (*see* Dkt. 53 ). First, by no later than September 27, 2022, the Parties shall submit a joint letter advising the Court whether there is still an evidentiary dispute regarding possible admission, or exclusion, by any side of: (1) Defendant's statements in conversations with UC, including in Government exhibit 803, (2) Defendant's messages, including in Government exhibit 807, and (3) Defendant's post-arrest statements. If any such dispute remains, the Parties shall accompany their letter with a searchable document, in PDF format, highlighting the relevant portions of any of the foregoing exhibits whose admission or exclusion the Parties dispute. Second, by the same date, the Parties shall submit a (preferably joint) proposed jury limiting instruction regarding the jury's consideration of certain encrypted text-messages and surveillance photos (*see* Dkt. 53 , at ECF 9, 11-14) only as to Count 2 of the Superseding Indictment. (Dkt. 28 .) (Court Reporter Sophie Nolan.) (Ben-Gigi, Yanai) (Entered: 09/23/2022) |
| 09/23/2022 | 66 | Letter *Regarding Redactions to Exhibits* as to Mustafa Goklu (Kassner, Gillian) (Entered: 09/23/2022) |
| 09/28/2022 | 67 | Letter *Disclosing Supplemental Rule 16 Discovery* as to Mustafa Goklu (Kassner, Gillian) (Entered: 09/28/2022) |
| 09/30/2022 | 68 | Letter *Attaching Government's Proposed Limiting Instruction* as to Mustafa Goklu (Kassner, Gillian) (Entered: 09/30/2022) |

A-13

| | | |
|---|---|---|
| 09/30/2022 | 69 | Letter *Objecting to Portion of Government's Proposed Limiting Instruction* as to Mustafa Goklu (Singer, Murray) (Entered: 09/30/2022) |
| 10/03/2022 | | Minute Entry for proceedings held before Judge Pamela K. Chen: Jury Selection and Voir Dire held on 10/3/2022. Appearances by AUSA Gillian Kassner, Marietou Diouf, AUSA Francisco Navarro, with Paralegal Bridget Donovan, and Special Agent Julian Hur, Murray Singer and Emilee Sahli, CJA, for defendant Mustafa Goklu (on bond). Turkish Interpreters Seyhan Sirtalan and George Esyan sworn and on stand-by to interpret the proceedings. Case called. Prospective jurors sworn. Jury selection and voir dire held and completed. Jury empaneled. Juror 5 was excused. Remaining jurors sworn. Trial begins. Opening statements from the Government and Defense. Witnesses sworn and testified. Exhibits marked and entered into evidence. Trial is continued to 10/4/2022 at 9:00 a.m. in Courtroom 4F North. (Court Reporter: Sophie Nolan) (RO) (Entered: 10/03/2022) |
| 10/04/2022 | | Minute Entry for proceedings held before Judge Pamela K. Chen: Jury Trial as to Mustafa Goklu held on 10/4/2022. Appearances by AUSA Gillian Kassner, AUSA Marietou Diouf, AUSA Francisco Navarro, with Special Agent Julian Hur, and Paralegal Specialist Bridget Donovan; Murray Singer and Emilee Sahli, CJA, for defendant Mustafa Goklu (on bond). Turkish Interpreters Seyhan Sirtalan and George Esyan. Testimony heard. Exhibits marked and entered into evidence. Trial continued to 10/6/2022 at 9 a.m. (Court Reporter Sophie Nolan.) (FG) (Entered: 10/07/2022) |
| 10/06/2022 | | Minute Entry for proceedings held before Judge Pamela K. Chen: Jury Trial as to Mustafa Goklu held on 10/6/2022. Appearances by AUSA Gillian Kassner, AUSA Marietou Diouf, AUSA Francisco Navarro, with Special Agent Julian Hur, and Paralegal Specialist Bridget Donovan; Murray Singer and Emilee Sahli, CJA, for defendant Mustafa Goklu (on bond). Turkish Interpreters Seyhan Sirtalan and George Esyan. Witnesses sworn and testified. Exhibits marked and entered into evidence. Government rests. Defense moves to dismiss the indictment. Application denied with leave to renew. Defense rests. Trial continued to 10/7/2022 at 9 a.m. Charge conference held. (Court Reporter Sophie Nolan.) (FG) (Entered: 10/07/2022) |
| 10/07/2022 | 70 | STIPULATION AND WAIVER OF JURY TRIAL AS TO FORFEITURE as to Mustafa Goklu. Ordered by Judge Pamela K. Chen on 10/3/2022. (FG) (Entered: 10/07/2022) |
| 10/07/2022 | | Minute Entry for proceedings held before Judge Pamela K. Chen: Jury Trial as to Mustafa Goklu held on 10/7/2022. Appearances by AUSA Gillian Kassner, AUSA Marietou Diouf, AUSA Francisco Navarro, with Special Agent Julian Hur, and Paralegal Specialist Bridget Donovan; Murray Singer and Emilee Sahli, CJA, for defendant Mustafa Goklu (on bond). Turkish Interpreters Seyhan Sirtalan and George Esyan. Summations made. Jury charged. Court Security Officer sworn. Deliberations begun and continued to 10/11/2022. Exhibits marked and entered into evidence. (Court Reporter Sophie Nolan.) Modified on 10/7/2022 to correct next trial date. (FG) (Entered: 10/07/2022) |
| 10/11/2022 | | Minute Entry for proceedings held before Judge Pamela K. Chen: Jury Trial as to Mustafa Goklu held on 10/11/2022. Appearances by AUSA Gillian Kassner, AUSA Marietou Diouf, AUSA Francisco Navarro, with Special Agent Julian Hur, and Paralegal Specialist Bridget Donovan; Murray Singer and Emilee Sahli, CJA, for defendant Mustafa Goklu (on bond). Turkish Interpreter George Esyan. Allen charge administered. Deliberations continued and completed. Verdict reached. Jury polled and excused with the thanks of the Court. The Court set the following briefing schedule: Defense to file any post trial brief by 11/10/2022; Government's opposition due by 12/5/2022; defendant's reply, if any, due by 12/12/2022. Oral argument will be held on 12/15/2022 at 4:00 p.m. (Court Reporter Victoria Torres Butler.) (FG) (Entered: 10/11/2022) |

A-14

| 10/11/2022 | 71 | Jury Instructions as to Mustafa Goklu, marked as Court Exhibit #1. (FG) (Entered: 10/11/2022) |
| 10/11/2022 | 72 | VERDICT SHEET/FORM as to Mustafa Goklu, marked as Court Exhibit #2. (FG) (Entered: 10/11/2022) |
| 10/11/2022 | 73 | Jury Note as to Mustafa Goklu marked as Court Exhibit no. 3. (Attachments: # 1 Jury note marked as Court Exhibit no. 5, # 2 Jury note marked as Court Exhibit no. 6, # 3 Jury note marked as Court Exhibit no. 7, # 4 Jury note marked as Court Exhibit no. 8, # 5 Jury note marked as Court Exhibit no. 9) (FG) (Entered: 10/11/2022) |
| 10/11/2022 | 74 | Portion of Transcript as to Mustafa Goklu marked as Court Exhibit no. 4. (FG) (Entered: 10/11/2022) |
| 10/11/2022 | 75 | Order of Sustenance as to Mustafa Goklu. Ordered by Judge Pamela K. Chen on 10/7/2022. (FG) (Entered: 10/11/2022) |
| 10/11/2022 | 76 | Order of Sustenance as to Mustafa Goklu. Ordered by Judge Pamela K. Chen on 10/11/2022. (FG) (Entered: 10/11/2022) |
| 10/11/2022 | | SCHEDULING ORDER as to Mustafa Goklu: The oral argument scheduled for 12/15/2022 will be held at 3 p.m. in Courtroom 4F North. Ordered by Judge Pamela K. Chen on 10/11/2022. (FG) (Entered: 10/11/2022) |
| 11/10/2022 | 77 | MOTION for Acquittal *pursuant to Fed R Crim P 29* by Mustafa Goklu. (Singer, Murray) (Entered: 11/10/2022) |
| 12/01/2022 | 78 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Mustafa Goklu held on October 3, 2022, before Judge Chen. Court Reporter/Transcriber Sophie Nolan, Telephone number 718-612-2622. Email address: NolanEDNY@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 12/22/2022. Redacted Transcript Deadline set for 1/2/2023. Release of Transcript Restriction set for 3/1/2023. (Nolan, Sophie) (Entered: 12/01/2022) |
| 12/01/2022 | 79 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Mustafa Goklu held on October 4, 2022, before Judge Chen. Court Reporter/Transcriber Sophie Nolan, Telephone number 718-613-2622. Email address: NolanEDNY@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 12/22/2022. Redacted Transcript Deadline set for 1/2/2023. Release of Transcript Restriction set for 3/1/2023. (Nolan, Sophie) (Entered: 12/01/2022) |
| 12/01/2022 | 80 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Mustafa Goklu held on October 6, 2022, before Judge Chen. Court Reporter/Transcriber Sophie Nolan, Telephone number 718-613-2622. Email address: NolanEDNY@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 12/22/2022. Redacted Transcript Deadline set for 1/2/2023. Release of Transcript Restriction set for 3/1/2023. (Nolan, Sophie) (Entered: 12/01/2022) |

A-15

| | | |
|---|---|---|
| 12/01/2022 | 81 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Mustafa Goklu held on October 7, 2022, before Judge Chen. Court Reporter/Transcriber Sophie Nolan, Telephone number 718-613-2622. Email address: NolanEDNY@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 12/22/2022. Redacted Transcript Deadline set for 1/2/2023. Release of Transcript Restriction set for 3/1/2023. (Nolan, Sophie) (Entered: 12/01/2022) |
| 12/05/2022 | 82 | RESPONSE in Opposition re 77 MOTION for Acquittal *pursuant to Fed R Crim P 29 19-CR-386* (Kassner, Gillian) (Entered: 12/05/2022) |
| 12/09/2022 | 83 | Consent MOTION to Continue *Oral Argument on Rule 29 Motion* by USA as to Mustafa Goklu. (Kassner, Gillian) (Entered: 12/09/2022) |
| 12/12/2022 | 84 | REPLY TO RESPONSE to Motion re 77 MOTION for Acquittal *pursuant to Fed R Crim P 29* (Singer, Murray) (Entered: 12/12/2022) |
| 12/13/2022 | | ORDER granting 83 Motion to Continue as to Mustafa Goklu: The oral argument scheduled for 12/15/2022 is adjourned without date. Ordered by Judge Pamela K. Chen on 12/13/2022. (FG) (Entered: 12/13/2022) |
| 01/13/2023 | 85 | MEMORANDUM AND ORDER: For the reasons stated in the attached Memorandum and Order, the Court denies Defendant's 77 Rule 29 Motion in its entirety as procedurally improper. Ordered by Judge Pamela K. Chen on 1/13/2023. (YB) (Entered: 01/13/2023) |
| 01/19/2023 | | SCHEDULING ORDER as to Mustafa Goklu: Sentencing will be held on 5/12/2023 at 12 noon in Courtroom 4F North. Ordered by Judge Pamela K. Chen on 1/19/2023. (FG) (Entered: 01/19/2023) |
| 03/14/2023 | 87 | MOTION to Appoint Counsel *new counsel to replace trial counsel* by Mustafa Goklu. (Singer, Murray) (Entered: 03/14/2023) |
| 03/15/2023 | | SCHEDULING ORDER as to Mustafa Goklu: The Court will hold a status conference on 3/17/2023 at 11:30 a.m. in Courtroom 4F North to discuss the 87 motion to appoint new counsel. Ordered by Judge Pamela K. Chen on 3/15/2023. (FG) (Entered: 03/15/2023) |
| 03/16/2023 | | ORDER as to Mustafa Goklu: The Court has reconsidered whether a conference is necessary with respect to Defendant's request for new counsel, and has determined that it is not. Accordingly, the conference scheduled for 3/17/2023 is canceled as unnecessary. Defendant's current counsel, Murray Singer and Emily Sahli, are excused with the Court's thanks, and CJA counsel Sabrina Shroff is hereby appointed to represent Defendant. Ordered by Judge Pamela K. Chen on 3/16/2023. (FG) (Entered: 03/16/2023) |
| 03/16/2023 | | ORDER granting 87 Motion to Appoint Counsel: Counsel Sabrina P. Shroff for Mustafa Goklu appointed. Ordered by Judge Pamela K. Chen on 3/16/2023. (FG) (Entered: 03/16/2023) |
| 03/16/2023 | 88 | CJA 20 as to Mustafa Goklu: Appointment of Attorney Sabrina P. Shroff for Mustafa Goklu. Attorney Emilee Ann Sahli and Murray Singer terminated in case. Ordered by Judge Pamela K. Chen on 3/16/2023. (FG) (Entered: 03/16/2023) |
| 04/27/2023 | 91 | SENTENCING MEMORANDUM by USA as to Mustafa Goklu (Diouf, Marietou) (Entered: 04/27/2023) |
| 04/28/2023 | | ORDER as to Mustafa Goklu: The parties are advised that sentencing in this matter will go forward as scheduled on 5/12/2023 at 12:00 pm in Courtroom 4F North. As indicated in the Court's Individual Rules, Defendant's sentencing submission should be filed at least |

A-16

| | | |
|---|---|---|
| | | five business days before sentencing, i.e., by 5/8/2023. Ordered by Judge Pamela K. Chen on 4/28/2023. (FG) (Entered: 04/28/2023) |
| 04/28/2023 | 92 | Letter MOTION TO CONTINUE SENTENCING *request for postponement of sentencing hearing* as to Mustafa Goklu (Shroff, Sabrina) Modified on 5/1/2023 to correct ECF filing event. (FG) (Entered: 04/28/2023) |
| 05/01/2023 | | ORDER as to Mustafa Goklu: The 92 Motion to continue sentencing is granted. Sentencing is adjourned to 8/7/2023 at 2 p.m. However, because the Court wants to address the issue raised in the Government's sentencing submission 91 regarding Defendant Goklu's refusal to grant his landlord access to his apartment to inspect and repair it, in defiance of a state court order (Dkt. 91 at 4), a status conference will be held on 5/4/2023 at 4 p.m. in courtroom 4F North. Should the parties agree and the defendant consents, the in-person proceeding may be converted to a video conference. Ordered by Judge Pamela K. Chen on 5/1/2023. (FG) (Entered: 05/01/2023) |
| 05/04/2023 | | Minute Entry for proceedings held before Judge Pamela K. Chen: Status Conference as to Mustafa Goklu held on 5/4/2023. Appearances by AUSA Gillian Kassner and Sabrina Schroff, CJA, for defendant Goklu (on bond). Pretrial services officer Bianca Carter. Defense counsel and defendant appeared via telephone. Turkish interpreter George Esayan. Case called. Interpreter sworn. Discussion regarding Defendant Goklu's refusal to grant his landlord access to his apartment to inspect and repair it, in defiance of a state court order, held. The Court directs the defendant to immediately give his landlord access to his apartment at a reasonably agreeable time. Defendant is warned that if he refuses to give access to his landlord, he may be remanded for failing to comply with a state court order. Pretrial services is respectfully directed to inform the Court as to whether the defendant has contacted the landlord to make the arrangements to allow her access to the apartment. (Court Reporter Michele Lucchese.) (FG) (Entered: 05/18/2023) |
| 07/26/2023 | 94 | MOTION to Continue Sentencing by Mustafa Goklu. (Shroff, Sabrina) (Entered: 07/26/2023) |
| 07/26/2023 | | ORDER granting 94 Motion to Continue Sentencing as to Mustafa Goklu: Sentencing is adjourned to 11/15/2023 at 1 p.m. in Courtroom 4F North. Ordered by Judge Pamela K. Chen on 7/26/2023. (FG) (Entered: 07/26/2023) |
| 08/11/2023 | 95 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Mustafa Goklu held on January 6, 2022, before Judge Chen. Court Reporter/Transcriber Sophie Nolan, Telephone number 718-613-2622. Email address: NolanEDNY@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 9/1/2023. Redacted Transcript Deadline set for 9/11/2023. Release of Transcript Restriction set for 11/9/2023. (Nolan, Sophie) (Entered: 08/11/2023) |
| 11/06/2023 | 96 | Letter as to Mustafa Goklu (Shroff, Sabrina) (Entered: 11/06/2023) |
| 11/07/2023 | | ORDER as to Mustafa Goklu re 96 request to adjourn sentencing: Sentencing will be held on 1/29/2024 at 10 a.m. in Courtroom 4F North. Defense counsel having been appointed to this matter for sentencing since March 2023 and two prior lengthy adjournment requests by Defendant having been granted, no further adjournments of sentencing will be granted. Ordered by Judge Pamela K. Chen on 11/7/2023. (FG) (Entered: 11/07/2023) |
| 01/16/2024 | 97 | SENTENCING MEMORANDUM by Mustafa Goklu (Attachments: # 1 Exhibit Letters of Support and excerpt from Trial Transcript) (Shroff, Sabrina) (Entered: 01/16/2024) |

A-17

| | | |
|---|---|---|
| 01/29/2024 | | Minute Entry for proceedings held before Judge Pamela K. Chen: Status Conference as to Mustafa Goklu held on 1/29/2024. Appearances by AUSA Francisco Navarro and Sabrina Shroff, CJA, for defendant (on bond). Turkish Interpreter Seyhan Sirtalan. Probation Officers Brian Woo and Jaime Turton. Case called. Interpreter sworn. Discussion held. For the reasons stated on the record, a Fatico hearing will be held 3/6/2024 at 11:30 a.m. in Courtroom 4F North, with sentencing to proceed immediately thereafter. (Court Reporter Charleane Heading.) (FG) (Entered: 01/29/2024) |
| 02/13/2024 | | ORDER as to Mustafa Goklu: The Factico hearing scheduled for 3/6/2024 will begin at 2 p.m. in Courtroom 4F North. Ordered by Judge Pamela K. Chen on 2/13/2024. (FG) (Entered: 02/13/2024) |
| 02/29/2024 | 98 | Letter *providing 3500 material for Fatico hearing* as to Mustafa Goklu (Navarro, Francisco) (Entered: 02/29/2024) |
| 02/29/2024 | 99 | MOTION to Continue Sentencing *redacted version of letter request* by Mustafa Goklu. (Shroff, Sabrina) (Entered: 02/29/2024) |
| 02/29/2024 | 100 | MOTION to Continue Sentencing by Mustafa Goklu as to Mustafa Goklu. (Shroff, Sabrina) (Entered: 02/29/2024) |
| 03/01/2024 | | ORDER granting 99 Motion to Continue Sentencing as to Mustafa Goklu: The Fatico hearing and sentencing is adjourned to 3/14/2024 at 2 p.m. in Courtroom 4F North. The Court grants defense leave to file a redacted version of her adjournment request based on the privileged nature of the redacted information. Ordered by Judge Pamela K. Chen on 3/1/2024. (FG) (Entered: 03/01/2024) |
| 03/11/2024 | 101 | Letter *providing updated 3500 material for Fatico hearing* as to Mustafa Goklu (Navarro, Francisco) (Entered: 03/11/2024) |
| 03/14/2024 | | Minute Entry for proceedings held before Judge Pamela K. Chen: Fatico Hearing and Sentencing held on 3/14/2024 for Mustafa Goklu. Appearances by AUSA Francisco Navarro with Tareva Torres, paralegal specialist; Sabrina Shroff, CJA, for defendant (on bond). Probation Officer Michelle Malko. Turkish interpreters AJ Elterman and George Esayan. Case called. Interpreters sworn. Fatico hearing held. Witness sworn and testified. Exhibits marked and entered into evidence. Sentencing held. Statements of government and defense heard. For the reasons stated on the record, the Court sentences the defendant to imprisonment for a period of sixteen (16) months on counts 1 and 2 of the Superseding Indictment (S-1) to run concurrently with each other. Two (2) years supervised release, with conditions, on counts 1 and 2 of the Superseding Indictment (S-1) to run concurrently with each other. $100 special assessment fee for each count for a total of $200. Defendant informed of right to appeal. The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons before 2 p.m. on 5/14/2024. Defendant's pretrial conditions of release remain unchanged and in effect until he is in the custody of the BOP. Open count/underlying Indictment dismissed on government's motion. (Court Reporter Avery Armstrong.) (FG) (Entered: 03/14/2024) |
| 03/21/2024 | 102 | JUDGMENT as to Mustafa Goklu: The Court sentences the defendant to imprisonment for a period of sixteen (16) months on counts 1 and 2 of the Superseding Indictment (S-1) to run concurrently with each other. Two (2) years supervised release, with conditions, on counts 1 and 2 of the Superseding Indictment (S-1) to run concurrently with each other. $100 special assessment fee for each count for a total of $200. Underlying Indictment dismissed on government's motion. Ordered by Judge Pamela K. Chen on 3/14/2024. (FG) (Entered: 03/21/2024) |
| 03/22/2024 | 104 | NOTICE OF APPEAL by Mustafa Goklu Appeal Record due by 3/22/2024. (Shroff, Sabrina) (Entered: 03/22/2024) |

A-18

10/14/24, 3:42 PM                    Eastern District of New York - LIVE Database 1.8 (Revision 1.8.1)

| 03/22/2024 | | Electronic Index to Record on Appeal as to Mustafa Goklu sent to US Court of Appeals [104](#) Notice of Appeal - Final Judgment Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (VJ) (Entered: 03/25/2024) |
| 06/10/2024 | [105](#) | TRANSCRIPT of Proceedings as to Mustafa Goklu held on August 29, 2019, before Judge Orenstein. Court Transcriber: Transcriptions Plus II, Inc. Email address: RL.Transcriptions2@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 7/1/2024. Redacted Transcript Deadline set for 7/11/2024. Release of Transcript Restriction set for 9/9/2024. (RC) (Entered: 06/10/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/14/2024 15:09:43 | | | |
| **PACER Login:** | Mbrissenden | **Client Code:** | Goklu |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-cr-00386-PKC |
| **Billable Pages:** | 17 | **Cost:** | 1.70 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Exempt CJA |

A-19

TJS:FJN
F. #2018R01809

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

MUSTAFA GOKLU
       also known as "MUSTANGY,"

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - X

**C O M P L A I N T**

(18 U.S.C. § 1956(a)(3))

No. 19-MJ-419

EASTERN DISTRICT OF NEW YORK, SS:

       PATRICK W. O'KAIN, being duly sworn, deposes and states that he/she is a

Special Agent with the Drug Enforcement Administration, duly appointed according to law and

acting as such.

       From in or about and between August 28, 2018 and April 30, 2019, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant MUSTAFA GOKLU, also known as "Mustangy," did knowingly and intentionally

conduct one or more financial transactions in and affecting interstate and foreign commerce, to

wit: the transfer and delivery of United States currency, which transactions involved property

represented by a law enforcement officer and by a federal official authorized to investigate

violations of Title 18, United States Code, Section 1956, to be the proceeds of specified unlawful

activity and property used to conduct and facilitate specified unlawful activity, to wit: narcotics

trafficking, in violation of Title 21, United States Code, Sections 841 and 846, with the intent to

A-20

2

conceal and disguise the nature, location, source, ownership and control of property believed to be the proceeds of such specified unlawful activity.

(Title 18, United States Code, Section 1956(a)(3))

The source of your deponent's information and the grounds for his/her belief are as follows:

1.    I am a Special Agent with the Drug Enforcement Administration ("DEA"). I have been a DEA Special Agent for approximately 6 years and am currently assigned to the New York Division.   During my tenure with the DEA, I have participated in numerous investigations of money laundering and drug trafficking organizations during which I have conducted physical and electronic surveillance, executed court-authorized search warrants, debriefed cooperating witnesses and victims, reviewed and analyzed numerous taped conversations of those engaged in illegal activity, monitored wiretapped conversations and reviewed line sheets prepared by wiretap monitors.   Through my training, education and experience, I have become familiar with the manner in which money laundering and drug trafficking schemes are carried out and the efforts of persons involved in each activity to avoid detection by law enforcement

2.    I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file, including the defendant's criminal history record; and from reports of other law enforcement officers involved in the investigation.   Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.   Where the contents of documents and the actions, statements, and conversations

A-21

3

of others are reported herein, they are reported in substance and in part, except where otherwise indicated

## I.  Background Regarding Digital Currency and the Dark Web

3.      Digital currency (also known as cryptocurrency) is as an electronic-sourced unit of value that can be used as a substitute for fiat currency (i.e. currency created and regulated by a government).   Digital currency exists entirely on the internet and is not stored in any physical form.   Digital currency is not issued by any government, bank, or company and is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.   Digital currency is legal in the United States and may be used for legitimate financial transactions.   However, criminals often use digital currency for conducting illegal transactions, such as the sale of controlled substances.

4.      Bitcoin ("BTC") is a type of digital currency.   BTC payments are recorded in a public ledger called a blockchain that is maintained by peer-to-peer verification and is thus not maintained by a single administrator or entity.   Individuals can acquire BTC either by "mining" or by purchasing BTC from other individuals.   An individual can "mine" for BTC by allowing his/her computing power to verify and record the BTC payments on the blockchain. Individuals are rewarded for this by being given newly created BTC.

5.      An individual can send and receive BTC through peer-to-peer digital transactions or by using a third-party broker.   Such transactions can be done on any type of computer, including laptop computers, tablets, and cellular telephones.

6.      BTC can be stored in "wallets".   A digital wallet essentially stores the access code that allows an individual to conduct BTC transactions on the public ledger.   To access BTC on the public ledger, an individual must use a public address (or "public key") and a

A-22

4

private address (or "private key").   The public address can be analogized to an account number while the private key is like the password to access that account.

7.      Even though the public addresses of those engaging in BTC transactions are recorded on the blockchain, the true identities of the individuals or entities behind the public addresses are not recorded.   If, however, a real individual or entity is linked to a public address, it is possible to determine what transactions were conducted by that individual or entity.

8.      Through the dark web or darknet – websites accessible only through encrypted means – individuals have established online marketplaces, such as Silk Road, AlphaBay, DreamMarket, Wall Street Market, Point/Tochka, and Berlusconi, for narcotics and other illegal items.   These markets often only accept payment through digital currencies, such as BTC.   Accordingly, individuals intending to purchase illegal items on the dark web need to obtain BTC.   Conversely, individuals who have received BTC as proceeds of illegal sales on the dark web need to sell their BTC or convert them to fiat currency in order to spend the proceeds outside of the dark web.   Peer-to-peer BTC exchangers, who advertise their services on website designed to facilitate such transactions, often facilitate such sales or exchanges of BTC.

**II.     The DEA Investigates GOKLU For Illegal Digital Currency Transactions**

9.      In or about July 2018, the DEA identified an individual who advertised on a website called localbitcoins.com.   The individual claimed that he could convert BTC into U.S. currency.   In the localbitcoins.com advertisement, the money exchanger identified his/her username as "MUSTANGY" and claimed that he/she could purchase up to $99,999 worth of BTC and convert them into U.S. currency for a fee.   MUSTANGY claimed that he/she could be contacted through encrypted messaging applications that are routinely accessed via a cellular telephone.

A-23

5

### A. Undercover BTC Transaction with GOKLU on August 28, 2018

10.      Beginning on or about July 11, 2018, a DEA Special Agent acting in an undercover capacity, exchanged several messages with MUSTANGY via an encrypted messaging application to set up an exchange of BTC for U.S. currency.   On or about August 27, 2018, the UC sent a message to MUSTANGY requesting to exchange approximately $5,000 worth of BTC for an equivalent amount of U.S. currency, to which MUSTANGY agreed.   The UC and MUSTANGY arranged to meet the next day in Midtown Manhattan to complete the transaction.

11.      On August 28, 2018, at approximately 3:30 pm, the UC met MUSTANGY in Midtown Manhattan.   MUSTANGY introduced himself as "Michael" and shook hands with the UC.   MUSTANGY then directed the UC to his car, which was parked nearby.

12.      MUSTANGY told the UC that the money was in the car and asked the UC to get in to count it.   The UC then sat in the front passenger seat of MUSTANGY's car and left the door open.   MUSTANGY sat in the driver's seat, opened the center console, and told the UC that the money was inside.   The UC observed multiple bundles of U.S. currency in the center console.   When the UC reached into the center console and retrieved a bundle of currency, MUSTANGY said that not all of the bundles were for the UC.   The UC then retrieved a different bundle and MUSTANGY again stated that that bundle was not for the UC. MUSTANGY then searched through the multiple bundles of U.S. currency to find a white plastic shopping bag that he handed to the UC.   Inside the white plastic bag were five bundles of U.S. currency separated by small black rubber bands. The five bundles were secured together with a larger rubber band.

A-24

6

13.     MUSTANGY then asked the UC to shut the front passenger door so as to not draw the attention of the police.   MUSTANGY then stated that the UC and he were not drug dealers, but simply buying BTC.

14.     The UC shut the door to the car and began to count the U.S. currency. MUSTANGY offered to help and stated that if it was too much he had a money counter available.   MUSTANGY and the UC then counted the money together, which totaled $5,000.

15.     When the UC finished counting the currency, MUSTANGY opened a Mycelium cryptocurrency wallet on his cellular telephone and asked the UC to send him the BTC, plus MUSTANGY's eight percent commission.[1]   The UC told MUSTANGY that he did not have enough BTC to cover the commission. MUSTANGY then asked the UC to send all of the BTC and then he would take his commission out of the U.S. currency being returned to the UC.

16.     The UC then sent 0.70453034 BTC from his cryptocurrency wallet to MUSTANGY's Mycelium wallet.   GOKLU used his Mycelium wallet to determine the BTC to U.S. currency exchange rate at the time of the transaction and then subtracted that amount and returned it to the UC in U.S. currency.

17.     Following the transaction, MUSTANGY and the UC engaged in conversation about future transactions.   MUSTANGY indicated that he could exchange more than $5,000 and said that he could do a transaction every two or three days.   MUSTANGY also stated that he did not like going to Manhattan because there were too many cameras and police. MUSTANGY said that he would meet the UC in Manhattan only for transactions of $20,000 or

---

[1]     Mycelium is a cellular telephone application that allows users to send and receive BTC.

7

more.   MUSTANGY said that he could bring a money counter, but that it was risky to do so, because it was evidence of being a drug dealer.

18.     The UC told MUSTANGY that he would have approximately $50,000 worth of BTC to exchange during the next transaction. MUSTANGY stated that he could do it on the following day.

### B. The DEA Identifies MUSTANGY as GOKLU

19.     During the August 28, 2018, meeting the DEA obtained the license plate and description of MUSTANGY's car.   A review of motor vehicle records revealed that the car is registered to GOKLU and that GOKLU holds a New York driver license.   I have reviewed the photograph associated with GOKLU's driver license and it appears to be the individual who introduced himself as Michael on August 28, 2018, and who responded to my messages to MUSTANGY.

### C. Undercover BTC Transaction with GOKLU on September 21, 2018

20.     On or about September 17, 2018, the UC contacted GOKLU via an encrypted messaging application to arrange another BTC/U.S. currency exchange.   GOKLU and the UC agreed to meet at a location in Queens, New York on September 21, 2018.

21.     On or about September 21, 2018, the UC met GOKLU in Queens, New York.   GOKLU arrived in his car and the UC got into the front passenger seat.   The UC told GOKLU that he had approximately $7,300 in BTC.   GOKLU asked how much that was in BTC and the UC replied 1.09687.

22.     GOKLU then retrieved a small black backpack from the rear seat of the SUBJECT VEHICLE, and retrieved a small orange envelope from one of the pockets.   GOKLU then pulled out U.S. currency from the orange envelope.   Together, GOKLU and the UC

A-26

8

reviewed the BTC to U.S. currency exchange rate and calculated GOKLU's eight percent commission.   They agreed that the UC would exchange 1.09687 BTC for $6,760 in U.S. currency.

23.     GOKLU and the UC then counted the U.S. currency at the same time that the UC sent the BTC to GOKLU's cryptocurrency wallet.   GOKLU then handed the UC $6,750, all of which came from the orange envelope, with the exception of $50, which GOKLU stated came from his tips.   GOKLU told the UC that he was $10 short, but that he would make it up to the UC in their next transaction.

**D.  Undercover BTC Transaction with GOKLU on November 27, 2018**

24.     On or about November 26, 2018, the UC contacted GOKLU via an encrypted messaging application to arrange another BTC/U.S. currency exchange.   The UC told GOKLU that he wanted to exchange approximately $60,000 worth of BTC for U.S. currency. GOKLU stated that he would be able to exchange approximately $40,000 on the following day and an additional $20,000 the day after.   The UC and GOKLU agreed to meet in Queens, New York on November 27, 2018.

25.     On or about November 27, 2018, the UC met GOKLU in Queens, New York.   GOKLU arrived in his car and the UC and GOKLU got into the back seat.   While in the back of the vehicle, GOKLU removed four bank envelopes containing U.S. currency from a plastic bag and asked the UC if he wanted to count it.   GOKLU then produced a money counter from a plastic bag on the floor of the rear driver's side of the vehicle.   GOKLU then plugged the money counter into the power outlet and began running the U.S. currency through the counter. Each of the four envelopes contained $10,000 in one hundred dollar denominations.

A-27

9

26.     After the money was counted, GOKLU and the UC reviewed the BTC/U.S. currency exchange rate and negotiated GOKLU's commission, which was ultimately agreed upon as approximately seven percent, or $3,400 based on the exchange rate at the time. GOKLU then removed the $3,400 from the $40,000 and handed the UC the remaining $36,600. The UC then sent the BTC to GOKLU's cryptocurrency wallet.

27.     While waiting for the transaction to confirm on the blockchain, GOKLU and the UC discussed how the UC obtained BTC.   The UC told GOKLU that he ran an online business that accepted payment in BTC.   Later in the conversation, GOKLU stated that he recently exchanged U.S. currency for BTC with an unidentified marijuana dealer from California.   The UC then told GOKLU that selling marijuana was part of his business. GOKLU also stated that his business partner was previously arrested for conducting a transaction with a drug dealer.

**E.  Undercover BTC Transaction with GOKLU on December 11, 2018**

28.     On or about December 10, 2018 the UC and GOKLU arranged a meeting via an encrypted messaging application to exchange approximately $20,000 worth of BTC for U.S. currency, which was the remainder of the $60,000 that they had previously agreed to exchange.

29.     On or about December 11, 2018, the UC met GOKLU at a location in Queens, New York.   GOKLU arrived in his car, and the UC and GOKLU got into the back seat. GOKLU asked the UC how much he wanted to exchange, and the UC replied that he had approximately $19,500 worth of BTC.   GOKLU and the UC then reviewed the U.S. currency/BTC exchange rate and agreed on the commission and terms.   GOKLU then removed

A-28

10

four bundles of U.S. currency from a small black bag, and plugged in a money counter that was on the rear driver's side floor.

30.     After the money was counted, the UC took the cash and sent the BTC to GOKLU's wallet.  While waiting for the transaction to confirm on the blockchain, the UC told GOKLU that he was going to have $100,000 to exchange after the new year and asked GOKLU if he could exchange that much.   GOKLU replied that he could, but would need one or two days advance notice.   GOKLU then stated that he could do $100,000 every ten days.

31.     Once the transaction confirmed on the blockchain, the UC was about to leave, but GOKLU said that he had an additional $20,000 if the UC wanted to exchange it.   At this moment, GOKLU saw an individual walking through the parking lot and said that the New York City Police Department ("NYPD") use people like the individual.   GOKLU said that the NYPD use homeless people too and that is why he does not like going to Manhattan.   Based on my training and experience, I believe that GOKLU was stating that the NYPD uses undercover officers or informants to conduct surveillance on criminal activities and that GOKLU knew that his money transactions with the UC were illegal.

32.     The UC then placed a telephone call to his purported business partner (in reality, another undercover DEA Special Agent) in GOKLU's presence.   During this call, the UC stated that they would wait to do another BTC/U.S. currency exchange until "we sell the other three keys."   Based on my training and experience, individuals involved in money laundering and narcotics trafficking understand "keys" to be short for "kilograms" of narcotics.

**F.  Undercover BTC Transaction with GOKLU on January 24, 2019**

33.     On or about January 17, 2019, the UC contacted GOKLU via an encrypted messaging application to arrange for a BTC/U.S. currency exchange in the amount of $100,000.

A-29

11

GOKLU replied that he may be able to do the exchange the following week.   On or about January 23, 2019, GOKLU told the UC that he could not do the $100,000 exchange, but that he could do a $25,000 exchange.   The UC and GOKLU then agreed to meet the following day.

34.     On or about January 24, 2019, the UC met GOKLU at a location in Queens, New York.   GOKLU arrived in his car and the UC entered it and sat in the front passenger seat.   The UC and GOKLU then reviewed the BTC/U.S. dollar exchange rate and agreed on the commission and terms.   The UC and GOKLU then completed the transaction. While they were waiting for the transaction to post to the blockchain, GOKLU asked whether the UC had brought him marijuana (likely in reference to the UC's prior statement to GOKLU that he sold marijuana).   During this conversation, the UC told GOKLU that part of his business (in addition to selling marijuana) was to sell pills.   Specifically, the UC told GOKLU that he sold Adderall and "Oxy" to college students.

**G.  Undercover BTC Transaction with GOKLU on January 30, 2019**

35.     On or about January 28, 2019, the UC contacted GOKLU via an encrypted messaging application to check on the status of the remaining $75,000 in BTC that the UC wished to exchange.   On or about January 30, 2019, GOKLU told the UC that he was in Manhattan with $45,000.   The UC and GOKLU agreed to meet at a location in Midtown Manhattan.

36.     Later that day, the UC met GOKLU in Midtown Manhattan and got into the back seat of GOKLU's car.   GOKLU got in the back seat with a black plastic bag that contained multiple stacks of U.S. currency.   GOKLU and the UC then ran the money through a money counter, which revealed a total amount of $43,500.   The UC and GOKLU then reviewed

A-30

12

the BTC/U.S. currency exchange rate, and agreed on the commission and terms of sale.  The UC
and GOKLU then consummated the transaction.

### H.  Attempted Undercover BTC Transaction with GOKLU on April 30, 2019

37.    On or about April 22, 2019, the UC contacted GOKLU via an encrypted
messaging application to arrange for a BTC/U.S. currency exchange in the amount of $100,000.
GOKLU replied he would only be able to exchange $49,999.

38.    On or about April 30, 2019, the UC met GOKLU at a location in Queens,
New York.  GOKLU arrived in his car and the UC entered it and sat in the back seat. The UC
observed a black plastic bag and a blue plastic bag on the rear driver's side floor.  GOKLU
removed a money counter from the blue bag and U.S. currency from the black bag.  GOKLU
indicated that there was $50,000 in the bag and asked if the UC wanted it counted.  The UC
responded affirmatively.  While GOKLU was counting the money, GOKLU asked the UC how
his business was doing.  The UC replied that business was thriving and GOKLU asked if the UC
was referring to the cannabis business they had previously discussed.  The UC told GOKLU that
the marijuana part of the business was fine, and but his partner was recently arrested by federal
agents, because marijuana is illegal on the federal level.  The UC told GOKLU that he makes
most of his money by selling Adderall and pills.

