# 24-767-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

MUSTAFA GOKLU, AKA Mustangy,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## APPENDIX
## Volume 2 of 5 (Pages A-256 to A-511)

MATTHEW BRISSENDEN
MATTHEW W. BRISSENDEN, P.C.
*Attorneys for Defendant-Appellant*
666 Old Country Road, Suite 501
Garden City, New York 11530
(516) 683-8500

CP COUNSEL PRESS    (800) 4-APPEAL • (333855)

i

## TABLE OF CONTENTS

**Page**

District Court Docket Entries ................................... A-1

Complaint, dated May 5, 2019................................. A-19

Superseding Indictment, Filed on
   October 28, 2020 ................................................ A-33

The Government's Requests to Charge, dated
   September 12, 2022, with Proposed Verdict Sheet
   Attached.............................................................. A-38

Defendant's Requests to Charge,
   dated September 12, 2022..................................... A-70

Transcript of Jury Selection Held before of the
   Honorable Pamela K. Chen, dated October 3,
   2022 .................................................................... A-76

Excerpts from Trial combined Opening through
   Verdict, Filed on December 1, 2022 ..................... A-264

Government Exhibit 501........................................... A-753

Government Exhibit 502........................................... A-761

Government Exhibit 503........................................... A-765

Government Exhibit 504........................................... A-770

Government Exhibit 505........................................... A-776

Government Exhibit 506........................................... A-786

Government Exhibit 507........................................... A-792

Government Exhibit 901........................................... A-799

ii

| | Page |
|---|---|
| Government Exhibit 902 | A-812 |
| Government Exhibit 903 | A-814 |
| Government Exhibit 904 | A-849 |
| Government Exhibit 906 | A-864 |
| Government Exhibit 907 | A-895 |
| Government Exhibit 909 | A-916 |
| Government Exhibit 1101 | A-928 |
| Jury Instructions, Filed on October 11, 2022 | A-929 |
| Verdict Form, dated October 11, 2022 | A-958 |
| Notice of Motion, by Defendant, for Judgment of Acquittal, dated November 10, 2022 | A-960 |
| Affirmation of Murray E. Singer, for Defendant, in Support of Motion, dated November 10, 2022 | A-961 |
| Government Memorandum of Law in Opposition to Defendant's Post-Trial Motion, dated December 5, 2022 | A-965 |
| Reply Affirmation of Murray E. Singer, for Defendant, in Further Support of Motion, dated December 12, 2022 | A-988 |
| Memorandum and Order, dated January 13, 2023 | A-990 |
| Sentencing Memorandum from Sabrina P. Shroff to the Honorable Pamela K. Chen, dated January 15, 2024 | A-999 |
| Transcript of First Sentencing Day held before the Honorable Pamela K. Chen, dated January 29, 2024 | A-1008 |

iii

**Page**

Excerpt from the Continued Sentencing Hearing
   held before the Honorable Pamela K. Chen, dated
   March 14, 2024 ....................................................... A-1054

Notice of Appeal, Filed on March 22, 2024 .............. A-1117

A-256

Proceedings                          181

1     THE COURT:  So we're now going to swear you in so if

2 you will rise and raise your right hand.  I promise you it's

3 the last time today you will have to be sworn in.

4          (Jury sworn.)

5     THE COURT:  Ladies and gentlemen, we are about to

6 begin the trial of this criminal case about which you heard

7 some during the process of jury selection.  Now that you have

8 been sworn in, I would like to give you some preliminary

9 instructions to guide you in your participation in this trial.

10          To begin with, you are here to administer justice in

11 this case according to the law and evidence.  You are to

12 perform this task with complete fairness and impartiality and

13 without bias, prejudice or sympathy for or against the

14 Government or the defendant.  This is important to the

15 defendant who is charged with two crimes and has a

16 Constitutional right to receive a fair trial.  The case is

17 also important to the Government, since the enforcement of

18 criminal law is important.

19          The case is based on an indictment, which I

20 discussed with you briefly during jury selection, which

21 charges the defendant with money laundering and unlicensed

22 money transmitting.  As I have already advised you, the

23 indictment is the document by which a criminal action is

24 commenced.  It is merely an accusation, a charge.  It is not

25 evidence of the defendant's guilt.  It will be your duty to

SN       OCR       RPR

A-257

Proceedings                                    182

1    find from the evidence what the facts are.  You and you alone

2    are the judges of the facts.  You will then have to apply

3    those facts to the law as I instruct you at the conclusion of

4    the trial.

5            You must follow the law whether you agree with it or

6    not.  Now, from time to time, legal issues may arise which are

7    of no concern to you.  You decide the facts, but I decide the

8    law.  These issues may make it necessary for me to confer with

9    the counsel at sidebar, as you have already seen, or to excuse

10   you from the room so that we can have a longer discussion and

11   you can be more comfortable during that brief break.  You are

12   not to be speculating as to what we're talking about and

13   please do not take any offense that we're talking about

14   something out of your presence.

15           Now, nothing I say or do during the course of the

16   trial is intended to indicate or should be taken by you as

17   indicating what your verdict should be.  At times I may ask

18   questions.  If so, it's only for the purpose of clarification.

19   It is not in any way intended to indicate an opinion about the

20   facts or indicate the weight that you should give the

21   testimony of any witness.

22           Now let's talk about the burden of proof and certain

23   rules relating to criminal cases.  There are three basic rules

24   about a criminal case that you must keep in mind.  First, the

25   defendant is presumed innocent until found guilty.  The

SN     OCR     RPR

A-258

Proceedings                                    183

1    indictment brought by the Government against the defendant is

2    only an accusation, nothing more.  It is not proof of guilt or

3    anything else.  The defendant, therefore, starts out with a

4    clean slate.  Second, the burden of proof is on the Government

5    until the very end of the case.  The defendant has no burden

6    to prove his innocence or to prove -- or to present any

7    evidence or to testify at the trial.  Since the defendant has

8    a right to remain silent, the law prohibits you from arriving

9    at your verdict by considering that the defendant may not have

10   testified or put on any evidence.  Third, the Government must

11   prove the defendant's guilt beyond a reasonable doubt.

12           I will give you further instructions on this point

13   later, but bear in mind that in this respect a criminal case

14   is different than a civil case which has a different burden of

15   proof.  The evidence from which you will find the facts will

16   consist of the testimony of witnesses on direct and

17   cross-examination, documents and other evidence received into

18   the record as exhibits and any facts that the lawyers agree or

19   stipulate to.

20           Certain things are not evidence and must not be

21   considered by you.  I will list them for you now:  Statements,

22   arguments and questions by the lawyers are not evidence.

23   Objections to questions are not evidence.  Lawyers have an

24   obligation to their clients to make objections when they

25   believe evidence is being offered for an improper purpose

SN        OCR        RPR

A-259

Proceedings                           184

1    under the rules of evidence.  You should not hold it against

2    the lawyers if they make objections.  You should not be

3    influenced by the objection or my ruling on it.  If the

4    objection is sustained, ignore the question.  If it is

5    overruled, treat the answer like any other.  So remember,

6    sustained, ignore the question and the answer; overruled,

7    treat it like any other answer.

8            If you are instructed that some item of evidence is

9    received for a limited purpose, you must follow that

10   instruction.  Testimony that I have excluded or told you to

11   disregard is not evidence and should not be considered.  And

12   anything you may have seen or heard outside the courtroom is

13   not evidence and must be disregarded.  You are to decide the

14   case solely on the evidence presented in this courtroom.  If

15   there is any publicity about this case, not that I expect it,

16   you must completely disregard it and not be influenced by it.

17   If something pops up on your phone or something happens that

18   suggests something about this case, you should avoid listening

19   or hearing that -- listening or seeing that.  Finally, you are

20   instructed once again not to read, listen or watch any news

21   reports on this case should there be any.

22           Now, there are two types of evidence, direct and

23   circumstantial.  Direct evidence is direct proof of a fact

24   such as testimony from an eyewitness.  Circumstantial evidence

25   is proof of facts from which you may infer or conclude that

A-260

Proceedings                              185

1   other facts exist.  I will give you further instructions on

2   these as well as other matters at the end of the case.  But

3   keep in mind that you can consider both types of evidence,

4   direct and circumstantial.  It will be up to you to decide

5   which witnesses to believe, which witnesses not to believe and

6   how much of any witness's testimony to believe or not.  I will

7   give you some guidelines at the end of the trial again about

8   determining the credibility of witnesses when you get closer

9   to your deliberation.

10          Now, a few words about your conduct as jurors.  As I

11  said before, you must decide this case based solely on the

12  evidence presented within the four walls of this courtroom.

13  This means that during the trial you must not conduct any

14  independent research about this case, the matters in the case

15  or the individuals or entities involved in this case.

16          In other words, don't consult any dictionaries or

17  reference materials, search the internet, websites or blogs or

18  use any other electronic tools to obtain information about

19  this case or to help you decide this case.  Please do not try

20  to find out any information from any source outside the

21  confines of this courtroom.  Similarly you are not to send any

22  information out about this case.  So you cannot Twitter, blog,

23  text, or Google the people in the case or about your

24  experience as a juror until after you are excused from jury

25  service.

SN      OCR      RPR

A-261

Proceedings                          186

1        Now, let me reiterate again that you are not to

2   discuss the case with anyone or let anyone talk to you about

3   the case during the entire time that you are a juror in this

4   case and that includes amongst yourselves.

5        So when you are taking breaks you cannot talk about

6   this case until you retire for your deliberations.  And,

7   lastly, keep an open mind, wait until you hear all of the

8   evidence before forming opinions about your verdict in this

9   case.  One last note about note taking.  If you want to take

10  notes during the course of the trial, you may do so.  However,

11  if you do take notes, be sure that your note taking doesn't

12  interfere with your listening to and considering the evidence.

13       Now, if this informs your decision about whether to

14  take notes or not, you should note that during your

15  deliberations you can have any part of the transcript sent

16  back to you in the jury room in case you forget about

17  someone's testimony or about some piece of evidence.  So for

18  those of you that are worried that you have to write down

19  everything that happened, you do not.  There will be a

20  transcript that will be available to you during your

21  deliberations.

22       If you do take notes, do not discuss them with

23  anyone before you begin deliberations and do not take your

24  notes home with you at the end of the day but leave them in

25  the jury room.  If you choose not to take notes, remember that

SN        OCR        RPR

A-262

Proceedings                                    187

1  it's still your individual responsibility to listen to and

2  receive the evidence in the case.  You cannot delegate that to

3  someone else who is taking notes.  We depend on the judgment

4  of all the members of the jury.  You all must remember the

5  evidence in this case as I said before.  However, if your

6  memories fail, you can ask to have the transcript sent back to

7  you.

8        Let me explain how the trial will proceed.  First,

9  the Government will make an opening statement which is simply

10 an outline to help you understand the evidence as it comes in.

11 It's not evidence itself.  It's not even argument.  It's

12 simply an outline or a preview of what the Government expects

13 the evidence to be.  Next, the defense attorney may but does

14 not have to make an opening statement.  Again, opening

15 statements are neither argument nor evidence.

16       The Government will then present its witnesses and

17 the counsel for the defendant cross-examine those witnesses.

18 Following the Government's case, the defendant may, if he

19 wishes present witnesses for the Government to cross-examine.

20       After all the evidence has been submitted the

21 attorneys will present their closing arguments to you to

22 summarize and interpret the evidence for you.  And then I will

23 instruct you on the law.  After that, you will retire for your

24 deliberations.  Now, specifically I want to address our one

25 alternate juror on the end there.  You should listen just as

SN       OCR       RPR

A-263

Proceedings                      188

1   carefully and conscientiously as the other jurors.  You may

2   well be called upon prior to the end of the case to take the

3   place of one of the other jurors and you will have to render a

4   verdict along with the other jurors.  So please pay strict

5   attention at all times.

6           As I am sure you have noticed -- we obviously are

7   wearing masks in the courtroom.  What you choose to do in the

8   jury room is really up to you individually.  I'm not going to

9   require you to wear a mask in the jury room itself, but for

10  those of you who feeling uncomfortable being unmasked, you

11  should keep it on.  I'm not going to dictate what happens in

12  the jury room, but you should all abide by whatever

13  precautions you feel are necessary and that you are most

14  comfortable with.

15          If there is any issue about that, you can raise it

16  with the deputy, Ryan, and then tomorrow the other deputy who

17  will be here named Fida.  One last thing about our schedule.

18  I ask that every day you be ready to go here in the jury room

19  by 9:30 a.m. and each day should run until about 5:30 p.m.  I

20  ask that you all be on time as a courtesy to each other and

21  the parties because we cannot start until all of you are here

22  and ready to go.  We will typically take a 15-minute break in

23  the morning and in the afternoon and then we will break for

24  such for an hour at 1 p.m. or thereabout, depending on where

25  we are in the presentation of evidence.  And that will be our

SN      OCR      RPR

A-264

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 189 of 263 PageID #: 675

Opening Statement - Diouf                    189

1    schedule throughout.

2          As I said before, we're not sitting on Wednesday

3    because of the Jewish holiday and then Monday, next Monday

4    which is Columbus Day.  In addition and I forgot to mention

5    this during jury selection, tomorrow we're going to break

6    early at 1 p.m. also because of observance of the Jewish

7    holiday.  Tomorrow we're going to have a short day from 9:30

8    to 1.  I appreciate your patience in terms of coming in, but

9    we're going to try to move this case along as expeditiously as

10   possible.

11         As I said to you during jury selection, not wasting

12   your time is one of my top priorities and I will do everything

13   I can to move this trial along as efficiently as possible.

14   All right.  So I think with that, Ms. Kassner -- Ms. Diouf,

15   are you making the opening?  Let's have you mic up.  You will

16   be heard better.

17         MS. DIOUF:  That man, the defendant, Mustafa Goklu

18   is a money launderer.  He ran an illegal business converting

19   Bitcoin, a type of digital currency, to cash.  Through that

20   business, the defendant met repeatedly with a man who he

21   thought was a drug dealer.  In exchange for hefty fees, the

22   defendant took the drug dealer's money and converted it from

23   Bitcoin into cash; concealing what it was, who owned it and

24   where it came from.

25         The defendant met the drug dealer seven times and

SN      OCR      RPR

A-265

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 190 of 263 PageID #: 676

Opening Statement - Diouf                    190

1   converted more than $130,000 worth of the drug dealer's money

2   from Bitcoin to cash.  What the defendant didn't know is that

3   the drug dealer was an undercover agent with the Drug

4   Enforcement Administration.  The defendant also didn't know

5   that the undercover agent recorded their meetings.  That is

6   why we are here today.

7          Members of the jury, my name is Marietou Diouf and

8   I'm an assistant United States attorney here in the Eastern

9   District of New York.  I am joined by my colleagues, Assistant

10  United States Attorneys, Gillian Kassner and Francisco

11  Navarro, paralegal specialist Bridget Donovan and DEA Special

12  Agent Julian Herr.  Together we represent the United States of

13  America.

14         Let's talk about Bitcoin.  Bitcoin is a type of

15  digital currency that can be used like cash.  There are two

16  main ways to change Bitcoin into cash.  The first is by using

17  a commercial exchange a platform similar to a bank.  One exam

18  of that is Coinbase.  Commercial exchanges require names and

19  identifications.  They are quick and relatively cheap to use.

20  The second way is through a peer-to-peer exchange.  And

21  peer-to-peer exchange.  People meet up directly, one person

22  transfers Bitcoin and the other in turn hands over cash.

23  Typically, peer-to-peer exchanges do not require

24  identification.

25         The defendant ran a peer-to-peer money exchange

SN     OCR     RPR

A-266

Opening Statement - Diouf                      191

1   business; meeting his customers in person in his parked car

2   where he exchanged their Bitcoin or cash for a fee and the

3   defendant's service was expensive.  Three to four times what

4   Coinbase charged for the same transaction.  But in exchange

5   for that cost, what the defendant offered his customers was

6   the ability to remain anonymous; to conceal where their money

7   was coming from and avoid detection by law enforcement so they

8   can continue to engage in illegal activities like drug

9   dealing.

10          In July 2018, an undercover DEA agent posing as a

11   drug dealer reached out to the defendant on an instant

12   messaging application, after seeing the defendants

13   peer-to-peer exchange advertisement online.  The agent asked

14   the defendant if he could meet to exchange $5,000 is worth of

15   Bitcoin into cash.  Within three minutes, sight unseen, the

16   defendant agreed to meet.

17          Over the next several months the defendant and the

18   undercover agent met seven times to convert Bitcoin to cash

19   and each time the undercover agent told the defendant more and

20   more about his business.  He told the defendant that he got

21   his money from selling pills to college kids, like oxycodone

22   and Adderall and that he sold marijuana.  The defendant was

23   undeterred.  He continued to exchange Bitcoin for the

24   undercover agent in greater and greater amounts, starting at

25   $5,000 at a time and progressing to more than $40,000 at a

SN      OCR      RPR

A-267

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 192 of 263 PageID #: 678

Opening Statement - Diouf                    192

1   time.  Finally, the defendant was arrested while in the middle

2   of exchanging approximately $50,000 worth of Bitcoin.

3       THE COURT:  Sorry, folks.  We need you to be a

4   little quieter with the translation.  If you can move back a

5   little bit farther.  It would be helpful to the Court

6   reporter.  My apologies.  Why don't you restart wherever you

7   left off.  The last sentence was $50,000 of Bitcoin.

8       MS. KASSNER:  Finally, the defendant was arrested in

9   the middle of exchanging approximately $50,000 worth of

10  Bitcoin.  For moving money and hiding where it came from, the

11  defendant is charged with money laundering.  For running a

12  business converting money from one form to another without a

13  license as required by law, the defendant is charged with

14  operating an unlicensed money transmitting business.

15      The Government will prove these charges to you

16  beyond a reasonable doubt through three main types of

17  evidence.  First, the defendant's statements.  The defendant's

18  exchanges with the undercover agent were audio recorded and we

19  will play those recordings for you.  You will hear the

20  defendant's own words, instructing the undercover agent to be

21  careful and discussing his fear of being caught by the NYPD.

22      Agreeing to exchange money for the undercover agent

23  after being told that the source of the money he's converting

24  are illegal drugs.  We'll show you the defendant's encrypted

25  text messages with the undercover agent as well as with his

SN      OCR      RPR

A-268

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 193 of 263 PageID #: 679

Opening Statement - Diouf                 193

1   other customers.  In these messages you will see the defendant

2   consistently agreed to meet customers sight unseen without

3   ever asking for a name, address or a form of ID.

4           Second, physical evidence.  You will learn that on

5   the day of the defendant's arrest law enforcement searched his

6   apartment and car.  You will see some of the items found

7   during that search; a money counter used to count cash for the

8   defendant's business; a cell phone the defendant used to

9   communicate with the undercover agent and his other customers;

10  a laptop containing documents relating to the defendant's

11  business.

12          Third, witness testimony.  You will hear from the

13  undercover agent about the transactions with the defendant.

14  He will tell you that he told the defendant that his Bitcoin

15  came from the sale of illegal drugs.  You will hear about the

16  precautions that the defendant took to avoid detection by law

17  enforcement.  You will also hear from an expert who will

18  explain the different ways that Bitcoin can be exchanged for

19  cash and how peer-to-peer exchanges facilitate a market for

20  drug dealers to use their profits to further their illegal

21  businesses.

22          You will hear from representatives from the New York

23  State Department of Financial Services, the United States

24  Department of Treasury, who will confirm that the defendant

25  did not have a license to operate a money transmitting

SN        OCR        RPR

A-269

```
                        Opening Statement - Diouf                194
```

1   business as required by law.

2         Members of the jury, after you have seen and heard

3   all of the evidence we will come back to you and ask you to

4   return the only verdict consistent with that evidence, guilty.

5         THE COURT:  Thank you very much Ms. Diouf.

6         Mr. Singer, do you wish to make an opening

7   statement?

8         MR. SINGER:  Yes, Your Honor.

9         THE COURT:  All right.

10        MR. SINGER:  Good afternoon, ladies and gentlemen.

11  Again, my name is Murray Singer.  Along with Emilee Sahli.  We

12  represent Mustafa or Michael Goklu.  We call him Michael

13  Goklu.  Mr. Goklu is referred to throughout these proceedings

14  as the defendant.  His name is Michael Goklu.  He's an

15  individual and he's the person who is being accused and has

16  entered a plea of not guilty to these charges.  So, okay, we

17  just heard the Government's opening, this is what the evidence

18  is going to show and it's my opportunity to come before you

19  and say not so fast.

20        There are two charges in this indictment as you have

21  heard; a charge called money laundering and a charge called

22  operation of an unlicensed money transmitting business.

23  There's a number of pieces, or elements, in the definition of

24  these charges and what the Government is required to prove.  I

25  want to highlight some of the evidence that you're going to

```
            SN        OCR        RPR
```

A-270

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 195 of 263 PageID #: 681

Opening Statement - Diouf                    195

1    hear as it relates to those elements or pieces.

2          One of the things that the Government is going to

3    have to prove and that is in dispute here is whether Mr. Goklu

4    believes that what this undercover officer was coming to him

5    with, the Bitcoin that he was coming to him with, was, in

6    fact, the proceeds of illegal, unlawful drug transactions,

7    okay?  Not what the undercover officer may have said, not what

8    the prosecutors may believe or infer from that, but what

9    Mr. Goklu understood, processed, believed.

10         So they have to prove that he believed that what was

11   being brought to him were the proceeds of unlawful drug

12   transactions and our contention is that the evidence is not

13   going to support that.  I will talk about that in a second.

14         If he believed -- if, in fact, he believed that what

15   we're talking about is unlawful -- the proceeds of unlawful

16   drug transactions, the Government also has to prove that

17   Mr. Goklu's intention or purposes in conducting these

18   exchanges was to hide the source of the money; to help the

19   person who was supposedly a drug dealer to help him hide,

20   launder, clean up, the source of the money that is not -- not

21   that it might have facilitated that, but then Mr. Goklu's

22   intention and purpose was to do so.

23         So the transactions start with and you can hear it

24   in the recordings.  Mr. Goklu is heard counting out the money

25   because they start with how much cash is there going to be.

SN      OCR      RPR

A-271

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 196 of 263 PageID #: 682

Opening Statement - Diouf                    196

1  I'm going to give you 3,000, 5,000, 20,000, whatever the

2  amount was in each of the transactions and they count it out

3  and you can hear the money machines.  You may be familiar with

4  them from the bank.  When you go to the bank and take out

5  $1,000, the teller will run it through a machine and it zips

6  right through and it counts the bills.  So he was getting a

7  fee to figure out the money.  I'm going to give you $5,000, my

8  fee is X percent, and, so we take that out.

9        And then the second part of the transaction was the

10  Bitcoin transfer.  And for those of you folks that don't deal

11  with and don't understand Bitcoin, nobody is ever going to

12  make you understand it, why it exists, but you're going to

13  learn about how it works; that when a transfer takes place and

14  you don't need to know every detail, but essentially, when you

15  are transferring out of your -- what's called your wallet or

16  the app on your phone, you initiate the transfer and it

17  takes -- it can take a little bit of time to get confirmation

18  that the transfer is taking place.  It's referred to as adding

19  to the block chain and you will hear about -- you will learn

20  about all of these terms, but essentially, the two of them are

21  sitting in the car.

22        First, they count out the cash and then the

23  undercover initiates the transfer and then they're sitting

24  there waiting for the transaction to clear.  And it could be

25  ten minutes or 20 minutes or 30 minutes and while they're

SN      OCR      RPR

A-272

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 197 of 263 PageID #: 683

Opening Statement - Diouf                    197

1   sitting there, they're just chatting, people that are sitting

2   there waiting for something just start talking about stuff.

3   And that's what you will hear on these tapes and then once the

4   transaction clears, they say goodbye and go their separate

5   ways.  Each one of the transactions is that.

6           Now, the Government alleges that each one of these

7   seven transactions was done by Mr. Goklu where he knew that

8   these were proceeds of unlawful drug transactions and that his

9   purpose was to help the undercover hide the source of the

10  money.  What you're going to hear -- the first time they met

11  was in August 2018.  And they met again -- these transactions

12  were between August of 2018 and April of 2019.

13          So there's one in August, one in September, one in

14  November, one in December, so these first four meetings, there

15  is not a single mention of where this money was coming from,

16  of where the Bitcoin was coming from.  And you will hear, you

17  know, Mr. Goklu they're exchanging large amounts of cash in

18  the street or in a car, and you know, you don't want to draw

19  law enforcement attention to yourself because they will sees

20  your money and ask questions later.  And only later after they

21  realize that there wasn't anything going on, you night get

22  your money back, but you don't want to get the police

23  involved.  It's none of their business but they're going to

24  look at it and Mr. Goklu expresses on several occasions that,

25  you know, if the police see a money changing machine, they're

SN      OCR      RPR

A-273

Opening Statement - Diouf                    198

1   going to think we're drug dealers.

2          The undercover officer never says to him, well, I

3   am.  That's the money I'm bringing to you.  He never says

4   anything like that.  He doesn't indicate either the text

5   messages leading up to the meeting or in the meeting itself

6   where the money is coming from or what his business is.  You

7   know, he dances around it.  I'm operating an online business.

8

9          (Continued to the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

A-274

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 199 of 263 PageID #: 685

Opening Statement - Singer                    199

1   (Continuing.)

2        MR. SINGER:  That his -- not just that it might have

3   facilitated that, but that Mr. Goklu's intention and purpose

4   was to do so and we submit the evidence is going to fail in

5   that regard as well.

6        So let's consider what you are going to hear in the

7   evidence here.  The prosecutor's opening statements just

8   indicated that there were a number of transactions.  There

9   were seven meetings between Mr. Goklu and the undercover

10  officer.  A person who turned out to be a undercover police

11  officer that Mr. Goklu was not aware of that until he was

12  arrested.  Each one of the seven meetings essentially were

13  conducted in the same way.

14       The undercover officer brought Bitcoin to the

15  meeting.  And you'll learn about Bitcoin.  It's essentially an

16  electronic or digital currency or something that is akin to an

17  app on your phone that you can access it and you can transfer

18  it from your phone to another person.  So the undercover

19  officer brought the Bitcoin essentially in his phone and

20  Mr. Goklu brought cash.  And each transaction was meant to be,

21  you're going to give me Bitcoin and I'm going to give you

22  cash.

23       And each one of the transactions, each of the seven

24  times, that's essentially what happened.  And we're talking

25  about thousands of dollars.  And Mr. -- the evidence will show

SG        OCR        RPR

A-275

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 200 of 263 PageID #: 686

Opening Statement - Singer                    200

1    Mr. Goklu had -- and you'll even hear it on the recordings of

2    each one of these transactions, six of the seven were fully

3    recorded.  And you will have them as evidence and you'll be

4    able to listen to them.  And believe me, I'm going to

5    encourage you to listen to them.  Every last second of it.

6           Because each one of these meetings counting out the

7    money and Mr. Goklu charged a fee.  Part of what he was doing,

8    he was making a percentage off of the transfer.  Welcome.

9    That's the money I'm bringing to you.  He never says anything

10   like that.

11          August, September, November, December, there's not a

12   single mention by the undercover officer where this Bitcoin is

13   coming from.  And ycet, the Government is here alleging that

14   Mr. Goklu knew that it was drug money.  And Mr. Goklu's

15   purpose in doing the transactions was not to earn his fee,

16   because he's making hundreds of dollars.  Not that's what his

17   purpose was, but that his purpose was to hide the source of

18   the money.  He didn't even know the source of the money.

19          Okay.  He didn't intend to hide it.  He doesn't even

20   know where it's coming from or that it needs to be hidden

21   because.  The undercover never said to him, Hey, I got to hide

22   this stuff.  I want to change it from Bitcoin to cash because

23   I need to launder this and hide it.  He never said that.  You

24   got two meetings in January, the fifth and sixth meetings.

25   And then a seventh meeting in April where at the end of the

SG       OCR       RPR

A-276

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 201 of 263 PageID #: 687

Opening Statement - Singer                     201

1    meeting the arrest takes place.

2           Well, the undercover finally starts to open up a

3    little bit and start to say things about the source of some of

4    his business.  Part of it, there's some discussion, and

5    Mr. Goklu indicates that he knows somebody that does this as

6    well, operates a legal marijuana business in California, where

7    the state law in California, they legalized marijuana.  Like

8    New York is doing now and in the process of doing now,

9    California has done that for a number of years.

10          And individuals can legally grow marijuana on a

11   farm, cannabis farm.  They can sell it to a dispensary, a

12   lawful dispensary.  You pay taxes on it.  It's all legal.  So

13   there's discussion about a legal marijuana business.  And,

14   again, the charge requires that it be unlawful drug money.

15          But in the first of the two January meetings, the

16   undercover starts mentioning, oh, I sell pills.  And he

17   says -- you'll hear this on the tapes.  It's all there.  There

18   is no dispute about what the undercover officer said to

19   Mr. Goklu.

20          But again, the dispute is about what he heard or

21   processed or understood from it.  Because the undercover

22   officer says, So I can get you Oxy's.  And Mr. Goklu.  This

23   sophisticated money launderer says to the undercover, What's

24   Oxy's?  He doesn't even know what they are.  That's there

25   evidence.

SG        OCR        RPR

A-277

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 202 of 263 PageID #: 688

Opening Statement - Singer                202

1    And then the undercover mentions something about

2    Adderall.  When you listen to these conversations, Mr. Goklu

3    doesn't respond.  He doesn't indicate in any way that he

4    understands what this guy is talking about, but he continues

5    to do the transactions like he did the first four because he

6    was making money off of it.  And then, what clearly -- what

7    the evidence will clearly demonstrate to you about what

8    Mr. Goklu knew and believed, happens at the beginning of the

9    April 30th of the 2019, a seventh meeting.  At the sixth

10   meeting, there was nothing about where the money was coming

11   from.

12       But in the final meeting on April 30th, you know,

13   while they're sitting there waiting for some of the

14   transactions to go through -- actually, this was at the

15   beginning before they did the transactions.  They're just, you

16   know -- it's the seventh time they've met.  They kind of know

17   each other by now.  And Mr. Goklu asked the undercover, how's

18   business?  Just your basic greeting when you met with somebody

19   that you had some dealings with.  How's business?  And the

20   undercover says, Booming.

21       And Mr. Goklu gives what I submit to you as the kind

22   of response that people kind of half jokingly make, half

23   meaning it, will give in that situations.  He says to the

24   undercover officer, Hey, may be I should get in on that

25   business.  Hey, your business is booming.  May be I should get

SG        OCR        RPR

A-278

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 203 of 263 PageID #: 689

Opening Statement - Singer                    203

1   in on that.  And the undercover says, You want, you want in?

2   And what Mr. Goklu says in response to that, he wants to know

3   how much it costs to get into a cannabis farm.  That's it.  He

4   wants to know how much is a cannabis farm.  The cannabis farms

5   that the undercover officers indicated that he operates or

6   connected with in California, a legal cannabis farm.  Nothing

7   about pills, or Oxy, or Adderall.  That's what the evidence is

8   going to show you.

9            Now, the reason we need you folks.  The reason you

10  are here spending your week with us, is because the

11  prosecution and the defense don't agree on what this means and

12  what this shows.  The Government has the obligation to

13  convince you beyond a reasonable doubt that Mr. Goklu knew and

14  believed that these were the proceeds of illegal drug

15  transactions and that his intention and purpose was to conceal

16  and disguise the source of the money, where it came from.

17           So folks, listen carefully to the evidence.  I

18  suspect that the prosecution's witnesses are going to get on

19  and they are going to highlight those portions of their

20  meetings where Mr. Goklu doesn't want the police around.  It's

21  like spooky and scary and why would somebody do that?  Why

22  would somebody want to do a private transaction rather than,

23  you know, a public one through some -- essentially a bank.

24  Why would somebody not want the police around.

25           In summations, I'll be able to talk to you a little

SG        OCR        RPR

A-279

Opening Statement - Singer                                    204

1    bit more about that and answer some of those questions, but

2    the Government is going to put in little bits and pieces of

3    this and rye to make it all spooky and scary and somehow

4    underhanded.  And I am urging you folks to keep an open mind.

5    There's another way of viewing this evidence.  There are other

6    inferences to be drawn from the evidence that will be

7    presented to you.

8             And I'm going to be going through them in my closing

9    arguments to you.  After I've asked you and begged you to

10   listen carefully to the recordings of these transactions.  So

11   folks, keep an open mind.  Don't just jump to the conclusions

12   that the prosecutors and the undercover agents jumped to right

13   from the get-go.  Keep an open mind, listen to all the

14   evidence, I will have a chance to speak to you at the end of

15   the case.

16            Thank you very much.

17            THE COURT:  Thank you very much, Mr. Singer.

18            MS. KASSNER:  Your Honor, before our first witness,

19   AUSA Francisco Navarro is going to read stipulation into the

20   record.

21            THE COURT:  All right.

22            MR. NAVARRO:  Your Honor, can I just get the Elmo?

23   It would be easier for the jury to follow.

24            THE COURT:  Yes.

25            You can publish it.

SG        OCR        RPR

A-280

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 205 of 263 PageID #: 691

Opening Statement - Singer                205

1        (Exhibit published.)

2        MR. NAVARRO:  I'll do my best to read it slowly.

3        United States of America against Mustafa Goklu, also

4   known as Mustangy.  It is hereby stipulated and agreed by and

5   between by the United States of American, by Assistant United

6   States attorneys Gillian A. Kassner and Marietou E. Diouf, and

7   the defendant, Mr. Mustafa Goklu, by his attorneys Murray

8   Singer and Emilee Sahli that:

9        Government's Exhibit 1001, is a cellular telephone.

10  And I'm going to hold it up to the jury.  Government's

11  Exhibit 1001, is a cellular telephone Samsung Galaxy S9 plus,

12  IMEI:  353522096665860, which was recovered from the defendant

13  on April 30, 2019.

14       Government's Exhibits 201 through 228 consist of

15  true and accurate copies of a subset of images extracted from

16  Government's Exhibit 1001.  Images in 228 contain screenshots

17  of messages from Government's Exhibit 1,001.

18       Government's Exhibit 1002, which I'm holding up to

19  the jury, consist of a laptop computer, Apple MacBook Pro

20  Retina Serial Number C02L58C1DR53, which is recovered from a

21  search of the defendant's residence, located at 50-30 39th

22  Place, Floor 2, Long Island City, New York on April 30, 2019,

23  and that's Exhibit 1002.

24       Government's Exhibit 701 through 765, consist of

25  true and accurate copies of a subset of images and documents

SG        OCR        RPR

A-281

Case 1:19-cr-00386-PKC  Document 78  Filed 12/01/22  Page 206 of 263 PageID #: 692

Opening Statement - Singer 206

1  extracted from Government's Exhibit 1002, which is the laptop

2  I was just holding.

3  Government's Exhibit 1003, consist of a G-star

4  Technologies money counter, which was recovered from a search

5  of the defendant's black 2013 Mercedes Benz sedan bearing

6  vehicle identification number WDDNG8DB2DA515230, and New York

7  license plate JER-4428 on April 30, 2019.  And that's

8  Government's Exhibit 1003.

9  Government's Exhibit 201 through 238, 701 through

10  765, and 1001, and 1003, and this stipulation, which has been

11  marked for identification as Government's Exhibit 1102 are

12  admissible in evidence.

13  So stipulated, Brooklyn, New York, September 28,

14  2022.  And I'm putting it on the screen so you can see that

15  it's signed by both parties.

16  That's it, Your Honor.  Thank you.

17  THE COURT:  Thank you.

18  Call your first witness.

19  MS. KASSNER:  The Government calls DEA Special Agent

20  Lilita Infante.

21  THE COURT:  So Ladies and Gentlemen, since we got a

22  late start in the afternoon session, I'm going to dispense of

23  our 15-minute break, but if anyone needs a nature break,

24  please raise your hand.  So we can get in more presentation

25  today.

SG        OCR        RPR

A-282

Opening Statement - Singer                 207

1        Agent, if you will approach the witness stand and

2   remain standing for a moment so you can be sworn in.

3        THE COURTROOM DEPUTY:  Do you solemnly swear or

4   affirm that the testimony you are about to give in this case

5   now before the Court, will be the truth, the whole truth and

6   nothing but the truth.

7        THE WITNESS:  I do.

8        THE COURTROOM DEPUTY:  Please state and spell your

9   name for the record, please.

10       THE WITNESS:  Lilita Infante; L-I-L-I-T-A.

11  I-N-F-A-N-T-E.

12       THE COURT:  You may have a seat.

13                          .

14       (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

SG        OCR        RPR

A-283

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 208 of 263 PageID #: 694

```
                         Infante - direct - Diouf                    208
 1   LILITA INFANTE,
 2              having been first duly sworn, was examined and
 3              testified as follows:
 4   DIRECT EXAMINATION
 5   BY MS. DIOUF:
 6   Q    Good afternoon, Special Agent Infante.
 7         I'm here in the back at the podium a few feet away
 8   from you.
 9   A    Good afternoon.
10   Q    Special Agent Infante, are you employed?
11   A    Yes.
12   Q    Where do you work?
13   A    I work at the Drug Enforcement Administration.
14   Q    Is the drug information administration --
15         MS. KASSNER:  Special Agent Infante, if you could
16   remove your mask while you're testifying.  Thank you.
17   Q    Is the Drug Enforcement Administration also known as the
18   DEA?
19   A    Yes, it is.
20   Q    And you mentioned you are a special agent.
21         What is the special agent at the DEA?
22   A    Special agent at the DEA is -- investigates narcotics and
23   money laundering crimes.  Common duties will include writing
24   affidavits, issuing subpoenas, doing physical surveillance,
25   financial investigations as well, tracing elicit funds,
```

A-284

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 209 of 263 PageID #: 695

Infante - direct - Diouf                209

1   writing affidavits for wiretaps, executing search warrants and
2   arrest warrants, et cetera.
3   Q    How long have you been a special agent at the DEA?
4   A    Approximately nine years.
5   Q    What is your current assignment?
6   A    I currently work at the cyber -- Counter Narcotics Cyber
7   Investigation Task Force in the Miami field division.
8   Q    And prior to serving as a special agent at the DEA for
9   nine years, where did you attend college?
10  A    I attended Columbia University where I studied economics
11  and Harvard University where I studied general management.
12  Q    What are your duties and responsibilities in the Miami
13  office that you currently work at?
14  A    I investigate specifically cryptocurrency related crimes
15  that relate to narcotics and money laundering.
16  Q    What are cryptocurrency related crimes?
17  A    Anything that has to do with utilizing cryptocurrency in
18  furtherance of a crime.  Such as taking cryptocurrency as a
19  payment for elicit goods and services or using cryptocurrency
20  to launder money or hide the proceeds of an elicit illegal
21  activity.
22  Q    Approximately how many cryptocurrency enabled money
23  laundering and narcotics cases have you investigated?
24  A    Probably over 20 at this point.
25  Q    And approximately how many of those investigations

SG      OCR      RPR

A-285

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 210 of 263 PageID #: 696

Infante - direct - Diouf                   210

1   involved cryptocurrency?