39.    Moments later, GOKLU finished counting the $50,000 and gave it to the
UC.  GOKLU then asked the UC if he wanted more money and told him he had an additional
$25,000 and retrieved a bundle of U.S. currency from behind the backseat middle armrest.  The
UC told GOKLU that he would ask his partner to send more BTC to cover the additional
money.  The UC then placed a call to his partner (in reality an undercover DEA Special

A-31

13

Agent).  During this conversation, the UC told the other agent to send more BTC to cover the additional money

40.    Following the phone call, GOKLU asked the UC if he wanted another $10,000, and retrieved another bundle of U.S. currency from behind the armrest. The UC said that he would wait to see how much BTC his partner sent before taking the extra $10,000. GOKLU then placed the bundle behind the armrest.

41.    WHEREFORE, your deponent requests that the defendant MUSTAFA GOKLU, also known as "Mustangy," be dealt with according to law.

PATRICK W. OKAIN
Special Agent, Drug Enforcement Administration

Sworn to before me this
5 day of May, 2019

s/Gold

THE HONORABLE
UNITED STATES M
EASTERN DISTRIC

A-32

TO: Clerk's Office
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**APPLICATION FOR LEAVE**
**TO FILE DOCUMENT UNDER SEAL**

*************************
UNITED STATES OF AMERICA

-against-

MUSTAFA GOKLU
also known as "Mustangy"
*************************

19 MJ 419
~~19 MJ 399~~
Docket Number

SUBMITTED BY: Plaintiff ____ Defendant ____ DOJ ✓
Name: Francisco J. Navarro
Firm Name: United States Attorney's Office
Address: 271 Cadman Plaza East
Brooklyn, NY 11201
Phone Number: (718) 254-6007
E-Mail Address: francisco.navarro@usdoj.gov

INDICATE UPON THE PUBLIC DOCKET SHEET: YES ____ NO ✓
If yes, state description of document to be entered on docket sheet:

_____
_____

**MANDATORY CERTIFICATION OF SERVICE:**
**A.)** ____ A copy of this application either has been or will be promptly served upon all parties to this action, **B.)** ____ Service is excused by 31 U.S.C. 3730(b), or by the following other statute or regulation: _____; or C.) ✓ This is a criminal document submitted, and flight public safety, or security are significant concerns.
(Check one)

5/3/2019
DATE

/s/Francisco J. Navarro
SIGNATURE

**A) If pursuant to a prior Court Order:**
Docket Number of Case in Which Entered: _____
Judge/Magistrate Judge: _____
Date Entered: _____

**B) If a new application, the statute, regulation, or other legal basis that**
authorizes filing under seal

Ongoing investigation and defendant is at large.
_____

**ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE,**
**AND MAY NOT BE UNSEALED UNLESS ORDERED BY**
**THE COURT.**

DATED:  Brooklyn  NEW YORK
5/3/2019

U.S. DISTRICT JUDGE/U.S. MAGISTRATE JUDGE

RECEIVED IN CLERK'S OFFICE 5/3/2019
DATE

A-33

ALB:FJN/JPL/GK
F. #2018R01809

**Filed: October 28, 2020**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

MUSTAFA GOKLU,
        also known as "Mustangy,"

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. <u>19-386 (S-1) (PKC)</u>
(T. 18, U.S.C., §§ 982(a)(1),
982(b)(1), 1956(a)(3)(B), 1960(a), 2
and 3551 <u>et seq.</u>; T. 21, U.S.C.,
§ 853(p))

THE GRAND JURY CHARGES:

<u>COUNT ONE</u>
(Money Laundering)

      1.      On or about and between August 28, 2018 and April 30, 2019, both

dates being approximate and inclusive, within the Eastern District of New York and

elsewhere, the defendant MUSTAFA GOKLU, also known as "Mustangy," together with

others, did knowingly and intentionally conduct and attempt to conduct one or more financial

transactions in and affecting interstate and foreign commerce, to wit: the transfer and

delivery of United States currency, which transactions involved property represented by a

law enforcement officer and by another person at the direction of, and with the approval of, a

Federal official authorized to investigate violations of Title 18, United States Code, Section

1956, to be the proceeds of specified unlawful activity, to wit: narcotics trafficking, in

violation of Title 21, United States Code, Sections 841 and 846, and to be property used to

conduct and facilitate such specified unlawful activity, with the intent to conceal and disguise

A-34

2

the nature, location, source, ownership and control of property believed to be the proceeds of such specified unlawful activity.

(Title 18, United States Code, Sections 1956(a)(3)(B), 2 and 3551 et seq.)

## COUNT TWO
### (Operation of an Unlicensed Money Transmitting Business)

2.      On or about and between August 28, 2018 and April 30, 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MUSTAFA GOKLU, also known as "Mustangy," together with others, did knowingly conduct, control, manage, supervise, direct and own all and part of an unlicensed money transmitting business affecting interstate and foreign commerce, to wit: a digital currency exchange business, which (a) operated without an appropriate money transmitting license in the State of New York, where such operation is punishable as a misdemeanor and a felony under New York State law; and (b) failed to comply with the money transmitting business registration requirements under Title 31, United States Code, Section 5330 and the regulations prescribed thereunder.

(Title 18, United States Code, Sections 1960(a), 2 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION

3.      The United States hereby gives notice to the defendant that, upon his conviction of either of the offenses charged herein, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offenses to forfeit any property, real or personal, involved in such offenses, or any property traceable to such property.

A-35

3

    4.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third party;

    (c)    has been placed beyond the jurisdiction of the court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any

A-36

4

other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

FOREPERSON

SETH D. DuCHARME
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

A-37

F.#2018R0109
FORM DBD-34
JUN. 85

No. 19-CR-386 (S-1) (PKC)

## UNITED STATES DISTRICT COURT
### EASTERN District of NEW YORK
### CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

MUSTAFA GOKLU,
*also known as "Mustangy,"*

Defendant.

## SUPERSEDING INDICTMENT

(T. 18, U.S.C., §§ 982(a)(1), 982(b)(1), 1956(a)(3)(B), 1960(a), 2 and
3551 et seq.; T. 21, U.S.C., § 853(p))

A true bill.

_____
                        Foreperson

Filed in open court this _____ day,

of _____ A.D. 20 _____

_____
                             Clerk

Bail, $ _____

*Francisco J. Navarro, Jonathan P. Lax, Gillian Kassner*
*Assistant United States Attorneys*
*(718) 254-7000*

A-38

FJN:GK/MED
F. #2018R01809

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

       - against -                                           Docket. No. 19-CR-386 (PKC)

MUSTAFA GOKLU,
    also known as "Mustangy"

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

THE GOVERNMENT'S REQUESTS TO CHARGE

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Gillian A. Kassner
Marietou E. Diouf
Assistant U.S. Attorneys
    (Of Counsel)

A-39

PRELIMINARY STATEMENT

Pursuant to Rule 30 of the Federal Rules of Criminal Procedure, the government requests that the Court include the following instructions in its charge to the jury.  In addition, the government requests leave to offer additional instructions as they may become necessary during the trial.

The submitted requests address the essential elements of the crimes charged in the superseding indictment and certain matters of evidence which the government believes may require instruction to the jury.  The government respectfully requests that copies of the superseding indictment and the jury instructions be provided to the jurors during their deliberations.

1

A-40

REQUEST NO. 1

General Requests

The government requests that the Court charge the jury in its usual manner on the following subjects:

a.    Function of the Court and the Jury;

b.    Jury Communications with Lawyers and the Court;

c.    Equality of the Parties before the Court;

d.    Presumption of Innocence;

e.    Burden of Proof and Reasonable Doubt;

f.    Circumstantial Evidence and Direct Evidence;

g.    Function of Indictment and What Is Not Evidence;

h.    Dates Approximate and Use of Conjunctive in the Indictment;

i.    Permissible Inferences from Evidence;

j.    Objections;

k.    Stipulations (if applicable);

l.    Credibility of Witnesses and Discrepancies in Testimony;

m.    Uncalled Witnesses Equally Available to Both Sides (if applicable);

n.    Defendant's Right Not to Testify (if applicable);

o.    Testimony of Law Enforcement Witnesses;

p.    Transcripts not Evidence;

q.    Questioning Wisdom of Law or Basing Verdict on Sympathy or Prejudice Prohibited;

r.    Punishment of the Defendant;

s.    Duty to Consult; Need for Unanimity; Deliberations; and

2

A-41

t.    Jury's Right to See Exhibits and Have Testimony Read During Deliberations.

A-42

REQUEST NO. 2

The Superseding Indictment

The defendant is formally charged in a superseding indictment.  As I instructed you at the outset of this case, the Superseding Indictment is not evidence—it is a charge or accusation. The Superseding Indictment in this case contains two separate counts against the defendant.  You must, as a matter of law, consider each count of the Superseding Indictment separately, and you must return a separate verdict for each count.

Count One of the Superseding Indictment charges the defendant MUSTAFA GOKLU with money laundering.  Specifically, it reads as follows:

> On or about and between August 28, 2018 and April 30, 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MUSTAFA GOKLU, also known as "Mustangy," together with others, did knowingly and intentionally conduct and attempt to conduct one or more financial transactions in and affecting interstate and foreign commerce, to wit: the transfer and delivery of United States currency, which transactions involved property represented by a law enforcement officer and by another person at the direction of, and with the approval of, a Federal official authorized to investigate violations of Title 18, United States Code, Section 1956, to be the proceeds of specified unlawful activity, to wit: narcotics trafficking, in violation of Title 21, United States Code, Sections 841 and 846, and to be property used to conduct and facilitate such specified unlawful activity, with the intent to conceal and disguise the nature, location, source, ownership and control of property believed to be the proceeds of such specified unlawful activity.

Count Two of the Superseding Indictment charges the defendant MUSTAFA GOKLU with operation of an unlicensed money transmitting business.  Specifically, it reads as follows:

A-43

On or about and between August 28, 2018 and April 30, 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MUSTAFA GOKLU, also known as "Mustangy," together with others, did knowingly conduct, control, manage, supervise, direct and own all and part of an unlicensed money transmitting business affecting interstate and foreign commerce, to wit: a digital currency exchange business, which (a) operated without an appropriate money transmitting license in the State of New York, where such operation is punishable as a misdemeanor and a felony under New York State law; and (b) failed to comply with the money transmitting business registration requirements under Title 31, United States Code, Section 5330 and the regulations prescribed thereunder.

Authority:  Adapted from the charge of the Hon. Eric N. Vitaliano, United States v. Amanor, No. 15-CR-79; Modern Federal Jury Instructions ("Sand"), Instruction 3-8.

A-44

<u>REQUEST NO. 3</u>

<u>Knowledge and Intent</u>

During these instructions, you have heard and will hear me use the words "knowingly" and "intentionally."  As a general rule, the law holds persons accountable only for conduct in which they intentionally engage.  Thus, before you can find the defendant guilty, you must be satisfied that the defendant was acting knowingly and intentionally.  Therefore, I will define those terms for you up front.

"Knowingly" means intentionally and voluntarily, and not because of ignorance, mistake, accident or carelessness.  Whether the defendant acted knowingly may be proven by his conduct and by all of the facts and circumstances surrounding the case.  In this regard, I instruct you that you may infer that a person ordinarily intends all natural and probable consequences of an act knowingly done.  In other words, you may infer and find that the defendant intended all of the consequences that a person standing in like circumstances and possessing like knowledge should have expected to result from the acts he knowingly committed.

A person acts "intentionally" when he or she acts deliberately and purposefully. That is, the defendant's acts must have been the product of his conscious objective decision rather than the product of a mistake or accident.

These issues of knowledge and intent require you to make a determination about a person's state of mind, something that can rarely be proven directly.  However, a wise and careful consideration of all the circumstances of the case may permit you to make such a determination as to the defendant's state of mind.  Indeed, in your everyday affairs, you are frequently called upon

A-45

to determine a person's state of mind from his or her words and actions in a given circumstance.

You are asked to do the same here.

> Authority:  Adapted from the charge of the Hon. Sterling Johnson, United States v. Djibo, No. 15-CR-88 (SJ) (E.D.N.Y.); Sand, Instruction No. 3A.

A-46

REQUEST NO. 4

Count One: Money Laundering

Count One charges the defendant with the crime of money laundering by conducting financial transactions involving property represented to be the proceeds of specified unlawful activity in violation of Title 18, United States Code, Section 1956(a)(3).

To prove the crime of money laundering, the government must establish beyond a reasonable doubt each of the following three elements:

First, that the defendant conducted or attempted to conduct a financial transaction that affected interstate or foreign commerce in any way or degree;

Second, that the transaction involved property represented by a law enforcement officer, and believed by the defendant, to be the proceeds of some form of unlawful activity; and

Third, that the defendant acted with the intent to conceal or disguise the nature, location, source, ownership, or control of the property.

The "specified unlawful activity" charged in the Superseding Indictment is narcotics trafficking.  I instruct you that the manufacture, importation, receiving, concealment, buying, selling or otherwise dealing in a controlled substance or listed chemical under the Controlled Substance Act is a "specified unlawful activity" for purposes of the crime charged in the Superseding Indictment.  And I instructed you earlier, marijuana, Adderall, and oxycodone are controlled substances under the Controlled Substances Act.

I will now explain each element in greater detail.

8

A-47

First Element: Financial Transaction

The first element the government must prove beyond a reasonable doubt is that the defendant conducted or attempted to conduct a financial transaction that affected interstate or foreign commerce in any way or degree.

The term "conducts" includes initiating, concluding, or participating in initiating or concluding a transaction.

A "transaction" includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition of property.

The term "financial transaction" means a transaction involving one or more monetary instruments, or the movement of funds by wire or other means, that in any way or degree affects interstate or foreign commerce. The term "funds" includes any currency, money, or other medium of exchange that can be used to pay for goods or services. The term "monetary instrument" includes, among other things, coin or currency of the United States or any other country.

The term "interstate or foreign commerce" means commerce between any combination of states, territories or possessions of the United States, or between the United States and a foreign country.

Second Element: Property Represented as Proceeds of Illegal Activity

The second element that the government must prove beyond a reasonable doubt is that the transaction the defendant conducted or attempted to conduct involved property represented by a law enforcement officer, and believed by the defendant, to be the proceeds of some form of unlawful activity.

9

A-48

For the purposes of this section, a law enforcement officer includes Drug Enforcement Administration officers, including undercover officers, authorized to investigate or prosecute money laundering. I instruct you that for purposes of this case the individual known as "Patrick O'Kain," who testified during this trial, was a law enforcement officer during the time period charged in the indictment.

The term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity. Proceeds can be any kind of property, not just money.

In order to sustain its burden of proof on this element, the government is not required to prove that the law enforcement officer made an express affirmative statement to the defendant that the property involved was the proceeds of unlawful activity. Instead, the government must prove that the law enforcement officer made the defendant aware of circumstances from which a reasonable person would infer that the property was the proceeds of illegal activity, and that the defendant believed that the property was the proceeds of illegal activity. You should consider all of the evidence in determining whether the government has satisfied this standard.

The government is not required to prove that the property actually was the proceeds of some form of unlawful activity. In this case, the Superseding Indictment charges that the defendant conducted or attempted to conduct financial transactions involving property that was represented to him by a law enforcement officer to be the proceeds of narcotics trafficking, meaning the distribution of a controlled substance or listed chemical under the Controlled Substance Act. I further instruct you that marijuana, oxycodone, and Adderall are controlled substances under the Controlled Substances Act.

10

A-49

The government is not required to prove that any narcotics trafficking actually took place, or that the property in the charged transactions actually constituted proceeds of narcotics trafficking.  To sustain its burden of proof on this element, the government is required to prove that the charged transactions involved property that was represented to the defendant to be the proceeds of narcotics trafficking, and that the defendant believed that the property was the proceeds of narcotics trafficking.

In determining whether the defendant believed that the property was the proceeds of narcotics trafficking, you may consider whether the defendant deliberately closed his eyes to what would otherwise have been obvious to him.  Guilty knowledge may not be established by demonstrating that the defendant was merely negligent, foolish, or mistaken.  However, if you find beyond a reasonable doubt that the defendant acted with a conscious purpose to avoid learning about the source of the proceeds involved in the charged transactions, then this element may be satisfied.  If you find beyond a reasonable doubt that the defendant was aware of a high probability that the charged transactions involved the proceeds of narcotics trafficking, and that the defendant acted with deliberate disregard of the facts, you may find that the defendant acted with the belief necessary to satisfy this element.  However, if you find that the defendant actually believed that the proceeds involved in the charged transactions were not the proceeds of narcotics trafficking, he may not be convicted.  It is entirely up to you whether you find that the defendant deliberately closed his eyes and any inferences to be drawn from the evidence on this issue.

Third Element: Intent to Promote Unlawful Activity

The third element the government must prove beyond a reasonable doubt is that the defendant acted with the intent to conceal or disguise the nature, location, source, ownership, or control of the property.

11

A-50

To act intentionally means to act deliberately and purposefully, and not by mistake or accident, with the purpose to conceal or disguise the nature, location, source, ownership, or control of the property.  To satisfy this element, the government must prove that the defendant knew of the purpose of the particular transaction in issue, and that he intended that the transaction conceal or disguise the origin of the property in question as he believed it to be.

Authority:   Adapted from the charges of the Hon. Roslynn R. Mauskopf, United States v. Flom, 14-CR-507 (RRM) (E.D.N.Y.) and the Hon. G. Murray Snow in United States v. Costanzo, 17-CR-585 (D. Ariz.).; Sand, Instruction Nos. 50A-20, 50A-23 and 50A-24 (2016 ed.); see also United States v. Nektalov, 461 F.3d 309, 315 (2d Cir. 2006);

A-51

REQUEST NO. 5

Count Two: Operation of an Unlicensed Money Transmitting Business

Count Two charges the defendant with the crime of operating an unlicensed money transmitting business in violation of Title 18, United States Code, Section 1960(a).

To prove the crime of operating an unlicensed money transmitting business, the government must establish beyond a reasonable doubt each of the following three elements:

First, that the defendant knowingly controlled, conducted, managed, supervised, directed, or owned all or part of a money transmitting business;

Second, that the money transmitting business affected interstate or foreign commerce; and

Third, that either the money transmitting business was not licensed, and operated in a state where the business was required to be licensed, or the business failed to register as required with the Secretary of the Treasury.

The first element the government must establish beyond a reasonable doubt is that defendant knowingly controlled, conducted, managed, supervised, directed, or owned all or part of a "money transmitting business." The government is not required to prove that the defendant did all the things in that list, but only that he did any one of them. In order for you to evaluate this element, let me define the following terms for you. A "business" is a commercial enterprise that is regularly carried on for profit. Thus, a single isolated transmitting of money is not a business under this definition. A "money transmitting business" is a business that, for a fee, accepts currency for transfer, within or outside the United States, by any means including wire, check, draft, facsimile, or hand delivery. The terms "conducted," "controlled," "managed," "supervised," "directed," or "owned" have their ordinary meanings.

13

A-52

The second element the government must establish beyond a reasonable doubt is that the money transmitting business affected interstate or foreign commerce. Interstate or foreign commerce simply means the movement of goods, services, money, and individuals between states or between the United States and a foreign state or nation. The government must prove that the money transmitting business affected interstate or foreign commerce in any manner, no matter how minimal. You do not have to decide whether the effect on interstate or foreign commerce would be harmful or beneficial to a particular business or to commerce in general. In addition, it is not necessary for the Government to show that the defendant actually intended or anticipated that his actions would have an effect on interstate or foreign commerce or that commerce was actually affected. All that is necessary is that the natural and probable consequences of certain acts would affect interstate or foreign commerce. I further instruct you that a transaction involving an interstate or foreign transfer of funds, by wire, check, courier, internet application, or other means, affects interstate or foreign commerce.

The third element the government must prove beyond a reasonable doubt is that the money transmitting business was unlicensed, meaning that the business either was operating in a state without a required license where operation without a license was punishable as a misdemeanor or felony under state law, or that the business was not registered as required with the United States Secretary of the Treasury.

I instruct you that to satisfy this element, the government needs to prove beyond a reasonable doubt only that the money transmitting business was unlicensed in either of these respects. That is to say, the government only needs to prove either, one, that the defendant operated a money transmitting business in a state without a license where such operation was punishable as a misdemeanor or felony, or two, that he conducted such a business without registering it with the

14

A-53

United States Secretary of the Treasury. The only state at issue in this trial is New York. The government does not need to prove that the defendant conducted a money transmitting business without both federal registration and state licenses. However, in order to convict on this count, you must be unanimous that the government proved beyond a reasonable doubt that at least one or the other of these two conditions was satisfied.

I will now explain the applicable licensing and registration requirements. Let me start with the federal registration requirement. As I mentioned, one of the ways the Government can satisfy this element is by proving that the defendant failed to register his business with the United States Secretary of the Treasury. Federal law requires certain money transmitting businesses to register with the Secretary of the Treasury within 180 days after the business was established. Specifically, this registration requirement applies to any money transmitting business, foreign or domestic, that engages in money transmitting functions in the United States. It is important to note that the Government does not need to prove that the defendant knew that such registration was required. The Government only has to prove that the business was not registered and that the defendant knew that the business was not registered.

Now let me turn to the other way the Government can prove that the defendant's business was unlicensed. The Government can satisfy this element by showing that the defendant operated his business without a required license in a State where such operation was punishable as a misdemeanor or felony under State law. I instruct you that the term "State" includes any State of the United States. Therefore, New York is a "State." I instruct you that the laws of the State of New York require that any person who engages in the business of receiving money for transmission or of transmitting money to be licensed as a money transmitter by the New York State Department of Financial Services. New York law also makes engaging in such a business without

15

A-54

a license punishable as a felony or a misdemeanor, depending on factors that are not relevant here. Again, the government does not need to prove that the defendant knew that a license was required in New York, or that the defendant knew that it was a misdemeanor or felony to engage in a money transmitting business without a license. The government only has to prove that the business was unlicensed and that the defendant knew that the business was unlicensed.

> Authority: Adapted from Sand, Instructions 50A-7, 50A-34, 50A-35 and 50A-36, the charges of the Honorable Lewis A. Kaplan in United States v. Trujillo, 01 Cr. 1077 (LAK) (S.D.N.Y.), and the elements set out in United States v. Mazza-Alaluf, 607 F. Supp. 2d 484, 489 (S.D.N.Y. 2009); United States v. Elfgeeh, 515 F.3d 100, 134 (2d Cir. 2008) (trial court correctly charged jury that "the government does not have to prove that the defendant knew of the [State] licensing requirement or that it was unlawful to operate such a business without a license"); New York Banking Law § 641 (providing in relevant part that "No person shall engage in the business of selling or issuing checks, or engage in the business of receiving money for transmission or transmitting the same, without a license therefor obtained from the superintendent as provided in this article, nor shall any person engage in such business as an agent of a licensee or as agent of a payee …"); United States v. Velastegui, 199 F.3d 590, 592 (2d Cir. 1999); 18 U.S.C. § 1960.

16

A-55

REQUEST NO. 6

Venue

In addition to the elements of the crimes charged in Counts One and Two, you must also decide whether any act in furtherance of the crimes occurred within the Eastern District of New York.  This requirement is called "venue."  The Eastern District of New York includes all of Brooklyn, Queens, Staten Island, and Nassau County and Suffolk County on Long Island.

In this regard, the government need not prove that the crime was committed in this District or that the defendant himself was present here.  It is sufficient to satisfy this element if any act in furtherance of the crime occurred in the Eastern District of New York.

I note that on this issue - and only on this issue - the government need not prove venue beyond a reasonable doubt, but only by a preponderance of the evidence.  A "preponderance of the evidence" means that the government must prove that it is more likely than not that any act in furtherance of the charge you are considering occurred in the Eastern District of New York.  Thus, with respect to each count, the government has satisfied its venue obligations if you conclude that it is more likely than not that any act in furtherance of the offense you are considering occurred within the Eastern District of New York.  If you find that the government has failed to prove this venue requirement, then you must acquit the defendant.  Let me stress, the preponderance of the evidence standard applies only to the question of venue.  As I have instructed you, the government must prove each and every element of the crime charged beyond a reasonable doubt.

Authority:  Adapted from the charges of the Hon. Roslynn R. Mauskopf, United States v. Flom, 14-CR-507 (RRM) (E.D.N.Y.).

17

A-56

REQUEST NO. 7

No Duty to Call All Witnesses

The law does not require any party to call as witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of the matters in issue at this trial. Nor does the law require the government to produce as exhibits all papers and other items mentioned during the course of the trial.

Authority:   Adapted from the charges of the Hon. Kiyo A. Matsumoto, United States v. Barret, et al., No. 10-CR-809 (KAM) (E.D.N.Y.); the Hon. Sterling Johnson, United States v. Scalisi, No. 10-CR-46 (SJ) (E.D.N.Y.).

18

A-57

REQUEST NO. 8

Interested Witness/Testimony of Defendant
(If Applicable)

If a witness is interested in the outcome of the trial on one side or the other, you may consider such interest in determining how much credit or weight you will give to his or her testimony.  A witness is an interested witness when by reason of relationship, friendship, antagonism, or prejudice in favor of or against one side or the other, his or her testimony, in your judgment, is biased or likely to be biased toward the side which he or she favors.  In determining the credibility of a witness, you may consider whether such witness has any bias or prejudice for or against any party in the case. In determining the credibility and weight to be given to the testimony of a witness, you should take into account such bias or prejudice.  Evidence that a witness is biased or prejudiced for or against a party requires you to view the witness'[s] testimony with caution, to weigh it with care, and to subject it to close and searching scrutiny.  However, keep in mind that you should not reject the testimony of an interested witness merely because of such interest.  Nor should you accept the testimony of a witness merely because of such disinterest. It is your duty in the case of all witnesses to accept such of the testimony as you believe to be truthful and reject only such testimony as you believe to be false.  As I said, interest and disinterest are merely factors you may consider in evaluating credibility.  As I have mentioned, in a criminal case, a defendant cannot be required to testify.  Our Constitution provides that he has the right to elect not to testify.  However, if a defendant chooses to testify, he is, of course, permitted to take the witness stand on his own behalf.  In this case, the defendant decided to testify.  You should examine and evaluate his testimony just as you would the testimony of any witness with an interest in the outcome of this case.

Authority:  United States v. Jenkins, 48 F.4th 300, 301-302 (2022)

19

A-58

REQUEST NO. 9

Guilty Knowledge from Clandestine Behavior

I instruct you that willful intent or guilty knowledge may be inferred from the secretive or irregular manner in which a transaction is carried out.

Authority:  Sand, Instruction No. 6-19.

A-59

<u>REQUEST NO. 10</u>

<u>Evidence Obtained Pursuant to Lawful Procedures</u>

You have heard testimony that interactions between law enforcement agents and the defendant were audio recorded.  In addition, you have seen evidence obtained pursuant to a search of a cellular telephone and laptop computer.  You have also seen evidence obtained pursuant to hidden recording devices.  This evidence was obtained lawfully.  The use of these procedures to gather evidence is perfectly lawful and the government has the right to use such evidence in this case.

The wisdom of the law and law enforcement policies and procedures are not your concern.  Your job is only to decide whether the government has proved that the defendant committed the crime charged in the superseding indictment.

<u>Authority</u>:  Adapted from the charge of the Hon. Joseph Bianco, <u>United States v. Kwame Richardson</u>, 09-CR-873; the Hon. Kiyo A. Matsumoto, <u>United States v. Broughton</u>, 13-CR-164; and the Hon. Carol B. Amon, <u>United States v. Gill, et al.</u>, 13-CR-487.

21

A-60

REQUEST NO. 11

Use of Undercover Agents and Informants

You have heard testimony from undercover law enforcement agents who were employed by the government to investigate the defendant.

Sometimes the government uses undercover law enforcement agents who may conceal their true identities in order to investigate suspected violations of the law.  There is nothing improper or illegal with the government using these techniques, so long as the defendant's rights are not violated, and the defendant has not claimed that his rights were violated in this case.  Indeed, certain types of evidence would be extremely difficult to detect without the use of undercover law enforcement agents.

Whether or not you approve of the use of undercover law enforcement agents to detect unlawful activities is not to enter into your deliberations in any way.

Authority: Adapted from Sand Instruction No. 5-23.

22

A-61

REQUEST NO. 12

Particular Investigative Techniques Not Required
(If Applicable)

During the trial, you may have heard testimony of witnesses and argument by counsel regarding whether the government used or did not use particular investigative techniques. You are instructed that there is no legal requirement that the government prove its case through any particular means. While you are to consider carefully the evidence offered by the government, you are not to speculate as to why it used the techniques it did or why it did not use other techniques. The government is not on trial. Law enforcement techniques are not your concern.

Your concern is to determine whether, on the evidence or lack of evidence, the defendant's guilt has been proved beyond a reasonable doubt.

Authority:  Adapted from the charge of the Hon. Joseph Bianco,
United States v. Kwame Richardson, 09-CR-874.

23

A-62

REQUEST NO. 13

Expert Testimony

You have heard the testimony of expert witnesses in this case. Ordinarily, witnesses are restricted to testifying concerning matters of fact. There are occasions, however, when there is some technical or other specialized area of knowledge that will assist the jury in deciding a disputed fact. On those occasions, a witness who is specially qualified by training, knowledge, experience, or education may be called to testify about some evidence or facts in issue in the form of an opinion.

Your role in judging credibility applies to experts as well as to other witnesses. You should judge this testimony in the same way that you judge the testimony of any other witness. The fact that such a person has given an opinion does not mean that you are required to accept it. In weighing the testimony, you should consider the factors that generally bear upon the credibility of a witness as well as the expert witness's education, training and experience, the soundness of the reasons given for the opinion and all other evidence in the case. You should consider the expert opinions which were received in evidence in this case and give them as much or as little weight as you think they deserve. If you should decide that the opinion of an expert was not based on sufficient education, experience, or sufficient data, or if you should conclude that the trustworthiness or credibility of an expert is questionable for any reason, then you may disregard the opinion of the expert. Furthermore, if the opinion of the expert was outweighed, in your judgment, by other evidence in the case, then you might disregard the opinion of the expert entirely or in part.

A-63

On the other hand, if you find the opinion of an expert is based on sufficient data, education, training and experience, and the other evidence does not give you reason to doubt the expert's conclusions, you would be justified in placing great reliance on the expert's testimony.

> <u>Authority</u>:  Adapted from the charges of the Hon. Roslynn R. Mauskopf, <u>United States v. Bert</u>, 14-CR-196; the Hon. Pierre N. Leval, <u>United States v. Mucciante</u>, 91-CR-403; the Hon. David G. Trager, <u>United States v. McKenzie</u>, 94-CR-469; and the Hon. Michael B. Mukasey, <u>United States v. Mensah</u>, 91-CR-705 (S.D.N.Y.); Sand, Instruction No. 7-21.

A-64

REQUEST NO. 14

Interviewed Witnesses
(If Applicable)

During the course of trial you heard testimony that the attorneys interviewed witnesses when preparing for the trial. You must not draw any unfavorable inference from that fact. On the contrary, attorneys are obliged to prepare their case as thoroughly as possible and in the discharge of that responsibility properly interview witnesses in preparation for the trial.

Authority: Adapted from the charges of the Hon. Kiyo A. Matsumoto, United States v. Greebel, 15-CR-637; and the Hon. I. Leo Glasser, United States v. Young Taek Lee, 93-CR-1072.

A-65

REQUEST NO. 15

Similar Acts – Intent, Knowledge, Absence of Mistake
(If Applicable)

The government has offered evidence tending to show that on different occasions the defendant engaged in other criminal activity.

In that connection, let me remind you that the defendant is not on trial for committing this act not alleged in the superseding indictment.  Accordingly, you may not consider this evidence of the similar act as a substitute for proof that the defendant committed the crime charged.  Nor may you consider this evidence as proof that the defendant has a criminal personality or bad character.  The evidence of the other, similar act was admitted for a much more limited purpose and you may consider it only for that limited purpose.

Specifically, if you determine that the defendant committed the acts charged in the superseding indictment and the similar acts as well, then you may, but you need not draw an inference that in doing the acts charged in the superseding indictment, the defendant acted knowingly and intentionally and not because of some mistake, accident, or other innocent reasons.

Evidence of similar acts may not be considered by you for any other purpose.  Specifically, you may not use this evidence to conclude that because the defendant committed the other acts he must also have committed the acts charged in the superseding indictment.

Authority: Adapted from Sand Instruction No. 5-25.

27

A-66

REQUEST NO. 16

Summary Evidence
(If applicable)

Some exhibits were admitted into evidence in the form of charts and summaries. Those charts and summaries were admitted in order to save the time of reviewing voluminous records and to avoid inconvenience.  You should consider these charts and summaries the same way you would any other evidence.

Authority:  Adapted from the charges of the Hon. William F. Kuntz, II, United States v. Pagett, 17-CR-306; and of the Hon. Brian M. Cogan, United States v. Nadeem, 13-CR-424.

A-67

<u>CONCLUSION</u>

The government respectfully requests that the Court include the foregoing in its instructions to the jury.  In addition, the government requests the opportunity to submit further instructions or amend those submitted as appropriate.

Dated: Brooklyn, New York
         September 12, 2022

                                    Respectfully submitted,

                                    BREON PEACE
                                    United States Attorney

                    By:      /s/
                                    Gillian A. Kassner
                                    Marietou E. Diouf
                                    Assistant U.S. Attorneys
                                    (718) 254-7000

cc:     Clerk of the Court (PKC) (by ECF)
         Murray Singer, Esq. (by ECF)
         Emilee Sahli, Esq. (by ECF)

A-68

Proposed Verdict Sheet

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

    - against -

                                   Docket. No. 19-CR-386 (PKC)

MUSTAFA GOKLU,
   also known as "Mustangy"

              Defendant.

– – – – – – – – – – – – – – – – – – X

COUNT ONE
(Money Laundering)

1.      On COUNT ONE, how do you find the defendant MUSTAFA GOKLU?

                GUILTY _____ NOT GUILTY _____

COUNT TWO
(Operation of an Unlicensed Money Transmitting Business)

2.      On COUNT TWO, how do you find the defendant MUSTAFA GOKLU?

                GUILTY _____ NOT GUILTY _____

    a.  If you find the defendant guilty on Count Two, indicate whether you unanimously

       find that the Government has proved beyond a reasonable doubt that the

30

A-69

defendant conducted, controlled, managed, supervised, or directed or owned all or part of an unlicensed money transmitting business, which:

   i.  operated without an appropriate money transmitting license in the State of New York.

       Yes _____      No _____

  ii.  failed to comply with the federal money transmitting business registration requirements.

       Yes _____      No _____

A-70

**Murray E. Singer**

Attorney at Law

14 Vanderventer Avenue                                                   tel: (516) 869-4207
Suite 147                                                               fax: (516) 706-7085
Port Washington, New York 11050                                         mobile: (516) 662-4950
email: msingerlaw@gmail.com

**BY ECF**                                              September 12, 2022

Hon. Pamela Chen
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   USA v. Mustafa Goklu
      19-CR-386

Your Honor:

I and Emilee Sahli represent Mustafa Goklu in the above-referenced matter. We are writing to propose three instructions to include in the General Considerations portion of the Court's charge, and jury instructions on the two counts of the indictment.

GENERAL INSTRUCTIONS

With respect to the General Instructions portion of the Court's charge, we request that the following be included:

Sympathy or Bias

You must evaluate the evidence calmly and objectively, without prejudice or sympathy. You must be completely fair and impartial. Your verdict must be based solely on the evidence introduced at this trial, or the lack of evidence. Our system of justice cannot work unless you reach your verdict through a fair and impartial consideration of the evidence. Under your oath as jurors you are not to be swayed by sympathy or prejudice. You are to be guided solely by the evidence in this case, and the crucial, bottom-line question that you must ask yourselves as you consider each charge against Mr. Goklu is: has the Government proven each element of that charge beyond a reasonable doubt? It is for you alone to decide whether the Government has proven that Mr. Goklu is guilty of the crimes charged, and you are to do so solely on the basis of the evidence, and subject to the law as I explain it to you. If you let fear or prejudice, or bias or sympathy, interfere with your thinking, there is a risk that you will not arrive at a true and just verdict. If you have a reasonable doubt as to Mr. Goklu's guilt as to a particular charge, you should not hesitate for any reason to reach a verdict of not guilty as to that charge. On the other hand, if you should find that the Government has met its burden of proving beyond a reasonable doubt that Mr. Goklu is guilty of a particular charge, you

A-71

Page 2

should not hesitate because of sympathy or any other reason to reach a verdict of guilty as to that charge.

The question of possible punishment must not enter into or influence your deliberations in any way. The duty of imposing a sentence, if necessary, rests exclusively on me. Your function is to weigh the evidence in the case and to determine whether or not the Government has proven Mr. Goklu's guilt beyond a reasonable doubt, solely on the basis of such evidence or lack of evidence. Under your oath as jurors, you cannot allow a consideration of the punishment that may be imposed on Mr. Goklu, if he is convicted, to influence your verdict in any way, or, in any sense, to enter into your deliberations. Similarly, you cannot permit any feelings you might have about the nature of the crimes charged to interfere with your decision-making process.

Your verdict must be based exclusively on the evidence or the lack of evidence in this case.

<u>All Persons Equal Before the Law</u>

In reaching your verdict, you must keep in mind that all parties stand equal before a jury in the courts of the United States. The fact that the Government is a party and that the prosecution is brought in the name of the United States does not entitle the Government or its witnesses to any greater consideration than that accorded to any other party. By the same token, you must give the Government and its witnesses no less consideration.

In reaching your decision as to whether the Government sustained its burden of proof, you may not consider any personal feelings you may have about the Defendant's race, religion, ethnicity, national origin, sex, or age. All persons are entitled to the same presumption of innocence.

<u>Improper Considerations: Race, Religion, National Origin, Sex, or Age</u>

Your verdict must be based solely on the evidence developed at trial or the lack of evidence. It would be improper for you to consider, in reaching your decision as to whether the Government sustained its burden of proof, any personal feelings you may have about the Defendant's race, religion, national origin, sex, or age. Similarly, it would be improper for you to consider any personal feelings you may have about the race, religion, national origin, sex, or age of any witness or anyone else involved in this case. Both sides are entitled to a trial free of prejudice, and our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

<u>COUNTS OF THE INDICTMENT</u>

With respect to Count One, charging Money Laundering under 18 U.S.C. §1956(a)(3)(B), we request that the Court charge the jury as follows:

"The first count of the indictment charges the defendant with Money Laundering in violation

A-72

Page 3

of Title 18, United States Code, Section 1956(a)(3)(B). The indictment reads as follows:

On or about and between August 28, 2018 and April 30, 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MUSTAFA GOK.LU, also known as "Mustangy," together with others, did knowingly and intentionally conduct and attempt to conduct one or more financial transactions in and affecting interstate and foreign commerce, to wit: the transfer and delivery of United States currency, which transactions involved property represented by a law enforcement officer and by another person at the direction of, and with the approval of, a Federal official authorized to investigate violations of Title 18, United States Code, Section 1956, to be the proceeds of specified unlawful activity, to wit: narcotics trafficking, in violation of Title 21, United States Code, Sections 841 and 846, and to be property used to conduct and facilitate such specified unlawful activity, with the intent to conceal and disguise the nature, location, source, ownership and control of property believed to be the proceeds of such specified unlawful activity.