2   A    All of them.

3   Q    Have you ever arrested an individual for money laundering

4   in connection with cryptocurrency?

5   A    Yes, on multiple occasions.

6   Q    Have you received any formal training in this area that

7   you investigate?

8   A    Yes.  I received training in tracing cryptocurrency,

9   Blockchain analysis, general financial investigations when it

10  comes to cryptocurrency, and narcotic sales on the internet as

11  well.

12  Q    Have you lead any trainings on cryptocurrency enabled

13  money laundering and narcotics trafficking offenses?

14  A    Yes.  I have lead several trainings all over the world

15  that include cyber investigations that have touched

16  cryptocurrency and narcotics trafficking on internet.

17  Q    Are you familiar with how cryptocurrency is accessed,

18  bought, exchanged and stored?

19  A    Yes, I am.

20  Q    And how are you familiar with that?

21  A    I have personally bought, exchanged, and stored

22  cryptocurrency in an undercover capacity in my cases and also

23  on a personal level as well.

24  Q    How many times have you bought, accessed, or stored

25  cryptocurrency through your work with the DEA?

SG       OCR       RPR

A-286

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 211 of 263 PageID #: 697

```
                    Infante - direct - Diouf                211

 1    A    Through my work with the DEA probably around 30, 40

 2    times.

 3    Q    And have you been involved in exchanging cash into

 4    cryptocurrency through your work with the DEA?

 5    A    Yes, I have.

 6    Q    And approximately how many times?

 7    A    Probably anywhere from 30 to 40 times as well.

 8    Q    And through your work with the DEA, have you opened

 9    accounts on Bitcoin exchanges?

10    A    Yes.  I have on multiple occasions.

11    Q    Have you purchased Bitcoin on exchanges?

12    A    Yes, I have.

13    Q    And approximately how many times?

14    A    Probably around 20 to 30 times.

15    Q    Have you purchased Bitcoin through peer-to-peer

16    transactions?

17    A    Yes, I have as well.

18    Q    How many times have you testified either before a Grand

19    Jury or at trial?

20    A    Over a dozen times.

21    Q    Were you involved in the investigation of this case?

22    A    No, I was not involved.

23    Q    Did you conduct any interviews of participants in this

24    case?

25    A    No.
```

A-287

```
                    Infante - direct - Diouf                  212

 1   Q     Have you had any contact with the defendant?
 2   A     No.
 3               MS. DIOUF:  At this time the Government moves
 4   pursuant to Federal Rule of Evidence 702 to qualify Special
 5   Agent Lilita Infante as an expert in the areas of crypto
 6   currency and the methods by which crypto currency are
 7   typically stored, accessed, transferred and exchanged.
 8               THE COURT:  Do you want to voir dire, Mr. Singer?
 9               MR. SINGER:  No, Your Honor.  No objection.
10               THE COURT:  Then she will be so qualified.
11               MS. DIOUF:  Thank you.
12   BY MS. DIOUF:
13   Q     Special Agent Infante, what is digital currency?
14   A     Digital currency is essentially like Internet money.  It
15   is transacted on a peer-to-peer basis, which is one of the
16   main differences between digital currency and regular
17   currency, such as the U.S. dollar.  On a peer-to-peer basis
18   means there is no intermediary, such as a bank for example, or
19   a credit card company.  It is governed by a code, as opposed
20   to a Government printing money.  It is governed by basically
21   computing power and code.  Individuals can also buy sell and
22   exchange digital currency on centralized exchanges.
23   Q     Is digital currency another term for crypto currency?
24   A     Yes.
25   Q     How would digital currency compare to a 20-dollar bill I
```

A-288

Case 1:19-cr-00386-PKC  Document 78  Filed 12/01/22  Page 213 of 263 PageID #: 699

Infante - direct - Diouf                    213

1   might have in my wallet?

2   A    When you have a -- first of all, a 20-dollar bill would

3   be considered fiat currency which is governed by for example

4   the U.S. Government.  Also in order to spend that 20-dollar

5   bill in your wallet would you have to physically be present

6   with whoever you are with you who you are transacting with;

7   while with crypto currency you can transfer value or make

8   payments across borders globally without having had to have

9   any kind of intermediary peer-to-peer, and without having to

10  be physically present with the individual.

11  Q    What can digital currency be used for?

12  A    Digital currency can be used to store value, to transfer

13  value across borders, to make payments for goods and services,

14  to make profits via trading, for example by buying low and

15  selling high because digital currency fluctuates in price as

16  well.

17  Q    Can you explain what you mean by store value?

18  A    So it can be used as a commodity, for example, kind of

19  like digital gold.  So because the price of the digital

20  currency a lot of time goes up over many years, you can use it

21  as a store value or an investment over time.

22  Q    Can you give us some examples of digital currency?

23  A    Like Bitcoin, Ethereum or Litecoin.

24  Q    What is Bitcoin?

25  A    Bitcoin is the first-ever crypto currency that was ever

A-289

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 214 of 263 PageID #: 700

Infante - direct - Diouf                    214

1    invented.  It was first invented in January of 2009 by an

2    anonymous individual that went by the moniker of Satoshi

3    Nakamoto.  It was the first ever peer-to-peer decentralized

4    currency based on code.

5    Q    Is Bitcoin also known as BTC?

6    A    Yes, it is.

7    Q    Does Bitcoin exist in physical form?

8    A    No, it only exists in digital form.

9    Q    What does it look like?

10   A    The Bitcoin logo looks like an orange B with a line going

11   through it.

12   Q    How is Bitcoin priced?

13   A    Bitcoin is priced by the market.  So usually a

14   centralized exchange, such as for example, Coinbase or Binance

15   will set the price based on supply and demand.

16   Q    What is the price of one Bitcoin currently?

17   A    Currently it's approximately $19,000.

18   Q    What about in 2018?

19   A    In 2018 it fluctuated, averaged about $6,000.

20   Q    How do people store their Bitcoin?

21   A    One can store Bitcoin in a variety of ways.  One way is

22   to use a hosted wallet or a wallet on a centralized exchange,

23   such as Coinbase, for example, or Binance.  In this case the

24   centralized exchange will actually hold your Bitcoin for you,

25   and will allow you to buy and sell Bitcoin for fiat currency.

Rivka Teich

A-290

Case 1:19-cr-00386-PKC  Document 78  Filed 12/01/22  Page 215 of 263 PageID #: 701

Infante - direct - Diouf                    215

1   So you can connect your bank account and transact in that way

2   via the centralized exchange.

3            Another way you can store is it using an unhosted

4   wallet.  An Unhosted wallet is basically, it can be a software

5   that you can download to your computer or mobile device.  An

6   example of that would be Electrum on the computer or Mycelium,

7   a wallet on a mobile device.  And this kind of wallet would

8   allow you to store Bitcoin and transact in Bitcoin without

9   having to go through an intermediary such as an exchange.

10  Q    You mentioned Mycelium wallet, what is Mycelium?

11  A    Mycelium is a software wallet that can be used on a

12  mobile device such as iPhone or an android device.

13  Q    Special Agent Infante, I'd like to show you and the jury

14  what is in evidence as Government Exhibit 717, which was

15  recovered from the defendant's computer.  Can you see this

16  document?

17  A    Yes.

18  Q    What is this?

19  A    This is a back up of the Mycelium wallet.  So it has a

20  key pair, I think there is a key pair missing here, which are

21  two key codes.  So it would be a public key and private key.

22  Also a password that one can set to decrypt the private key

23  for the wallet.

24  Q    Let's go to the second page of the wallet.  Special Agent

25  Infante, what is this?

A-291

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 216 of 263 PageID #: 702

Infante - direct - Diouf                    216

1   A    This is the private and public key pair for the, looks

2   like, a Bitcoin wallet from Mycelium.  What this means is

3   because this Bitcoin is based on encryption, every wallet will

4   have a public key, which is the key that you will give to

5   other people to send you money, so it looks like an

6   alphanumeric string of characters.  Then it also has a private

7   key, which you keep to yourself, which you could use to

8   recover your balance.

9          So let's say if you lost your phone and you need to

10  get a new phone, you have to download a new Mycelium wallet,

11  you would need that private key in order to recover the

12  balance of your wallet.

13  Q    Thank you.  You can take that exhibit down.

14         Special Agent Infante, how do people access their

15  Bitcoin to sell or exchange it using an unhosted wallet?

16  A    Using an unhosted wallet, one can do a peer-to-peer

17  exchange.  Which means that you would basically meet up with

18  whoever it is that you're transacting with, or you could agree

19  to use credit card payment or bank transfer.  And you would

20  trade directly with them using your unhosted wallet.

21  Q    How would someone access their Bitcoin to sell or

22  exchange using a commercial exchange?

23  A    With the commercial exchange, one would have to create an

24  account on the commercial exchange.  It's very similar to

25  creating a bank account, for example.  So you would create a

Rivka Teich

A-292

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 217 of 263 PageID #: 703

Infante - direct - Diouf                    217

1   log in with a password.  You would have to provide identity

2   verification, like would you with a bank account.  Then you

3   would link your bank account or your credit card to your

4   centralized exchange account, that way the exchange will allow

5   you to buy or sell digital currency through the exchange.

6   Q     You mentioned that people can use Bitcoin to purchase

7   things and conduct other financial transactions.  Are all

8   Bitcoin payments recorded somewhere?

9   A     Yes.  Every Bitcoin transaction is recorded on a public

10  ledger called the blockchain.  This is a public ledger that

11  can be accessed by anybody with an Internet connection.  So

12  you can go on a website and actually see every single

13  transaction that ever transpired on the Bitcoin blockchain.

14  Q     So is it fair to say that Bitcoin blockchain exists

15  throughout the world?

16  A     Yes.

17  Q     Does every Bitcoin transaction impact the global

18  blockchain?

19  A     Yes, absolutely.

20  Q     Can you conduct a Bitcoin transaction without using the

21  Internet?

22  A     No.

23  Q     Why not?

24  A     Because in order to send funds via Bitcoin, you would

25  have to connect to the blockchain.  And in order to connect to

A-293

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 218 of 263 PageID #: 704

Infante - direct - Diouf                          218

1   the blockchain, you would need to connect to the Internet.

2   Q    How does the one access information stored in the Bitcoin

3   blockchain?

4   A    It's very simple.  You can go online to various, they are

5   called block explorers, and you can check the date or

6   transaction number or even a wallet address, and the

7   blockchain will give you information about those transactions.

8   So for example if you have conducted a transaction, you can

9   put in a transaction number, called a hash.  It will give you

10  who sent it or the actual Bitcoin address of the alphanumeric

11  string of characters of the sender.  It will give you the

12  alphanumeric of the address of the receiver.  It will give you

13  the exact date and time and the amount that it was sent as

14  well.

15  Q    Are the identities of individuals or entities behind

16  wallet addresses recorded on the public ledger?

17  A    No.  The only thing that is recorded would be the

18  alphanumeric characters of the address wallets.

19  Q    How do people acquire Bitcoin?

20  A    There are multiple ways to acquire Bitcoin.  One would be

21  to use one of the centralized exchanges, such as Coinbase for

22  example.  Set up an account, verify your identity, then you're

23  able to link your bank account or credit card and purchase

24  Bitcoin that way.

25          Another way will be to use a peer-to-peer exchange.

A-294

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 219 of 263 PageID #: 705

Infante - direct - Diouf                    219

1   This is basically an exchange that brings buyers and sellers

2   of Bitcoin together.  An example of that would be

3   LocalBitcoins.  So it's basically a middle-man between the

4   buyer and the seller.

5            Or you can always do a direct transaction with

6   somebody.  So if I know somebody that wants to sell me

7   Bitcoin, I can go and pay them cash in-person or by credit

8   card and do it directly with that individual.

9   Q    You mentioned Coinbase as an example a centralized

10  exchange.  Can you give us other examples?

11  A    Sure.  Binance, is a popular one.  Kraken is a popular

12  one.  And on peer-to-peer, LocalBitcoins would be, or Paxful.

13  Q    If I wanted to buy Bitcoin on Coinbase, what would I do?

14  A    You would have to first create an account.  And then go

15  through identity verification process, like you would with a

16  regular bank.  Then you have to basically provide your

17  driver's license, social security number, date of birth, real

18  name, usually you also have to provide proof of address with

19  utility bill.  After that process, you would link your bank

20  account to your Coinbase account, then you're able to buy

21  crypto currency.

22  Q    Is any special equipment required to access Coinbase?

23  A    Just an Internet connection.

24  Q    Do commercial exchanges charge fees?

25  A    Yes, they do.

A-295

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 220 of 263 PageID #: 706

Infante - direct - Diouf                    220

1   Q    How is the fee assessed?

2   A    The fee is generally set by the exchange.

3   Q    What was Coinbase's transaction fee in 2018?

4   A    In 2018 it was about 1.49 percent for bank transfers and

5   3.99 percent for credit card transactions.

6   Q    Are commercial exchanges regulated?

7   A    Yes, they are regulated.

8   Q    Who regulates them?

9   A    The Government in which they operate.  Generally it has

10  to do with where the customers are, if any of the customers

11  are in the United States, for example, then they would have to

12  abide by regulation set by the United States.

13  Q    Can Coinbase be used anonymously?

14  A    It would be very difficult, unless the individual stole

15  someone else's identity.  It would be very difficult to use it

16  anonymously.

17  Q    Why is that?

18  A    Because you have to go through a rigorous identity

19  verification process in order to transact on Coinbase.

20  Q    Turning to what you referred to as peer-to-peer

21  exchanges.  What does peer-to-peer mean?

22  A    It means that unlike Coinbase where you're actually

23  buying crypto currency from the exchange, you would be buying

24  on a peer-to-peer basis from another individual.  So a

25  peer-to-peer exchange would act as an arbitrator or a

Rivka Teich

A-296

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 221 of 263 PageID #: 707

Infante - direct - Diouf                   221

1  middle-man between you and another individual that would like
2  to transact in crypto.
3  Q    Can peer-to-peer exchanges happen over the Internet?
4  A    Yes.
5  Q    Can they happen in person?
6  A    Yes, absolutely, they can also happen in person.
7  Q    How would that work?
8  A    Many times if you want to conduct a peer-to-peer
9  transaction, many times you would first go to a peer-to-peer
10 exchange, see who is actually selling or buying crypto.  Then
11 you would find a listing for whatever it is that you want to
12 buy.  And then the exchange would facilitate that transaction.
13       Many people will actually then go off of the
14 exchange and conduct subsequent deals directly with that
15 individual that they found on the exchange.  So that can be
16 either in person, so they can meet in-person.  I'll sell them
17 the Bitcoin, I'll send it to their wallet that they give me.
18 Then they'll give me cash in-person, or if they have a credit
19 card reader we can also do that, or bank transfer or wire
20 transfer as well.
21 Q    Special Agent Infante, are you familiar with the ways in
22 which individuals who conduct off-exchange peer-to-peer
23 transactions communicate?
24 A    Yes.  They usually communicate via messaging platforms or
25 apps such as Signal, Wickr, WhatsApp.

A-297

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 222 of 263 PageID #: 708

Infante - direct - Diouf                    222

1  Q    What is Signal?

2  A    Signal is an encrypted messaging app that is used to

3  communicate.  It uses end-to-end encryption, which means that

4  the individuals that operate Signal can't see the content of

5  the messages that are being transmitted.

6  Q    And how would I use Signal?

7  A    You would have to download it to your phone, and it's

8  fairly simple.

9  Q    What is Telegram?

10  A    Telegram is also a similar app that allows peer-to-peer

11  communication.

12  Q    Do peer-to-peer exchanges charge transaction fees?

13  A    Yes, they do.

14  Q    In general, how do those fees compare as commercial

15  exchanges like Coinbase?

16  A    Usually the fees are, the fee itself set by the

17  peer-to-peer exchange are similar.  But the spread or the

18  price of the actual asset is higher, so it actually may be

19  more expensive for you to transact on a peer-to-peer exchange

20  than it would be on a centralized exchange such as Coinbase.

21  Q    Why would someone use a peer-to-peer exchange over a

22  commercial exchange if it's more expensive?

23  A    One reason would be avoid having to provide identifying

24  information.  So, many peer-to-peer exchanges don't require

25  identifying information to be provided, especially if they are

A-298

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 223 of 263 PageID #: 709

Infante - direct - Diouf                          223

1   located in other countries that don't have those regulations.

2   So that would be, I think, one of the main reasons that

3   somebody wouldn't want to use, for example Coinbase, and have

4   to pay more money to use a peer-to-peer exchange.

5   Q    In your experience, can you buy illegal drugs online?

6   A    Yes.

7   Q    How are they paid for?

8   A    Usually the most common way would be in crypto currency.

9   Q    If I'm an online drug dealer and I have crypto currency

10  that comes from drug sales, how I would change it into cash?

11  A    Many times you would use either brokers that you already

12  know, so in a peer-to-peer manner.  Or if you don't know any

13  brokers that would exchange your crypto currency for cash, you

14  could use one of those peer-to-peer exchanges that will

15  connect you with other individuals that are buying crypto.

16  Q    In your experience, have you investigated peer-to-peer

17  exchanges?

18  A    I have, yes.

19  Q    And are you familiar with the types of crimes that might

20  occur on peer-to-peer exchanges?

21  A    Yes.

22  Q    What are those?

23  A    Generally money laundering, money laundering of crypto

24  currencies that spring from different types of crimes, such as

25  the sales of drugs online, for example.

Rivka Teich

A-299

```
                    Infante - direct - Diouf                      224
 1   Q    You mentioned LocalBitcoins.com earlier what is that?
 2   A    LocalBitcoins.com is an example of a peer-to-peer crypto
 3   currency exchange.
 4   Q    Is LocalBitcoins.com still operating?
 5   A    Yes, it is.
 6   Q    Was it operating in 2018?
 7   A    Yes.
 8   Q    Have you worked on any investigations involving
 9   LocalBitcoins.com?
10   A    Yes, on multiple occasions.
11   Q    What sorts of investigations were these?
12             MR. SINGER:  Objection, your Honor.
13             THE COURT:  Overruled.
14   Q    You can answer.
15   A    Usually they were money laundering and drug trafficking
16   investigations involving crypto currencies.
17   Q    Where is LocalBitcoins.com based?
18   A    In Finland.
19   Q    And in 2018 if someone wanted to use LocalBitcoins.com,
20   what would they do?
21   A    They would have to create an account with a username and
22   password, usually they wouldn't have to provide a name or any
23   kind of identifying information, and they could trade crypto
24   currency without having to provide identity basically.
25             MS. DIOUF:  Just a moment, your Honor.
```

A-300

Case 1:19-cr-00386-PKC  Document 78  Filed 12/01/22  Page 225 of 263 PageID #: 711

Infante - cross - Singer                     225

1          Nothing further.  Thank you.

2          THE COURT:  How are we doing?  Could we start

3    cross-examination without a break?  Okay.

4          Let's go, Mr. Singer.

5    CROSS-EXAMINATION

6    BY MR. SINGER:

7    Q    Good afternoon, Special Agent Infante.

8    A    Good afternoon.

9    Q    We have not met before, correct?

10   A    That's correct.

11   Q    It's a pleasure to meet you.

12   A    Likewise.

13   Q    You described digital currency as a means of exchange; is

14   that right?

15   A    That's correct.

16   Q    I just find it easier to refer to it as Bitcoin.  Is it

17   okay if I just speak of it as Bitcoin, understanding that

18   we're speaking generally about digital currency, okay?

19   A    Sure.

20   Q    So digital currency is a form of property, it's not money

21   like it's a 20-dollar bill, right?

22   A    It could be considered money.

23   Q    It's used like money.

24   A    It is used like money, yes.

25   Q    Okay.  And but essentially it's a form of property that

Rivka Teich

A-301

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 226 of 263 PageID #: 712

Infante - cross - Singer                226

1   exists in a digital form on the blockchain, correct?

2   A    It could be considered as property, yes.

3   Q    The U.S. Treasury Department doesn't consider it currency

4   like U.S. currency for tax purposes, does it?

5   A    I'm not sure.  I'm not a tax expert, so I'm not sure for

6   taxes.

7   Q    You indicated that any digital currency the value is

8   determined by the market?

9   A    Yes.

10   Q    And it's determined, therefore, by just what somebody

11   will pay for it, correct?

12   A    Yes.

13   Q    And so the fluctuations in the value of a Bitcoin can

14   change significantly over time, right?

15   A    That's correct.

16   Q    I think you indicated that today one Bitcoin is worth

17   approximately $19,000?

18   A    Yes.

19   Q    And you said four years ago in 2018, that a Bitcoin was

20   worth an average of about $6,000?

21   A    That's correct.

22   Q    Maybe a little below, maybe a little above, but in that

23   general range, correct?

24   A    Correct.

25   Q    The value of Bitcoin, in your experience, has been known

A-302

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 227 of 263 PageID #: 713

```
                    Infante - cross - Singer                227
 1   to vary quickly and wildly?
 2   A    Yes.
 3   Q    That would be fair to say, correct?
 4   A    Yes.
 5   Q    You talked about different ways that a person may acquire
 6   a Bitcoin -- let me step back for a second.
 7            When a person -- Bitcoin can be owned in fractional
 8   units as well, correct?
 9   A    Yes.
10   Q    So you don't own one or two or three Bitcoins, you can
11   own 1.276 Bitcoin, correct?
12   A    Yes, correct.
13   Q    So it's actually broken down by, I'm not sure by how
14   many, but past a number of decimal points?
15   A    Correct.
16   Q    The market value is simply the value of one Bitcoin, then
17   you have to calculate the value to get to the fractional part,
18   correct?
19   A    Yes.
20   Q    You said that a Bitcoin can be purchased in several ways.
21   You indicated a person can go to an exchange and buy Bitcoin,
22   correct?
23   A    Yes.
24   Q    That was the Coinbase?
25   A    Right.
```

Rivka Teich

A-303

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 228 of 263 PageID #: 714

Infante - cross - Singer                      228

1  Q    And again, Coinbase operates like a bank.  It's a company

2  that operates like a bank where you have an account with them?

3  A    Yes.

4  Q    It's more of an electronic bank that operates only with

5  digital currencies?

6  A    Yes.

7  Q    There isn't a Coinbase branch on my corner where I can

8  get a passbook and put some savings in, right?

9  A    Right.

10  Q    Showing my age with a passbook reference.

11        You said a person can also obtain Bitcoin through a

12  peer-to-peer transaction, correct?

13  A    Right.

14  Q    Or through a direct transaction with an individual?

15  A    Right.

16  Q    Peer-to-peer, if it's LocalBitcoins.com or some other

17  peer-to-peer exchange, essentially acts as a way of

18  introducing people to each other?

19  A    Right.

20  Q    Like Craigslist.  If you have a sofa you want to sell,

21  you can advertise it on Craigslist and someone will find it

22  and say, yes, I'm interested in buying it and it puts people

23  together, correct?

24  A    Very similar, but LocalBitcoins also has an escrow system

25  as well.

A-304

Case 1:19-cr-00386-PKC  Document 78  Filed 12/01/22  Page 229 of 263 PageID #: 715

Infante - cross - Singer                    229

1  Q    It's more sophisticated for digital currencies, but it's

2  the manner in which people are put together, right?

3  A    Right.

4  Q    There is another way that individuals can obtain Bitcoin

5  and that's referred to as mining; is that right?

6  A    Yes.

7  Q    You're familiar with mining Bitcoin?

8  A    Yes.

9  Q    I'll try to put my question to you, then you can correct

10  me.  Okay?  The mining, what is referred to as mining of

11  Bitcoin, is essentially a very complicated series of

12  mathematical equations that are done by computer; is that

13  fair?

14  A    Yes.

15  Q    Okay.  The computer equipment can be expensive to obtain,

16  correct?

17  A    Correct.

18  Q    And they are known to take or use enormous amounts of

19  electricity, correct?

20  A    Yes.

21  Q    Because of the number of transactions, the amount of data

22  that is going through the computer, and the amount of time

23  that it takes, all of those things are using large amounts of

24  electricity, correct?

25  A    Yes.

Rivka Teich

A-305

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 230 of 263 PageID #: 716

Infante - cross - Singer                230

1   Q    A person who is successful -- is mining considered a

2   difficult way of obtaining Bitcoin?

3   A    Very difficult.  And for a regular person, probably

4   almost impossible nowadays.

5   Q    Nowadays?

6   A    Right.

7   Q    You said that Bitcoin was first created in 2009?

8   A    Yes.

9   Q    And so in the early years of the existence of Bitcoin,

10  would it be fair to say that mining was -- there was more

11  activity in mining because of a greater opportunity to

12  actually obtain Bitcoin that way?

13  A    I wouldn't say more activity.  But there may have been

14  more opportunity for an individual with a regular computer to

15  be able to mine, yes.

16  Q    Would you say that in 2018 it would have been easier to

17  mine than it is today?

18  A    Not really, no.  2018 would probably be similar

19  difficulty.

20  Q    Are you familiar with a company called Bitmain?

21  A    Yes.

22  Q    Bitmain is a Chinese company?

23  A    Yes.

24  Q    A company that exists in China?

25  A    I'm not sure if they still do.  I think they may have

A-306

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 231 of 263 PageID #: 717

Infante - cross - Singer                231

1   left China recently.

2   Q     Recently.  Back in 2018, 2019 Bitmain was a Chinese

3   company, yes?

4   A     Yes.

5   Q     Bitmain manufactured machines that individuals could buy

6   that are called mining machines; is that right?

7   A     Right.

8   Q     An individual who wanted to buy a mining machine, do you

9   recall approximately how much that costs back then, 2018?

10  A     No, I can't recall.  There is also different tiers of

11  them, depending on the structure of the machine.

12  Q     So different types of machines depends on their size,

13  sophistication, whatever it might be with varying costs?

14  A     Yes.

15  Q     But any individual, as far as you understand, could go to

16  Bitmain's website and purchase one or multiple machines if

17  they were available; is that correct?

18  A     I'm not sure if Bitmain had a way of purchasing through

19  their website; but I do know that Bitmain machines could be

20  purchased, yes.

21  Q     If I were able to purchase a Bitmain mining machine here

22  in New York, I would purchase it from Bitmain and they would

23  ship it to me, correct?

24  A     I really can't -- I really don't know if Bitmain would

25  ship it or it would have to be a third-party to ship it.  But

Rivka Teich

A-307

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 232 of 263 PageID #: 718

Infante - cross - Singer                    232

1   you can obtain a mining machine, yes.

2   Q    Obtaining a mining machine from Bitmain, or any other

3   company that would make them, is and was legal in the United

4   States, correct?

5   A    Yes.

6   Q    Once I obtain a mining machine, I could resell it to

7   somebody else, correct?

8   A    Sure.

9   Q    If I were to purchase a machine from Bitmain, have it

10  sent either directly or through a third-party to me here in

11  New York, I could then advertise that on any kind of website

12  if someone wanted to purchase it, I could sell it to them?

13  A    Sure.

14  Q    That would be legal, correct?

15  A    Yes.

16  Q    Not illegal in the United States and it wasn't in 2018 to

17  buy, or sell, or resell a mining machine; is that correct?

18  A    That's correct.

19  Q    You've indicated some reasons why a person may seek to

20  use a peer-to-peer exchange or a direct meeting, personal

21  meeting, with a person to exchange Bitcoin, any digital

22  currency but here Bitcoin, for cash; is that correct?

23  A    Yes.

24  Q    One of them, I think you indicated was perhaps the most

25  common reason, was essentially to have some privacy in the

A-308

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 233 of 263 PageID #: 719

Infante - cross - Singer                    233

1   transaction; is that fair to say?

2   A    Sure, yes.

3   Q    A peer-to-peer exchange is legal in the United States?

4   A    It's depends.  As long as -- it depends on the quantity

5   of the exchanges and how the exchanges are being operated.  So

6   in some instances you would need a license to operate an

7   exchange; without a license it would be illegal.

8   Q    The peer-to-peer exchange would need a license or the

9   individuals using the peer-to-peer exchange?

10  A    Both.  In some instances both would need a license.

11  Q    You referenced specifically LocalBitcoins.com?

12  A    Yes.

13  Q    You said that is a company that is based in Finland?

14  A    Yes.

15  Q    And that it's on the Internet so it's accessible here in

16  the United States, correct?

17  A    Yes.

18  Q    LocalBitcoins was a place where individuals could go to

19  advertise either I want to buy or sell Bitcoin or any other

20  digital exchange, right?

21  A    Yes.

22  Q    Digital currency, I'm sorry.  In 2018 it existed and was

23  legal?

24  A    Yes.  It was legal, yes.  As long as licenses were

25  obtained where they are needed.

A-309

Infante - cross - Singer                    234

1  Q    LocalBitcoins.com is still in business, isn't it?

2  A    It is, yes.

3  Q    It's still accessible on the Internet?

4  A    It is.

5  Q    Is the U.S. Government, to your knowledge, presently

6  attempting to shut it down as being an illegal operation?

7  A    I'm not sure if I'm allowed to talk about existing cases.

8         THE COURT:  Sustained.  Move on, Mr. Singer.

9  Q    But it still exists?

10  A    It still exists, yes.

11  Q    If I want go onto LocalBitcoins and find somebody who is

12  selling Bitcoin and I want to buy some Bitcoin, I can arrange

13  through LocalBitcoins to meet with them and do the exchange?

14         MS. DIOUF:  Objection, your Honor.

15         THE COURT:  Overruled.

16  BY MR. SINGER:

17  Q    I can give them a credit card or cash or wire them money

18  and they can transmit the Bitcoin to me, correct?

19  A    So as far as I know, nowadays they don't do in-person

20  meetings any more.  But you can use bank transfers, credit

21  cards, and PayPal, things like that.

22  Q    If you find a person -- I think you indicated these

23  personal exchange, not peer-to-peer but direct transaction

24  within an individual, if I find an individual or I know an

25  individual that has Bitcoin and I want to purchase it for

Rivka Teich

A-310

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 235 of 263 PageID #: 721

```
                      Infante - cross - Singer                    235
 1   cash, I can meet with that person and do the exchange,
 2   correct?
 3   A     Yes.
 4   Q     And that's legal, is it not?
 5   A     It depends.
 6   Q     It's standing alone.  Obviously, if I'm doing it for some
 7   illegal purpose it might not be.  But the exchange itself, of
 8   cash for Bitcoin, is legal, is it not?
 9   A     It depends.
10   Q     It depends.
11   A     Yes.
12   Q     Okay.  Well --
13   A     If you're doing it that one time, then it would be legal,
14   yes.  But if you're doing it continuously without a license,
15   it wouldn't be legal.
16   Q     That is your understanding of the law, correct?
17   A     If you're acting as a money transmitter, which is
18   continuously doing exchanges back and forth, then you're
19   acting as a money transmitter and you would have to get a
20   license.  If you're doing without a license --
21   Q     If you're accepting money for a fee and transmitting it,
22   then you might be a money transmitter, correct?
23   A     Sure.
24   Q     If I do an exchange, an individual exchange like that, it
25   may take 15, 20 minutes, half hour, an hour for the blockchain
```

A-311

Case 1:19-cr-00386-PKC  Document 78  Filed 12/01/22  Page 236 of 263 PageID #: 722

Infante - cross - Singer                    236

1   to complete its work.  But if I meet with someone and pay cash

2   for Bitcoin, that transaction is complete in that meeting; is

3   that correct?

4   A    It depends if you're using LocalBitcoins as an escrow

5   service.

6   Q    Let's keep LocalBitcoins out of it.

7         If I'm doing an individual exchange.  I have

8   Mycelium wallet on my phone, and I meet with someone.  I meet

9   with you and you have a Mycelium wallet with Bitcoin on your

10  phone.  I give you X dollars in exchange for a certain amount

11  of Bitcoin.  I give you the money, you've got the cash, you

12  transfer the Bitcoin to my wallet and the exchange is done; is

13  that right?

14  A    Yes.

15  Q    Nothing else that needs to be done?

16  A    Right.

17  Q    It can be completed within that meeting that we have?

18  A    Yes.

19  Q    You indicated Coinbase, again, as an example of one of

20  the commercial exchanges that exists?

21  A    Right.

22  Q    And you said that it was quick and easy, I think you

23  referenced; is that right?  I hear you correctly that using

24  Coinbase could be quick and easy?

25  A    It would be cheaper than using a peer-to-peer exchange.

Rivka Teich

A-312

Infante - cross - Singer                    237

1   Q    Cheaper?

2   A    Yes.

3   Q    Quicker?

4   A    Maybe, sometimes, it depends.

5   Q    So if I have Bitcoin and I want to sell it and get cash

6   for it so I can make use of that cash quickly, I would set up

7   an account with -- I wanted to use the commercial exchange --

8   I would set up an account with Coinbase, correct?

9   A    Sure.

10  Q    And whatever time period that might be, if it's a matter

11  of hours or days for the various verifications to take place,

12  then I have a Coinbase account, right?

13  A    Yes.

14  Q    Then if I say, for instance, that what I'm linking to my

15  Bitcoin account with Coinbase is my checking account?

16  A    Yes.

17  Q    Regular commercial bank.

18  A    Yes.

19  Q    Citibank, Chase, whatever it is.  I go on Coinbase and I

20  indicate I want to exchange 1.5 Bitcoin for whatever the

21  market value is that day.  Okay.  $30,000?

22  A    Sure.

23  Q    How soon is that $30,000 going to be in my bank account?

24  A matter of days, isn't it?

25  A    It could be, yes.

A-313

Infante - cross - Singer          238

1  Q    It's the electronic transfer system that commercial banks

2  use to transmit money; is that correct?

3  A    Right.  And they could also use wire transfers, which

4  could be faster, and credit card transaction would be

5  immediate as well.

6            (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rivka Teich

A-314

Case 1:19-cr-00386-PKC  Document 78  Filed 12/01/22  Page 239 of 263 PageID #: 725

Infante - cross - Singer                    239

1   BY MR. SINGER: (Continuing.)

2   Q    I'm talking about cash because if it's on a credit card

3   and I need the cash for something, I'm still slowed up because

4   I don't have the cash available to me.  If I'm going to do the

5   exchange and put it in my bank account so I can withdraw cash,

6   I can go to a teller and withdraw the cash from the bank

7   account, that may take several days if I use Coinbase; is that

8   fair to say?

9   A    It's possible, yes.

10  Q    And, so, a peer-to-peer or a direct meeting with an

11  individual may be quicker than that?

12  A    It may be, yes.

13  Q    Okay.  And might I pay a premium to do it quicker, pay a

14  little more?

15  A    Maybe.

16  Q    I might?

17  A    Maybe, yes.

18  Q    Okay.  Now, you've -- as part of your training and

19  experience and I guess work, you attend various conventions

20  related to cryptocurrencies?

21  A    Yes.

22  Q    In the U.S. or around the world?

23  A    Yes.

24  Q    Let's keep it in the United States.  Now, have you been

25  to any conventions in, say, the last year?

SN      OCR      RPR

A-315

Case 1:19-cr-00386-PKC  Document 78  Filed 12/01/22  Page 240 of 263 PageID #: 726

Infante - cross - Singer                    240

1    A    Yes, I have.

2    Q    Now, sometimes as a speaker, sometimes simply to observe

3    and go to different talks about things?

4    A    Yes.

5    Q    And perhaps as part of your work and I'm not asking you

6    any questions about that, okay?

7              Have you seen at any of these conventions what I

8    guess could be called an ATM for Bitcoin?

9    A    I can't recall.

10   Q    Are you familiar with ATMs, special machines that appear

11   and operate like a regular ATM, but that's used for Bitcoin?

12   A    I am familiar with an ATM, but I can't recall if I ever

13   saw one at conference or a convention.

14   Q    Have you seen one out on the streets in Miami or New

15   York?

16   A    I have, yes.

17   Q    And they look like a regular ATM, correct, approximately

18   the same size?

19   A    You're.

20   Q    And have you ever used one of them, just to see what they

21   are and how they operate?

22   A    Yes, I have.

23   Q    And the way you use one of those Bitcoin ATMs and it may

24   be for other digital currencies, but I'm using Bitcoin

25   generically, okay?

SN      OCR      RPR

A-316

Infante - cross - Singer                    241

1  A    Sure.

2  Q    The way you would use those ATMs is I would open whatever

3  I have on my phone and put it up to a screen and it would read

4  my code.  Is that right?

5  A    Depending on what kind of transaction you would like to

6  effectuate, if it's a buy or a sell.

7  Q    If I want to sell Bitcoin at one of those machines and

8  get cash for it, how would I do that?

9  A    The machine will usually give you a Bitcoin wallet to

10 send the Bitcoin to and then you would use your -- if it's

11 Mycelium, if it's Mycelium, you would use Mycelium Wallet to

12 send the currency to -- the cryptocurrency to the machine and

13 then the machine would give you cash.

14 Q    And are those becoming more prevalent in your experience,

15 the existence of Bitcoin ATMs?

16 A    They're becoming more prevalent in terms of quantity.

17 There's more of them.

18 Q    And are they legal?

19 A    If they are operating with a license, then, yes, they're

20 legal.

21 Q    That's a suit.  If you're doing things properly with

22 whatever licenses, whatever are needed, the ability to use it

23 is legal, it's not illegal in all circumstances; right?