Section 1956(a)(3)(B) of Title 18, United States Code provides, in relevant part:

Whoever, with the intent to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity, conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be [guilty of a crime].

In order to prove the crime of money laundering in violation of section 1956(a)(3)(B), the government must establish beyond a reasonable doubt each of the following elements:

First, that the defendant conducted or attempted to conduct a financial transaction that affected interstate or foreign commerce in any way or degree.

Second, that the transaction involved property represented by a law enforcement officer, and believed by the defendant, to be the proceeds of narcotics trafficking.

Third, that the defendant acted with the intent to conceal or disguise the nature, location, source, ownership, or control of the property believed to be the proceeds of narcotics trafficking.

The first element that the government must prove beyond a reasonable doubt is that the defendant conducted or attempted to conduct a financial transaction that affects interstate or foreign commerce in any way or degree.

The term "conducts" includes initiating, concluding, or participating in initiating or concluding a transaction.

A "transaction" includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other

A-73

Page 4

disposition of property.

The term "financial transaction" means a transaction involving a financial institution that is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree, or a transaction that in any way or degree affects interstate or foreign commerce and involves the movement of funds by wire or other means, or involves one or more monetary instruments, or involves the transfer of title to any real property, vehicle, vessel or aircraft.

The term "interstate or foreign commerce" means commerce between any combination of states, territories or possessions of the United States, or between the United States and a foreign country.

The second element that the government must prove beyond a reasonable doubt is that the transaction the defendant conducted or attempted to conduct involved property represented by a law enforcement officer, and believed by the defendant, to be the proceeds of narcotics trafficking.

For the purposes of this section, a law enforcement officer includes federal law enforcement officers and any other person acting under the direction or with the approval of a federal official authorized to investigate or prosecute money laundering.

The third element the government must prove beyond a reasonable doubt is that the defendant acted with the intent to conceal or disguise the nature, location, source, ownership, or control of the property.

To act intentionally means to act deliberately and purposefully, and not by mistake or accident, with the purpose to conceal or disguise the nature, location, source, ownership, or control of the property. To satisfy this element, the government must prove that the defendant knew of the purpose of the particular transaction in issue, and that he intended that the transaction conceal or disguise the origin of the property in question as he believed it to be."

See 3 Modern Federal Jury Instructions-Criminal P 50A.05 (2022)

With respect to Count Two, charging Operation of an Unlicensed Money Transmitting Business under 18 U.S.C. §1960(a), we request that the Court charge the jury as follows:

"The second count of the indictment charges the defendant with Operation of an Unlicensed Money Transmitting Business in violation of Title 18, United States Code, Section 1960(a). The indictment reads as follows:

On or about and between August 28, 2018 and April 30, 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MUSTAFA GOKLU, also known as "Mustangy," together with others, did knowingly conduct, control, manage, supervise, direct and own all and part of an unlicensed money transmitting business affecting

A-74

Page 5

interstate and foreign commerce, to wit: a digital currency exchange business. which (a) operated without an appropriate money transmitting license in the State of New York, where such operation is punishable as a misdemeanor and a felony under New York State law; and (b) failed to comply with the money transmitting business registration requirements under Title 31, United States Code, Section 5330 and the regulations prescribed thereunder.

Section 1960(a) of Title 18, United States Code provides, in relevant part:

Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be [guilty of a crime]."

In order to prove that the defendant operated an unlicensed money transmitting business, the government must establish beyond a reasonable doubt each of the following elements of the offense:

First, that the defendant, Mustafa Goklu, also known as "Mustangy" was an unlicensed money transmitting business;

Second, that defendant knowingly controlled or conducted or managed or supervised or directed or owned that business; and

Third, that the money transmitting business affected interstate commerce.

The first element the government must prove beyond a reasonable doubt is that the defendant, Mustafa Goklu, also known as "Mustangy" was an unlicensed money transmitting business.

A "business" is a commercial enterprise that is regularly carried on for profit. Thus, a single isolated transmitting of money is not a business under this definition.

A "money transmitting business" is a business that, for a fee, accepts currency for transfer within or outside the United States.

To satisfy this element, the money transmitting business must be unlicensed. I instruct you that under the laws of the state of New York, a business that engages in the business of receiving money for transmission or transmitting the same must be licensed by the state. It is for you to determine whether the money transmitting business was licensed as required.

To satisfy this element, the government must prove that defendant knew that the business was unlicensed. However, the government does not have to prove that defendant knew that state law required the business to be licensed.

The second element the government must establish beyond a reasonable doubt is that defendant knowingly controlled or conducted or managed or supervised or directed or owned that business.

A-75

Page 6

To prove that defendant knowingly controlled the money transmitting business, the government must establish that defendant was involved in the management of the business and was not merely an employee of that business.

An act is done knowingly when it is done voluntarily and intentionally and not because of accident, mistake or some other innocent reason.

The third element the government must establish beyond a reasonable doubt is that the money transmitting business affected interstate or foreign commerce.

Interstate or foreign commerce simply means the movement of goods, services, money and individuals between states or between the United States and a foreign state or nation.

The government must prove that the money transmitting business affected interstate or foreign commerce in any manner, no matter how minimal.

See 1 Modern Federal Jury Instructions-Criminal P 50A.07 (2022).

We reserve the right to modify this request if warranted by the evidence introduced at trial.

Thank you for your consideration.

Very truly yours,

/s/
Murray Singer

cc:    AUSA Gillian Kassner by ECF and email
       AUSA Marietou Diouf by ECF and email

A-76

```
                                                                        1

 1                      UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF NEW YORK
 2
      - - - - - - - - - - - - - X
 3
      UNITED STATES OF AMERICA,        : 19CR386(PKC)
 4                                     :
               Plaintiff,              :
 5                                     :
               -against-              : United States Courthouse
 6                                     : Brooklyn, New York
      MUSTAFA GOKLU,                    :
 7                                     :
               Defendant.              : Monday, October 3, 2022
 8                                     : 9:00 a.m.
                                       :
 9                                     :
                                       :
10
      - - - - - - - - - - - - - X
11
          TRANSCRIPT OF CRIMINAL CAUSE FOR PRETRIAL CONFERENCE
12            BEFORE THE HONORABLE PAMELA K. CHEN
                 UNITED STATES DISTRICT JUDGE
13
                     A P P E A R A N C E S :
14
      For the Government: United States ATTORNEY'S OFFICE
15                          Eastern District of New York
                            271 Cadman Plaza East
16                          Brooklyn, New York 11201
                        BY:  GILLIAN KASSNER, ESQ.
17                          MARIETOU E. DIOUF, ESQ.
                            FRANCISCO NAVARRO, ESQ.
18                          Assistant United States Attorneys

19    For the Defendant:    MURRAY E. SINGER, ESQ.
                            14 Vanderventer Avenue, Suite 147
20                          Port Washington, New York 11050
                        SAHLI LAW PLLC
21                          195 Broadway, 4th Floor
                            New York, New York  11211
22                      BY:EMILEE SAHLI, ESQ.

23
      Court Reporter:    SOPHIE NOLAN
24                        225 Cadman Plaza East/Brooklyn, NY 11201
                          NolanEDNY@aol.com
25    Proceedings recorded by mechanical stenography, transcript
      produced by Computer-Aided Transcription
```

A-77

```
                          Proceedings                      2

 1               (In open court.)

 2               (The Hon. PAMELA K. CHEN, presiding.)

 3               (Defendant present.)

 4               THE COURTROOM DEPUTY:  Criminal cause for jury

 5      selection and trial, United States versus Goklu, docket

 6      19-cr-386.

 7               Will the parties please state their appearances for

 8      the record, starting with the Government.

 9               MS. KASSNER:  Good morning, Your Honor.  Gillian

10      Kassner for the United States.

11               MS. DIOUF:  Good morning, Your Honor.  Marietou E.

12      Diouf for the Government.

13               MR. NAVARRO:  Good morning, Your Honor, Francisco

14      Navarro and we're joined by Bridget Donovan, who is a

15      paralegal specialist in our office.

16               THE COURT:  Good morning to all of you.

17               MR. SINGER:  For Mr. Goklu, Murray Singer.  Good

18      morning, Your Honor.

19               MS. SAHLI:  Emilee Sahli also for defendant.  Good

20      morning, Your Honor.

21               Special Agent Julian Herb from the Drug Enforcement

22      Agency.

23               THE COURT:  Good morning to you all.

24               So, folks, a couple of things before we get started.

25      As you can see, I have a mask.  I'm going to require the jury
```

A-78

Case 1:19-cr-00386-PKC     Document 78     Filed 12/01/22     Page 3 of 263 PageID #: 489

Proceedings                               3

1   and the entire venire to wear a mask.  I want you folks to be

2   masked unless you are speaking.  We are in a closed, confined

3   environment for hours on end with a lot more people in our

4   room than for usual proceedings.  I want to be sure that we

5   don't get any infections in the middle of the trial or losing

6   any jurors because of needing to quarantine.  Since this is a

7   smaller group you can take them off, but I want to be sure

8   that everyone has one and if you don't, we should have extras.

9          The jurors are all going to have masks given to them

10  and they'll be told by the Jury Department that they will be

11  required to wear them during the trial and I will tell them

12  that as well and tell them why.  I will also say that the

13  lawyers will be able to unmask while they're speaking during

14  the trial.  I am also concerned about the number of people

15  we're going to have in here.

16         Mr. Singer, did you want to say something?

17         MR. SINGER:  Just in terms of when we're speaking I

18  noticed the small podium in front of the jury box.  Have a

19  preference or a direction as to where we should be?

20         THE COURT:  That is for opening statements, the

21  smaller one, and the larger one is to do your questioning as

22  before.  It's pretty much the same as pre-COVID.

23         So, there are a few preliminary matters I want to

24  address.  A couple relate to voir dire.  The Government's

25  proposed voir dire questions 12 G and H are about the dark

SN      OCR      RPR

A-79

Case 1:19-cr-00386-PKC      Document 78      Filed 12/01/22      Page 4 of 263 PageID #: 490

Proceedings                                              4

1    web.  The defense has objected to those questions because they

2    maintain that this case doesn't involve any transactions on

3    the dark web.  But I don't know if there are any

4    communications via the dark web or if there's any relevance to

5    that.

6            So let me ask the Government, why do you want me to

7    ask questions about the dark web?

8            MS. KASSNER:  Your Honor, I don't expect the dark

9    web to come up very much during the course of the trial.  I do

10   think the Government and the defense have a bit of a dispute

11   about whether it should be mentioned as all.  There are no

12   communications that were made through any avenue associated

13   with the dark web, but what the Government does plan to ask is

14   the undercover agent, if asked, what was your cover story when

15   you were dealing with the defendant, will answer, I was posing

16   as a dark web narcotics dealer and there would only be one or

17   two questions after that.  They would be along the lines of

18   why did you -- what is a dark web narcotics dealer and why did

19   you decide to be a dark web dealer versus a street dealer.

20           And the reason for that is the undercover agent was

21   taking Bitcoin and exchanging it into cash.  I don't think the

22   jury will understand why a drug dealer would be paid in

23   Bitcoin without that additional context because street dealers

24   are paid in cash.  Dark web dealers are almost always paid in

25   crypto currency and they need it converted into cash to pay

SN      OCR      RPR

A-80

Case 1:19-cr-00386-PKC     Document 78     Filed 12/01/22     Page 5 of 263 PageID #: 491

```
                              Proceedings                     5
 1   their suppliers and other people associated with the business.
 2         THE COURT:  And will that be part of the narrative
 3   told by the Government?  In other words, his cover to the
 4   defense was I operate on the dark web, I get paid in Bitcoin
 5   or, therefore, I get paid in Bitcoin.
 6         MS. KASSNER:  So, in the recording he never uses the
 7   word dark web, but he says, I have an online business.  He
 8   says I get paid in Bitcoin and convert it into cash as soon as
 9   possible.  What I think the Government is expected to ask is
10   really no more than that particular question, but just to
11   explain that it's outside a layman's understanding of how
12   narcotics are sold.
13         THE COURT:  If someone says, yes, I know about the
14   dark web, what exactly would be either disqualifying or
15   relevant to you folks?  I mean, it doesn't seem to me to be
16   particularly relevant to the case and I don't want to suggest
17   that the defendant was operating on the dark web even through
18   the questioning.
19         Mr. Singer?
20         MR. SINGER:  Can I weigh in?
21         THE COURT:  Absolutely.  Before you do.  The person
22   sitting up with me is our newest judge, Nina Morrison, and she
23   wanted to observe a trial.  So she will be here with us part
24   of today and at some other parts of the trial in case you see
25   her.
```

SN     OCR     RPR

A-81

Case 1:19-cr-00386-PKC     Document 78     Filed 12/01/22     Page 6 of 263 PageID #: 492

Proceedings                    6

1          Mr. Singer.

2          MR. SINGER:  Welcome.

3          JUDGE MORRISON:  Thank you.

4          MR. SINGER:  There is no evidence of any

5   communication by Mr. Goklu on the dark web.  There's no

6   evidence of any kind that Mr. Goklu knows what the dark web is

7   or has dealt with it in any way.  It is not a relevant

8   consideration here and it is used to dirty up this whole

9   transaction or there's no any evidence to suggest that

10  Mr. Goklu knows what to make of the dark web or that he

11  understands what it means that the undercover is saying I

12  operated an online business.

13          How is this at all relevant to anything in the case?

14          THE COURT:  Consider this:  If the Government asked

15  a couple of questions of the undercover about what his cover

16  story was and he said I said I was selling drugs via the dark

17  web online.

18          MR. SINGER:  He didn't.

19          THE COURT:  He never said that to Mr. Goklu?

20          MR. SINGER:  No, there's no communication with

21  Mr. Goklu about it.

22          THE COURT:  It's part of the setup regarding the

23  investigation.

24          Was he actually operating on the dark web?  Has the

25  undercover ever gone to the dark web to try to purportedly

SN      OCR      RPR

A-82

Case 1:19-cr-00386-PKC     Document 78     Filed 12/01/22     Page 7 of 263 PageID #: 493

```
                         Proceedings                        7
```

1   sell drugs?

2          MS. KASSNER:  So I think there are two separate

3   questions.  This agent has experience with the dark web, but

4   for the purposes of this case there are no real drugs.  So,

5   no, he never purchased drugs on the dark web in connection

6   with his dealings with Mr. Goklu, but what he -- what he would

7   say is that his cover story was that he sold drugs online and

8   was paid in Bitcoin and had to convert it to cash.  That's

9   what he told the defendant.

10         THE COURT:  I thought you were going to ask him

11  something about the dark web.

12         MS. KASSNER:  I would ask what was your cover story

13  when you were dealing with the defendant, what role were you

14  playing and he will say I was a dark web narcotics dealer, but

15  he didn't say the word dark web.  What he said was I sell my

16  product online and I'm paid in Bitcoin and convert it to cash.

17         So I think the point here is for voir dire, we don't

18  need to ask about it.  I don't think there's a dispute that

19  striking those questions is fine, but while we're on the

20  subject I wanted to make sure that Your Honor would allow the

21  Government to ask those very few probing questions just to

22  give the jury background about what the undercover agent's

23  role was when dealing with the defendant.

24         THE COURT:  I'm glad you asked that because that was

25  my concern is that you raised a different issue.

A-83

Case 1:19-cr-00386-PKC     Document 78     Filed 12/01/22     Page 8 of 263 PageID #: 494

Proceedings                    8

1     What I was going to say to you Mr. Singer, if there

2  is a reference to the dark web it's in your interest to ferret

3  out anyone who has negative connotations about the dark web

4  because it suggests illegality or nefariousness or wanting to

5  conceal one's identity.

6         MR. SINGER:  Exactly, which is why it has no place

7  in voir dire or any testimony.

8         THE COURT:  Well, now we're on a different issue.

9         MR. SINGER:  That's an issue that I wanted to raise

10  with Your Honor this morning because there is -- if the

11  undercover is, I guess, intending to say that his cover story

12  is that he was operating on the dark web, gee, that's nice,

13  but he never communicated that to Mr. Goklu and so it's not

14  part of the case.

15         THE COURT:  I do not think the Government should be

16  referencing it unless it was actually said to Mr. Goklu.  It

17  does create this aura of illegality or trying to operate

18  without being depicted.  That wasn't communicated to

19  Mr. Goklu.

20         What's relevant here is his knowledge or intent to

21  conceal the source or the location of the funds for purposes

22  of the money laundering.  So I'm glad this came up, albeit I

23  wish it had come up in a motion in limine, but I'm glad it

24  came up before trial.  The Government shouldn't elicit that if

25  it wasn't said to the defendant.  You can say, yes, I told him

SN        OCR        RPR

A-84

Proceedings                              9

1   I was doing online drug dealing, but just avoid any references

2   to this the dark web unless it was specifically said to him.

3          MS. KASSNER:  I understand your ruling.  I just want

4   to clarify one thing; without using the term dark web, I think

5   our first witness is going to be a cryptocurrency expert and

6   we plan to ask her questions -- she's a DEA agent -- in your

7   training and experience are you familiar with instances where

8   a narcotics dealer is paid in Bitcoin and needs to convert it

9   into cash.  We can -- we can instruct her she should not use

10  the word dark web, but is she permitted to say it happens when

11  they sell online because that word does show up in the

12  recordings where he said my business is online.

13         THE COURT:  No, I think that's all fine.

14         MS. KASSNER:  Okay.

15         THE COURT:  And I would again avoid using the word

16  dark web.

17         MS. KASSNER:  Understood, Your Honor.

18         THE COURT:  Since that never was communicated to

19  Mr. Goklu.

20         MS. KASSNER:  Yes, Your Honor.

21         THE COURT:  Drug dealing no matter how you do it is

22  still illegal, so it doesn't seem necessary to guild that

23  lilly.

24         So we've resolved the issue about voir dire.  I will

25  not ask proposed questions 12 G and H about the dark web.  I

SN      OCR      RPR

A-85

Case 1:19-cr-00386-PKC     Document 78     Filed 12/01/22     Page 10 of 263 PageID #: 496

```
                          Proceedings                    10
```

1   want to confirm for purposes of advising the venire about the

2   length of the trial.  Is four days enough?  Because that would

3   take us to Friday, so the question comes up should I say

4   potentially five which would take us to Monday.

5               MR. SINGER:  Tuesday.  Monday is a holiday.

6               THE COURT:  Tuesday.

7               MS. KASSNER:  I'm always hesitant to promise but I

8   expect we'll be done on Friday.

9               THE COURT:  When you say done --

10              MS. KASSNER:  So the Government will certainly rest

11  by Friday.

12              THE COURT:  That's a different story.

13              MS. KASSNER:  Okay.

14              THE COURT:  Because obviously they have to

15  deliberate.  I want to overestimate because you never want a

16  jury to think the trial will be over.  I will say four or five

17  days potentially to Tuesday because we're not sitting on

18  Wednesday.

19              MR. SINGER:  Wednesday or Monday.

20              THE COURT:  Right.  Exactly.  I'm confirming that

21  the Government now has decided not to redact portions of

22  Government Exhibits 801, 804, 806 and 807 and 809.  That's

23  correct, right?

24              MR. SINGER:  Judge, I think what you're referring to

25  is portions from hello to goodbye that the Government had

A-86

|                       | Proceedings                                    | 11 |

1  indicated that they may seek to redact and they had indicated

2  that they are not seeking to redact any of the portions within

3  from hello to goodbye.

4          THE COURT:  That was much longer an explanation than

5  necessary.  I was just confirming the Government's letter.

6          MS. KASSNER:  Yes, Your Honor.  There will be no

7  redactions in the communication between the undercover agent

8  and the defendant.

9          THE COURT:  And obviously some of the side

10  conversations will be redacted as we previously discussed.

11          MS. KASSNER:  Yes, Your Honor.

12          THE COURT:  That is what you mean by hello to

13  goodbye, Mr. Singer?

14          MR. SINGER:  Yes.

15          THE COURT:  One last thing is this limiting

16  instruction.  So we can deal with this after we pick the jury,

17  but I did want to let you know that I believe the defense is

18  correct on this, unless you're going to tell me that these

19  other conversations, meaning conversations with people other

20  than the undercover with the defendant did specifically

21  reference or suggest concealment or an intent to conceal the

22  source, location, et cetera, of the proceeds.

23          MS. KASSNER:  Yes, Your Honor.  We do believe that

24  some of these other communications do reference detection by

25  the NYPD, you know, washing money, things that we believe are

SN      OCR      RPR

A-87

Case 1:19-cr-00386-PKC     Document 78     Filed 12/01/22     Page 12 of 263 PageID #: 498

|  | Proceedings | 12 |
|---|---|---|

1  properly considered for the money laundering count as well.

2       THE COURT:  Let's take this up after we pick the

3  jury, so I can hear more specifics.

4       MR. SINGER:  Judge I have other issues I want to

5  raise and we can do it after jury selection.

6       THE COURT:  Give me some idea of what they are while

7  he's calling for them.

8       MR. SINGER:  There is a portion of the statement

9  that Mr. Goklu is said to have made on the day that he was

10  arrested.  The Government indicated that there are portions

11  from the 302 of the interview of Mr. Goklu after he was

12  arrested on April 30th and there is one particular comment or

13  statement by Mr. Goklu in there that I think should not be

14  included that has to do with him -- the agents asking if they

15  can go into his phone and Mr. Goklu saying no and taking the

16  phone back.  I think that's an exercise of his right to remain

17  silent and not to be subject to a search and should not be

18  used by the Government as suggesting anything about Mr. Goklu.

19       THE COURT:  You mean consciousness of guilt?  Is the

20  Government intending to offer that statement where he says no,

21  don't look into my phone?

22       MS. KASSNER:  Not -- we spoke with defense counsel

23  about this.  We will not elicit that he consented to have a

24  portion of his phone reviewed by law enforcement and did not

25  offer such consent for the rest of his phone.  We're not going

SN     OCR     RPR

A-88

|  | Proceedings | 13 |
|---|---|---|

1    to elicit that.

2          THE COURT:  Didn't you say the opposite; that

3    Mr. Goklu initially said no to letting them look into his

4    phone and that's the part that they don't want to have

5    introduced?

6          MR. SINGER:  Judge, there's one line in the 302,

7    Special Agent Liefke asked if he could look through the app of

8    the other conversations that Goklu was having with other

9    people.  Goklu said no and took the phone back.

10         MS. KASSNER:  We won't --

11         MR. SINGER:  I believe that's a portion that was not

12   properly elicited from the agent.

13         MS. KASSNER:  We will not elicit that, Your Honor.

14         THE COURT:  So this is a nonissue.  Next?

15         MS. KASSNER:  We have a stipulation and waiver of

16   jury trial as to forfeiture, which has been signed by all the

17   parties.  Whenever Your Honor would like it, it's ready.

18         THE COURT:  He's stipulating to forfeit even

19   before --

20         MR. SINGER:  No.  If there is a determination of

21   guilt, that the issue of forfeiture would be left to the Court

22   and not for the jury to decide.

23         THE COURT:  That is a sentencing issue.  It's not

24   decided by the jury.  Has it ever been decided by the jury?

25         MS. KASSNER:  Your Honor, it almost never is, but it

A-89

Case 1:19-cr-00386-PKC     Document 78     Filed 12/01/22     Page 14 of 263 PageID #: 500

```
                          Proceedings                      14
```

1  is a right of the defendant to have, in certain circumstances,

2  forfeiture heard before the jury.  So he would be waiving that

3  right.

4          THE COURT:  And he did?

5          MS. KASSNER:  I have the signed stipulation which I

6  can hand up to Your Honor.

7          (Counsel approaches.)

8          THE COURT:  What are the circumstances where a

9  defendant has the right to have a jury decide forfeiture?

10         MS. KASSNER:  Your Honor, I think under most

11 statutes, it's a right of a defendant to have the issue heard

12 by a jury.  It's just almost always that it's stipulated but I

13 believe in almost -- it's certainly for the charges here.

14         MR. NAVARRO:  Your Honor, this was surprising to me

15 as well.  I am happy to talk to our forfeiture people and get

16 details on it, but this is unusual for us as well.  But this

17 is what we're being told is the procedure from our forfeiture

18 folks.

19         THE COURT:  You learn something new every day.  I'm

20 thinking back to all of the other cases that involved

21 financial crimes and wondering if there's something defective

22 with them.  But that's for another day.

23         Anything else, Mr. Singer?

24         MR. SINGER:  There's an issue concerning the form in

25 which the redacted recordings are being introduced.  The Court

SN      OCR      RPR

A-90

Proceedings                                    15

1   had indicated and certainly the Government agrees that the

2   recordings, both before the undercover officer met with

3   Mr. Goklu and after he left Mr. Goklu are to be redacted.

4          What the Government has done with those recordings

5   is they left the recording intact and simply created empty

6   space on the recording.  So, one recording may be blank for

7   ten minutes and then the conversation starts.  It's the

8   equivalent of putting in a document with just a bunch of

9   things blacked out and we think that that simply opens up the

10  issue for speculation by the jury.  It's something that can

11  easily be done by simply creating a recording from start to

12  finish without the dead space.  We would request that it be

13  done that way so it doesn't open up this question for the

14  jury.

15         THE COURT:  I think that's fair.  Why didn't you

16  folks do that?

17         MS. KASSNER:  Your Honor, this is really for

18  practical reasons.  We expect if we are moving quickly, we

19  would be putting on Special Agent O'Kain today.  All of our

20  timestamps that we are going to be referencing are with

21  respect to the exhibits as they existed when we first reviewed

22  them with him.  And so, we just suggest that in order for the

23  timestamps -- there are quite a few timestamps.  It's just

24  easier to do it this way.  I don't think there's really any

25  prejudice.

SN        OCR        RPR

A-91

Case 1:19-cr-00386-PKC     Document 78     Filed 12/01/22     Page 16 of 263 PageID #: 502

```
                            Proceedings                      16
 1          THE COURT:  I am happy to give a cautionary
 2   instruction that there are portions where redactions are made
 3   based on rulings that I made and don't infer anything from
 4   those gaps.  You're going to have that issue come up anyway,
 5   Mr. Singer, just in terms of the jumps in the time and the
 6   time should be accurate for purposes of the record.
 7          MR. SINGER:  Could you add to that that they are
 8   portions that did not involve any communications with
 9   Mr. Goklu?
10          THE COURT:  Or I could just say I decided were not
11   relevant to the case.
12          Does that satisfy everybody?
13          MS. KASSNER:  Either way, Your Honor.
14          MR. SINGER:  We understand that, but the jurors
15   don't.
16          THE COURT:  Is it accurate to say that it didn't
17   involve conversations with Mr. Goklu?
18          MS. KASSNER:  Yes, Your Honor.
19          THE COURT:  I can say that as well.  That's fine.
20   When we get to that point perhaps I'll discuss the exact
21   language -- I will have my law clerk draft something quickly
22   so we can all literally be on the same page.
23          Anything else?
24          MR. SINGER:  Another matter that I think is simply
25   confusing or creating a potential for confusion with the jury.
```

SN        OCR        RPR

A-92

Case 1:19-cr-00386-PKC     Document 78     Filed 12/01/22     Page 17 of 263 PageID #: 503

Proceedings                    17

1   As I've made clear in our pretrial conference, the entirety of

2   the recording viewed all together is important to understand

3   Mr. Goklu's knowledge or intention and the Government -- we

4   have agreed with the Government to the transcripts to be given

5   to the jury to follow along with the recordings.

6           And I believe what the Government is going to seek

7   to do, and it's certainly their right, is to play certain

8   limited portions of the recordings with the agent on the

9   stand, but what we're doing is creating a separate, I

10  believe -- I haven't received them, but I believe they're

11  creating a second binder with a transcript of only those

12  portions that they're playing.  So then we end up with two

13  different transcripts where it's really just a portion of the

14  entire transcript that is easier and less confusing for the

15  jury if the Government simply says, we're playing this

16  portion, it starts on page nine and goes to page 11 and you

17  can follow along in your binder; rather than creating a

18  separate binder that they're giving to the jury because then

19  if I'm going to cross-examine and try and expand upon what

20  they put in, then it's a matter of providing them with a

21  separate binder and they may not know that it's the same

22  thing.

23          THE COURT:  Go ahead.

24          MS. KASSNER:  Yes, Your Honor.  We tried our best to

25  think ahead of all of these potential inconveniences what the

SN        OCR        RPR

A-93

|                      Proceedings                      | 18 |

1   Government's concern is if you give a full transcript, the

2   jury is going to read in between the lines and read it

3   through.  What we have done -- we have provided a copy of the

4   shorter, condensed transcripts.  We provided it yesterday so

5   they could see everything we plan to play with our undercover

6   agent.

7          We have a binder.  The first part is the condensed

8   transcripts that we plan to play and the second half of the

9   binder is the full transcript and it's very clear that they

10  have the same numbers and so if on cross the defense wants to

11  say, well, this is the part you didn't play.  I think it will

12  be quite clear and convenient look at the full transcript in

13  your binder, this is what you didn't play.

14          THE COURT:  It sounds pretty reasonable to me.

15  Mr. Singer, I think the Government quite rightly has the

16  excerpts, if you will, in the first part of the binder because

17  that's all the jury should be focusing on.  These are just

18  aids to the jury and I don't want them reading other things

19  while the audio is being played.  So it's quite reasonable and

20  I think it's clearer to have them focus and get only those

21  portions of the audio that are being played at that time.

22          But the Government, it sounds like, has provided a

23  second half of the binder that you can use to refer them to

24  other portions that you intend to play.  Nobody should be

25  using the binders unless audio is being played.  Let's confine

A-94

Case 1:19-cr-00386-PKC     Document 78     Filed 12/01/22     Page 19 of 263 PageID #: 505

Proceedings                                    19

1   the transcripts to the audio being played.  You can figure it

2   out but it seems the Government has come up with a perfectly

3   reasonable solution.

4          MR. SINGER:  One other issue, Your Honor, when we

5   were here for the pretrial conference, there was a discussion

6   about whether the agent who took Mr. Goklu's phone and

7   questioned him had prepared any -- had gotten a written

8   consent to search --

9          THE COURT:  Can we table this for the moment?  We

10  have our jury here.  You're all going to be getting a list of

11  the jurors -- potential jurors names.

12         One other note, Mr. Goklu has not used our

13  interpreter.  We will need to get our interpreter sworn in so

14  we will take care of that.

15         THE COURTROOM DEPUTY:  Raise your right hand.

16         (Interpreter sworn.)

17         THE COURTROOM DEPUTY:  Please state your names.

18         THE INTERPRETER:  Seyhan Sirtalan

19         THE INTERPRETER:  George Esayan.

20         THE COURT:  Thank you.  Have a seat everyone.  I

21  want to observe for the record that thus far, Mr. Goklu has

22  not been, as far as I can tell, been using the interpreters.

23  Have you been interpreting all of this time.

24         MS. SIRTALAN:  We were instructed to be on standby

25  and whenever he needs he puts the ear piece on.

SN     OCR     RPR

A-95

```
                              Jury Selection                      20
```

 1          THE COURT:  I want to confirm that that is correct,

 2    Mr. Singer.

 3          Mr. Goklu has opted to use the translators on a

 4    standby basis?

 5          MR. SINGER:  That's true.

 6          THE COURT:  And we have two standby interpreters for

 7    that purpose.

 8          (Potential jurors enter.)

 9          THE COURT:  Have a seat, everyone.  Good morning

10    ladies and gentlemen, my name is Pamela Chen and I am the

11    judge who will be presiding over trial for which you have been

12    summoned.  I would also like to introduce Nina Morrison.  She

13    is our newest district court judge and she will be here today

14    observing.

15          You are here today because we are about to

16    select a jury to serve in a criminal case.  Thank you for your

17    presence here today.  The contribution that each of you makes

18    of your time and effort is important to the success of the

19    judicial system.  Your service as jurors is appreciated by the

20    court and the individuals who are litigating this case here

21    today.

22          One note before we begin, as we transition out of

23    the pandemic, the courthouse has eliminated certain

24    COVID-related requirements, such as mask-wearing and social

25    distancing.  So, while you are in the public areas in the

                              SN      OCR      RPR

A-96

Jury Selection                          21

1  courthouse, such as the lobby, hallways, and bathrooms, you
2  are not required to wear a mask or maintain a particular
3  distance from others.  But judges still retain the authority
4  to require these precautions in our courtrooms and during
5  proceedings such as trial and jury selection.  Because this
6  jury selection will take some time, during which we will all
7  be confined to this courtroom in close proximity to one
8  another, I am requiring everyone to wear a mask, so as to
9  minimize the risk of COVID infection.  Masks will be required
10  during the trial as well, except that the lawyers and
11  witnesses will be permitted to unmask when speaking or
12  presenting evidence.
13      so you will see some of the lawyers unmask today
14  especially during continuity deductions when I introduce each
15  of them and ask if any of you know them.  It's easier to
16  recognize someone if they remove their mask.
17          Now, turning to the trial in this case.  *The trial*
18  *is expected to about four or five days, so the rest of this*
19  *week, but we will not be sitting this Wednesday, because of*
20  *Yom Kippur.*  Although this may be a burden, it is important
21  that you make every effort to accept and perform the
22  responsibility of a juror.  It is both a responsibility and an
23  honor to participate in the judicial system.  All of us who
24  participate are keenly aware of the importance of an
25  impartial, fair and just trial.

SN      OCR      RPR

A-97

Jury Selection                                22

1    As part of the voir dire process, you will be asked

2    questions to determine whether you can render a fair and

3    impartial verdict.  Please accept the questioning process in

4    the spirit of its objective.  The purpose of voir dire is not

5    to embarrass any of you but rather to ensure fairness and

6    impartiality to both sides.  At times this will be tedious.  I

7    ask you to bear with me.  As I'm sure you can all appreciate

8    our task today is an important one.  If in the course of the

9    questioning process you think that because of some experience

10   you've had in your life or because of something you've read or

11   heard, you cannot be fair and impartial; that is, you would be

12   inclined towards one side or the other, you must tell me.  It

13   is your duty to do so.  This is not unusual and there is no

14   reason to be upset that you cannot serve on any particular

15   jury.  There may be another matter for which you can serve on

16   the jury and we can send you back to the Jury Department and

17   see if you can is it on another trial.

18        On the other hand, again, as I'm sure you all

19   appreciate our system of justice only works if all citizens

20   are prepared to perform jury duty when they can do so fairly

21   and impartially.

22        I would not expect any of you to avoid this duty but

23   for the most important reasons.  Now, quite apart from whether

24   I excuse some or all of you, the lawyers for both sides are

25   entitled to exercise a certain number of peremptory challenges

SN        OCR        RPR

A-98

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 23 of 263 PageID #: 509

Jury Selection                                  23

1   which means that they may strike some of you for no reason

2   whatsoever.  If that happens, no affront is intended and you

3   should not be offended in any way.  Again, you will be excused

4   and sent back to the jury room to see if there's another trial

5   that you can serve on the jury for.

6           Let me close by thanking you again for your presence

7   here today and your willingness to serve as jurors and by

8   assuring you that all of us in the courthouse are taking and

9   will continue to take every precaution to ensure your safety

10  during your service.  Your safety as well as moving the trial

11  along expeditiously are my highest priorities.

12          A final reminder that you must wear your face mask

13  at all times while in the courtroom.  All of us who work in

14  the courthouse or at least in this courtroom have to do the

15  same.  I know this can be difficult but I believe that this

16  precaution is necessary for all of our safety and your

17  cooperation is greatly appreciated.  Because the answers you

18  must give have to be under oath, our deputy will administer

19  the oath to all of you so please rise and raise your right

20  hand.

21          (Potential jurors sworn.)

22          THE COURT:  Have a seat, everyone.  So the first

23  question I ask or the first thing we need to do rather is to

24  have 32 called up.  So the first 32 individuals whose names

25  and numbers are called we're going to ask you to start filling

SN        OCR        RPR

A-99

Jury Selection                    24

1   in this jury box to my left and we'll move to the front row

2   there.  We'll need to have those folks move to chairs over

3   here.

4          I was just advised by the deputy that we have the

5   first 32 seated on what is my left over here.  So, the

6   important thing is that even though I'm focusing on these

7   first 32 individuals, it is possible that during the course of

8   questioning some of you will be required to fill in or replace

9   those who are excused.  So everyone should pay attention to

10  all the questions that I ask and if one of you is called to

11  fill in, the first question I will ask you is whether you had

12  a positive response to anything that I've asked you so far.

13  So I need you all to focus on the questions even though we're

14  going to focus first on the 32 individuals on this said.

15          THE COURTROOM DEPUTY:  Juror No. 1, Marcia Donaldson

16  Juror 2, Kathleen Fischer.  Juror 3, Yashika Dawkins.  Juror

17  4, Amy Durante.  Juror 5, Michael Okane.  Juror 6, Melissa

18  Osorio Chimal.  Juror 7, Gerard Discala.  I apologize if I

19  mispronounce any name.  Juror No. 8, Lloyd Price.  Juror No.

20  9, Veronica Ramos.  Juror 10, Joseph Hess.  Juror 11, Karen

21  Ferrer.  Juror 12, Neil Roopnauth.  Juror No. 13, Francis

22  Dean.  Juror No. 14, Dana Nzirubusa.  Juror No. 15, Alynn

23  Parola.  Juror No. 16, Loren Mattina.  Juror 17, Evelyn Yepez.

24  Juror No. 18, Maria Cipriano.  Juror No. 19, Joseph Duran.

25  Juror No. 20, Sonnja Williams.  Juror No. 21, Vanessa

SN      OCR      RPR

A-100

Jury Selection                                  25

1   Nardulli.  Juror 22, Amena Faison.  Juror 23, Arthur Thomas.

2   Juror 24, Ethan Ries.  Juror 25, Walter Chesaniuk.  Juror No.

3   26, Elizabeth Chang.  Juror 27, Valerie James.  Juror 28, Adam

4   Chu.  Juror No. 29, Joann Kirk.  Juror 30, Kevin Donovan.

5   Juror 31, Harold Gonzalez.  Juror No. 32, Kevin Cheng.

6              THE COURT:  Thank you very much, Ryan.

7              So, ladies and gentlemen, this case comes before the

8   Court by way of an indictment.  The indictment is captioned

9   *United States against Mustafa Goklu* and it charges the

10  defendant, Mr. Goklu, with engaging in money laundering and

11  operating an and unlicensed money-transmitting business.  The

12  defendant has pleaded not guilty to these charges and has thus

13  raised issues of fact to be determined by the jury.