24 A    Sure.

25 Q    Okay.  And --

SN      OCR      RPR

A-317

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 242 of 263 PageID #: 728

Infante - cross - Singer                242

```
 1   A    As long as you're not exchanging, as long as your
 2   cryptocurrency is not from illicit proceeds, yes it's legal.
 3   Q    Do the ATMs charge fees?
 4   A    Yes.
 5   Q    And are you familiar with the approximate fees that are
 6   charged by these machines?
 7   A    It can be anywhere from two to 10 percent.
 8   Q    To 10 percent, even more in some instances?
 9   A    Could be, yes.
10   Q    And these are available for people to use because it's --
11   well, withdrawn.
12          So, individuals may be using these machines and
13   paying as much as 10 percent to exchange their Bitcoin for
14   cash.
15   A    Yes, sometimes, yes.
16          MR. SINGER:  Judge, can I have one minute, please?
17          THE COURT:  Yes, you may.
18          (Pause in proceedings.)
19          MR. SINGER:  I'm sorry, just one or a few brief
20   questions to follow up.
21   BY MR. SINGER:
22   Q    When I go to a regular commercial bank Citibank, Chase,
23   whatever, the money that I have in that bank is insured by the
24   FDIC?
25   A    Yes.
```

SN      OCR      RPR

A-318

Infante - cross - Singer                    243

1  Q    So the FDIC is a government agency that insures up to a
2  certain limit the money that I have in the bank so that in
3  case the bank goes under its protection for the deposit; is
4  that right?
5  A    Yes.
6  Q    To your knowledge are the commercial exchanges like
7  Coinbase and other similar commercial exchanges, are they
8  insured by the federal government?
9  A    To my knowledge, no.
10            MR. SINGER:  Thank you, very much.  I have nothing
11  else.
12            THE COURT:  Thank you, Mr. Singer.
13            Any redirect?
14            MS. DIOUF:  No redirect, Your Honor.
15            (Witness excused.)
16            THE COURT:  Government, call your next witness.
17            MR. NAVARRO:  Your Honor, I have another stip to
18  read.  Can I confer with Mr. Singer?
19            THE COURT:  Yes.
20            (Counsel confer.)
21            MR. NAVARRO:  May I have the ELMO again, Your Honor?
22            THE COURT:  You may.
23            MR. NAVARRO:  If I can have the lights, I think it
24  might help a little bit.
25            Ladies and gentlemen I have another stipulation to

SN      OCR      RPR

A-319

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 244 of 263 PageID #: 730

Infante - cross - Singer                    244

1   read to you.  It is hereby stipulated and agreed by and

2   between the United States of America by Assistant United

3   States attorneys Gillian Kassner, Marietou Diouf, and the

4   defendant Mustafa Goklu, by his attorneys Murray Singer,

5   Esquire and Emilee Sahli, Esquire that -- I'm going to read

6   the first one and then summarize it for you because it gets

7   repetitive.

8           The document marked Jury Aid 801 is a fair and

9   accurate transcript of an audio recording of the defendant's

10  interaction with a law enforcement agent captured on August

11  28, 2018.

12          Similar language in paragraphs two, three and four,

13  for Jury Aids 802, 803, and 804 and they have dates that will

14  be on the transcripts that are going to be handed out to you

15  shortly.  The same thing on the next page.  You see there

16  paragraphs five, six and seven.  Documents marked Jury Aids

17  806, 807 and 809 are fair and accurate transcripts of the

18  audio recordings of the defendant's interactions with the law

19  enforcement agent captured on the date in the paragraph which

20  is on transcripts that you're going to receive.

21          Finally, the documents marked as Jury Aids 801, 802,

22  803, 804, 806 and 809 can be used to aid the jury during this

23  the trial dated Brooklyn, New York September 28, 2022 and it's

24  been signed by both parties.

25          THE COURT:  Thank you very much Mr. Navarro.

SN      OCR      RPR

A-320

Infante - cross - Singer                    245

1          Ladies and gentlemen, you are now receiving binders

2   of those transcripts that were just spoken about in the

3   stipulation.  Just keep them closed until you are told to

4   refer to a particular transcript by the assistant U.S.

5   Attorney.

6               MS. KASSNER:  Thank you, Your Honor.

7               The Government calls Mr. Patrick O'Kain to the

8   stand.

9               THE COURT:  Okay.  Let's have Agent O'Kain up here.

10              (Witness takes the stand.)

11              THE COURT:  Remain standing for one moment so you

12  can be sworn in.

13              THE COURTROOM DEPUTY:  Raise your right hand.

14              (Witness sworn/affirmed.)

15              THE COURTROOM DEPUTY:  Have a seat.  Please state

16  and spell your name for the record.

17              THE WITNESS:  Patrick O'Kain, P-A-T-R-I-C-K

18  O-'-K-A-I-N.

19              (Continued on the next page.)

20

21

22

23

24

25

SN        OCR        RPR

A-321

```
                      O'Kain - direct - Kassnerr                246
```

1  **PATRICK O'KAIN**,

2              having been first duly sworn, was examined and

3              testified as follows:

4  DIRECT EXAMINATION

5  BY MS. KASSNER:

6  Q    Good afternoon, Mr. O'Kain.

7  A    Good afternoon.

8  Q    Mr. O'Kain, if you could remove your mask, please.  Thank

9  you.

10             From approximately September 2012 through January

11  2021, what were you doing for a living?

12  A    I worked as a special agent for the Drug Enforcement

13  Administration.

14  Q    Is the Drug Enforcement Administration also known as the

15  DEA?

16  A    That's correct.

17  Q    What does a special agent at the DEA do?

18  A    We're responsible for investigating drug crimes and money

19  laundering crimes surrounding drug dealing.

20  Q    Can you tell us a little bit about your educational and

21  professional background from before you joined the DEA?

22  A    I got my undergraduate degree at a school called Mercy

23  Hurst University.  I majored in intelligence studies.  After I

24  graduate dead from Mercy Hurst I went to work in the

25  intelligence field.  So I went to work for a few different

```
              SN        OCR        RPR
```

A-322

Case 1:19-cr-00386-PKC  Document 78  Filed 12/01/22  Page 247 of 263 PageID #: 733

O'Kain - direct - Kassnerr                    247

1  companies that were responsible for working with the

2  Government in the United States intelligence community.

3  Q    While you were working at the DEA were you assigned to

4  work at any particular offices?

5  A    Yes, I started at the DEA in California in San Francisco.

6  I worked there for several years and then I transferred to the

7  New York division.  And in the New York division I worked in

8  various enforcement groups and that's the -- an enforcement

9  group is what they -- the DEA calls a team of agents that

10 investigates crimes.  And I also worked with New York's cyber

11 division as well.

12 Q    And were you working with New York's cyber division or

13 working on cyber cases in July 2018?

14 A    Yes, I was working on cyber-related cases.  I cannot

15 recall exactly when we started up the cyber unit, but I was

16 working cyber investigations and at some point we created the

17 officially designated cyber unit.

18 Q    And while you were in the cyber unit did you ever work on

19 investigations involving cryptocurrency?

20 A    I did, yes.

21 Q    What is cryptocurrency?

22 A    Cryptocurrency, also known as digital currency, is

23 essentially an all-online currency.  There's no physical form

24 and it's -- the currency is essentially computer code that is

25 transferred to -- from one individual to another or one entity

A-323

O'Kain - direct - Kassnerr                          248

1  to another on what is called the block chain.  And the block

2  chain is essentially an online accounting ledger that keeps

3  track of all of the transactions with a specific

4  cryptocurrency.

5  Q    And did you work on any investigations involving Bitcoin?

6  A    Yes.

7  Q    What is Bitcoin?

8  A    Bitcoin is a type of cryptocurrency or digital currency.

9  Q    Is the use of Bitcoin illegal in the United States?

10 A    No.

11 Q    Is it always legal or always illegal?

12 A    Well, I think it depends but it's generally legal.

13 Q    And while at the DEA did you work -- what was the nature

14 of your investigations that involved Bitcoin?

15         MR. SINGER:  Objection, Your Honor.  Relevance.

16         THE COURT:  Overruled?

17         PROSPECTIVE JUROR:  We would investigate Bitcoin as

18 it pertained to suspected money laundering involving drug

19 crimes.

20 Q    While at the DEA did you ever work undercover?

21 A    I did.

22 Q    In general terms, what does it mean to work undercover?

23 A    When an agent is working undercover they essentially

24 assume a different persona that is not a special agent for the

25 Government and the purpose of that is to investigate suspected

SN      OCR      RPR

A-324

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 249 of 263 PageID #: 735

O'Kain - direct - Kassnerr                    249

1   crimes and, you know, there's a lot of different types of

2   undercover operations but generally speaking you play a role

3   and you investigate a crime as an agent, but you're not

4   letting the target of the investigation or the suspect know

5   that you're with the Government.

6   Q    And, generally speaking, when you're working undercover,

7   do you wear any particular clothing or do anything differently

8   than you otherwise normally would?

9   A    I think you generally try to dress and act and speak the

10  part of the role that you're trying to play.  So that could

11  mean anything.  If you just try to play the part that you

12  think would best fit the role that you're trying to play, so

13  you dress in accordance to what you think.

14  Q    Breaking it down step-by-step can you please explain to

15  the jury from beginning to end what happens during a typical

16  undercover operation?

17          MR. SINGER:  Objection, Your Honor.  If it's not

18  related to his dealings with Mr. Goklu.  I don't know how it's

19  relevant.

20          THE COURT:  Overruled.

21  A    A typical undercover operation, you know, you start out

22  with the target of the investigation, the individual or entity

23  that you suspect is comitting the crime.  Then you start

24  communicating with that suspect in a certain capacity to set

25  up a meeting and then you also have a team of other agents or

A-325

Case 1:19-cr-00386-PKC  Document 78  Filed 12/01/22  Page 250 of 263 PageID #: 736

O'Kain - direct - Kassnerr                250

1  law enforcement officers that you coordinate with internally

2  and -- so, let's say we're setting up an undercover meeting

3  with a suspect.  You would set up that meeting with the

4  suspect, you know, relatively when and where that's going to

5  take place, and then you coordinate with a team of Special

6  Agents and other law enforcement officers.

7          You have a team of surveillance agents that will be

8  available on the field to observe what's happening during that

9  undercover meeting and also to protect the undercover agent

10 that will be going out there.

11         Prior to the undercover meeting, the undercover

12 agent typically puts on various listening devices and then

13 goes out to meet the suspect and then you have your team out

14 there to make sure that everything is -- the conversation --

15 the undercover is protected.

16 Q    Are you familiar with an investigation into an individual

17 named Mustafa Goklu?

18 A    Yes, I am.

19 Q    Was what your role in that investigation?

20 A    I was the undercover agent.

21 Q    Do you see Mustafa Goklu in the courtroom today?

22         THE COURT:  You can stand up.

23         MS. KASSNER:  If it's possible for everyone at

24 defendant's able to remove masks.

25         THE COURT:  That is fine.  If you will all unmask so

SN      OCR      RPR

A-326

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 251 of 263 PageID #: 737

O'Kain - direct - Kassnerr                 251

1   we don't have any issue about --

2   BY MS. KASSNER:

3   Q    You mentioned that you could see Mustafa Goklu.  Can you

4   identify an item of clothing?

5   A    He's agent two from the left said with the red tie.  From

6   my orientation.

7         THE COURT:  All right.  And a red tie.  There are

8   two individuals with red ties.

9         THE WITNESS:  Brighter red tie and a full head of

10  gray hair.

11        MR. SINGER:  Judge, we stipulate he's indicating

12  Mr. Goklu.

13        THE COURT:  He is the third individual from the

14  left?

15        THE WITNESS:  Yeah, third.

16        THE COURT:  So the record is clear, the witness did

17  identify the defendant, Mr. Goklu.

18        Proceed.

19  BY MS. KASSNER:

20  Q    To your knowledge, did Mustafa Goklu go by any other

21  names?

22  A    Michael.

23  Q    Generally speaking, how did you first become familiar

24  with the defendant?

25  A    Become familiar?  The first time we met was during an

SN      OCR      RPR

A-327

```
                    O'Kain - direct - Kassnerr                    252
```

1    undercover operation, but I began communicating with him prior

2    to physically meeting him.

3                (Continued on the following page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

A-328

```
                    O'Kain - direct - Kassner              253

1    BY MS. KASSNER:   (Continuing.)

2    Q     And why did you begin communicating with him?

3    A     We, I say we, so me and the co-case agent that was

4    working on this investigation, we identified a profile for an

5    individual that went by the street name Mustangy on a website

6    called localbitcoins.com.

7    Q     What is -- continue.

8    A     I think the question is, what is localbitcoins.com?

9    Localbitcoins.com was a website that matched up individuals

10   that wanted to buy cryptocurrency with individuals who wanted

11   to sell cryptocurrency.  So I guess it was sort of like an

12   eBay style website but for cryptocurrency.

13   Q     In your work as a DEA special agent, did you learn how

14   people can purchase Bitcoin?

15   A     Yes.

16   Q     Are you familiar with the term commercial exchange?

17   A     Yes.

18   Q     Can you give the jury an example of a commercial

19   exchange?

20   A     I think the most relevant, sort of, company would be

21   Coinbase.  So it's a licensed commercial financial institution

22   that exchanges various cryptocurrencies with one another or

23   cryptocurrencies with cash.

24   Q     And are commercial exchanges typically available on a

25   cellphone or laptop?
```

SG          OCR          RPR

A-329

Case 1:19-cr-00386-PKC  Document 78  Filed 12/01/22  Page 254 of 263 PageID #: 740

```
                     O'Kain - direct - Kassner                254
 1   A    Yes.
 2   Q    And generally speaking, to use a commercial exchange, are
 3   you required to provide any forms of identification?
 4   A    To use a commercial exchange?
 5   Q    Yes.
 6   A    Yes.  So you have to provide typically a social security
 7   number, address, usually a driver's license.
 8   Q    Are you familiar with any other ways in addition to
 9   commercial exchanges to purchase Bitcoin?
10   A    Yeah.  You can purchase through websites like
11   localbitcoins.com or directly with other individuals on a
12   peer-to-peer basis.
13   Q    And this peer-to-peer basis, does it typically involve a
14   physical exchange?
15   A    It can, yes.
16        So one thing localbitcoins.com facilitated was the
17   option for people that wanted to buy and sell Bitcoin to meet
18   up with the counter-party in person for a physical Bitcoin for
19   cash transactions.
20   Q    Now, you mentioned earlier that you first -- you're first
21   interaction with the defendant began after seeing a page on
22   localbitcoins.com.
23        Were why were you and other members of the DEA
24   looking into users of localbitcoins.com?
25   A    I remember -- I recall that we had information from other
```

SG          OCR          RPR

A-330

O'Kain - direct - Kassner                    255

1   non-related DEA investigations that website was used by

2   individuals to facilitate money laundering.  So that was one

3   reason we turned to localbitcoins.com.  And also, what we

4   noticed when we were looking through some of the

5   advertisements, they would -- the fees that individuals would

6   charge to make that transaction were significantly higher than

7   what you would have to do on commercial exchange.  And, you

8   know, it just didn't make sense why somebody would use --

9            MR. SINGER:  Objection, Your Honor, to this

10  speculative question.

11           THE COURT:  Overruled.

12           You're answer is complete.  Ask you're next

13  question.

14           MS. KASSNER:  If we could pull up just for the

15  witness what has been previously marked for identification as

16  Government's Exhibit 401.

17  A    I can see it.

18           THE COURT:  Yes.  The agent can see it.

19           MS. KASSNER:  Okay.

20  Q    Do you recognize Government's Exhibit 401?

21  A    Yes.  This is a screen capture of the defendant's

22  localbitcoins.com profile.

23  Q    And how do you recognize it?

24  A    I've seen it before.  I was there when it was captured.

25           MS. KASSNER:  At this time, the Government would

SG        OCR        RPR

A-331

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 256 of 263 PageID #: 742

```
                    O'Kain - direct - Kassner              256
```

 1  move to admit Exhibit 401 into evidence and publish it to the

 2  jury.

 3              (Government Exhibit 401, was received in evidence.)

 4              THE COURT:  Any objection?

 5              MR. SINGER:  No.

 6              THE COURT:  Exhibit 401 is admitted and you may

 7  publish.

 8                    (Exhibit published.)

 9  Q    When you were going through localbitcoins.com, what, if

10  anything, about the defendant's profile stood out to you?

11  A    Well, a couple of things.  So we were -- I was located in

12  the New York area.  So we were looking at people located in

13  New York, so that was one thing that stood out.  The other

14  thing that stood out at the time, from what I recall, was the

15  amounts that were listed that the defendant could exchange

16  were relatively high.  From what I recall, they were

17  significantly higher than some of the other advertisements

18  that we saw from the New York area.

19  Q    At the top of Government's Exhibit 401 it says, Mustangy.

20          What is Mustangy?

21  A    I believe that is the screen name that the defendant

22  chose to use for this website.

23  Q    When does the profile say that the account was created?

24  A    The account was created one year prior to when this

25  screen capture was created.

```
            SG      OCR      RPR
```

A-332

```
                    O'Kain - direct - Kassner                257
```

1   Q    When was the first purchased?

2   A    Seven months and one week prior to the screen capture.

3   Q    And according to Government's Exhibit 401, when was the

4   last time the user Mustangy was last seen on the website?

5   A    23 hours and 21 minutes prior to the screen capture.

6   Q    Is there anywhere on the localbitcoins.com page that

7   lists Mustangy name or provides any identifying information

8   for him?

9   A    No.

10  Q    And is there anywhere on the localbitcoins.com page that

11  indicates whether or not Mustangy was licensed to transmit

12  money in the State of New York or the U.S. government?

13  A    No.

14  Q    At the bottom of the second page of Government's

15  Exhibit 401, there's a section that says, buy Bitcoins with

16  cash fromMustangy.

17        What do you understand the list that followed to

18  include?

19  A    I can't see the list that follows.

20        MS. KASSNER:  If we could turn to Page 3.

21  Q    Do you see the list at the very top of the page?

22  A    Yes.  So I understood each of those rows to be separate

23  listings for the defendant's ability to exchange

24  cryptocurrency for cash.  So at the very top you can see

25  Midtown New York, so that was the location that he was willing

SG        OCR        RPR

A-333

O'Kain - direct - Kassner                    258

1   to make the exchange.  I believe the 727,445.

2            THE COURT:  Hold on.  A little too fast.

3            727,445.  Go ahead.

4   A    Was the price of the Bitcoin at the time.  And then 100

5   to 20,000 USD was the range on the amounts that he was able to

6   transact.

7            MS. KASSNER:  And if we can focus on the list right

8   under that where it says, sell Bitcoins for cash to Mustangy.

9   And if we can blow that section up, please.

10  Q    So there's a similar list of rows here.  What do you

11  understand each row so correspond to?

12  A    Different like similar to the above.  Different listings

13  for the services that Mustangy could provide.  So the location

14  that he could operate in for that specific listing and then

15  the price of Bitcoin.  And then on the far right, it's the

16  limit of the amounts that he was able to transact at that

17  specific time.

18            THE COURT:  Can you pull the microphone closer to

19  you.

20            THE WITNESS:  Sorry.

21            THE COURT:  Keep you're voice up.

22  Q    So there's an entry here for Manhattan, New York.  How

23  much according to this page was the defendant -- what was his

24  limit to transact to sell Bitcoin for cash in Manhattan?

25  A    $9,999.

SG      OCR      RPR

A-334

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 259 of 263 PageID #: 745

```
                    O'Kain - direct - Kassner              259
```

1  Q     And there are other locations that have higher amounts.

2         Which locations had the highest amount he was

3  willing to exchange?

4  A     Could we zoom out, please.

5         So Jersey City, New Jersey.  The listed amount is

6  $99,999.  And then in Sheepshead Bay, Brooklyn $99,999.

7  Q     And at the very bottom of the page, there's a section

8  that says feedback.

9         Can you read what it says under feedback?

10  A     Feedback left by users with noticeable trade volume on

11  May 24, 2018 at 12:52 a.m. It looks like a review was

12  submitted saying fast paying transaction.  Pleasure to do

13  business with.

14         MS. KASSNER:  And Your Honor, it is 5:29.  This

15  might be a good place to pause.

16         THE COURT:  Perfect.  So we'll do that.

17         Ladies and Gentlemen, we are going to stop for

18  today.  And I'll ask the witnesses to remain seated for a

19  moment.

20         Just a quick reminder, when you go home, don't talk

21  to anybody about the case.  Your experience here today other

22  than saying that you were picked for a jury.  You can say

23  that.  And don't do any research.  Don't post anything at all

24  about what's happening.  Keep an open mind.  And remember,

25  don't talk to each other about the case.

A-335

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 260 of 263 PageID #: 746

O'Kain - direct - Kassner                    260

1        So have a good night, everybody.  We'll see you here

2   tomorrow morning ready to go by 9:30.  We'll break at 1:00

3   p.m. tomorrow.

4        Yes.

5        MS. KASSNER:  Your Honor, the binders.

6        THE COURT:  Please leave your binders on the chairs.

7   Remember to leave you're notes in the jury room.

8        Thank you, everyone.  Have a great night.

9        All rise.

10        You can step down.  Thank you.

11        Have a seat, everyone.

12        So just to confirm so everyone remembers, we are

13   doing a half day tomorrow until 1:00 p.m.  And then we are off

14   on Wednesday.

15        How much longer do you anticipate with this witness?

16   I'm guessing that he'll consume all of tomorrow's half day.

17        MS. KASSNER:  Your Honor, it's possible that we

18   could get to our next witness.  It really will depend on the

19   length of cross.  I think we probably have at least two hours

20   just to get through all the recordings.  So it could be a

21   little bit more than that depending on friction with putting

22   up exhibits, but it'll be at least two hours of direct.

23        THE COURT:  All right. And imagine cross would be

24   lengthy as well, since obviously that is the heart of the case

25   it seems.  The other witnesses, I imagine, will be relatively

SG        OCR        RPR

A-336

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 261 of 263 PageID #: 747

```
                    O'Kain - direct - Kassner              261

 1   short.  These seem to be records folks mostly.

 2             MS. KASSNER:  Yes, Your Honor.

 3             I think the other witnesses are probably under an

 4   hour each.

 5             THE COURT:  Okay.  All right.  Good.

 6             So there's some possibility we'll see that the jury

 7   might get the case by Friday.  Obviously, I haven't asked the

 8   Defense yet whether or not Mr. Goklu intends to testify, but I

 9   don't know if there's going to be a defense case, but at any

10   rate, we're moving at least fairly quickly.

11             MR. SINGER:  Judge, I indicated to the Government

12   the other day that, if there was a defense case, it would be

13   Mr. Goklu.  We do not have any other witnesses that we would

14   be calling.

15             THE COURT:  Okay.  All right.  Thank you very much.

16             Anything we need to discuss before I let you all go?

17             We will hopefully have a copy of the jury

18   instructions for you to review by tomorrow.  And then, you'll

19   obviously have half of tomorrow and Wednesday, although not so

20   much for you Mr. Singer, but to review them and then we can

21   have a charge conference, may be, Thursday after at the end of

22   the trial date.  Okay.

23             MR. SINGER:  That's fine.

24             THE COURT:  All right.  Thank you, everyone.

25             Have a good holiday.  No.  I'll see you tomorrow.
```

A-337

Case 1:19-cr-00386-PKC   Document 78   Filed 12/01/22   Page 262 of 263 PageID #: 748

```
                    O'Kain - direct - Kassner                 262

 1          MS. KASSNER:  Thank you, Judge.

 2          MR. NAVARRO:  Thank you, Judge.

 3                    *    *    *    *    *

 4

 5   (Matter adjourned until Tuesday, October 4, 2022, 9:30 a.m.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SG      OCR      RPR

A-338

263

1                               I N D E X

2

3     WITNESS                                          PAGE

4

5        LILITA INFANTE

6            DIRECT EXAMINATION BY MS. DIOUF            208

7            CROSS-EXAMINATION BY MR. SINGER            225

8        PATRICK O'KAIN

9            DIRECT EXAMINATION BY MS. KASSNER          246

10

11    E X H I B I T S

12

13       Government Exhibit 401                         256

14

15

16

17

18

19

20

21

22

23

24

25

VB        OCR        CRR

A-339

264

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - X
 3
     UNITED STATES OF AMERICA,      : 19CR386(PKC)
 4                                  :
              Plaintiff,            :
 5                                  :
          -against-                 : United States Courthouse
 6                                  : Brooklyn, New York
     MUSTAFA GOKLU,                 :
 7                                  :
              Defendant.            : Tuesday, October 4, 2022
 8                                  : 9:00 a.m.
                                    :
 9                                  :
                                    :
10
     - - - - - - - - - - - - - X
11
          TRANSCRIPT OF CRIMINAL CAUSE FOR PRETRIAL CONFERENCE
12            BEFORE THE HONORABLE PAMELA K. CHEN
                 UNITED STATES DISTRICT JUDGE
13
                      A P P E A R A N C E S :
14
     For the Government: UNITED STATES ATTORNEY'S OFFICE
15                          Eastern District of New York
                            271 Cadman Plaza East
16                          Brooklyn, New York 11201
                       BY:  GILLIAN KASSNER, ESQ.
17                          MARIETOU E. DIOUF, ESQ.
                            FRANCISCO NAVARRO, ESQ.
18                          Assistant United States Attorneys

19   For the Defendant:    MURRAY E. SINGER, ESQ.
                            14 Vanderventer Avenue, Suite 147
20                          Port Washington, New York 11050
                         SAHLI LAW PLLC
21                          195 Broadway, 4th Floor
                            New York, New York  11211
22                       BY:EMILEE SAHLI, ESQ.

23
     Court Reporter:    SOPHIE NOLAN
24                         225 Cadman Plaza East/Brooklyn, NY 11201
                         NolanEDNY@aol.com
25   Proceedings recorded by mechanical stenography, transcript
     produced by Computer-Aided Transcription
```

A-340

Proceedings                              265

1            (In open court.)

2            (The Hon. PAMELA K. CHEN, presiding.)

3            (Defendant present.)

4        THE COURT:  Let me mention, the reason we're delayed

5    is because at least one juror, Alternate 1, had a real issue

6    with the 7 subway.  Apparently it was smoking.  So we told him

7    to take an Uber here which we will hopefully pay for.  I will

8    pay for it if it comes down to it because we needed to get him

9    here today and I think another juror had a delay related to

10   the subway.

11           (Pause in proceedings.)

12       THE COURT:  They're all here now.  So I would say

13   Alternate No. 1 made a heroic effort to get here and called us

14   far in advance to let us know what the situation was.  So,

15   that's a good sign.  Nonetheless, we're a little bit delayed

16   today.  We'll move expeditiously.  The one thing I want to

17   address is I intend, before you play any audio recordings, to

18   give the cautionary instruction.

19           I do intend to give the cautionary instruction about

20   the edited recordings and this is what it will say in

21   substance:  Members of the jury you are about to hear certain

22   audio are recordings that have been edited to eliminate

23   portions that are irrelevant to this case.  Those portions do

24   not include conversations with Mr. Goklu.  The fact that the

25   recording has been edited should not be of concern you in any

SN        OCR        RPR

A-341

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 3 of 82 PageID #: 752

|  | Proceedings | 266 |
|---|---|---|

1   way.

2   　　　　Any objection to that?

3   　　　　MS. KASSNER:  No objection.

4   　　　　MR. SINGER:  No objection.

5   　　　　THE COURT:  Just cue me whenever it is that you're

6   about to play the audio.  I can do it before we resume today.

7   Does that make the most sense?

8   　　　　MS. KASSNER:  Let's do that, Your Honor.

9   　　　　THE COURT:  Okay.

10   　　　　(Jury enters.)

11   　　　　THE COURT:  So, good morning, ladies and gentlemen.

12   Thank you for your heroic efforts of some of you to get here

13   today and my apologies to those who had to wait, but I know at

14   least one of our jurors experienced some real subway craziness

15   and -- and for those of us that have taken the subway, we all

16   know that that happens.  And, so, Alternate No. 1, we thank

17   you because I know it was quite a hassle for you to get here

18   this morning and I'm glad you're safe because it sounds like

19   it was a bit of a somewhat hazardous-sounding situation.

20   We're glad you're safe.

21   　　　　And thank you everyone else for getting here on

22   time.  We are going to resume with the testimony of

23   Mr. O'Kain.

24   　　　　MS. KASSNER:  He's just outside the courtroom, Your

25   Honor.

A-342

Case 1:19-cr-00386-PKC  Document 79  Filed 12/01/22  Page 4 of 82 PageID #: 753

O'Kain - direct - Kassner                    267

1          THE COURT:  And as he's approaching.  I did want to

2     tell you, ladies and gentlemen, that you're going to hear

3     today certain audio recordings that have been edited to

4     eliminate portions that are irrelevant to this case.  Those

5     portions do not include conversations with Mr. Goklu so the

6     fact that the recordings have been edited in this way should

7     not concern you in any way, all right?

8               I will remind you Mr. O'Kain you are still under

9     oath.

10              (Witness resumes the stand.)

11          THE COURT:  Please have a seat.

12    **PATRICK O'KAIN**, having been previously duly sworn/affirmed,

13         testified as follows:

14    CONTINUED DIRECT EXAMINATION

15    BY MS. KASSNER:

16    Q    When we left off yesterday, you were explaining that you

17    saw the user Mustangy on LocalBitcoins.com; is that right?

18    A    Yes.

19    Q    After you discovered Mustangy on LocalBitcoins.com what

20    if anything did you do next?

21    A    Myself and the other special agent that was working the

22    case with me, started to communicate with Mustangy through an

23    application -- a telephone application called Signal.

24    Q    What is Signal?

25    A    Signal is an encrypted chat application for smartphones.

SN       OCR       RPR

A-343

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 5 of 82 PageID #: 754

O'Kain - direct - Kassner                    268

1   Q     And how is Signal different, if at all, from a regular

2   text message?

3   A     To the best of my knowledge, it is -- it just has

4   enhanced security and end-to-end encryption.  I recall that

5   they did not have any -- the company or the entity that runs

6   Signal did not keep any records.  So if the Government were to

7   subpoena them they wouldn't have any information to return.

8   Q     And I believe earlier you mentioned that you were working

9   with another special agent at the DEA; is that right?

10  A     That's correct.

11  Q     Who is that person?

12  A     Former Special Agent Allan Liefke.

13  Q     And is it fair to say that you were working together on

14  your investigation of Mustangy?

15  A     That's correct.

16  Q     At this point did you know Mustangy's true identity?

17  A     No.

18  Q     When you reached out to Mustangy on Signal were you

19  operating undercover?

20  A     Yes, I was.

21  Q     And in dealing with the defendant generally, did you

22  assume a cover story?

23  A     Yes.

24  Q     What was your cover story?

25  A     The cover story that I was operating under was that I was

                    SN      OCR      RPR

A-344

Case 1:19-cr-00386-PKC  Document 79  Filed 12/01/22  Page 6 of 82 PageID #: 755

O'Kain - direct - Kassner                    269

1   an online drug dealer getting drug proceeds in the form of

2   Bitcoin that I needed to turn into cash.

3   Q    Why did you assume the role of a narcotics dealer selling

4   drugs or buying drugs on the internet as opposed to a

5   street-level dealer?

6   A    When you sell.  --

7            THE COURT:  We're going to pause for a moment --

8   thank you very much -- so that the young child could be

9   removed.

10           Start your answer again.

11  A    When individuals sell drugs online, typically they

12  receive payment in some form of cryptocurrency and not cash;

13  versus if somebody is selling drugs on the street, typically

14  the payment is received in cash.

15           MS. KASSNER:  Now, if we could please pull up just

16  for the witness what has been previously marked for

17  identification as Government Exhibits 501 through 507.

18  A    I can see it.

19  Q    It's a collection of exhibits.

20           (Exhibit published to witness only.)

21  Q    Do you recognize Government Exhibits 501 through 507?

22  And I believe we're going through each exhibit one by one.

23  A    That's correct.

24  Q    Do you recognize these exhibits?

25  A    I do.

SN      OCR      RPR

A-345

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 7 of 82 PageID #: 756

```
                      O'Kain - direct - Kassner                270
```

1    Q    What are they?

2    A    These are photographs of the undercover phone that I was

3    using in the conversations with the defendant on the chat app

4    Signal.

5    Q    Are Government Exhibits 501 through 507 a fair and

6    accurate depictions of screenshots of all the messages you

7    exchanged with the defendant on Signal from July 28 -- sorry,

8    from July 2018 through April 2019?

9    A    I believe so, yes.

10         MS. KASSNER:  Your Honor, at this time the

11   Government would move to admit Government Exhibits 501 through

12   507 and public 501 for the jury.

13         THE COURT:  Any objection?

14         MR. SINGER:  No, Your Honor.

15         THE COURT:  501 through 507 are admitted and you may

16   publish them.

17         (Government Exhibits 501 through 507 received in

18   evidence.)

19         (Exhibit published.)

20   BY MS. KASSNER:

21   Q    So there are messages in light gray to the right.  Who

22   sent those messages?

23   A    I sent those messages.

24   Q    And there are messages in dark gray to the left.  Who

25   sent those messages?

A-346

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 8 of 82 PageID #: 757

O'Kain - direct - Kassner                    271

1   A    The defendant.

2   Q    Beginning on July 11, 2018, can you read your messages

3   into the record from the top and I'll, in turn, read the

4   messages from the defendant?

5   A    "Hey, Mustangy want to sell about 10K BTC?  What's your

6   availability?

7   Q    I'll be Queens tomorrow.  What is your location?

8   A    Manhattan.  I'm out of town until next week though.  Just

9   didn't know how much advance notice you wanted.

10  Q    Text me when coming, mostly will cover.

11  A    Okay, thanks.

12  Q    You are welcome."

13          So, very briefly, what is BTC?

14  A    BTC is the shorthand for Bitcoin.

15  Q    What is 10K?

16  A    10K is 10,000.  So that is saying I want to sell $10,000

17  worth of Bitcoin.

18  Q    And at a high level what's going on in this back and

19  forth?

20  A    This is the beginning of setting up a meeting between

21  myself and the defendant to exchange $10,000 worth of Bitcoin

22  for cash.

23  Q    Turning to page two of Government Exhibit 501, beginning

24  on August 27, 2018 at 12:34 p.m. can you read your messages

25  and I'll read the defendant's messages?

SN     OCR     RPR

A-347

Case 1:19-cr-00386-PKC  Document 79  Filed 12/01/22  Page 9 of 82 PageID #: 758

O'Kain - direct - Kassner                    272

1   A    "Hi.  Are you still available?  I have to sell 5-K BTC

2   tomorrow.

3   Q    If sharp, I might be around midtown.  Let me know.

4   A    I can do midtown.  What time?  Are we good for tomorrow?

5   I'll be in midtown around 1."

6   Q    What does 5K mean here?

7   A    $5,000 worth of Bitcoin.

8   Q    Turning to page three, can you continue reading your

9   messages, beginning after Mustangy says:

10          "Yes after 8 a.m. to maybe noon, how much you want?

11  A    Okay.  Let's do noon.  Can you do just 5K tomorrow?

12  Q    Yes, okay.

13  A    Cool."

14  Q    And turning to page four, just jumping ahead.

15  A    Four?

16  Q    Yes.  On August 28th at 11:01 a.m. you write:

17          "Hello.  Are we still on for today?"

18          How does the defendant respond?

19  A    The defendant writes:

20          "Yes, I am at midtown, 55, 55 Street and Seventh."

21  Q    And skipping ahead to page eight?

22          THE COURT:  I think you said 11:01.  Didn't it say

23  10:01?  You didn't say that she said that.  I want to be sure

24  you're looking at the same messages.

25          MS. KASSNER:  Apologies, 10:01 a.m.  That's correct,

SN      OCR      RPR

A-348

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 10 of 82 PageID #: 759

```
                    O'Kain - direct - Kassner              273
```

1   Your Honor.

2           THE COURT:  Go ahead.

3   BY MS. KASSNER:

4   Q    And if we could skip ahead to page eight.  The defendant

5   writes at four -- it's hard -- the defendant writes on this

6   date:

7           "Can we meet at 54th and Seventh at 4:10 because I

8   have to be at London Hotel at 4:30.  Can you read your

9   messages?

10  A    Yeah.  Where do you want to meet?

11  Q    54th and Seventh Avenue northeast corner?

12  A    Heading there now.

13  Q    Okay.  Let me when here.

14  A    Here."

15  Q    What, if anything, happened after you wrote "here" at

16  4:16 p.m. on August 28, 2018?

17  A    So, at that time I was in a government unmarked vehicle

18  and when I wrote "here" I was in the area and I got out of the

19  vehicle across the street and met with the defendant at the

20  54th Street/Seventh Avenue location.

21  Q    Prior to that date had you ever encountered the defendant

22  in person?

23  A    No.

24          MS. KASSNER:  And if we could pull up just for the

25  witness Government Exhibit 302.  Do you recognize the area

A-349

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 11 of 82 PageID #: 760

```
                    O'Kain - direct - Kassner              274

 1    shown in Government Exhibit 302?

 2              (Exhibit published to witness only.)

 3    A    Yes.

 4    Q    What is that area?

 5    A    This is an aerial image of Manhattan and the area in

 6    which me and the defendant met.

 7              MS. KASSNER:  At this time the Government would move

 8    to admit Government Exhibit 302 into evidence and publish it.

 9              THE COURT:  Any objection?

10              MR. SINGER:  No, Your Honor.

11              THE COURT:  All right.  Government Exhibit 302 is

12    admitted.

13              (Government Exhibit 302 received in evidence.)

14              THE COURT:  And you may publish.

15              (Exhibit published.)

16    BY MS. KASSNER:

17    Q    For the record, can you point out for the jury where you

18    met the defendant on August 28, 2018?

19    A    Right at the red dot.  I'm not sure the jury can see that

20    from there, but there's a red dot in the middle of the map

21    there.

22    Q    Are you generally familiar with the neighborhood around

23    54th Street and Seventh Avenue in Manhattan?

24    A    I am, yes.

25    Q    How would you describe that neighborhood?
```

SN        OCR        RPR

A-350

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 12 of 82 PageID #: 761

O'Kain - direct - Kassner                    275

1   A    It's very commercial, lots of highrises, busy, a lot of

2   shops on the street corners, a lot of people and this was

3   summertime so it was a sunny day.

4   Q    Were any other members of the DEA present on the day when

5   you met the defendant?

6   A    Yes.  There were several members of the DEA in the area.

7   Q    What were they doing?

8   A    They were on surveillance.  They were on the surveillance

9   team.  I kind of referenced that yesterday.  They were there

10  to observe the meeting and make sure that I was safe.