14             The indictment merely contains allegations.  The

15  indictment is not evidence itself and you may not consider it

16  as evidence.  It simply contains the charges that the

17  Government is required to prove to the satisfaction of the

18  jury beyond a reasonable doubt.  You must not think of the

19  indictment as any evidence of the guilt of the defendant or

20  draw any conclusions about the guilt of the defendant just

21  because he's been indicted.

22             Before we begin the questioning process, let me

23  advise you that if there is any answer that you would prefer

24  not to give in open court you merely need to indicate private

25  please or request a sidebar.

SN       OCR       RPR

A-101

Jury Selection                                26

1          First question:  Has anyone heard or read anything

2     about this case, again focusing on the first 32 here?

3          Seeing no show of hands, let me introduce the

4     parties and their attorneys in this case.  The Government is

5     represented by Assistant United States Attorneys Gillian

6     Kassner, Marietou Diouf, Francisco J. Navarro and they are

7     being assisted by paralegal specialist Bridget Donovan of the

8     U.S. Attorney's Office and Special Agent Julian Herr, from the

9     Drug Enforcement Agency, or DEA.

10          The defendant, Mustafa Goklu, is represented by

11     attorneys Murray Singer and Emilee Sahli.

12          You may be seated.

13          Does anyone recognize any of these individuals, the

14     lawyers or the defendant or the agent or the paralegal?  All

15     right.  Is there anyone who knows me, my staff, or at least

16     the staff who are here today or anyone else who works in the

17     courthouse?

18

19          (Continued on the following page.)

20

21

22

23

24

25

SN        OCR        RPR

A-102

Preliminary Instructions                                27

1    (Continuing.)

2             THE COURT:  Is anyone familiar with any of the

3    following individuals who maybe referenced or called as

4    witnesses during the trial or any of the places or entities

5    that maybe mentioned during the trial?

6             Patrick O'Kain, K-A-I-N, former DEA; Allan Liefke,

7    L-I-E-F-K-E, former DEA; Special Agent Koffidige Degbe,

8    K-O-F-F-I-D-I-G-E.  D-E-G-B-E with the DEA, Special Agent

9    Lilita Infante, L-I-L-I-T-A, Infante, with the DEA; Theodore

10   Vlahakis, V-L-A-H-A-K-I-S, Compliance Officer with FinCEN,

11   F-I-N-C-E-N; Robert Tarwacki, T-A-R-W-A-C-K-I, New York

12   Department of Financial Services.  And finally, in terms of

13   people, Forensic IT Specialist Anthony Mosher, M-O-S-H-E-R,

14   with the DEA.

15            Now, let me know if you're familiar with any of the

16   locations that I'm about to list.  46-09 Queens Boulevard,

17   Sunnyside, New York, 44-16 Queens Boulevard, Sunnyside, New

18   York, 7th Avenue and 54th Street, New York, New York.  And

19   when I say, familiar, other than passing through there.  Any

20   particular familiarity.

21            THE PROSPECTIVE JUROR:  No.

22            THE COURT:  And then, finally, 5th Avenue and 33rd

23   Street, New York, New York.

24            Anyone spend a lot of time there?

25            THE PROSPECTIVE JUROR:  No.

A-103

Preliminary Instructions                      28

1      THE COURT:  Now, let me remind you that it is the

2  Government who has the burden of proof in any criminal case to

3  establish the defendant's guilt beyond a reasonable doubt.

4  Mr. Goklu is presumed to be innocent and is not required to

5  prove that he is innocent.  He need not call witnesses and

6  need not take the stand.

7      If a defendant elects not to present any evidence,

8  the jury cannot draw any adverse inference against the

9  defendant based on that decision.  This is a basic principle

10 of our criminal justice system.

11     Would any of you have difficulty following my

12 instruction in that regard?

13     So I see no show of hands.

14     Your role, if you are selected as a juror in this

15 criminal case is to hear evidence and decide the facts.  That

16 is, to decide what happened.  I do not have any role to play

17 in your determination of the facts.  My role will be to

18 instruct you on the applicable law.  You will apply the facts

19 as you find them to the law as I instruct you and your

20 conclusion will be your verdict.  You must apply the law as I

21 state it regardless of any opinion you may have personally to

22 what the law is or what the law should be.

23     Would anyone have any difficulty following those

24 instructions?

25     THE PROSPECTIVE JUROR:  No.

SG        OCR        RPR

A-104

Preliminary Instructions                    29

1      THE COURT:  Okay.  If you're selected as a juror,

2  you will not be permitted to read or listen to any news or do

3  any internet research about this case or about the defendant

4  or anyone else mentioned in the case while serving as a juror.

5      Is there anyone who would be unable to follow that

6  instruction?

7      THE PROSPECTIVE JUROR:  No.

8      THE COURT:  The right to a jury trial is critically

9  important to both the accused and the Government.  If selected

10 as a juror for this trial, is there anyone who would either

11 favor -- either blame the Government or the defendant for

12 having to sit on a jury during the COVID pandemic?

13     THE PROSPECTIVE JUROR:  No.

14     THE COURT:  Blame the Government or the defendant

15 for having to sit through the pandemic and wear these masks?

16     It is important that jurors take their obligations

17 seriously and do not rush for a verdict for one side or the

18 other.

19     Is there anyone who would feel pressure to return a

20 verdict quickly and not fully deliberate due to the COVID

21 pandemic?

22     THE PROSPECTIVE JUROR:  No.

23     THE COURT:  Okay.  This case is a result of an

24 investigation by the Drug Enforcement Administration or DEA

25 and the United States Attorney's Office for the Eastern

SG        OCR        RPR

A-105

Preliminary Instructions                                30

1    District of New York, which is part of the United States

2    Department of Justice.

3           Does anyone have any basis, prejudice, or other

4    feelings for or against the United States Department of

5    Justice, the United States Attorney's Office, the Drug

6    Enforcement Administration or DEA, the New York City Police

7    Department or any other law enforcement agency; positive or

8    negative?

9           Juror Number 4, Ms. Durante, right?

10          THE PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Do you have feelings for or against any

12   of those entities?

13          THE PROSPECTIVE JUROR:  For.

14          THE COURT:  Okay.  Let's have a sidebar with you.

15   We're going to go over here.

16                      (Sidebar)

17          THE COURT:  So you said for.

18          THE PROSPECTIVE JUROR:  My husband is an NYPD

19   Detective.

20          THE COURT:  Where is he --

21          THE PROSPECTIVE JUROR:  He's in the 62 Squad in

22   Brooklyn.

23          THE COURT:  How long?

24          THE PROSPECTIVE JUROR:  He's been a Detective for

25   about two years now and he is six or seven years on.

SG        OCR        RPR

A-106

Preliminary Instructions                          31

1       THE COURT:  Okay.  Because of his job, you have

2   positive feelings about?

3       THE PROSPECTIVE JUROR:  The law enforcement and all

4   of that part.

5       THE COURT:  Okay.  Can you still be objective and

6   fair and impartial with respect to a criminal matter that is

7   investigated and brought by law enforcement?

8       THE PROSPECTIVE JUROR:  Yes.  Yes.

9       THE COURT:  Okay.  You hesitated a bit.

10      THE PROSPECTIVE JUROR:  Yeah.  I mean, because of

11  what he does and what I see every day, it is a little bit

12  difficult, so...

13      THE COURT:  You'll be instructed, if you are picked

14  as a juror, that you must judge the testimony of any law

15  enforcement agent the same you would as any other witness and

16  weigh the credibility just as would any other witness?

17      Could you follow that instruction?

18      THE PROSPECTIVE JUROR:  It would be difficult.

19      THE COURT:  It would be difficult for you to find

20  that a law enforcement agent wasn't testifying credibly?

21      THE PROSPECTIVE JUROR:  No.  I can understand that

22  would be.  I don't know.  I'm way towards more than what they

23  say.

24      THE COURT:  Meaning law enforcement?

25      Just stand over there on the side.

SG        OCR        RPR

A-107

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 32 of 263 PageID #: 518

Preliminary Instructions                              32

1      THE PROSPECTIVE JUROR:  I'm sorry.

2      THE COURT:  So do I have a motion?

3      MR. SINGER:  To excuse her for cause.

4      THE COURT:  Any objection?

5      MR. NAVARRO:  No objection.

6               (Sidebar ended)

7      THE COURT:  So we are going to have you go back to

8  the jury department and tell them that you are excused from

9  this case, but there could be another trial that you could sit

10  for.

11      Thank you.

12      Replacing Juror Number 4.

13      THE COURTROOM DEPUTY:  Juror 33, Simiao Chen.

14      THE COURT:  Okay.  So Ms. Chen, if you could

15  approach the jury box.

16      Did you have any positive responses?

17      THE PROSPECTIVE JUROR:  No.

18      THE COURT:  No.  Okay.  Come forward.

19      Juror Number 5, you had your hand up.  Hold on.

20  Let's wait until Juror Number 4 gets in place.

21      Okay.  So Juror Number 5, do you have any feelings

22  about any of those law enforcement entities or any law

23  enforcement agency?

24      THE PROSPECTIVE JUROR:  I do.

25      THE COURT:  Okay.  Positive, negative?

SG        OCR        RPR

A-108

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 33 of 263 PageID #: 519

Preliminary Instructions                    33

1      THE PROSPECTIVE JUROR:  Positive.

2      THE COURT:  All right.  Why don't we have you come

3  to the sidebar as well.

4                      (Sidebar)

5      THE COURT:  So tell me, Mr. Okane.

6      THE PROSPECTIVE JUROR:  Yes.  My son is a police

7  officer.  So I'm bias in favor of --

8      THE COURT:  Now, could you be objective though about

9  the testimony of law enforcement officers and weigh them just

10  like you would any other witness?

11      THE PROSPECTIVE JUROR:  I think honestly I'd lean

12  towards law enforcement.

13      THE COURT:  What's your --

14      THE PROSPECTIVE JUROR:  Depending on how it is

15  presented.  But I want to bring another thing to your

16  attention if I could.

17      THE COURT:  Go ahead.

18      THE PROSPECTIVE JUROR:  I take care of my mother

19  every day, an elderly mother.  A block away from my house, to

20  make sure she takes her pills, put her patch on the arm after

21  she takes a bath, because, you know, dementia.  I just wanted

22  to bring that up.

23      THE COURT:  Do you work normally?

24      THE PROSPECTIVE JUROR:  I work from home.  I'm a

25  project manager.  I work from home.

SG        OCR        RPR

A-109

Preliminary Instructions                    34

1          THE COURT:  Who's taking care of your mother now?

2          THE PROSPECTIVE JUROR:  My sister, but it would be

3   difficult on a daily basis.

4          THE COURT:  So let's go back to your son.

5          How long has he been with the NYPD?

6          THE PROSPECTIVE JUROR:  He was with the correction

7   officer about two years and with NYPD going about four or

8   five.

9          THE COURT:  And going back, again, do you think you

10  cannot be fair and impartial with respect to this case simply

11  because it's brought by law enforcement?

12         THE PROSPECTIVE JUROR:  I don't know.  I think the

13  matter depends on the evidence.

14         THE COURT:  It would depend on the evidence,

15  correct.

16         THE PROSPECTIVE JUROR:  I guess you could say that.

17         THE COURT:  Okay.  If you were told you have to

18  consider all the evidence, weigh it objectively.

19         Could you do that?

20         THE PROSPECTIVE JUROR:  I don't know.  Again, I

21  really don't know.

22         THE COURT:  If law enforcement officers were

23  testifying, do you think you would go into believing them

24  automatically?

25         THE PROSPECTIVE JUROR:  I don't know.

SG        OCR        RPR

A-110

Preliminary Instructions                          35

1      THE COURT:  Do you think --

2      THE PROSPECTIVE JUROR:  I think it comes down to,

3  you know, the way it's presented or I don't know how better to

4  answer that.

5      THE COURT:  Okay.  So when you say the way it's

6  presented, you would look at their testimony and decide if you

7  believed it or not depending on their demeanor and all the

8  other evidence.?

9      THE PROSPECTIVE JUROR:  Sure.

10      THE COURT:  You could do that?

11      THE PROSPECTIVE JUROR:  I guess I could do that.

12      THE COURT:  All right.  With respect to your mother,

13  do you have to be there all day or just in the morning to help

14  her?

15      THE PROSPECTIVE JUROR:  I have to be there between

16  10:00 and 11:00.

17      THE COURT:  Okay.  And do you think your sister

18  could handle that for this week, except for no Monday, and

19  possibly next Tuesday?

20      THE PROSPECTIVE JUROR:  I would have to check.  I

21  don't know.

22      THE COURT:  Can I have you stand over there for one

23  second.

24      THE PROSPECTIVE JUROR:  Sure.

25      THE COURT:  Any motions?

SG        OCR        RPR

A-111

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 36 of 263 PageID #: 522

Preliminary Instructions                    36

1      MR. SINGER:  I would like to excuse him for cause.

2      MR. NAVARRO:  Your Honor, I think that it's very

3  clear that he does not want to serve for multiple reasons.

4  I'm not sure how much credence the Government places in the

5  answers about law enforcement, but under the circumstances, we

6  are early in the process.  We would not impose the motion.

7      THE COURT:  I'm going to let him go.  He didn't

8  really want to be here.  On the other hand, he did suggest,

9  although somewhat equivocally, he could be fair despite his

10  son being with law enforcement.  I'm going to let him go.

11                      (Sidebar ends)

12      THE COURT:  I'm sorry.  We'll let you go back to the

13  jury department as well.  Let them know that you are excused

14  for this trial, but there could be another one you can sit on

15  instead.  So go back to the same office where you came from.

16      THE PROSPECTIVE JUROR:  Thank you.

17      THE COURT:  Thank you very much.

18      Yeah.  Let's go ahead and call the next one.

19      THE COURTROOM DEPUTY:  Juror Number 34, Patrick

20  Corbet.

21      THE COURT:  So Mr. Corbet, as you approach the box,

22  did you have any positive responses?

23      THE PROSPECTIVE JUROR:  No.

24      THE COURT:  All right.  Please have a seat.

25      And Ladies and Gentlemen, it was pointed out to me

SG        OCR        RPR

A-112

```
                      Preliminary Instructions                    37
```

 1   that when the defendant rose in response to my identification

 2   of all the parties, he didn't remove his mask.  I think that

 3   would be helpful to the jury to make sure that no one knows

 4   him.

 5           So Mr. Goklu, if you will stand again and just

 6   remove your mask this time.  Okay.  So that's the defendant,

 7   Mr. Goklu.

 8           All right.  Thank you very much.  I appreciate that.

 9   He was following my instructions very strictly about the mask.

10   So now that he has been unmasked, so to speak or you could see

11   his full face, is there anyone who recognizes Mr. Goklu --

12           THE PROSPECTIVE JUROR:  No.

13           THE COURT:  Or believes that they know him?

14           PROSPECTIVE JURORS: No.

15           THE COURT:  Okay.  No.

16           Any other positive or negative responses?

17           THE PROSPECTIVE JUROR:  Positive.

18           THE COURT:  Yes.  Why don't we have you come over to

19   the sidebar as well.

20                          (Sidebar)

21           THE COURT:  Yes.  Why do you have positive --

22           THE PROSPECTIVE JUROR:  I'm positive towards law

23   enforcement.  I have multiple, five or six, family members

24   that are police officers right now and one retired FBI agent.

25   So when you said can you be fair, I don't think I can be fair.

```
        SG        OCR        RPR
```

A-113

Preliminary Instructions                    38

1  I'm always going to side with the law enforcement.

2          THE COURT:  Even if you have to view the testimony

3  of a law enforcement agent or officer just like you would any

4  other witness, you don't think you could do that?

5          THE PROSPECTIVE JUROR:  I don't think I could be

6  that fair, no.

7          THE COURT:  You don't think you could look at it

8  objective?

9          THE PROSPECTIVE JUROR:  I don't think I would be

10  objective.  Not speaking every day with my cousins who are

11  police officer and hearing the stories that they tell.  I

12  just --

13          THE COURT:  Okay.  Thank you.

14          We're going to send you back to the jury department.

15          MR. SINGER:  Yes.  I would move to excuse him for

16  cause.

17          And Judge, you didn't introduce or identify the

18  interpreter.  So I don't know if that was intentional or not.

19          THE COURT:  Do you think that matters?

20          MR. SINGER:  So the jury knows who these other

21  people are sitting at the table.

22          THE COURT:  Fair enough.  I could that.

23          MR. SINGER:  Okay.  Thank you.

24                  (Sidebar ends)

25          THE COURT:  That was Juror Number 7, Mr. Discala.

SG        OCR        RPR

A-114

Preliminary Instructions                    39

1      THE COURTROOM DEPUTY:  Juror 35, Zhen Chen.

2      THE COURT:  So wait a second.  There are two Chens

3  in the jury and then there's me.  This never happened to me

4  before and we are not related just in case anyone is

5  wondering.

6      So folks, there are two other individuals that I

7  failed to identify sitting at the defense table and they are

8  interpreters in the Turkish language.  We have Interpreter

9  Sirtalan.

10     And then, I don't have your name, sir.

11     THE INTERPRETER:  George Esayan.

12     THE COURT:  So they are interpreters who are here

13  interpreting.  Okay.  Have a seat.

14     Dos anyone think they know either of them?

15     THE PROSPECTIVE JUROR:  No.

16     THE COURT:  Okay.  Thank you very much.

17     All right.  Any other positive responses to the

18  questions about feelings about law enforcement?

19     Okay.  So Juror Number -- what number are you, 28?

20     THE PROSPECTIVE JUROR:  28.

21     THE COURT:  Juror Number 28, Mr. Chu.

22     THE PROSPECTIVE JUROR:  Yes.

23     THE COURT:  What feelings do you have?

24     THE PROSPECTIVE JUROR:  Positive.

25     THE COURT:  All right.  Do you want to come up here?

SG        OCR        RPR

A-115

Preliminary Instructions                    40

1        THE PROSPECTIVE JUROR:  Sure.

2                    (Sidebar)

3        THE COURT:  Why do you have positive views?

4        THE PROSPECTIVE JUROR:  Well, a very good friend of

5   mine is a NYPD officer or actually a captain that focuses on

6   financial crimes.

7        THE COURT:  And how long has he been there?

8        THE PROSPECTIVE JUROR:  I think almost 20 years --

9   18 or so.

10       THE COURT:  Okay.

11       THE PROSPECTIVE JUROR:  We've been friends since six

12  growing up.

13       THE COURT:  So this case is brought primarily by the

14  DEA.

15       THE PROSPECTIVE JUROR:  Okay.

16       THE COURT:  Does that -- do you think that you can

17  be fair and impartial in this case even though you have a

18  friend that works in law enforcement?

19       THE PROSPECTIVE JUROR:  I think so.  I don't know.

20  I just want to bring it out there.

21       THE COURT:  No.  I appreciate that.

22       So you are going to be instructed that if law

23  enforcement officers testify that you have to view their

24  evidence just like any other witness and judge their

25  credibility the same you would any other witness.

SG        OCR        RPR

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 41 of 263 PageID #: 527

Preliminary Instructions                          41

1          Can you do that?

2          THE PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Okay.  Can you -- even though your

4   friend's a law enforcement officer, could you find that a law

5   enforcement officer might not be telling the truth.

6          Do you think you can find that?

7          THE PROSPECTIVE JUROR:  I think so.  Yeah.

8          THE COURT:  You're hesitating a little.  Tell me.

9          THE PROSPECTIVE JUROR:  A little bit.  So there's

10  some other ties to law enforcement that I think are positive.

11  I'm just positive.  I'm not sure how deep they run.  That is

12  what we are instructed to do.

13         THE COURT:  Right.

14         THE PROSPECTIVE JUROR:  My sister-in-law, my wife's

15  sister was a victim of a homicide.  And so, she was working

16  for the NYPD at the time as well in the coroner's office, but

17  you know, the NYPD basically, you know, took over our lives

18  for a couple of weeks.

19         THE COURT:  In a positive --

20         THE PROSPECTIVE JUROR:  In a positive way.  Helping

21  her and the family.  So I just have very, I think, strong

22  ties.  I'm not clear how deep they may run.

23         THE COURT:  I understand.

24         THE PROSPECTIVE JUROR:  But --

25         THE COURT:  Does it make a difference its NYPD

SG        OCR        RPR

A-117

Preliminary Instructions                    42

1    versus a federal agency in terms of your ability to be

2    objective in this case?

3              THE PROSPECTIVE JUROR:  That, I'm not sure.  I

4    wasn't, you know -- I think they're in many respects I view

5    them performing the same tasks.

6              THE COURT:  So you view them as interchangeable?

7              THE PROSPECTIVE JUROR:  I understand that there are

8    differences, but in many ways in terms of, you know, their

9    members and their family.

10             THE COURT:  All right.  Let me have you just take

11   one second and stand over by that wall.

12             THE PROSPECTIVE JUROR:  Sure.

13             THE COURT:  First of all, any other follow-up you

14   want me to ask him?

15             It's a rare unusual set of circumstances.

16             MR. SINGER:  If he said his friend, who is the

17   captain works in financial crimes, whether there is any

18   discussions?

19             THE COURT:  Fair enough.

20             MS. KASSNER:  I think the real and important

21   question is, would he be able to set aside everything and view

22   the law enforcement agents testimony and evaluate it one way

23   or the other based on if the person --

24             THE COURT:  Sir, if you can come back.

25             THE PROSPECTIVE JUROR:  Sure.

SG        OCR        RPR

A-118

Case 1:19-cr-00386-PKC     Document 78     Filed 12/01/22     Page 43 of 263 PageID #: 529

Preliminary Instructions                    43

```
1          THE COURT:  Mr. Chu.

2          THE PROSPECTIVE JUROR:  Sure.

3          THE COURT:  You mentioned that you have a close

4   friend that does financial crimes, right?

5          THE PROSPECTIVE JUROR:  Yes.

6          THE COURT:  What exactly does he do?

7          THE PROSPECTIVE JUROR:  He's a captain of a unit

8   that works in Queens that works across the city and I think a

9   lot of it is fraud.

10          THE COURT:  Do you talk to him about his work?

11          THE PROSPECTIVE JUROR:  Not in any great details.

12   Any articles and things he might be in the paper, so only

13   those.

14          THE COURT:  Do you remember which ones you read and

15   don't worry if you don't because I won't tell him?

16          THE PROSPECTIVE JUROR:  No.

17          Most of them are pictures of him on the scene, not

18   necessarily -- I think there was a Wells Fargo ATM thing

19   something like that.

20          THE COURT:  Do you feel that you acquired any

21   knowledge about fraud or the kinds of crimes he investigated

22   based on your conversations with him?

23          THE PROSPECTIVE JUROR:  No.

24          THE COURT:  Do you think you can be fair and

25   impartial in this case and put aside feelings that you have
```

SG          OCR          RPR

A-119

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 44 of 263 PageID #: 530

Preliminary Instructions                    44

1   about law enforcement, which are largely positive --

2           THE PROSPECTIVE JUROR:  Yeah.

3           THE COURT:  -- in weighing objectively the evidence

4   in this case and whether you find as a juror it proves the

5   defendant's guilt or not beyond a reasonable doubt?

6           THE PROSPECTIVE JUROR:  Yeah.  I think I can try

7   that yeah.

8           THE COURT:  Okay.  Do you feel pretty confident that

9   you can do that?

10          THE PROSPECTIVE JUROR:  I think I could.  I'm not a

11  terribly confident individual generally.

12          THE COURT:  Okay.  Maybe that was the wrong --

13          THE PROSPECTIVE JUROR:  Yeah.  Yeah.  You know --

14          THE COURT:  But you are going to hear testimony from

15  law enforcement agents who get up there to swear to tell the

16  truth.

17          Do you feel like you can be objective and fair and

18  impartial about their testimony?

19          THE PROSPECTIVE JUROR:  Sure.

20          THE COURT:  These individuals, agents or officers,

21  you can do that?

22          THE PROSPECTIVE JUROR:  I think so.

23          THE COURT:  Thank you very much.

24          Have a seat.

25          Okay.  Any motion?

SG        OCR        RPR

A-120

```
                    Preliminary Instructions                45
```

1          MR. SINGER:  No.

2          MS. KASSNER:  No.

3          THE COURT:  Okay.  Thank you.

4                    (Sidebar ends)

5          THE COURT:  I think Juror Number 30, you also had a

6    positive response.

7          THE PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Why don't I have you come up here.

9                    (Sidebar)

10          THE PROSPECTIVE JUROR:  I work for New York City

11    Parks.  So most of my friends and people who I work with are

12    Parks Police on a daily basis.  My co-worker is a Sergeant.

13    She got injured on the job.  So right now she's doing a desk

14    job.  I interact with her.

15          THE COURT:  Slow down a little bit.

16          THE PROSPECTIVE JUROR:  I interact with her a lot.

17          THE COURT:  You interact with her a lot?

18          THE PROSPECTIVE JUROR:  Every day.

19          THE COURT:  All right.

20          THE PROSPECTIVE JUROR:  And I just generally have

21    positive outlook towards police.  They do a lot of like

22    troublesome stuff and I feel for them.

23          THE COURT:  Okay.  So despite your positive feelings

24    about the Park Police and the people you work with, could you

25    be fair and objective in this case, which is obviously brought

SG        OCR        RPR

A-121

Preliminary Instructions                    46

1   by law enforcement officers?

2           THE PROSPECTIVE JUROR:  Well, I don't know honestly.

3   But I do remember stuff about like when Bernie Madoff scandals

4   and stuff like that.  I had a friend that was affected by

5   that, so I don't really know --

6           THE COURT:  Right.

7           But remember as a juror, you'd be asked to consider

8   just the evidence that's presented during that trial and the

9   testimony you hear, some of it from law enforcement, and

10  decide whether or not you think the Government has proved its

11  case beyond a reasonable doubt.

12          Do you think you can do that?

13          THE PROSPECTIVE JUROR:  I'm not sure.

14          THE COURT:  Why do you say that?

15          THE PROSPECTIVE JUROR:  Because I feel like my

16  judgment might be affected by my life experiences.  My

17  interactions are mostly with law enforcement.  Interactions

18  with my friends that were affected by matters related to

19  money.

20          THE COURT:  So --

21          THE PROSPECTIVE JUROR:  And I feel injustice about

22  that.  But I guess I will try my best, like I said.

23          THE COURT:  Okay.  You're certainly willing to try

24  you're best, right?

25          THE PROSPECTIVE JUROR:  Yes.

A-122

Preliminary Instructions                                    47

1     THE COURT:  So there will be law enforcement

2 witnesses who take the stand and you are going to be told that

3 you have to view their testimony just like you would any other

4 witness and weigh its credibility like you would any other

5 witness.

6          Can you do that?  And put out of your mind any

7 positive feelings you have had about law enforcement in

8 general?

9     THE PROSPECTIVE JUROR:  I mean, I don't know

10 anything about this case, so I guess, like --

11     THE COURT:  Okay.  And that's something you think

12 you can do?

13     THE PROSPECTIVE JUROR:  Possibly.

14     THE COURT:  And can you view their testimony against

15 all the other evidence that's submitted during the trial and

16 decide whether to believe it or not?

17     THE PROSPECTIVE JUROR:  If it's presented in a

18 neutral manner.  Okay.

19     THE COURT:  And can you put aside any feelings that

20 you might have about your friends who lost money and just

21 decide the facts in this case based on the evidence presented

22 to you?

23     THE PROSPECTIVE JUROR:  Well --

24     THE COURT:  This is obviously not a Madoff scheme,

25 right?

SG        OCR        RPR

A-123

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 48 of 263 PageID #: 534

Preliminary Instructions                                48

1          THE PROSPECTIVE JUROR:  Okay.

2          THE COURT:  So can you put that out of your mind?

3          THE PROSPECTIVE JUROR:  I believe so.

4          THE COURT:  Okay.  Do you feel confident about that?

5          THE PROSPECTIVE JUROR:  Like I said, I'll try my

6     best.

7          THE COURT:  All right.  Take a moment back there.

8          MR. SINGER:  I would move to dismiss him for cause.

9          MR. NAVARRO:  Your Honor, what is the grounds for

10    the cause?

11         MR. SINGER:  I don't believe that the Court has been

12    given an unequivocal assurance that this witness would not be

13    affected by his personal beliefs coming in.

14         THE COURT:  Okay.  I'm not going to strike him for

15    cause.  I'm going to let him sit.

16         Just for the record, he said he would try his best

17    and seems sincere about that.  And honestly, I'm a little

18    concerned more about not serving and not.  That's why I don't

19    want to strike him.  I think he can be objective at the end of

20    the day.  And this case is nothing like a Madoff scam, so I

21    don't think that's even going to raise any issues to the

22    extent that he generally feels aggrieved for them.  Okay.

23    Have a seat Mr. Chu.

24                        (Sidebar ends)

25         THE COURT:  Okay.  All right.  Next question, have

SG        OCR        RPR

Preliminary Instructions                              49

1  you, a family member, or anyone close to you ever been the
2  victim of a crime?
3          And just remember, of course you have the private
4  option.  Victim of a crime.  Okay.  So Juror Number -- first
5  Juror Number 8, do you want answer this in open court?
6          THE PROSPECTIVE JUROR:  I don't mind.
7          THE COURT:  Okay.  So let's give you the microphone.
8  My only requirement is no singing unless you're really good,
9  then you can sing.
10          Yes.  Hold it close to your mask.  There we go.
11          Okay.  So tell me what happened.
12          THE PROSPECTIVE JUROR:  I was shot.
13          THE COURT:  You were shot and what?
14          THE PROSPECTIVE JUROR:  Two summers in a row.  Two
15  incidents where I was shot.
16          THE COURT:  You were shot on two separate occasions?
17          THE PROSPECTIVE JUROR:  Yes.
18          THE COURT:  Oh, my.  Okay.  When was the first time?
19          THE PROSPECTIVE JUROR:  The Summer of '94.
20          THE COURT:  Okay.  And where did that happen?
21          THE PROSPECTIVE JUROR:  That was at White Castle on
22  Berriman and Atlantic in Brooklyn.
23          THE COURT:  What was the first street?
24          THE PROSPECTIVE JUROR:  Berriman.
25          THE COURT:  Berriman and Atlantic.  So here in

SG        OCR        RPR

A-125

Preliminary Instructions                               50

1    Brooklyn.

2              THE PROSPECTIVE JUROR:  Yes.

3              THE COURT:  Okay.  And the second time?

4              THE PROSPECTIVE JUROR:  The second time was on

5    South Oxford Street off of Atlantic.

6              THE COURT:  Okay.  And as a result of you being

7    shot, was there any law enforcement response?

8              THE PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Okay.

10             THE PROSPECTIVE JUROR:  Both times.

11             THE COURT:  And was it the NYPD that responded?

12             THE PROSPECTIVE JUROR:  Correct.

13             THE COURT:  Okay.  And how did you feel about the

14   response?

15             THE PROSPECTIVE JUROR:  I mean, they were doing

16   their job.  So I mean, there wasn't much they could do for me

17   at the time but to help me get to the hospital.

18             THE COURT:  And was there any prosecution that

19   resulted?

20             THE PROSPECTIVE JUROR:  No.

21             THE COURT:  Now, do you have any feelings positive

22   or negative from that in terms of how law enforcement

23   responded?

24             THE PROSPECTIVE JUROR:  Not at all.

25             THE COURT:  All right. And then, the second time.

SG      OCR      RPR

A-126

Preliminary Instructions                    51

1   And I'm sorry there was a second time.

2           What happened that time?  Was there a response?

3           THE PROSPECTIVE JUROR:  What do you mean?  As far as

4   the police coming to the scene?

5           THE COURT:  Yes.

6           THE PROSPECTIVE JUROR:  Yes, they responded.

7           THE COURT:  Okay.  And that time, was there a

8   prosecution that resulted?

9           THE PROSPECTIVE JUROR:  No.

10          THE COURT:  And again, did you feel negatively or

11  positively about how law enforcement responded?

12          THE PROSPECTIVE JUROR:  No.

13          THE COURT:  So you are neither satisfied or

14  dissatisfied?

15          THE PROSPECTIVE JUROR:  Yeah.  I'm just neutral.

16          THE COURT:  Okay.  All right.  I'm glad you seemed

17  to have recovered.

18          THE PROSPECTIVE JUROR:  Yeah.  I'm back.

19          THE COURT:  Okay.  All right.  Anything else?  I'm

20  afraid to ask.

21          THE PROSPECTIVE JUROR:  No, that's it.

22          THE COURT:  That certainly seems enough.

23          Thank you very much.

24          THE PROSPECTIVE JUROR:  Thank you.

25          THE COURT:  All right.  We had some hands back

SG        OCR        RPR

A-127

Preliminary Instructions                            52

1   there, so we will grab the microphone.  We only use the

2   microphone, folks, because it is difficult to hear in a room

3   this big with masks on especially.  So I think it was in the

4   last row.

5           THE COURTROOM DEPUTY:  21.

6           THE COURT:  Okay.

7           THE PROSPECTIVE JUROR:  I'm sorry.  Can you please

8   repeat the question?

9           THE COURT:  Yes.

10          Have you, a family member, or someone close to you

11  been a victim of a crime?

12          And you're Juror Number 21.

13          THE COURTROOM DEPUTY:  Yes.

14          THE PROSPECTIVE JUROR:  My mother's apartment was

15  robbed.

16          THE COURT:  And when did that happen?

17          THE PROSPECTIVE JUROR:  Probably like ten years ago.

18          THE COURT:  And where in the city or somewhere else?

19          THE PROSPECTIVE JUROR:  In Brooklyn.  She lives in

20  Brooklyn.

21          THE COURT:  Okay.  And do you know if there was any

22  law enforcement response?

23          THE PROSPECTIVE JUROR:  Yes.  She did file a report.

24  A lot of missing jewelry, but nothing was recovered.

25          THE COURT:  And no prosecution?

SG        OCR        RPR

A-128

Preliminary Instructions                          53

1     THE PROSPECTIVE JUROR:  No prosecution.

2     THE COURT:  Do have any feelings about the law

3  enforcement response in anyway?

4     THE PROSPECTIVE JUROR:  Honestly, no.  I was just

5  upset that nothing ever got solved.  And to this day, she

6  feels it was a third floor tenant that robbed her, but they no

7  longer live there.  They were evicted, but they could never

8  prove anything.

9     THE COURT:  Okay.  Is there anything about your

10 mother's experience that would make it difficult for you to be

11 fair and impartial in this case, which obviously involves a

12 fair amount of law enforcement work presence?

13    THE PROSPECTIVE JUROR:  I'm honestly not sure.  This

14 is my first time dealing with something like that.  I

15 honestly, I'm not sure.

16    THE COURT:  Let's have you come up to the sidebar.

17 And if you will hand the microphone to your next door neighbor

18 there, that would be great.

19              (Sidebar)

20    THE COURT:  So you expressed some reservations.  How

21 come?

22    THE PROSPECTIVE JUROR:  I guess, it's just the way I

23 was brought up.  I'm very negative and I just -- I feel like

24 more could have been done for my mother and it wasn't.

25    THE COURT:  Okay.

SG          OCR          RPR

A-129

Preliminary Instructions                              54

1          THE PROSPECTIVE JUROR:  I have nothing more to say

2     on it.

3          THE COURT:  Okay.  But as a result of this, do you

4     have sort of more global or bigger impression either positive

5     or negative about law enforcement?

6          THE PROSPECTIVE JUROR:  I feel law enforcement -- I

7     feel like everyone -- there's going to have good people and

8     bad people.

9          THE COURT:  Okay.

10         THE PROSPECTIVE JUROR:  No matter, there's always

11    going to be people in the system not doing the right thing and

12    you just don't know.

13         THE COURT:  Okay.

14         THE PROSPECTIVE JUROR:  It's -- I'm not very

15    trusting. I don't like to trust people.

16         THE COURT:  Understood.

17         THE PROSPECTIVE JUROR:  That's all.

18         THE COURT:  But does that apply to people whether

19    they're law enforcement or regular people?

20         THE PROSPECTIVE JUROR:  Everybody.

21         THE COURT:  So you are a little skeptical of

22    everyone?

23         THE PROSPECTIVE JUROR:  Yeah, I am.

24         THE COURT:  You're going to be instructed that if

25    there is a law enforcement witness, you have to judge that

SG        OCR        RPR

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 55 of 263 PageID #: 541

Preliminary Instructions                    55

1  person's credibility just like you would any other person.

2           Do you think you can do that?

3           THE PROSPECTIVE JUROR:  I can try.

4           THE COURT:  But importantly, would you go into this

5  assuming that somehow the law enforcement didn't do the right

6  thing or isn't telling you the truth?

7           THE PROSPECTIVE JUROR:  It's always that

8  possibility.  Yeah.  I always have that little inkling, you

9  know.  Just it's not always 100 percent.

10          THE COURT:  Will you feel that way about any witness

11  whether it's a civilian or law enforcement person?

12          THE PROSPECTIVE JUROR:  Yeah, I would.

13          THE COURT:  So you go in sort of skeptical to begin

14  with?

15          THE PROSPECTIVE JUROR:  I do.

16          THE COURT:  In that regard, you treat law

17  enforcement just like other people?

18          THE PROSPECTIVE JUROR:  I do.

19          THE COURT:  Sort of until they earn your trust?

20          THE PROSPECTIVE JUROR:  Yes.

21          THE COURT:  You're skeptical.

22          THE PROSPECTIVE JUROR:  Yes.

23          THE COURT:  But again, do you think you can be fair

24  and impartial, at least, as to all the people?

25          THE PROSPECTIVE JUROR:  I can try my best.

A-131

Preliminary Instructions                                 56

1      THE COURT:  And can you weigh their testimony
2  against all the other evidence?
3      THE PROSPECTIVE JUROR:  I can try.  If it's given in
4  a good positive way that I can agree with it, yes.
5      THE COURT:  All right.  Can you take a step right
6  over there for one moment.
7      Okay.  Folks, I'm not inclined to strike her.  She
8  has a lot of skepticism about people.
9      MR. SINGER:  I'm not making a motion.
10      MS. KASSNER:  No motion, Your Honor.
11      THE COURT:  Have a seat.
12                    (Sidebar ends)
13      THE COURT:  Thank you very much.  Thank you very
14  much, Juror Number 21.  We have another hand there in the
15  back.  Thank you so much, Juror Number 20.
16      You're Juror Number 26.  Okay.
17      Ms. Chen.  Yes.  Just turn it on.
18      THE PROSPECTIVE JUROR:  Can I just approach?
19      THE COURT:  Yes, you may approach.
20                      (Sidebar)
21      THE COURT:  If you will stand with your back to this
22  wall.
23      THE PROSPECTIVE JUROR:  Yep.
24      THE COURT:  Tell us what happened.
25      THE PROSPECTIVE JUROR:  About a month ago my

SG        OCR        RPR

A-132

Preliminary Instructions                          57

1   significant other was attacked in a hate crime and punched in

2   the face and his teeth were basically displaced.  And it's

3   been very frustrating because, like, this for the past month

4   we haven't had any progress on the case and it happened just a

5   block from our apartment.  Every time we leave the apartment,

6   it's been really scary.  With the recent bail laws that the

7   attacker has just been released even though there has been two

8   previous incidents.