11  Q    Was your transaction with the defendant recorded?

12  A    It was recorded through audio.

13  Q    Why wasn't it recorded by video?

14  A    It's -- it was often challenging to record things through

15  video and when you're in an undercover capacity especially

16  you're not controlling the environment.  So oftentimes you

17  have to have some sort of camera on your person.  I already

18  had two cellphones and a listening device and this being the

19  first time that I was meeting the defendant, I had no idea who

20  he was and I didn't know if there was any safety concerns.  So

21  having more devices seemed outside of my comfort zone.

22          MS. KASSNER:  If I could just approach very briefly,

23  Your Honor?

24          THE COURT:  Yes, you may.

25          (Counsel approaches.)

SN       OCR       RPR

A-351

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 13 of 82 PageID #: 762

O'Kain - direct - Kassner                    276

1   BY MS. KASSNER:

2   Q     I just handed you a CD that's been marked Government

3   Exhibit 801 through 809.  Are you familiar with these

4   exhibits?

5   A     Yes.

6   Q     What are they?

7   A     These are audio recordings of the meetings that I had

8   with the defendant.

9   Q     How do you recognize them?

10  A     I listen to the CD and after confirming that the audio

11  recordings were on this disk, I signed it and dated it.

12        MS. KASSNER:  Your Honor, the Government would move

13  to admit Government Exhibits 801 through 809 into evidence.

14        THE COURT:  Any objection?

15        MR. SINGER:  No, Your Honor.

16        THE COURT:  Government Exhibits 801 through 809 are

17  admitted.

18        (Government Exhibits 801 through 809 received in

19  evidence.)

20        THE COURT:  And you may publish them to the jury.

21        (Exhibit published.)

22  BY MS. KASSNER:

23  Q     Okay.  Beginning with Government Exhibit 801, so,

24  everyone should that I have transcripts in the binders that

25  they have in front of them.  And, so, the transcripts are

SN      OCR      RPR

A-352

O'Kain - direct - Kassner                    277

1  going to be marked 801R which is where we're going to begin.

2  It's, I believe, the first tab in everyone's binders.

3          MR. SINGER:  Your Honor, could we explain to the

4  jury that R is simply a portion of --

5          THE COURT:  I thought I did that already, but --

6          MR. SINGER:  On the transcripts, not about the

7  recordings.

8          THE COURT:  All right.  I think the transcripts

9  reflect the edited recordings and furthermore, as I understand

10 it, the Government is only going to play a portion of the

11 entire recording.  Even as to the edited portion, I think the

12 Government is still playing a smaller portion of that edited

13 recording.  Obviously the parties and you will have available

14 to you the full recording, but for now the Government wants to

15 focus on certain portions.

16          Am I correct?

17          MS. KASSNER:  That's correct, Your Honor.  Thank

18 you.

19          THE COURT:  All right.

20          MS. KASSNER:  If we could play from timestamp 1:45

21 to timestamp 2:47.

22          (Audio played; audio paused.)

23 Q    How does the defendant introduce himself to you?

24 A    As Michael.

25 Q    How do you introduce yourself?

SN      OCR      RPR

A-353

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 15 of 82 PageID #: 764

O'Kain - direct - Kassner                    278

1   A    As Pat.

2   Q    Where are you during this portion of the conversation

3   with the defendant?

4   A    We are on the street corner, the northeast corner of 54th

5   and Seventh outside of a black Mercedes sedan.

6   Q    And at some point do you get into the car?

7   A    Yes.  After we introduce each other, we both get into the

8   car.

9   Q    You ask here -- you ask here, "Where is it" and then the

10  defendant responds "this one," and you respond "you got too

11  much of that lying around.  Is this it?"

12       What are you and the defendant talking about here?

13  A    So, when I got into the vehicle, the defendant opened the

14  center console and inside of the console there were multiple

15  bundles of cash.  And that discussion is me trying to identify

16  which one is destined for me and so I picked up one and the

17  defendant said that that's not the right one so I went to

18  another one and he said that wasn't it either and then

19  identified the right one for me.

20  Q    The defendant instructs you -- the defendant says, "Close

21  the door, man.  We're not drug dealers.  We're buying

22  Bitcoin."

23       What did you understand that to mean?

24       MR. SINGER:  Objection, Your Honor.  It's irrelevant

25  to what he believed.

SN      OCR      RPR

A-354

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 16 of 82 PageID #: 765

O'Kain - direct - Kassner                  279

1           THE COURT:  Overruled.

2   A    I opened the door because I didn't know who the defendant

3   was and if there were any safety concerns.  Then the defendant

4   asked me to close the door and said, close the door, man, the

5   cops, we're not drug dealers.  We're buying Bitcoin.  So I

6   think what was interesting to me --

7           MR. SINGER:  Objection, what was interesting, Judge.

8           THE COURT:  Overruled, overruled.

9   A    -- was that on our first encounter the defendant was

10  concerned about being identified by the cops.  That stood out

11  as something notable, something that was notable to me at the

12  time.

13          MS. KASSNER:  If we could play from 2:47 to 3:23.

14          (Audio played/audio paused.)

15  Q    The defendant here says, "If it too much, I have

16  machine."  What did you understand that to mean?

17  A    I understood the machine to be a reference to the money

18  counter.

19  Q    And what is going on during this section of the

20  recording?

21  A    I recall that we're getting ready to count the currency

22  or in the early stages of counting the currency from the

23  bundle of cash that we were going to transact with.

24          MS. KASSNER:  Moving ahead, if we could play from

25  4:30 to 5:35.

SN       OCR       RPR

A-355

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 17 of 82 PageID #: 766

O'Kain - direct - Kassner                    280

1           (Audio played/audio paused.)

2   Q    What are you and the defendant discussing here?

3   A    So, initially, again, so we're starting to coordinate how

4   much Bitcoin for cash the -- we're going to exchange, less the

5   fees that the defendant was charging.  So, when the -- I asked

6   the defendant what do you charge and he said 8, and 8 was a

7   reference to the percent of the total transaction that he was

8   charging for the service that he was providing.

9   Q    You respond, "You charge at 8 percent, all right.  That's

10  high."  Why did you say that?

11  A    A couple of reasons.  One, 8 percent is quite high --

12           MR. SINGER:  Judge, I object to this.  Again,

13  relevance.  His thinking not relevant.

14           THE COURT:  Overruled.

15  A    8 percent is quite high considering you can go to a

16  commercial exchange for significantly less, most often under 2

17  percent and then also in my experience doing undercover work,

18  it's very rare that there's not a negotiation of the fees.

19  Q    Can you explain to the jury how you actually transferred

20  your Bitcoin to the defendant?

21  A    Sure.  In this instance and often if you're doing a

22  peer-to-peer Bitcoin transaction, you have an application on

23  your cellphone, a cryptocurrency wallet.  When you want to

24  send cryptocurrency to somebody else, you can use a QR code.

25  You can scan a QR code.  A QR code are those little square

SN        OCR        RPR

A-356

O'Kain - direct - Kassner                    281

1   codes often found on restaurant tables now for menus.

2            So I would open up my cryptocurrency wallet.  The

3   defendant would open up his cryptocurrency wallet and his QR

4   code.  I would pull up the amount I wanted to send to this to

5   his QR code and that would populate the recipient's address in

6   my phone.  I would hit Bitcoin send and that would to his

7   Bitcoin address through the block chain.

8            MS. KASSNER:  If we could play from 8:30 to 9:33.

9            (Audio played/audio paused.)

10  Q    At the very beginning of this segment, when you ask, "How

11  much can you do at one time," the defendant answers "50."

12  What did you understand 50 to mean?

13  A    50,000.

14  Q    And then the defendant later says -- you asked, "Are you

15  in Manhattan here," and the defendant says, "I don't want to

16  come here.  You know these fucking malls all have the

17  cameras."  And then he says, "That's the other one -- that's

18  the other one that has cameras 2, 3, 5.  They call me, hey,

19  are you a drug dealer, no."

20           What did you understand that to mean?

21  A    I understood that the defendant was concerned about the

22  cameras seeing what he was doing and I interpreted that that

23  he was aware that there was something not aboveboard that he

24  was doing --

25           MR. SINGER:  Objection, Judge.  Again, he's not in a

SN        OCR        RPR

A-357

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 19 of 82 PageID #: 768

O'Kain - direct - Kassner                282

1   position --

2           THE COURT:  Overruled, overruled.  Mr. Singer,

3   overruled.

4   A    And he indicated that they had called him before so that

5   indicated to me that this was not the first time that he's

6   done a transaction like this.

7   Q    And later the defendant says, "But it's Manhattan but I

8   bring the machine.  It's another risk, the machine."  And then

9   later he says, "The fucking thing is evidence that you're a

10  drug dealer."

11          What did you understand him to be talking about

12  here?

13  A    I understood that he was referencing the money counter

14  again and then him -- the possibility of him being caught with

15  the money counter by law enforcement -- they would assume he

16  was a drug dealer if law enforcement saw him driving around

17  with a money counter in his car.

18          MS. KASSNER:  If we could play from timestamp from

19  9:43 to 10:12.

20          (Audio played/audio paused.)

21  Q    You asked for a bag here.  What did you do that?

22  A    I wanted somewhere where I could put the bundles of money

23  he gave to me after the transaction because I had to walk

24  through Manhattan back to the undercover -- well, the agent

25  that was going to pick me up and take me out of the area and I

SN        OCR        RPR

A-358

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 20 of 82 PageID #: 769

```
                        O'Kain - direct - Kassner                    283
```

 1  didn't want to walk around with just a bunch of cash

 2  throughout Manhattan.

 3          MS. KASSNER:  If we could play from 10:57 to 11:23.

 4          (Audio played/audio paused.)

 5  Q    The defendant here talks about making sure, using the

 6  machine -- "So I make sure because I'm getting -- I'm getting

 7  money from somewhere, something bad.  Who knows."

 8          What did you understand that to mean?

 9          MR. SINGER:  Can I have a continuing objection?

10          THE COURT:  Yes.  You may note the continuing

11  objection.  Overruled.

12          MR. SINGER:  Thank you.

13  A    The defendant was telling me how the money counter works

14  and when he was -- when he stated that he's getting money from

15  somewhere, something bad, I understood that to mean that he

16  does this frequently and he is aware of him interacting with

17  potentially bad people doing bad things.  That's how I

18  understood it.

19          MS. KASSNER:  If we could play from 11:24 to 12:30.

20          (Audio played; audio paused.)

21  Q    At the end you say, "Okay out of the car walking

22  northbound on Seventh."  Who are you speaking to then?

23  A    I was speaking to the agents that were on surveillance.

24  So not only did my listening device record, but it also

25  transmitted live.  So I was talking to the other agents that I

```
              SN        OCR        RPR
```

A-359

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 21 of 82 PageID #: 770

O'Kain - direct - Kassner                284

1  knew could hear me.

2  Q    What's going on during the segment of the recording that

3  we just listened to?

4  A    We were starting to set up a potential next meet

5  together.

6  Q    For how much -- how much Bitcoin?

7  A    So, $50,000 worth of Bitcoin.

8  Q    You mentioned during the segment -- you say, "I have an

9  online business so I'm getting money in."

10           Why do you say that?

11  A    Because my undercover story was to be an online drug

12  dealer.  That was the first part of me setting the stage to

13  unfold that story as the defendant and I continued our

14  meetings and transactions.

15  Q    During your first meeting with the defendant, do you

16  mention drugs?

17  A    No.

18  Q    Why not?

19  A    It would be completely out of character for two

20  individuals to meet and if one of them is a drug dealer to

21  divulge the fact that they're a drug dealer during a first

22  encounter.  In my experience in the DEA that never happened.

23  In fact, drugs are -- the real names for drugs are rarely, if

24  ever, used when you're selling drugs.

25  Q    Did you keep a record of the Bitcoin you transferred to

SN        OCR        RPR

A-360

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 22 of 82 PageID #: 771

```
                        O'Kain - direct - Kassner              285

 1   the defendant?
 2   A    Yes.
 3             MS. KASSNER:  If we could show just the witness
 4   Government Exhibits 1 through 5 and Government Exhibit 7 and
 5   we'll show them to you one by one on your screen.
 6             (Exhibit published to witness only.)
 7   Q    Do you recognize Government Exhibits 1 through 5 and 7?
 8   A    Right now we're just scrolling through the exhibits.
 9             Yes, I recognize these.
10   Q    What are Government Exhibits 1 through 5 and Government
11   Exhibit 7?
12   A    These are photographs of the transaction receipts from
13   our undercover cryptocurrency wallet.
14             MS. KASSNER:  At this time the Government would move
15   to admit Government Exhibits 1 through 5 and 7 into evidence.
16             THE COURT:  Any objection?
17             MR. SINGER:  No, Your Honor.
18             THE COURT:  All right.  1 through 5 and 7 are
19   admitted.
20             (Government Exhibits Exhibit 1 through 5 and 7
21   received in evidence.)
22             THE COURT:  And you may publish them to the jury.
23             MS. KASSNER:  If we could publish Government Exhibit
24   7, please.
25             (Exhibit published.)
```

SN     OCR     RPR

A-361

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 23 of 82 PageID #: 772

O'Kain - direct - Kassner                    286

1   Q     So if you could just repeat what this is, Government

2   Exhibit 7?

3   A     This is a photograph of the receipt that the

4   cryptocurrency wallet that we were using offers after you make

5   a transaction with cryptocurrency.

6   Q     There's a section that says to -- well, I'll ask how much

7   Bitcoin did you actually exchange?

8   A     So, the top series of numbers .70453034 BTC.  That is the

9   amount of Bitcoin that I sent to the defendant.

10  Q     And there's a section that says "To" and a string of

11  letters and numbers.  What is that?

12  A     That is called a public address and that is essentially

13  the identifier to somebody's wallet, so almost like a bank

14  account number, I guess, but it's a series of letters and

15  numbers and that's tied to, in this case, the defendant's

16  wallet address.

17        MS. KASSNER:  If we could just show the witness

18  Government Exhibits 602 and 607 through 614.

19  Q     And we'll show them to you one at a time and then I will

20  ask you if you recognize them.  So just let us know when

21  you're finished looking at them.

22        (Exhibit published to witness only.)

23  A     (Reviewing.)

24  Q     Do you recognize Government Exhibits 602 and 607 through

25  614?

SN       OCR       RPR

A-362

O'Kain - direct - Kassner                287

1   A    I do.

2   Q    What are they?

3   A    They are photographs of the cash that I received from my

4   transactions with the defendant.

5        MS. KASSNER:  At this time the Government would move

6   to admit Government Exhibits 602 and 607 through 614 into

7   evidence.

8        THE COURT:  Any objection?

9        MR. SINGER:  No.

10       THE COURT:  They're admitted.

11       (Government Exhibits 602 and 607 through 614

12   received in evidence.)

13       THE COURT:  You may publish.

14       MS. KASSNER:  614.

15       (Exhibit published.)

16  Q    What is Government Exhibit 614?

17  A    This is a photograph of the cash that I received from the

18  defendant I believe on that first -- following that first

19  transaction.

20  Q    What did you do with the cash after you received it from

21  the defendant?

22  A    After we took photographs, and scanned it in to record

23  the serial numbers, we would give all of the currency to the

24  DEA's high-value custodians and then that unit of the DEA

25  handles it according to their procedures but as agents that

A-363

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 25 of 82 PageID #: 774

O'Kain - direct - Kassner                288

1  seized money off of -- during an investigation, that's the

2  process where we give it to the DEA's high-value team.

3  Q    Is that consistent with the DEA's normal practices and

4  procedures?

5  A    Yes.

6  Q    After your interaction on August 28, 2018, did you

7  ultimately determine Michael's legal name?

8  A    Yes, we did.

9  Q    How did you do that?

10 A    I believe it was through his license plate on his car

11 which was GOKLU.  We ran the license plate into DMV records to

12 identify his true identify.

13        MS. KASSNER:  If we could pull up a photograph

14 marked as Government Exhibit 601, just for the witness.

15        (Exhibit published to witness only.)

16 Q    Do you recognize Government Exhibit 601?

17 A    Yes, I do.

18 Q    What is it?

19 A    This is the photo of the defendant that I believe was on

20 file with the DMV.

21        MS. KASSNER:  The Government would move to admit

22 Government Exhibit 601 into evidence.

23        THE COURT:  Any objection?

24        MR. SINGER:  No.

25        THE COURT:  All right.  601 is admitted.

A-364

O'Kain - direct - Kassner                289

1          (Government Exhibit 601 received in evidence.)

2          THE COURT:  And you may publish it.

3          (Exhibit published.)

4   BY MS. KASSNER:

5   Q    Is this photo consistent with how the defendant appeared

6   when you met him in 2018?

7   A    Yes.

8          MS. KASSNER:  If we could pull up for the witness

9   Government Exhibit 604.

10         (Exhibit published to witness only.)

11  BY MS. KASSNER:

12  Q    Do you recognize Government Exhibit 604?

13  A    I do.

14  Q    What is it?

15  A    This is a surveillance photo of the defendant standing

16  outside of his vehicle, the black Mercedes sedan that I

17  referenced.

18         MS. KASSNER:  The Government moves to admit

19  Government Exhibit 604 and to publish it to the jury.

20         THE COURT:  You may.  Did you want to establish a

21  date or did he say?

22  BY MS. KASSNER:

23  Q    Is this a fair and accurate depiction of the car the

24  defendant was driving and the defendant as he appeared in

25  2018?

SN        OCR        RPR

A-365

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 27 of 82 PageID #: 776

```
                    O'Kain - direct - Kassner                 290
```

1   A    Yes.

2          THE COURT:  Just the year 2018?

3   Q   In August 2018?

4   A    Yes.

5          THE COURT:  All right.  Any objection?

6          MR. SINGER:  No, Your Honor.

7          THE COURT:  604 is admitted.

8          (Government Exhibit 604 received in evidence.)

9          THE COURT:  And you may publish it.

10          (Exhibit published.)

11  BY MS. KASSNER:

12  Q   Is this same car where you met the defendant in 2018 and

13  2019?

14  A    Yes, that appears to be the same car.

15          MS. KASSNER:  At this time may I approach, Your

16  Honor?

17          THE COURT:  Yes, you may.

18          (Counsel approaches.)

19  Q   I just handed you a box within which is Government

20  Exhibit 1003, which has already been admitted into evidence.

21  If you could just open the box and take out the item inside

22  the box.  Do you recognize Government Exhibit 1003?

23  A   I do.

24  Q   What is it?

25  A   This is a money counter and the money counter that was in

SN      OCR      RPR

A-366

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 28 of 82 PageID #: 777

```
                    O'Kain - direct - Kassner              291
 1   the defendant's car.
 2           MS. KASSNER:  May I approach again?
 3           THE COURT:  Yes, of course.
 4           (Counsel approaches.)
 5           MS. KASSNER:  Your Honor, would it be possible to
 6   just allow the jurors to see the money counter?
 7           MR. NAVARRO:  I will hand it to Juror 1 --
 8           And if you can pass it down.
 9           THE COURT:  All right.
10           (Counsel approaches.)
11           MS. KASSNER:  Your Honor, I can continue questioning
12   or I can pause.
13           THE COURT:  I would pause just to make sure you have
14   all the jurors' attention.
15           MS. KASSNER:  Thank you, Your Honor.
16           THE COURT:  Go ahead.
17   BY MS. KASSNER:
18   Q    Did you have any further interactions with the defendant
19   after August 28, 2018?
20   A    Yes, I did.
21   Q    How did you communicate with the defendant?
22   A    Through the Signal app.
23           MS. KASSNER:  If we could pull up what's previously
24   been admitted as Government Exhibit 502 for the jury.
25           THE COURT:  You may.
```

SN      OCR      RPR

A-367

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 29 of 82 PageID #: 778

O'Kain - direct - Kassner                    292

1           (Exhibit published.)

2    BY MS. KASSNER:

3    Q    So, turning to page -- the first page of Government

4    Exhibit 502, can you read your messages with the defendant

5    that occurred on September 17, 2018 starting at 5:47 p.m. and

6    I'll read the messages from the defendant.

7    A    "Hey you around this week?

8    Q    Wednesday.

9    A    Okay.  What time works for you?  And we have about

10   7,500?"

11   Q    We can pause there.  If we can turn to page two.  And I

12   will start by reading the messages from the defendant in the

13   second half of the page on Thursday, September 20th.

14         "Hi.  At Queens now.  If early is better I can meet

15   you at Queens tonight, Star" -- and then there's an address

16   for Starbucks at 46 Queens Boulevard in Sunnyside, Queens, New

17   York.  And if we could turn to page three to see your

18   response.

19         THE COURT:  Just so the record is clear, visually

20   the dark messages sort of shaded in black are the defendant's.

21         Correct?

22         MS. KASSNER:  Yes, Your Honor.

23         THE COURT:  Because as you read them, it's helpful

24   to point that out so people know where you're reading from.

25         MS. KASSNER:  Yes, Your Honor.

SN      OCR      RPR

A-368

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 30 of 82 PageID #: 779

O'Kain - direct - Kassner                293

1          THE COURT:  Okay, go ahead.

2     BY MS. KASSNER:

3     Q    So after the defendant at the top sends that Starbucks

4     address, how do you respond at 5:21 p.m.?

5     A    I write:

6               "I don't know if I can make it out there tonight.

7     Can you do tomorrow morning like 11?"

8     Q    If we can keep scrolling to the next page, page four of

9     Government Exhibit 502.  In the middle of the page on Friday

10    September 21, 2018, can you read your message starting at

11    12:02 p.m.?

12    A    "Hi.  I'm heading over now should be there around 12:30."

13    Q    "Okay" says the defendant.  And how do you respond?

14    A    "Here."

15    Q    And then the defendant responds "five min."  Here

16    outside.  And how do you respond?

17    A    "K."

18    Q    What, if anything, happened after you wrote K at 12:34

19    p.m. on September 21, 2018?

20    A    I met with the defendant outside of the Starbucks that

21    was referenced in those messages.

22          MS. KASSNER:  If we could show just the witness

23    what's been previously marked at Government Exhibit 305.

24          (Exhibit published to witness only.)

25    Q    Do you recognize the area shown in Government Exhibit

SN     OCR     RPR

A-369

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 31 of 82 PageID #: 780

```
                    O'Kain - direct - Kassner              294
```

1   305?

2   A    I do.

3   Q    What is that area?

4   A    That's an aerial view of the area where the Starbucks is

5   that was referenced in that chat.

6        MS. KASSNER:  Your Honor, the Government would move

7   to admit Government Exhibit 305 into evidence and publish it

8   to the jury.

9        THE COURT:  Any objection?

10        MR. SINGER:  No, Your Honor.

11        THE COURT:  305 is admitted.

12        (Government Exhibit 305 received in evidence.)

13        THE COURT:  And you may publish.

14        (Exhibit published.)

15   BY MS. KASSNER:

16   Q    Using Government Exhibit 305 can you note for the jury

17   where you met the defendant on September 21, 2018?

18   A    On the street directly in front of where that red pin is.

19   Q    Are you generally familiar with the neighborhood around

20   the Starbucks at 4609 Queens Boulevard in Sunnyside, Queens?

21   A    I am, yes.

22   Q    Can you describe the area for the jury?

23   A    Yeah, it's a neighborhood in Queens so a lot of -- a lot

24   of vehicle traffic, no skyscrapers like there are in

25   Manhattan.  There are a lot of shops lining the streets,

A-370

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 32 of 82 PageID #: 781

O'Kain - direct - Kassner                295

1    relatively busy.

2    Q    Were any other DEA agents present during that transaction

3    in the vicinity?

4    A    Yes, there were agents, surveillance agents, around just

5    like the previous time.

6    Q    Was the transaction recorded?

7    A    This one it was not.  We attempted to but the recording

8    cut out immediately as I got to the defendant's vehicle.

9             MS. KASSNER:  Permission, Your Honor, to play

10   Government Exhibit 802 from timestamp 11 to the finish for the

11   jury?

12            THE COURT:  Yes, you may.  Are you going to refer

13   them to the --

14            MS. KASSNER:  Yes, Your Honor.

15   BY MS. KASSNER:

16   Q    There's another tab in the binder which is marked 802

17   with an R at the top.

18            THE COURT:  Before you start the video --

19            Ladies and gentlemen, I also wanted to advise you

20   that the transcripts that you're reviewing along with

21   listening to the audio are merely aids to your listening.  In

22   other words, it's your hearing of what happens on the audio

23   what governs here, not what's transcribed.

24   A    If there's some difference between them, remember it's

25   your hearing of the audio that matters; not so much the

SN        OCR        RPR

A-371

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 33 of 82 PageID #: 782

O'Kain - direct - Kassner                    296

1   transcript.  Along the same lines, I want you to know that the

2   transcripts themselves, because they're only aids to your

3   listening and not evidence, will not be sent back with you to

4   the jury room for your deliberations, but the audio will be

5   available to you.  So just keep that in mind.  Go ahead.

6           (Audio played/audio paused.)

7   BY MS. KASSNER:

8   Q    So, you mentioned earlier that the audio equipment

9   failed.  Can you explain -- is that something that's happened

10  in your experience at the DEA?

11  A    Yeah.  I mean, it doesn't happen all the time but it does

12  happen.  So that it wasn't too abnormal.  It was unfortunate,

13  but that has happened before.

14  Q    Can you explain to the jury what, if anything, happened

15  during your meeting with the defendant on September 21, 2018

16  right after the recording cut out?

17  A    Yes, the defendant and I -- we negotiated or conducted a

18  Bitcoin-for-cash exchange that was very similar to the process

19  that I described before from the first one.  So, I exchanged

20  Bitcoin and received cash.

21          MS. KASSNER:  Permission to publish what's been

22  previously admitted as Government Exhibit 1 for the jury.

23          THE COURT:  Yes, you may.

24          (Exhibit published.)

25  Q    What is Government Exhibit 1?

SN      OCR      RPR

A-372

O'Kain - direct - Kassner                297

1   A    This is a photograph of the receipt regarding that

2   transaction from our cryptocurrency wallet.

3   Q    How much Bitcoin did you transfer to the defendant on

4   September 21, 2018?

5   A    1.096872021 Bitcoin.

6        MS. KASSNER:  Permission to publish what's been

7   previously admitted as Government Exhibit 602 for the jury?

8        THE COURT:  Yes.

9        (Exhibit published.)

10  BY MS. KASSNER:

11  Q    What is Government Exhibit 602?

12  A    I believe that's the cash that I received from that

13  transaction.

14  Q    What did you do with the cash after you received it from

15  the defendant?

16  A    We took it to the DEA's high-value custodian team.  I

17  cannot recall what that unit actually is called, but it's the

18  entity at the DEA that handles the seized money and the

19  high-value items.

20  Q    And is that what you did with all of the cash that you

21  received from the defendant in 2018 and 2019?

22  A    That's correct.

23  Q    Did you have any further dealings with the defendant

24  after this date?

25  A    I did.

SN      OCR      RPR

A-373

Case 1:19-cr-00386-PKC    Document 79    Filed 12/01/22    Page 35 of 82 PageID #: 784

O'Kain - direct - Kassner                    298

1      MS. KASSNER:  If we could pull up what's been

2  previously admitted as Government Exhibit 503.

3          (Exhibit published.)

4  Q   Beginning with the messages on Monday, November 26, 2018

5  at 1:03 p.m. can you read your messages into the record which

6  are the light gray messages on the right and then I will read

7  the defendant's messages into the record which are the dark

8  gray bubbles to the left.

9  A   "Hey man.  It's been a while are you around this week?

10 Q   Hi, yes, how much you selling?

11 A   About 60K.

12 Q   When?

13 A   Tomorrow.

14 Q   Let me try and make fund ready.

15 A   Okay.  When will you know?"

16 Q   What does 60K refer to here?

17 A   That's $60,000.

18 Q   If we can continue on to page two and I'll continue

19 reading the defendant's messages.

20          (Exhibit published.)

21 Q   "Will text you.  Cash from bank started to be a problem

22 but I can get.

23 A   Okay. "

24 Q   And if we can continue on to page three, in the middle of

25 the page on Tuesday November 27, 2018, you write:  "Hey, you

SN      OCR      RPR

A-374

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 36 of 82 PageID #: 785

O'Kain - direct - Kassner                   299

1   still good today?"

2          What are you referring to there?

3   A    The -- meaning that, the meeting that we were starting to

4   establish.

5   Q    And turning to the next page, page four.  In the middle

6   of the page you say:  "Hey, I'm here.  I'm at the Wendy's near

7   where we met last time."

8          Where were you when you wrote this message?

9   A    I was somewhere near, if not in the parking lot of the

10  Wendy's.  I believe I was in the parking lot in another

11  agent's vehicle.  And the -- it was across the street and

12  adjacent from the Starbucks where we met the previous time.

13  Q    What, if anything, happened after you wrote -- you wrote

14  this message and then later at 1:45 p.m. said, "Yeah," on

15  November 27th?

16  A    Well, I met up with the defendant in the parking lot of

17  the Wendy's.

18          MS. KASSNER:  If we can pull up what's previously

19  been admitted into evidence as Government Exhibit 305 for the

20  jury.

21          (Exhibit published.)

22  Q    Using Government Exhibit 305, can you note for the jury

23  where you met the defendant on November 27, 2018?

24  A    If you can see that blue pin, that's the Wendy's and I

25  was in the parking lot near the Wendy's -- the parking lot of

SN      OCR      RPR

A-375

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 37 of 82 PageID #: 786

```
                    O'Kain - direct - Kassner                    300
```

 1   the Wendy's.  That's where we met.

 2   Q    Were any other members of the DEA present for the

 3   transaction?

 4   A    Yes, I had the DEA surveillance team out.

 5   Q    Was the transaction recorded?

 6   A    Yes.

 7   Q    So I'm going to turn in the binder to the next tab

 8   labeled 803R.

 9        MS. KASSNER:  And permission to play portions of

10   Government Exhibit 803 to the jury starting at 11 -- timestamp

11   11 to 11:20?

12        THE COURT:  All right.

13        (Audio played/audio paused.)

14   Q    The defendant here says --

15        First of all, where were you during the portion of

16   the recording that we just listened to?

17   A    I just got out of the vehicle that I arrived at the

18   parking lot in and we were sitting outside in the parking lot.

19   Q    The defendant here says, "The black -- the black window

20   scares me."  What did you understand him to be talking about

21   there?

22   A    I understood that he was referring the window tint from

23   the vehicle that I got out of and that was an unmarked

24   government vehicle.  It had very dark tints on the windows.

25   Q    Generally speaking, do law enforcement agents -- do their

                    SN      OCR      RPR

A-376

Case 1:19-cr-00386-PKC    Document 79    Filed 12/01/22    Page 38 of 82 PageID #: 787

```
                      O'Kain - direct - Kassner                301
 1   cars typically have black tinted windows?
 2   A    Yeah.
 3            MS. KASSNER:  And if we can continue listening
 4   beginning at timestamp 13:52 until timestamp 14:25.
 5            (Audio played/audio paused.)
 6   Q    So here the defendant says, "I can give you some more
 7   tomorrow because bank is getting pissed.  When you withdraw
 8   too much they get pissed."  What do you understand him to be
 9   talking about there?
10   A    I understood that he wasn't buying that he was taking the
11   money out of the bank and he was withdrawing more than the
12   bank would allow him.
13   Q    And there's a sound at the end of the recording.  What is
14   that sound?
15   A    That was the money counter.  So the kind of shuffling of
16   paper there's beeping and shuffling of paper.  That's the
17   money counter.
18   Q    What's happening when you're having this conversation
19   with the defendant?
20   A    The defendant is putting money into the money counter and
21   running it through in an attempt to count the money.
22   Q    And where are you and the defendant both situated at this
23   time?
24   A    I believe we're in the back of his black Mercedes sedan.
25   Q    Are the doors open or closed?
```

SN       OCR       RPR

A-377

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 39 of 82 PageID #: 788

```
                      O'Kain - direct - Kassner              302
```

1   A    Closed.

2           MS. KASSNER:  If we can continue playing at

3   timestamp 18:53 until 21:42.

4           (Audio played/audio paused.)

5   Q    Could you explain to the jury what's going on during the

6   section of the audio we just listened to?

7   A    So, the defendant and I are at the beginning of that

8   segment of the recording trying to determine how much cash

9   he's going to give me for the amount of Bitcoin that I have.

10  So, then we move into discussing the fee again and I tried to

11  negotiate a smaller fee and we ultimately land on a 7 percent

12  fee for that transaction.

13          MS. KASSNER:  If we can continue playing from

14  timestamp 23:45 to timestamp 25:45.

15          (Audio played/audio paused.)

16  Q    So, in this section, you say, "I have Bitcoin coming in

17  and I turn it into cash as soon as possible."  And you also

18  mentioned that your business, quote, is picking up again.  Why

19  do you say these things?

20          MR. SINGER:  Objection, Your Honor.

21  A    The point of me saying that was --

22          THE COURT:  Overruled.

23  A    -- to get the conversation going about where the money is

24  coming from to get the defendant start asking more questions

25  and also to -- you know, steps to unfold the story, my cover

```
                      SN      OCR      RPR
```

A-378

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 40 of 82 PageID #: 789

O'Kain - direct - Kassner                303

1   story, of being an online drug dealer.

2   Q    You also say, "I have to pay people.  They want it in

3   cash."  Why do you say that?

4   A    In my experience when I was a DEA agent oftentimes when

5   people would sell drugs, they had people to pay for those

6   drugs.  So oftentimes they would get them on consignment and

7   once they sold their share, they would have to pay their

8   suppliers back and that's with cash.  So it's part of the

9   cover story that I was using.

10  Q    You also say, "In a week or two, you will have 100 to

11  do."  What do you mean by that?

12  A    I was letting the defendant know I would have $100,000 of

13  Bitcoin to exchange.

14       MS. KASSNER:  If we could continue playing from

15  timestamp 27:45 to 29:25.

16       (Audio played; audio paused.)

17       (Continued on the following page.)

18

19

20

21

22

23

24

25

SN      OCR      RPR

A-379

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 41 of 82 PageID #: 790

```
                   Patrick O'Kain - Direct - Ms. Kassner            304

1    BY MS. KASSNER: (Continuing.)

2

3    Q    So in the beginning, the defendant says, Okay.  Now, I

4    trust you.  The first, I came, I said how the hell do you know

5    if the cops come out of fucking black.  I said, Ops.

6              What did you understand him to be talking about

7    there?

8    A    I understood that he was referencing the tinted windows

9    again where he said that he was scared because of the black

10   tints.  So when he says, he didn't -- you don't know if the

11   cops come out.  It suggested to me that he was aware that

12   there could be potential cops.  That I might have been a cop

13   or undercover or there are undercovers in the area.

14   Q    The defendant also says, My partner is in judgment.  They

15   caught him 50K.

16              What did you understand that to mean?

17   A    I understood that he was telling me that his partner --

18   and I understood "partner" to mean somebody else he's doing

19   this with that also transacts Bitcoin or cryptocurrency for

20   cash got caught doing a transaction.  And 50K, $50,000 worth.

21   Q    Then the defendant says, Because they follow these guys

22   almost always.  And one of the idiots sold their bot from him.

23   So when they tracked him, the drug guy, the cop said, bingo we

24   caught somebody else.

25              What did you understand that to mean?
```

A-380

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 42 of 82 PageID #: 791

Patrick O'Kain - Direct - Ms. Kassner                    305

1   A    So the defendant said that -- before that, they said they

2   weren't tracking for Bitcoins, they were tracking some idiot

3   guy who buys and sells drugs.  So it is a continuation of the

4   story he's telling me about his partner.  The story goes that

5   the law enforcement was following a drug dealer and his

6   partner conducted a transaction with that drug dealer.  And

7   moving forward, while the cops weren't looking at his partner,

8   they came across his partner during that transaction that he

9   was doing with the drug dealer and the defendant said, Bingo.

10  We caught somebody else.  I believe that was in refence to,

11  not only did the law enforcement catch the drug dealer, but

12  they also caught the individual that was laundering that

13  money.

14  Q    You don't think they're looking at you; do you?

15       And the defendant responds, No.  I don't think

16  its -- I mean, it's not a crazy big amount.

17       What did you understand that to mean?

18  A    I understood that the defendant believed that if he was

19  not transacting large amounts then law enforcement would not

20  be looking at him.

21  Q    You say, Either way, I don't want them around.

22       Why did he say that?

23  A   That's just part of my cover story and letting him know

24  that I don't want cops around.  You know, because my cover

25  story is I'm a drug dealer.  Just another thing I can say to

SG          OCR          RPR

A-381

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 43 of 82 PageID #: 792

Patrick O'Kain - Direct - Ms. Kassner           306

1   let him know that my side of what we're doing in this was not

2   legitimate.

3           MS. KASSNER:  If we can continue playing from 40:30

4   to 49:42.

5                   (Audio recording played.)

6

7                   (Audio recording stopped.)

8   Q    The defendant tells you in this segment of the recording,

9   but just -- I don't want to count money in Manhattan.

10  Manhattan sucks man.

11          What did you understand that to mean?

12  A    Well, the defendant mentioned to me before that he didn't

13  like Manhattan because of the camera and then he referenced

14  the -- so that was the end part of, I think, the first

15  interaction.  And then, again, he said there's a camera on

16  top.  So he references the cameras again.  So at that time, I

17  understood that the defendant was very concerned about getting

18  caught.  And at that time, you know, as I'm conducting this

19  investigation, I took that to mean that he was aware that what

20  he was doing was not -- not legal because otherwise he

21  wouldn't be concerned about cameras seeing him.

22  Q    And then, you again say or you say, I hope they're not

23  looking at you.

24          Why do you say that?

25  A    Again, just to facilitate my cover story.

SG        OCR        RPR

A-382

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 44 of 82 PageID #: 793

Patrick O'Kain - Direct - Ms. Kassner          307

1     MS. KASSNER:  If we can pull up what was been

2  previously admitted into evidence as Government's Exhibit 2

3  and publish to the jury.

4              (Exhibit published.)

5  Q    Do you recognize Government's Exhibit 2?

6  A    I do.

7  Q    What is it?

8  A    That's is photograph of the cryptocurrency wallet

9  transaction receipt from November 27th.

10     THE COURT:  Pull the microphone a little lower and

11 speak a little slower.