9              THE COURT:  I'm so sorry.

10             THE PROSPECTIVE JUROR:  So it's been kind of

11  frustrating dealing with it.

12             THE COURT:  As a result of what happened to your

13  significant other, do you have feelings about law enforcement

14  in general or in particular towards the NYPD?

15             THE PROSPECTIVE JUROR:  Yeah.  I would think very

16  negative reaction to this because I felt very frustrated and

17  mismanaged.

18             THE COURT:  Okay.

19             THE PROSPECTIVE JUROR:  Just like talking with other

20  people who have been part of this, all of their interactions

21  have been very negative and just really have not like had much

22  support there.

23             THE COURT:  Do you feel like -- and I know it's a

24  very recent terrible event, do you feel like you can put aside

25  what happened to your partner and the response from law

SG        OCR        RPR

A-133

Preliminary Instructions                          58

1   enforcement in judging this case objectively?

2          THE PROSPECTIVE JUROR:  I'm not too sure about that.

3          THE COURT:  Okay.  Well, though there will be law

4   enforcement officers or agents testifying, do you think you

5   could view their testimony just like you would any other

6   witness and not either assume that they are not telling the

7   truth or assuming they are telling the truth?

8          THE PROSPECTIVE JUROR:  I don't think so.

9          THE COURT:  Why do you say this?  And I mean just

10  explain a little bit.

11         THE PROSPECTIVE JUROR:  It's because in the past

12  month I had to talk to numerous law enforcement officials and

13  its just been -- just not a positive experience where they

14  were very dismissive and not cooperative.

15         THE COURT:  Okay.  All right.  I'm going to excuse

16  you and I'm very sorry about your partner's situation.

17         Thanks.

18         THE PROSPECTIVE JUROR:  Thank you.

19         THE COURT:  Go back to the jury room and tell them

20  that you can't sit for this.

21         THE PROSPECTIVE JUROR:  Thank you.

22         THE COURT:  Folks, I didn't bother to solicit.  I

23  think it's just a recent and traumatic experience and she

24  clearly had an emotional response.  I don't think she could be

25  fair given her negative feelings about law enforcement.

SG        OCR        RPR

A-134

Preliminary Instructions                              59

1      MR. NAVARRO:  I just want to put on the record that

2  I spoke with Mr. Singer.  He is waiving his client's

3  appearance.

4      THE COURT:  The defendant doesn't have a right to be

5  at sidebar, but I appreciate that.

6      MR. SINGER:  And it would be for him to waive.  I

7  have not discussed it with him, but yes.

8      THE COURT:  Okay.  All right.  So the defendant has

9  waived his --

10     MR. SINGER:  I've not discussed it with him.  As I

11  understand it.  As the Court has indicated, he doesn't have a

12  legal right to be here, so there is nothing to worry.

13     THE COURT:  Okay.  Thank you.

14                  (Sidebar ends)

15     Do we have anyone else?

16     Okay.  Do we have anyone else that had a positive

17  response?

18     First we have to call someone else to replace Juror

19  Number 20.  What was she?

20     MR. SINGER:  Twenty-six.

21     THE COURT:  Yes.  Thank you, Ms. Chen.

22     So let's first replace Ms. Chen.

23     MR. SINGER:  Judge, this juror would be new number

24  26?

25     THE COURT:  Correct.

SG       OCR       RPR

A-135

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 60 of 263 PageID #: 546



Preliminary Instructions                                    60

1          (Continued on the following page.)

SG        OCR        RPR

A-136

```
                          Jury Selection                      61

1    (Continuing.)

2            THE COURT:  Ms. Gordon, as you take your seat, do

3    you have any positive responses?

4            PROSPECTIVE JUROR:  No.

5            THE COURT:  So nothing, all right.

6            Now raise your hand again, juror number 17,

7    Ms. Yepez, do you want to answer in private?

8            PROSPECTIVE JUROR:  No, it's okay, I even forgot

9    about it.  Twenty-six years ago my family was robbed in our

10   bakery.

11           THE COURT:  At gun point?

12           PROSPECTIVE JUROR:  Yes.

13           THE COURT:  Where was that located?

14           PROSPECTIVE JUROR:  In the Bronx.

15           THE COURT:  Was there any law enforcement response?

16           PROSPECTIVE JUROR:  Yes.

17           THE COURT:  Was there any prosecution that resulted?

18           PROSPECTIVE JUROR:  No, I don't think so.

19           THE COURT:  Do you have any feelings positive or

20   negative about that interaction with law enforcement.

21           PROSPECTIVE JUROR:  No, I kind of forgot about it.

22           THE COURT:  Would that experience make it difficult

23   for you to be fair and impartial in this case?

24           PROSPECTIVE JUROR:  No, I don't think so.

25           THE COURT:  Thank you very much, Ms. Yepez.
```

A-137

Jury Selection                                    62

1          Any other hand up?

2          PROSPECTIVE JUROR:  Just regarding what we spoke

3   about, do you have any follow-up?

4          THE COURT:  No, I don't.  Let's go back for a

5   minute -- I think we're fine.  I remember your response now.

6          Anybody else?  Juror number --

7          PROSPECTIVE JUROR:  Thirty-four.

8          THE COURT:  You're five, believe it or not, we

9   renumbered you.

10          PROSPECTIVE JUROR:  Again, I had forgotten it, it

11  was many years ago.  My sister was the victim of several

12  violent crimes.

13          THE COURT:  I'm sorry to hear about that.  How long

14  ago was that?

15          PROSPECTIVE JUROR:  The last about 15 years ago.

16          THE COURT:  Was that here in New York?

17          PROSPECTIVE JUROR:  No, it wasn't.

18          THE COURT:  Do you know if there was any law

19  enforcement response?

20          PROSPECTIVE JUROR:  In the one case, because I

21  called them; it was a Pennsylvania state police.

22          THE COURT:  Is there anything about that experience

23  that would make it difficult for you to be fair and impartial

24  in this case?

25          PROSPECTIVE JUROR:  Not at all, just letting you

Rivka Teich

A-138

Jury Selection                                                63

1    know out of the interest of full disclosure.

2              THE COURT:  Much appreciated.  As a result of your

3    sister's feeling, did you develop any feelings about law

4    enforcement positive or negative?

5              PROSPECTIVE JUROR:  No.

6              THE COURT:  Thank you.

7              Anyone else?

8              Have you, a family member, or anyone close to you

9    ever been a witness in a Grand Jury investigation or been

10   questioned in any manner by law enforcement agents or

11   officers?  Grand Jury witness or any questioning by law

12   enforcement.  Okay.

13             Have you, a family member, or someone close to you

14   ever been a witness or a complainant in a prosecution whether

15   federal, state, or local?  A witness or a complainant in a

16   prosecution.

17             Juror number 16, I believe Ms. Mattina; is that

18   right?

19             PROSPECTIVE JUROR:  Yes.  I was a claimant against

20   an attorney who took care of an accident claim for me, but he

21   was also real estate attorney and he embezzled client's money.

22   So I was interviewed by the Brooklyn DA's office and he was

23   successfully prosecuted.

24             THE COURT:  As a result of that, or would that

25   experience affect your ability to be fair and impartial in

A-139

| Jury Selection | 64 |

1   this case?

2          PROSPECTIVE JUROR:  No, not at all.

3          THE COURT:  Okay.  And did you develop any

4   particularly positive or negative feelings about law

5   enforcement or prosecutors as a result of that?

6          PROSPECTIVE JUROR:  No, not at all.

7          THE COURT:  Thank you very much, juror number 16.

8          Anyone else?  Witness or claimant in a criminal

9   case?  Sir, hold that thought.

10          Have you, a family member, or close friend ever been

11   employed by law enforcement?  Now those of who you previously

12   responded you don't need to respond again.

13          So juror number two -- maybe we should start in the

14   back, with juror number 25. Mr. Chesaniuk.

15          PROSPECTIVE JUROR:  I have a couple of nephews who

16   are police officers, a brother who was in corrections, deputy

17   warden for a couple of years.

18          THE COURT:  All here in New York City?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  As a result of -- or let me go back.  Do

21   you talk to them about their work?

22          PROSPECTIVE JUROR:  Oh, yes.

23          THE COURT:  The two who were NYPD, what do they do?

24          PROSPECTIVE JUROR:  One is Richmond Hill patrol, the

25   other one formerly auto theft and now I think train or

A-140

Jury Selection                                      65

1    somewhere in Queens.

2          THE COURT:  Can you be fair and impartial in this

3    case and put out of your mind anything you may have heard

4    about your relative's jobs in deciding what happened in this

5    case?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Can you be fair and impartial to law

8    enforcement witnesses if they take the stand and judge their

9    credibility just like anyone else's?

10          PROSPECTIVE JUROR:  Just like anybody else's, yes.

11          THE COURT:  And decide if they are telling the truth

12    or not telling the truth just like you would with any other

13    witnesses?

14          PROSPECTIVE JUROR:  Yep.

15          THE COURT:  You wouldn't give them more benefit of

16    the doubt because you have relatives who are in the NYPD?

17          PROSPECTIVE JUROR:  No, they wouldn't get more of a

18    benefit of a doubt, no.

19          THE COURT:  Thank you very much.

20          Any other folks in the cheap seats over there?

21    Sorry.  Let's bring the microphone up this way.

22          Juror number two, Ms. Fischer.

23          PROSPECTIVE JUROR:  My cousin and my uncle are in

24    the NYPD.  My uncle retired, but my cousin is currently

25    working for NYPD in Manhattan.

Rivka Teich

A-141

```
                          Jury Selection                        66
```

1      THE COURT:  Do you know what he does?

2      PROSPECTIVE JUROR:  Patrol, I don't know much of

3  what he does.  He doesn't talk about it, but he does work

4  there.

5      THE COURT:  Could you be fair and impartial in this

6  case?

7      PROSPECTIVE JUROR:  Yes.

8      THE COURT:  Even though it's brought by law

9  enforcement?

10      PROSPECTIVE JUROR:  Yes.

11      THE COURT:  Thank you very much.

12      Next, juror number three Ms. Dawkins.

13      PROSPECTIVE JUROR:  My current employer is

14  considered a law enforcement department.

15      THE COURT:  Who is your current employer.

16      PROSPECTIVE JUROR:  The New York City Department of

17  Investigation.

18      THE COURT:  DOI?

19      PROSPECTIVE JUROR:  Yes.

20      THE COURT:  How long have you been there?

21      PROSPECTIVE JUROR:  Six months.

22      THE COURT:  What do you do?

23      PROSPECTIVE JUROR:  Investigator.

24      THE COURT:  You do investigations yourself?

25      PROSPECTIVE JUROR:  Yes.

A-142

```
                        Jury Selection                        67
```

1          THE COURT:  Can you be fair and impartial in this

2    case even though there may will be law enforcement officer

3    testimony?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Could you judge their credibility just

6    like anybody else's?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Thank you very much, Ms. Dawkins.

9          Anyone else?

10         Have you, a family member, or a someone close to you

11   had negative experiences with law enforcement agents?  Again,

12   if you gave a previous response you don't need to respond

13   again.

14         Would any of you have difficulty in finding the

15   defendant guilty if the Government proves its case beyond a

16   reasonable doubt based solely on the testimony of law

17   enforcement officers?

18         Is there anyone who feels predisposed for any reason

19   to either believe or disbelieve a law enforcement agent's

20   testimony?  I appreciate some of these questions are now

21   redundant.

22         This case involves a law enforcement agent who

23   worked in an undercover capacity, is there anyone who has

24   strong feelings concerning the use of sting operations, as

25   they are called, or undercover agents, or who believe that law

                        Rivka Teich

A-143

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 68 of 263 PageID #: 554

Sidebar                                    68

1   enforcement should not be permitted to use undercover agents?

2   Anyone with strong feelings?

3          As I mentioned earlier, in this case the defendant

4   is charged with money laundering in connection with property

5   that was allegedly represented to the defendant as being the

6   proceeds of narcotic trafficking.  Do you any of you have any

7   strong feelings concerning with the distribution or sale of

8   illegal drugs in general?

9          Juror number 25, Mr. Chesaniuk.  Maybe we should

10  have you come up to the sidebar.

11          (Sidebar.)

12          THE COURT:  Tell me, what is your feelings?

13          PROSPECTIVE JUROR:  I have real strong feelings

14  about people who distribute, sell, and in any way support the

15  drug industry, the illegal drug industry.  I have a personal

16  friend who overdosed and died.  Relatives have gotten AIDS as

17  a result of heroin addictions.  Personally I know people,

18  addicts -- when I was growing up heroin was a big thing; I

19  personally saw people dying.

20          THE COURT:  This case isn't about drug dealing

21  directly.

22          PROSPECTIVE JUROR:  I understand.  If you are

23  supporting it in any way, you're part of the problem.

24          THE COURT:  This is just an accusation, though.  The

25  question becomes, can you fair and impartial and view the

Rivka Teich

A-144

Jury Selection                                    69

1   evidence to determine whether or not the Government has proved

2   its case beyond a reasonable doubt as to this defendant?  Can

3   you put your feelings about drugs, drug use, drug sale, drug

4   industry?

5          PROSPECTIVE JUROR:  No.  I've seen people die.

6          THE COURT:  Thank you very much.

7          PROSPECTIVE JUROR:  There is no way.

8          THE COURT:  Go back to the jury room.  Thank you

9   very much.  I'm sorry about your loss.

10          (Juror exits sidebar.)

11          THE COURT:  He was so emphatic, I don't think he

12  could be fair to the defendant in this case.

13          (In open court.)

14          THE COURTROOM DEPUTY:  Juror 37 replacing number 25,

15  Kathleen St. Jeanos.

16          THE COURT:  Did you have any positive responses to

17  anything I asked before?

18          PROSPECTIVE JUROR:  An early one, I'm not sure it's

19  a yes, but my son is interning in for a judge in the Southern

20  District of New York.

21          THE COURT:  Who is that?

22          PROSPECTIVE JUROR:  I don't know the judge's name,

23  sorry.

24          THE COURT:  I'm not going to tell your son that.

25  Have a seat.  Let me ask you, Ms. St. Jeanos, is there

A-145

```
                          Jury Selection                        70

 1   anything about the fact that your son is interning for an

 2   anonymous judge would that affect your ability to be fair and

 3   impartial in this case?

 4          PROSPECTIVE JUROR:  No, it would not.

 5          THE COURT:  Thank you very much.  Very nice for your

 6   son.

 7          Did we get everyone with respect to drug sales in

 8   general, the drug trade in general?  Okay.

 9          Is there anyone who has strong feelings concerning

10   the distribution or sale of marijuana, Adderall, or Oxycodone

11   known as Oxy, in particular?

12          Have you, a family member, or anyone close to you

13   ever been arrested or convicted of a drug crime?  Glad to hear

14   that.

15          Have you or someone close to you been affected in

16   any way by illegal drugs or the sale of illegal drugs?

17          Did you want to answer in private?

18          PROSPECTIVE JUROR:  No, that's okay.  My brother was

19   arrested and did serve time.

20          THE COURT:  It was for drug dealing?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  How long ago was that?

23          PROSPECTIVE JUROR:  Quite a bit, 20 years.

24          THE COURT:  Here in this city?

25          PROSPECTIVE JUROR:  Yes.
```

A-146

```
                        Jury Selection                      71

 1         THE COURT:  Do you remember which law enforcement

 2  agency was involved in that?

 3         PROSPECTIVE JUROR:  No, I don't.

 4         THE COURT:  Do you know much about his case?

 5         PROSPECTIVE JUROR:  No.  Actually I came to find out

 6  he was arrested after he came down with HIV, he had to notify

 7  the family member; so I didn't know he was arrested until that

 8  time.

 9         THE COURT:  Sorry to hear that.  Do you know how

10  long he was in prison for?

11         PROSPECTIVE JUROR:  I think 18 months.

12         THE COURT:  Do you have any feelings about what

13  happened to your brother and whether or not he was treated

14  fairly or not?

15         PROSPECTIVE JUROR:  I don't know the details, but I

16  don't have any feeling.  If you do something wrong, you're

17  going to get charged.

18         THE COURT:  You don't have any feelings positive or

19  negative about the law enforcement or the prosecutors who

20  handled that case?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  Do you think you can be fair and

23  impartial in this case?

24         PROSPECTIVE JUROR:  Of course.

25         THE COURT:  To the extent there might be some
```

A-147

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 72 of 263 PageID #: 558

```
                         Jury Selection                      72
```

1    suggestion about drugs being peripherally involved?

2              PROSPECTIVE JUROR:  Of course I can.

3              THE COURT:  Thank you juror, number one.

4              Anyone else who had someone close to them affected

5    by drugs?  Juror number five, Mr. Corbet.

6              PROSPECTIVE JUROR:  What I referred to earlier about

7    my sister, it was resulting from her boyfriend who was

8    cultivating and distributing marijuana.

9              THE COURT:  The violent crime you mean?

10             PROSPECTIVE JUROR:  Yes.

11             THE COURT:  Was it a robbery of some sort?

12             PROSPECTIVE JUROR:  No, he assaulted her.  I believe

13   he was convicted of cultivation.

14             THE COURT:  As a result of your sister's experience,

15   do you have any feelings that would affect your ability to be

16   fair and impartial in this case if there is some suggestion --

17             PROSPECTIVE JUROR:  Not at all.  Towards him, yes,

18   and her yes; but the situation in general, no.

19             THE COURT:  The drug trade in general.

20             PROSPECTIVE JUROR:  No.

21             THE COURT:  Or marijuana selling.

22             PROSPECTIVE JUROR:  No.

23             THE COURT:  Thank you.

24             Is there anyone who has strong feelings concerning

25   money laundering in general?

A-148

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 73 of 263 PageID #: 559

Sidebar                                          73

1          Have you, a family member, or anyone close to you

2    ever been arrested or convicted of a financial crime?

3          Is there anyone who has prior or specialized

4    knowledge of digital currency, also known as crypto currency?

5          Is there anyone who is familiar with Bitcoin or

6    other crypto currency?  When I say familiar, not if you've

7    heard of Bitcoin but have some particular knowledge about

8    Bitcoin or crypto currency?

9          Yes, Mr. Corbet.

10         PROSPECTIVE JUROR:  Small-time investor in crypto

11   currency, generally familiar with the basics of block chain

12   and so on.

13         THE COURT:  So you're actually an investor.

14         PROSPECTIVE JUROR:  No longer.

15         THE COURT:  Let's have you come to sidebar.

16         (Sidebar.)

17         THE COURT:  When did you invest in Bitcoin?

18         PROSPECTIVE JUROR:  Over the past 12 months.  It

19   wasn't Bitcoin, it was several others.  I have a few residual,

20   maybe $50 worth.

21         THE COURT:  Which one?

22         PROSPECTIVE JUROR:  ADA Coin and Cardano.  Beyond

23   that, only in the value of say $20, $30.

24         THE COURT:  Why did you invest in them?

25         PROSPECTIVE JUROR:  It was just speculation.  I was

A-149

Sidebar                                                            74

1    curious, and an easy way to learn is to participate.

2              THE COURT:  Okay.  It sounds like it was a

3    short-lived experiment, why is that?

4              PROSPECTIVE JUROR:  The market spiked and I realized

5    that I was either going to exit with a profit or I was going

6    to be in it for the long-term.

7              THE COURT:  As a result of your experience, do you

8    know a fair amount about how crypto currencies work?

9              PROSPECTIVE JUROR:  I know a fair amount about

10   markets in general, I have a degree in economics and am an

11   investor; but I have no specialized knowledge.

12             THE COURT:  As a result of your experience or

13   otherwise, do you have any feelings positive or negative about

14   crypto currency.

15             PROSPECTIVE JUROR:  I think it's a good way to lose

16   money, for the casual investor.

17             THE COURT:  You may hear testimony in this case

18   about the use of crypto currency, in particular Bitcoin -- I

19   should say use transactions involving that.  Would that affect

20   your ability to be fair and impartial in this case?

21             PROSPECTIVE JUROR:  No, not at all.

22             THE COURT:  Most importantly, you may hear testimony

23   about how Bitcoin or crypto currencies work.  Could you rely

24   just on what you hear today here in the trial about that

25   subject and put out of your mind whatever else you might know

A-150

```
                              Sidebar                          75
1   about Bitcoin, crypto currency, block chain, et cetera?
2              PROSPECTIVE JUROR:  Right.
3              THE COURT:  Can you do that?
4              PROSPECTIVE JUROR:  Yes.
5              THE COURT:  Rely solely on the evidence put before
6   you?
7              PROSPECTIVE JUROR:  Absolutely.
8              THE COURT:  Not import anything that you believe to
9   be true about any of those subjects.
10             PROSPECTIVE JUROR:  I'm not signing up for this job,
11  but I can fulfill that obligation.
12             THE COURT:  Thank you.
13             (In open court.)
14             THE COURT:  Juror number ten, go ahead.
15             PROSPECTIVE JUROR:  Same scenario as the previous
16  juror, small-time kind of investing in crypto.
17             THE COURT:  Come join us at sidebar.
18             (Sidebar.)
19             THE COURT:  Tell us what is your experience?
20             PROSPECTIVE JUROR:  I was given Bitcoin as a gift
21  from my brother-in-law for Christmas one year.  Then basically
22  I kind of started investing in a theory and some other smaller
23  ones, this is probably like five or six years ago.  Then my
24  brother-in-law's father he told me to switch to Bitcoin Cash,
25  because I trusted him, I lost a lot of money out of that.  I
```

Rivka Teich

A-151

```
                          Sidebar                      76
 1   don't hold a grudge or anything like that.
 2          THE COURT:  You do not.
 3          PROSPECTIVE JUROR:  I do not.
 4          THE COURT:  As a result of that, I have to ask you
 5   more globally, do you have negative or positive feelings about
 6   crypto currency in general?
 7          PROSPECTIVE JUROR:  I'm a little skeptical, but I
 8   look as it another option for my portfolio, put money away and
 9   not think about it.  I'm not actively trading it, just added
10   it to the list.
11          THE COURT:  You're likely to hear testimony in this
12   trial about crypto currency and about Bitcoin how it works.
13   Can you put out of your mind anything you know about all these
14   crypto currencies and just rely on the evidence that is
15   presented before you in trial about that subject?
16          PROSPECTIVE JUROR:  I think many more people know
17   more than I do, so yes.
18          THE COURT:  Even if someone is said at trial and you
19   think, I don't know if that's right, can you put that out of
20   your mind and rely on the testimony and evidence?
21          PROSPECTIVE JUROR:  To the best of my ability, yes.
22          THE COURT:  Do you have any doubt?
23          PROSPECTIVE JUROR:  I'm a little skeptical about the
24   concept of it.  Again, I don't know enough, like compared to
25   other people who are specialists, but I probably have some
```

A-152

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 77 of 263 PageID #: 563

```
                     Jury Selection                    77
```

1    scepticism about the crypto currency in general and what it is

2    based off of, from my knowledge.

3           THE COURT:  Remember, I'm going to instruct all the

4    jurors that you have to rely just on the evidence presented

5    and put everything else out of your mind.

6           PROSPECTIVE JUROR:  I can do that.

7           THE COURT:  You can do that.  Thank you, juror

8    number ten.

9           (In open court.)

10           THE COURT:  Anyone else?  I think this is already

11    covered, have you, a family member, or close friend ever

12    purchased or sold Bitcoin or any other crypto currency?

13    Obviously if you've responded before you don't need to respond

14    again.  Okay.

15           Similarly, does anyone have experience with block

16    chain technology?

17           Does anyone have any views about the existence or

18    use of crypto currency that would interfere with your ability

19    to be fair and impartial in this case, which will involve

20    Bitcoin?  And again, if you responded before you don't have to

21    respond again.

22           Is there anyone who believes that transactions

23    involving Bitcoin or other crypto currencies should not be

24    regulated in any way by the Government?  Anyone have that

25    view?

Rivka Teich

A-153

```
                          Jury Selection                        78
```

1          Have you, a family member, or close friend ever had

2    any experience or otherwise participated in foreign financial

3    transactions?  For example, sending money to or receiving

4    money from a person or business in another country?

5          Juror number 14, Ms. Nzirubusa.  What is your

6    experience?

7          PROSPECTIVE JUROR:  Just sending money to my

8    country.

9          THE COURT:  What vehicle do you use to do that.

10          PROSPECTIVE JUROR:  Ria money transfer.

11          THE COURT:  You do that from here in New York?

12          PROSPECTIVE JUROR:  Yes, New York.

13          THE COURT:  I don't know if any testimony about

14    those kinds of services will come up, but if some evidence

15    comes up about money transmission via a service like Ria,

16    could you put out of your mind anything that you know based on

17    your own experience and judge this case based on the

18    experience put before you.

19          PROSPECTIVE JUROR:  Yes, I can do that.

20          THE COURT:  Thank you very much.  Anyone else?

21          Is there anyone who has difficulty reading or

22    understanding English?  Juror number 17, I think Ms. Yepez,

23    17.

24          PROSPECTIVE JUROR:  When I read I get the letters

25    mixed up.

A-154

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 79 of 263 PageID #: 565

Jury Selection                                    79

1          THE COURT:  Like dyslexia?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  But you understand English perfectly?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Obviously, if you need more time to look

6    at written documents you'll have as much time you need to

7    address any concern you have.

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Thank you.  Let me go back for one

10   minute, Ms. Yepez.  Is it a question of needing more time

11   or --

12         PROSPECTIVE JUROR:  More time.

13         THE COURT:  Not times when you cannot simply read

14   something.

15         PROSPECTIVE JUROR:  More time.  I go really quick

16   and it gets mixed up.

17         THE COURT:  I understand that.  I have that also.

18         Is there anyone who has a physical disability or

19   problem that would make serving as a member of the jury

20   difficult or impossible?  Physical ailment or condition, other

21   than sitting on hard wooden cases?

22         This case will likely involve listening to audio

23   recordings, looking at television monitors, looking at

24   typewritten exhibits in the English language, any medical

25   issues like eyesight, hearing, or language difficulties that

A-155

```
                        Jury Selection                    80
```

1   would make it difficult for you to serve as a juror in this

2   case given that fact?  Ms. Yepez, you don't need to respond

3   again.  All right.

4           As mentioned earlier, the trial is expected to last

5   through the rest of this week and possibly until next Tuesday.

6   We won't be sitting on Wednesday because of the Jewish holiday

7   or Monday because of Columbus Day.  Is there anyone for whom

8   the length of the trial is a genuine hardship?  Juror number

9   six.

10          PROSPECTIVE JUROR:  I just got hired to a new job.

11  I start tomorrow.

12          THE COURT:  Do you they know you've been called to

13  jury service?

14          PROSPECTIVE JUROR:  No.  I just got my schedule this

15  Saturday, I couldn't tell them that I have jury duty.

16          THE COURT:  They are expecting you to show up?

17          PROSPECTIVE JUROR:  Tomorrow.

18          THE COURT:  Where is your employment?

19          PROSPECTIVE JUROR:  In Manhattan, Fifth Avenue.

20          THE COURT:  Is it a company?

21          PROSPECTIVE JUROR:  No, it's a retail store.

22          THE COURT:  They are supposed to give you time off

23  if you have jury service.

24          PROSPECTIVE JUROR:  I would have told them, but I

25  didn't know the date that I was going to come.

A-156

Sidebar                                      81

1      THE COURT:  Let me talk to the lawyers at sidebar.

2      (Sidebar.)

3      THE COURT:  I just want to solicit your views.  My

4  inclination is to let her go.  She's just starting a job.

5      MR. SINGER:  I agree.

6      THE COURT:  Normally I would say your job has to

7  excuse you -- all right, we're all in agreement?

8      MS. KASSNER:  Yes.

9      (In open court.)

10      THE COURT:  Juror number six, Ms. Osorio, I'm going

11  to let you go.  I don't want you to get in trouble on your

12  first day of work.

13      PROSPECTIVE JUROR:  Thank you.

14      THE COURT:  It would have different if you'd already

15  been there for a while.  Juror number six be replaced by --

16      THE COURTROOM DEPUTY:  Juror 38, Kenneth Kresowaty.

17      PROSPECTIVE JUROR:  Do you have a moment?

18      THE COURT:  Yes, come to sidebar.

19      (Sidebar.)

20      PROSPECTIVE JUROR:  I'm retired from New York State

21  Department of Health Office of Professional Medical Conduct.

22  I was a senior medical conductor investigator.  I did

23  interaction with DEA on a limited basis, would it be

24  inappropriate prescribing issues on one case.

25      THE COURT:  Do you believe your experience as law

A-157

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 82 of 263 PageID #: 568

Sidebar                82

1  enforcement or quasi-law enforcement as an investigator to

2  affect your ability to be fair and impartial in this case?

3          PROSPECTIVE JUROR:  I have a positive outlook.  The

4  case went forward that I presented to our committee.  It was

5  prosecuted by the DEA.  It was a positive experience.

6          THE COURT:  It was a positive experience with the

7  DEA.

8          PROSPECTIVE JUROR:  Oh, yes.

9          THE COURT:  Let me ask you, as an investigator you

10 know that evidence has to be brought and relied upon when

11 doing anything in your line of work.

12         PROSPECTIVE JUROR:  That's correct.

13         THE COURT:  Do you feel you can weigh the evidence

14 in this case and decide whether or not the prosecutors and the

15 DEA have done their job and brought enough evidence to satisfy

16 you of guilt beyond a reasonable doubt?

17         PROSPECTIVE JUROR:  So long as it's obtained

18 correctly.

19         THE COURT:  So you would evaluate it to determine

20 whether or not it was obtained correctly.

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  And whether or not it convinces you of

23 the defendant's guilt beyond a reasonable doubt.

24         PROSPECTIVE JUROR:  Yes.  It has to be beyond a

25 reasonable doubt, that's correct.

Rivka Teich

A-158

Jury Selection                                              83

1      THE COURT:  You think you can be fair and impartial
2  in this case?
3      PROSPECTIVE JUROR:  Yes.
4      THE COURT:  Despite your positive experiences with
5  DEA.
6      PROSPECTIVE JUROR:  I feel comfortable with that.
7      THE COURT:  Fair to both sides?
8      PROSPECTIVE JUROR:  Yes.
9      THE COURT:  Thank you very much.
10      (In open court.)
11      THE COURT:  Come up here in the box next to juror
12  number five.
13      Anyone else a genuine hardship?  Juror number 25,
14  Ms. St. Jeanos.
15      PROSPECTIVE JUROR:  I think it should be fine, it's
16  not a hardship.  I have a family trip, departing Saturday the
17  15th, so we would be fine.
18      THE COURT:  If you're not fine, then we're all not
19  fine.  I might have to go with you at that point.
20      Yes, sir, number 23, Mr. Thomas.
21      PROSPECTIVE JUROR:  I have a court date October 5.
22      THE COURT:  Okay.  Where is it you are appearing in
23  court?
24      PROSPECTIVE JUROR:  Supreme Court.
25      THE COURT:  Here in Brooklyn?

A-159

```
                              Sidebar                          84
 1           PROSPECTIVE JUROR:  Yes.
 2           THE COURT:  Is it a civil case or a criminal case?
 3           PROSPECTIVE JUROR:  Criminal.
 4           THE COURT:  And are you a witness or a party.
 5           PROSPECTIVE JUROR:  Party.
 6           THE COURT:  What time is it on October 5.
 7           PROSPECTIVE JUROR:  526.
 8           THE COURT:  Could we have you come up to sidebar.
 9           (Sidebar.)
10           THE COURT:  We're not sitting on Wednesday.  We
11   won't have court on Wednesday, that's why I wanted to ask you
12   a little more about your situation.  So you would be free to
13   go there to court on Wednesday.
14           PROSPECTIVE JUROR:  Okay.
15           THE COURT:  What kind of case is it?
16           PROSPECTIVE JUROR:  DWI.
17           THE COURT:  So you got arrested for a DWI?
18           PROSPECTIVE JUROR:  Yes.
19           THE COURT:  That's pending right now?
20           PROSPECTIVE JUROR:  Yes.
21           THE COURT:  Is this your first interaction with law
22   enforcement?  Is this your first arrest?
23           PROSPECTIVE JUROR:  No.
24           THE COURT:  Was it the NYPD who arrested you?
25           PROSPECTIVE JUROR:  Yes.
```

A-160

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 85 of 263 PageID #: 571

```
                              Sidebar                        85
1          THE COURT:  How many other arrests have you had?
2          PROSPECTIVE JUROR:  Two.
3          THE COURT:  Were they also by the NYPD?
4          PROSPECTIVE JUROR:  No.
5          THE COURT:  What kind of crimes were they?
6          PROSPECTIVE JUROR:  Possession of marijuana.
7          THE COURT:  Mr. Thomas, I'm going to let you go back
8   to the jury room.  Thank you very much.
9          PROSPECTIVE JUROR:  Thank you.
10         (Prospective juror exits sidebar.)
11         THE COURT:  I know I did that sua sponte?  My
12  feeling was he wasn't comprehending what I said.  He clearly
13  missed all the questions about knowledge about involvement in,
14  arrested for drugs, and everything else.  So I was quite
15  concerned that he wouldn't necessarily be all there for this
16  trial.  He seemed to me possibly to be under the influence of
17  something at this exact moment.  His eyes were a bit glazed.
18  And given he was appearing for a DUI, and he didn't respond as
19  he should have to all the questions that should have elicited
20  his prior arrest and involvement in the criminal justice
21  system.
22         You may have an objection, you can lodge it if you
23  like.
24         MR. SINGER:  I'm not sure that the record was
25  sufficiently developed.  I understand the concerns that you
```

A-161

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 86 of 263 PageID #: 572

```
                          Jury Selection                        86
1    have, but we have concerns with lots of jurors and we
2    developed them a bit more.  I didn't think that was done.
3             THE COURT:  Let me make clear, it's not about him
4    having been arrested before.  It's about the fact that he
5    didn't respond to any questions at all prior to this about his
6    arrests.  So it was more a concern of comprehension of his
7    mental status.  But your objection is noted.
8             (In open court.)
9             THE COURT:  We'll replace juror number 23.
10            THE COURTROOM DEPUTY:  Juror 39 replacing 23,
11   Gabriel, Glasgow.
12            THE COURT:  Mr. Gabriel, you can take your seat.
13   Did you have any positive responses about anything I asked you
14   so far?
15            PROSPECTIVE JUROR:  No, Your Honor.
16            THE COURT:  Thank you very much.
17            Juror number 18, you were standing up?
18            PROSPECTIVE JUROR:  I was going to go to the
19   bathroom.
20            THE COURT:  If you hold on one second we're very
21   close to a breaking point.
22            PROSPECTIVE JUROR:  Sure, no problem.
23            THE COURT:  Thank you.  Any other genuine hardship?
24            Is there anyone who has any biases or prejudices
25   against members of any racial, ethnic, national or religious
```

A-162

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 87 of 263 PageID #: 573

```
                        Jury Selection                    87
```

1   group that would make it difficult for you to be fair and

2   impartial in this case?

3          Is there anyone who feels that even if the evidence

4   establishes the defendant's guilt beyond a reasonable doubt

5   you might not be able to render a guilty verdict for reasons

6   unrelated to the law and the evidence?

7          If you're selected as a juror, you'll be instructed

8   that you must follow and apply the law as I instruct you, even

9   if you disagree with the law.  Is there anyone who would have

10  difficulty following that instruction?

11         If you're selected as a juror you'll be instructed

12  that the question of punishment is for the Court alone to

13  decide.  And that you must not let that enter into your

14  deliberations, the possibility of punishment, in any way.  Is

15  there anyone who would have difficulty following that

16  instruction?

17         Last question, is there anyone who believes they

18  cannot be fair and impartial in rendering a verdict in this

19  case for any reason that we haven't discussed?  Terrific.

20         I'm going to let all of you take a 15-minute break,

21  being realistic about restrooms and how many we have.  You can

22  go to other floors if you need to use a restroom.  Be ready to

23  go again at 20 of 12, and back in your seats.  Thank you

24  everyone.

25         (Prospective jury panel exits.)

A-163

```
                         Jury Selection                        88

1              (Sidebar.)

2              THE COURT:  Mr. Goklu, I know you're heading to use

3    the restroom as well.  Since we have so many potential jurors

4    out there in the hallway, I want to make sure you understand

5    you cannot speak to any of the potential jurors at all, just

6    don't speak to anybody to make sure you don't run afoul of

7    that.  Thank you.

8              (Defendant exits sidebar.)

9              THE COURT:  Any other follow-up questions for

10   anyone?

11             MS. KASSNER:  No.

12             MR. SINGER:  No.

13             THE COURT:  Okay, then you guys are free to go as

14   well.  Be back at 20 of and we'll start with peremptory.

15             MR. SINGER:  You'll be asking further questions

16   individual questions?

17             THE COURT:  Yes.

18             (Brief recess.)

19

20

21

22

23

24

25
```

Rivka Teich

A-164

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 89 of 263 PageID #: 575

Jury Selection                                          89

1   (Continuing.)

2           THE COURT:  Ladies and gentlemen, as you can see,

3   the first 32 of you have received a paper questionnaire.

4   Sorry about the right side here.  You might be having FOMO

5   right now.  We're going to go through these questions one by

6   one.  Each juror will be required to answer each question and

7   you don't have to repeat the question and if you get very

8   good, you can just say the number and give an answer.

9           So we're going to go one by one as soon as we get a

10  microphone back.  Let's start with Juror No. 1.

11          PROSPECTIVE JUROR NO. 1:  I reside in Cambria

12  Heights, Queens, New York.  I've been living there for 30

13  years.  Before that, I lived in Corona.

14          THE COURT:  Formal education?

15          PROSPECTIVE JUROR NO. 1:  I have a Bachelor's degree

16  in the science of nursing.  Employment, currently employed by

17  Northwell Health Long Island Jewish Medical Center.  I've

18  worked for them for 29 years.

19          THE COURT:  What is your position there?

20          PROSPECTIVE JUROR NO. 1:  I'm a nurse care manager.

21          THE COURT:  Spouse or partner?

22          PROSPECTIVE JUROR NO. 1:  No, I'm divorced.  I have

23  two children --

24          THE COURT:  Could we go back for a minute.  Your

25  former spouse, did that person work outside the home?

SN      OCR      RPR

A-165

Jury Selection                                    90

1          PROSPECTIVE JUROR NO. 1:  I'm sorry?

2          THE COURT:  Did your former spouse work outside the

3     home?