12     Go ahead.

13 Q    How much Bitcoin did you exchange to the defendant or did

14 you transfer to the defendant on November 27, 2018?

15 A    10.65127282.

16     MS. KASSNER:  If we could pull up, one at a time,

17 for the jury, what's been previously admitted as Government's

18 Exhibit 607 through 610.  So starting with 607 -- actually,

19 starting with 610.  My apologies.  Right.

20     And then 608, and then 609, finally 607.

21 Q    What are Government Exhibit's 607 through 610?

22 A    Those are photographs of the cash that the defendant gave

23 during our transactions.

24     MS. KASSNER:  And I'm going to pause here.

25     Your Honor, I'm not sure if we are doing a break

SG        OCR        RPR

A-383

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 45 of 82 PageID #: 794

Patrick O'Kain - Direct - Ms. Kassner          308

1   today.

2         THE COURT:  Actually, why don't we take a break now.

3         We are going to go to 1:00 today, but let's take a

4   10-minute break.  Roughly a quarter of.  So we can make up

5   some of the lost time.  So at a quarter of, let's start again.

6         THE COURTROOM DEPUTY:  All rise.

7         THE COURT:  And leave your binders on the chair.

8   Don't talk about the case.  Just keep an open mind.  Let's

9   take a break.

10        (Jury exits the courtroom.)

11        THE COURT:  All right.  Did you want to break for a

12  particular reason or you are keeping track of the time?

13        MS. KASSNER:  I'm keeping track of the time, so I

14  thought this was a good place to stop here.

15        THE COURT:  Thank you for reminding me.  You have

16  about ten minutes.

17             (A recess was taken.)

18        THE COURT:  Back on the record for a quick second

19  here.

20        So Mr. Singer, I know you have a standing objection

21  to the questions and answers of the witness relating to how he

22  interpreted statements by Mr. Goklu during their encounters.

23  I did want to, sort of, explain a little bit more.  I do find

24  that it is appropriate for the agent to give his

25  interpretation or view of the conversations because I believe

SG        OCR        RPR

A-384

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 46 of 82 PageID #: 795

Patrick O'Kain - Direct - Ms. Kassner          309

1   it provides necessary context to the agent actions to the

2   progress of the investigation to explain what the agent was

3   thinking when he was interacting with the defendant.  Because

4   it obviously explains the next steps that were taken and why

5   they continued investigations.  Especially, because on the

6   face of it, some of the statements may sound innocuous or

7   maybe even deny any involvement in some forms of illegal

8   activities.  In particular, drug trafficking or even

9   interacting with drug traffickers or doing transactions with

10  drug traffickers.

11        So I think it is appropriate for the agent to say

12  this is what I thought he meant because it obviously explains

13  why the agent said some of what he said and did what he did

14  next and certainly why he continued to set up more

15  transactions with the defendant.

16        I also think it's appropriate that this agent gets

17  to testify because he does have some training as an undercover

18  and in particular dealing with individuals who might be

19  engaging in similar conduct since this seem to be his

20  specialty at the time.

21        So those are my reasons, sort of, more fully

22  explained, but you have your objection and a standing

23  objection at that, Mr. Singer, to questions of that sort of.

24        MR. SINGER:  All right.  Thank you.

25        I do respectfully disagree with the Court's

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 47 of 82 PageID #: 796

```
                  Patrick O'Kain - Direct - Ms. Kassner        310
```

 1   conclusion there.  And so, yes, I do ask to maintain the

 2   standing objection so I don't have to keep objecting

 3   repeatedly.

 4          THE COURT:  And I also want to caution both sides

 5   and you didn't do this too much.  But to avoid speaking

 6   objections, to some extent, if there is something that you

 7   really want to argue in more detail, let's have a sidebar.  So

 8   far, I think, Mr. Singer, I think its been fine.  Just be

 9   mindful of it.  Both sides have their arguments about what

10   Mr. Goklu meant.  And so, I think it is -- there's minimal

11   harm from allowing the -- or prejudice for allowing the agent

12   to testify about his understanding.

13          THE COURTROOM DEPUTY:  All rise.

14                  (Jury enters the courtroom.)

15          THE COURT:  Please be seated, everyone.  Welcome

16   back, Ladies and Gentlemen.

17          We are going to resume with the Agent's testimony.

18          You may inquire.

19          MS. KASSNER:  Thank you, Your Honor.

20   BY MS. KASSNER

21   Q    Before the break I was asking you about -- questions

22   about a transaction in November 2018.

23          Did you have any further transactions with the

24   defendant after November 2018?

25   A    Yes.

```
               SG        OCR        RPR
```

A-386

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 48 of 82 PageID #: 797

Patrick O'Kain - Direct - Ms. Kassner          311

1      MS. KASSNER:  If we could pull up and publish to the

2  jury what has been previously admitted as Government's

3  Exhibit 504.

4      THE COURT:  All right.

5      (Exhibit published.)

6      MS. KASSNER:  And if we can turn to Page 4 of

7  Government's Exhibit 504.

8  Q    If you could read your messages on the right-hand side in

9  light gray beginning at 11:25 a.m. and I'll read the messages

10 that the defendant sent on the left-hand side.

11 A    Hey, what's your schedule today?

12 Q    Until 3:30, Queens.  How much you want?

13 A    What about tomorrow morning?  Where are you going to be

14 after 3:30?  I need 20K now.

15 Q    Will be in Manhattan after 5:00 p.m.?

16 A    Can you do tomorrow morning for like 12:00.

17 Q    Okay.  Text tomorrow, please.

18     MS. KASSNER:  And if you can turn to Page 6 of

19 Government's Exhibit 504.

20 Q    At 12:36 p.m., you write, Okay.  I'll head to Wendys.

21 And then, at 12:53 p.m. you write, Here.

22     What, if anything, happened after you wrote here at

23 12:53 p.m. on December 11, 2018?

24 A    I, again, I met with the defendant.

25 Q    And earlier there were messages where you discussed

SG       OCR       RPR

A-387

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 49 of 82 PageID #: 798

Patrick O'Kain - Direct - Ms. Kassner          312

1   meeting in Manhattan.

2          Did you end up meeting in Manhattan?

3   A    I don't believe so.

4          MS. KASSNER:  If we can pull up Government's

5   Exhibit 305, which has been previously admitted to the jury.

6   Q    Using Government's Exhibit 305, can you point out to the

7   jury where you met the defendant on December 11, 2018?

8   A    We met in the parking lot of the Wendys.  And the Wendys

9   is the blue pin.

10  Q    Were any of the members of the DEA present for that

11  transaction?

12  A    Yes, the DEA surveillance team was up.

13  Q    Was the transactions recorded?

14  A    Yes.

15         MS. KASSNER:  Permission to play portions of what

16  has been previously admitted as Government's Exhibit 804 to

17  the jury and I'm also going to turn in the binder to the

18  section marked 804 Exhibit R on top of the transcript.

19         And if you can start at timestamp 10:00 and play

20  until 11:06.

21         (Audio recording played.)

22         (Audio recording stopped.)

23  Q    Where are you and the defendant situated during this

24  portion of the recording?

25  A    We're in the defendant's vehicle, the black Mercedes.

SG       OCR       RPR

A-388

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 50 of 82 PageID #: 799

Patrick O'Kain - Direct - Ms. Kassner          313

1   Q    And what's going on here?

2   A    We're getting ready to make a Bitcoin for cash

3   transaction.

4   Q    You say, I've got about 19,600, so 5.16.

5        What does that mean?

6   A    19,600 is the approximate dollar amount of the Bitcoin

7   that I had, which was 5.16, et cetera.

8        MS. KASSNER:  And if we can play starting at

9   timestamp 12:10 to timestamp 13:26.

10       (Audio recording played.)

11       (Audio recording stopped.)

12  Q    What is going on while you and the defendant is having

13  the conversation?

14  A    The defendant is trying to calculate the amount of cash

15  to give me for the amount of Bitcoin that I have less the fee

16  he's taking out.  There was a little confusion on the -- how

17  much Bitcoin I had, so that's why we had -- there was a little

18  confusion over the exact amount of Bitcoin that I had at the

19  time.  So that's why we went back and forth several times.

20       THE COURT:  Again, remember to pull the microphone

21  close to you.

22       Go ahead.

23       MS. KASSNER:  If we can continue playing starting at

24  14:05 to timestamp 14:50.

25       (Audio recording played.)

SG      OCR      RPR

A-389

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 51 of 82 PageID #: 800

```
                    Patrick O'Kain - Direct - Ms. Kassner          314
 1              (Audio recording stopped.)
 2   Q    So you say here, The last week I needed to get the rest
 3   of the 20.  I had to go out to California to explain why I
 4   didn't have their 20 grand?
 5              THE COURT:  You have to read a little slower.
 6              MS. KASSNER:  Understood, Your Honor.
 7              So I'll pause here.
 8   Q    Why did you say that?
 9   A    That was part of my cover story.  I was opening up on,
10   you know, where the money that I was getting and where the
11   money needed to go to.  Starting to plant seeds for that
12   hoping that the defendant would kind of ask more questions
13   about why I needed to take cash to California, et cetera.
14   Q    Did the defendant ask more questions?
15   A    No.
16              MS. KASSNER:  If we could continue playing at times
17   tamp 19:30 to timestamp 21:24.
18              (Audio recording played.)
19              (Audio recording stopped.)
20   Q    So in this segment, you say -- you talk about having "A
21   lot of people to say pay."  You say, they are not great
22   people.  But I'm going to have a lot of money coming in after
23   the New Year.  A hundred grand, can you do that?
24              What are you saying here essentially.
25   A    I mean, talking more about what I'm doing, where the
```

SG          OCR          RPR

A-390

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 52 of 82 PageID #: 801

Patrick O'Kain - Direct - Ms. Kassner          315

1   money is going and coming from, and I tell him directly that
2   the people I have to pay are not good people.  Letting him
3   know that the -- my attempt was letting him know that the
4   money was -- that I was involved in something not good.
5   Something that was concerning.  So, you know, a lot of that
6   was to, you know, unfold the cover story about me being a
7   online drug dealer.  And also, a large part of this was
8   hinting at that this was -- I'm not doing something legitimate
9   and he is transacting with someone that is not doing something
10  legitimate and getting him to start asking, but those
11  questions -- he never really asked any questions about it.
12  And moving onto a hundred grand, I told him that business was
13  going great and I should have $100,000 worth of Bitcoin in the
14  New Years -- after the New Years.
15  Q    Did the defendant also mention Bitfinex.
16       Are you familiar with Bitfinex?
17  A    My --
18       THE COURT:  Can I stop you for one second.
19       First of all, B-I-T --
20       THE WITNESS:  F-I-N-E-X.
21       THE COURT:  -- F-I-N-E-X.  Okay.
22       Go back to what you just said a moment ago.
23  A    Yeah.  So Bitfinex, I'm familiar that it is a
24  cryptocurrency exchange, but beyond that, I'm not sure where
25  it's domiciled, but it is a cryptocurrency exchange.

SG        OCR        RPR

A-391

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 53 of 82 PageID #: 802

Patrick O'Kain - Direct - Ms. Kassner          316

1    MS. KASSNER:  If we can continue playing starting at
2    timestamp 24:40 to timestamp 25:45.
3            (Audio recording played.)
4            (Audio recording stopped.)
5    MS. KASSNER:  We can actually keep playing.
6            (Audio playing).
7            Audio stopped).
8    Q   So earlier in the segment you say, That you will be
9    getting a hundred either next week or the week after.  And
10   then you explain, It's like depending on how much we sell, you
11   know.
12           What do you mean by that?
13   A   Well, first I told the defendant that I have $100,000
14   worth of Bitcoin to exchange with him shortly.  And then, when
15   I said, it depends on how much we sell.  Again, that's the
16   trying to get the defendant to say, well, what are you selling
17   to have $100,000?
18   Q   And then, the defendant later says, If you want, I have
19   another 50.  And then, he says, no.  No.  No.  Hold on.
20   Another 20, 25.
21           What did you understand that to mean?
22   A   The defendant had an extra $25,000 cash at that moment
23   that he could exchange with me in addition to what we already
24   agreed upon.
25   Q   And then, the defendant says, NYPD use people like this.

SG        OCR        RPR

A-392

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 54 of 82 PageID #: 803

Patrick O'Kain - Direct - Ms. Kassner          317

1   In Manhattan that, this is the way, I don't go fucking

2   Manhattan.  Even a homeless, I saw.  He's working for NYPD.

3          Can you explain what's --

4          THE COURT:  Yeah.  Pause.

5          Go ahead.

6   Q    Can you explain what's going on when the defendant makes

7   that statement?

8   A    Yes.  At that time, there were two individuals -- I

9   believe there were two individuals that walked through the

10  parking lot behind the defendant's vehicle and I guess they

11  were wearing raggedy clothes and appeared to be homeless.  And

12  the defendant noticed them and then told me a story saying,

13  the NYPD, New York Police Department, uses people like that.

14  Uses homeless people.  And I understood that to mean, he

15  believes that the law enforcement will used homeless people to

16  conduct surveillance or try to identify people doing illegal

17  things.  So my -- I guess to -- my frame of mind at the time

18  when he's saying that, it's again, referencing police,

19  referencing -- implying that he doesn't want to be caught.

20  The way I interrupted that, that the defendant understood we

21  were doing was warranted potential law enforcement attention.

22          MS. KASSNER:  If we can continue playing from

23  timestamp 26:30 to 27:40.

24          (Audio recording played.)

25          (Audio recording stopped.)

SG        OCR        RPR

A-393

Case 1:19-cr-00386-PKC    Document 79    Filed 12/01/22    Page 55 of 82 PageID #: 804

Patrick O'Kain - Direct - Ms. Kassner              318

1  Q    So during the first portion of this recorded segment, who

2  are you speaking to?

3  A    So that was right after the defendant asked if I wanted

4  another 20, 25 grand.  So I made an actual call to special

5  agent -- former Special Agent Liefke, so we spoke.  While

6  Allan was not typically acting in an undercover capacity for

7  this case, during that specific call he was.  So in that

8  moment, I was pretending as if Allan was my business partner

9  in this online drug business.  So I made this phone call to

10  him and asked him if we wanted the other money that the

11  defendant was offering us.

12  Q    Where is the defendant during your call with Special

13  Agent Liefke?

14  A    Right beside me in the vehicle.

15  Q    Was the call made so that he could hear and understand

16  what you were saying?

17  A    I made the call so he could hear at least what I was

18  saying to Allan.

19  Q    During your call to Special Agent Liefke, you

20  referenced -- you say, I don't know if it make sense or we

21  just do it when we sell the other three keys.

22       What does keys mean?

23  A    So keys, that's a short for kilogram and that's very

24  common terminology for when you're selling drugs.  A kilogram

25  for cocaine or heroin, what -- you call that a key.  You

SG        OCR        RPR

A-394

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 56 of 82 PageID #: 805

Patrick O'Kain - Direct - Ms. Kassner          319

1  wouldn't necessarily reference the drug, but you would say,

2  Hey, I have a key.  I want to sell a key.  So that's why I

3  specifically said keys in front of the defendant.  And yeah,

4  keys are just -- like I said earlier, drug dealers don't

5  typically ever mention the actual name of the drug when

6  they're making transactions, so keys was kind of a normal

7  thing that a drug dealer would say.

8  Q    And at the end of the recording you could sort of hear

9  certain things slamming.

10       Where are you going at the end of the recording?

11 A    I don't recall.

12 Q    Well, I guess I'll say that you say, Bye, dude.  I'll see

13 you next time.

14       What happened after you said I'll see you next time?

15 A    I believe I got out of the vehicle.  We didn't have any

16 more interaction at that specific time.

17       MS. KASSNER:  If we can pull up what has been

18 previously admitted as Government's Exhibit 3 and publish it

19 to the jury.

20       THE COURT:  All right.

21            (Exhibit published.)

22 Q    Do you recognize Government's Exhibit 3?

23 A    I do.  This is, again, the photograph of the

24 cryptocurrency wallet transaction receipt.

25 Q    In total, how much did you transfer to the defendant on

SG        OCR        RPR

A-395

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 57 of 82 PageID #: 806

Patrick O'Kain - Direct - Ms. Kassner          320

1   December 11, 2018?

2   A    5.86191089 Bitcoin.

3        MS. KASSNER:  Permission to publish what has been

4   previously admitted as Government's Exhibit 611 to the jury.

5        THE COURT:  Go right ahead.

6                  (Exhibit published.)

7   Q    Do you recognize Government's Exhibit 611?

8   A    Yes.  That is cash that I received from the defendant.

9   Q    Did you have any further dealings with the defendant

10  after December 11, 2018?

11  A    Yes.

12       MS. KASSNER:  If we could pull up what has been

13  previously admitted as Government's Exhibit 505 and publish it

14  to the jury and turn it Page 2.

15  Q    So beginning on January 23, 2019, could you read your

16  messages in the light gray on the right into the record and

17  I'll read the defendant's messages in the dark gray to the

18  left?

19  A    Sure.

20            When did you want me to start?

21  Q    At 12:55 p.m. on January 23rd in the middle?

22  A    Okay.  Hey, tomorrow at 1:00 work for you?

23  Q    Hi there.  How much?

24  A    Hey, 100 still.

25  Q    Oh, was blocking chat history to find you dude.  I got

SG        OCR        RPR

A-396

Patrick O'Kain - Direct - Ms. Kassner          321

1   big last week via gold deal rate.  Sorry, I can't handle.

2          MS. KASSNER:  And if we can continue onto the next

3   page, which is Page 3 of the exhibit.  If you could continue

4   reading your messages.

5   A    What?

6   Q    Tried to contact you, but couldn't find chat history.

7          So when the defendant says that tried to contact you

8   but couldn't find chat history, what did you understand that

9   to mean?

10  A    Yeah.  Tough to say.  I think one of options that came to

11  mind was he deleted our chat history before so he couldn't

12  find the contact and that's why he was -- I think he was

13  uncertain.  He said he couldn't find where I was, so -- but

14  tough to tell.

15         MS. KASSNER:  If we can continue onto Page 4.

16  Q    Here you ask, What happened to you being able to do 100

17  every other week?

18         And the defendant responds, someone offer a big BTC

19  with percent ten.  I get all amount full of BTC, no cash.

20         What did you understand this discussion to mean?

21  A    So the defendant, instead of committing the $100,000

22  transaction with me, he told me that he found someone with a

23  better offer.  He made the transaction with another individual

24  and it was for a 10 percent fee.  So he gave all of his cash

25  to this individual for Bitcoin, so now the defendant only had

SG          OCR          RPR

A-397

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 59 of 82 PageID #: 808

Patrick O'Kain - Direct - Ms. Kassner          322

1   Bitcoin.

2           MS. KASSNER:  If we could continue onto Page 5.

3   Q    At the bottom of Page 5 of Government's Exhibit 505, the

4   defendant says at 3:06p.m., I have 25K today, but really don't

5   know for future in and outs.  I have 8 percent guy ready.

6   Will give him if you don't want it.

7           What did you understand that to mean?

8   A    I understood that the defendant had $25,000 worth of cash

9   at this time and he also was able -- he was potentially able

10  to transact with that $25,000 with another individual that

11  could offer him 8 percent in fees.

12          MS. KASSNER:  If we can continue onto Page 8 of

13  Government's Exhibit 505.

14  Q    At the top you say, I'll do the 25K.  You sure that's all

15  you can get today?  Can you do at least 50 or LWAST 50.

16          And defendant responds, No, sorry.  Max today 25K.

17          What did you understand that to mean?

18  A    I asked the defendant if he could do $50,000.  If he

19  could transact with $50,000.  He said, no.  That he only had

20  $25,000.

21          MS. KASSNER:  And turning to Page 10 of Government's

22  Exhibit 505.

23  Q    At 2:13 p.m. you write, pulling in.  And then, 2:19 you

24  write behind you.

25          And then, the defendant responds, okay.

SG       OCR       RPR

A-398

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 60 of 82 PageID #: 809

Patrick O'Kain - Direct - Ms. Kassner          323

1      What happens, if anything, right after you wrote

2  behind you at 2:19 p.m. on January 24, 2019?

3  A    I meet up with the defendant again.

4          MS. KASSNER:  If we could pull up what has been

5  previously admitted Government's Exhibit 305.

6  Q    Using Government's Exhibit 305, can you point out to the

7  jury where you met the defendant on January 24, 2018?

8  A    At the Wendys in the blue pin.

9  Q    Were other members of the DEA in the vicinity for the

10  transaction?

11  A    Yes.  The DEA surveillance team was present.

12  Q    Was the transaction audio recorded?

13  A    Yes.

14          MS. KASSNER:  Permission to play portions of

15  Government's Exhibit 806, which has been admitted into

16  evidence for the jury.

17          THE COURT:  You may.

18          MS. KASSNER:  And I'm going to turn to the tap 806R

19  in the transcript to correspond what we're playing.

20          THE COURT:  Just remember to read slowly if you're

21  reading parts to the Agent.

22          MS. KASSNER:  Noted, Your Honor.

23          Thank you.

24          If we can start at timestamp 08:52 and play until

25  timestamp 10:55.

SG        OCR        RPR

A-399

Case 1:19-cr-00386-PKC    Document 79    Filed 12/01/22    Page 61 of 82 PageID #: 810

```
                Patrick O'Kain - Direct - Ms. Kassner           324
```

1          (Audio recording played.)

2          (Audio recording stopped.)

3    Q    What's happening during the portion of the audio

4    recording that we just listened to?

5    A    We start to make a Bitcoin for currency transaction.  We

6    talk about why the defendant didn't have the $100,000 that we

7    previously agreed upon.

8    Q    The defendant says, Scary man.  It's every time.  This

9    place is not good.  Every time someone here.  Too fucking four

10   black tinted cars there.

11         What did you understand him to be saying here?

12   A    The defendant was -- I guess he noticed two cars with

13   dark tinted windows and he was calling them out to me.  I'm

14   actually not sure whether they were surveillance cars or just

15   generally car with black tinted windows.  I can't say.  Again,

16   at the time, I noted that again the defendant was cognizant

17   about the potential for law enforcement to be there and

18   showing concern about it.  He said this place was no good

19   because he assumed that there were potentially law enforcement

20   vehicles in the area.

21

22         (Continued on the following page.)

23

24

25

```
              SG        OCR        RPR
```

A-400

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 62 of 82 PageID #: 811

```
                      O'Kain - direct - Kassner              325
 1  BY MS. KASSNER:  (Continuing.)
 2  Q    The defendant also says towards the end of the segment,
 3  "Most finks become trouble.  They keep calling, hey, where is
 4  the money coming from?"
 5         What did you understand him to be saying here?
 6  A    I guess he was implying to me that the banks were giving
 7  him a hard time and asking him where he was getting his money
 8  and that was causing problems for him.
 9         MS. KASSNER:  If we can continue playing at
10  timestamp 19:55 to 20:36.
11         (Audio played/audio paused.)
12  Q    The defendant here says he has money in Turkey.  If I
13  withdraw that it's going to take two or three days at least.
14         What do you understand him to be saying here?
15  A    I understood that the defendant was telling me he had
16  funds in Turkey.  I'm not sure where, if it was a bank or
17  whatnot, but if he wanted to try to withdraw that to use for
18  our transactions, it would take some time.
19         MS. KASSNER:  If we can play timestamp 21:26 to
20  21:52.
21         (Audio played/audio paused.)
22  Q    You say here, "These college kids cannot get enough."
23  Why do you say that?
24  A    I was bringing that up because I was saying we, meaning
25  me and my undercover group in this role that I was playing, we
```

SG        OCR        RPR

A-401

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 63 of 82 PageID #: 812

O'Kain - direct - Kassner                    326

1   were selling a lot, making a ton of money.  I was saying these

2   college kids cannot get enough.  I didn't specify what, but

3   the intent of that was to let him know that I'm selling

4   something to college kids and opening the door because at this

5   time we've exchanged quite a bit of money, tens, if not

6   100,000 at this point, and getting him to ask what are you

7   selling, and what can't the college kids get enough of.  That

8   was my intent in saying, "These college kids cannot get

9   enough."

10              THE COURT:  All right.

11              MS. KASSNER:  If we can continue playing from

12   timestamp 22:15 through 23:25.

13              (Audio played/audio paused.)

14   Q    So at the beginning of the section we just listened to

15   the defendant says, "Actually I'm exposing myself" and later

16   he says, "I'm visible right now.  If something goes wrong,

17   they can catch your history and say, hey, let me see your

18   wallet."

19              What did you understand him to be saying here?

20   A    I understood that he was implying it's something that he

21   was doing on the phone.  If law enforcement saw it, they would

22   be able to tell that that was his wallet.  I think -- this was

23   quite a long time ago, but I think if you search a wallet

24   address in the browser, that would be in your search history

25   and if the defendant was searching a specific wallet address

SG        OCR        RPR

A-402

Case 1:19-cr-00386-PKC    Document 79    Filed 12/01/22    Page 64 of 82 PageID #: 813

O'Kain - direct - Kassner                    327

1   that would show up in the search history and that would be

2   easy for law enforcement to say you searched this address that

3   must be your wallet so that's how I think I interpreted it.

4   Q    Later the defendant said, "Nothing would happen.  They

5   would seize your money.  It's happened to one guy I know."

6   And you respond, "Yeah, yeah, you told me that."

7           What are you two talking about here?

8   A    So, continuing the conversation about being exposed, the

9   defendant -- why he was concerned was if something went wrong

10  and when I asked, what would go wrong, he told me that it

11  could be seized so at that time it was another indicator that

12  the defendant was fully aware that what he was doing was not

13  legal and that money could be seized by law enforcement.  And

14  then he referenced a person that he knew that had money seized

15  and I assumed he was referring to his business partner or

16  partner from one of the previous interactions that we had.

17  Q    You say, "Well, if I get seized with this, I'm going to

18  get my fucking head chopped off or something."

19          Why do you say that?

20  A    Again, just part of my cover story; letting the defendant

21  know that the people that I was interacting with were not good

22  people; in fact, people that could potentially kill me if I

23  did not pay them their money.

24  Q    And why did you do that?

25  A    Well, I mean, it's part of the cover.  I was posing as an

SG        OCR        RPR

A-403

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 65 of 82 PageID #: 814

O'Kain - direct - Kassner                    328

1  online drug dealer and I was letting him -- letting the

2  defendant know that all of these things that I'm telling him

3  and doing with this money are coming from not great places and

4  it was just another part of my story to let the defendant know

5  that, hey, this money and what we're doing here, this is not

6  coming from a legitimate place.

7           MS. KASSNER:  If we could play from timestamp 23:55

8  to 24:10.

9           (Audio played/audio paused.)

10 Q    Why did you say that you definitely want to keep this

11 under the table?

12 A    I say that to let the defendant know that I'm concerned

13 about my privacy in transacting this money.  So I don't want

14 anyone to be alerted of this.  So keeping it under the table,

15 meaning this is -- what I'm doing needs to stay secret.

16          MS. KASSNER:  If we could play from timestamp 25:35

17 to 26 minutes.

18          (Audio played/audio paused.)

19 Q    What are you and the defendant discussing here?

20 A    I asked him where -- who he gave the $100,000 that he and

21 I previously agreed to transact, I asked him who that went to

22 and, you know, partly to keep the conversation going but also

23 to hopefully get identifying information for another potential

24 individual that was conducting illegal transactions that the

25 DEA could then pivot or extend the investigation to rather.

A-404

O'Kain - direct - Kassner                    329

1     MS. KASSNER:  If we could play from timestamp 30:55

2  to 32:15.

3          (Audio played/audio paused.)

4  Q    Here you say, "I'm not touching the Coinbase.  I can't

5  touch the Coinbase."  Why do you say that?

6  A    Coinbase is a commercial exchange.  It has licenses to

7  operate and do business and reporting requirements and it's

8  pretty common knowledge that Coinbase is a legitimate

9  business.  So when I tell the defendant that I'm not touching

10  Coinbase, I can't touch Coinbase, that's reiterating the fact

11  that this needs to stay anonymous so I can't interact with a

12  legitimate cryptocurrency exchange.

13  Q    The defendant tells you, "I mean, don't pass $100,000

14  toward the Coinbase.  They're not going to question you.  But

15  one person, one year, no more than 99, they're not going to

16  question you."

17          What did you understand that to mean?

18  A    I understood that the defendant believed if you

19  transacted up to $99,000 on Coinbase, they would not -- you

20  would not draw attention to yourself, but if you went over

21  $100,000, then the people at Coinbase would become alerted to

22  what you're doing and to a higher volume and then they would

23  start asking questions.  So that's how I interpreted that

24  statement.

25     MS. KASSNER:  If we could play from 31 -- excuse me

SG        OCR        RPR

A-405

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 67 of 82 PageID #: 816

```
                    O'Kain - direct - Kassner              330
```

1    41:35 to timestamp 43:30.

2              (Audio played/audio paused.)

3    Q    Can you explain for the jury what you and the defendant

4    are discussing here?

5    A    We start discussing actually where I'm getting the money

6    from for the first time.  So, at the beginning of this segment

7    talking about those, those little ones, that's in reference to

8    marijuana -- I don't think part of that conversation was in

9    this segment, but the defendant and I -- he mentioned that he

10   did a transaction with somebody that was selling marijuana.

11             So that's when I started to get more comfortable in

12   talking about -- being more explicit in the drug discussions.

13   So this conversation was coming off of that.  So the little

14   ones and all of that is in reference to marijuana.  And then

15   moving forward -- actually, I'll pause there.  Does that

16   answer part of your question?

17   Q    Sure, I can follow up with additional questions.

18   A    Okay.

19   Q    So, what do you tell the defendant about your business?

20   A    I tell him that I sell oxycodone and Adderall.

21   Q    What is oxycodone?

22   A    Oxycodone is an opiate.  It's a controlled substance.  It

23   is a prescription medication that is only allowed to be sold

24   by a licensed -- well, prescribed by a licensed physician and

25   sold by a licensed pharmacist to somebody that has a valid

```
          SG          OCR          RPR
```

A-406

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 68 of 82 PageID #: 817

                    O'Kain - direct - Kassner                331

1  prescription for it.

2          But it is -- oxycodone and also Adderall are

3  common -- while there are prescription medications they are

4  common recreational street drugs and sold illegally and

5  they're often sold online.  So a lot of the marketplaces that

6  sells -- the illegal marketplaces that sell illegal drugs

7  online, a lot of a portion of their sales are in Adderall,

8  oxycodone and prescription medications like that.

9  Q    Does the DEA investigate people who are involved in the

10 illegal sale of oxycodone?

11 A    Yes, they do.

12 Q    You also mentioned -- well, when you say, "I got that.  I

13 can get you some oxys if you like that shit."  The defendant

14 says, "What's oxys?"  You say, "It's, like, oxycodone, that

15 stuff."  And the defendant responds, "Don't bring those.  Just

16 bring regular street things."

17          What did you understand him to be saying?

18 A    I understood that he didn't want me to bring him any

19 oxys, oxycodones, but he wanted other street drugs and

20 specifically I think he was referring to marijuana in this

21 instance.

22 Q    And you say in response, "Oh, like Adderall?  That's what

23 all the college kids are taking," and you mentioned Adderall

24 earlier.  What is Adderall?

25 A    Adderall is a stimulant.  It's a prescription drug

                    SG      OCR      RPR

A-407

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 69 of 82 PageID #: 818

O'Kain - direct - Kassner                    332

1    prescribed for ADD, ADHD, but, again, it's a controlled

2    substance.  You have to have -- physicians have to have a

3    license to prescribe it and it has to be distributed by a

4    licensed pharmacist to those individuals with a valid

5    prescription.

6    Q    Does the DEA investigate cases involving the illegal sale

7    of Adderall?

8    A    They do.

9    Q    And then you say later, "You seriously want that stuff

10   because that's what we do.  We do all of that."

11         What do you mean by that?

12   A    I said that to -- in the attempt to make it very clear

13   that that was my business, selling illegal drugs.

14   Q    After you disclosed to the defendant that you were

15   selling Adderall and oxys, does the defendant finish the

16   transaction?

17   A    Yes.

18   Q    Does he at any point say that he, for some reason, would

19   refuse to transact money with you?

20   A    No.

21         MS. KASSNER:  If we could play from timestamp 44:50

22   to 46:38.

23         (Audio played/audio paused.)

24   Q    Who were you speaking to during this segment of the

25   recording?

SG        OCR        RPR

A-408

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 70 of 82 PageID #: 819

O'Kain - direct - Kassner                    333

1   A     That was Special Agent Alan Liefke.

2   Q     And you asked Special Agent Liefke -- well, did the

3   defendant hear this conversation to the best of your

4   knowledge?

5   A     Yes.

6   Q     And you ask the other undercover agent, "Can you put him

7   off?"  Why do you ask that?

8   A     Just sort of, again, playing the role of online drug

9   dealer, putting off the people that we owe, because the

10  defendant was not able to deliver the money at the time he

11  said he said he would.  It was part of the color story where I

12  said I needed to pay these bad people.

13            THE COURT:  Go a little slower.  Enunciate more.

14  That will slow you down.

15            MS. KASSNER:  If we could play from 48:51 to

16  timestamp 50:20.

17            (Audio played/audio paused.)

18  Q     And what happens during this segment we just listened to?

19  A     We sort of talk about the next interaction, the next

20  transaction and the defendant was just talking about the

21  difficulties or what he has to go through to get the cash,

22  whether it's Bitcoin or cash, to make those transactions.

23            MS. KASSNER:  If we could pull up just briefly

24  what's previously been admitted as Government Exhibit 4 and

25  publish to the jury.

SG        OCR        RPR

A-409

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 71 of 82 PageID #: 820

O'Kain - direct - Kassner                334

1              (Exhibit published.)

2    BY MS. KASSNER:

3    Q    According to Government Exhibit 4, in total how much

4    Bitcoin did you send to the defendant on January 24, 2019?

5    A    7.15946367 Bitcoin.

6              MS. KASSNER:  If we could pull up what's been

7    previously admitted at Government Exhibit 612.

8              (Exhibit published.)

9    Q    What is Government Exhibit 612?

10   A    This is a photograph of the cash that I received from the

11   defendant.

12   Q    Did you have further dealings with the defendant?

13   A    Yes.

14             MS. KASSNER:  If we could publish what's been

15   previously admitted as Government Exhibit 506 to the jury?

16             (Exhibit published.)

17   BY MS. KASSNER:

18   Q    And if we could turn to page six.  On page six of

19   Government Exhibit 506, you write at 3:02 p.m., "Okay, I'm

20   close."  And then you later write, "Okay, five minutes."

21             What, if anything, is happening when you're sending

22   these messages?

23   A    I was traveling to the next meeting location with the

24   defendant.

25   Q    And prior to sending this message about your location,

SG        OCR        RPR

A-410

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 72 of 82 PageID #: 821

O'Kain - direct - Kassner                    335

1   had you arranged to conduct another transaction with the

2   defendant?

3   A    Correct.

4   Q    What, if anything, happened after you wrote "five

5   minutes" or "five min"?

6   A    I had met up with the defendant.

7        MS. KASSNER:  If we could publish for the jury

8   Government Exhibit -- apologies, this hasn't been admitted.

9        If we could show the witness Government Exhibit 301.

10       (Exhibit published to witness only.)

11  Q    Do you recognize Government Exhibit 301?

12  A    Yes.  This is an aerial image of Manhattan right where

13  the defendant and I met on this occasion.  Again, very busy

14  area, large skyscrapers, very commercial.

15       MS. KASSNER:  If we could -- Your Honor, the

16  Government moves at this time to admit Government Exhibit 301

17  into evidence and publish it for the jury.

18       THE COURT:  Any objection?

19       MR. SINGER:  No, Your Honor.

20       THE COURT:  All right.  It's admitted.

21       (Government Exhibit 301 received in evidence.)

22       THE COURT:  And you may publish it.  Just so you

23  know, we're going to stop after this exhibit is shown because

24  I need to take up an issue with the lawyers before we break

25  for the day.

SG        OCR        RPR

A-411

Case 1:19-cr-00386-PKC    Document 79    Filed 12/01/22    Page 73 of 82 PageID #: 822

O'Kain - direct - Kassner                336

```
 1              (Exhibit published.)
 2   BY MS. KASSNER:
 3   Q    Could you point out to the jury where either transaction
 4   with the defendant occurred on January 30, 2019?
 5   A    The transaction occurred essentially where that red pin
 6   is placed.
 7              THE COURT:  Thank you very much.
 8              Ladies and gentlemen, as I just said we're going to
 9   stop a few minutes early.  It's about ten of 1.  There's a
10   matter I want to take up with the lawyers.
11              So, remember, we're not sitting tomorrow.  So the
12   next time you should come back is on Thursday and, as
13   Ms. Gonzalez told you because she is really the power behind
14   the throne here, she said you need to be here by 9 or aim for
15   9 a.m. so that way if there are any unexpected delays, which
16   certainly happens as we discussed, if you ride the subways
17   especially, you'll get here on time.  So disregard what I said
18   about being here at 9:30 and listen to Ms. Gonzalez always.
19              Have a wonderful day and a half off.  Do not talk
20   about the case with anyone.  Don't do any kind of research.
21   Don't send out any messages about the case to anyone.  Don't
22   talk to each other about anything involving this case or any
23   of the individuals involved in this case.  Just have a
24   wonderful day and a half off and keep an open mind.  We'll see
25   you on Thursday.
```

SG          OCR          RPR

A-412

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 74 of 82 PageID #: 823

O'Kain - direct - Kassner                337

1           THE COURTROOM DEPUTY:  All rise.

2           (Jury exits.)

3           THE COURT:  You may step down.  The agent is free to

4      go or Mr. Okaying is free to go.

5           So, the issue I wanted to discuss with the parties

6      is about something that occurred at the last break.  As you

7      remember, Alternate No. 1 was late this morning because of a

8      problem with the subway.  He unfortunately feels so badly

9      about it he's been apologizing profusely to Ms. Gonzalez.  In

10     particular, he said to Ms. Gonzalez, but in the presence of

11     the other jurors, that he was sure that I was mad at him and

12     also believed that the defendant was shooting mean looks at

13     him or giving him mean looks about being late.  He further

14     made a comment that he was sure the defendant was mad because

15     here he was paying his lawyer $2,000 an hour and the alternate

16     was late.