4          PROSPECTIVE JUROR NO. 1:  Yes.

5          THE COURT:  What did he do?

6          PROSPECTIVE JUROR NO. 1:  He was a contractor.  He

7     owned his own business construction.

8          THE COURT:  Children?

9          PROSPECTIVE JUROR NO. 1:  I have two children, 33

10    and 31 and they do work outside the home.

11         THE COURT:  And what do they do?

12         PROSPECTIVE JUROR NO. 1:  My daughter works for

13    Toyota and my son works for Google.

14         THE COURT:  What does your son do at Google?

15         PROSPECTIVE JUROR NO. 1:  I'm not sure honestly.

16         THE COURT:  How about your daughter, what does she

17    do at Toyota?

18         PROSPECTIVE JUROR NO. 1:  She's in cars sales.

19         THE COURT:  Any other adult you live with?

20         PROSPECTIVE JUROR NO. 1:  No, I live alone.  Legal

21    knowledge, not so much.

22         THE COURT:  Ever practiced or studied it?

23         PROSPECTIVE JUROR NO. 1:  Not at all.

24         THE COURT:  Any friends or family members?

25         PROSPECTIVE JUROR NO. 1:  No.

SN      OCR      RPR

A-166

Jury Selection                          91

1          THE COURT:  How about jury service?

2          PROSPECTIVE JUROR NO. 1:  I have done it before and

3    it was a criminal case.

4          THE COURT:  Was it state or federal?

5          PROSPECTIVE JUROR NO. 1:  State.

6          THE COURT:  Was it here in Brooklyn?

7          PROSPECTIVE JUROR NO. 1:  No, in Queens.

8          THE COURT:  Without telling us the verdict were you

9    and the other jurors able to reach a verdict?

10         PROSPECTIVE JUROR NO. 1:  Of course.  We were

11   anonymous.

12         THE COURT:  11?

13         PROSPECTIVE JUROR NO. 1:  Involvement in litigation,

14   no, not at all.

15         THE COURT:  Not as a party or as a witness?

16         PROSPECTIVE JUROR NO. 1:  No.  I was subpoenaed to

17   go but it never came to fruition.

18         THE COURT:  Subpoenaed as a witness?

19         PROSPECTIVE JUROR NO. 1:  As a witness, yes, for my

20   job.

21         THE COURT:  As a nurse?

22         PROSPECTIVE JUROR NO. 1:  Yes.

23         THE COURT:  All right.

24         PROSPECTIVE JUROR NO. 1:  I do watch MSNBC, Channel

25   7, Channel 2.

SN        OCR        RPR

A-167

```
                        Jury Selection                    92
 1          THE COURT:  These are your news sources?
 2          PROSPECTIVE JUROR NO. 1:  Yes.  And cable television
 3  I do Netflix and Hulu.  NCIS.
 4          THE COURT:  So you watch NCIS?
 5          PROSPECTIVE JUROR NO. 1:  I watch NCIS, I watch
 6  Chicago Fire, I watch Chicago PD.  It's just entertainment.
 7  Social media, I only barely do Facebook.
 8          THE COURT:  What do you use Facebook for?
 9          PROSPECTIVE JUROR NO. 1:  Just to keep up, I follow
10  closely and if I have a comment, I give one but that's it.  On
11  organization membership, I belong to the American Nurses
12  Association.
13          THE COURT:  Thank you very much, Juror No. 1.  If
14  you will pass the mic to Juror No. 2.
15          Ms. Fischer, take it away.
16          PROSPECTIVE JUROR NO. 2:  I live in Nassau County
17  for 38 years.  I have a Bachelor's degree.  I have not done
18  any military service.  I am currently employed with a
19  nonprofit agency doing quality enhancement.
20          THE COURT:  What is the agency?
21          PROSPECTIVE JUROR NO. 2:  YAI.
22          THE COURT:  What does that stand for if you know.
23          PROSPECTIVE JUROR NO. 2:  It stands for Young Adult
24  Institute, but we've been around for a while.
25          THE COURT:  Formerly young.  We all feel that way.
```

SN      OCR      RPR

A-168

Jury Selection                                                    93

1        PROSPECTIVE JUROR NO. 2:  I've been there for 16

2   years.  I do not have a spouse.  I do not have any children.

3   My mother is in my household and she is a nurse.  I have no

4   legal knowledge.  My brother-in-law is a lawyer.  He is an

5   attorney.  He works for the Department of State, for New York

6   State.

7        THE COURT:  And do you know what he does there?

8        PROSPECTIVE JUROR NO. 2:  He seems to do a little

9   bit of everything.  Like, he has -- sometimes with the

10  Athletic Commission doing stuff with the boxing, but, yeah,

11  his hands seem to be in a bunch of things but the most I know

12  about it is the Athletic Commission.

13       THE COURT:  Okay.

14       PROSPECTIVE JUROR NO. 2:  I have done jury service

15  before.  I served on a case about four years ago.  It wasn't

16  criminal.  It was I think it was -- I'm not sure what to call

17  it, but we reached a verdict.

18       THE COURT:  Okay.

19       PROSPECTIVE JUROR NO. 2:  I haven't had any

20  involvement in litigation.  Mostly Channel 7, ABC News for my

21  news resources.  I usually just watch them all.  Netflix,

22  Hulu.  All of them pretty much.

23       THE COURT:  Are there particular shows you watch?

24       PROSPECTIVE JUROR NO. 2:  I'm more of a Bridgerton

25  person, not the crime shows.

SN        OCR        RPR

A-169

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 94 of 263 PageID #: 580

```
                        Jury Selection                      94
 1            THE COURT:  All right.
 2            PROSPECTIVE JUROR NO. 2:  Social media mostly
 3   Facebook and Instagram.  I'm not sure how the other ones work.
 4   And I'm not in any organized membership.
 5            THE COURT:  Do you do any blogging on social media?
 6            PROSPECTIVE JUROR NO. 2:  No.
 7            THE COURT:  To go back to the prior jury service do
 8   you remember if it was federal or state?
 9            PROSPECTIVE JUROR NO. 2:  It was federal in Central
10   Islip.
11            THE COURT:  You think it was a civil matter because
12   it wasn't criminal?
13            PROSPECTIVE JUROR NO. 2:  Correct.
14            THE COURT:  Thank you very much Juror No. 3
15   Ms. Dawkins?
16            PROSPECTIVE JUROR NO. 3:  The place I currently live
17   is in Brooklyn.  I've been living there for twelve years.  I
18   have an Associate's in criminal justice.  No military service.
19   I'm employed by the DOI, New York City DOI.
20            THE COURT:  What is your title again?
21            PROSPECTIVE JUROR NO. 3:  Confidential investigator.
22            THE COURT:  How long have you been there?
23            PROSPECTIVE JUROR NO. 3:  Six months.
24            THE COURT:  And before that, did you work anywhere
25   else?
```

SN      OCR      RPR

A-170

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 95 of 263 PageID #: 581

Jury Selection                                95

1          PROSPECTIVE JUROR NO. 3:  The New York City Human

2     Resources Administration, HRA.

3          THE COURT:  And what did you do there?

4          PROSPECTIVE JUROR NO. 3:  I would say a clerk.

5          THE COURT:  And how long were you there?

6          PROSPECTIVE JUROR NO. 3:  Six years.

7          THE COURT:  Okay.  All right.  Spouse or partner?

8          PROSPECTIVE JUROR NO. 3:  My husband is an

9     electrician.  I have an 11 year-old.

10          THE COURT:  Not working yet, right?

11          PROSPECTIVE JUROR NO. 3:  No.

12          THE COURT:  Okay.

13          PROSPECTIVE JUROR NO. 3:  And my mom lives with us

14    and she's a home health aide.  The legal knowledge is just

15    based on my schooling.

16          THE COURT:  Okay.

17          PROSPECTIVE JUROR NO. 3:  The only relationship with

18    lawyers is my supervisor is a lawyer.

19          THE COURT:  Your current supervisor?

20          PROSPECTIVE JUROR NO. 3:  Yeah.

21          THE COURT:  That is the only person you know who's a

22    lawyer?

23          PROSPECTIVE JUROR NO. 3:  And that's another lawyer

24    in the office.

25          THE COURT:  Okay.  Could we go back one minute about

A-171

```
                        Jury Selection                    96
```

1   your education, did you have a particular focus when you were

2   studying criminal justice?  I'm just wondering if there's a

3   specialty or some subcategory or subject you specialized in?

4              PROSPECTIVE JUROR NO. 3:  No.

5              THE COURT:  All right.

6              PROSPECTIVE JUROR NO. 3:  The jury service about six

7   years ago I was excused to be a juror.

8              THE COURT:  Where were you called for jury service?

9              PROSPECTIVE JUROR NO. 3:  The state.

10             THE COURT:  All right.

11             PROSPECTIVE JUROR NO. 3:  No involvement in

12  litigation and I really don't watch the news.  I try not to

13  watch news in regards to television.  I mostly watch YouTube

14  and watching people travel the world and eat food.  I'm not

15  really active on social media.  I have an Instagram and it's

16  probably three posts up.  Around I'm not related to any

17  organization or any memberships.

18             THE COURT:  Okay.  Thank you very much, Ms. Dawkins.

19  Next Juror No. 4, Ms. Chang?

20             PROSPECTIVE JUROR NO. 4:  For number one, I live in

21  Flushing, Queens for about twelve years.  Number 2, I have a

22  Bachelor/s degree in accounting.

23             THE COURT:  Okay.

24             PROSPECTIVE JUROR NO. 4:  Number three, no.  Number

25  four, I'm working at a shipping company for about nine years.

A-172

```
                          Jury Selection                        97

 1            THE COURT:  And what's the name of the company?
 2            PROSPECTIVE JUROR NO. 4:  It's called Future
 3     Maritime Group.
 4            THE COURT:  Future Maritime Group?
 5            PROSPECTIVE JUROR NO. 4:  Yes.
 6            THE COURT:  And so the record is clear, number three
 7     is no military service, right?
 8            PROSPECTIVE JUROR NO. 4:  Yes.
 9            THE COURT:  How long have you been at your current
10     job?
11            PROSPECTIVE JUROR NO. 4:  Nine years.
12            THE COURT:  Are you an accountant there?
13            PROSPECTIVE JUROR NO. 4:  No.
14            THE COURT:  What do you do?
15            PROSPECTIVE JUROR NO. 4:  Operator.
16            THE COURT:  So you help run the business?
17            PROSPECTIVE JUROR NO. 4:  A little bit.
18            THE COURT:  Do you operate a machine?
19            PROSPECTIVE JUROR NO. 4:  No, it's just deal with
20     the customers and the -- like, another company.
21            THE COURT:  Got it, okay.
22            PROSPECTIVE JUROR NO. 4:  Number five, yes, my
23     husband working in liquor store as a cashier.
24            THE COURT:  Go ahead.
25            PROSPECTIVE JUROR NO. 4:  I have one child.  He is
```

A-173

```
                        Jury Selection                      98
```

1    now seven years old.

2           THE COURT:  Definitely not working.  All right.

3           PROSPECTIVE JUROR NO. 4:  Also, my mom-in-law live

4    with us.

5           THE COURT:  Okay.  And does she work outside the

6    home?

7           PROSPECTIVE JUROR NO. 4:  No.  Number eight, no.

8           THE COURT:  I imagine your mother is babysitting

9    your seven year-old.  That's a real job.

10          PROSPECTIVE JUROR NO. 4:  Number nine, no, we didn't

11   have any family member who is a lawyer.

12          THE COURT:  Or any friends who are lawyers?

13          PROSPECTIVE JUROR NO. 4:  No.  Number ten, I think

14   it's about six years ago I served as a juror in the state.

15          THE COURT:  Criminal or civil?

16          PROSPECTIVE JUROR NO. 4:  It's civil.

17          THE COURT:  And were you and the other jurors able

18   to reach a verdict, without telling us what it was?

19          PROSPECTIVE JUROR NO. 4:  No.

20          THE COURT:  Do you know if it was declared a hung

21   jury or undecided, or did it settle before you were asked to

22   reach a verdict?  Do you remember?

23          PROSPECTIVE JUROR NO. 4:  No.

24          THE COURT:  But you don't recall reaching a verdict?

25          PROSPECTIVE JUROR NO. 4:  No.

A-174

```
                        Jury Selection                    99

  1             THE COURT:  Okay.  Have you ever been involved in

  2    litigation yourself?

  3             PROSPECTIVE JUROR NO. 4:  No.

  4             THE COURT:  Okay.

  5             PROSPECTIVE JUROR NO. 4:  Number 12, news sources --

  6    I don't watch any news.

  7             THE COURT:  Do you watch any news?

  8             PROSPECTIVE JUROR NO. 4:  No.

  9             THE COURT:  Do you listen to anything or read

 10    anything for news?

 11             PROSPECTIVE JUROR NO. 4:  Just sometimes on the work

 12    site.

 13             THE COURT:  At the work site?

 14             PROSPECTIVE JUROR NO. 4:  Yes.

 15             THE COURT:  Do you have any particular source of

 16    news that you use?

 17             PROSPECTIVE JUROR NO. 4:  No.

 18             THE COURT:  Okay.  All right.  Shows that you watch?

 19             PROSPECTIVE JUROR NO. 4:  No.

 20             THE COURT:  Nothing in particular?

 21             PROSPECTIVE JUROR NO. 4:  No.

 22             THE COURT:  Social media?

 23             PROSPECTIVE JUROR NO. 4:  I just use the Facebook

 24    sometimes.

 25             THE COURT:  And what do you use it for?  Do you post
```

SN     OCR     RPR

A-175

Case 1:19-cr-00386-PKC     Document 78     Filed 12/01/22     Page 100 of 263 PageID #: 586

```
                         Jury Selection                    100

 1   any comments or do you just --

 2            PROSPECTIVE JUROR NO. 4:  I just look at the

 3   comments from my other friends.  I don't post anything.

 4            THE COURT:  Organizational memberships?

 5            PROSPECTIVE JUROR NO. 4:  I'm not a member of any

 6   organization.

 7            THE COURT:  Thank you very much, Ms. Chang.

 8            Mr. Corbet, No. 5.

 9            PROSPECTIVE JUROR NO. 5:  I live in Brooklyn, New

10   York for nine years.  Previous to that to that I was in the

11   State of Pennsylvania.  I have a Bachelor's degree in

12   economics, a master's degree in English and a Ph.D. in

13   rhetoric.  No military service.  I'm currently employed at the

14   City University of New York as a professor.  I have a domestic

15   partner.  They do not work outside of the home.

16            THE COURT:  Go back for a minute.  You're a

17   professor teaching what?

18            PROSPECTIVE JUROR NO. 5:  Writing.

19            THE COURT:  All right.

20            PROSPECTIVE JUROR NO. 5:  I have two children, 15

21   and 8, both in New York City public schools.  No other

22   employed adults in the household.  I have never practiced law

23   or anything like that.

24            THE COURT:  You never studied it along the way with

25   all of those degrees?
```

A-176

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 101 of 263 PageID #: 587

Jury Selection                    101

1        PROSPECTIVE JUROR NO. 5:  I did case studies, but

2   not doing the legal framework.

3        THE COURT:  Just criticizing the writing?

4        PROSPECTIVE JUROR NO. 5:  The rhetoric of law at

5   times, you know, the argumentation.

6        THE COURT:  It can be a little turgid, right?

7        PROSPECTIVE JUROR NO. 5:  A professor of rhetoric

8   and a lawyer have a bit in common.

9        THE COURT:  Sometimes.  Okay.  Go ahead.

10        PROSPECTIVE JUROR NO. 5:  Well, my most recent

11   ex-girlfriend was a lawyer, but other than that just a lot of

12   peripheral relationships.

13        THE COURT:  What kind of law did the ex practice, if

14   you remember?

15        PROSPECTIVE JUROR NO. 5:  IP law.

16        THE COURT:  Intellectual property?

17        PROSPECTIVE JUROR NO. 5:  Yes.

18        THE COURT:  The other lawyers?

19        PROSPECTIVE JUROR NO. 5:  Also IP and judges, but

20   that's in the periphery not in New York.  I have actually

21   never served on a jury.

22        THE COURT:  Or a grand jury?

23        PROSPECTIVE JUROR NO. 5:  Or a grand jury although I

24   was excused from grand jury service about four years ago in

25   Kings County.  I have a lot of class action lawsuit

SN      OCR      RPR

A-177

Jury Selection                                                    102

1   participation; hey, you ate tainted tuna, do you want two free

2   cans, that kind of thing.

3        THE COURT:  Okay.

4        PROSPECTIVE JUROR NO. 5:  News.  I subscribe to the

5   Wall Street Journal and the New York Times.  The Washington

6   Post I cancelled that.  CNN, Fox News, MSNBC.  I'm embarrassed

7   but also the New York Post and the New York Daily News.  TV

8   shows I try to avoid but my partner is a vast consumer.  So I

9   do watch by periphery.  No radio.  Just, you know, occasional

10  online magazines that show up in my news feed websites.  I

11  guess Reddit, community blogs.  Television -- you know,

12  whatever series, you know, Bridgerton or she wants to line up,

13  I will sit in with.

14       THE COURT:  Okay.

15       PROSPECTIVE JUROR NO. 5:  I find actually courtroom

16  and law procedurals to be really insufferable, but I'm

17  familiar with the Law and Order universe.

18       THE COURT:  The mega universe?

19       PROSPECTIVE JUROR NO. 5:  Yes, mega universe.

20       Social media, I guess Facebook, Instagram, LinkedIn,

21  Discord, and Reddit.  As far as organizational memberships,

22  just a few professional organizations that I have to be a part

23  of.

24       THE COURT:  Do you do any posting on social media?

25       PROSPECTIVE JUROR NO. 5:  Rarely, but I am working

SN        OCR        RPR

A-178

Jury Selection                    103

 1   with Brick Media to develop a podcast.

 2           THE COURT:  About?

 3           PROSPECTIVE JUROR NO. 5:  Essentially helping my

 4   students a few years later advance their careers, wrangle

 5   through complex decisionmaking processes.

 6           THE COURT:  And then one question for you about

 7   grand jury.  You said you were excused from it?

 8           PROSPECTIVE JUROR NO. 5:  Yes.

 9           THE COURT:  Why was it, if you know, that you were

10   excused from it?

11           PROSPECTIVE JUROR NO. 5:  I was going through a

12   difficult marital separation at the time.

13           THE COURT:  Thank you very much.

14           Juror No. 6, Mr. Kresowaty.

15           PROSPECTIVE JUROR NO. 6:  Yes, that's correct.

16           Residency is in Queens.  I've been there all of my

17   life.  Education, I have a Master's of Art in urban studies.

18   Military service I served in the United States Navy along with

19   the Reserves for six years.  Employment, I'm retired, but I

20   worked for the New York State Department of Health, the Office

21   of Professional Medical Conduct as a senior medical conduct

22   investigator.  Spouse/partner, I don't have any.  Children,

23   none.  There are employed adults in the household, none.

24   Legal knowledge, just from studies and that's it.

25           THE COURT:  When you say studies, was there a

SN     OCR     RPR

A-179

```
                          Jury Selection                    104

 1   particular area that you studied?

 2          PROSPECTIVE JUROR NO. 6:  Basically introductory to

 3   law in college.

 4          THE COURT:  Okay.

 5          PROSPECTIVE JUROR NO. 6:  Relationships with

 6   lawyers, my brother was an administrative judge with the New

 7   York State Department of Social Services.  He's retired also.

 8          THE COURT:  All right.

 9          PROSPECTIVE JUROR NO. 6:  Jury service, I was

10   involved with a civil case.  I was going to be a juror, but

11   they settled before the trial.

12          THE COURT:  All right.

13          PROSPECTIVE JUROR NO. 6:  Involvement in litigation,

14   none.  My news sources are from New York 1, watching YouTube

15   and Channel 7, et cetera.  Television cable streaming

16   services, basically YouTube.  That's it.  I don't watch

17   courtroom drama or anything like that.

18          THE COURT:  Okay.

19          PROSPECTIVE JUROR NO. 6:  Social media, Facebook.

20   My family members are on there so occasionally I comment.

21   That's it.  Organizational memberships, none.

22          THE COURT:  Thank you, Mr. Kresowaty.

23          PROSPECTIVE JUROR NO. 6:  Thank you.

24          THE COURT:  Next, Juror No. 7, Mr. Chen.

25          PROSPECTIVE JUROR NO. 7:  I recently moved from
```

A-180

```
                          Jury Selection                    105

 1   Nassau County and I do have a two-year college Associate

 2   Degree and I'm working with CPI doing mobile engineering and

 3   my wife is a house maker and I have one son, four years old.

 4            THE COURT:  So you have a wife, but she does not

 5   work outside the home?

 6            PROSPECTIVE JUROR NO. 7:  Yes.

 7            THE COURT:  And she takes care of your four year-old

 8   son?

 9            PROSPECTIVE JUROR NO. 7:  Yes.

10            THE COURT:  Other adults you live with?

11            PROSPECTIVE JUROR NO. 7:  No.

12            THE COURT:  Go ahead.

13            PROSPECTIVE JUROR NO. 7:  I don't practice any law

14   or class and I don't have any member or friends that is

15   lawyer.  And I don't do jury service in the past.

16            THE COURT:  No grand jury either?

17            PROSPECTIVE JUROR NO. 7:  No.  I do have a lawsuit

18   about a car accident.

19            THE COURT:  Were you --

20            PROSPECTIVE JUROR NO. 7:  I'm one of the parties.

21            THE COURT:  Are you a plaintiff or defendant?

22            PROSPECTIVE JUROR NO. 7:  Plaintiff.

23            THE COURT:  Have you had to go to court for that?

24            PROSPECTIVE JUROR NO. 7:  Not yet.

25            THE COURT:  Do you have a lawyer that's representing
```

SN      OCR      RPR

A-181

```
                          Jury Selection                    106

 1    you in that car accident case?

 2              PROSPECTIVE JUROR NO. 7:  Yes.

 3              THE COURT:  One last question, do you know if that's

 4    happening in --

 5              PROSPECTIVE JUROR NO. 7:  Two months ago.

 6              THE COURT:  But in Brooklyn or --

 7              PROSPECTIVE JUROR NO. 7:  In Garden City.

 8              THE COURT:  All right.

 9              PROSPECTIVE JUROR NO. 7:  I don't watch much TV and

10    I listen to the radio on the road and not much television and

11    I do use WeChat a Chinese app for news and I don't have any

12    organizational membership.

13              THE COURT:  All right.  Thank you very much

14    Mr. Chen.  Pass the microphone to the back row to Juror No. 8,

15    Mr. Price.

16              PROSPECTIVE JUROR NO. 8:  Yes, I live in Brooklyn

17    all of my life.  59 years.  Education, I have an Associate's

18    degree in computer science and local area networking.  No

19    military service.  Currently employed with New York City

20    Transit as a train operator for nine years.  No spouse.  I

21    have three children.  My oldest December is 24, my son.  He

22    works at Costco doing stock and I have two younger daughters

23    as well, 13 and -- 15 and 9, sorry.

24              THE COURT:  Could we go back for one minute to your

25    employment?  Before Transit did you work somewhere else?
```

SN        OCR        RPR

A-182

Jury Selection                                   107

1          PROSPECTIVE JUROR NO. 8:  Before Transit I worked

2     for the New York City Veteran's Home in St. Albans.

3          THE COURT:  What did you do there?

4          PROSPECTIVE JUROR NO. 8:  I was a supervisor for the

5     supply clerks.

6          THE COURT:  All right.  Do you live with any other

7     assaults, number seven?

8          PROSPECTIVE JUROR NO. 8:  No.

9          THE COURT:  Okay.

10          PROSPECTIVE JUROR NO. 8:  My legal knowledge is just

11     Law and Order on TV.  No relationship with lawyers.  I did

12     jury duty seven or eight years ago, but it was a civil case

13     and they settled out of court so we didn't get to do anything.

14     No involvement in litigation.  News, I watch the news

15     sometimes, Channel 7, Channel 4.  Television, every now and

16     then, you know, a good movie.  Beats was pretty good.  I just

17     watched that the other day.

18          THE COURT:  You can get that online?

19          PROSPECTIVE JUROR NO. 8:  Yes, Fire Stick.

20          THE COURT:  Okay.

21          PROSPECTIVE JUROR NO. 8:  Social media, I do

22     Facebook and Instagram now and then.  I don't post too much

23     unless it's somebody's birthday and I'm not a member of any

24     organizational membership.

25          THE COURT:  Thank you, Mr. Price.

SN       OCR      RPR

A-183

Jury Selection                                108

1          Juror No. 9, Ms. Ramos.

2          PROSPECTIVE JUROR NO. 9:  I live in Sunnyside

3    Queens.  I've lived there my whole life.  I have my

4    Associate's in business administration.  No military service.

5    I have been working for my father's company for about ten

6    years.  I'm a secretary.

7          THE COURT:  What kind of a company is it?

8          PROSPECTIVE JUROR NO. 9:  It's a moving company.

9          THE COURT:  All right.

10         PROSPECTIVE JUROR NO. 9:  No spouse, no children.  I

11   live with my parents.  My mother doesn't work outside the

12   home.  My father obviously works for his own company.  No

13   legal knowledge.  No relationship to lawyers and I have not

14   served on a jury nor grand jury.  No litigations.  I watch the

15   news sometimes, Channel 7, and sometimes -- if I watch

16   anything it's mostly true crime documentaries.  For social

17   media, it's Twitter or Instagram but I don't post.  I just

18   browse and I'm not part of any organizations.

19         THE COURT:  Thank you very much.  Efficiently done,

20   Ms. Ramos.

21         Number 10, Mr. Hess?

22         PROSPECTIVE JUROR NO. 10:  I live in Woodside,

23   Queens for three years.  Before that Brooklyn for three years

24   and before that Manhattan for six years.  Education, I have a

25   business and politics bachelor degrees.  No military service

SN      OCR      RPR

A-184

```
                        Jury Selection                    109
 1   although my girlfriend is a military widow.  Employment, I run
 2   a small retail business as well as a coaching business as
 3   well.
 4              THE COURT:  What kind of retail business?
 5              PROSPECTIVE JUROR NO. 10:  Hockey and figure stating
 6   equipment.
 7              THE COURT:  And the coaching?
 8              PROSPECTIVE JUROR NO. 10:  Also hockey and figure
 9   skating.  No children, no spouse, although I do live with my
10   girlfriend.
11              THE COURT:  Back to your employment how long have
12   you been in the retail and coaching business?
13              PROSPECTIVE JUROR NO. 10:  I've been doing the
14   retail for about twelve years now.  Coaching I've been doing
15   since I was 18, somewhere around there.  No children.
16   Obviously live with the girlfriend at home.  Legal knowledge,
17   I took the LSAT a few times when I was younger but decided
18   against law school.  I did not want the loans.
19              THE COURT:  Understandable.
20              PROSPECTIVE JUROR NO. 10:  The relationship to
21   lawyers, I do have a couple of friends who are lawyers.  One
22   is in patent law.  The other one just started so he's a paper
23   pusher.  I don't know what he does specifically.
24              THE COURT:  What paper does he push?
25              PROSPECTIVE JUROR NO. 10:  I don't know.  He doesn't
```

SN      OCR      RPR

A-185

Jury Selection                                    110

1  go into detail.  More often they complain about what they're

2  doing more than anything.  Jury service I have not.  Involved

3  in litigation, no.  News sources, I try not to keep it to one

4  particular -- it's you know, the BBC, CNN, Fox, usually try to

5  get as many different sides of things as possible.  Television

6  and streaming services, you know, Netflix.  My girlfriend

7  loves Asian dramas, so lots of those.  Just got done watching

8  Better Call Saul which is also good.

9            Social media, not a whole lot outside of just

10 business aspects.  Facebook, you know, Instagram and that type

11 of thing, but not really personal usually and the only

12 organizational memberships are usually coaching-involved

13 organizations.

14           THE COURT:  To go back for a minute, you may have

15 said this does your girlfriend work outside of the home?

16           PROSPECTIVE JUROR NO. 10:  She's basically a figure

17 coach as well.  She handled the figure side and I handle the

18 hockey side.

19           THE COURT:  Okay.  Juror No. 11 Ms. Ferrer?

20           PROSPECTIVE JUROR NO. 11:  I live in Staten Island

21 for 25 years.  A high school graduate.  No military service.

22 I am currently employed for a dialysis clinic in Staten

23 Island.  No spouse.

24           THE COURT:  Go back for a minute.  How long have you

25 been at the dialysis clinic?

SN     OCR     RPR

A-186

```
                            Jury Selection                    111

 1          PROSPECTIVE JUROR NO. 11:  Almost a year.  About to

 2   be a year in a few days.

 3          THE COURT:  What do you do there?

 4          PROSPECTIVE JUROR NO. 11:  Admissions coordinator.

 5          THE COURT:  Before that?

 6          PROSPECTIVE JUROR NO. 11:  I worked at LabQuest as a

 7   lab tech.

 8          THE COURT:  Spouse or partner?

 9          PROSPECTIVE JUROR NO. 11:  No spouse or children.  I

10   live with my mother and aunt.  They're both retired.

11          THE COURT:  What did they do before they retired

12   if --

13          PROSPECTIVE JUROR NO. 11:  My aunt was a nurse and

14   my mother was a dialysis technician.  I have no legal

15   knowledge.  No relationships with lawyers.  I never served on

16   a jury or grand jury.  No involvement in litigation.  I don't

17   really watch the news.  I don't have cable.  I have Netflix,

18   Hulu, the same as everybody else.  Social media, Facebook,

19   Instagram, mostly keep in touch with family in the Philippines

20   and no organizational membership.

21          THE COURT:  Go back for a minute to Netflix or Hulu.

22   Do you watch any particular shows?

23          PROSPECTIVE JUROR NO. 11:  Whatever is trending.

24   Right now Dahmer.

25          THE COURT:  Dahmer?
```

SN      OCR      RPR

A-187

```
                             Jury Selection                    112

 1            PROSPECTIVE JUROR NO. 11:  Yes.

 2            THE COURT:  Thank you very much, Juror No. 11.

 3            Juror No. 12, Mr. Roopnauth.

 4            Just in case you're wondering about the timeline in

 5    general.  We need to get this set of questions with everyone

 6    else on that side of the room and we'll be close to being done

 7    after that.

 8            PROSPECTIVE JUROR NO. 12:  I live in Nassau for two

 9    years.

10            THE COURT:  We have a court reporter who is

11    transcribing every word that's being said.  So go slower and

12    speak louder.

13            PROSPECTIVE JUROR NO. 12:  Hempstead, Nassau.

14    Before that Queens, Queens, New York.  Richmond Hill for 17

15    years.  Education go ahead, no military.  Employment, New York

16    Presbyterian for 11 years.

17            THE COURT:  What do you do?

18            PROSPECTIVE JUROR NO. 12:  I work in the linen

19    department.

20            THE COURT:  The linen -- got it.

21            PROSPECTIVE JUROR NO. 12:  My spouse works at Mount

22    Sinai for eight years as a tech in the CAT lab.

23            THE COURT:  C-A-T?

24            PROSPECTIVE JUROR NO. 12:  Yes.  Children, three

25    kids, two sons, one daughter, 18, 26, 27.
```

SN        OCR        RPR

A-188

Jury Selection                    113

1      THE COURT:  Do they work outside the home?

2      PROSPECTIVE JUROR NO. 12:  Yes, my daughter also

3  works at New York Presbyterian in the OR department admitting

4  and discharge.  My son works at Mount Sinai also.  He's an

5  electrical engineer there.

6      THE COURT:  Okay.

7      PROSPECTIVE JUROR NO. 12:  Number seven, no other

8  employ, no.  No other adults who work outside the home.  No

9  jury service for number ten.  Number eleven, no involvement in

10  legal.  Number 12, I don't watch news.  I don't like the news.

11  13, television, I have Netflix and Prime.

12      THE COURT:  Are there shows you watch regularly?

13      PROSPECTIVE JUROR NO. 12:  Just basically movies.

14      THE COURT:  Okay.

15      PROSPECTIVE JUROR NO. 12:  No social media, just

16  Facebook basically just to keep in touch with family and

17  friends.  No organization membership;

18      THE COURT:  Thank you very much Mr. Roopnauth.

19      Number 13, Mr. Dean.

20      PROSPECTIVE JUROR NO. 13:  I live in Nassau County

21  for the last 30 years.  Education, BS in economics.  No

22  military service.  Currently self-employed, real estate

23  broker.

24      THE COURT:  How long have you been doing that?

25      PROSPECTIVE JUROR NO. 13:  The last 20 years.

SN      OCR      RPR

A-189

Jury Selection                    114

1        THE COURT:  Okay.

2        PROSPECTIVE JUROR NO. 13:  Married.  My wife does

3   not work outside of the house.  Three children; 28, 24 and 23.

4   They all -- one works from the house, but they all work

5   outside of the house.

6        THE COURT:  And what do they do?

7        PROSPECTIVE JUROR NO. 13:  One works for Deloitte on

8   the consulting side and the other is an accountant and the

9   other works in the travel business, the travel industry.

10       THE COURT:  All right.

11       PROSPECTIVE JUROR NO. 13:  No other employed adults

12   in the household.  No legal knowledge.  My father was an

13   attorney, but he's long since passed.

14       THE COURT:  What kind of law did he practice?

15       PROSPECTIVE JUROR NO. 13:  Corporate.  Jury service,

16   twelve years ago, state criminal case and we did reach a

17   verdict.  Not involved in any litigation.  News, Fox, network

18   news.  Television, I don't watch too much shows, occasionally

19   Blue Bloods.  I am not on social media and I'm a member of a

20   CIBS, Commercial Industrial Brokerage Society.

21       THE COURT:  Thank you very much, Mr. Dean.

22       Juror No. 14, Ms. Nzirubusa?

23       PROSPECTIVE JUROR NO. 14:  I live in Queens for the

24   last twelve years.  I have a Bachelor's degree in nursing.  No

25   military service.  I'm employed by the Department of Health of

SN      OCR      RPR

A-190

```
                            Jury Selection                    115

 1   New York City for the last five years.  Previous to that, I

 2   was at New York Presbyterian and previous to that was the

 3   Department of Health again.

 4            THE COURT:  And what do you do for the Department of

 5   Health?

 6            PROSPECTIVE JUROR NO. 14:  I'm a supervisor for a

 7   program that the Department of Health runs.

 8            THE COURT:  And what does the program do?

 9            PROSPECTIVE JUROR NO. 14:  We work with first time

10   moms, pregnant moms, to give them support through the

11   pregnancy until the baby turns two.

12            THE COURT:  Spouse or partner?

13            PROSPECTIVE JUROR NO. 14:  My husband is employed.

14   He's an economist.  He works for a major financial institution

15   as a manager.

16            THE COURT:  Which one?

17            PROSPECTIVE JUROR NO. 14:  J.P. Morgan.

18            THE COURT:  Okay.

19            PROSPECTIVE JUROR NO. 14:  Children, I have two,

20   both of them in college.  One is studying history and labor

21   law and the other one is undecided on what he wants to do.  He

22   just started first year.

23            THE COURT:  Okay.

24            PROSPECTIVE JUROR NO. 14:  No one else in my

25   household and no legal knowledge.  Relationship with lawyers,
```

SN        OCR        RPR

A-191

Jury Selection                          116

1   my brother is a lawyer that doesn't practice, but he lives

2   overseas.

3            THE COURT:  I see, okay.

4            PROSPECTIVE JUROR NO. 14:  Never have a chance to do

5   jury service.  No involvement in litigation.  News, NPR and

6   network news.  That's basically it.  Streaming services, I

7   think we have all of them at home.  I don't watch it, but my

8   kids do.

9            THE COURT:  No shows?

10           PROSPECTIVE JUROR NO. 14:  Just like Bachelorette.

11  Nothing good.  Social media, I have Facebook, Twitter and

12  Instagram, but they're inactive.  My kids they handle that.

13  Organizational membership, none.

14           THE COURT:  Okay.  Thank you very much

15  Ms. Nzirubusa.

16           Let's go now to 15, Ms. Parola?

17           PROSPECTIVE JUROR NO. 15:  I currently live in

18  Brooklyn.  I've been living in Brooklyn for about four years.

19  Previously I was in Queens for two years.  I have a BFA in

20  dance.  No military service.  I am currently a freelance

21  dancer and I also work at a climbing gym and at a brewery.  My

22  partner is a climbing coach and a personal trainer.  We have

23  no children and no other employed adults in the home.  No

24  legal knowledge or formal training there.  No relationships

25  with lawyers.  No jury service of any kind or involvement in

SN      OCR      RPR

A-192

```
                         Jury Selection                    117
```

1    litigation.  News, I predominantly consume that through NPR

2    and Crooked Media podcasts as well as New York Times.  I watch

3    very little television.  Social media, Instagram for the most

4    part and no organizational membership.

5           THE COURT:  Thank you very much Ms. Parola.  Very

6    efficient as well.

7           Ms. Mattina, 16?

8           PROSPECTIVE JUROR NO. 16:  I currently live in

9    Queens for the last six years.  Prior to that, I lived in

10   Brooklyn for 30 years.  I have a high school diploma.  No

11   military service.  I'm currently employed by a grocery chain

12   for the last three and a half years.  Prior to that, I worked

13   40 years at various brokerage firms.

14          THE COURT:  And what do you do now for the grocery

15   store?

16          PROSPECTIVE JUROR NO. 16:  Stock shelves and

17   register basically.

18          THE COURT:  And, before, what did you do for

19   brokerage firms?

20          PROSPECTIVE JUROR NO. 16:  I dealt with dividends

21   and income disbursement and corporate actions.

22          THE COURT:  All right.  Spouse or partner?

23          PROSPECTIVE JUROR NO. 16:  Excuse me?

24          THE COURT:  Do you have a spouse or partner?

25          PROSPECTIVE JUROR NO. 16:  Legally I have a partner

A-193

```
                      Jury Selection                    118
1    but we haven't lived to go for eight years, but he's currently
2    retired.
3             THE COURT:  What did he do before retirement?
4             PROSPECTIVE JUROR NO. 16:  He worked for Accounts
5    receivable for a law firm.
6             THE COURT:  Which one?
7             PROSPECTIVE JUROR NO. 16:  Milbank, Tweed.
8             THE COURT:  I've heard of it.
9             PROSPECTIVE JUROR NO. 16:  We have a child.  He's
10   33.  He's currently an adjunct with SUNY.
11            THE COURT:  What does he teach?
12            PROSPECTIVE JUROR NO. 16:  Classic literature and
13   writing.  No other employed adults.  No legal knowledge.  My
14   first cousin's husband is a lawyer.  He's retired right now
15   and last I knew he worked for the commodity exchange and an
16   ex-brother-in-law, he's also retired.  He was a defense
17   attorney.
18            THE COURT:  And where was he a defense attorney?
19            PROSPECTIVE JUROR NO. 16:  Up in Peakskill, New
20   York.
21            THE COURT:  All right.
22            PROSPECTIVE JUROR NO. 16:  Jury service, I was
23   second alternate in a federal case in this building about 30
24   years ago.
25            THE COURT:  Wow.
```

A-194

Jury Selection                                            119

1          PROSPECTIVE JUROR NO. 16:  I wasn't involved in

2  deliberations.  I was excused.  As I mentioned prior, there

3  was two litigations one I mentioned where the attorney

4  embezzled the funds.