17          So those were the comments he made.  Now, I will say

18     this; the other jurors, some of whom apparently heard these

19     comments, did try to assure Alternate No. 1 that nobody was

20     mad at him and that certainly I wasn't mad at him and that he

21     should -- the other jurors assured him that no one was mad at

22     him and they knew that it wasn't his fault that he was late.

23     So they seem, and this is based on the conversation as relayed

24     to me and I think Ms. Gonzalez's perception is the jurors

25     think he's a little sensitive and I think perhaps a little

SG        OCR        RPR

A-413

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 75 of 82 PageID #: 824

O'Kain - direct - Kassner                    338

1   less mature, for lack of a better word than other members of

2   the jury.  They certainly didn't take seriously his concern

3   about him being late and everyone being mad at him.

4           So what I propose at a minimum right now is bring

5   him out here because, of course -- and I asked Ms. Gonzalez to

6   keep him here for a moment.  I want to explain to him that he

7   cannot make any statements about anyone involved in the case

8   or about the case itself in front of the other jurors.  I

9   don't think he believed he was violating the general rule of

10  not discussing the case, but, again, I'm not sure about his

11  level of maturity, for lack of a better way to explain it,

12  given how he's interacted even with my chambers.

13          He called, which was a responsible thing to do to

14  let us know he was late, but he has an overdeveloped sense of

15  guilt or something, somewhat childlike is the only way I can

16  describe our perception of him.  So I do want to reinforce

17  that with him and also that he shouldn't be speculating about

18  what any lawyer makes in this room and that it's really

19  important that he not make any comments to other jurors at all

20  during the course of this trial.

21          Now, I want you folks -- obviously I wanted to raise

22  it so you folks can consider whether you want me to take any

23  other measures vis-à-vis the rest of the jurors.  I

24  certainly -- I personally think especially with the passing of

25  a day or so this will all fade away as something that was just

SG        OCR        RPR

A-414

O'Kain - direct - Kassner                     339

1    inconsequential blech if you will and I am concerned with

2    raising it with the jurors again because I think it

3    exaggerates or focuses on a nonevent, but consider whether or

4    not you want me to give some general instruction to the jury

5    simply to say, to the extent that you may have heard from

6    other members of the jury any comments about anyone involved

7    in this litigation, or even about how much the lawyers may be

8    making in connection with this lawsuit, you obviously should

9    disregard those and they're completely irrelevant to your

10   consideration.  Something very neutral like that, perhaps.

11   But I think the preferred course is just to let it lie because

12   I don't think the jurors are taking any of it seriously, given

13   the source as I mentioned.

14            MR. SINGER:  Can I have one brief moment with my

15   client?

16            THE COURT:  Certainly.  Talk amongst yourselves.  I

17   think Ms. Kassner wants to say something.

18            (Pause in proceedings.)

19            MR. SINGER:  Judge, I don't think that any

20   discussion with the entire jury is necessary.  Obviously I

21   will leave it to your discretion but I don't believe it's

22   necessary and I'm certainly not requesting it.  Did I

23   understand that you're going to bring the first alternate out

24   now?

25            THE COURT:  Yes, to emphasize with him that he

SG          OCR          RPR

A-415

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 77 of 82 PageID #: 826

O'Kain - direct - Kassner                340

1   shouldn't be talking to the jurors about anyone involved in

2   the case at all.

3          MR. SINGER:  I would ask if you feel comfortable

4   doing this, that you can indicate that defense has discussed

5   this with you and nobody at the defense table has -- is

6   blaming him for anything or has any concerns about it.

7          THE COURT:  Absolutely.  I will actually say

8   everyone, including the defendant and his lawyers, are not mad

9   at him and we all understand that it was circumstances beyond

10  his control and then just say; just to remind you, you should

11  not be talking with anyone else or in front of any other

12  jurors or with other jurors.

13         MR. SINGER:  Or that we discussed it with you, our

14  concern.

15         THE COURT:  I will do that.  Government, do you

16  agree with that approach to talk to Alternate No. 1 but

17  otherwise not talk about this issue or raise it again with the

18  rest of the jury?

19         MS. KASSNER:  Yes, Your Honor.  That's fine.

20         THE COURT:  We'll do that.

21         (Off the record.)

22         (The alternate juror enters the courtroom.)

23         THE COURT:  Don't worry, this is not bad.  Have a

24  seat, Juror.

25         I understand this morning that you may have made

A-416

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 78 of 82 PageID #: 827

```
                   O'Kain - direct - Kassner              341
```

 1    some comments to Mrs. Gonzalez that were made in front of the

 2    rest of the jurors in the jury room and that you were

 3    concerned that I or any of the parties or the lawyers or the

 4    defendant, for example, might have been mad at you because you

 5    were late today.

 6            THE ALTERNATE JUROR:  It was partially a joke.

 7            THE COURT:  Okay, good, because I want to assure you

 8    and I think I told you this directly when you came out here

 9    with the rest of the jury.  I certainly am not mad.

10            THE ALTERNATE JUROR:  It was out of my control.

11            THE COURT:  Exactly.

12            THE ALTERNATE JUROR:  I made sure to be earlier and

13    then unfortunately the announcer, the conductor, said that

14    there was all 7 trains -- they were all halted.

15            THE COURT:  I understand.  And so --

16            THE ALTERNATE JUROR:  My first thing to do was, "oh

17    my God, is everyone waiting for me?"

18            THE COURT:  Just listen for a moment.  You needn't

19    explain anything, trust me.  I just wanted to tell you and

20    relieve you of any fear or guilt that you had that anyone

21    is -- was upset with you.  We all understood that it was out

22    of your control and specifically, I have talked with the

23    defense attorneys and they have talked with their client.  IT

24    he is not at all up set with you at all.

25            THE ALTERNATE JUROR:  It was a joke.

```
              SG        OCR        RPR
```

A-417

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 79 of 82 PageID #: 828

O'Kain - direct - Kassner                    342

1    THE COURT:  It was a joke.

2    THE ALTERNATE JUROR:  Yes.

3    THE COURT:  I do not want you to think for a moment

4 that the defendant was upset with you and nobody here is.  So

5 that's good to know.

6         The other thing is it's important for you not to

7 speculate how much any of lawyers in this room make.  And,

8 again, you may have been making a joke but y ou know that

9 that's irrelevant to your consideration.

10    THE ALTERNATE JUROR:  Okay.

11    THE COURT:  And the last thing be very mindful of

12 things you say around the other jurors.  Now, you were making

13 a joke about your personal situation and feeling, you know,

14 the perception maybe that people were mad at you, but,

15 remember, you shouldn't be talking about any of the parties or

16 anything relating to the case in front of or with your fellow

17 jurors.

18         So I understand that you didn't necessarily think

19 that that is contrary to what I had asked or told you to do,

20 but it does cross the line a bit because you're making jokes

21 about people involved in this case and suggesting maybe

22 certain thoughts they may be having.  Just don't do that.

23 Just remember, talk about baseball or the weather --

24    THE ALTERNATE JUROR:  Anything except.

25    THE COURT:  Anything except what's happening here.

SG       OCR       RPR

A-418

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 80 of 82 PageID #: 829

O'Kain - direct - Kassner                   343

1    Or anything even related to us.  I know it would be easy to

2    make jokes about me or of Ms. Gonzalez, but avoid doing that

3    to your fellow jurors.

4            THE ALTERNATE JUROR:  I personally felt very, very

5    bad and I wanted to make light of the situation.

6            THE COURT:  Thank you.  You are a super, A-plus

7    juror, calling us.  We got around the problem and you weren't

8    in any danger at least on a smoking train.  You did what you

9    were supposed to do.  Don't feel bad at all but just don't

10   about it with anybody else at all, okay.

11           THE ALTERNATE JUROR:  I understand.

12           THE COURT:  Have a wonderful couple of days.  See

13   you on Thursday bright and early.  Thank you.  And remember to

14   send your bill to our chambers.

15           THE ALTERNATE JUROR:  Okay.

16           (Alternate juror exits.)

17           THE COURT:  Let me confirm with anyone if there is

18   any objection to what I just did with alternate Juror No. 1.

19           MS. KASSNER:  No, Your Honor.

20           THE COURT:  I hope your fast goes well.  Have a

21   smooth holiday.

22           ALTERNATE JUROR 1:  Thank you, Your Honor.

23           MR. SINGER:  Judge, you had indicated yesterday that

24   you were hoping to get the charges out to us.  Are we any

25   closer to that?

SG        OCR        RPR

A-419

Case 1:19-cr-00386-PKC   Document 79   Filed 12/01/22   Page 81 of 82 PageID #: 830

```
                    O'Kain - direct - Kassner                   344

 1          THE COURT:  So that's what's going to happen.  We'll

 2   e-mail them to you later today.

 3          MR. SINGER:  Thank you.

 4          MR. NAVARRO:  You're anticipating the charge

 5   conference Thursday after the jury leaves?

 6          THE COURT:  Yes, thank you.

 7

 8   (Matter adjourned until Thursday, October 6, 2022, 9:30 a.m. )

 9

10                          - ooOoo -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SG        OCR        RPR

A-420

345

1                              I N D E X

2

3    WITNESS                                          PAGEG

4    PATRICK O'KAIN

5       CONTINUED DIRECT EXAMINATION BY MS. KASSNER     267

6

7

8            E X H I B I T S

9

     Government Exhibits 501 through 507          270
10
     Government Exhibit 302                       274
11
     Government Exhibits 801 through 809          276
12
     Government Exhibits Exhibit 1 through 5 and
13   7                                            285

14   Government Exhibits 602 and 607 through 614  287

15   Government Exhibit 601                        289

16   Government Exhibit 604                        290

17   Government Exhibit 305                        294

18   Government Exhibit 301                        335

19

20

21

22

23

24

25

                         VB      OCR      CRR

A-421

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 1 of 216 PageID #: 832

346

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - X
 3
     UNITED STATES OF AMERICA,      : 19CR386(PKC)
 4                                  :
                Plaintiff,          :
 5                                  :
           -against-               : United States Courthouse
 6                                  : Brooklyn, New York
     MUSTAFA GOKLU,                 :
 7                                  :
                Defendant.          : Thursday, October 6, 2022
 8                                  : 9:00 a.m.
                                    :
 9                                  :
                                    :
10
     - - - - - - - - - - - - - X
11
            TRANSCRIPT OF CRIMINAL CAUSE FOR PRETRIAL CONFERENCE
12             BEFORE THE HONORABLE PAMELA K. CHEN
                    UNITED STATES DISTRICT JUDGE
13
                    A P P E A R A N C E S :
14
     For the Government: United States ATTORNEY'S OFFICE
15                           Eastern District of New York
                             271 Cadman Plaza East
16                           Brooklyn, New York 11201
                        BY:  GILLIAN KASSNER, ESQ.
17                           MARIETOU E. DIOUF, ESQ.
                             FRANCISCO NAVARRO, ESQ.
18                           Assistant United States Attorneys

19   For THE DEFENDANT:    MURRAY E. SINGER, ESQ.
                             14 Vanderventer Avenue, Suite 147
20                           Port Washington, New York 11050
                           SAHLI LAW PLLC
21                           195 Broadway, 4th Floor
                             New York, New York  11211
22                        BY:EMILEE SAHLI, ESQ.

23
     Court Reporter:    SOPHIE NOLAN
24                        225 Cadman Plaza East/Brooklyn, NY 11201
                         NolanEDNY@aol.com
25   Proceedings recorded by mechanical stenography, transcript
     produced by Computer-Aided Transcription
```

SN        OCR        RPR

A-422

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 2 of 216 PageID #: 833

Proceedings                         347

1              (In open court.)

2              (The Hon. PAMELA K. CHEN, presiding.)

3              (Defendant present.)

4              THE COURT:  So I understand we have an issue.

5              MR. NAVARRO:  We do have an issue, but Ms. Kassner

6    just ran to the restroom.  Judge, when she is back, the

7    intention is to have the charge conference this evening after

8    the jury leaves.

9              THE COURT:  Correct.  Because I'm guessing that

10   we're going to be done with the Government's presentation of

11   evidence today, right.

12             MR. NAVARRO:  We expect to be resting at the end of

13   the day, but it's possible it spills over but our best guess

14   is today.

15             THE COURT:  And obviously there's the unknown

16   question about whether the defendant intends to testify, but

17   we'll address that at the end of the day as well, but it seems

18   best to me to have our charge conference this evening.  And,

19   thankfully, our court reporter, our stellar court reporter, is

20   willing to stay on.

21             So now that Ms. Kassner has returned, tell me what

22   the issue is.

23             MS. KASSNER:  Yes, Your Honor, very briefly, and I

24   spoke with defense counsel about this before beginning today

25   so I don't think there is going to be a dispute.  I just want

SN      OCR      RPR

A-423

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 3 of 216 PageID #: 834

Proceedings                                      348

1   to put on the record that -- and this will come up, I expect

2   at the charging conference -- that under the 1960 charge Count

3   Two, we want to make clear that Bitcoin qualifies as a fund

4   under the statute.  So we want to make sure that there is no

5   dispute that if you are transmitting Bitcoin that it qualifies

6   as transmitting money and the reason that this came to the

7   Government's attention was that there was some

8   cross-examination of Special Agent Infante about whether or

9   not Bitcoin was a currency, whether or not it was treated as a

10  currency for tax purposes.

11          So we just want to make sure that there's no jury

12  confusion about that issue which we view as a legal issue and

13  not an issue for the jury to decide.

14          THE COURT:  And either she said she didn't know or I

15  sustained an objection.  But I think she said she didn't know

16  without even any objection from the Government, right?

17          MS. KASSNER:  That's right.  We're not worried about

18  any prejudice or anything having to do with her testimony, but

19  that's what prompted us to think about this issue and we

20  wanted it to be clear.  We understand from defense counsel

21  that there will be no argument that because this is Bitcoin it

22  doesn't qualify as transmitting money but we wanted the record

23  to be clear that our position is that that argument should not

24  be raised.  It's a legal argument and not a factual argument.

25          THE COURT:  Mr. Singer, and use your microphone

SN      OCR      RPR

A-424

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 4 of 216 PageID #: 835

```
                      O-Kain - direct - Kassner                349
 1   please.
 2            MR. SINGER:  Judge, that is correct that under my
 3   understanding of the law that this Bitcoin has been
 4   interpreted by, I think, courts around the country as being
 5   funds --
 6            THE COURT:  For purposes of the unlicensed money
 7   transmitting statute?
 8            MR. SINGER:  Yes.  So I don't intend to argue that
 9   it's not.
10            THE COURT:  Great.  Those are my favorite issues,
11   non-issues.  So, you folks can go around preparing for the
12   rest of the day.
13            (Pause in proceedings.)
14            (Jury enters.)
15            THE COURT:  Have a seat, everyone.  Good to see you
16   again.  I hope you had a restful day and a half off and thank
17   you all, again, for being so punctual.  I really appreciate
18   it.
19            We're going to resume now with the questioning of
20   Agent O'Kain may resume.
21            I will remind you -- I don't know if you're still an
22   agent -- Mr. O'Kain, you are still under oath.
23   PATRICK O'KAIN,
24        called as a witness, having been previously duly
25        sworn, was examined and testified as follows:
```

SN        OCR        RPR

A-425

Case 1:19-cr-00386-PKC    Document 80    Filed 12/01/22    Page 5 of 216 PageID #: 836

```
                        O-Kain - direct - Kassner              350

1   CONTINUED DIRECT EXAMINATION

2   BY MS. KASSNER:

3           THE COURT:  Go ahead, Ms. Kassner.

4           MS. KASSNER:  Thank you, Your Honor.

5           At this time if we could show the witness what has

6   previously been marked as Government Exhibit 622, and --

7           Apologies, Your Honor, one moment.

8           (Pause in proceedings.)

9   Q    Can you see that image on the screen?

10  A    Not yet.

11          (Exhibit published to witness only.)

12  Q    Just let us know when you can see it on the screen.

13  A    I can see it now.

14  Q    Do you recognize what has been marked as Government

15  Exhibit 622?

16  A    I do.

17  Q    What is this?

18  A    This is a photograph of the Starbucks where I met the

19  defendant.

20  Q    And it is a fair and accurate depiction of the Starbucks

21  where you met the defendant on September 21, 2018?

22  A    Yes.

23          MS. KASSNER:  Your Honor, permission to admit

24  Government Exhibit 22 into evidence and publish it to the

25  jury.
```

SN          OCR          RPR

A-426

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 6 of 216 PageID #: 837

```
                        O-Kain - direct - Kassner                351

 1             THE COURT:  Any objection?

 2             MR. SINGER:  No, Your Honor.

 3             THE COURT:  622 is admitted and you may publish it.

 4             (Government Exhibit 622 received in evidence.)

 5   Q     And you also mentioned that on other dates you met the

 6   defendant at a Wendy's also in Sunnyside, Queens; is that

 7   correct?

 8   A     That's correct.

 9             MS. KASSNER:  Your Honor, permission to show the

10   witness what's previously marked as Government Exhibit 621.

11             THE COURT:  All right.

12             (Exhibit published to witness only.)

13   Q     And please let us know when you can see it.

14   A     I see 623 right now.

15             THE COURT:  Did you say 621?

16             MS. KASSNER:  One moment Your Honor, yes, 621.

17   A     Okay, I can see 621 now.

18   Q     Do you recognize Government Exhibit 621?

19   A     I do.

20   Q     What --

21   A     That is the Wendy's in which I met the defendant at.

22   Q     And is it a fair and accurate depiction of where you met

23   the defendant on November 27, 2018, December 11, 2018 and

24   January 24, 2019?

25   A     Yes.
```

SN        OCR        RPR

A-427

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 7 of 216 PageID #: 838

O-Kain - direct - Kassner                352

1          MS. KASSNER:  At this time the Government would move

2   to admit Government Exhibit 621 into evidence and publish it

3   on the jury.

4          THE COURT:  Any objection?

5          MR. SINGER:  No, Your Honor.

6          THE COURT:  621 is admitted and you my publish.

7          (Exhibit published.)

8   BY MS. KASSNER:

9   Q    Thank you.  So, when we left off on Tuesday, we were

10  discussing a further transaction that you had with the

11  defendant on January 30, 2019.  Do you remember that?

12  A    Yes, I do.

13  Q    And we had just shown you an image of the corner 1 East

14  33rd Street in Manhattan.  Do you recall that as well?

15  A    Yes.

16  Q    And, so that transaction, is it fair to say was in

17  midtown Manhattan?

18  A    That's correct.

19  Q    Was that transaction recorded?

20  A    Yes.

21          MS. KASSNER:  Your Honor, at this time the

22  Government would seek permission to play portions of

23  Government Exhibit 807 for the jury.

24          THE COURT:  All right.

25          MS. KASSNER:  I'm going to turn to tab marked 807 R

SN      OCR      RPR

A-428

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 8 of 216 PageID #: 839

O-Kain - direct - Kassner                    353

1  in the transcript per.

2          THE COURT:  And again, ladies and gentlemen, these

3  transcripts are just an aid to listening to the audio but what

4  you hear, as opposed to what's on the page, governs.

5          MS. KASSNER:  If we could play from timestamp 9:05

6  to timestamp 9:47.

7          (Audio played/audio paused.)

8          MS. KASSNER:  If we could pause here.

9  Q    Can you describe for the jury what's happening during the

10  segment of the audio recording we just listened to?

11  A    Yes, I met with the defendant and got into his vehicle.

12  Q    And if we can continue playing from timestamp 11:27 to

13  timestamp 12:10 and if we could turn the volume up just a bit.

14          (Audio played/audio paused.)

15  Q    Can you describe to the jury what is happening during the

16  recorded segment that we're listening to?

17          THE COURT:  Ms. Kassner, you may want to point the

18  jury to what page of the transcript you are on and I think the

19  audio skipped mayb7e a page or two, at least by my reckoning.

20  I think we're on page three of 807R where it says "35"?

21          MS. KASSNER:  So, I think we're on page two.

22          THE COURT:  Okay.

23          MS. KASSNER:  So it starts "335, put it in the bag."

24  Does everyone have that?

25          THE COURT:  Maybe I'm crazy.  I'm looking at page

SN        OCR        RPR

A-429

O-Kain - direct - Kassner                    354

1   two of 807jR?

2           MS. KASSNER:  Your Honor it's -- so there's the

3   cover page and then there's one page.  That was the segment we

4   listened to last and I believe the next page at the top says

5   335.

6           THE COURT:  It's numbered at the bottom two.  Am I

7   the only one that's having this issue?  Maybe it's just me.

8   So just to confirm we're on 807R; correct?

9           MS. KASSNER:  Yes, Your Honor.

10          THE COURT:  And the date is January 30, 2019?

11          MS. KASSNER:  Yes, Your Honor.

12          THE COURT:  And if you look at page two, you're

13  saying at the top it says 35?

14          MS. KASSNER:  So, there should be a page, there's

15  the cover page and then there's one page on the left and then

16  a page on the right.

17          THE COURT:  No, but they're numbered.  It says page

18  two.  Do we that I have different books?

19          MS. KASSNER:  Your Honor, may we approach?

20          THE COURT:  Absolutely.  Maybe I don't have the same

21  book as everyone else.  I was in a different section of the

22  binder.  My apologies, everybody, and especially you,

23  Ms. Kassner.  Please continue.

24  BY MS. KASSNER:

25  Q    So Mr. O'Kain if you could explain what we were just

SN     OCR     RPR

A-430

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 10 of 216 PageID #: 841

O-Kain - direct - Kassner                  355

1  listening to?

2  A    The defendant was running cash through the money counter

3  so that was the sound that you heard with the paper flipping.

4  Q    Okay.  And turning to the next page of the transcript.

5            MS. KASSNER:  And if we could play timestamp 16:17

6  to 17:16.

7            (Audio played/audio paused.)

8  Q    Can you explain for the jury what you and the defendant

9  were discussing here?

10  A    We were discussing another transaction for the remaining

11  30 K, 30,000 and the defendant was talking about who he would

12  get that $30,000 from.

13  Q    And the defendant here says, "That idiot, my friend,

14  maybe one time, yeah, he has the money.  I have a lot of money

15  with him but lazy motherfuckers here.  His job is hookers."

16            What did you understand that to mean?

17  A    So I understood that the defendant was saying his friend

18  and where he was going to get that money, his -- he was

19  getting that money from hookers and prostitution.

20            MS. KASSNER:  If we could continue playing at time

21  stamp 24:24 to 24:52.

22            (Audio played/audio paused.)

23  Q    So here the defendant says that the car is bulletproof.

24  What did you understand him to mean by that?

25  A    Just that the defendant was telling me that his vehicle

SN        OCR        RPR

A-431

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 11 of 216 PageID #: 842

O-Kain - direct - Kassner                    356

1   was bulletproof and, frankly, I don't recall why he brought

2   that up, but he was trying to imply that his vehicle was

3   bulletproof.

4   Q    And you say, "Who is going to be shooting at us, it's the

5   guy that is back in California who wants the rest of the 100,

6   that's who."  Why did you say that?

7   A    That was a reference to my cover story where I owed money

8   to people back in California.  And it's sort of a reference if

9   you recall I mentioned to him that I had people that I owed

10  money to and they would chop off of my head if I didn't pay

11  them so it was just a reference to those same fictitious

12  individuals in California.

13          MS. KASSNER:  If we could continue playing from

14  27:40, to 28:35.

15          (Audio played/audio paused.)

16  Q    Here the defendant mentions a partner and he says the

17  partner got the cash in the Hamptons and I sent Bitcoin from

18  here.

19          What did you understand that to mean?

20  A    I understood that the defendant was just describing an

21  individual with whom he's transacting with and getting cash

22  from and that's -- the defendant sent that individual

23  Bitcoins.

24  Q    And the defendant also says, "100 one time can we do

25  split?"  And then says, "It's that one is too much, man.  With

SN      OCR      RPR

A-432

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 12 of 216 PageID #: 843

O-Kain - direct - Kassner                    357

1    100 bucks if we get -- if -- if we get in trouble we are both

2    fucked up."  Then he says, "40 is okay.  100, I told you.  You

3    don't tell me working that's --"

4            What did you understand that to be talking about?

5    A   I understood that -- again, the defendant believed that

6    transacting smaller amounts would -- it was safer than doing

7    100.  So I think 100 has come up a couple of times and that

8    was the defendant's belief that if -- if we were transacting

9    100 or larger, we would draw attention, but anything below

10   that the defendant felt safer.  And then to describe, you

11   know, at the time when I was a special agent investigating

12   this case that was just another indication that -- that I

13   believe that the defendant knew that he was doing something

14   elicit because otherwise there would be no talk of splitting

15   things up to avoid getting in trouble.

16   Q   And when you say -- when the defendant says "100," how

17   much money exactly did you understand that to be referring to?

18   A   $100,000.

19   Q   And when he says "40 is okay," how much money did you

20   understand 40 to be referring to?

21   A   $40,000.

22           MS. KASSNER:  If we could continue playing at time

23   scam 32:40 to 33:04, please.

24           (Audio played/audio paused.)

25   Q   Let's pause here.  Rather than playing that section can

SN      OCR      RPR

A-433

O-Kain - direct - Kassner                    358

1    you tell us what happened with that?  What happened after you

2    had this conversation with the defendant?

3    A    If I recall correctly, the way Bitcoin works, you send

4    Bitcoin and it has to go through the block chain and there's a

5    series of several confirmations that ---- kind of the more

6    confirmations you get, the more trusted that the money

7    actually landed in that wallet and it was taking quite a while

8    for those confirmations to come through.  So that's what we

9    were waiting for.  Through that transaction it took quite a

10   while.  But once we determined that we were comfortable that

11   the transaction went through, I left the meeting.

12            MS. KASSNER:  If we could show you -- if we could

13   publish on the jury what's been previously been admitted as

14   Government Exhibit 5.

15            (Exhibit published.)

16   BY MS. KASSNER:

17   Q    Do you recognize Government Exhibit 5.

18   A    I do.  This is a photograph of the receipt from our

19   undercover cryptocurrency wallet.

20   Q    And how much Bitcoin did you provide to the defendant on

21   January 30, 2019?

22   A    13.67287 Bitcoin.

23            MS. KASSNER:  If we could pull up what's been

24   previously admitted as Government Exhibit 61 -- 613 and

25   publish it to the jury.

SN      OCR      RPR

A-434

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 14 of 216 PageID #: 845

```
                    O-Kain - direct - Kassner              359

 1              (Exhibit published.)
 2   BY MS. KASSNER:
 3   Q    What is Government Exhibit 613?
 4   A    This is a photograph of the cash that the defendant gave
 5   to me during the transaction.
 6   Q    Did you meet with the defendant again after January 30,
 7   2019?
 8   A    Yes.
 9        MS. KASSNER:  If we could pull up and publish to the
10   jury what's been previously admitted as Government Exhibit
11   507.
12              (Exhibit published.)
13   Q    And on page one of Government Exhibit 507 starting at
14   6:05 p.m. on April 1st, can you read your messages in light
15   gray to the right and I'll read the defendant's messages in
16   dark gray to the left?
17   A    "Hey."
18   Q    "Hi."
19   A    "Just seeing if you are going to be around next week or
20   the week after."
21   Q    "Yes.  I am around."
22   A    "How much could you do?"
23   Q    "Who is this?  Sorry, history deleted."
24        What did you understand the defendant's last message
25   to mean?
```

SN      OCR      RPR

A-435

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 15 of 216 PageID #: 846

O-Kain - direct - Kassner                    360

1  A    I understood that the defendant deleted the Signal chat

2  history from our previous conversations.

3  Q    Turning to page two of Government Exhibit 507, at the

4  bottom on April 22, 2019, if you could continue reading your

5  messages to the right and I'll read the defendant's messages

6  on the left.

7  A    "Hey, dude.  Can you meet up next week?  I'm flying back

8  from L.A. Saturday or Sunday."

9  Q    "How much?"

10        And if we could continue on to the next page and

11  continue reading.

12  A    "I need 100.

13  Q    Dude, I can do 49,999.  I am a Bitcoin trader, not a

14  money laundering guy.  I refuse when I feel Bitcoin buyer is

15  drug guy.  Yup, real.  I don't care of income.  I refused a

16  lot because they look alike, dirty.  That's why limited.  Can

17  give you rest next day whatever you want.  No bad man here.

18  A    I can do 49,999.  Anything helps.  I know you don't like

19  to do more than 50 at a time.  Hey, man, are you good for next

20  week?

21  Q    Yes, good.  You Saturday or Sunday?"

22        So, I want to pause here.  Here you say "I need 100"

23  and the defendant says "Dude, I can do $49,999."  What did you

24  understand his response to mean?

25  A    I understood that he again felt that doing amounts up to

SN      OCR      RPR

A-436

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 16 of 216 PageID #: 847

O-Kain - direct - Kassner                361

1    100 were risky and he wanted to keep the amount under 50,000
2    or around 50,000.
3    Q    The defendant goes on to say, I am Bitcoin trader not
4    money laundering guy.  I refuse when I feel Bitcoin buyer is
5    drug guy.  And then he says that's why limited.  Can give you
6    rest next day whatever you want.
7         What did you understand him to be saying there?
8    A    I understood that he was implying that he is not doing
9    anything wrong and that's why he wands to do less than 100.
10   He says that he is not a drug guy.  But based on the
11   circumstances of the entire investigation up to this point, I
12   felt that he was just trying to imply that while his
13   actions --
14            MR. SINGER:  Objection, Your Honor.
15            THE COURT:  Sustained as to the last part of the
16   answer.
17   BY MS. KASSNER:
18   Q    After sending this message to you did the defendant
19   refuse to meet with you?
20   A    No.
21   Q    Did he ask for clarification about where your money was
22   coming from?
23   A    No.
24   Q    Did he ask you to confirm that you were not a drug
25   dealer?

SN      OCR      RPR

A-437

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 17 of 216 PageID #: 848

```
                        O-Kain - direct - Kassner              362

 1    A      No.

 2    Q      What did he do instead?

 3    A      We set up more transactions.

 4    Q      So turning to page four, the next page of this Government

 5    Exhibit 507, if we could scroll down.  Here we are.  In the

 6    middle of the page on April 26, 2019, the defendant asks:

 7            "Do you want to sell?"  How did you respond?

 8    A      "Yeah.  Can you do 50 on Tuesday?

 9    Q      "Okay, text when ready."

10            And if we could turn to page seven of this exhibit,

11    here at 12:28 p.m. you write:

12            "Five out."  The defendant responds "coming Wendy."

13    You write "Okay where?"  The defendant responds backside.

14    What happened right after the defendant wrote backside on

15    April 30, 2019?

16    A      I believe I get into the -- meet up with the defendant

17    again.

18    Q      Was your interaction with the defendant recorded?

19    A      Yes.

20            MS. KASSNER:  Permission to play portions of

21    Government Exhibit 809.

22            THE COURT:  You may.

23            MS. KASSNER:  And I'm turning to the portion of the

24    transcript marked 809 with an R on top.  If we could start at

25    timestamp 13:05 and end at 15 minutes.
```

SN      OCR      RPR

A-438

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 18 of 216 PageID #: 849

O-Kain - direct - Kassner                363

1          THE COURT:  In case anyone is concerned, I'm on the
2   same page.
3               (Audio played/audio paused.)
4          MR. NAVARRO:  Your Honor, one second.  We're just
5   having a technical problem.
6          THE COURT:  All right.
7               (Audio played/audio paused.)
8   BY MS. KASSNER:
9   Q    Can you tell the jury where you were seated during this
10  conversation?
11  A    I was inside the defendant's vehicle.  I can't recall if
12  I was in the back or the front seat though.
13  Q    When the defendant asked about your business, you say,
14  "booming.  I'm making tons of money, man."  Why did you say
15  that?
16  A    That was a continuation of my cover story that I was
17  selling drugs online and I was letting the defendant know that
18  I had consistent money coming into the business.
19  Q    The defendant asked about a cannabis farm and you
20  respond, "I don't make -- I don't make them as much as
21  cannabis."  You say, "I sell pounds of that in California but
22  the real money is in Adderall and the pills."  Why do you say
23  that?
24  A    I wanted to make it clear to the defendant again that the
25  money was not coming from just cannabis but also more of it

SN      OCR      RPR

A-439

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 19 of 216 PageID #: 850

O-Kain - direct - Kassner                    364

1   was coming from Adderall and the other pills.  The reason I

2   said that was because based on the uncertain legalities of

3   marijuana at the time in California I wanted to make sure that

4   this money was coming from Adderall and other controlled

5   substances.

6   Q    After you mentioned the Adderall and the pills, how does

7   the defendant respond?

8   A    He asks how much do I want, meaning how much money do I

9   want for this transaction to work.

10        MS. KASSNER:  If we can continue playing starting at

11   15 and ending at 16.

12   Q    What is happening during this section of the recording we

13   just listened to?

14   A    I'm clarifying with the defendant how much money we're

15   going to transact.  And the defendant again reiterates that he

16   doesn't like to do large amounts, like 100,000 and then we

17   start to count the money or send the money through the money

18   counter and there were some technical difficulties with the

19   money counter but ultimately it sounds like the money cycled

20   through the machine.

21   Q    And here you say "I always need the 100."  Why do you say

22   that?

23   A    Just to let the defendant know that I still need to

24   transact more money from my online drug business.

25   Q    And the defendants response is he's, scared from the

SN      OCR      RPR

A-440

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 20 of 216 PageID #: 851

O-Kain - direct - Kassner                365

1   hundreds, man.  What did you understand that to mean in

2   particular?

3   A    Just again that he doesn't like to do $100,000 because he

4   believes that that is an amount that could potentially draw

5   attention and get him in trouble.

6          MS. KASSNER:  And if we could continue playing from

7   timestamp 18:50 to 19:33.

8          (Audio played/audio paused.)

9   Q    Here the defendant says, "Somebody told me you can buy

10  cannabis farm in California to do cannabis business."  You

11  respond and, "Say still risky though, my buddy got arrested

12  the other day."

13         What do you mean by that?

14  A    I made that part up.  That was just setting the stage to

15  let the defendant know that marijuana was illegal federally,

16  still.

17  Q    And the defendant asks, "Why is that and you say still

18  federally.  I mean, he got arrested by the feds."  Why did you

19  say that?

20  A    Just to let the defendant know that that marijuana was

21  illegal federally because part of what the defendant believed

22  I was selling was marijuana and I was letting him know that

23  that is illegal as well.

24  Q    Is marijuana a controlled substance under federal law?

25  A    It is.

SN        OCR        RPR

A-441

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 21 of 216 PageID #: 852

O-Kain - direct - Kassner                      366

1  Q    The defendant says, got to be in California.  If you go

2  out it's trouble, right?  What did you understand him to mean

3  there?

4  A    I understood that the defendant was aware that there were

5  different laws between California and outside of California.

6  And that if you sell marijuana outside of California, he knew

7  that you could get in trouble.

8  Q    If we could continue playing at timestamp 21:45 to 22:34.

9         (Audio played/audio paused.)

10 Q    What is happening during the segment of the recording we

11 just listened to?

12 A    The defendant is running money through the money counter

13 and, I believe he's offering more -- he had more money that he

14 was willing to transact with me at that time.

15 Q    So the defendant asks -- he says, that's 50, this is 25,

16 total 75.  How much did you understand that he was offering to

17 exchange in total?

18 A    $75,000.

19 Q    And is this -- just for clarity is this before or after

20 your conversation with the defendant about whether or not

21 marijuana is legal in California, out of California?

22 A    It's right afterwards.

23 Q    And if we could finish playing until timestamp 23:40.

24        (Audio played/audio paused.)

25 Q    So during the first half the recording, you are speaking

SN      OCR      RPR

A-442

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 22 of 216 PageID #: 853

O-Kain - direct - Kassner                    367

1   to somebody other than the defendant.  Who are you talking

2   to?

3   A    That was a call to former Special Agent Allan Liefke.

4   Q    And what did you discuss with Special Agent Liefke?

5   A    So, prior to this specific transaction with the

6   defendant, myself and the entire investigative team working on

7   this case determined that that was going to be the time that

8   we arrested the defendant.  And prior to the meeting, we

9   agreed on a specific arrest Signal and when I called Special

10  Agent Liefke, what was when I gave him the arrest Signal and I

11  will pause there.

12  Q    What happened during the second portion of the

13  recording?

14  A    When you hear the yelling, is that -- so, yeah, that's --

15  there was an arrest team and the defendant and I were sitting

16  in the back of the defendant's vehicle and the DEA arrest team

17  came up and opened the car doors, announced police, and

18  arrested both the defendant and myself but that part of when I

19  was arrested that was still in an undercover capacity.

20  Q    Why did they arrest you?

21  A    We weren't -- depending on how the arrest of the

22  defendant went, I wasn't sure if it was going to be more

23  beneficial to the investigation if I remained as an undercover

24  and the defendant thought that I was under arrest with him or

25  if at that time I should let the defendant know that I was an

SN        OCR        RPR

A-443

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 23 of 216 PageID #: 854

O-Kain - direct - Kassner                      368

1    undercover agent.  So we didn't know how that was going to

2    play out.  So initially I was just arrested, fictitiously

3    arrested, to convince the defendant that I was still a

4    criminal.

5    Q    Did you ever actually transfer Bitcoin to the defendant

6    on April 30, 2019?

7    A    No.

8    Q    And did you ever actually receive the cash from the

9    defendant?

10   A    Yes.

11   Q    -- well -- in exchange?

12   A    Not an exchange but we did sees that cash that was in

13   the car that the defendant planned to exchange to me for

14   Bitcoin.

15            MS. KASSNER:  If we could pull up just for the

16   witness what's been previously marked as Government Exhibit

17   304 published to witness only.

18   Q    Let me know when you see it?

19   A    I see it.

20   Q    What is Government Exhibit 304?

21   A    This is a map of the broader New York area and on it --

22   displayed on the map are the locations, the general locations

23   all of the transactions that we just went through with the

24   defendant.