5          THE COURT:  Right.

6          PROSPECTIVE JUROR NO. 16:  And currently I'm in

7  litigation for a car accident in January.

8          THE COURT:  Where is that being litigated?

9          PROSPECTIVE JUROR NO. 16:  Nassau County, I believe.

10          THE COURT:  You were the plaintiff or the defendant?

11          PROSPECTIVE JUROR NO. 16:  I was the victim.

12          THE COURT:  Okay.

13          PROSPECTIVE JUROR NO. 16:  News, I just peruse,

14  like, the New York Post, just for breaking news.  That's

15  basically it.  Television, I prefer British shows, mysteries

16  and comedies.  I have Facebook.  I don't participate too much.

17  It's more of a watchdog, stay in touch.  I belong to a

18  wonderful Golden Age Club at my neighborhood church.

19          THE COURT:  Terrific.  Thank you very much

20  Ms. Mattina.

21          Next we have Ms. Yepez.

22          PROSPECTIVE JUROR NO. 17:  I live in Astoria, Queens

23  for more than 20 years.  Education, high school.  No military.

24  I'm employed by the DOE.  I'm a school lunch helper a/k/a

25  lunch lady.

A-195

Jury Selection                               120

1        THE COURT:  And DOE, Department of Education?

2        PROSPECTIVE JUROR NO. 17:  Yes.

3        THE COURT:  How long have you been doing that?

4        PROSPECTIVE JUROR NO. 17:  Eight years.  I'm not

5   married.  I don't have children.  I live with my mother who is

6   not employed and I don't really know much about legal stuff.

7        THE COURT:  Okay.

8        PROSPECTIVE JUROR NO. 17:  No relationships with a

9   lawyer or anything like that.  I have done jury duty, but I've

10  never been picked as a juror.

11       THE COURT:  Okay.

12       PROSPECTIVE JUROR NO. 17:  Litigation, when I was

13  small, seven or eight, there was a car accident my parents

14  sued and they got money and that's about it that I remember.

15       THE COURT:  Okay.

16       PROSPECTIVE JUROR NO. 17:  News, I watch New York 1

17  that's about it.  Television, Netflix, Google, Hulu and I

18  watch It's Always Sunny, Witcher and the Goblin.  Social

19  media, I have a Facebook but I haven't used it in years.

20  Instagram, I like to look at the travel posts and I do not

21  belong to any organizations.

22       THE COURT:  Thank you Ms. Yepez.

23       Juror 18, Ms. Cipriano.

24       PROSPECTIVE JUROR NO. 18:  I've lived in Staten

25  Island, New York for over 25 years.  I went to business school

SN        OCR        RPR

A-196

Jury Selection                                          121

1   for about ten months.  I have no military service.  I

2   currently work for Skadden Arps.

3            THE COURT:  What do you do there?

4            PROSPECTIVE JUROR NO. 18:  I work for -- I'm

5   administrative assistant.

6            THE COURT:  How long?

7            PROSPECTIVE JUROR NO. 18:  20 years.

8            THE COURT:  You said that.  Go ahead.

9            PROSPECTIVE JUROR NO. 18:  My husband, he works for

10  Mercedes Benz in Brooklyn as an auto mechanic.  I have three

11  children, a set of twins, 14, boys, and a nine year-old little

12  girl.  Okay.  No other adults in the household.  Legal

13  knowledge I just work with lawyers.  Relationship to lawyers,

14  my bosses.

15           THE COURT:  And, so, are you in a particular section

16  or department?

17           PROSPECTIVE JUROR NO. 18:  I work for the white

18  collar crime in the office of general counsel.

19           THE COURT:  Are there particular lawyers you work

20  with regularly?

21           PROSPECTIVE JUROR NO. 18:  Both.

22           THE COURT:  What are their names?

23           PROSPECTIVE JUROR NO. 18:  I have for office of

24  general counsel I work for Larry Spiegel.  He's a partner in

25  white collar and also for Office of General Counsel, I work

SN        OCR        RPR

A-197

Jury Selection                                    122

1  for counsels -- I work for counsels -- for white collar I work

2  for Chad Silverman and a few others.

3          THE COURT:  Do you get involved much in the

4  substance of what they're doing or what do you do exactly for

5  them?

6          PROSPECTIVE JUROR NO. 18:  More administrative, you

7  know.

8          THE COURT:  So what would be an example of something

9  you would handle?

10          PROSPECTIVE JUROR NO. 18:  Travel, expenses,

11  sometimes document work.  It depends on the day.

12          THE COURT:  Do you talk to them much about the kinds

13  of cases they're working on?

14          PROSPECTIVE JUROR NO. 18:  There are days that we

15  talk, there are days that= -- you know, they're always so

16  busy -- yeah.

17          THE COURT:  Something that I mentioned to others

18  before, but I'm going to instruct the jurors on the law.

19  Would you have any difficulty following the law as I instruct

20  you and put out of your mind anything you might have heard

21  about at your job?

22          PROSPECTIVE JUROR NO. 18:  I don't think so.

23          THE COURT:  Can you --

24          PROSPECTIVE JUROR NO. 18:  Can I speak to you in

25  private for one second?

SN      OCR      RPR

A-198

```
                          Jury Selection                        123

1           THE COURT:  Sure, come on up.

2           (Sidebar held outside of the hearing of the jury.)

3           (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SN       OCR       RPR

A-199

```
                       Jury Selection                    124

 1          (The following sidebar took place outside the

 2   hearing of the jury.)

 3          PROSPECTIVE JUROR NO. 18:  I'm sorry, I didn't

 4   mention it before, but my white collar crime was involved in

 5   the Michael Nowak versus the US Government in Chicago.  So it

 6   was about a month ago.

 7          THE COURT:  Okay.

 8          PROSPECTIVE JUROR NO. 18:  So I'm not sure if it has

 9   any --

10          THE COURT:  Anything to do with this?

11          PROSPECTIVE JUROR NO. 18:  Right.

12          THE COURT:  No, but more importantly since you work

13   in a white collar unit it's important that you feel you can

14   put out of your mind any of the stuff you know about the law,

15   this area of the law, in assessing the facts of this case and

16   applying the law as I instruct you.  Do you think you could do

17   that?

18          PROSPECTIVE JUROR NO. 18:  That should be okay.

19          THE COURT:  And there's no connection to that Nowak

20   case?

21          PROSPECTIVE JUROR NO. 18:  And also I just lost my

22   dad seven days ago so I don't know if I would be handling

23   things very well.  We just buried him on Thursday, so I don't

24   know if I'm fully --

25          THE COURT:  Do you have concerns about your ability
```

SN        OCR        RPR

A-200

Jury Selection                          125

1   to focus right now?

2            PROSPECTIVE JUROR NO. 18:  Right now it's all

3   emotional right now, between my kids and my mom who's by

4   herself right now.  My apologies for not saying it before.

5            THE COURT:  I am so sorry, but I want to be sure

6   that you feel you can be here and focused on this case because

7   it does require your attention while you're here do you feel

8   you can do that?

9            PROSPECTIVE JUROR NO. 18:  I don't know that.  Every

10  day is a different story right now.

11           THE COURT:  Step away for one sec.

12           (Juror leaves sidebar.)

13           MS. KASSNER:  The Government would move to strike

14  her for cause.  I think there's a concern she might not be

15  able to focus on the trial given everything that she's going

16  through.

17           MR. SINGER:  I'm not sure it's a cause challenge,

18  but on a human basis I would say let her go.

19           THE COURT:  I am going to let her go.  She does seem

20  to be upset, understandably.

21           (Juror approaches.)

22           THE COURT:  So just go down to the Jury Department.

23           I am sorry for your loss.

24           (Continued on the following page.)

25

SN      OCR      RPR

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 126 of 263 PageID #: 612

```
                        Jury Selection                    126

 1              THE COURTROOM DEPUTY:  Juror 40 replacing Juror 18,

 2    Eugenia Stapor.

 3              THE COURT:  So Ms. Stapor, before you take a seat is

 4    there anything that you want to talk about?

 5              THE PROSPECTIVE JUROR:  Can I talk to you for a

 6    second?

 7              THE COURT:  Yeah.  Come up to the sidebar.

 8                    (Sidebar)

 9              THE PROSPECTIVE JUROR:  Okay.  My English isn't

10    perfect enough to take any decisions.  I don't want to be

11    confused because of the language is like not for me.

12              THE COURT:  Okay.  Have you understood everything

13    that's been said so far?

14              THE PROSPECTIVE JUROR:  Not much.

15              THE COURT:  Okay.  What's your country of origin?

16              THE PROSPECTIVE JUROR:  I am from Poland.

17              THE COURT:  How long have you lived here?

18              THE PROSPECTIVE JUROR:  Fifteen years.

19              THE COURT:  Have you worked outside?

20              THE PROSPECTIVE JUROR:  No, I am in house.

21              THE COURT:  Do you have much occasion to use English

22    during the day?

23              THE PROSPECTIVE JUROR:  Not much.  So I am not sure

24    what it do because I don't want to be confused and I don't

25    want to make decisions without knowing what's going on.
```

SG        OCR        RPR

A-202

```
                          Jury Selection                    127

 1            THE COURT:  Do you remember what I said when I
 2   described this case?  What it's about?
 3            THE PROSPECTIVE JUROR:  Yes, I remember.
 4            THE COURT:  What do you recall me saying?
 5            THE PROSPECTIVE JUROR:  Something about financial
 6   stuff.
 7            THE COURT:  Okay.
 8            THE PROSPECTIVE JUROR:  About crypto stuff.
 9            THE COURT:  And have you understood some of the
10   answers that people have been giving?
11            THE PROSPECTIVE JUROR:  Some of them, but not all of
12   them.
13            THE COURT:  Okay.  Before you came here, did you
14   study English?
15            THE PROSPECTIVE JUROR:  No, never.
16            THE COURT:  Okay.  So you learned once you got here?
17            THE PROSPECTIVE JUROR:  Yes.
18            THE COURT:  And are you married?
19            THE PROSPECTIVE JUROR:  Yes, I am married.
20            THE COURT:  To an American citizen?
21            THE PROSPECTIVE JUROR:  No.  My husband is Polish.
22            THE COURT:  I see.
23            THE COURT:  Does he speak English?
24            THE PROSPECTIVE JUROR:  Not at all.
25            THE COURT:  So you don't use English in the house?
```

SG        OCR        RPR

A-203

|  |  |  |
|--|--|--|
|  | Jury Selection | 128 |

1        THE PROSPECTIVE JUROR:  No.  Only my children speak
2  English.

3        THE COURT:  How old is your children?

4        THE PROSPECTIVE JUROR:  My daughter is 23 and my son
5  is 20.

6        THE COURT:  They've been here for 17 years also?

7        THE PROSPECTIVE JUROR:  Yes.

8        THE COURT:  And they are fluent in English?

9        THE PROSPECTIVE JUROR:  Of course.

10        THE COURT:  Let me have you take a step to the side
11  for a moment.

12        THE PROSPECTIVE JUROR:  Yeah.  Sure.

13        THE COURT:  I mean, it's hard for me to say, folks,
14  she seemed to have no problem understanding me right now and
15  she has two children who she raised here, who she's been
16  speaking English with, but her husband doesn't speak English
17  and doesn't work outside of the home.

18        MR. SINGER:  My concern is that she doesn't feel
19  she's understanding.

20        THE COURT:  And is a somewhat complicated case in
21  certain ways, so I'm inclined to let her go.

22        MR. SINGER:  I agree.

23        MS. KASSNER:  Thank you.

24        THE COURT:  Thank you.

25        Just go to the jury department and explain to them

A-204

```
                          Jury Selection                     129

 1   that you have some language issue.
 2             THE PROSPECTIVE JUROR:  Okay.
 3             THE COURT:  All right.  Thank you.
 4             THE PROSPECTIVE JUROR:  Thank you.
 5                        (Sidebar ends)
 6             THE COURTROOM DEPUTY:  Juror 41, Mohamed Ameela
 7   replacing Juror 18.
 8             THE COURT:  Do you have any positive responses to
 9   anything that was asked during the first round of questions?
10             THE PROSPECTIVE JUROR:  No, Your Honor.
11             Your Honor, I am currently employed by the New
12   York State Unified System and I work with the Deputy Chief
13   Administrative Judge.
14             THE COURT:  Okay.  Let's have you come up to the
15   sidebar for one second.
16                          (Sidebar)
17             THE COURT:  So you work for the administrative law
18   judges?
19             THE PROSPECTIVE JUROR:  She's the Deputy Chief
20   Administrative Judge for New York State for Access of Justice.
21             THE COURT:  How interesting.
22             THE PROSPECTIVE JUROR:  Yeah.
23             THE COURT:  I must confess, I don't know that much
24   about the State structure.
25             What is your job?
```

A-205

Jury Selection                           130

1    THE PROSPECTIVE JUROR:  I am an admin assistant and

2    I work directly with one of the attorneys.  We train newly

3    admitted attorneys, consumer debt training.  We have a

4    consumer debt, family law --

5              THE COURT:  So what subjects do your courts cover?

6              THE PROSPECTIVE JUROR:  Well, the department that we

7    are in, they cover family.  Right now, because it's COVID,

8    some of the programs are suspended.  Family law, housing,

9    consumer debt, and then we have consumer debt lawyers for the

10   day training.  They represent litigants who just -- they

11   represent litigants just for the day.  Just for that program.

12             THE COURT:  Okay.  Now, you obviously have extensive

13   knowledge about the court system in general, right?

14             THE PROSPECTIVE JUROR:  Yes, some.  Yeah.

15             THE COURT:  Bottom line, can you be fair and

16   impartial in this case despite the fact that you have a lot of

17   familiarity with courts and administrative proceedings?

18             THE PROSPECTIVE JUROR:  Yes, I can.

19             THE COURT:  It's okay, that you especially, and I

20   hope you appreciate this, have to judge this case based solely

21   on the evidence that's put forth during the trial and nothing

22   else.

23             THE PROSPECTIVE JUROR:  Yes.

24             THE COURT:  And the law, as I instruct it to you --

25             THE PROSPECTIVE JUROR:  Yes.

SG      OCR      RPR

A-206

```
                      Jury Selection              131

1          THE COURT:  Can you do that as well.

2          THE PROSPECTIVE JUROR:  Yes.

3          THE COURT:  And you can put out of your mind

4  whatever else you may see in your normal work life and base

5  your verdict solely on what happens here?

6          THE PROSPECTIVE JUROR:  Yes.

7          THE COURT:  You can do that?

8          THE PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Terrific.

10         Any other responsibilities?

11         THE PROSPECTIVE JUROR:  No.

12         THE COURT:  Thank you.

13         THE PROSPECTIVE JUROR:  Thank you.

14         THE COURT:  So Juror Number 18, you get to answer

15  the question that the others have, as well.

16         So Ms. Mohammed, I know you haven't had a chance to

17  look at the questionnaire yet, so take you're time.

18         Starting with question number one, what borough or

19  town do you live in currently?

20         THE PROSPECTIVE JUROR:  I live in Queens, New York.

21         THE COURT:  How long?

22         THE PROSPECTIVE JUROR:  For 18 years.

23         THE COURT:  Okay.  Formal education.

24         THE PROSPECTIVE JUROR:  Associate's degree in

25  computer science.  No military service.  I'm currently
```

SG     OCR     RPR

A-207

```
                          Jury Selection                    132

 1   employed with the New York State Unified Court System for

 2   18 years.  I have a spouse.  He is a sales associate.

 3            THE COURT:  Go a little slower.

 4            Do you have the microphone there?  Just make sure

 5   you get close to it.

 6            And as you know, we have a court reporter here

 7   transcribing everything, so go a tad slower.

 8            Your spouse works as a sale associates?

 9            THE PROSPECTIVE JUROR:  Yes.

10            THE COURT:  Where?

11            THE PROSPECTIVE JUROR:  P.C. Richards.

12            THE COURT:  How long?

13            THE PROSPECTIVE JUROR:  Six years.

14            THE COURT:  Okay.  Children?

15            THE PROSPECTIVE JUROR:  Yes.  I do have a

16   23-year-old son, 18-year-old daughter, and a 13-year-old

17   daughter.

18            My son works for Jet Blue as a aircraft technician.

19   My 18 year old is at Pace University, and the 13 year old is

20   in middle school.

21            THE COURT:  Do you have live with any other adults

22   besides --

23            THE PROSPECTIVE JUROR:  No.

24            Legal knowledge, I have some because I work for the

25   courts.
```

SG        OCR        RPR

A-208

Jury Selection                                         133

1        THE COURT:  Okay.  Did you ever study it independent

2   of your work?

3        THE PROSPECTIVE JUROR:  No.

4        THE COURT:  Okay.  Relationships with lawyers?

5        THE PROSPECTIVE JUROR:  I have some lawyer friends,

6   yes.

7        THE COURT:  Okay.  Outside of your work, do you have

8   any other friends or family who are lawyers?

9        THE PROSPECTIVE JUROR:  I have an ex-judge.

10       THE COURT:  Okay.  Where did that judge sit?

11       THE PROSPECTIVE JUROR:  She's no longer a judge at

12  the court, but she's a -- she works at Hofstra.

13       THE COURT:  Does she teach?

14       THE PROSPECTIVE JUROR:  She teaches law.

15       THE COURT:  What kind of law?

16       THE PROSPECTIVE JUROR:  I'm not sure.

17       THE COURT:  Okay.  All right.  Jury service?

18       THE PROSPECTIVE JUROR:  I've served at the state

19  court I think about ten years ago, but I wasn't -- I was just

20  waiting in the pool.

21       THE COURT:  Okay.

22       THE PROSPECTIVE JUROR:  Involved in litigation, no.

23       News, Channel 7, Channel 1.  Television, I watch

24  20/20, Lifetime.

25       Social media, Facebook, just for friends and family.

SG        OCR        RPR

A-209

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 134 of 263 PageID #: 620

```
                        Jury Selection                    134

 1           THE COURT:  All right.

 2           THE PROSPECTIVE JUROR:  And I am in no

 3   organizations, no membership.

 4           THE COURT:  All right.  Thank you very much,

 5   Ms. Mohammed.

 6           Juror Number 19, Mr. Duran.

 7           THE PROSPECTIVE JUROR:  I live in Queens, New York

 8   for all my 22 years.

 9           Education, I graduated high school, but one class

10   away from my associate's and then after that I'm going to work

11   on my bachelor's.

12           THE COURT:  And what will your associate's be in?

13           THE PROSPECTIVE JUROR:  Math and science.

14           THE COURT:  Okay.

15           THE PROSPECTIVE JUROR:  No military service.

16           Employment, I work for Dick's Sporting Goods.

17           THE COURT:  You work for?

18           THE PROSPECTIVE JUROR:  Dick's Sporting Goods.

19           THE COURT:  Oh, Dick's Sporting Goods.  As a sale

20   associates.  Okay.

21           THE PROSPECTIVE JUROR:  For a year and a half.

22           THE COURT:  And anything before that?

23           THE PROSPECTIVE JUROR:  No.

24           THE COURT:  Okay.

25           THE PROSPECTIVE JUROR:  No spouse or partner.
```

SG     OCR     RPR

A-210

```
                           Jury Selection                   135
 1   Definitely no children.  I live with my parents.  My dad is a
 2   truck driver who delivers shipments of fruit, and then my mom
 3   works with the kids on the school bus.
 4           THE COURT:  Okay.
 5           THE PROSPECTIVE JUROR:  Any legal knowledge, I never
 6   practiced law or anything like that.
 7           THE COURT:  Okay.  No   legal studies?
 8           THE PROSPECTIVE JUROR:  No.
 9           All right.  Relationship with lawyers, I have a
10   friend who wants to be a lawyer.  He just started today at his
11   new job at a firm.  I don't know the name of it.  I got to ask
12   him later.
13           THE COURT:  You don't have to ask him.
14           Do you know what kind of law he is going to
15   practice?
16           THE PROSPECTIVE JUROR:  No.  I didn't ask that.
17           THE COURT:  Okay.  Go ahead.
18           THE PROSPECTIVE JUROR:  Jury service, this is my
19   first time ever to reporting for jury duty.
20           THE COURT:  You're having fun, too.  I can tell.
21           THE PROSPECTIVE JUROR:  No involvement in
22   litigation.
23           News, I don't watch any news or anything like that.
24           THE COURT:  Okay.
25           THE PROSPECTIVE JUROR:  Services, I just watch
```

A-211

Jury Selection                    136

1  YouTube.  I watch video games and all that.

2          THE COURT:  All right.

3          THE PROSPECTIVE JUROR:  Social media, I use Twitter

4  most of the time.  I like -- it's funny watching people argue

5  about stupid things and then as well as I collect --

6          THE COURT:  You collect what?

7          THE PROSPECTIVE JUROR:  I collect shoes, as well as

8  resale.  It's a hobby.  It is not a job.

9          THE COURT:  Hang on.

10          Do you ever get involved in the stupid commentary?

11          THE PROSPECTIVE JUROR:  No, no, no.  I just like

12  watching them.  I just like getting a good laugh at it.

13          THE COURT:  Okay.

14          THE PROSPECTIVE JUROR:  And as for any

15  organizational membership, no.  No membership or anything like

16  that.

17          THE COURT:  Okay.  Great.  Thank you very much,

18  Juror Number 19.

19          Juror Number 20, Ms. Williams.

20          THE PROSPECTIVE JUROR:  I resided in Brooklyn for

21  28 years.

22          THE COURT:  28, okay.

23          THE PROSPECTIVE JUROR:  Yes.

24          And I have a MSN degree in nursing.  And another

25  seven months, I'll add doctorate nursing practice to my name.

A-212

Jury Selection                137

1        THE COURT:  Oh, good.  So say it again, you're about
2   to add doctor to my name?
3        THE PROSPECTIVE JUROR:  Yes.  Doctor of nursing
4   practice.
5        THE COURT:  Great.  Okay.
6        THE PROSPECTIVE JUROR:  And it's funny that you said
7   this because earlier you said about researching.  I do
8   extensive research in racial and social justice, because as
9   part of our studies and --
10       THE COURT:  Hold on one second.  I think you're
11  losing our court reporter.  And she can't actually see you
12  either.
13       Let's go back.  You do a lot of research about race
14  and social justice issues?
15       THE PROSPECTIVE JUROR:  Yes.
16       THE COURT:  Not as part of your job, but just on
17  your own?
18       THE PROSPECTIVE JUROR:  No, as part of my school.
19  It's a requirement.  Because as a nurse leader, you have to
20  know how to deal with people of different -- of diverse race.
21       THE COURT:  Okay.  So that's part of your current
22  education?
23       THE PROSPECTIVE JUROR:  Correct.
24       THE COURT:  All right.  Thank you.
25       THE PROSPECTIVE JUROR:  Yes.  So I have no military

A-213

```
                          Jury Selection                    138
 1   background.  I'm currently employed by New York City Health
 2   and Hospitals Services in Queens for the last few years.
 3   Prior to that, I was at Bronx Lebanon Hospital Systems.
 4              THE COURT:  Could you say that again.  Prior to
 5   that, you were --
 6              THE PROSPECTIVE JUROR:  At Bronx Lebanon.
 7              THE COURT:  Oh, Bronx Lebanon?
 8              THE PROSPECTIVE JUROR:  Yes.
 9              THE COURT:  Okay.
10              THE PROSPECTIVE JUROR:  But currently, I'm now at
11   New York Health and Hospitals in Queens.  I'm an assistant
12   nursing director.  I actually just got promoted last week to
13   associate nursing director, and my orientation started today,
14   but I was excused for jury duty.
15              THE COURT:  Very good.
16              THE PROSPECTIVE JUROR:  So hopefully I get to go
17   tomorrow.
18              THE COURT:  I don't control that, but okay.
19              THE PROSPECTIVE JUROR:  I know.
20              And my spouse is retired last year.  He worked at
21   Metropolitan Transit Authority System.  He was a bus operator.
22              THE COURT:  Okay.
23              THE PROSPECTIVE JUROR:  But he moved back home.  He
24   comes, like, about every three months, six months, just to
25   visit.  And my kids are grown, 34, and 30.  My daughter, she's
```

SG      OCR      RPR

A-214

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 139 of 263 PageID #: 625

Jury Selection                    139

1   a teacher with a charter school in Brooklyn.  And my son, he's
2   a manager at Capsule Pharmacy.
3            THE COURT:  A manager?
4            THE PROSPECTIVE JUROR:  At Capsule Pharmacy.
5            THE COURT:  Capsules Pharmacy, okay.  I never heard
6   of it.  Okay.
7            THE PROSPECTIVE JUROR:  And I don't have any other
8   adults in the household.  No -- not much in legal practice or
9   knowledge.  Just probably a little from school from when I was
10  in school doing my bachelor's.  We did probably, you know, a
11  little talking about legal stuff.
12           THE COURT:  Okay.
13           THE PROSPECTIVE JUROR:  And my cousin husband
14  actually is an immigration lawyer.  He works out of
15  Pennsylvania.
16           THE COURT:  Your cousin is an immigration lawyer?
17           THE PROSPECTIVE JUROR:  Her husband.
18           THE COURT:  Oh, cousin's husband?
19           THE PROSPECTIVE JUROR:  Mm hm.
20           THE COURT:  Okay.  And he works here in New York?
21           THE PROSPECTIVE JUROR:  No, in Pennsylvania.
22           THE COURT:  Pennsylvania, alrighty.
23           THE PROSPECTIVE JUROR:  And I work closely with a
24  risk manager that's actually -- she is a lawyer also.  She
25  does corporate law and any risk management stuff at my job.

SG      OCR      RPR

A-215

Jury Selection                                    140

1   And we have to communicate because of different people might

2   be suing the organization, and we have to give, you know, our

3   input as nurses.

4            THE COURT:  Okay.

5            THE PROSPECTIVE JUROR:  And RCAs.

6            I was here in 2014 for jury service.  I wasn't

7   chosen.  I have no involvement in litigation.

8            For news, I like to get different perspective of

9   news.  I look any kind of news, CNN, Channel 4, NBC, Fox News,

10  ABC, Channel 12 in New York.  Any news.  I look at any news

11  station.  I'm not bias.  I just like to get different

12  perspective.  And I listen to the morning show with Steve

13  Harvey when I going to work.  When I'm coming home I listen to

14  1010 WINS to know what the weather will be in the next day.

15           THE COURT:  The weather, that is?

16           THE PROSPECTIVE JUROR:  Yes.

17           THE COURT:  Okay.

18           THE PROSPECTIVE JUROR:  And I read different

19  magazines.  You know, I just like reading a lot of magazines.

20  I am in a book club, actually, a national book club.  So I do

21  a lot of reading.  I visit a lot of websites because of my

22  job, again.  Mostly like CDC, World Health Organization.  You

23  know, anything regarding healthcare.

24           THE COURT:  Okay.

25           THE PROSPECTIVE JUROR:  And I listen to any type of

A-216

Jury Selection                    141

1   music.  So television, I watch -- I have a Fire Stick, so I

2   look at a lot of movies when I have the time.  I'm not big on

3   the legal shows, like, the Law and Order stuff.  I like mostly

4   game shows like Family Feud, Jeopardy, Wheel of Fortune,

5   Pictionary.  Anything with game, I will look at it just to get

6   my mind off of regular work.

7            Social media, of course I'm not Facebook, Instagram,

8   and I really look at Facebook just to follow up, you know, see

9   how friends and family are doing.  Not making much comments,

10  just saying, hi, hello, happy birthday.

11           THE COURT:  Okay.  Pause.

12           THE PROSPECTIVE JUROR:  Sorry.

13           THE COURT:  Go ahead.

14           THE PROSPECTIVE JUROR:  Yes.  And organizational

15  membership, I am a member of the Association of Women's Health

16  and Obstetrics Nursing, A1.  I'm also a member of the

17  Association On Nurse leadership, AONL.  And I'm also a member

18  of the AMA Nursing Association.  And actually, I play a part

19  in the New York State Birth Equity Improvement Project.  It's

20  a project that's been going on since 2020.

21           THE COURT:  Is the word birth?

22           THE PROSPECTIVE JUROR:  Birth.

23           THE COURT:  Birth, I'm so sorry.  It's the mask, I

24  think.

25           THE PROSPECTIVE JUROR:  Yes, it is.

SG      OCR      RPR

A-217

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 142 of 263 PageID #: 628

Jury Selection                    142

1        THE COURT:  I got it.  Birth equity --

2        THE PROSPECTIVE JUROR:  -- improvement project.

3        THE COURT:  Got it.  Thank you.

4        THE PROSPECTIVE JUROR:  And I'm actually am a member

5   of a church -- of my church.

6        THE COURT:  Which church?

7        THE PROSPECTIVE JUROR:  Mount Sinai Church of God

8   and Christ.

9        THE COURT:  Mount Sinai Church of God and Christ.

10   Okay.

11        THE PROSPECTIVE JUROR:  I think that's about it.

12        THE COURT:  All right.  Thank you very much.

13        THE PROSPECTIVE JUROR:  You're welcome.

14        THE COURT:  Juror Number 19, Ms. William.  Now --

15   sorry, that was 20.

16        And 21 is Ms. Nardulli.

17        THE PROSPECTIVE JUROR:  Hi.  Let's see, I've lived

18   in Nassau County for 17 years.  I have a Bachelor's in

19   computer science.  No military service.  I am working at CUNY

20   Brooklyn College.  I've been there for 22 years.

21        THE COURT:  What do you do there?

22        THE PROSPECTIVE JUROR:  Helpdesk technician.  I have

23   a husband who is a project accountant at Turner Construction.

24        THE COURT:  Okay.

25        THE PROSPECTIVE JUROR:  I have one child,

SG      OCR      RPR

A-218

```
                         Jury Selection                    143

 1   fourteen-years-old.

 2           THE COURT:  All right.

 3           THE PROSPECTIVE JUROR:  No other adults live with

 4   us.  I know nothing about legal practice or studies.  No law

 5   school classes.  I don't know any lawyers.  No relationships.

 6   I've never served on a jury or Grand Jury.

 7           THE COURT:  All right.

 8           THE PROSPECTIVE JUROR:  No involvement with

 9   litigation.

10           News, I like to watch a lot of news.  I watch them

11   all, CBS, NBC, ABC, News 12.

12           THE COURT:  Like your neighbor.

13           THE PROSPECTIVE JUROR:  I also have a lot of

14   streaming channels.  I like a little bit of everything.  I do

15   enjoy Law and Order.  I like Food Network, as well.  Survivor,

16   Amazing Race, that type of thing.

17           Facebook and Instagram for social.  I enjoy being in

18   touch with friends and family.  I am not a member of any

19   organizations.

20           THE COURT:  Okay.  Thank you very much,

21   Ms. Nardulli.

22           Twenty-two, Ms. Faison; is that right?

23   THE PROSPECTIVE JUROR:  Yes.

24   THE COURT:  Okay.

25           THE PROSPECTIVE JUROR:  I currently live in
```

SG      OCR      RPR

A-219

Jury Selection                        144

1   Brooklyn.  I've been there for -- well, been here for about
2   33 years.  I have an associate's degree in nursing.  I have no
3   military background.  I currently work for DaVita Dialysis.
4           THE COURT:  You work for what dialysis?
5           THE PROSPECTIVE JUROR:  DaVita.
6           THE COURT:  DaVita, okay.
7           THE PROSPECTIVE JUROR:  I have no spouse.  I have no
8   children.  My dad -- I live with my dad.  He doesn't work
9   right now.
10          THE COURT:  Did he work before?
11          THE PROSPECTIVE JUROR:  Well, with the family
12  business.
13          THE COURT:  What's that?
14          THE PROSPECTIVE JUROR:  They have a -- well, he had
15  a grocery store and a couple of apartment buildings.
16          THE COURT:  Okay.
17          THE PROSPECTIVE JUROR:  No legal knowledge.  No
18  relationship with lawyers.  I've never served on a jury.  I
19  was involved in a lawsuit before.
20          I don't watch anything involving the news.  I don't
21  really watch TV like that, but I do have subscriptions.  I do
22  have social media; Instagram, Facebook, Twitter.  And no
23  organization.
24          THE COURT:  Thank you very much, Juror Number 22.
25          Juror Number 23, Mr. Gabriel or Ms.-- Mr. Gabriel.

SG      OCR      RPR

A-220

Jury Selection                    145

1   Yep.

2           THE PROSPECTIVE JUROR:  Residence, I'm living --

3   currently living in Brooklyn.  I lived here all my life.

4   Education, high school.  Military service, none.  Employment,

5   not currently.  I am currently retired.  Spouse, yes.  She

6   currently lives in the same house as me.

7           THE COURT:  Does she work outside of the home?

8           THE PROSPECTIVE JUROR:  Yes.  She have her own

9   business in end of life care.

10          THE COURT:  Okay.

11          THE PROSPECTIVE JUROR:  At many nursing homes.

12          THE COURT:  All right.

13          THE PROSPECTIVE JUROR:  Children, I got two.  My son

14  is a structural engineer for New York City.  My daughter is an

15  investment banker for Chase.  Other adults, no.  Legal

16  knowledge, no.  Relationship with lawyers, don't have any.

17          Jury service, I did two cases, state court of --

18          THE COURT:  Criminal or civil?

19          THE PROSPECTIVE JUROR:  Civil.

20          THE COURT:  Okay.  Were you --

21          THE PROSPECTIVE JUROR:  Before it was over, it was

22  settled.

23          THE COURT:  Okay.

24          THE PROSPECTIVE JUROR:  I never get to try any.

25          THE COURT:  In both cases?

SG      OCR      RPR

A-221

Jury Selection                                146

1         THE PROSPECTIVE JUROR:  In both cases.

2         THE COURT:  Okay.

3         THE PROSPECTIVE JUROR:  Involvement in legal

4    litigation, no.

5              News, I like CNN, 60 Minutes.

6              Television, cable, streaming, none.

7              Social media.  I don't like any social media.

8         THE COURT:  Okay.

9         THE PROSPECTIVE JUROR:  Organizational membership,

10   none.

11        THE COURT:  Okay.  I may have missed this.

12             Did you say that you are currently employed?

13        THE PROSPECTIVE JUROR:  No.  I'm currently retired.

14        THE COURT:  Okay.  What did you do before

15   retirement?

16        THE PROSPECTIVE JUROR:  Drive New York City Transit.

17        THE COURT:  Okay.  All right.  Thank you very much,

18   Juror Number 23.

19             And just to pause for a moment, folks.  Ordinarily,

20   we break for lunch at 1:00, but because we are pretty close to

21   getting to a point where I can let you all go for a bit of

22   time, we're going to push through, so that we can get, at

23   least, a part of you out of here soon for the rest of the day,

24   and then some of you a little bit later than that.  But

25   assuredly, we'll have some decision relatively soon, so the

SG        OCR        RPR

A-222

Jury Selection                                    147

1   day will not be that long for everyone.  I would like to push

2   through past 1:00 o'clock right now.

3              Juror Number 24, Mr. Ries.

4              THE PROSPECTIVE JUROR:  I live in Brooklyn.  I moved

5   here about 30 years I, guess.  I have a BS in psychology.  No

6   military service.  I am self-employed.  I have a S Corp.  That

7   does --

8              THE COURT:  Commercial art?

9              THE PROSPECTIVE JUROR:  What's that?

10             THE COURT:  What do you do?

11             THE PROSPECTIVE JUROR:  Commercial art, graphics and

12   music.

13             THE COURT:  Okay.

14             THE PROSPECTIVE JUROR:  My wife is a clinical social

15   worker.  They work on Zoom now.  I don't know if you call it

16   outside of the home or not.

17             THE COURT:  Okay.

18             THE PROSPECTIVE JUROR:  I have two children.  Son

19   34, daughter 28.  They don't live at home.

20             THE COURT:  Do they work outside of the house?

21             THE PROSPECTIVE JUROR:  Yeah.  Well, my son is a

22   coder for an internet startup.

23             THE COURT:  Hold the microphone.

24             Your son is a coder for?

25             THE PROSPECTIVE JUROR:  I'm sorry?

SG      OCR      RPR

A-223

```
                         Jury Selection                    148

 1            THE COURT:  Just hold the mic up.

 2            Your son is a coder for?

 3            THE PROSPECTIVE JUROR:  Yeah.  He writes codes,

 4   computer code.

 5            THE COURT:  Right.  Okay.  Just a reminder to keep

 6   the microphone close up.

 7            Go ahead.

 8            THE PROSPECTIVE JUROR:  Okay.

 9            THE COURT:  And your daughter?

10            THE PROSPECTIVE JUROR:  My daughter just gave birth

11   to a boy who is four months old.  She's at home now.

12            THE COURT:  Congratulations.

13            Okay.  So she's home for now.

14            THE PROSPECTIVE JUROR:  Let me see, legal knowledge,

15   nothing directly.  Okay.  I know a fair amount of lawyers and

16   my family has lawyers.

17            THE COURT:  What do they practice in?

18            THE PROSPECTIVE JUROR:  I have like cousins, inlaws,

19   but they're all in the west coast.  I'm not really that close.

20   I had a neighbor who was a class action guy for a number of

21   years.  And I know a couple of guys who pass the Bar, but they

22   work as accountants basically.

23            THE COURT:  All right.

24            THE PROSPECTIVE JUROR:  Jury service, I've been on

25   two juries.  I was impanelled once and then they settled.  And
```

SG      OCR      RPR

A-224

```
                         Jury Selection                    149

1    the second time they reached a verdict.  Both cases were

2    civil.

3               THE COURT:  All right.

4               THE PROSPECTIVE JUROR:  Let's see.  Okay.  I've been

5    in litigation.

6               THE COURT:  In what capacity?

7               THE PROSPECTIVE JUROR:  Going back to lawyers, I've

8    actually -- in my business, I've worked for a number of

9    campaigns, like, civilian circuit court judge doing, you know,

10   campaign materials.

11              THE COURT:  All right.

12              THE PROSPECTIVE JUROR:  I used to do that sort of

13   thing.  I was involved in litigation.  I was sued by somebody

14   who claimed they fell down the stairs of my building.  And let

15   me see --

16              THE COURT:  How was that resolved?

17              THE PROSPECTIVE JUROR:  You know, I don't really

18   know.  The insurance company for the house handled it.  I was

19   deposed.  The guy was deposed.  He claimed that he was running

20   down the stairs.  I don't know.  So the insurance company

21   dropped me.  I got a new insurance company after the

22   deposition and so on.  I never heard about it again so.