25            MS. KASSNER:  Permission to admit Government Exhibit

A-444

```
                    O-Kain - direct - Kassner               369

 1    304 into evidence and publish to the jury.

 2              THE COURT:  Any objection?

 3              MR. SINGER:  No, Your Honor.

 4              THE COURT:  304 is admitted.

 5              (Government Exhibit 304 received in evidence.)

 6              THE COURT:  And you may publish.

 7              (Exhibit published.)

 8              (Continued on the following page.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SN        OCR        RPR

A-445

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 25 of 216 PageID #: 856

O'KAIN - DIRECT - MS. KASSNER                    370

1   BY MS. KASSNER:  (Continuing.)

2   Q    Are these all of the locations where you met the

3   defendant in 2018 and 2019?

4   A    Yes.

5        MS. KASSNER:  If we could show just to the witness

6   what has been previously marked as Government's Exhibit 1101.

7   Q    And if you could let us know when you see it on your

8   screen.

9   A    I see it.

10  Q    Do you recognize Government's Exhibit 1101?

11  A    I do.

12  Q    Did you review --

13       Let's start by asking, what is Government's

14  Exhibit 1101?

15  A    This is a summary chart of the transactions that I

16  conducted with the defendant and the amounts of BitCoin that I

17  provided.  The amount of cash that the defendant provided to

18  me and the commission that the defendant took for those

19  transactions.

20  Q    Did you review Government's Exhibit 1101 and ensure that

21  it accurately summarized the amounts you and the defendant

22  exchanged and the commissions that the defendant charged on

23  the listed dates in 2018 and 2019?

24  A    Yes.

25       MS. KASSNER:  Your Honor, I ask that Government's

Shernelle Griffith - Official Court Reporter

A-446

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 26 of 216 PageID #: 857

```
                   O'KAIN - DIRECT - MS. KASSNER              371
 1   Exhibit 1101 be admitted into evidence and published to the
 2   jury.
 3              THE COURT:  Any objection?
 4              MR. SINGER:  No, Your Honor.
 5              THE COURT:  1101 is admitted and you may publish.
 6                     (Exhibit published.)
     Q    In total, how much BitCoin -- how much cash -- I'll ask
 7   it this way.
 8              In total, how much cash did the defendant provide to
 9   you in exchange for the BitCoin you sent to him?
10   A    $133,190.
11   Q    During all of the times that you met with the defendant,
12   did he ever ask for your name?
13   A    No.
14   Q    Did he ever ask for a form of identification?
15   A    No.
16   Q    Did he ever ask for your date of birth or a driver's
17   license number?
18   A    No.
19   Q    Your social security number?
20   A    No.
21   Q    Did he ever mention anything -- I guess, did he ever ask
22   where you got the money from?
23   A    No.
24   Q    The BitCoin from?
25   A    No.
```

Shernelle Griffith - Official Court Reporter

A-447

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 27 of 216 PageID #: 858

```
              O'KAIN - CROSS - MR. SINGER              372

 1   Q    And did he ever ask you to confirm that you got the

 2   BitCoin from legal transactions?

 3   A    No.

 4              MR. SINGER:  One moment, Your Honor.

 5              THE COURT:  All right.

 6              MR. SINGER:  No further questions.

 7              Thank you.

 8              THE COURT:  Thank you very much.

 9              Mr. Singer, cross examination.

10   CROSS-EXAMINATION

11   BY MR. SINGER

12   Q    Mr. O'Kain, good morning, sir.

13   A    Good morning.

14   Q    We never met before, correct?

15   A    Correct.

16   Q    So you just testified about the meeting that you had with

17   Mr. Goklu on April 30th of 2019, the day that he was placed

18   under arrest, correct?

19   A    Yes.

20   Q    And you indicated that you had made some statements to

21   Mr. Goklu about Adderall or pills, then you said that part of

22   the reason for that was because of the, I think, you said the

23   uncertain legality of surrounding marijuana in California; is

24   that right?

25   A    Yeah.  That's what I said.
```

Shernelle Griffith - Official Court Reporter

A-448

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 28 of 216 PageID #: 859

O'KAIN -  CROSS - MR. SINGER                    373

1   Q    In 2018 and 2019, the growing and selling of marijuana in

2   licensed businesses was legal; was it not under California

3   law?

4   A    Under --

5   Q    California law.

6   A    California law.  You know, I know I knew this for certain

7   at one point.  I don't -- at this time, I don't exactly know

8   what the laws were.  I know there was some loosening of

9   restrictions on the sale of marijuana in the State of

10  California, but I do know that this was sold very legal

11  federally at that time.

12  Q    Thank you.  But that wasn't my question.  My question had

13  to do with the state laws in California.  There were legal

14  cannabis farms.  Farms where cannabis was being grown by

15  farmers for sale in state licensed dispensaries in California;

16  were they not?

17        Are you telling us that you are not aware of that?

18  A    I believe so.  I just explained my understanding.

19  Q    You believe that that is true, that farmers legally grew

20  marijuana on farms and sold it to licensed state licensed

21  dispensaries that were operating legally in the State of

22  California?

23  A    I believe that's correct.

24  Q    You know that's correct.  You were a DEA agent.  And you

25  know that was correct and you knew that it was correct in

A-449

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 29 of 216 PageID #: 860

```
                    O'KAIN -  CROSS - MR. SINGER              374
```

1  April 30, 2019; didn't you?

2  A    It was several years sine I have been a DEA agent.  But

3  I'm sure at the time when I was a DEA Agent, I had a better

4  understanding of the intricacies of the legal status of

5  marijuana at that time.

6  Q    And, in fact, it's the same as what's happening now in

7  New York where the State is beginning to license dispensaries

8  for the legal sale of marijuana here, correct?

9  A    I have no idea what is happening with the status of

10 marijuana at this time.  Like I said, I'm not a special agent

11 anymore.

12 Q    You don't have to be a DEA Agent to read the news and be

13 aware of changes in the law.

14        Are you telling us that you're not aware of New

15 York State is in the process of licensing dispensaries of the

16 legal sale of marijuana in the State of New York?

17        THE COURT:  Sustained as to relevance.

18 Q    And today, it's still -- marijuana to your knowledge, if

19 you know this, it's still illegal federally, correct?

20 A    Yes.

21 Q    Are you aware that in many states that marijuana is sold

22 under state law legally?

23        MR. SINGER:  Objection, Your Honor.

24        THE COURT:  I'll allow this one question.

25        If you know.

Shernelle Griffith - Official Court Reporter

A-450

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 30 of 216 PageID #: 861

O'KAIN - CROSS - MR. SINGER                    375

1   A    I'm sorry, sir.  I don't follow the drug laws now.  I
2   clearly don't have time for that.
3   Q    So after -- well, after you told Mr. Goklu in this
4   April 30th meeting, that about marijuana is -- or that you
5   were selling pills or whatever, Mr. Goklu came back and asked
6   about buying a cannabis farm in California, correct?
7   A    Yes.
8   Q    Even after you told him that this was not -- that
9   federally it was illegal.  He's still talking about a legal --
10  what you understood him to mean was a legal cannabis farm in
11  California?
12  A    I would have to go back to the transcript to see the
13  sequence of the conversation.
14  Q    Then a little bit after that, Mr.-- you indicated to
15  Mr. Goklu something to the effect that there were different
16  laws in and out -- inside and outside of California regarding
17  marijuana; is that right?
18  A    I think I said that a friend of mine was arrested because
19  it was federally illegal and he was arrested by the Feds.
20  Q    Well, you told us in your testimony just a few moments
21  ago, that your understanding of what Mr. Goklu was saying to
22  you was that Mr. Goklu was aware that there were different
23  laws inside and outside of the State of California; is that
24  right?
25  A    I think more accurately, the defendant was letting me

A-451

O'KAIN -  CROSS - MR. SINGER                    376

1   know he was aware that it was -- you could get in trouble

2   outside of California.

3   Q    Selling marijuana, correct?

4   A    Yes.

5   Q    Was Mr. Goklu selling marijuana to you during any of

6   these transactions?

7   A    No.

8   Q    Were you selling marijuana to Mr. Goklu during any of

9   these transactions?

10  A    No.

11  Q    Was there any discussions about sale of marijuana outside

12  of California in any of these conversations?

13  A    I'd have to go back.  Again, I don't necessarily think it

14  was specifically stated that marijuana sales were occurring

15  outside of California.

16  Q    The discussions that you had with Mr. Goklu had do with

17  the growing and sale of marijuana in the State of California;

18  would you agree with that?

19  A    Part of our discussions were about that.

20  Q    All right.  So let me step back a bit.

21       Other than the text that have been introduced into

22  evidence and these are the signaled texts between you and

23  Mr. Goklu that led up to each one of the meetings that you had

24  with him.  And the recordings that were made of your meetings

25  with him.

Shernelle Griffith - Official Court Reporter

A-452

Case 1:19-cr-00386-PKC  Document 80  Filed 12/01/22  Page 32 of 216 PageID #: 863

O'KAIN -  CROSS - MR. SINGER                377

1          There were no other communications with Mr. Goklu,

2    correct?

3    A    That's correct.

4    Q    And you had initially found Mr. Goklu on the

5    localbitcoins.com website, correct?

6    A    That's correct.

7    Q    And that site, localbitcoins.com, is it still operating

8    today?

9    A    I have not checked.

10   Q    Now, at the time that you determined that you were going

11   to reach out to Mr. Goklu, you did so because you suspected

12   that he might be involved in laundering drug money, correct?

13   A    Correct.

14   Q    That's why you selected him from other people that were

15   advertising on the localbitcoins site, correct?

16   A    That was -- the investigation started to identify if that

17   theory was correct.  Why we selected the defendant was because

18   of the larger amounts that he was advertising his ability to

19   transact that was sort of the primary reason.

20   Q    Okay.  But again, it was a suspicion that you had based

21   on the information you saw on the website?

22   A    Yeah.  So we -- like I testified to earlier, from other

23   unrelated DEA investigations, we became aware that money was

24   being laundered -- drug money was being laundered through

25   localbitcoins.com.

Shernelle Griffith - Official Court Reporter

A-453

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 33 of 216 PageID #: 864

O'KAIN -  CROSS - MR. SINGER                 378

1   Q    Understood.  That's why you went looking at that website.

2        But at the time you and your fellow agents decided

3   on that you would focus some attention on Mr. Goklu, it was a

4   suspicion that you had; is that right?

5   A    Sure.

6   Q    You didn't have any affirmative evidence or proof that

7   Mr. Goklu was laundering drug money; did you?

8   A    No.

9   Q    So you went into your meetings with Mr. Goklu for the

10  purpose of determining whether the suspicions would be borned

11  out?

12  A    Correct.

13  Q    And if you had determined that, at any point, they were

14  not borned out, you would of dropped your interest in

15  Mr. Goklu and gone looking for someone else who you were

16  suspicious of?

17  A    That's correct.

18  Q    Now, each meeting that you had with Mr. Goklu, and there

19  were seven of them, right?

20  A    Correct.

21  Q    From August through April.  August of 2018 to August of

22  2019, there were seven meetings, right?

23        And each time the meeting was essentially the same

24  to the extent that Mr. Goklu brought cash, right?

25  A    Um-hmm --

Shernelle Griffith - Official Court Reporter

A-454

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 34 of 216 PageID #: 865

O'KAIN - CROSS - MR. SINGER                  379

1  Q    You have say yes or no for the record.  I'm sorry.

2  A    Yes.

3  Q    Mr. Goklu would count out the money.  You'd agree on an

4  amount and Mr. Goklu would count out the money, right?

5  A    Yes.

6  Q    You would agree on the fee that he was charging?

7  A    Yes.

8  Q    You would then initiate the transfer of BitCoin to

9  Mr. Goklu, correct?

10 A    Yes.

11 Q    And then, each time you had to wait for the BitCoin

12 transfer to take place; is that right?

13 A    Yes.

14 Q    And sometimes that transfer and the confirmation that you

15 would receive would happen quickly and sometimes it would drag

16 on for awhile?

17 A    Correct.

18 Q    Maybe a half an hour, 45 minutes, something like that?

19 A    Correct.

20 Q    But each time, I think the longest meeting would have

21 been up to an hour, you walked away with the cash and he

22 received the BitCoin, right?

23 A    Yes.

24 Q    And in each one of the transactions, the -- Mr. Goklu was

25 receiving a fee, right?

Shernelle Griffith - Official Court Reporter

A-455

Case 1:19-cr-00386-PKC  Document 80  Filed 12/01/22  Page 35 of 216 PageID #: 866

O'KAIN -  CROSS - MR. SINGER                380

1   A      Yes.

2   Q      He was making money on each one of the transactions?

3   A      Yes.

4   Q      Now, the BitCoin that Mr. Goklu was receiving from you,

5   it varied in price from day-to-day, correct?

6   A      Yes.

7   Q      And in fact, the first meetings that you had the rate,

8   the BitCoin rate, exchange rate, was something over $7,000 per

9   BitCoin; is that right?

10  A    I would have to go back and check, but --

11  Q      Well, on the reports that you verified and are in

12  evidence.

13          THE COURT:  You want to pull up 1101.

14          MR. SINGER:  No.

15          THE COURT:  The summary of the docket.

16          MR. SINGER:  It doesn't have the information, Judge,

17  one moment.

18          THE COURT:  I'm sorry.  It didn't have the rate.

19          MR. SINGER:  We'll start with Government's Exhibit

20  -- I think it's one actually.

21          Ms. Sahli, if you could pull up Government's

22  Exhibit 1.  Actually, Government's Exhibit 7.  I think they're

23  not in date order.

24          THE COURTROOM DEPUTY:  Previously admitted.

25  Q    All right.  Mr. O'Kain, you see this is the -- you

Shernelle Griffith - Official Court Reporter

A-456

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 36 of 216 PageID #: 867

```
                    O'KAIN -  CROSS - MR. SINGER            381
```

1   indicated was the photo of the transaction receipt from

2   August 28th of 2018, correct?

3   A    Yes.

4   Q    And on that receipt it indicates the exchange rate at the

5   time?

6   A    Correct.

7   Q    That was the exchange rate for one BitCoin; is that

8   correct?

9   A    Yes, correct.

10  Q    It was $7,114.57?

11  A    Correct.

12           MR. SINGER:  Can we jump to the December 11th.  The

13  screen is not working.

14           THE COURTROOM DEPUTY:  Hold on.

15           Exhibit 3, previously admitted.

16  Q    Okay.  You are able to see this exhibit?

17  A    Yes.

18  Q    And this was from the photo of the transaction receipt

19  from December 11, 2018, correct?

20  A    Correct.

21  Q    And the exchange rate at this time was 3,000 --

22  $3,342.33, correct?

23  A    Correct.

24  Q    So less than half of the exchange rate in August?

25  A    Correct.

Shernelle Griffith - Official Court Reporter

A-457

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 37 of 216 PageID #: 868

O'KAIN -  CROSS - MR. SINGER                    382

1    Q    And, in fact, Mr. Goklu indicated to you during the

2    course of some of these transactions that he had actually lost

3    money in the some of the transactions with you because of the

4    change in the price of BitCoin?

5    A    He did.

6    Q    But in each one of the transactions, each time you met

7    with him, he was making some money from the fee?

8    A    Correct.

9    Q    And losing money if the value of the BitCoin dropped?

10   A    Correct.

11        MR. SINGER:  Thank you, Ms. Sahli.  I don't need

12   that anymore.

13   Q    Now, you indicated that your cover story as an undercover

14   officer was that you were an online drug dealer selling drugs

15   online in exchange for BitCoin, correct?

16   A    Correct.

17   Q    Now, in the text, the Signal text messages that you sent

18   to Mr. Goklu, you never indicated to him that that's who you

19   were and what you were doing, correct?

20   A    Well, I --

21   Q    Did you ever tell him that you were selling drugs

22   directly?

23   A    Yes.

24   Q    In the text messages?

25   A    No, not in the text messages.

Shernelle Griffith - Official Court Reporter

A-458

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 38 of 216 PageID #: 869

O'KAIN -  CROSS - MR. SINGER                383

1   Q    Okay.  So nothing ever came up in the text messages?

2   A    No.

3   Q    And when you first met with Goklu on -- Mr. Goklu on

4   August 28th of 2018, you didn't tell him that you were selling

5   drugs?

6   A    Correct.

7   Q    Or that your business was selling drugs and the BitCoin

8   that you were seeking to exchange was from the sale of drugs;

9   is that right?

10  A    That's correct.

11  Q    And you didn't tell him that on September 21st of 2018,

12  correct?

13  A    That's correct.

14  Q    And you didn't tell him that in November of 2018; did

15  you?

16  A    I did not.

17  Q    And you started to hint at it a little bit in December --

18  on December 11th of 2018?

19  A    Yes.

20  Q    And that was the first time?

21  A    Correct.

22  Q    So prior to the December 11th meeting, was there any

23  basis -- based on anything that you had told to Mr. Goklu, was

24  there any reason for him to believe that you were selling --

25  that the BitCoin that you were exchanging with him was from

Shernelle Griffith - Official Court Reporter

A-459

O'KAIN -  CROSS - MR. SINGER                    384

1   the sale of illegal drugs?

2   A    Can you repeat that question?

3   Q    Well, I'll state it affirmatively.

4        There was no information that you had provided to

5   Mr. Goklu in those first four conversations that would lead

6   him to believe that the BitCoin had been obtained from selling

7   illegal drugs; isn't that correct?

8   A    Yeah.  Not necessarily.

9   Q    Not necessarily?

10  A    He would -- I think if you could state that a different

11  way.  Well, I guess, I did not specifically state anything

12  about drugs during those interactions, that's correct.

13  Q    Well, in fact, you testified -- I think it was yesterday

14  or maybe on Monday afternoon -- that Tuesday or Monday

15  afternoon, that people -- well, the prosecutor had asked you

16  whether you said anything in that first meeting about drugs

17  and your answer was that people that are involved in the drug

18  business don't talk about it openly; is that right?

19  A    That's correct.

20  Q    Right.  The first rule of fight club is that you don't

21  talk about fight club, right?

22  A    So the movie goes.

23  Q    So the movie goes.

24       And that's essentially is what your sayings, is the

25  cultural of people who are involved in buying or selling or

Shernelle Griffith - Official Court Reporter

A-460

O'KAIN - CROSS - MR. SINGER                385

1  laundering money from drugs, that people involved in to don't

2  talk about it directly.

3        That's your experience as an undercover officer with

4  the DEA?

5  A    Yes.

6  Q    And is that -- it's not a rule.  Would it be fair to call

7  it a custom or practice of people who are involved in illegal

8  drug transactions?

9  A    Yeah.  I think it would be -- and this is based on my

10 experience when I was at the DEA.  It would be highly

11 irregular for two individuals that don't know each other to

12 openingly discuss any illegal things that they are doing.

13 Q    Well, I understand that.  That's what you testified to

14 and that is sort of a practice or custom that was understood

15 for people who are involved in the drug business, correct.

16 A    That's correct.

17 Q    Again, that's based on your experience that people in the

18 drug business kind of knew that you don't talk about it

19 openingly, right?

20 A    That's correct.

21 Q    And you said that's why you didn't talk about it or

22 didn't raise that in your first meeting with Mr. Goklu?

23 A    That's correct.  And also it would be -- it would just be

24 out of character.

25 Q    It would be out of character for someone who is involved

Shernelle Griffith - Official Court Reporter

A-461

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 41 of 216 PageID #: 872

```
                    O'KAIN -  CROSS - MR. SINGER              386
 1   in the drug business?
 2   A    That's correct.
 3   Q    And people in the drug business know that, right?
 4   A    I believe so, yes.
 5   Q    And people that are not part of the drug business would
 6   have no reason to know that, correct?
 7   A    Perhaps.
 8   Q    But in the first meeting with Mr. Goklu, on three
 9   separate occasions Mr. Goklu started talking about drug
10   dealing, right?
11   A    Yes.
12   Q    Did that -- withdrawn.
13         He told you right when you got into the car and he
14   asked you to close the door, he says, we're not drug dealers,
15   right?
16   A    He did say that.
17   Q    And then, a short while later when referring to security
18   cameras on buildings that were nearby, he -- what he said was
19   what someone who was viewing the cameras if they came to the
20   car might say, Hey, are you a drug dealer, right?
21         That's what he said to you in that meeting?
22   A    I'm sorry, what's your question though?
23   Q    He said that to you, correct?
24   A    He said --
25   Q    Hey, are you a drug dealer?  Meaning, someone who would
```

A-462

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 42 of 216 PageID #: 873

O'KAIN -  CROSS - MR. SINGER                387

1   view the security cameras and come over to the car?

2   A    Yeah.  Something to that effect.  Sure.

3   Q    And he also reference the money counting machine and said

4   that the police might view a money counting machine as being

5   evidence that you're a drug dealer, right?

6   A    Yes.

7   Q    So three times the person that -- Mr. Goklu, in your

8   first meeting with you references drug dealing, correct?

9   A    He references drug dealing.  I don't know if that was

10  three times.

11  Q    Yes.  He did three times.  Right?

12  A    I would have to go back.  I remember him saying it once

13  and then implying other things or not necessarily directly

14  implying.

15  Q    I'm not playing the tapes.  The jury can listen to the

16  recordings.

17           So didn't this -- I guess, the unusual aspect of

18  Mr. Goklu openingly referencing drug dealing to you in your

19  first meeting, didn't that offer you an opportunity to try to

20  hint to Mr. Goklu that in fact your business was selling

21  drugs?

22  A    At that time, no.

23  Q    It didn't offer you that opportunity?

24  A    No.

25  Q    You could have said something?  Was there anybody

Shernelle Griffith - Official Court Reporter

A-463

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 43 of 216 PageID #: 874

```
                    O'KAIN -  CROSS - MR. SINGER              388
 1   muzzling you?
 2           You could have suggested in some way to Mr. Goklu,
 3   laughed about it, or something to try to convey to Mr. Goklu
 4   that in fact that that's what you were involved with and you
 5   chose not to?
 6   A    I chose not to.
 7   Q    Yes, but you could have.
 8   A    I chose not to --
 9   Q    But you could have.  Please listen to my question, not
10   what you want to say.
11           You could have?
12   A    I could have said a lot of things and I chose to say what
13   I did.
14   Q    Now, couldn't you have possibly saved you and your fellow
15   agents a lot of time if you would have somehow suggested to
16   Mr. Goklu when he raises the issue of drug dealing, if you
17   would have somehow suggested to him that's what you were
18   involved in and he either would have gone along, and in which
19   case you would have had a real solid ground for continuing
20   your investigation or made clear to you, I don't deal with
21   that, and you could have stopped your focus on him and gone
22   onto someone else.
23           You could have done that, correct?
24   A    That could potentially have out of the infinite scope of
25   things I could have said, sure, but at that time I --
```

Shernelle Griffith - Official Court Reporter

A-464

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 44 of 216 PageID #: 875

O'KAIN -  CROSS - MR. SINGER                    389

1   Q    You didn't.

2   A    The reason --

3   Q    Thank you.  You've answered my question, sir.

4        Now, Mr. Goklu repeated concerns to you about the

5   police?

6   A    Yes, correct.

7   Q    And he also told you why he was concerned about the

8   police; didn't he?

9   A    Yes.  He didn't want to get caught doing something

10  illegal.

11  Q    Well --

12  A    That's how I --

13  Q    That's not quite.

14  A    That's how I understood it.

15  Q    Okay.  I'm not interested in your interpretations, sir.

16  I'm interested in what he may have said to you.

17       Now, isn't it a fact that he expressed to you that

18  if police found two people in a car with a large amount of

19  cash and a money counting machine, they would -- the police

20  would believe that you are doing something illegal; whether

21  you are or not, correct?

22  A    That's what you understood, yes.

23  Q    And if the police saw something that they thought might

24  be illegal, they would seize first and ask questions later,

25  right?  Isn't that what he was expressing to you?

Shernelle Griffith - Official Court Reporter

A-465

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 45 of 216 PageID #: 876

```
                O'KAIN -  CROSS - MR. SINGER              390
```

1   A    I don't think that I understood it that way at the time.

2   Q    Well, Mr. Goklu told you -- expressed to you at various

3   times that he understood that if money was seized from him

4   that he would get the money back; didn't he?

5   A    Yes.

6   Q    And that the police would seize the money, possibly the

7   money counting machine, and possibly even the BitCoin,

8   correct?

9   A    Correct.

10  Q    And that essentially it would be an enormous

11  inconvenience and you'd be without the money for sometime

12  until you were able to get it back, right?

13  A    I don't know if that ever was articulated.

14  Q    Well, do you recall him on November 27th of 2018, telling

15  you that he wasn't concerned about jail, we're not talking

16  about jail, but that the police would keep the money for days.

17  A    Yeah.

18  Q    Do you recall him telling you that?

19  A    He expressed concern about the money being seized.

20  Q    No.  That's not my question.

21       He told you that it's not jail.  He's not concerned

22  about jail.  He's concerned about the money being taken away

23  from him.  At that point he said for days.

24  A    Okay.  You know, I just want --

25  Q    You don't recall?

A-466

O'KAIN - CROSS - MR. SINGER                    391

1   A    I want to make sure I'm answering accurately.

2        MR. SINGER:  Ms. Sahli, could you play that portion

3   from November 27th.

4        THE COURTROOM DEPUTY:  Which exhibit?

5        MS. SAHLI:  803.

6        THE COURTROOM DEPUTY:  I'm sorry, which one?

7        THE COURT:  803.

8        Do you want to refer to the jury to the transcript?

9        MS. SAHLI:  Page 15 in the transcript.  The full

10  transcript at the back of your binder.

11       THE COURT:  Ladies and Gentlemen, if you note, which

12  is where I was before.  At the back of your binder, you have

13  the full transcripts or transcripts of the fuller portions of

14  the recordings and they don't have an R.  And so, if you look

15  at 803, apparently Ms. Sahli is saying that you should start

16  at Page 15; is that right?

17       Did you say, Ms. Sahli, 15?

18       MS. SAHLI:  Yes, Page 15.

19       THE COURT:  Of transcript 803.

20       And the timestamp is?

21       MS. SAHLI:  27:52.

22       THE COURT:  Starting at 27:52.  Thank you.

23                  (Audio recording played.)

24                  (Audio recording stopped.)
    Q    So Mr. O'Kain, Mr. Goklu in fact told you it's not jail,
25  correct?

Shernelle Griffith - Official Court Reporter

A-467

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 47 of 216 PageID #: 878

O'KAIN -  CROSS - MR. SINGER                    392

1   A    That's right.

2   Q    And the police are going to keep your money two or

3   three days?

4   A    That's correct.

5   Q    That's what he expressed to you as his concern about the

6   police seeing what the two of you were doing in the car,

7   right?

8   A    Correct.

9   Q    Okay.  And on January -- yes.

10        On January 24th of 2019, Mr. Goklu indicated to you

11   that it could take a year to get your money back; didn't he?

12        Do you remember that?

13   A    I recollect that.  I believe it.  I just want to -- when

14   I -- I just want to make sure I'm answering the questions

15   accurately.

16   Q    Well, the question is very specific.  Did Mr. Goklu tell

17   you on January 24th of 2019 in relation to the money being

18   seized by the police that they keep your money -- that it

19   could take a year to get your money back?

20   A    I believe so.

21   Q    You believe so.

22        MR. SINGER:  Ms. Sahli, could we play the segment

23   from January 24th and this is in -- what's the exhibit?

24        MS. SAHLI:  Government's Exhibit 806 already in

25   evidence.

Shernelle Griffith - Official Court Reporter

A-468

O'KAIN - CROSS - MR. SINGER                393

1          MR. SINGER:  The full 806, not 806R.  The full 806

2     towards the back.

3          MS. SAHLI:  Starting at Page 10, 22:46.

4                     (Audio recording played.)

5                     (Audio recording stopped.)

6     Q    In fact, Mr. O'Kain, Mr. Goklu told you in relation to

7     the possible seizure of money by the police that it could take

8     a year to get it back; is that right?

9     A    That's correct.

10    Q    And he repeated essentially the same concern to you on a

11    number of occasions, that he was expressing to you, that's why

12    he did not want to transact -- do the transactions in

13    Manhattan and why he was concerned about other people that

14    might see what the two of you were doing in the car; is that

15    right?

16    A    Yeah, that's correct.

17    Q    Okay.

18    A    That's part --

19    Q    And it was again --

20    A    -- of the investigation.

21    Q    And I'm not talking about your belief?

22         THE COURT:  So you said you're not talking about his

23    belief.  Go on.

24    Q    We're talking about the -- these are things that

25    Mr. Goklu expressed to you as the reasons why he didn't want

Shernelle Griffith - Official Court Reporter

A-469

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 49 of 216 PageID #: 880

O'KAIN - CROSS - MR. SINGER                394

1  to police to see what the two of you were doing in the car?

2  A    That's correct.

3  Q    All right.  And he never said to you, I don't want the

4  police to see what's going on in the car because I'm concerned

5  that I'm going to be arrested and get charged with some drug

6  offense.

7         He never said that to you or anything like that to

8  you, correct?

9  A    No.

10 Q    He was concerned about the seizure of the money for

11 whatever period of time it would take before he was able to

12 get it back; is that right?

13 A    Exactly.  He was concerned about the money being seized.

14 Q    Seized.

15 A    Um-hmm --

16 Q    And he never expressed concern that he would not be able

17 to get it back.  It would just take some time to do so, right?

18 A    I believe so.

19 Q    Now, you indicated that on Tuesday as you were on direct

20 examination, as you were going through each one of meetings

21 with Mr. Goklu, that you took opportunities to try to convey

22 or hint to Mr. Goklu what your business actually was in terms

23 of your cover story, right?

24 A    That's correct.

25 Q    And you testified, I believe, that the -- one of the

Shernelle Griffith - Official Court Reporter

A-470

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 50 of 216 PageID #: 881

O'KAIN - CROSS - MR. SINGER                395

1  reasons that you did that was to try to get Mr. Goklu to ask

2  questions, correct?

3  A    That's correct.

4  Q    Which would give you an opportunity to more clearly state

5  what your cover story business was?

6  A    And to give the defendant an opportunity to have any sort

7  of inclination on whether this money was legitimate or

8  illegitimate.

9  Q    And repeatedly, Mr. Goklu simply did not respond; is that

10  right?

11  A    That's correct.  It did not seem that he cared one way or

12  cared.

13  Q    Well, again, you're not a mind reader; are you?  And what

14  you're giving us is just your opinion about his reaction.

15       I'm asking specifically, factually, he didn't

16  respond to these efforts that you were making to raise -- to

17  get him to raise questions?

18  A    No.  He didn't respond at all.

19  Q    Now, during the meetings, as soon as you would get in the

20  car with him, the recordings indicated that you immediately

21  started talking about the money, correct?

22  A    Correct.

23  Q    And Mr. Goklu would right at the beginning of your

24  meeting, take out the cash however he had it that day, bundles

25  tided up, envelopes, whatever it might be, correct?

Shernelle Griffith - Official Court Reporter

A-471

O'KAIN -  CROSS - MR. SINGER                    396

1   A   Correct.

2   Q   And started running the money through the money counting

3   machine to make sure for both of you that the amount that was

4   being given to you was correct; is that right?

5   A   Correct.

6   Q   So the first part of the meeting is making sure that the

7   cash part was correct, right?

8   A   Typically, yes.

9   Q   Well, each time?

10  A   Yeah.

11  Q   Each time you did a transaction, August 28, September

12  21st, November 27th, December 11th, January 24th, January

13  30th --

14        THE COURT:  Hey.  Sorry.  Please, you got to listen

15  to me when I call out to you.  You got to go slower for the

16  court reporter.

17        Shernelle, where did you leave off?

18        MR. SINGER:  I'll withdraw it.

19        THE COURT:  You're withdrawing it.

20        MR. SINGER:  I'll withdraw that and state it again.

21  Q   In the six times that you conducted cash for BitCoin

22  transactions with Mr. Goklu, that's how the meeting started;

23  is that right?

24  A   That's correct.

25  Q   All right.  And then, I'm excluding the April 30th

A-472

O'KAIN -  CROSS - MR. SINGER                397

1   because it was not actually an exchange of BitCoin on that

2   date?

3   A    Correct.

4   Q    All right.  So the meeting starts with Mr. Goklu focusing

5   on the cash, correct?

6   A    Correct.

7   Q    Focusing on the exchange rate, right?

8   A    Yes.

9   Q    How much BitCoin you had to sell that day?

10   A    Correct.

11   Q    How much cash that would convert into, correct?

12   A    Yes.

13   Q    And then, what the fee -- his percentage fee would be

14   seven or eight percent, whatever it was?

15   A    Yes.

16   Q    To make sure that the cash being provided to you was the

17   correct amount for the exchange that you were doing, right?

18   A    Correct.

19   Q    And so, the first part of the meeting, Mr. Goklu, is

20   focused on that and is engaged in doing that, correct?

21   A    Yes.

22   Q    And then, you would -- once that was resolved, you would

23   then initiate a transfer of BitCoin from the wallet in your

24   phone; is that right?

25   A    Correct.

Shernelle Griffith - Official Court Reporter

A-473

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 53 of 216 PageID #: 884

O'KAIN -  CROSS - MR. SINGER                398

1  Q    And there would be some discussion, and it's in the

2  recordings, you would discuss the transfer -- how much BitCoin

3  you were transferring, correct?

4  A    Correct.

5  Q    And then, you would stay in the car with Mr. Goklu until

6  that transactions was confirmed, right?

7  A    Yes.

8  Q    And the confirmation was not on your phone.  It was on

9  Mr. Goklu's phone; is that right?

10  A    That's not necessarily correct based on how the BitCoin

11  blockchain worked.  So the confirmations --

12  Q    Well, was Mr. Goklu looking at your phone to get

13  confirmation or was he looking at his own phone to get

14  confirmation that the BitCoin had been transferred to him?

15  A    He was looking at his phone.

16  Q    Okay.

17  A    But again.

18  Q    Well, I'm asking what he was doing.  He was looking at

19  his phone, correct?

20  A    That's correct.  He was looking at his phone.

21  Q    Okay.  And again, the -- we're talking about populating

22  the blockchain and all of that, right?  But those are the

23  electronic steps that had to happen, not in the car, but out

24  in the ether somewhere until the confirmation would come to

25  Mr. Goklu; is that right?

Shernelle Griffith - Official Court Reporter

A-474

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 54 of 216 PageID #: 885

O'KAIN - CROSS - MR. SINGER                    399

1  A    That -- yeah.  And -- yes.  That's for all intensive
2  purposes, that's right.
3  Q    Okay.  And you were not going to leave and he certainly
4  wanted you to stay in the car until the confirmation was
5  received, that he had received the BitCoin; is that right?
6  A    That's correct.  It was a certain number of -- there are
7  multiple confirmation.  And like I mentioned before, the more
8  confirmations that occur on the blockchain, the more
9  solidified that transaction is solid and the money is in his
10 account, so yes.
11 Q    So at that point, Mr. -- in each one of the transactions,
12 Mr. Goklu had given you the cash, right.
13 Q    Or it was sitting there for you to take?
14 A    Yeah.  Exactly.
15 Q    That it had been counted out and segregated from any
16 money he had and it was sitting there in the car for you to
17 take?
18 A    Correct.
19 Q    And the meeting that the -- you were not going to take
20 the cash until Mr. Goklu was satisfied by whatever
21 confirmations there were, however many there would have been,
22 you weren't going to leave until Mr. Goklu was satisfied that
23 the confirmations were sufficient for him?
24 A    That's correct.
25 Q    Okay.  (Continued on the following page.)

Shernelle Griffith - Official Court Reporter

A-475

```
                    O'KAIN - CROSS - MR. SINGER                  400
```

1   CROSS-EXAMINATION (Continued)

2   BY MR. SINGER:

3   Q    Okay.  And those confirmations, as I asked you a little

4   bit earlier, could come quickly or they could take some time,

5   correct?

6   A    Correct.

7   Q    And during the entire time while you're waiting,

8   Mr. Goklu is looking at his phone; is that right?

9   A    I can't recall specifics about how frequently he looked

10  at his phone.

11  Q    Well, the only place that Mr. Goklu was going to receive

12  the confirmations that he sought was by information that came

13  up on his phone; is that right?

14  A    Correct.

15  Q    And so whether he was staring at it 100 percent of the

16  time or whether he simply kept going back to it to see what

17  was going on or to refresh the phone, that's what he was

18  doing, correct?

19  A    Correct.

20  Q    And it was during that time that he's waiting for the

21  confirmations that you are talking to him about your cover

22  business; is that right?

23  A    Correct.

24  Q    You said you needed money for California and he didn't

25  ask any questions about that?