23              THE COURT:  All right.

24              THE PROSPECTIVE JUROR:  I assume it was settled.

25              THE COURT:  Any news sources?
```

SG        OCR        RPR

A-225

```
                          Jury Selection                   150

 1           THE PROSPECTIVE JUROR:  Yeah.  I read the Times

 2   online.  That sort of thing.  You know, just TV shows.  I

 3   don't watch a lot of legal shows or anything like that.  I'm

 4   on all the social media, but not very actively.

 5           THE COURT:  Okay.

 6           THE PROSPECTIVE JUROR:  I'm not really a member of

 7   any organizations.

 8           THE COURT:  All right.  Thank you very much,

 9   Mr. Ries.

10           Next Juror Number 25, Ms. St. Jeanos; is that right?

11           THE PROSPECTIVE JUROR:  St. Jeanos.

12           THE COURT:  Sorry.

13           THE PROSPECTIVE JUROR:  I live in Nassau County my

14   entire life.  I have a Bachelors degree in business and an MBA

15   in finance.  Never apart of the military.  I stopped working

16   when my first son was born and I haven't been back.  I was

17   married two years ago -- up to two years ago.  My husband

18   passed away.

19           THE COURT:  I'm sorry.

20           THE PROSPECTIVE JUROR:  I have three children.  One

21   is a CPA.  He's 29.  My daughter is 28 and she works for the

22   Discovery network in the marketing area.  And as I said

23   earlier, I have a son who is in law school, in Brooklyn law

24   school.  And I don't personally have any legal knowledge

25   unlike my family.  Lawyers, my husband was actually a lawyer.
```

SG      OCR      RPR

A-226

Jury Selection                                    151

1    He was a partner at Herr and Feinstein and he was in real

2    estate, commercial real estate.  Mainly the lending end.

3    Mostly worked for banks.  Represented banks I should say.

4              THE COURT:  Very sorry about your loss.

5              THE PROSPECTIVE JUROR:  Thank you.  Thank you.

6              Again, my son is in law school.  And also my

7    brother-in-law is an attorney.  He's a partner at Willkie

8    Farr.

9              THE COURT:  Okay.

10             THE PROSPECTIVE JUROR:  And he worked mainly in the

11   insurance industry.  Not health insurance, just general

12   insurance.

13             THE COURT:  Do you know if he is a litigator?

14             THE PROSPECTIVE JUROR:  He is a litigator actually.

15             THE COURT:  All right.

16             THE PROSPECTIVE JUROR:  I never sat on a Grand Jury.

17             Involved in litigation, I almost forgot about this,

18   but my children encouraged me to make one of those phone calls

19   against Zantac, which we took off the market.  Which we feel

20   like that had something to do with my husband's passing.  I

21   had contacted them about six months ago.  Nothing has

22   happened.  I know that the case is being decided in

23   California.  I'm not really following up on it.

24             THE COURT:  Okay.

25             THE PROSPECTIVE JUROR:  But I am, I guess, involved

SG        OCR        RPR

A-227

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 152 of 263 PageID #: 638

Jury Selection                       152

1    with that.

2            THE COURT:  That's a class action lawsuit?

3            THE PROSPECTIVE JUROR:  It's not considered class

4    action.  There's another name for it.  I forget what it's

5    called because class action everybody would share, but I guess

6    you're represented as an individual.

7            THE COURT:  Okay.

8            THE PROSPECTIVE JUROR:  But part of a part class

9    action.  I don't really understand exactly.

10           THE COURT:  All right.

11           THE PROSPECTIVE JUROR:  News, I watch all sources

12   ABC, NBC, CBS, Fox News.

13           TV, I have cable.  I like to laugh at sitcom.  Like,

14   young Sheldon came back on, I like it.  I like HGTV, House

15   Hunters, Food Network.  I do like 20/20.  Nothing over the

16   top, you know, for law related shows.

17           Social media, I just have Instagram mainly to follow

18   friends and mainly golden retriever videos.  That's what I

19   watch all the time.  That's my feed.  And I'm not a member of

20   any organization.

21           THE COURT:  All right.  Thank you very much.

22           Next we have Juror Number 26, Ms. Gorton.

23           THE PROSPECTIVE JUROR:  Okay.  Residence, I've been

24   in Brooklyn always.  Education, high school, grad, no

25   military, employment.  I work at St. Ephrem Catholic Academy.

SG        OCR        RPR

A-228

Jury Selection                          153

1        THE COURT:  Yep.  Okay.

2        THE PROSPECTIVE JUROR:  Yeah.  Lunchroom duty.  I've

3   been there 18 years.

4        THE COURT:  One of you have the same job.

5        THE PROSPECTIVE JUROR:  Yeah.  It's part-time.  It's

6   easy.

7        THE COURT:  Okay.

8        THE PROSPECTIVE JUROR:  My husband is a program

9   manager for the computers in MTA.  Children, two grown

10  children still living with me.  My son is 28.  He works for a

11  nonprofit organization, but he worked in their computer

12  department.  MY daughter is 26.  She works for a publicist.  I

13  don't know the names of their companies.  Sorry.

14       THE COURT:  It's all right.

15       THE PROSPECTIVE JUROR:  No other adults.  No legal

16  knowledge.  Not really.

17       THE COURT:  All right.

18       THE PROSPECTIVE JUROR:  Let's see, no lawyers.  I

19  served on a civil case once and in the middle of the trial

20  they settled.  Let's see, no litigation.

21       News, I do like NY1.  Sometimes Channel 2 or 7, but

22  I mostly like NY1.  Oh, here.  Courtroom, Law and Order, of

23  course.  And I do like old Matlock repeats.

24       Social media, no.  No organization either.

25       THE COURT:  All right.  Thank you very much, Juror

SG      OCR      RPR

```
                        Jury Selection                    154
```

1   Number 26.

2          Juror Number 27, Ms. James?

3          THE PROSPECTIVE JUROR:  I live in Brooklyn for over

4   20 years.  High school diploma.  No military service.  I work

5   for the Center for Family Support over 20 years now.  No

6   spouse.  I have three children.  Two boys in the military.  My

7   daughter is a nurse.  No other person in the household.  No

8   legal knowledge.

9          THE COURT:  Okay.

10         THE PROSPECTIVE JUROR:  No relationship to the

11  lawyers.  Never served as a juror or Grand Jury.  No

12  litigation.  News, Channel 1, Channel 7.  TV, I have Hulu and

13  Netflix.

14         Social media, Facebook, just to browse.  And no

15  organization membership.

16         THE COURT:  Okay.  Going back to Hulu and Netflix,

17  do you watch anything in particular?

18         THE PROSPECTIVE JUROR:  Just a lot of movies.

19         THE COURT:  All right.  No shows?  No particular

20  shows.?

21         THE PROSPECTIVE JUROR:  Oh, no.  No.

22         THE COURT:  All right.  So Juror Number 28 Mr. Chu.

23         THE PROSPECTIVE JUROR:  Yes.  I've been in Queens

24  all my life.  I have a Bachelors in business.  No military

25  service.  I am currently self-employed.  I am trading equities

A-230

Jury Selection                              155

1    with my own money.

2              THE COURT:  For himself in his own account.  Okay.

3              THE PROSPECTIVE JUROR:  Yeah.  My wife is a product

4    manager at an investment bank.  We have two children, ten and

5    nine.  No other adults in the house.  No legal knowledge.  My

6    aunt is a lawyer with Legal Aid, Albany.

7              THE COURT:  Does she do criminal or civil?

8              THE PROSPECTIVE JUROR:  I believe, civil.  Mostly

9    family related cases.

10             THE COURT:  Okay.

11             THE PROSPECTIVE JUROR:  And my cousin is a lawyer

12   that works for the DOJ.  She's in D.C. right now.

13             THE COURT:  Do you know what she does?

14             THE PROSPECTIVE JUROR:  Not specifically, no.

15             THE COURT:  Okay.

16             THE PROSPECTIVE JUROR:  Jury service, I've never

17   served on a jury or Grand Jury before.

18             THE COURT:  Okay.

19             THE PROSPECTIVE JUROR:  Not involved in litigation.

20   News, mostly, you know, finance related.  Bloomberg, CNBC,

21   Wall Street Journal and the Economist.  Streaming services, I

22   do subscribe to them all.  I basically watch whatever is

23   trending with my wife or kid.

24             Social media, mostly Twitter for headlines to see

25   what people are talking about.  Organizational membership,

SG      OCR      RPR

A-231

```
                          Jury Selection                    156

 1   I've launched a CFA Institute, which stand for Charter

 2   Financial Analysis.

 3            THE COURT:  Stanford Charter.

 4            THE PROSPECTIVE JUROR:  Just Charter Financial

 5   Analysis.

 6
                    (Continued on the following page.)
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SG      OCR      RPR

A-232

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 157 of 263 PageID #: 643

Jury Selection                      157

1   (Continuing.)

2           THE COURT:  Juror number 29, Ms. Kirk.

3           PROSPECTIVE JUROR:  I live in Long Beach 12 years.

4   I have BA in philosophy.  No military service.  I am currently

5   employed in market research.

6           THE COURT:  Keep your microphone close to your

7   mouth.

8           PROSPECTIVE JUROR:  I'm a widow.  I have one

9   daughter who is 33, she's autistic and a ward of the state.  I

10  have two other adults that live in the house.  My sister is a

11  retired school librarian, and her daughter is in early

12  childhood education.  I have no legal knowledge.  I have no

13  relationships with lawyers.  I have never served on a jury or

14  a Grand Jury.  I have been a plaintiff in a lawsuit that was

15  settled out of court.  And I listen to NPR and I read the New

16  York Times feed.  And I watch MSNBC.  I don't watch any TV

17  besides that.  I don't go on social media.  And I'm not a

18  member of any organization.

19          THE COURT:  Go back for one minute to you're a

20  widow.  Did your husband work outside the home before he

21  passed?

22          PROSPECTIVE JUROR:  Yes, he also worked in market

23  research.

24          THE COURT:  Thank you very much, juror 29.

25          Juror 30, Mr. Donovan.

Rivka Teich

A-233

```
                          Jury Selection                      158

1          PROSPECTIVE JUROR:  I currently live in Astoria,
2    been there for four years.  Before that in White Plains for
3    two years.  Before that outside of Albany.  Education, a
4    Bachelor's in business economics with a finance concentration.
5    No military service.  Employment, I'm a senior
6    biller/collector recorder for a law firm in the city,
7    Proskauer Rose, before that it was Carvath.
8          THE COURT:  How long have you been there?
9          PROSPECTIVE JUROR:  Proskauer, four years, four
10   and-a-half years; and Carvath two years.
11         I have a fiancée, she's a six grade English teacher
12   in Rigo Beach, Long Island.  No children.  No other adults in
13   the household.  Legal knowledge, I think I took business law
14   in college and just reading time entries -- I don't know what
15   they are talking about.  Relationship with lawyers, I work
16   with a bunch of partners. I have not served on a jury or Grand
17   Jury before.  I've not been involved in litigation.  News, I
18   prefer ABC7, but I read a little bit of everything, CNN, Fox
19   News to get a broader perspective.  Television cable, House of
20   the Dragon I'm watching now; other than that, just sports.
21   Social media, Facebook, Twitter, Instagram a little bit of
22   everything.  I don't post, but keep up with friends and
23   family.  And no organizations.
24         THE COURT:  Thank you very much.
25         Juror number 31, Mr. Gonzalez.
```

Rivka Teich

A-234

```
                        Jury Selection                    159

 1          PROSPECTIVE JUROR:  I lived in Hollis, Queens, about
 2   20 years.  I'm currently in college, second year, pursuing
 3   Bachelor's degree.  Number three is no.  Four, no.  Five, no.
 4   Six, no.  Seven, my mother and father.  My mother is an IT
 5   administrator, my father a construction worker.  Eight no.
 6   Nine, no.  Ten, also no.  Eleven, no.  Twelve, no newspapers
 7   or TV shows or radio shows or magazines or blogs.  In terms of
 8   websites, YouTube.  Thirteen, I do not watch any regularly.
 9   Fourteen, Instagram.  And 15 is no.
10          THE COURT:  Very economical and efficient, thank you
11   very much.
12          Last, but not least, we have Mr. Cheng.
13          PROSPECTIVE JUROR:  I lived in Queens, New York, for
14   over 33 years.  Education, I started with pharmacy doctor but
15   ended with accounting Bachelor's.  I have not done military
16   service.  My employment is at New York City Parks, I'm doing
17   permits.  I'm not married, no children.  My mom and dad.  My
18   father is a waiter, my mom is an interpreter.  Legal knowledge
19   is Business Law one, two, three from accounting.  I have a
20   friend that is a lawyer, I don't know what he practices.  I
21   have not been picked for jury service.  My girlfriend got hit
22   by a car, but I think it was settled.  I don't really read
23   news too much.  Nothing specific for 13.  Fourteen I only use
24   Facebook for messaging.  I read Reddit.  And no organization.
25          THE COURT:  Thank you very much, Mr. Cheng.  I'm
```

Rivka Teich

A-235

Sidebar                                                          160

1   going to have a word with the lawyers at sidebar.

2          (Sidebar.)

3          THE COURT:  Any follow-up questions.  Defense?

4          MR. SINGER:  I don't think so.

5          MS. KASSNER:  No.

6          THE COURT:  Okay.  My plan is to basically let

7   people go who are not in the 32 -- you know what, to err on

8   the safe side, I'll let everybody go for about 20 minutes,

9   you'll exercise your peremptories, then we'll call everybody

10  back.  Then we'll release those and the rest of the venire

11  after that, just in case we have any unexpected crisis okay.

12  I can't imagine at this point because unless somebody does

13  something, unless we lose someone during lunch, suppose

14  somebody doesn't come back.

15          I'll let them go for 20 minutes.  You guys assemble

16  at five before the 20, so you get 15 minutes to put together

17  your selections.  We'll do it, then we'll bring them all back.

18          MR. SINGER:  And then?

19          THE COURT:  Then take a break for lunch and opening

20  after.

21          MR. NAVARRO:  Your Honor, just because we have a

22  couple witnesses lined up, is the expectation that the first

23  witness will go in the morning at this point?

24          THE COURT:  No.  How long are your openings?  It

25  can't be that long.

Rivka Teich

A-236

```
                           Jury Selection                    161
 1          (In open court.)
 2          THE COURT:  We'll take 20 minutes.  Everybody will
 3  leave so the parties can do the peremptories.  We'll let you
 4  know the good news of who is in the jury and who is not.  I'll
 5  ask that everybody return in case we have unexpected glitches
 6  and need to fill-in the first 32.  Come back at quarter of
 7  two.
 8          I know it's not long enough for you to get lunch.
 9  There is a snack concession downstairs on the first floor if
10  you need to get something to eat, but be back here.  For many
11  of you, you'll be completely done -- for everyone but the
12  people on the jury, you'll be done by the time you return at
13  quarter of.  Those papers leave here, all the questions leave
14  here.  If you want to get outside, although it's not nice
15  weather, you can do that.  But we have to have everyone leave
16  the courtroom.
17          (Prospective jury panel exits.)
18          (Brief recess.)
19          THE COURT:  We're going to start with the peremptory
20  challenges.  The Government gets one, and then back to the
21  defense for four.
22          MS. KASSNER:  Yes, Your Honor.  The Government would
23  strike juror number four.
24          THE COURT:  That is Ms. Chen.
25          MS. KASSNER:  That's correct.
```

A-237

Jury Selection                           162

1     THE COURT:  Okay.  Back to the defense for four.

2     MR. SINGER:  The defense will challenge number one,

3  Ms. Donaldson; six, Mr. Kresowaty; number 13, Mr. Dean; number

4  17, Ms. Yepez.

5     THE COURT:  Back to the Government for two.

6     MS. KASSNER:  The Government would strike number 20.

7     THE COURT:  Ms. Williams.

8     MS. KASSNER:  That's correct.

9     And the Government would additionally strike number

10  21.

11     THE COURT:  Ms. Nardulli.

12     Back to the defense for four.

13     MR. SINGER:  Defense would challenge number three,

14  Ms. Dawkins.

15     THE COURT:  Just remember for the regular jury you

16  can only go up to juror number 28.

17     MR. SINGER:  Yes.

18     THE COURT:  Three more.

19     MR. SINGER:  Number nine, Ms. Ramos.  Number 25,

20  Ms. St. Jeanos; number 26, Ms. Gorton.

21     THE COURT:  Back to the Government for two.

22     MS. KASSNER:  Number five, Mr. Corbet; and number

23  eight, Mr. Price.

24     THE COURT:  Back to the defense for two.

25     MR. SINGER:  Number 11, Ms. Ferrer.

Rivka Teich

A-238

```
                         Jury Selection                    163

 1          THE COURT:  One more.

 2          MR. SINGER:  And number 27, Ms. James.  That's my

 3   tenth, right?

 4          THE COURT:  Yes.  Last strike for the Government.

 5          MS. KASSNER:  Number ten, Mr. Hess.

 6          THE COURT:  Okay.  Let's go to the alternates and

 7   then after we're done I'll recapitulate the final list of

 8   jurors.

 9          First to the Government for the one strike for the

10   alternate.

11          MR. NAVARRO:  Just to clarify we're going from 28

12   up --

13          THE COURT:  Twenty-nine.

14          MR. NAVARRO:  Twenty-nine to 32.

15          THE COURT:  Correct.

16          MR. NAVARRO:  Could we have one moment to confer?

17          THE COURT:  Yes.

18          MS. KASSNER:  Number 31.  And I'm confirming the

19   name --

20          THE COURT:  Gonzalez.

21          MS. KASSNER:  That's correct.

22          THE COURT:  And then strike for the defense.

23          MR. SINGER:  Defendants challenge number 29,

24   Ms. Kirk.

25          THE COURT:  All right.  So with respect to the
```

A-239

```
                    Jury Selection                    164
```

1    regular jury, juror one is Ms. Fisher.  Juror two should be, I

2    think it's Simiao Chen, who was juror number 33.

3         MR. NAVARRO:  I believe --

4         THE COURT:  It's Zhen Chen.  Correct.

5         MS. KASSNER:  Yes.

6         THE COURT:  That's number two.

7         MR. SINGER:  Sorry.  That is?

8         THE COURT:  Formerly 35.  Zhen Chen is now number

9    two.  Juror three is Mr. Roopnauth, formerly 12.

10        MR. NAVARRO:  Yes.

11        THE COURT:  Juror four is Ms. Nzirubusa, formerly

12   14.  Five is formerly 15, Ms. Parola.  Six is formally 16,

13   Ms. Mattina.  Seven is formerly 18, Ms. Mohammed --

14        MR. SINGER:  I'm sorry?

15        THE COURT:  Formerly 18 is now seven, Ms. Mohammed,

16   and she was 31 before.  Formerly 19 is now number eight,

17   that's Mr. Duran.  Ms. Faison, formerly 22, is now nine.

18   Formerly 23, Mr. Thomas, is now ten.

19        MR. SINGER:  I'm sorry.

20        MR. NAVARRO:  Your Honor --

21        THE COURT:  I'm sorry.  Gabriel, last name, that's

22   formerly 39, then he became 23, and now he's ten, that's

23   Mr. Gabriel Glasgow, as in the city.  Number 11 is Ethan Ries,

24   formerly 24.  And number 12, last regular juror, is Mr. Chu,

25   formerly 28.

A-240

Case 1:19-cr-00386-PKC    Document 78    Filed 12/01/22    Page 165 of 263 PageID #: 651

```
                         Jury Selection                    165

 1          Do I have that right Government?

 2          MR. NAVARRO:  Yes, Your Honor.

 3          THE COURT:  And defense?

 4          MR. SINGER:  One moment, Judge.  Yes.

 5          THE COURT:  Then the two alternates will be number

 6   one, Mr. Donovan, formerly 30.  And Mr. Cheng, formerly 32,

 7   he's alternate two.

 8          Correct, Government?

 9          MR. NAVARRO:  That's correct.

10          THE COURT:  And defense?

11          MR. SINGER:  Yes.

12          THE COURT:  We'll bring everybody back in here and

13   Ryan will excuse everyone who is excused.

14          We'll let everyone else go and take a break for

15   lunch before opening, and I'll give them a full hour.  So

16   we'll start up around three.

17          THE COURT:  Once we seat the jury I'll ask if you're

18   both -- if you consent to the jury, or is the jury acceptable.

19          (Prospective jury panel enters.)

20          THE COURT:  Please be seated everyone.  I know this

21   is the moment you've all been waiting for.  Our deputy will

22   announce the jurors.  Amongst those who are excused, don't get

23   up and leave yet because everyone who has been excused,

24   including everyone on this side of the room, can all leave at

25   once with our thanks.  So go ahead, Ryan.
```

A-241

Jury Selection                                    166

1        THE COURTROOM DEPUTY:  First juror excused Marcia

2  Donaldson, Yashika Dawkins, Simiao Chen, Patrick Corbet,

3  Kenneth Kresowaty, Lloyd Price, Veronica Ramos, Joseph Hess,

4  Karen Ferrer, Francis Dean, Evelyn Yepez, Sonnja Williams,

5  Vanessa Nardulli, Kathleen St. Jeanos, Ann Gorton, Valerie

6  James, Joann Kirk, Harold Gonzalez.

7        THE COURT:  So again, thank you everyone for your

8  patience this morning and you're willingness to serve as

9  jurors.  I especially appreciate how punctual you've all been.

10  With our thanks, you are free to go.  As are all of the other

11  individuals who have not yet participated in the selection.

12  Thank you everyone.

13             (Excused juror exit.)

14        If you were not struck, remain here.  For those of

15  you who are here, we'll have you re-arranged.

16        Juror number two can move to juror number one.

17        Addressing the jurors, thank you very much again for

18  your patience throughout this process.  As you can see one of

19  the jurors who was selected isn't here at the moment.  What

20  we're going to do is break for lunch and you guys have an hour

21  for lunch.

22        And then the plan is to start the trial after the

23  lunch break with opening statements.  I'll give you some other

24  instructions about how the trial will proceed.  We will swear

25  you in after the lunch break.  I need to talk to the lawyers a

Rivka Teich

A-242

```
                         Jury Selection                     167
```

 1   little bit about what to do about our one missing juror.  At

 2   any rate, it's my anticipation or expectation that we'll go

 3   forward this afternoon in any event.

 4          For now the only instructions I want to give you is

 5   henceforth:  You should not talk at all about this case with

 6   anyone.  Don't let anyone talk to you about the case.  And I'm

 7   instructing the lawyers, the parties, the trial teams, the

 8   translators even, not to speak to you at all, for the purpose

 9   of avoiding any appearance that they are talking to you about

10   the case.  So if you see them in the hallway and they

11   completely disregard you, they are not being rude; they are

12   following my instruction not to speak you to at all.  I am, on

13   the other hand, able to say hello to you of course and we can

14   chat about anything but the case, the weather or something

15   like that.

16          Don't do any research, don't blog or chat with

17   anybody about the fact that you've even been chosen for this

18   jury.  For now basically no communications at all with anyone

19   about the case, about the lawyers, or anyone else involved in

20   this case.  That will be true from now until when you finish

21   your jury service.  And even amongst yourselves, you should

22   not talk about the case.  Because until you reach your

23   deliberations, the point that you're actually in that room

24   deliberating, you're not to talk about the case with anyone

25   including each other.

A-243

Jury Selection                              168

1      So at some point when you go home this afternoon you

2  can't talk to anybody about the case other than you can say:

3  I got picked for a jury.  But avoid any conversation at all

4  about the substance of the case.  If anyone tries to speak you

5  to about the case, let our deputy Ryan know immediately.

6          Okay.  Go and have a good lunch.  Be ready to go at

7  five after three, we'll start the trial then.

8          (Jury exits the courtroom.)

9      THE COURT:  I've never had this happen before.  He

10  didn't understand my directions, or I guess the exercise of

11  calling out those people who were excused.  We have a couple

12  of options.  I will ask Ryan to talk to the jury department

13  about seeing if they can contact Mr. Ries on his cellphone.

14      MR. SINGER:  Why not call the Marshals, ask them to

15  call out his name.

16      THE COURT:  Assuming he has a cellphone.

17      MR. SINGER:  Everybody's got a cellphone.

18      THE COURT:  Or if he checked it.  Let's do that.  I

19  don't have the number for downstairs.

20      MR. NAVARRO:  I'm happy to walk down.

21      THE COURT:  Mr. Navarro is going to see if he can

22  find Mr. Ries and his phone.  If that fails and if we can't

23  contact him to get him back here by three, the question is

24  whether or not we should proceed with the jurors we have; and

25  my suggestion is yes.  Because we'll have still one alternate

Rivka Teich

A-244

```
                        Jury Selection                    169

1   for a relatively short trial.  I'll hear from the parties.

2            MS. KASSNER:  Your Honor, the Government would be

3   fine with proceeding with one alternate given the brevity of

4   the trial.

5            THE COURT:  Mr. Singer.

6            MR. SINGER:  That's fine.

7            THE COURT:  All right.  Let's hope we can reel

8   Mr. Ries back in.  I think between maybe the phone option,

9   let's hope for a long line, or get in touch during the lunch

10  break and we'll be able to have the full 14 back here.

11           I'll wait until the jury comes back to swear them

12  in, and then ask you if they are satisfactory to you before.

13  I didn't want to do that now since we're missing the one.

14  Then start with the opening at 3:00 o'clock.

15           There was one issue that was unresolved that you

16  raised, Mr. Singer.  I don't know if it's going to effect

17  openings, but let's try to resolve now.

18           MR. SINGER:  It does not effect openings.

19               (Juror enters courtroom.)

20           THE COURT:  Are you Mr. Ries?

21           PROSPECTIVE JUROR:  Yes.

22           THE COURT:  Perhaps you misunderstood, you're part

23  of the jury now.  You weren't excused.  You just need to hold

24  here for one moment.  I'm going to send my law clerk back,

25  we'll give you instructions and a pass card.  What will happen
```

A-245

```
                         Jury Selection                      170
```

1  next, after the deputy orients you to where the jury room is

2  and all that, we'll take a break for lunch until about

3  3:05 p.m.  You'll be free to go for about an hour but come

4  back because we're starting the trial after that.

5          Have a seat.  You're part of the jury now.  Did they

6  find you in the lobby?

7          PROSPECTIVE JUROR:  No.  I was in the assembly room.

8          THE COURT:  Here is Mr. Ries.

9          THE COURTROOM DEPUTY:  Great.

10          THE COURT:  Thank you, Mr. Ries.

11          (Juror exits the courtroom.)

12          THE COURT:  If you can text Mr. Navarro, tell him to

13  come back.  Crisis averted.  We found our prodigal juror.

14          Mr. Singer, what was the last issue?  Let's tee it

15  off.

16          MR. SINGER:  It's simply that when the questions

17  came up about the use of the phone of Mr. Goklu's phone after

18  he was arrested, the Government had spoken to one of the two

19  agents and provided a report of their conversation.  And that

20  Agent Liefke had indicated that there were, that he was

21  unaware of or there were no signed consents of any kind --

22          THE COURT:  Okay.

23          MR. SINGER:  -- with regard to the phone.

24          On Friday according to the notes -- we received

25  notes of a conversation with the undercover officer, we

A-246

```
                        Jury Selection                    171
```

 1  received those on Saturday, two days ago -- I believe it was a

 2  conversation that the notes indicated had taken place on

 3  Friday.  In the conversation with the undercover officer, he

 4  had indicated that in his experience, four years of experience

 5  with Agent Liefke, that he always obtained a signed Miranda

 6  form.  And O'Kain also indicated that his belief was that

 7  Liefke did get a signed consent to use the phone.

 8          I suspect he might be mistaken about that, but I

 9  wanted to clarify.  Because we never received either a signed

10  Miranda form or other consent to review the phone.  And the

11  undercover seems to indicate that one or both of those forms

12  may have been prepared and signed.  So I just wanted to

13  clarify them.

14          MS. KASSNER:  Yes, Your Honor.  I'm sorry I would

15  have clarified this with defense counsel earlier, but as far

16  as -- I guess, I'll clarify two things.

17          There is no, as far as we're aware, we've done a

18  diligent search of the case file and there is no written

19  Miranda waiver in this case.  None has been produced because

20  it doesn't exist.  There is also no written form that was

21  signed by the defendant giving written consent to use his

22  cellphone after his arrest.

23          I will note that while we produced the notes of our

24  conversation with the undercover agent as 3500, that doesn't

25  mean his account, his recollection, is accurate.  He actually

A-247

Jury Selection                                   172

 1    wasn't in the room when the interview began.  And so with

 2    respect to the Miranda form, he wouldn't have been there if

 3    one had been signed.

 4              So I'm not sure what -- I guess that's the

 5    clarification, I'm not sure if there is more information the

 6    Government can provide.

 7              THE COURT:  So that resolves what seemed to be an

 8    inconsistent.  There is no written Miranda or consent form

 9    still.  The undercover, to the extent that he thought one

10    might have been or would have been created, was presumably

11    mistaken.

12              MR. SINGER:  Judge, that's fine.  It's just there

13    was that rather glaring inconsistency.  I just wanted it on

14    the record, how that had been resolved.  That's fine.

15              THE COURT:  Okay.  Is there going to be any

16    testimony, though, about any oral consent by Mr. Goklu to

17    allow the agents to use his phone to reach out to other

18    individuals?  No.

19              MS. KASSNER:  No, Your Honor.

20              THE COURT:  So nothing else I assume before we have

21    openings?

22              MS. KASSNER:  Very briefly, your Honor.  I just, and

23    this has to do with the limiting instruction that the parties

24    drafted.  It is the Government's position that some of the

25    defendant's signal messages with other customers do discuss

Rivka Teich

A-248

```
                          Jury Selection                      173
 1   washing money, detection by the NYPD, reporting people to the
 2   NYPD, and other things that fall under the category of
 3   attempting to conceal the nature, source, location of the
 4   funds being exchanged.  We just want to make sure that our
 5   opening statement won't run afoul of your Honor's ruling.
 6              THE COURT:  I think the defense's counter proposal
 7   is the way to go.  Because the defense basically says, you
 8   should be allowed to argue that these conversations with other
 9   people that suggest law enforcement sensitivity or trying to
10   avoid law enforcement detection can give rise to an inference
11   about trying to conceal the identity, location, or source of
12   the funds or the property.  So you can still argue that.
13              The question, though, is whether or not I instruct
14   the jury or characterize really for the jury, that these
15   communications relate to an intent to conceal or disguise the
16   nature, location, et cetera.  To me, I think the defense is
17   right, because it's one thing for me to say yes you heard a
18   conversation where the defendant said oh, watch out for
19   police; or, I always try to avoid the police, than saying the
20   intent was to conceal or disguise.  So the defense is only
21   asking that I not specifically say that those are
22   communications, relating to the intent to do all of those
23   things.
24              It doesn't mean the Government cannot argue that.
25   So all we would be doing is excising that reference where I'm
```

Rivka Teich

A-249

```
                          Jury Selection                      174
1   characterizing the communication.  But you would be free to
2   argue that that's what they should infer from those law
3   enforcement related conversations.
4            MS. KASSNER:  Thank you, your Honor, that clarifies
5   it.
6            THE COURT:  I've given the alternative instruction
7   that the defense is asking for.
8            Okay, we'll see you folks at five at after three
9   ready to go.  We'll swear in the jury and start from there.
10
11                  (Lunch recess.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Rivka Teich

A-250

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 175 of 263 PageID #: 661

|  | Proceedings | 175 |
|---|---|---|

1          A F T E R N O O N   S E S S I O N

2          (Time noted: 3:05 p.m.)

3          THE COURT:  Ryan brought to my attention that Juror

4    No. 5 told him that she just contacted her workplace and

5    understands that she might lose pay later this week if she is

6    on jury duty and doesn't go to work.  Now, I don't know what

7    later this week means but let's assume Thursday and Friday,

8    for example.  She wasn't aware of this before and she feels

9    badly for not bringing it up.  Juror No. 5 I believe is Alynn

10   Parola who was previously number 15.  I don't know what she

11   said she did, but it sounds like she might be in the physical

12   therapy area --

13          MR. SINGER:  She was a dancer.  A freelance dancer.

14   She works at a gym and at a brewery.

15          THE COURT:  What do you folks want to do?  We can

16   bring her out to ask more details about this and the question

17   is whether or not if she says she's going to literally lose

18   salary over this, which does happen; unfortunately we do tell

19   people who are independent contractors that they still have to

20   stay here for jury service.  Would you like me to bring her

21   out here to ask her more about her situation?

22          MS. KASSNER:  Yes, please.

23          MR. SINGER:  Yes, to get a sense of how she

24   responds.

25          THE COURT:  And then you will have a better sense of

SN        OCR        RPR

A-251

Proceedings                                176

1   if you want to excuse her or not.

2           Ryan, tell her we need to speak to her before we

3   start.

4           THE COURT:  Off the record.

5           (Discussion off the record.)

6           (Juror No. 5 enters.)

7           THE COURT:  Have a seat Ms. Parola.  Ryan advised us

8   that you just learned that there might be some issue with your

9   work as the week progresses.  So, can you tell us what the

10  situation is?

11          PROSPECTIVE JUROR NO. 5:  Sorry to make your life

12  hard.  I'm a hand-to-mouth worker so I have a lot of jobs and

13  if I don't work I don't get paid and I'm starting a new job

14  this week and it's a dance job which are really hard to get

15  right now.  So there's a lot of concern that if I don't make

16  it to work, that I might lose that job.

17          THE COURT:  Are you okay?  This is obviously very

18  upsetting to you.

19          PROSPECTIVE JUROR NO. 5:  I've got a lot of doctor's

20  appointments lined up this week, too, because I have a lot of

21  health stuff, too.  I apologize.

22          THE COURT:  No need to apologize.  It's good that

23  you were willing to serve and didn't raise this until now.

24  When you say a dance job, is that something you need to be

25  there for this week?

SN       OCR       RPR

A-252

Proceedings                                    177

1          PROSPECTIVE JUROR NO. 5:  Yes.

2          THE COURT:  When does that start?

3          PROSPECTIVE JUROR NO. 5:  Thursday morning.

4          THE COURT:  And then if you don't show up on

5    Thursday morning is there a chance that you won't be able to

6    keep that?

7          PROSPECTIVE JUROR NO. NO. 5:  Correct, yes.

8          THE COURT:  Where is that at, if you don't mind me

9    asking?

10          PROSPECTIVE JUROR NO. 5:  We are usually in Brooklyn

11   but occasionally we're in Manhattan.

12          THE COURT:  And then you also have doctor's

13   appointments?

14          PROSPECTIVE JUROR NO. 5:  Yes.

15          THE COURT:  When do those start?

16          PROSPECTIVE JUROR NO. 5:  Tomorrow.

17          THE COURT:  And those are not appointments that you

18   can move or want to movie I'm guessing?

19          PROSPECTIVE JUROR NO. 5:  They've been a little hard

20   to get.

21          THE COURT:  How many appointments do you have?

22          PROSPECTIVE JUROR NO. 5:  I think it might just be

23   one for this week.

24          THE COURT:  Now, is there anything else besides the

25   new dance position and the doctor's appointment that would

SN      OCR      RPR

A-253

Proceedings                                      178

1    cause problems for you?

2              PROSPECTIVE JUROR NO. 5:  I also probably wouldn't

3    get paid from the brewery that I work at or from the climbing

4    gym, which means I might not be able to pay rent this month.

5    It's a little stressful.

6              THE COURT:  Okay.  I'm going to have you go back to

7    the jury room.  Ryan will take you back.  Just give us a

8    second so I can talk with the lawyers.

9              PROSPECTIVE JUROR NO. 5:  Sorry about that.

10             THE COURT:  I am sorry this has caused so much

11   stress.

12             (Prospective juror exits.)

13             THE COURT:  Folks, it's a bit of see-saw.  We lost a

14   juror and we found a juror and now it appears we might lose

15   another one.  How do the parties want to proceed?

16             MS. KASSNER:  Your Honor, I think that it makes

17   sense to proceed with just one alternate given -- I think it's

18   readily apparent how much stress and -- frankly, it seems like

19   she really can't sit for this trial.

20             THE COURT:  Mr. Singer?

21             MR. SINGER:  I'm a little annoyed because she had

22   lots of opportunities to tell us this, but it seems pretty

23   clear that she's -- ordinarily if a juror came in and said

24   these things, I'm one of the first people to say let them go.

25   We're not trying to destroy their lives and have them lose

A-254

Proceedings                                        179

1    income.

2            THE COURT:  Well, annoyance --

3            MR. SINGER:  I don't think we have any choice now.

4    We have to let her go.

5            THE COURT:  On the other hand, I think she was

6    perhaps trying to do her duty but she should have raised this

7    before.  I'm going to let her go.  I do feel it would be

8    unduly stressful especially the last part about not being able

9    to pay rent.  Everything she raises are legitimate concerns

10   and obstacles to her serving.  We'll let her go and proceed

11   with the 13 jurors, 12 regular and one alternate.  I will tell

12   the jurors not to speculate at all as to why she's not with

13   them.  Let's just bring in everyone but her and then you can

14   go back and let her --

15           MS. KASSNER:  While that is happening, Your Honor,

16   could I place one thing on the record?

17           THE COURT:  Sure.

18           MS. KASSNER:  I spoke earlier with one of the

19   Government's anticipated witnesses, Mr. Patrick O'Kain,

20   formerly Special Agent Patrick O'Kain, and he alerted me that

21   he when he was in the restroom he ran into somebody who did

22   have a juror sticker on and there was a very brief exchange

23   where that individual held the door for him and he said thank

24   you.  That, as far as I'm aware, is the entirety of the

25   conversation, but just inn an extreme abundance of caution, I

SN        OCR        RPR

A-255

|  | Proceedings | 180 |
|---|---|---|

1   wanted to put that on the record.

2          THE COURT:  It's seemed innocent.  Do you want to

3   say anything, Mr. Singer, about that?

4          MR. SINGER:  Ms. Kassner informed me of that and I

5   agree, that's noneventful.

6          THE COURT:  For what it's worth, Mr. Singer, I could

7   have lectured her but it seemed like she was perhaps

8   misguidedly trying to do her duty, but not really realizing

9   that she could let us know the hardship it would have caused

10  her.

11         MR. SINGER:  I agree.  And she understands that it

12  was an inconvenience for all of us.

13         THE COURT:  Understood.  We're in a less-than-ideal

14  position, but certainly not fatal.

15         (Pause in proceedings.)

16         (Jury enters.)

17         THE COURT:  Please be seated everyone.  Ladies and

18  gentlemen of the jury, you may have noticed that we have one

19  less juror amongst you, but you are not to speculate at all as

20  to why it is that Juror No. 5 is no longer seated with you.

21         First, let me ask the Government, is the jury

22  satisfactory to the Government?

23         MS. KASSNER:  Yes, Your Honor.

24         THE COURT:  And to the defense?

25         MR. SINGER:  Yes.