```
              AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER
```

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 56 of 216 PageID #: 887

O'KAIN - CROSS - MR. SINGER                   401

1    A    Correct.

2    Q    You said that, you know, the amount of money that -- or

3    the BitCoin that you'd be able to bring to him was depending

4    on how much we sell, and he never responded to that?

5    A    That's correct.

6    Q    You asked him about -- or you spoke on your cell phone

7    with your supposed partner about keys, correct?

8    A    That's correct.

9    Q    And Mr. Goklu didn't respond to that in any way?

10   A    That's correct.

11   Q    What's a key, what are you talking about, does this have

12   to do with me; he didn't say anything, right?

13   A    That's correct.  He said nothing.

14   Q    And you said that keys refer to cocaine and heroin.

15        That's how cocaine and heroin are sold?

16   A    Yes.  That's correct.

17   Q    Was there ever any discussion with Mr. Goklu about

18   cocaine or heroin?

19   A    No.  Outside of me referencing keys, no he did not

20   reference --

21   Q    Well, again, keys are something that someone in the drug

22   business would be expected to understand; is that right?

23   A    That is accurate.

24   Q    And someone who's not involved in the drug business would

25   not necessarily know what the heck you were talking about,

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-477

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 57 of 216 PageID #: 888

O'KAIN - CROSS - MR. SINGER                    402

1   right?

2   A    Not necessarily.  I think it's pretty common, based on

3   movies and popular culture.

4   Q    So everybody knows that a key refers to cocaine and

5   heroin?

6   A    That a question?

7   Q    Is that what you're saying?

8   A    Does everyone know?  I'm not sure if everyone knows.

9   Q    Of course you don't.

10          You made a reference to getting your head chopped

11  off; he didn't respond?

12  A    No.

13  Q    You made a reference to not being able to touch CoinBase

14  and he didn't respond?

15  A    Not at all.

16  Q    Then on January 24th, you make some reference to oxy?

17  A    That's correct.

18  Q    And he did respond to that, right?

19          He asked you, what's oxy?

20          He didn't even know what you were talking about; is

21  that right?

22  A    He asked what oxy was.

23  Q    He said, what's oxy.

24          That's the specific words that he used to you,

25  what's oxy, right?

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-478

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 58 of 216 PageID #: 889

O'KAIN - CROSS - MR. SINGER                403

1   A    That's correct.

2   Q    And you simply gave him the full name, oxycodone, right?

3   A    That's correct.

4   Q    He didn't ask any other questions about that, what's

5   that, what are we talking about?

6   A    No.

7   Q    No indication that he knew what you were talking about?

8   A    He --

9   Q    You assumed that everybody should know what you're

10  talking about, but he never said anything; is that right?

11  A    He never asked any questions after I told him that it was

12  oxycodone.

13  Q    That's correct.

14       Now, you testified that on one of your earlier

15  meetings with Mr. Goklu that Mr. Goklu had said that he had

16  done a transaction with someone who was selling marijuana; is

17  that right?

18  A    That's correct.

19  Q    And that was actually on November 27th of 2018, where

20  Mr. Goklu raised that, correct?

21  A    I believe so, yes.

22  Q    And again, that wasn't in response to any hint or

23  suggestion from you that was trying to bring that information

24  out of him, this was something that he simply went into on his

25  own; is that right?

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-479

```
                      O'KAIN - CROSS - MR. SINGER                404
```

1   A    That's correct.

2   Q    And is that all he said, that he was doing a transaction

3   with somebody selling marijuana?

4   A    I don't think that portion was played in court, so I'd

5   have to get the actual specifics -- I'd have to refresh my

6   memory.

7   Q    Well, why don't we do that.

8   A    Sure.

9   Q    All right.

10           MR. SINGER:  November 27th, Ms. Sahli.

11           MS. SAHIL:  Yes, it's Government Exhibit 803, the

12   full transcript at Page 26, and then to play from timestamp

13   43:24.

14           THE COURTROOM DEPUTY:  43:24?

15           MS. SAHIL:  Yes, 43:24.

16           (Exhibit published.)

17           (Audio recording played.) (Audio recording stopped.)

18   Q    So Mr. Goklu, didn't simply reference that someone that

19   was selling marijuana in California, he said more than that,

20   didn't he?

21   A    Yes.

22   Q    In fact, what he said to you -- you had -- you responded

23   by indicating that you didn't understand what he was saying to

24   get him -- and he responded to that; is that right?

25   A    That's correct.

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-480

O'KAIN - CROSS - MR. SINGER                405

1  Q    And he said, it's a licensed marijuana thing in
2  California, right?
3          We just heard it.  Did you hear that?
4          Did you hear him say that it's a licensed marijuana
5  thing?
6  A    Yes.
7  Q    Okay.  And did you hear Mr. Goklu say that it was legal?
8  A    He did say that.
9  Q    And did you hear Mr. Goklu say that you pay taxes?
10 A    Yes.
11         THE COURT:  Mr. Singer, just so you know, we'll take
12 our morning break in about a couple of minutes.
13         MR. SINGER:  I will be done in about a couple of
14 minutes, so the timing will be perfect.
15         THE COURT:  Okay.  Thank you.
16 Q    You responded to Mr. Goklu that marijuana was also part
17 of your business, didn't you?
18 A    Yes.
19 Q    And that was immediately after Mr. Goklu referenced what
20 he stated was a licensed marijuana thing in California that
21 was legal and pays taxes, and you said that's part of my
22 business too?
23 A    Marijuana was part of my business, that's what I told
24 him.
25 Q    That's what the conversation was about, marijuana.

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-481

O'KAIN - CROSS - MR. SINGER                    406

1          You said, that's part of my business too, right?

2   A    Correct.

3   Q    And then on April 30th, the day of the arrest, when you

4   first got into the car, there was -- this was not the seventh

5   time that you were meeting with him, right?

6   A    Correct.

7   Q    And were certainly more comfortable with each other?

8   A    Yes.

9   Q    And he -- Mr. Goklu begins by asking you, how's business,

10  right?

11  A    Yes.

12  Q    You told him it was booming?

13  A    Correct.

14  Q    And Mr. Goklu responds, like, you know, hey, I should get

15  into that, right?

16         If your business is booming, maybe I should get into

17  that, right?

18  A    Correct.

19  Q    And you answered, oh, you want a cut, you want to get

20  into it, right?

21  A    Correct.

22  Q    And then the business that he referenced that he wanted

23  to get into with you was a cannabis farm; is that right?

24         He asked you how much is a cannabis farm?

25  A    That's correct, and that's why I referenced --

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-482

O'KAIN - CROSS - MR. SINGER                     407

1  Q    Sir, you answered my question.

2         When you offered him a cut of the business, what he

3  indicated to you -- what Mr. Goklu indicated to you was how

4  much it would cost to buy part of a cannabis farm; isn't that

5  right?

6  A    That's correct.

7  Q    Thank you.

8         MR. SINGER:  I have nothing else.

9         THE COURT:  All right.  Thank you.

10        Timing is perfect.  Let's take our morning break,

11  folks.  It's 11:15, thereabout.  Let's be ready to go at 11:30

12  or a minute or two after.

13        Have a good break.  Keep an open mind.  Do not talk

14  about the case or don't do any research.

15        THE COURTROOM DEPUTY:  All rise.

16        (Jury exits the courtroom.)

17        THE COURT:  Thank you.  You can step down,

18  Mr. O'Kain.

19        Folks, you have 15 minutes, roughly for a break.

20        (A recess was taken.)

21        (Jury enters the courtroom.)

22        THE COURT:  So jurors -- by the way, you can sit.

23  We stand for you, but you can sit.

24        So welcome back.  Have a seat, everyone.

25        Ms. Kassner, your witness for redirect.

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-483

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 63 of 216 PageID #: 894

O'KAIN - REDIRECT - MS. KASSNER          408

1          MS. KASSNER:  Thank you, Your Honor.

2    REDIRECT EXAMINATION

3    BY MS. KASSNER:

4    Q    On cross-examination -- excuse me.

5          On cross-examination, defense counsel asked you a

6    few questions about the drug business.

7          Do you recall that?

8    A    Yes.  I do.

9    Q    Is money laundering part of the drug business?

10   A    Yes.

11   Q    And in your training and experience, as a former Drug

12   Enforcement Administration agent, is it possible to run a

13   successful drug operation without money laundering?

14   A    No.  Money laundering was typically always part of the

15   scope of circumstances around drug dealing.

16   Q    You were also asked some questions about marijuana.

17         Was marijuana a controlled substance under federal

18   law in 2018?

19   A    Yes, it was.

20   Q    Is it still a controlled substance under federal law

21   today?

22   A    It still is.

23   Q    Has marijuana ever been legal to distribute in the United

24   States under federal law?

25   A    Not to the best of my knowledge.

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-484

O'KAIN - REDIRECT - MS. KASSNER                          409

1   Q    You were also asked about selling marijuana outside the

2   State of California.

3          Do you remember that?

4   A    Yes.

5   Q    And I'd like to refer you to Jury Aid 801 which is the

6   full transcript, on Page 11.  And near the bottom of Page 11,

7   transcript 801 -- not the one with the R, but the full one at

8   the back -- you say that you have an online business.

9          Do you recall what you told the defendant about your

10  business?

11  A    At that time, I believe it was just generic, an online

12  business.

13  Q    And if we now turn to page -- transcript of 806.  It's a

14  few tabs over.  On Page 13?

15          MR. SINGER:  Your Honor, if I may, the jury aids are

16  not in evidence.

17          THE COURT:  I'm sorry, what's not in evidence?

18          MR. SINGER:  The jury aids are not in evidence.

19          THE COURT:  Right.  I'm sorry, so what was the

20  request, to have the jury just read the transcripts?

21          You do have to play the audio.  You can't just have

22  them read the transcripts.

23          Is that what's being proposed?

24          MR. SINGER:  That was my concern, Your Honor.

25          THE COURT:  So just play the audio again, because

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-485

O'KAIN - REDIRECT - MS. KASSNER              410

1   remember, the transcripts are simply aids to what they hear on

2   the audio.

3           The audio is the evidence.

4           MS. KASSNER:  Yes, Your Honor.

5           For this question, I'm not asking to play the

6   transcripts.  I'm asking what the witness recalls saying to

7   the defendant based on reviewing the transcript.  But I can

8   also just ask him what he recalls.

9           THE COURT:  Ask him what he recalls.  If he has a

10  failure of memory, you can refer him to the transcript.  But

11  he would read it to himself then, and don't refer the jury to

12  look at it.

13          MS. KASSNER:  Okay.

14  Q   Mr. O'Kain, what, if anything, did you tell the defendant

15  about where you sold the product --

16          THE COURT:  Mr. O'Kain, close your binder, listen to

17  the question, do you recall, and then go ahead.

18  Q   Mr. O'Kain, do you recall telling the defendant where you

19  sold the products that your business was selling?

20  A   Vaguely.  It would help if I could refresh my memory.

21  Q   Would it refresh your recollection to look at a

22  transcript dated January 24, 2019?

23  A   Yes.

24  Q   Okay.  And if you could look at, in your binder, tab 806,

25  Page 13.

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-486

```
                   O'KAIN - REDIRECT - MS. KASSNER              411

 1          THE COURT:  Just read it to yourself, and jurors,

 2    don't open your binders.

 3             Go ahead.  Just let the AUSA know what you're ready.

 4    A    Can you please tell me the page number again.

 5    Q    Page 13.

 6    A    Okay.

 7    Q    Did that refresh your recollection as to where you told

 8    the defendant you sold your products?

 9    A    Yes.  I told the defendant that we got our stuff from

10    California and brought it back here, meaning, New York.

11    Q    In your training and experience, do drug dealers usually

12    write in text messages, I'm selling drugs?

13    A    No.

14    Q    During your -- and in your training and experience, do

15    drug dealers typically call drugs, drugs?

16    A    No.  They typically don't.  They call them anything about

17    the actual name for the drugs.

18    Q    During your time as a Drug Enforcement Administration

19    agent, how many times did you see or hear anybody say, I'm

20    dealing drugs?

21    A    I can't remember any times that that happened.

22    Q    And earlier, it was -- there was a discussion of the fact

23    that you never said, I'm dealing drugs.

24             Why didn't you say that?

25    A    Because that would be completely out of character with
```

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-487

O'KAIN - REDIRECT - MS. KASSNER                412

1   somebody that is selling drugs.  And as I was operating in an
2   undercover capacity with a cover story that I was selling
3   drugs, I hug to the cover story as best I could, and part of
4   that was not actually stating so bluntly that I'm selling
5   drugs.
6   Q    In January and April of 2019, did you tell the defendant
7   that you were selling Adderall?
8   A    Yes.
9   Q    And did you tell the defendant that you were selling
10  marijuana?
11  A    Yes.
12  Q    And did you tell you the defendant you were selling
13  oxycodone?
14  A    Yes.
15  Q    Now, I want to pull you up the section where you told --
16          MS. KASSNER:  So I want to play, if we could, a
17  portion of the transcript.  And this is Government
18  Exhibit 806.  And if we could play 41:35 until 43:30.
19          And this is going to be in the binders, 806, Page
20  25, in the long version of the transcript.  It might go a bit
21  before and a bit after.
22  A    I'm sorry, before that plays, can you give the page
23  number one more time.
24  Q    Yes.  It's Page 27 of tab 806, the full tab that has the
25  page numbers at the bottom.  And the recording may start a bit

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 68 of 216 PageID #: 899

```
                    O'KAIN - REDIRECT - MS. KASSNER                413
```

1   before this page.

2            (Audio recording played.)

3            MS. KASSNER:  If we could pause here.

4            (Audio recording stopped.)

5   Q    So earlier there was a discussion about whether or not

6   the defendant responded when you said that oxies refer to

7   oxycodone.

8            Did the defendant respond when you said that?

9   A    Yes, he did.

10  Q    And what did he say?

11  A    He said don't bring those expensive things.

12  Q    Did he say anything else?

13  A    And he said then just bring regular street things.

14  Q    After you told the defendant that you sold Adderall,

15  oxycodone, and marijuana, did the defendant refuse to exchange

16  your BitCoin?

17  A    No.

18  Q    Now, I want to turn back to one last thing.

19           Do you recall being asked questions about the

20  defendant not wanting money to be seized?

21  A    Yes.

22  Q    Now, earlier, we listened to Government Exhibit 803, and

23  I believe we stopped at timestamp 28:02.

24           MS. KASSNER:  If we could continue playing where we

25  had left off on cross at 28:02 of Government Exhibit 803.

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-489

```
                  O'KAIN - REDIRECT - MS. KASSNER              414
```

1   Q    And before we do that, I just want to refer you to the

2   transcript, tab 830, and it's -- it begins, I believe, on Page

3   15 of tab 803 in the back of the binder.  So this is just

4   starting where we left off.

5              (Audio recording played.)

6              MS. KASSNER:  If we could pause here.

7              (Audio recording stopped.)

8   Q    Based on your discussion with the defendant on -- in this

9   section of the recording which was an November 27th, 2018, do

10  you have an understanding -- what was your understanding of

11  why the defendant's partner's money was seized?

12  A    My understanding was that his partner's money was seized

13  because he was effectively laundering drug money and it was

14  seized because of that.

15  Q    And in your training and experience, can you explain --

16  do you have an understanding of when the police typically

17  seize money?

18             MR. SINGER:  Objection, Your Honor.

19             THE COURT:  Sustained.

20             MS. KASSNER:  No further questions, Your Honor.

21  Thank you.

22             THE COURT:  All right.  Mr. Singer.

23             MR. SINGER:  Nothing else.  Thank you, Judge.

24             THE COURT:  All right.  Thank you.  You may step

25  down, Mr. O'Kain.  Thank you very much.  You're excused.

                 AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-490

```
                    LIEFKE - DIRECT - MS. DIOUF                    415

 1               (The witness steps down.)

 2          THE COURT:  Next witness.

 3          MS. DIOUF:  The Government calls former DEA Special

 4     Agent Allan Liefke.

 5               THE COURT:  Is it correct that it's also Mr. Liefke;

 6     is that right?

 7          MS. DIOUF:  Mr. Liefke, yes.

 8               (The witness enters the stand.)

 9               THE COURT:  If you'll remain standing for one minute

10     so you can be sworn in.

11               (The witness was sworn and/or affirmed in by the

12     courtroom deputy.)

13               THE WITNESS:  I do.

14               THE COURTROOM DEPUTY:  Thank you.  Have a seat.

15     Just speak directly into the microphone.

16               Please state and spell your name, for the record.

17               THE WITNESS:  Allan Liefke, A-L-L-A-N, L-I-E-F-K-E.

18               THE COURT:  All right.  You may inquire.

19     ALLAN LIEFKE, called as a witness, having been first duly

20               sworn/affirmed, was examined and testified as

21               follows:

22     DIRECT EXAMINATION

23     BY MS. DIOUF:

24     Q    Good morning, Mr. Liefke.

25               Can you see me in the back here?
```

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-491

```
                    LIEFKE - DIRECT - MS. DIOUF              416
 1    A      Yes.
 2    Q      Where were you employed in July 2018?
 3    A      July 2018, I was employed at the DEA or Drug Enforcement
 4    Administration.
 5    Q      What does the DEA do?
 6    A      They investigate violations of the United States Drug
 7    Laws and also money laundering with respect to drug
 8    trafficking.
 9    Q      And what was your title at the DEA?
10    A      I was a special agent at the DEA.
11    Q      And how long were you a special agent at the DEA?
12    A      I was a -- for approximately 13 years, I was a special
13    agent.  I started my career in March of 2009, and I left in
14    this past June.
15             THE COURT:  Mr. Liefke, could we have you pull the
16    microphone closer to you.
17             THE WITNESS:  Sure.
18             THE COURT:  Good.  Thanks.
19             THE WITNESS:  You're welcome.
20    Q      What does a special agent at the DEA do?
21    A      A special agent, basically they run cases.  So they'll do
22    different things, like, surveillance, you know, write
23    affidavits.  They're basically in charge of cases.
24    Q      And in July 2018, were you partnered with anyone at the
25    DEA?
```

A-492

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 72 of 216 PageID #: 903

```
                    LIEFKE - DIRECT - MS. DIOUF                  417
```

1   A    Yes.  My partner at the time was Special Agent Patrick

2   O'Kain.

3   Q    And did you and Mr. O'Kain focus your investigations on

4   any particular area?

5   A    Yes.  We were focused mainly on cyber investigations to

6   include dark web investigations and also investigations

7   involving crytocurrency.

8            MR. SINGER:  Objection, Your Honor.

9            THE COURT:  Did you say something?

10           MR. SINGER:  Objection.

11           THE COURT:  Overruled.

12  Q    And Mr. Liefke, I'll remind you to speak slowly for the

13  court reporter, please.

14  A    Okay.

15  Q    Prior to becoming a DEA special agent, did you have any

16  other law enforcement jobs?

17  A    Prior to the DEA, I worked at the New York City Police

18  Department Crime Laboratory where initially I was in the

19  Controlled Substances Analysis Section where I would analyze

20  drug evidence, and then after that, I was assigned to the

21  Trace Evidence Section where my specialty was paint analysis.

22  Q    And can you describe your educational background prior to

23  working at the NYPD crime laboratory?

24  A    Yes.  I have a bachelor's degree in forensic science from

25  John Jay College, and a master's degree in forensic drug

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-493

LIEFKE - DIRECT - MS. DIOUF                 418

1   chemistry from the University of Florida.

2   Q    Mr. Liefke, are you familiar with digital currency?

3   A    Yes, I am.

4   Q    How are you familiar with it?

5   A    Like I said, our investigations that myself and Special

6   Agent O'Kain were doing centered around crytocurrencies, and

7   currently, my job that I'm at now, that's my specialty, as

8   well.

9   Q    What is digital currency?

10  A    It's a currency that takes place on a decentralized

11  network.  It's a peer-to-peer network, so it's not like a

12  bank.  It's interconnected computers.

13  Q    And you mentioned crytocurrency.

14        Is digital currency also known as crytocurrency?

15  A    Yes.  They're synonyms.

16  Q    Can you give some examples of digital currency, please?

17  A    The main ones that people know about is BitCoin, and then

18  there's different ones as well like Ethereum or Monero.

19  Q    Is BitCoin also known as BTC?

20  A    Yes, that's the abbreviation for BitCoin.

21  Q    And through your role as a special agent at the DEA, did

22  you also work on investigations involving digital currency?

23  A    Yes, we did.

24  Q    And what sorts of investigations were those?

25  A    Those involved, you know, things pertaining to the dark

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-494

```
                    LIEFKE - DIRECT - MS. DIOUF                419

 1   web where we'd have to pay --

 2            MR. SINGER:  Objection.

 3            THE COURT:  Sustained.

 4            Let's have a sidebar really quickly.

 5            (Continued on the next page.)

 6            (Sidebar conference.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                    AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-495

SIDEBAR CONFERENCE                    420

1      (The following occurred at sidebar.)

2      THE COURT:  So I presume everyone remembers as part

3  of the pretrial motions, there weren't supposed to be any

4  references to the dark web, so I'm going to give a curative

5  instruction to say that the jury should disregard any

6  references to the dark web which is completely irrelevant to

7  this case.

8      So just be very careful not to ask him, maybe, these

9  open-ended questions and guide him a little bit more.

10     MS. DIOUF:  I'm happy to lead him more through the

11  section.

12     THE COURT:  Yeah, I'll give you a little leeway so

13  we could avoid this, if possible.

14     MR. SINGER:  Wasn't he directed not to raise this?

15     THE COURT:  Let's not get into that.  It doesn't

16  matter.  It's really quite a de minimis harm, but I will cure

17  it by simply saying just disregard it.  You just try to keep

18  him away from that topic.

19     Hopefully, once he hears my instruction, he'll get

20  the hint.

21     (End of sidebar conference.)

22     (Continued on the next page.)

23

24

25

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-496

```
                    LIEFKE - DIRECT - MS. DIOUF              421
```

 1            (In open court; Jury present.)

 2            THE COURT:  So ladies and gentlemen, I just want to

 3    give you an instruction that you should disregard any

 4    references to the dark web.  That has no relevance at all to

 5    this case and which is partly the reason I wanted to have this

 6    quick sidebar.  So disregard any references you hear to the

 7    dark web.  Not relevant to this case.

 8            You may proceed Ms. Diouf.

 9    BY MS. DIOUF:

10    Q    Mr. Liefke, are you familiar with an investigation into

11    an individual named Mustafa Goklu?

12    A    Yes, I am.

13    Q    And how are you familiar with that investigation?

14    A    Myself and Patrick O'Kain were the case agents on that

15    investigation.

16            THE COURT:  I'm going to ask you to both go a little

17    slower.

18    Q    And what does the case agent do?

19    A    The case agent is responsible for running the case,

20    telling other agents when to do surveillance, when to, you

21    know, write different affidavits.  Basically, in charge of

22    running the case from the beginning to the end.

23    Q    Mr. Liefke, do you see Mustafa Goklu in the courtroom

24    today?

25    A    Yes, I do.

```
              AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER
```

A-497

LIEFKE - DIRECT - MS. DIOUF                    422

1          MS. DIOUF:  And with your permission, Your Honor,

2     I'd ask that everyone at defense table remove their mask,

3     please.

4          THE COURT:  Yes.

5     Q    Mr. Liefke, can you please identify Mr. Mustafa Goklu by

6     where he is sitting and an item of clothing he's wearing?

7     A    Yes.  He's sitting on the far right table and he's

8     wearing a red tie.

9          THE COURT:  Let the witness reflect that the witness

10    has identified the defendant, Mr. Goklu.

11         MS. DIOUF:  Thank you, Your Honor.

12    Q    Do you know Mustafa Goklu by any other names or aliases?

13    A    Yes.  He also goes by Michael Goklu and Mustangy.

14    Q    How did your investigation into the defendant begin?

15    A    We -- myself and Patrick -- Special Agent O'Kain was

16    looking on a website called localbitcoins.com and it's a

17    peer-to-peer website where people can look for other people

18    that are exchanging BitCoin for cash or cash for BitCoin.

19    Q    And when was this, approximately?

20    A    This was in July of 2018.

21    Q    And did the defendant have a profile on local BitCoins in

22    July of 2018?

23    A    Yes.  The defendant had a profile on localbitcoins.com

24    under the name Mustangy.

25    Q    And did this profile tell you how to contact Mustangy?

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-498

LIEFKE - DIRECT - MS. DIOUF                423

1   A    Yes.  On the profile, it said to contact him through

2   Signal Messaging app.

3   Q    What is Signal?

4   A    Signal is an encrypted messaging app.

5   Q    Have you used Signal before?

6   A    Yes, I have.

7   Q    And you said it's encrypted.

8        What does that mean?

9   A    That means the communications between both parties are

10  encrypted.  So even if a Government agency had a wiretap, they

11  wouldn't be able to read those messages because they're

12  encrypted.

13  Q    Did you contact the defendant on Signal?

14  A    Yes, we contacted the defendant on Signal.

15  Q    And when you say, "we," who are you referring to?

16  A    Myself and Special Agent O'Kain.

17  Q    And what happened next?

18  A    After some negotiations, eventually, a meeting was set up

19  in order to exchange BitCoin for cash.

20  Q    And what was your role in that meeting?

21  A    So during the meeting where Special Agent O'Kain met with

22  the defendants, I was there, as well, performing surveillance

23  and also providing safety cover for the undercover.

24  Q    And was then Special Agent O'Kain acting in an undercover

25  capacity?

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-499

LIEFKE - DIRECT - MS. DIOUF                     424

1   A     Yes, he was.

2   Q     Have you been involved in undercover operations before?

3   A     Yes, I have.

4   Q     What is the role of a surveillance agent in an undercover

5   operation?

6   A     Again, the role of a surveillance agent is to monitor the

7   meeting to see what takes place and also to provide security

8   for the undercover.

9   Q     Did you surveil the undercover meetings in this case?

10  A     Yes, all the meetings that the UC was present at was

11  surveiled.

12  Q     And did you do any other surveillance of the defendant in

13  this investigation?

14  A     Yes.  There are other times where the UC wasn't involved

15  where we did surveillance on the defendant.

16  Q     And when you say, "UC," are you referring to the

17  undercover?

18  A     Yes, I am.

19  Q     And can you describe that surveillance of the defendant

20  when the undercover wasn't involved?

21  A     So there was times where we would set up at the

22  defendant's residence and then follow his comings and goings

23  throughout the day to see who he was meeting up and what he

24  was doing.

25  Q     Did you observe the defendant meet with people other than

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-500

LIEFKE - DIRECT - MS. DIOUF                425

1   the undercover during this surveillance?

2   A    Yes, we did.

3   Q    And can you describe that?

4   A    In January of 2019, we observed the defendant meet up

5   with a female in Manhattan.  The female had what looked to be

6   a weighted bag that we thought she was carrying a large amount

7   of U.S. currency.  And at this same time, the undercover,

8   Special Agent O'Kain was also in communication with the

9   defendant.

10        We had a meeting set for the next day that was

11   supposed to be for $100,000, and after the defendant met up

12   with this female, he advised the undercover agent that he had

13   $25,000 to do a deal the next day.

14   Q    Did there come a time when you personally interacted with

15   the defendant?

16   A    Yes, there was.

17   Q    And when was that?

18   A    After his arrest in April of 2019, I was able to

19   interview the defendant.

20   Q    And what happened to the undercover agent during this

21   arrest?

22   A    During the arrest, we also arrested the undercover agent

23   so that the defendant didn't know he was working for the

24   Government at the time.

25   Q    Where did you interview the defendant?

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-501

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 81 of 216 PageID #: 912

LIEFKE - DIRECT - MS. DIOUF                          426

1  A     After we arrested the defendant, we took him back to his

2  residence and interviewed him in his dining room.

3  Q     And when you interviewed the defendant, did you inform

4  him that the person he was arrested with was a law enforcement

5  officer?

6  A     Initially, we did not advise the defendant that the

7  person he was arrested with was an undercover agent, no.

8  Q     Did you ask the defendant whether he had done BitCoin

9  exchanges with other people during this interview?

10 A     I did.  He said he did it on a few other occasions.

11 Q     And did you ask about any particular customers?

12 A     Yes.  I asked about the female that we observed him meet

13 up with in January of 2019.

14 Q     And how did the defendant respond?

15 A     Initially, he said he did not remember meeting up with

16 the female.  I then showed him a picture to try and jog his

17 memory, and at that time, he stated he did a small deal with

18 her for approximately 2- to $3,000.

19 Q     And did you ask the defendant what his typical

20 transaction amount was for?

21 A     Yes.  He said he usually only did a few thousand dollars,

22 smaller amounts.

23 Q     And did you ask the defendant how he communicated with

24 potential buyers and sellers of crytocurrency?

25 A     Yes.  He said he did it through Signal Messaging app and

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-502

LIEFKE - DIRECT - MS. DIOUF                      427

1    also WhatsApp.

2    Q    Mr. Liefke, did there come a time when you reviewed the

3    defendant's phone?

4    A    Yes.  After he was arrested, we had also obtained a

5    search warrant that gave us permission to search his house and

6    also his electronic devices.

7         MS. DIOUF:  And I want to show you now what's in

8    evidence as Government Exhibit 228 and also publish to the

9    jury, with permission.

10        THE COURT:  All right.  You may do so.

11        Was this previously admitted, Fida?

12        THE COURTROOM DEPUTY:  Yes.

13        THE COURT:  Okay.  All right.

14   Q    Mr. Liefke, what is this exhibit?

15   A    This is a download of the Signal messaging app messages

16   from the defendant's phone.

17   Q    Did you review the messages contained in this exhibit?

18   A    Yes, I did.

19   Q    And can you describe them, generally?

20   A    It was approximately 53 separate messages, messages

21   threads with different people.  It was just, you know, a bunch

22   of threads talking about meeting up and exchanging BitCoin for

23   cash.

24   Q    Did you review any messages in this exhibit on Government

25   Exhibit 228 where the person the defendant was communicating

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-503

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 83 of 216 PageID #: 914

```
                    LIEFKE - DIRECT - MS. DIOUF                  428
```

1   with referenced the defendant's localbitcoins ad?

2   A    Yes, I did.

3   Q    I'd like to direct your attention to Page 50 in this

4   exhibit, and this is message thread 15.

5        Mr. Liefke, what is this?

6   A    This is a message between defendant and someone else

7   asking if he had any BitCoin for cash to sell and that he saw

8   his posting on localbitcoins.com.

9   Q    And is this one of the message threads you viewed

10  pursuant to a search warrant?

11  A    Yes, it was.

12  Q    And which text bubbles here belong to the defendant?

13  A    The bubbles on the right-hand side.

14  Q    And can you read the first message on the left-hand side

15  starting with, hi.

16       And I'll read the defendant's response.

17  A    Hi.  I'm looking to sell BTC for cash.  Saw your post on

18  local BitCoins.

19  Q    Hi.  How much.

20  A    Depends on the rate, but would like to do .5 to 1 BTC.

21  Q    Percent eight CoinBase.

22       Mr. Liefke, directing your attention now to Page 66

23  of this exhibit which is message thread 21.

24       What's the date on this exchange?

25  A    April 17, 2019.

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-504

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 84 of 216 PageID #: 915

LIEFKE - DIRECT - MS. DIOUF                    429

1   Q    And can you read the message the customer sends starting

2   with, hello.

3   A    Hello.  I'm a buyer of BTC.  Do I fill out the form

4   online through localbitcoins first.

5   Q    Directing your attention now to Page 228 in this exhibit,

6   Government Exhibit 228.  And this is message thread 54.

7        What's the date on this exchange?

8   A    October 13, 2018.

9   Q    And can you read the customer message, and I'll read the

10  defendant.

11  A    Hey, I saw your ad on localbitcoins.  I'm looking to buy

12  about $2,000 worth in BitCoin or BitCoin cash.  I was

13  wondering what your fees were.

14  Q    Please check price at localbitcoin page.

15       Mr. Liefke, were these just some of message threads

16  you reviewed in this exhibit where the customer or defendant

17  mentions his localbitcoins page?

18  A    Yes.  It's just a select few.

19  Q    Did you review any messages in this exhibit that appear

20  to reference prior transactions with the defendant?

21  A    Yes, there were a number of those.

22  Q    And directing your attention in this exhibit, Government

23  Exhibit 228, Page 67, which is message thread 22.

24       Mr. Liefke, how many pages long is this message

25  thread?

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-505

```
              LIEFKE - DIRECT - MS. DIOUF              430
 1   A    Twenty-six pages.
 2   Q    And can you start reading as the customer at the top and
 3   I'll read the defendant.
 4   A    Hey, what's good, William.  Looking for the BTC.
 5   Q    Where?
 6   A    What's good homie.
 7   Q    And Starbucks.  46/09 Queens Boulevard Sunnyside, New
 8   York.
 9             And can you skip ahead to the response.
10   A    I'm headed there now.  I'll be there at 8:57.
11   Q    Okay.
12             And what does the customer say?
13   A    I'm here.
14   Q    Mr. Liefke, are you familiar with the Starbucks on Queens
15   Boulevard the defendant references?
16   A    Yes.  This was also the location that Undercover Agent
17   O'Kain did a deal with the defendant at, as well.
18   Q    And turning to the next page of this thread which is Page
19   68 in this exhibit.
20             The defendant says, we're inside.  Come to front
21   door.
22   A    Grabbing my coffee quick.  Way.
23   Q    Okay.
24   A    I'm right in front.
25   Q    And what does the customer next say after December 25,
```

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-506

```
                    LIEFKE - DIRECT - MS. DIOUF                    431
 1   2018?

 2   A    Hey what's up homey.

 3   Q    How much?

 4   A    Not sure.  I just wanted to reach out.  I'll be in the

 5   city Friday or Saturday.

 6   Q    Turning to the next page in this thread which is Page 69

 7   of this exhibit.

 8             Can you start reading as the customer at the top?

 9   A    Will you able to meet in Friday.

10   Q    Yes.  Text before heading.

11   A    I'll be in the city at 3:00 p.m. tomorrow.  Where do you

12   want to meet?  I'm guessing we could meet around four or five.

13   Will that work.

14   Q    Sorry.  Cleared texted.  How much and buying or selling?

15   A    Buying, 15 or 16,000.

16   Q    Same place.  Sunnyside Starbucks.

17             And skipping ahead to Page 6 in this thread which is

18   page 72 of this exhibit.

19             The defendant says, when I text you, go anywhere

20   Upper East Side, I'm going Manhattan.

21             Can you read the customer starting with, I'm not too

22   familiar.

23   A    I'm not too familiar with Upper East Side.  Can you give

24   me a place to meet so I can be in the right area.

25   Q    And can you read the last thing the customer says on this
```

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-507

```
                    LIEFKE - DIRECT - MS. DIOUF                    432
```

1    page?

2    A    I'm going to the Starbucks on Lexington Avenue.

3    Q    And turning to the next page, page seven of this thread

4    and Page 73 in this exhibit.

5           Can you start reading the customer message starting

6    with, cool.

7    A    Cool.  I'm here.

8    Q    Five min.

9    A    Okay.  I'm going to use the bathroom quick.

10   Q    Go ahead.  Here at corner.

11          And then turning to the next page of this thread

12   which is Page 74 in this exhibit.

13          Can you start reading as the customer at the top?

14   A    Hey what's up homey.  Was looking to take a trip down to

15   see you on Saturday.  I'm buying some BitCoin, around 10 15

16   USD worth.

17   Q    And the said BitCoin, but the text says BTC.

18          Is that the also Bitcoin?

19   A    Yes.  That's correct.

20   Q    And the defendant says, okay.  Text me.

21          What does the customer say next?

22   A    Hey what's up man?

23   Q    Hi.  I'm at Queens if are you driving it is easier to

24   you?

25   A    I'll be in Queens.  Can meet -- can you meet me around

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-508

LIEFKE - DIRECT - MS. DIOUF                    433

1    eight.  I have to go there any way.  That's perfect.

2    Q    Skipping ahead to Page 10 of this thread which is Page 76

3    in this exhibit.

4           The defendant says, on the way?

5           How does the customer respond?

6    A    Yeah, I'm already in Queens in Ridgewood.

7    Q    Give me an ETA when heading Starbucks at.

8           And he provides the address at 46-09 Queens

9    Boulevard.

10           And moving to the next page, Page 11 of the same

11   thread and Page 77 in this exhibit.

12           Can you read the customer starting with, I'm here,

13   in the middle of the page.

14   A    I'm here.  Just ordering a coffee and using the bathroom.

15   I got a spot right out in front.

16   Q    Okay.  In front, says the defendant.

17   A    Okay.  Cool.  Be right out.

18

19           (Continued on the following page.)

20

21

22

23

24

25

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

A-509

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 89 of 216 PageID #: 920

```
                    Liefke - direct - Diouf                  434
```

1    BY MS. DIOUF:   (Continuing.)

2    Q    And moving to the next page, page 12 of this thread which

3    is page 78 in this exhibit, can you start reading as the

4    customer at the top?

5    A    "Hey.  What's up Homie?"

6    Q    "How much you want $$$ or how BTC you have," says the

7    defendant?

8    A    "I'm going to bring around 60K.  Just had a huge music

9    event and want to buy more BTC."

10   Q    "You are a seller, right?  Sorry, I delete history for

11   effect reasons.  How many BTC you have?

12   A    "No, I'm to buy BTC again.  You should remember me.  We

13   met a couple of times now, Starbucks."

14   Q    And the defendant says, "How many BTC you want?"

15        And then skipping ahead to page 24 of this thread

16   which is page 90 of this exhibit, can you read as the customer

17   starting at the top?

18   A    "Where?"

19   Q    And the defendant replies, "Starbucks, 4609 Queens

20   Boulevard, Sunnyside, New York.  How far to here?"

21        What does the customer say?

22   A    "45 minutes, tops.  I should be there by 9:55.  I'm

23   getting to my Lyft now."

24   Q    "Okay."

25   A    "I'm here getting a coffee."

A-510

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 90 of 216 PageID #: 921

Liefke - direct - Diouf                    435

1   Q    "Okay, come out when have coffee."

2        Switching now to a different thread in this exhibit,

3   message thread two on page 23 of this exhibit, Mr. Liefke

4   what's the date at the top of this page?

5   A    July 29, 2018.

6   Q    And can you start reading as the customer at the top?

7   A    "Hey, can you do 65K?  Seller here."

8   Q    And I'll read the defendant.  "Yes, I can.  Sorry, just

9   saw MSG."

10  A    "You've dealt for 20K, Asian guy with glasses.  I'll let

11  you know when I need it."

12  Q    "Okay."

13  A    "I'm still thinking RN.  I will let you know by

14  tomorrow."

15  Q    "Okay."

16        Mr. Liefke, when you interviewed the defendant, what

17  did he say the typical size of his transactions were?

18  A    Between one and $5,000.

19  Q    Mr. Liefke, were these only some of the message threads

20  you reviewed in this exhibit where the defendant talked about

21  meeting customers more than once?

22  A    Yes.

23  Q    And you mentioned earlier that the defendant told you

24  when you interviewed him that he only did small transactions

25  around a few thousand dollars.  In addition to the

SN      OCR      RPR

A-511

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 91 of 216 PageID #: 922

Liefke - direct - Diouf                    436

1   conversations with Signal user William, which we reviewed, did

2   you come across other Signal conversations where the defendant

3   discussed amounts larger than a few thousand dollars?

4   A    Yes, there were multiple messages discussing amounts

5   larger than $5,000.

6   Q    And directing your attention to page 237 of this exhibit

7   which is message thread 58, can you start reading as the

8   customer starting with, "Your price"?

9   A    "Your price does not suit us."

10  Q    "This is high VOL man.  Not one BTC.  If you get 50K,

11  then we talk.  20K 7, 50K 6."

12           Mr. Liefke -- withdrawn.

13           Mr. Liefke was this only one of the message threads

14  in this exhibit you reviewed where the defendant and customer

15  talked about exchanging more than a few thousand dollars?

16  A    Yes, that is correct.

17  Q    Did you review messages where the defendant mentioned the

18  NYPD or New York City Police Department?

19  A    Yes, there was mention of NYPD.

20  Q    And directing your attention to page 96 in this exhibit

21  which is message thread 23, how many pages long is this

22  thread?

23  A    Eight pages.

24  Q    And what page are we on?

25  A    Page four.