# 24-767-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

MUSTAFA GOKLU, AKA Mustangy,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## APPENDIX
**Volume 3 of 5 (Pages A-512 to A-767)**

MATTHEW BRISSENDEN
MATTHEW W. BRISSENDEN, P.C.
*Attorneys for Defendant-Appellant*
666 Old Country Road, Suite 501
Garden City, New York 11530
(516) 683-8500

CP COUNSEL PRESS     (800) 4-APPEAL • (333855)

i

# TABLE OF CONTENTS

                                                                    **Page**

District Court Docket Entries ................................... A-1

Complaint, dated May 5, 2019.................................. A-19

Superseding Indictment, Filed on
    October 28, 2020 ................................... A-33

The Government's Requests to Charge, dated
    September 12, 2022, with Proposed Verdict Sheet
    Attached................................................. A-38

Defendant's Requests to Charge,
    dated September 12, 2022.................................... A-70

Transcript of Jury Selection Held before of the
    Honorable Pamela K. Chen, dated October 3,
    2022 ................................................ A-76

Excerpts from Trial combined Opening through
    Verdict, Filed on December 1, 2022 ..................... A-264

Government Exhibit 501........................................... A-753

Government Exhibit 502........................................... A-761

Government Exhibit 503........................................... A-765

Government Exhibit 504........................................... A-770

Government Exhibit 505........................................... A-776

Government Exhibit 506........................................... A-786

Government Exhibit 507........................................... A-792

Government Exhibit 901........................................... A-799

ii

|  | Page |
|---|---|
| Government Exhibit 902 | A-812 |
| Government Exhibit 903 | A-814 |
| Government Exhibit 904 | A-849 |
| Government Exhibit 906 | A-864 |
| Government Exhibit 907 | A-895 |
| Government Exhibit 909 | A-916 |
| Government Exhibit 1101 | A-928 |
| Jury Instructions, Filed on October 11, 2022 | A-929 |
| Verdict Form, dated October 11, 2022 | A-958 |
| Notice of Motion, by Defendant, for Judgment of Acquittal, dated November 10, 2022 | A-960 |
| Affirmation of Murray E. Singer, for Defendant, in Support of Motion, dated November 10, 2022 | A-961 |
| Government Memorandum of Law in Opposition to Defendant's Post-Trial Motion, dated December 5, 2022 | A-965 |
| Reply Affirmation of Murray E. Singer, for Defendant, in Further Support of Motion, dated December 12, 2022 | A-988 |
| Memorandum and Order, dated January 13, 2023 | A-990 |
| Sentencing Memorandum from Sabrina P. Shroff to the Honorable Pamela K. Chen, dated January 15, 2024 | A-999 |
| Transcript of First Sentencing Day held before the Honorable Pamela K. Chen, dated January 29, 2024 | A-1008 |

iii

**Page**

Excerpt from the Continued Sentencing Hearing
   held before the Honorable Pamela K. Chen, dated
   March 14, 2024 ...................................................... A-1054

Notice of Appeal, Filed on March 22, 2024 .............. A-1117

A-512

```
                          Liefke - direct - Diouf                    437
 1   Q    Can you start reading the customer starting with "meet
 2   me" and I'll read the defendant?
 3   A    "Meet me inside Starbucks, please."
 4   Q    "No, bye."
 5   A    "Dot dot dot."
 6   Q    "I'm not going to count money in Starbucks, sorry."
 7          Moving to the next page, page five on this thread,
 8   and page 97 in this exhibit, can you read the customer's
 9   response starting with "Why not."
10   A    "Why not?  I'm sitting at a corner table.  That's the
11   whole point of meeting somewhere public.  It's safe for both
12   parties."
13   Q    "Two MIN you COMR, or I leave.  Sorry, not risking for
14   2K."
15   A    "There's no risk for you to come inside.  There is a risk
16   for me to get in your car."
17   Q    "I am double-parked.  Okay, bye, man, good luck."
18          And skipping to page seven of this thread which is
19   page 99 in this exhibit, can you start reading the customer at
20   the top.
21   A    "I don't know if you're going to pull out a weapon and
22   threaten me after I made the transaction.  That's why meet at
23   public places.  You are acting shady AF."
24   Q    And the defendant says, "Middle of street in crowd,
25   question mark."
```

SN     OCR     RPR

A-513

Liefke - direct - Diouf                    438

1   A    "You're a joke."

2   Q    "Dude, sorry, try ATMs.  As I said, I did many trades.

3   First time cancelled.  Really are you worked for NYOD or

4   what?"

5           Mr. Liefke, what is your understanding of what AF

6   typically means?

7   A    As fuck.

8   Q    And does NYOD appear to be a typo for NYPD?

9   A    Yes, it does.

10  Q    Mr. Liefke, are these only some of the messages you

11  reviewed in this exhibit where the defendant talks about the

12  police?

13  A    Yes, that is correct.

14  Q    During your investigation did the defendant make any

15  statements to the undercover agent about the police?

16  A    Yes, he did.  He said he didn't like to go into Manhattan

17  to do video --

18          MR. SINGER:  I object to this.  He was not present

19  for the conversation.  We've already --

20          THE COURT:  Overruled.  Why don't you just establish

21  that this was made to him and are you going to be using the

22  overhead again?  I'm wondering about the lights.

23          MS. DIOUF:  Yes, I have a few more to go.

24          THE COURT:  Okay, go ahead.

25  Q    Mr. Liefke, did you listen to the conversations between

SN    OCR    RPR

A-514

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 94 of 216 PageID #: 925

Liefke - direct - Diouf                    439

1   the undercover and the defendant?

2   A    Yes.  So while the deals were being made I was listening

3   in real time and also I reviewed the recordings afterwards as

4   well.

5   Q    And what statements, if any, did the defendant make to

6   the undercover about the police?

7           MR. SINGER:  Your Honor, I object to this.

8           THE COURT:  Overruled.

9   A    One of the reasons the defendant did not like to go to

10  Manhattan is he said that there was lots of NYPD in Manhattan

11  and also lots of different surveillance cameras that the NYPD

12  uses.  Also he mentioned that the NYPD likes to dress their

13  officers as bums so you don't know they're officers and they

14  walk around to do surveillance like that.

15  Q    Mr. Liefke, did you review any messages in this Exhibit

16  228, Government Exhibit 228, where the defendant expressed

17  opinions about doing business in Manhattan?

18  A    Yes, I did.

19  Q    Directing your attention to page 242 of Government

20  Exhibit 228 and this is message thread 60.  Mr. Liefke, how

21  many pages long is this thread?

22  A    13 pages.

23  Q    And starting with the customer at the top, can you start

24  reading and I'll read as the defendant?

25  A    "Hey Mustang, wanted to trade coin for 1160 cash."

SN     OCR     RPR

A-515

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 95 of 216 PageID #: 926

Liefke - direct - Diouf                    440

1  Q    "Hey Trade, what you are buying BTC or seller?"

2  A    "Looking to sell BTC."

3  Q    "Okay.  I can do at Starbucks 47 S Street and Queens

4  Boulevard."

5  A    "Can you do somewhere in Manhattan by any chance?"

6  Q    "No, sorry.  Manhattan sucks, LOL."

7  A    "LOL, what makes it suck?"

8  Q    Turning to the next page, page 243 in this exhibit, the

9  defendant replies, "Traffic, safety, et cetera, hard to meet."

10        And how does the customer respond?

11 A    "You can only do Queens or you'll do Brooklyn too?"

12 Q    "If you coming from Jersey, Queens is easier, George

13 Washington Bridge to Triboro.  I am Brooklyn, but going

14 Queens."

15 A    "I mean solo right now.  Was going to head to Brooklyn

16 around Prospect Avenue stop."

17 Q    And skipping ahead to page eight of the same thread, page

18 249 of this exhibit, can you read the customer starting with

19 "think we can meet" in the middle of the page?

20 A    "Think we can meet downtown somewhere?"

21 Q    And the defendant says, "No, sorry, Manhattan at all."

22        Mr. Liefke was this only one of the messages in this

23 thread where the defendant expressed an opinion about doing

24 business in Manhattan?

25 A    Yes, it was.

SN     OCR     RPR

A-516

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 96 of 216 PageID #: 927

Liefke - direct - Diouf                          441

1  Q     Did you review any message threads where someone mentions
2  washing money?
3  A     Yes.
4  Q     Based on your training and experience, what do you
5  understand "wash to" typically mean with respect to money?
6  A     Washing money is -- it's another term for money
7  laundering or they're trying to hide or obfuscate the origin
8  of the funds.
9  Q     And directing your attention to message thread one in
10  Government Exhibit 228 which is page 12 in this exhibit, is
11  this another message you reviewed pursuant to the search
12  warrant?
13  A     Yes, it was.
14  Q     What is the date at the top of this thread?
15  A     April 26, 2019.
16  Q     And how many pages long is this thread?
17  A     12 pages.
18  Q     Can you read the customer starting with "Hi"?
19  A     "Hi.  Trying to buy BTC, ready now.  10 percent over
20  spot?  Asking 3,600 for 3,960."
21  Q     And the defendant says, "Hi, can meet tomorrow afternoon
22  on Queens Boulevard and 47 Street Starbucks."
23        And turning now to the next page, page 13 in this
24  exhibit, can you start reading as the customer at the top?
25  A     "Can we move this conversation to Telegram?  I will text

SN     OCR     RPR

A-517

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 97 of 216 PageID #: 928

Liefke - direct - Diouf                    442

1   you exactly two only BC I am late on this transaction.  Sorry

2   to put a rush on you."

3   Q    The defendant says, "Okay.  Michi 340634, Telegram."

4   A    "Thanks.  You rock.  Wait, you're the same person who

5   blew me off today."

6   Q    "Question mark, what do you mean?"

7        Mr. Liefke are you familiar with Telegram?

8   A    Yes.  Telegram is another encrypted messaging app.

9   Q    Skipping ahead to page 10 of the thread, page 20 of the

10  exhibit, can you read the customer at the top?

11  A    "Yes, yeah, sure.  Asshole for calling out, for wasting

12  my time for catching you in a lie."

13  Q    And the defendant says, "Go ahead.  What's wrong with

14  you?  I'll report you to NYPD."

15  A    "And when I approached you, you cry like a bitch.  Dude,

16  you are a liar, liar.  Your IP even matches the Telegram."

17  Q    And the defendant says, "As I am contacted by NYPD to

18  mark drug dealers, you will be reported, son of a bitch."

19        Mr. Liefke, when you interviewed the defendant did

20  he tell you that the NYPD asked him to report drug dealers?

21  A    No, he did not.

22  Q    Did he try to report any drug dealers to you?

23  A    Not that I'm aware of.

24  Q    And turning to the next page, page 21 in this exhibit,

25  can you start reading as the customer starting at the top?

SN      OCR      RPR

A-518

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 98 of 216 PageID #: 929

Liefke - direct - Diouf                    443

1  A    "Good luck with your scams.  Yeah, yeah, sure, good luck

2  good luck.  You don't have my name.  All you have is a burner

3  cellphone number.  Ha ha."

4  Q    Mr. Liefke, based on your training and experience are you

5  familiar with burner cellphone numbers?

6  A    Yes, burner cellphone numbers are just numbers that

7  people get through various places like Metro PCS or they don't

8  require you to actually give a real name for you to get a

9  phone.

10 Q    And turning to the next page, page 22 of this exhibit,

11 can you start reading the customer starting with, "This is why

12 I split."

13 A    "This is why I split my transactions, you fool.  I did

14 eight transactions all over 3,000 and still got to wash

15 another 29K, lame liar.  Only a matter of time before you

16 snitch on the wrong person and get killed."

17 Q    And can you remind us of what your understanding of what

18 washing means with respect to money?

19 A    Washing with respect to money is the process of money

20 laundering where you're trying to hide the origin of the funds

21 that you have.

22        MS. DIOUF:  Thank you.  You can take this down now.

23 BY MS. DIOUF:

24 Q    Mr. Liefke, did you review any other of the defendant's

25 electronics recovered during the search?

SN    OCR    RPR

A-519

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 99 of 216 PageID #: 930

Liefke - direct - Diouf                          444

1    A    Yes, I also reviewed a computer that belonged to him.

2    Q    And can you describe generally what you found in the

3    computer?

4    A    There was different things related to Bitcoins, different

5    shipping labels and some banking documents as well.

6    Q    I want to show you what's in evidence as Government

7    Exhibit 753.

8              (Exhibit published.)

9              MS. DIOUF:  And publish to the jury with permission,

10   please.

11             THE COURT:  You may, go ahead.

12   BY MS. DIOUF:

13   Q    Mr. Liefke, can you see this document?

14   A    Yes.

15   Q    What is it?

16   A    It's a TD Bank statement for a business checking account

17   under the name Mustangy Corp. USA.

18   Q    And are you familiar with Mustangy Corp. during --

19             Did become familiar with Mustangy Corp. during the

20   course of your investigation?

21   A    Yes.  This was a corporation that the defendant started.

22   Q    And what is the address under Mustangy Corp. USA?

23   A    It's 5030 39th Street, second floor, Sunnyside, New York.

24   This is also the residence where the defendant was living.

25   Q    I want to show you what's in evidence and publish to the

SN     OCR     RPR

A-520

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 100 of 216 PageID #: 931

Liefke - direct - Diouf                              445

1   jury Government Exhibit 754?

2              (Exhibit published.)

3   A    This is also a TD Bank statement for a convenience

4   checking account under the name Michael Goklu at that same

5   address.

6   Q    And showing you now what's in evidence as Government

7   Exhibit 711 and 712 and hopefully we can pull these upside by

8   side.

9              THE COURT:  Previously admitted.

10             MS. DIOUF:  Previously admitted.

11             (Exhibit published.)

12  BY MS. DIOUF:

13  Q    Mr. Liefke, can you see these documents?

14  A    Yes.

15  Q    What are these?

16  A    These are shipping labels that were sent from Mustangy

17  Corp. at that same address in Sunnyside.

18  Q    And showing you now what's in evidence as Government

19  Exhibit 716 and 718, previously admitted.

20             (Exhibit published.)

21  Q    And what are these?

22  A    Again, these are more shipping labels with the return

23  address of Mustangy Corp. at the Sunnyside address.

24             MS. DIOUF:  Thank you.  You can take those down now.

25             Switching gears a bit, at this time the Government

A-521

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 101 of 216 PageID #: 932

Liefke - direct - Diouf                 446

1   would like to offer Government Exhibit 104 into evidence under

2   Federal Rule of Evidence 902-4.

3            THE COURT:  Any objection?

4            MR. SINGER:  Can I see what it is?

5            THE COURTROOM DEPUTY:  You don't have a copy?

6            MR. SINGER:  No objection.

7            THE COURT:  104 is admitted pursuant to Rule 902

8   certified as a business record.

9            MS. DIOUF:  Permission to publish both to the jury

10  and the witness.

11           THE COURT:  You may.

12           (Government Exhibit 104 received in evidence.)

13           (Exhibit published.)

14  Q    And this is page two of the exhibit.  Mr. Liefke what is

15  this document?

16  A    This is a certificate of incorporation for Mustangy Corp.

17  USA that was issued by New York State.

18  Q    And if you can look at the bottom of the page, what name

19  do you see there?

20  A    Mustafa Goklu.

21  Q    And --

22           MS. DIOUF:  Just a moment, please, Your Honor.

23           THE COURT:  All right.

24           (Pause in proceedings.)

25           MS. DIOUF:  Nothing further.

A-522

Liefke - cross - Singer                447

1          THE COURT:  All right, thank you very much.

2          Your witness, Mr. Singer.

3    CROSS-EXAMINATION

4    BY MR. SINGER:

5    Q    Good afternoon, sir.

6    A    Good afternoon.

7    Q    Now, you referenced Signal messages that you indicated

8    had been downloaded from Mr. Goklu's phone?

9    A    Correct.

10   Q    All right.  In fact, they were not able to download them

11   but there was a series of photographs taken of each of the

12   messages; correct?

13   A    It was sent to our digital evidence laboratory and that's

14   what they produced to us.

15   Q    Okay.  So 228 is what was produced to you from the

16   technicians that were getting information off of the phone?

17   A    Correct.

18   Q    Okay.  Now, you indicated that you had obtained a search

19   warrant for Mr. Goklu and for his home?

20   A    That is correct.

21   Q    And you executed that search warrant on April 30, 2019

22   shortly after Mr. Goklu's arrest; correct?

23   A    Yes.

24   Q    And at the time of the interview -- withdrawn.

25          You indicated that you interviewed Mr. Goklu in his

A-523

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 103 of 216 PageID #: 934

Liefke - cross - Singer                         448

1  dining room I think you said.

2  A    Yes.

3  Q    At his home?

4  A    Correct.

5  Q    So he was taken into custody by various agents including

6  you; correct?  You were part of the arrest team?

7  A    I was, yes.

8  Q    So Mr. Goklu was taken into custody and at some point was

9  taken back to his residence; correct?

10  A    Yes.

11  Q    And when he was back in the residence, was the search

12  already underway?

13  A    Yes, he started the search, yes.

14  Q    So you had -- you or the members of the team that were

15  working on this case that day had gone into the home and had

16  started the search before you returned to the home with

17  Mr. Goklu?

18  A    That is correct.

19  Q    So when you got -- when you -- were you the person who

20  transported Mr. Goklu back to his house?

21  A    Yes, I was.

22  Q    Or you were in the car with him?

23  A    Correct.

24  Q    And when you got back to Mr. Goklu's house with Mr. Goklu

25  and you went inside, there were agents going through the

SN     OCR     RPR

A-524

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 104 of 216 PageID #: 935

Liefke - cross - Singer                    449

1   house; correct?

2   A    Yes, there were.

3   Q    And would it be fair to say that Mr. Goklu was unaware of

4   the fact that there were going to be multiple federal agents

5   searching his house at the -- until he arrived at the home and

6   saw it happen?

7   A    I believe when I arrested him I told him we had the

8   search warrant for his residence and his electronic devices so

9   I believe he was aware prior to arriving at his house.

10  Q    And when you got him to his house, you took him inside to

11  the dining room and sat down to interview him?

12  A    Correct.

13  Q    And the interview that took place took place while the

14  agents were in the house searching?

15  A    Correct.

16  Q    Looking in drawers, looking under -- looking everywhere;

17  correct?

18  A    Correct.

19  Q    And as a result of the search, you ant you meaning the

20  team, recovered approximately 20 or more electronic devices?

21  A    I don't remember the exact amount but it was --

22  Q    There were a number of them?

23  A    A number of different electronic devices, yes.

24  Q    Computers, phones, various flash drives or external hard

25  drives, things of that nature?

SN    OCR    RPR

A-525

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 105 of 216 PageID #: 936

Liefke - cross - Singer                    450

1   A     Yes.

2   Q     And all of these items were sent to a lab to be reviewed

3   by technicians?

4   A     Yes, they were.

5   Q     All right, so the last -- you just offered some testimony

6   about various Signal threads that were recovered from the

7   phone and these were Signal threads from Mr. Goklu's phone

8   with other people; correct?

9   A     Correct.

10  Q     And you -- I think the last one that you referenced was

11  the -- were the messages where the term washed was mentioned;

12  is that right?

13  A     Yes.

14  Q     Okay.  And this was with a person whose identification

15  along with the phone number on the top of the thread also says

16  the name Big Apple; is that right?

17  A     I don't know who -- I don't know if it was labeled or

18  not.

19            MR. SINGER:  Ms. Sahli, can we put up one page of

20  that.

21            MS. SAHLI:  This is Government Exhibit 228 in

22  evidence starting at page 12, message thread with Big Apple.

23            MR. SINGER:  Yes.

24  BY MR. SINGER:

25  Q     Mr. Liefke, you're able to see that on your screen?

SN    OCR    RPR

A-526

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 106 of 216 PageID #: 937

Liefke - cross - Singer                     451

1   A    Yes, I am.

2   Q    And let me direct your attention to the top of the page,

3   right, there's a phone number listed, correct; 1201 with some

4   other numbers, is that --

5   A    Correct.

6   Q    All right.  And that would be the phone number of the

7   person who was communicating with Mr. Goklu?

8   A    Yes.

9   Q    And underneath that there's the name Big Apple; right?

10  A    Yes.

11  Q    Would that be a nickname of some kind for the person who

12  is using that phone?

13  A    Correct.

14       MR. SINGER:  Thank you, Ms. Sahli.

15  Q    So I guess just to -- for clarity sake when we're talking

16  about this thread we're talking about Big Apple, okay?

17  A    Okay.

18  Q    So Mr. Goklu has a conversation with Big Apple a text

19  message conversation on Signal; correct?

20  A    Correct.

21  Q    And you reviewed the entire -- the entire thread?

22  A    Yes.

23  Q    Okay.  Meaning the entire text history that's on the

24  phone between those two people?

25  A    Whatever was still present on the phone, yes.

A-527

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 107 of 216 PageID #: 938

Liefke - cross - Singer                    452

1  Q    And there was a lot of ugliness on there, would it be

2  fair to say?

3  A    Yes.

4  Q    Name calling, threats, things of that nature?

5  A    Correct.

6  Q    Between the two -- between the Big Apple and Mr. Goklu?

7  A    Yes.

8  Q    Okay.  And the Reference to the term wash, that they

9  needed to wash some additional money, that reference was made

10 by Big Apple, is that correct, not by Mr. Goklu?

11 A    That is correct.

12 Q    And, in fact, the message, the bubble, I guess, that

13 is -- that contains the word wash in it, is the last bubble or

14 message in the entire thread with Big Apple; is that correct?

15 A    I don't recall off the top of my head.

16         MR. SINGER:  Ms. Sahli, if you can pull that up

17 please.

18         MS. SAHLI:  Government Exhibit 228 in evidence page

19 22.

20         (Exhibit published.)

21 BY MR. SINGER:

22 Q    I'm sorry, it was the third from the left.  This page

23 that's on the screen now is the -- is the end of the thread

24 that appears who Mr. Goklu's phone is that correct?

25 A    Yes.

SN    OCR    RPR

A-528

Case 1:19-cr-00386-PKC  Document 80  Filed 12/01/22  Page 108 of 216 PageID #: 939

Liefke - cross - Singer                    453

1  Q    And the series, I think there's one, two, three, four,

2  five, six bubbles -- six separate bubbles that have the dark

3  background.  Those were texts made by Big Apple; correct?

4  A    Yes, correct.

5  Q    Not by Mr. Goklu?

6  A    Not by the defendant, no.

7  Q    All right.  And, again, the third to the last where it

8  says I still got to wash another 29K and then two others after

9  that, that is the end of the thread between Big Apple and

10 Mr. Goklu that was recovered from the phone; is that right?

11 A    Yes.

12          MR. SINGER:  Thank you, Ms. Sahli.

13 BY MR. SINGER:

14 Q    And from your investigation, you have no evidence that

15 Mr. Goklu and Big Apple ever engaged in any transaction; is

16 that correct?

17 A    I do not know.

18 Q    Okay.  And that is the -- that one mention by Big Apple

19 of the term wash, is the only reference in the 350 or so pages

20 in Government Exhibit 228 of anything suggesting drugs; is

21 that correct, or money laundering?

22 A    Yes.

23 Q    And in your investigation of Mr. Goklu and I guess based

24 on review of all the -- all of his electronics, in various

25 forms, from the surveillance that you conducted, from the

SN      OCR      RPR

A-529

Case 1:19-cr-00386-PKC  Document 80  Filed 12/01/22  Page 109 of 216 PageID #: 940

```
                     Liefke - redirect - Diouf              454
```

1  interview that you had with Mr. Goklu after he was arrested,

2  you have no other evidence that Mr. Goklu engaged in any

3  transaction that you know involved money laundering or drug

4  money; is that correct?

5  A    I, I did not witness any other transactions besides the

6  ones I spoke about, no.

7  Q    Well, the ones that you spoke about, the various threads

8  that you testified about, the only one that references even

9  obliquely money laundering is the one with Big Apple; is that

10 correct?

11 A    I believe so, that --

12 Q    Okay.  Well, you know so, there were no other

13 communications or text messages referencing either directly or

14 by implication drug money; is that correct?

15 A    Correct.

16         MR. SINGER:  Thank you, sir, I have nothing else.

17         THE COURT:  Redirect?

18         MS. DIOUF:  Just very briefly.

19 REDIRECT EXAMINATION

20 BY MS. DIOUF:

21 Q    Mr. Liefke, in your training and experience, do people in

22 text messages usually explicitly reference drugs?

23 A    No, they do not.

24 Q    What about drug money?

25 A    No.

A-530

Case 1:19-cr-00386-PKC  Document 80  Filed 12/01/22  Page 110 of 216 PageID #: 941

Liefke - redirect - Diouf                    455

1    Q    What about money laundering?

2    A    No, they're trying to hide what their true intentions

3    are.

4              MS. DIOUF:  Thank you, nothing further.

5              THE COURT:  Any recross?

6              MR. SINGER:  No, Your Honor, thank you.

7              THE COURT:  Thank you very much you may step down

8    and you are excused.

9              (Witness excused.)

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN    OCR    RPR

A-531

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 111 of 216 PageID #: 942

Proceedings                                456

1           THE COURT:  Let me ask the government, do you have

2   another witness here?

3           MS. DIOUF:  We're checking, Your Honor.

4           THE COURT:  You know what folks, we're going to take

5   an early lunch break.  It's about quarter of 1 so be ready to

6   go again at 1:45 and we'll start again with the next witness,

7   might as well take our break now.  Enjoy your lunch.  Remember

8   don't talk about the case even with each other.  Don't do any

9   research and keep an open mind.  Have a good lunch everyone.

10          THE COURTROOM DEPUTY:  All rise.

11          (Jury exits.)

12          THE COURT:  Thanks, sorry about that quick change of

13  mind my deputy whispered to me.  I have a 1 o'clock civil

14  conference so this is perhaps better for me.  So folks be

15  ready to go as quarter to 2 and we'll start with your next

16  witness.

17          How many more, two more I think you said.

18          MS. DIOUF:  Yes, Your Honor two more and they are, I

19  expect, going to be very brief.  FinCEN witness and a

20  Department of Financial Services person and that's it.

21          THE COURT:  Okay.  In the interim my law clerk also

22  will give you a copy of the draft verdict sheet which won't

23  seem all that earth shattering I don't think, okay?

24          MS. DIOUF:  Thank you, Your Honor.

25          (Luncheon recess taken.)

SN      OCR      RPR

A-532

```
                    TARWACKI - DIRECT - MS. KASSNER            457

 1                         AFTERNOON SESSION

 2                    (Time noted 1:45 p.m.)

 3          THE COURTROOM DEPUTY:  All rise.

 4          (Jury enters the courtroom.)

 5          THE COURT:  Have a seat everyone.  I hope you had a

 6   good lunch Ladies and Gentlemen, and maybe got outside and

 7   enjoyed the weather.

 8          Okay.  So we'll have the Government call their next

 9   witness.

10          MS. KASSNER:  Thank you, Your Honor.

11          The Government calls Robert Tarwacki of the New

12   York State Department of Financial Services to the stand.

13          THE COURT:  All right.  Mr. Tarwacki, if you will

14   approach the witness stand up here and remain standing for a

15   moment so that you can be sworn in.

16          THE COURTROOM DEPUTY:  Please raise your right hand.

17          Do you solemnly swear or affirm the testimony you

18   are about to give will be the truth, the whole truth, and

19   nothing, but the truth?

20          THE WITNESS:  I do.

21          THE COURTROOM DEPUTY:  State and spell your name for

22   the record.

23          THE WITNESS:  Robert Tarwacki; T-A-R-W-A-C-K-I.

24          THE COURT:  You may inquire.

25          (Continued on the next page.)
```

Shernelle Griffith - Official Court Reporter

A-533

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 113 of 216 PageID #: 944

TARWACKI - DIRECT - MS. KASSNER          458

1   **ROBERT TARWACKI,**

2        called as a witness, having been duly

3        sworn, was examined and testified as follows:

4   DIRECT EXAMINATION

5   BY MS. KASSNER:

6   Q    Good afternoon.  Mr. Tarwacki.

7             Where do you currently work?

8   A    I work for the New York State Department of Financial

9   Services.

10  Q    What is your job title?

11  A    I am a criminal investigator.

12  Q    What geographic area does your office cover?

13  A    Our office covers the entire State of New York.

14  Q    Are you assigned to a particular unit or section?

15  A    Yes.  The Criminal Investigations Bureau.

16  Q    How long have you worked at the Criminal Investigations

17  Bureau?

18  A    Since March of 2008.

19  Q    What are your current job responsibilities as the -- at

20  the Criminal Investigations Bureau?

21  A    We investigate any violations of the banking law as well

22  as any violations of the superintendent regulations related to

23  the money services businesses throughout the state.

24             THE COURT:  You have to go slower.

25             THE WITNESS:  Sorry.

Shernelle Griffith - Official Court Reporter

A-534

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 114 of 216 PageID #: 945

TARWACKI - DIRECT - MS. KASSNER                459

1          THE COURT:  Remember, court reporter.

2          THE WITNESS:  Sorry.

3          THE COURT:  Yes.

4    Q    Have you obtained any certifications in connection with

5    your role as a criminal investigator?

6    A    I am a certified fraud examiner.

7    Q    Based on your training and experience, are you familiar

8    with the requirements for people and companies to engage in

9    the business of transmitting money in the State of New York?

10   A    Yes.

11   Q    Generally speaking, what is required to conduct a money

12   transmitting business in the State of New York?

13   A    You must be vetted by the Department of Financial

14   Services as well as your owners and operators.  You must

15   submit filings for a license and pay a fee.

16   Q    What is the purpose of the license and all of these

17   steps?

18   A    The license generally serves to protect the consumers of

19   the State of New York from practices that maybe harmful to

20   them.

21   Q    Does that licensing requirement apply to the exchange of

22   cryptocurrency for cash?

23   A    Yes.

24   Q    And move specifically, do you need a license to engage in

25   a business of exchanging BitCoin for cash in exchange for a

Shernelle Griffith - Official Court Reporter

A-535

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 115 of 216 PageID #: 946

TARWACKI - DIRECT - MS. KASSNER                460

1   fee in the State of New York?

2   A    Yes.

3   Q    And if you wanted to exchange BitCoin for cash in New

4   York State, can you briefly explain to the jury what exactly

5   you need do to get that license?

6   A    You would need to first apply with the Department of

7   Financial Services and then you would have to submit to a KYC

8   information for your customers as well as your owners and

9   principles for your organization.  The Department would then

10  vet that personnel as well as do background checks on both the

11  institutions and the individuals.  And then, examiners will do

12  a bi-yearly exam of the organization to make sure you maintain

13  those principles.

14  Q    You used the term "KYC."  What is KYC?

15  A    Know your customer.  It's general information about the

16  customers that are going to use your services.

17  Q    Is it in the regular practice of The New York State

18  Department of Financial Services to maintain records of

19  entities and individuals that are licensed to conduct the

20  business of money transmitting money?

21  A    Yes.

22  Q    Are you familiar with those records?

23  A    Yes.

24  Q    Are the records made and kept in the regular course of

25  business?

Shernelle Griffith - Official Court Reporter

A-536

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 116 of 216 PageID #: 947

TARWACKI - DIRECT - MS. KASSNER                    461

1   A      Yes.

2   Q      Are they saved in realtime?

3   A      Yes.

4   Q      Is the New York State Department of Financial Services is

5   under a duty to accurately record and maintain such records?

6   A      Yes.

7   Q      Is it the regular practice of members of the New

8   York State Department of Financial Services to search for and

9   retrieve licenses of individuals and companies engaged in the

10  business of transmitting money?

11  A      Yes.

12  Q      Have you personally conducted those searches?

13  A      Yes, I have.

14  Q      Were you asked to conduct a search of official records in

15  connection with this case?

16  A      Yes.

17  Q      Were you otherwise involved in the investigation of this

18  case?

19  A      No.

20  Q      Did you perform that search?

21  A      Yes, I did.

22  Q      Did you document the results of your search?

23  A      Yes.

24         MS. KASSNER:  So, with permission from Your Honor,

25  I'd like to show just the witness Government's Exhibit --

Shernelle Griffith - Official Court Reporter

A-537

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 117 of 216 PageID #: 948

TARWACKI - DIRECT - MS. KASSNER                    462

1   first what's been marked as Government's Exhibit 102.

2            THE COURT:  Yes, you may.  If you look on the screen

3   in front of you.

4            THE WITNESS:  Okay.

5   Q    And if you can just let us know when you can see it?

6   A    It's here.

7   Q    And let's start with Government's Exhibit 102 alone.

8            What is Government's Exhibit 102?

9   A    If you could just go back.  I have 103 on the screen.

10  Thank you.

11           Exhibit 102 is a certification from the Department

12  of Financial Services signed by myself stating that Mustafa

13  Goklu is not licensed to perform money service businesses in

14  the State of New York.

15           MS. KASSNER:  If we could also show just the witness

16  what has been previously marked as Government's Exhibit 103.

17  Q    Do you recognize Government's Exhibit 103?

18  A    I do.

19  Q    What is it?

20  A    Exhibit 103 is also a certification from the New

21  York State Department of Financial Services signed by myself

22  stating that Mustangy Corp. USA is not licensed to conduct

23  money service business in the New York State.

24  Q    How do you recognize Government's Exhibit 102 and 103?

25  A    I created them.

Shernelle Griffith - Official Court Reporter

A-538

TARWACKI - DIRECT - MS. KASSNER                463

1    MS. KASSNER:  At this time, the Government would

2    move to admit Government's Exhibit 102 and 103 into evidence

3    and publish them to the jury.

4    THE COURT:  Any objection?

5    MR. SINGER:  No, Your Honor.

6    THE COURT:  All right.  102 is admitted and you may

7    publish them.

8                     (Exhibit published.)

9    MS. KASSNER:  If we could first pull up

10   Government's Exhibit 102.

11   Q    What were the conclusions of your search of Mustafa Goklu

12   also known as Michael Goklu, with the listed date of birth and

13   social security number on Government's Exhibit 102?

14   A    When we conducted the search there were not results in

15   our licensing database for Michael Goklu or that social

16   security number.

17   Q    And Mustafa Goklu?

18   A    The same.  There were no results for Mustafa Goklu

19   either.

20   MS. KASSNER:  If you could pull up

21   Government's Exhibit 103 for the jury, please.

22   Q    What were the conclusions of your search with respect to

23   Mustangy Corp. USA with the listed identification number in

24   Government's Exhibit 103?

25   A    For Mustangy Corp. USA and the ID number provided, there

Shernelle Griffith - Official Court Reporter

A-539

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 119 of 216 PageID #: 950

TARWACKI - DIRECT - MS. KASSNER                    464

1   were no results in the licensing database.

2   Q    What, if anything, are you able to conclude based on your

3   search about whether Michael Goklu or Mustafa Goklu or

4   Mustangy Corp. USA is licensed to exchange BitCoin for cash in

5   the State of New York?

6   A    The Department of Financial Services does not recognize

7   the license for any of these entities or individuals.

8            MS. KASSNER:  Thank you, Your Honor.

9            No further questions.

10           THE COURT:  All right.  Thank you.

11           Your witness, Mr. Singer.

12           MR. SINGER:  I have no questions.

13           Thank you, judge.

14           THE COURT:  All right.  Thank you.

15           You are free to go.

16           Thank you very much, Mr. Tarwacki.

17           Does the Government have another witness?

18           MS. KASSNER:  Yes, Your Honor.

19           At this time the Government calls Theodore Vlahakis

20  of the U.S. Department of Treasury to the stand.

21           THE COURT:  All right.  Mr. Vlahakis, if you will

22  approach the witness stand and remain standing for one moment

23  so we can swear you in.

24           THE WITNESS:  Thank you.

25           THE COURTROOM DEPUTY:  Please raise your right hand.

Shernelle Griffith - Official Court Reporter

A-540

Case 1:19-cr-00386-PKC  Document 80  Filed 12/01/22  Page 120 of 216 PageID #: 951

```
                    TARWACKI - DIRECT - MS. KASSNER              465
```

1          Do you solemnly swear or affirm that the testimony

2    you are about to give is the truth, the whole truth and

3    nothing, but the truth?

4              THE WITNESS:  Yes, I do.

5              THE COURTROOM DEPUTY:  Thank you.

6              You can have a seat.

7              THE WITNESS:  Thank you.

8              THE COURTROOM DEPUTY:  Just speak into the

9    microphone.

10             Please state and spell your name for the record.

11             THE WITNESS:  Theodore Vlahakis.  T-H-E-O-D-O-R-E.

12             V-L-A-H-A-K-I-S.

13             THE COURT:  All right.  You may inquire.

14             (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

Shernelle Griffith - Official Court Reporter

A-541

Case 1:19-cr-00386-PKC  Document 80  Filed 12/01/22  Page 121 of 216 PageID #: 952

VLAHAKIS - DIRECT - MS. KASSNER                466

1  **THEODORE VLAHAKIS,**

2       called as a witness, having been duly

3       sworn, was examined and testified as follows:

4  DIRECT EXAMINATION

5  BY MS. KASSNER

6  Q    Good afternoon.

7  A    Good afternoon.

8  Q    Where do you currently work?

9  A    U.S. Department of Treasury Financial Crimes Enforcement

10 Network commonly known as FinCEN.

11 Q    How long have you worked at FinCEN?

12 A    Since March of 2009.

13 Q    When you started working at FinCEN, what was your role?

14 A    Bank Secrecy Act Specialist.

15 Q    What is the bank secrecy act?

16 A    The Bank Secrecy Act is a federal antimoney laundering

17 statute.

18 Q    What did your role as a Bank Secrecy Act Specialist

19 entail?

20 A    I address regulatory inquiries regarding the Bank Secrecy

21 Act for financial institutions, regulators, and law

22 enforcement via email and telephone.

23           THE COURT:  You can pull that microphone closer to

24 you.

25           THE WITNESS:  Oh.

A-542

```
                    VLAHAKIS - DIRECT - MS. KASSNER              467

 1          THE COURT:  Yeah, it moves.  There you go.
 2          THE WITNESS:  Thank you.
 3          THE COURT:  That's wonderful.  Okay.
 4   Q    Are you currently assigned to a particular unit or
 5   division at FinCEN?
 6   A    Yes, I am.
 7   Q    What is your current job title?
 8   A    Senior Compliance Officer.
 9   Q    What are your job responsibilities as a Senior Compliance
10   Officer?
11   A    I help to ensure that financial institutions understand
12   the requirements under the Bank Secrecy Act and I also provide
13   training to internal and external institutions.
14   Q    How long have you been doing that work?
15   A    Since July of 2017.
16   Q    Can you tell the jury a little bit about what FinCEN
17   does?
18   A    Sure.
19          FinCEN is a bureau of the U.S. Department of
20   Treasury tasked with protecting the financial system from
21   money laundering and other types of elicit financial activity.
22   Q    How does FinCEN accomplish that mission?
23   A    FinCEN accomplishes that mission by requiring certain
24   type of financial institutions to file reports with us and to
25   keep certain types of records and to have an antimoney
```

A-543

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 123 of 216 PageID #: 954

VLAHAKIS - DIRECT - MS. KASSNER                    468

1   laundering program.

2   Q    What is an antimoney laundering program?

3   A    An antimoney laundering program has as its purpose to

4   help ensure that a financial institution is not laundering

5   money wittingly or unwittingly.  And so, the purpose is to

6   help protect the financial institution -- to help protect the

7   financial system.

8   Q    Earlier and several times now you've mentioned financial

9   institutions.

10          What are some kinds of financial institutions that

11  FinCEN regulates?

12  A    Okay.  So when we think of as a depository institution,

13  so a bank or a credit union, but also a casino, a broker

14  dealer, a hedge fund, what is known as a money services

15  business, and various types of financial institutions.  We

16  require them to file certain reports with us and keep records

17  and have a money laundering program.

18  Q    Is there a minimum size of a business that FinCEN

19  regulates?

20  A    No.

21  Q    Could it be as small as one person?

22  A    Yes.

23  Q    You mentioned money service businesses.  What is a money

24  service business?

25  A    So we characterize a money service business based on the

Shernelle Griffith - Official Court Reporter

A-544

VLAHAKIS - DIRECT - MS. KASSNER                    469

1    type of activity, financial activity, that they conduct.  And

2    so, money service business is defined as, for example, a check

3    cashers a money transmitter, /-FPLT ers and/-S sellers of

4    money /PHUPB s, or /-RBGS paid access, U.S. Postal Service.

5    /S-FS are some example/K-FRPL .

6    Q    You mentioned money transmitters.  What is a money

7    transmitter?

8    A    Money transmitter is an entity that is engaged in money

9    transmission. And money transmission is defined as the

10   acceptance of currency funds or its equivalent from one person

11   or the location and the transmission of the currency funds or

12   its equivalent to another person or location by any means.

13   Q    Would that include somebody that engages in the business

14   of exchanging cryptocurrency, specifically BitCoin, for cash?

15   A    Yes.

16   Q    In exchange for a fee?

17   A    Sure.  Yes.

18   Q    Based on your training and experience, are you familiar

19   with the requirements for people and companies to engage in

20   the business of transmitting money in the United States?

21   A    Yes, I am.

22   Q    Generally speaking, what is required to conduct a money

23   transmitting business in the United States?

24   A    Number one, the money transmitter, since they are a money

25   services business, must register with FinCEN by completing

A-545

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 125 of 216 PageID #: 956

VLAHAKIS - DIRECT - MS. KASSNER                    470

1   what's called a registration of money services business form,

2   FinCEN 107, within 180 days of establishing their business or

3   conducting the first qualifying transaction.  And since

4   they're there financial institutions, they have to file

5   certain reports with us, including reports of suspicious

6   transactions, keep certain records and have an antimoney

7   laundering program.

8   Q   You mentioned a Form 107, what is the purpose of

9   requiring that registration, that Form 107?

10  A    When a money services business, a money transmitter

11  completes that form, it provides valuable information

12  regarding the type of business, the owner information, the

13  address, identifying information such as taxpayer

14  identification number, location supporting documents, primary

15  transaction account where the bank account is held.  And so,

16  that provides valuable information for FinCEN and law

17  enforcement officials to follow the paper trial.

18          MS. KASSNER:  If we could please show the witness

19  what has been previously marked as Government's Exhibit 105.

20          THE COURT:  Just the witness?

21          MS. KASSNER:  Just the witness.

22          THE COURT:  All right.

23          MS. KASSNER:  Thank you.

24  Q   If you could let us know when you see it on the screen.

25  A   I see it.

Shernelle Griffith - Official Court Reporter

A-546

VLAHAKIS - DIRECT - MS. KASSNER                471

1  Q    Do you recognize Government's Exhibit 105?

2  A    Yes, I do.

3  Q    What is it?

4  A    FinCEN Form 107, Registration of Money Service Business.

5  Q    How do you recognize Government's Exhibit 105?

6  A    This form was created and maintained in the ordinary

7  course of business.

8  Q    And is this a form that you use in your role at FinCEN?

9  A    Yes.

10           MS. KASSNER:  At this time, the Government would

11  move to admit Government's Exhibit 105 into evidence and

12  publish it to the jury.

13           THE COURT:  Any objection?

14           MR. SINGER:  No, Your Honor.

15           THE COURT:  All right.  105 is admitted and you may

16  publish.

17           (Exhibit published.)

18           MS. KASSNER:  So if we could turn to Page 2 of

19  Government's Exhibit 105.  And blow up the section that says

20  part two, registrant information.

21  Q    Can you please explain to the jury what a registrant is

22  required to fill out as part of part two of the Form 107?

23  A    Sure.

24           So this is information relating to --

25           THE COURT:  You may want to wait.  I can't read it

Shernelle Griffith - Official Court Reporter

A-547

```
                    VLAHAKIS - DIRECT - MS. KASSNER              472
```

 1   on the large screen.

 2            MS. KASSNER:  If we can just blow up the top part.

 3            Is that clearer?

 4            THE COURT:  No.  This screen is terrible.  It is so

 5   washed out is the problem.  There we go.  Much better.

 6            Thank you.

 7   Q    So according to this part of the Form 107, what is a

 8   registrant required to provide in terms of information?

 9   A    So in part two, a registrant is providing very basic

10   information about their business and their identity.  So their

11   name, their address, taxpayer identification number.  And if

12   it's a corporate entity, they'd indicate that and they would

13   input the corporate information, such as the business name,

14   business address.  And so, that's what we want to know.  Also

15   website, you can see email, compliance contact.  So just very

16   basic information that we would expect the business would have

17   on file.

18            MS. KASSNER:  Moving to Page 3 of

19   Government's Exhibit 105.

20   Q    There's a section at the top that says, part three, owner

21   or controlling person.

22            What is a registrant required to provide here in

23   terms of information?

24   A    So this is the person who owns or controls the money

25   services business.  And especially when we're talking about

                    Shernelle Griffith - Official Court Reporter

A-548

VLAHAKIS - DIRECT - MS. KASSNER                473

1  entities, corporate entities, in part two.  Here in part

2  three, we want to know the person behind the entities.  We

3  don't just want the business information names and identifying

4  information, we want to know the person who is actually

5  controlling it.  The individual identifying with the business.

6  Q    Why does FinCEN request this information?

7  A    It's the theme of the paper trial.  So it allows FinCEN

8  and law enforcement to understand who is conducting this

9  business.  And these businesses are required to file certain

10  reports with us so we can cross reference the information in

11  the reports with the information in this form.

12           MS. KASSNER:  Moving to the bottom of this, there's

13  a section part four that says, money services and product

14  information.  And perhaps we can just blow up the very top

15  with the heading so everyone can see it.

16  Q    What kind of information is a registrant required to

17  provide as part of part four?

18  A    Okay.  In part four, FinCEN is requesting information

19  relating to the types of activities the money service business

20  is engaged.  So that could be, money transmission, as I

21  mentioned earlier.  It could be check cashing, issue or sale of

22  money orders, prepaid access and product information.  And also

23  we're requesting information relating to the location where

24  they are conducting business.  Is it in one or more states,

25  all states, territories.  And they would check the

A-549

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 129 of 216 PageID #: 960

VLAHAKIS - DIRECT - MS. KASSNER                    474

1   corresponding boxes relating to both geographical and product

2   services information.

3         MS. KASSNER:  If we could turn to the next page of

4   Government's Exhibit 105, which I believe is Page 5. At the

5   top there is a section that says part five.

6         Moment.

7   Q    Part five, primary transaction account for MSB

8   activities.

9         What is an MSB?

10  A    Money services business.

11  Q    At a high level, what kind of information is the form

12  asking for?

13  A    Just where they keep their bank account.  So which

14  financial institutions holds their account.

15  Q    Why does FinCEN request this information?

16  A    So I go back to the paper trial theme.  And in this case,

17  we would like to know the financial institution name and

18  information because financial institutions, including

19  depository institutions, can file reports, including reports

20  of suspicious activity on money services businesses.  And

21  also, this is very helpful for foreign located MSBs.  So those

22  are MSBs that are not physically located in the United States,

23  but are availing themselves of this jurisdiction.  Maybe they

24  have U.S. based customers.  And, if so, we would like to know

25  where the primary transaction account is.

Shernelle Griffith - Official Court Reporter

A-550

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 130 of 216 PageID #: 961

VLAHAKIS - DIRECT - MS. KASSNER                475

1          MS. KASSNER:  Turning to the second part of this
2   form.  There is a section that says part six.  If we can blow
3   that up.
4   Q    Part six says, location of supporting
5   documentation/address of agent for service of process.
6          What is part six requesting?
7   A    Okay.  So part six, just building off of my previous
8   point relating to foreign MSBs.  If the MSB is in a foreign
9   country, we would like to know where are they keeping their
10  supporting documentation.  So information relating to the type
11  of business, you know, business volumes, and also their
12  investment agent service process since they're using this
13  jurisdiction to conduct activity.  So that's all that's asking
14  for.
15         MS. KASSNER:  Okay.  If we can take this exhibit
16  down.
17         Thank you.
18  Q    In addition to registering with the U.S. Secretary of
19  Treasury by filing a Form 107.
20         What, if anything, else is a money transmitting
21  business required to do to transmit money in the United
22  States?
23  A    Okay.  So they are required to have what's known as a
24  antimoney laundering program and they also are required to
25  file certain reports with FinCEN.  And by reports, I'm

Shernelle Griffith - Official Court Reporter

A-551

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 131 of 216 PageID #: 962

VLAHAKIS - DIRECT - MS. KASSNER                476

1  referring to reports possibly related to suspicious

2  transactions and also reports of transactions in currency over

3  $10,000.  And they also required to keep certain records,

4  internal records.  So they're not filing reports of those

5  records.  They're just keeping them internally.

6  Q    Are all these requirements setout in a place that is

7  available to the public?

8  A    Yes.

9  Q    Where is it available?

10  A    On the FinCEN public website.  If you go to

11  www.FinCEN.gov there is a special pretty visible tab for money

12  services business.  And anyone can click on that tab and we

13  have FAQ documents that describe what a money services

14  business is in far more detail than I have just described,

15  what qualifies as an MSB.  What an antimoney laundering

16  program is.  We have materials in English, and I believe,eight

17  foreign languages. And, you know,if someone reads over those

18  materials and are still confused, they can contact the

19  regulatory helpline, which I mentioned I was working in that

20  helpline for almost nine years, and pose their questions via

21  email or telephone and it is answered within 24-hours.

22  Q    Does FinCEN maintain a database of all of the registered

23  money transmitting businesses?

24  A    Yes.

25  Q    Are you familiar with the contents of those records?

Shernelle Griffith - Official Court Reporter

A-552

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 132 of 216 PageID #: 963

VLAHAKIS - DIRECT - MS. KASSNER                477

1    A    Yes.

2    Q    Are the records made and kept in the regular course of

3    FinCEN's business and activities?

4    A    Yes.

5    Q    Are they saved in realtime?

6    A    Yes.

7    Q    Is FinCEN under a duty to accurately record and maintain

8    such records?

9    A    Yes.

10   Q    Is it the regular practice of FinCEN employees to search

11   for or retrieve registrations of individuals and companies

12   engaged in the business of transmitting money?

13   A    Yes.

14   Q    Have you personally conducted searches of registrations

15   and records pertaining to money transmitters?

16   A    Yes.

17   Q    On approximately how many occasions?

18   A    I would say at least 30.

19   Q    Was FinCEN asked to conduct a search of official records

20   in connection with this case?

21   A    Yes.

22   Q    Did FinCEN perform that search?

23   A    Yes.

24   Q    Did you personally review the results of that search and

25   confirm that they were accurate?

Shernelle Griffith - Official Court Reporter

A-553

VLAHAKIS - DIRECT - MS. KASSNER                478

1   A    Yes, I did.

2   Q    Were you otherwise involved in the underlining

3   investigation of this case?

4   A    No.

5   Q    Did FinCEN document the results of its search?

6   A    Yes.

7        MS. KASSNER:  At this time, I would request to show

8   just the witness what has been previously marked for

9   identification as Government's Exhibit 101.

10       THE COURT:  All right.

11  Q    Do you recognize Government's Exhibit 101?  And you can

12  let us know when you see it.

13  A    Sure.  I'm still waiting for it.

14  Q    It might take a moment.

15  A    I see it now.

16  Q    What is Government's Exhibit 101?

17  A    Government's Exhibit 101 is the records of our certified

18  search for BSA records and this is just a cover letter.

19       MS. KASSNER:  If we could turn to Page 2 and then

20  also show this Page 3.

21  Q    What are those pages?

22  A    These pages document the results of our search for the

23  entities named in the report.

24  Q    How do you recognize Government's Exhibit 101?

25  A    This is a record that is created and maintain in the

Shernelle Griffith - Official Court Reporter

A-554

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 134 of 216 PageID #: 965

VLAHAKIS - DIRECT - MS. KASSNER                479

1   ordinary course of business by FinCEN.

2   Q    And have you reviewed it before?

3   A    Yes.

4         MS. KASSNER:  At this time, the Government would

5   move to admit Government's Exhibit 101 into evidence and

6   publish it to the jury beginning with Page 2.

7         THE COURT:  Any objection?

8         MR. SINGER:  No, judge.

9         THE COURT:  All right.  101 is admitted and you may

10  publish.

11            (Exhibit published.)

12  Q    While we're pulling that up, you mentioned BSA.

13        Just for clarity, what does BSA stand for?

14  A    BSA stands for Bank Secrecy Act and that's the antimoney

15  laundering statute that requires financial institutions to

16  have certain recording keeping and reporting obligations.

17  Q    So just looking at just Page 2 of

18  Government's Exhibit 101, what were the results of the search

19  for a FinCEN registration for Mustafa Goklu AKA Michael Goklu

20  with the listed date of birth and social security number on

21  Government's Exhibit 101?

22  A    This indicates that a diligent search was not able to

23  reveal any registrations or FinCEN Form 107 registrations.

24        THE COURT:  Oh, I'm sorry.  It's not legible on this

25  overhead.

Shernelle Griffith - Official Court Reporter

A-555

Case 1:19-cr-00386-PKC  Document 80  Filed 12/01/22  Page 135 of 216 PageID #: 966

```
            VLAHAKIS - DIRECT - MS. KASSNER            480
 1          MS. KASSNER:  Your Honor, perhaps we could use the
 2   Elmo.  I don't know if that would help.
 3          THE COURT:  You know, it is really the projector.  I
 4   gather the jury is looking at the screen in front of them.  I
 5   don't know if you want to pivot that one over there a little
 6   bit more.  At least some people will be able to see that one.
 7
 8                (Continued on the following page.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Shernelle Griffith - Official Court Reporter

A-556

VLAHAKIS - REDIRECT - MS. KASSNER                481

1   MS. KASSNER:  (Continuing)

2          THE COURT:  Don't get it too far from the wall.  I

3   think you might be pulling the cord out.  Be careful.

4          I shouldn't have you moving furniture.  Why don't

5   you just go back to what you were doing.

6   BY MS. KASSNER:

7   Q    So you were just explaining what this second page of

8   Government Exhibit 101 indicates?

9   A    Correct.  It indicates that FinCEN has conducted a

10  diligent search for FinCEN 107, registration of money services

11  businesses and for these entities, and we were able to find no

12  such records for the dates ranging from January 1st, 2001

13  through July 20th, 2020.

14  Q    And turning to the third page of Government Exhibit 101.

15         What, if anything, is indicated by this page?

16  A    This page indicates the same information for a different

17  subject, Mustangy Corp USA.  We were able to after diligent

18  search, not able to locate any FinCEN Form 107 registration of

19  money service business forms for the dates January 1st, 2001

20  through July 20, 2020.

21  Q    Based on your search or FinCEN search, what, if anything,

22  are you able to conclude about whether Mustafa Goklu, also

23  known as Michael Goklu, or Mustangy Corp. USA registered a

24  money transmitting business with the U.S. Department of

25  Treasury.

AVERY ARMSTRONG - OCR

A-557

PROCEEDINGS                    482

1  A    There was no such registration submitted by or behalf of

2  either of those entities.

3            MS. KASSNER:  Just one moment, Your Honor.

4            THE COURT:  All right.

5            MS. KASSNER:  Nothing further, Your Honor.  Thank

6  you.

7            THE COURT:  Thank you.  Your witness.

8            MR. SINGER:  I have no questions.  Thank you.

9            THE COURT:  Okay.  Thank you very much Mr. Tarwacki.

10  You're free to do.

11            THE WITNESS:  Thank you very much.

12            (The witness steps down.)

13            THE COURT:  Government.

14            MS. KASSNER:  Your Honor, at this time, the

15  Government rests.

16            THE COURT:  All right.  So ladies and gentlemen,

17  since the Government has rested with respect to its

18  presentation of evidence, I do need a few minutes to discuss

19  some matters with the parties.  I'm going to give you an

20  early, but slightly shorter break.  So hopefully, you'll be

21  ready to go at 35 after 2:00.  Okay.

22            THE COURTROOM DEPUTY:  All rise.

23            (Jury exits the courtroom.)

24            (In open court; Jury not present.)

25            THE COURT:  Have a seat.

AVERY ARMSTRONG - OCR

A-558

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 138 of 216 PageID #: 969

PROCEEDINGS                                 483

1          So Mr. Singer, first of all, I want to ask you if

2    you've decided how you wanted to proceed, if, at all, with the

3    defense case.

4          MR. SINGER:  Your Honor we intend to rest.

5          THE COURT:  All right.

6          MR. SINGER:  I've discussed with Mr. Goklu his

7    constitutional right to testify in his own behalf, and he has

8    indicated that he will not be testifying.

9          THE COURT:  All right.  So Mr. Goklu, as you just

10   heard your lawyer, Mr. Singer, has confirmed for me that you

11   do not intend to testify in your own defense at this trial.

12         THE DEFENDANT:  Correct, Your Honor (in English).

13         THE COURT:  Okay.  I want to make sure that you feel

14   you've had sufficient time to discuss with your attorneys

15   whether or not to testify.

16         Do you feel like you've had enough time to discuss

17   that decision with them?

18         THE DEFENDANT:  Your Honor, I decided I'm not going

19   to testify, yes (in English).

20         THE COURT:  But do you feel like you've had enough

21   time to make that decision.

22         You have to speak a little slower and clearer for

23   our court reporter.  Say that again.

24         THE DEFENDANT:  This morning I am not going to

25   testify in this court, Judge (in English).

AVERY ARMSTRONG - OCR

A-559

PROCEEDINGS                    484

1      THE COURT:  And you feel you've had enough time to

2  discuss that decision with your attorneys?

3      THE DEFENDANT:  Yes, Your Honor.  I have enough

4  time.  I discussed with my attorney (in English).

5      THE COURT:  Okay.  And you understand that you have

6  the write to testify, but as importantly, you have the right

7  not to testify, and the jury cannot consider the fact that you

8  did not testify in deciding whether you're guilty or not.

9      Do you understand that, right?

10     THE DEFENDANT:  Correct, Your Honor (in English).

11     THE COURT:  Okay.  And it's entirely up to you

12  whether you want to testify or not.

13     Do you understand that?

14     THE DEFENDANT:  Yes, Your Honor (in English).

15     THE COURT:  All right.  Thank you very much,

16  Mr. Goklu.

17     THE DEFENDANT:  Your Honor, thank you (in English).

18     THE COURT:  All right.  So we'll bring the jury back

19  in here.

20     Let me ask, also, is there any motion at this time

21  from the defense?

22     MR. SINGER:  Judge, the defense motion at this time

23  would be to dismiss the two counts of the indictment on the

24  ground that the evidence, even when viewed in the light most

25  favorable to the Government does not establish beyond a

AVERY ARMSTRONG - OCR

A-560

PROCEEDINGS                              485

1    reasonable doubt each and ever element of the two crimes

2    charged.

3              THE COURT:  All right.  Do you want to elaborate any

4    further on that with respect to either count, just to preserve

5    the record?

6              MR. SINGER:  No, Your Honor.  I will rest on the

7    record.

8              THE COURT:  All right.  So let me say I am denying

9    that request, which obviously can be renewed later.  But I'm

10   denying that because I do find that the evidence is sufficient

11   for the jury to find, beyond a reasonable doubt, that the

12   defendant is guilty of both the money laundering and the

13   unlicensed money transmitting crime.  The second crime is,

14   obviously, more straightforward in terms of the elements,

15   because it doesn't require a showing of intent of any kind or

16   even knowledge beyond knowing that he is engaging in what is

17   unlicensed money transmitting.  But the evidence has been

18   submitted by the Government and that is sufficient for the

19   jury to find that Mr. Goklu is engaged in the business of

20   exchanging BitCoin for money, and it appears also may be

21   selling BitCoin himself, based on the last bit of testimony

22   that came in through former DEA agent -- and I forgot --

23   Vlahakis I think his name was.

24             MS. KASSNER:  Liefke, Your Honor.

25             THE COURT:  Oh, Mr. Liefke.  That's right, Liefke.

AVERY ARMSTRONG - OCR

A-561

Case 1:19-cr-00386-PKC  Document 80  Filed 12/01/22  Page 141 of 216 PageID #: 972

PROCEEDINGS                              486

1          And so then it's a question of whether he had a

2    license or not, and the evidence we just heard established

3    that he neither had a license, as required by the State of New

4    York, nor was he registered as required by the Department of

5    Treasury.

6          With respect to the money laundering, I think the

7    real issue in dispute is the knowledge about the illegal

8    source of the funds or any intent to conceal or disguise the

9    source or assist with that.  And there has been testimony,

10   quite honestly, on both issues -- I mean, on both sides of

11   this issue that a jury can consider, but I do find that

12   there's enough that they could find beyond a reasonable doubt

13   that Mr. Goklu was aware, at least, that the undercover was

14   involved in the drug trade, and that the money that Mr. Goklu

15   was exchanging for him via these BitCoin transactions was

16   proceeds from that drug business, the illegal drug business.

17   And I know much was made of marijuana farms or cannabis farms

18   being legal in California.

19          And just to cite some of this evidence so the record

20   is clear, in conversation 804, there was this -- and I say

21   804, meaning Government Exhibit 804 which happened on

22   December 11, 2018.  The undercover pointedly referenced keys,

23   K-E-Y-S, trying to introduce the idea to Mr. Goklu that the

24   undercover was purportedly involved in drug trafficking.

25   There were several references made by the undercover to

A-562

Case 1:19-cr-00386-PKC  Document 80  Filed 12/01/22  Page 142 of 216 PageID #: 973

PROCEEDINGS                    487

1  dealing with college kids, his head being chopped off by his

2  people in California that he was working with, again, in an

3  effort to build this narrative or profile as a drug dealer

4  with Mr. Goklu.  That came from Government Exhibit 806.  The

5  UC also mentioned in that conversation that he couldn't touch

6  CoinBase.  Again, trying to suggest that the source of his

7  money was illegal.

8          There were, of course, many references to the

9  defendant himself being very law enforcement conscious,

10  concerned about being detected by the NYPD in particular.  The

11  defense has obviously offered a counter narrative about that.

12  Namely, that Mr. Goklu simply believed that the police would

13  always act first, take his money, and then figure out later

14  whether or not there was any illegality, and that Mr. Goklu

15  was simply concerned about these spurious activities by law

16  enforcement, and not about -- and not being -- or rather not

17  being concerned that he was, himself, engaging in anything

18  illegal, and certainly, not engaging in drug dealing, which he

19  said on numerous occasions.

20          In Government Exhibit 806, the undercover made clear

21  that he could get Mr. Goklu oxy and Adderall, A-D-D-E-R-A-L-L,

22  besides marijuana.  Specifically saying, that's what we do.

23  Mr. Singer, of course, brought out the fact that Mr. Goklu had

24  no idea what oxy was, so it seemed, and that in general,

25  Mr. Goklu never bit, if you will, on any of these leads about

A-563

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 143 of 216 PageID #: 974

PROCEEDINGS                         488

1   drug dealing or expressed any interest or one might argue,

2   even that it registered what the undercover was talking about.

3   But again, that's for the jury to decide, what all of those

4   conversations mean or if they reflect Mr. Goklu's

5   understanding that the money he was -- or that the BitCoin he

6   was getting from the undercover was proceeds of drug activity,

7   illegal drug activity.

8           And then just a couple of other notes.  In

9   Government Exhibit Number 807, the UC again made pointed

10  remarks about his partner getting money -- oh, I'm sorry, the

11  defendant made a remark about his partner getting money from

12  hookers.  Again, potentially, some reflection of Mr. Goklu's

13  own understanding that the financial transactions he and his

14  partner were involved in were from individuals who engaged in

15  criminal activity.

16          There were also references to the car being

17  bullet-proof, and also a number of conversations about

18  Mr. Goklu's desire to keep the amount of the transactions

19  below $100,000 and closer to $40,000.  Again, suggesting, but

20  it's for the jury to decide, whether or not those indicate

21  Mr. Goklu's understanding and knowledge that he was doing

22  something illegal.  And again, that inference could go either

23  to the unlicensed money transmitting or the alleged money

24  laundering.

25          And then in Government Exhibit 507, there is, of

AVERY ARMSTRONG - OCR

A-564

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 144 of 216 PageID #: 975

PROCEEDINGS                          489

1   course, the defendant's statement that he is not a drug guy,

2   and suggesting further that he wouldn't deal with drug

3   dealers, so I think even recognizing those statements, there

4   is enough for a jury to discredit that in some way, because as

5   the Government then pointed out, via conversation, Government

6   Exhibit 809, despite Mr. O'Kain, the undercover making clear

7   that he was selling illegal drugs, Mr. Goklu didn't, at that

8   moment say I don't want to deal with you.

9           So as I said at the outset, there is obviously

10  evidence that the parties will argue both ways on the issue of

11  intent to conceal or disguise money from illegal activities

12  for purposes of the money laundering charge, but nonetheless I

13  think the jury could find, as the Government argues, that

14  Mr. Goklu he is guilty of that.  So I will let this case go

15  forward to them.

16          All right.  So we'll bring the jury back in, we will

17  have the defense rest, and then I guess we could just go ahead

18  with our jury charge conference, because rather than wait

19  until 5:30, we have the luck luxury of more time, all right.

20          MS. KASSNER:  Yes, Your Honor.  And I'm not sure

21  what Your Honor's preference is, but we are -- we expect the

22  charging conference will be quite brief.  The Government has

23  one suggested edit and otherwise no comments, and so we are

24  prepared to close today if Your Honor would prefer to proceed.

25          THE COURT:  Well, that would be preferable.

AVERY ARMSTRONG - OCR

A-565

PROCEEDINGS                     490

1          Mr. Singer.

2          MR. SINGER:  Are you asking my preference or if I

3    could --

4          THE COURT:  Can you close today?

5          MR. SINGER:  If Your Honor directs me to close

6    today, I will.  I would prefer to do it in the morning.  It's

7    not -- it was not clear to me until Agent Liefke briefly got

8    on the stand, until we finished the direct of Mr. O'Kain,

9    exactly the extent to which the Government was going to be

10   introducing various pieces of evidence or what the testimony

11   would be.  And so I --

12         THE COURT:  I find that --

13         MR. SINGER:  I would appreciate the time to process

14   that so that I can make a, I think, fuller and more coherent

15   closing argument.

16         THE COURT:  All right.  Well, let's first see where

17   we end up with the charge conference.  My priority, of course,

18   is the jury's time, because I don't really want to delay it

19   unnecessarily, and it seems that we could finish this charge

20   conference within an hour, and it's just 2:30 now.  So I

21   really want to void having them come back unnecessarily or to

22   have their deliberation time shortened because tomorrow is

23   Friday.  And so the sooner they get the case, the more time

24   they have and won't feel rushed to end their deliberations so

25   that they finish by Friday.  That's my concern.

AVERY ARMSTRONG - OCR

A-566

Case 1:19-cr-00386-PKC  Document 80  Filed 12/01/22  Page 146 of 216 PageID #: 977

PROCEEDINGS                491

1      MR. SINGER:  But the alternative, Your Honor, is to

2   have them sitting around waiting for an hour, perhaps, and

3   then perhaps staying later this evening.

4          I understand we want to be finished this tomorrow.

5          THE COURT:  But do you have any objections to the

6   jury charge, because this could take all of 10 minutes?

7          MR. SINGER:  I have some.

8          THE COURT:  But realistically, do you think this is

9   going to take more than a half an hour?

10         MR. SINGER:  Probably not.

11         THE COURT:  All right.

12         MR. SINGER:  But again, it's a matter of my

13  processing the information that came in at the end, both,

14  certainly, with Mr. O'Kain, as well as with Mr. Liefke's

15  testimony.

16         THE COURT:  Yeah.

17         MR. SINGER:  And being able to process that to make

18  a coherent argument on behalf of my client, and I would

19  appreciate the time to do that.

20         THE COURT:  I understand that.  But please

21  understand what this means, though, because this has some

22  consequence for your client, and I certainly don't want to

23  hear any complaint that somehow the jurors are going to be

24  rushed because it's Friday and they'll get the case by maybe

25  mid morning tomorrow because we won't use the two hours or so

A-567

Case 1:19-cr-00386-PKC  Document 80  Filed 12/01/22  Page 147 of 216 PageID #: 978

PROCEEDINGS                          492

1   we have today.  So what will happen is tomorrow the Government

2   will open -- do their initial closing, you will give your

3   closing, and then the Government will rebut, and then I have

4   to give them instructions.  So we'll probably not give them

5   the case until noon, maybe, I would guess.  That's two and a

6   half hours from when we start.  Yeah.

7       MR. SINGER:  I understand that.  And they have the

8   day that they'll have certainly a number of hours in the

9   afternoon to deliberate, and if they doesn't finish their

10  deliberations by the end of the day, it'll goes over.  There's

11  nothing unusual about that.

12      THE COURT:  No.  But a very standard argument I hear

13  then is, oh, the jury felt pressured to be done by Friday

14  because they didn't want to come back on Monday.  I just want

15  to make sure you understand and appreciate that.  Listen, I'm

16  willing to give you more time --

17      MR. SINGER:  I --

18      THE COURT:  Hang on.  Please let me finish.

19      If your preference is to put off closings and

20  summations until tomorrow, you will let you do that, but I

21  want you to, sort of, understand that one potential

22  consequence is the jury will have less time on a Friday

23  afternoon to reach a decision, and sometimes, attorneys

24  believe that that puts pressure on the jury to reach a

25  decision more hastily so they don't have to come back in on

AVERY ARMSTRONG - OCR

A-568

PROCEEDINGS                    493

1   Monday.

2           MR. SINGER:  I'm not concerned about that, Judge.

3           THE COURT:  All right.  So I'll let them go early

4   today and then they don't have to sit around for the jury

5   charge conference and then you'll sum up first thing in the

6   morning, starting at 9:30.  So I'll bring them back in solely

7   for the purpose of letting the defense rest and then letting

8   them go early.

9           THE COURTROOM DEPUTY:  All rise.

10          (Jury enters the courtroom.)

11          THE COURT:  All right.  So Mr. Singer, does the

12  defense intend to present any evidence?

13          MR. SINGER:  No, we do not.  The defense rests, Your

14  Honor.

15          THE COURT:  All right.  Thank you very much,

16  Mr. Singer.

17          So ladies and gentlemen, today has ended somewhat

18  unexpectedly earlier than I thought, so I'm going to let you

19  go today right now, because there are some other matters that

20  I need to address with the lawyers before they give their

21  closing statements to you tomorrow.  So that's going to happen

22  first thing tomorrow morning as soon as all of you get here,

23  so again, follow Ms. Gonzalez's instructions and aim for

24  9:00 a.m., and then we'll start promptly at 9:30.  So you'll

25  hear both sides' closing statements, Government, then the

AVERY ARMSTRONG - OCR

A-569

```
                       CHARGE CONFERENCE                    494
```

1   defense, and then the Government again, I'll give you the

2   instructions on the law, and then you'll begin your

3   deliberations right after that.  Okay.

4           So have a wonderful evening, enjoy the rest of the

5   afternoon, don't talk about the case, don't do any research,

6   and keep an open mind, all right.

7           THE COURTROOM DEPUTY:  All rise.

8           (Jury exits the courtroom.)

9           THE COURT:  Okay.  Have a seat, everyone.  Give me

10  one second to pull up something on my computer.

11          All right.  So I understand that the Government has,

12  at least, one comment about the draft charges that you

13  received yesterday.  And tell me what page that's on.

14          MS. KASSNER:  Yes, Your Honor.  It's on Page 25.

15          THE COURT:  All right.

16          MS. KASSNER:  Count Two.  It's the first element.

17  Actually, I believe it's 24.

18          THE COURT:  Twenty-four, yup.

19          MS. KASSNER:  So this is related to what the

20  Government raised at the beginning of the day where it says,

21  in the middle of the first paragraph, a money transmitting

22  business is a business which, for a fee, accepts currency for

23  transfer within or outside the United States.

24          I think the proposal is to change this to, funds,

25  and then to note, I instruct you that BitCoin qualifies as

AVERY ARMSTRONG - OCR

A-570

CHARGE CONFERENCE                    495

1    funds under the statute.

2           Alternatively, another option would be to write

3    currency, funds, or other value that substitutes for currency.

4    I'm not sure if that makes anything easier.  But I think the

5    purpose of this is to clarify that courts have held that

6    BitCoin qualifies as funds for purposes of this 1960 charge.

7           THE COURT:  So the proposal is simply to add a

8    sentence at the end of that paragraph and after the sentence

9    that defines conducted controlled, et cetera, as having their

10   plain meanings.

11          MS. KASSNER:  I would do it right after.  So I would

12   put it right after the sentence we're discussing.

13          So it would read, A money transmitting business is a

14   business which, for a fee, accepts funds for transfer within

15   or outside the United States.  I instruct you that BitCoin

16   qualifies as funds under the statute.  And then continue the

17   term, money transmitting includes transferring funds on behalf

18   of the public.

19          THE COURT:  Actually, let me look at what your --

20          MS. KASSNER:  And I confess, Your Honor, it's very

21   possible that the Government is responsible for using the term

22   currency in the first instance.  I will note that the

23   Government wasn't aware that there would be any argument that

24   BitCoin would not qualify as currency until Special Agent

25   Infante's testimony.

AVERY ARMSTRONG - OCR

A-571

CHARGE CONFERENCE                    496

1          THE COURT:  And hence the issue you raised this

2     morning.

3          MS. KASSNER:  Yes.

4          THE COURT:  And I know that you, Mr. Singer, don't

5     dispute that.

6          Do you have any objection to including that

7     language?  Because I do think we ought to put that issue to

8     rest and not have the jury speculate.  Even though there was

9     some testimony from the witness, I don't want the jury to

10    erroneously think that funds won't or don't include BitCoin,

11    as a legal matter.

12         MR. SINGER:  Judge, I think there's actually an

13    easier way of doing this that is consistent with the law on --

14    under this charge and the definition of a money transmitting

15    business, rather than changing the definition of money

16    transmitting business.

17         I would suggest leaving this sentence as is, that a

18    money transmitting business is a business which, for a fee,

19    accepts currency for transfer within or outside the United

20    States, and then you could add, for purposes of this statute,

21    BitCoin constitutes currency.  That solves the problem that

22    the Government is rasing, but leaves the definition consistent

23    with what the law is on this statute.

24         THE COURT:  Right.  It doesn't sound like a bad

25    suggestion.  I just want to -- let me take one look.

AVERY ARMSTRONG - OCR

A-572

```
                     CHARGE CONFERENCE                    497
```

1          MR. SINGER:  And I do not intend to argue the point

2     that BitCoin is not currency under the statute.

3          MS. KASSNER:  And Your Honor, just very briefly, the

4     reason for the preference for the term, funds, is because

5     that's actually the word used in the statute.

6          THE COURT:  That's what I was thinking.  I think

7     it's actually not currency, right, and that's what I wanted to

8     look up just now.  We don't recite that part of 1960, but that

9     is correct, that the words funds and not currency is used,

10    correct?

11         MS. KASSNER:  Yes, Your Honor.  I believe it's under

12    XXXI U.S.C. 5330(d)(1).

13         THE COURT:  Right.

14         MS. KASSNER:  Which defines money transmitting

15    business.  And it uses the term, Any person who engages as a

16    business in the transmission of funds.

17         THE COURT:  And did you say 5331?

18         MS. KASSNER:  5330(d)(1), I believe.  Of Title XXI

19    which I confess is not a Title I often consult.

20         THE COURT:  Right.  You probably don't stray outside

21    of Title XVIII.

22         Okay.  Here we go, 5330.

23         And did you say it was -- which subpart of 5330?

24         MS. KASSNER:  I believe it's (d)(1).

25         THE COURT:  Oh, here it is.  Yes, it is.

A-573

```
                          CHARGE CONFERENCE                      498
```

1       Okay.  So it uses all these words, transmission of

2    currency, funds, or value that substitutes for currency.  I

3    mean, so I actually don't know why we just don't do that.  But

4    your preference, I guess -- and I'm referring to the

5    Government -- is just to use the word fund instead of

6    currency, even though all of them are included?

7       Why don't we use the whole definition.

8       MS. KASSNER:  Yeah, that's the other suggestion.  I

9    think either one is fine.

10      The other suggestion would be currency, funds, or

11   other value that substitutes for currency or some variant on

12   that.  I think any of that that will be fine, Your Honor.

13      THE COURT:  Yeah, Mr. Singer, I think if we want to

14   stay true to the statute, why don't we just use what's in 31

15   United States Code, Section 5330(d)(1)(A), and that it

16   literally refers to currency, funds, or value that substitutes

17   for currency, and then add a sentence that BitCoin qualifies

18   as -- here's the question, currency or funds.

19      MR. SINGER:  I'm sorry, which section of 53 --

20      THE COURT:  5330(d)(1)(A), definitions.  And

21   specifically, the definition of money transmitting business,

22   subpart A which basically says a money transmitting business

23   provides -- it has a number of different things -- but

24   currency exchange or money transmitting or remittent services,

25   et cetera, et cetera.

A-574

Case 1:19-cr-00386-PKC  Document 80  Filed 12/01/22  Page 154 of 216 PageID #: 985

CHARGE CONFERENCE                      499

1     MR. SINGER:  So how much of the language of

2   (d)(1)(A) would you include?

3     THE COURT:  So if you look just midway through the

4   subpart A paragraph where it says, and starts, Any other

5   person who engages as a business in the transmission of

6   currency, funds, or value that substitutes for currency.

7     So all I'm proposing is that we insert after,

8   currency, in our current instruction, the terms, funds or

9   value that substitutes for currency.

10    MR. SINGER:  Okay.  So the instruction would read --

11    THE COURT:  So while you're looking at that up --

12    MR. SINGER:  So a money transmitting business is a

13  business which, for a fee.  Is that still how it's going to

14  read?

15    THE COURT:  Yes.  Accepts, currency, funds, or the

16  value that substitutes for currency or value that substitutes

17  for currency.  No, the.

18    MR. SINGER:  For transfer within or outside the

19  United States?

20    THE COURT:  Correct.

21    MR. SINGER:  That's fine.

22    THE COURT:  Then the additional sentence will read

23  something to the effect of, I advise you that BitCoin

24  qualifies under the law as, and then the question is currency

25  or funds or both?  I'm asking you, folks.

AVERY ARMSTRONG - OCR

A-575

```
                        CHARGE CONFERENCE                    500
```

1       In the case law, does it say that BitCoin is

2  considered currency, as you suggested, Mr. Singer, or funds,

3  as the Government has suggested.

4       MS. KASSNER:  Your Honor, the case law cause

5  discusses it in the context of funds because 18 U.S.C. Section

6  1960 only uses the word funds, and so I think it's fine to be

7  over-inclusive, but I think it's accurate to say that BitCoin

8  qualifies as a fund.

9       THE COURT:  Okay.  So the proposal would be then, I

10  advise you -- and this is a new sentence after the one we were

11  just discussing -- I advise you that BitCoin qualifies under

12  the law as a fund or funds?

13       MS. KASSNER:  Funds.

14       THE COURT:  Funds, plural.

15       Mr. Singer any objections to that?

16       MR. SINGER:  No.

17       THE COURT:  All right.  So we'll make those two

18  additions.

19       Does the Government have anything else?

20       MS. KASSNER:  No, Your Honor.

21       THE COURT:  Okay.  Mr. Singer, you said you had a

22  few objections.

23       MR. SINGER:  I do.  And some are repeating

24  objections that I've put in my earlier letter to the Court

25  objecting to some of the Government's language.

AVERY ARMSTRONG - OCR

A-576

CHARGE CONFERENCE                    501

1          THE COURT:  All right.

2          MR. SINGER:  And the jury was not here, so I took my

3     mask off.

4          THE COURT:  That's fine.  I did the same.

5          I mean, if you're worried about, whatever, exposure,

6     that's still --

7          MR. SINGER:  Worry, I worry all the time.  We all

8     worry.  But I'm willing to take that risk.

9          THE COURT:  Tell me the first page.

10         MR. SINGER:  Page 13, section O.

11         THE COURT:  Section O, undercover agent.

12         MR. SINGER:  The first sentence reads that, you have

13    heard testimony from an undercover agent from --

14         THE COURT:  Yup.  We'll correct that typo.

15         MR. SINGER:  From undercover agent.  And then this

16    is a part that I'm objecting to, who were employed by the

17    Government to investigate the defendant.

18         That's not accurate.  They were employed by the

19    Government to conduct investigations.  The way this reads --

20         THE COURT:  Hold on.  Why don't we just change it to

21    employed by the DEA?

22         So you have heard testimony from an undercover agent

23    who was employed by the DEA, period.

24         MR. SINGER:  Actually, it's more accurate undercover

25    agents -- actually, there was only one uncover.

AVERY ARMSTRONG - OCR

A-577

Case 1:19-cr-00386-PKC  Document 80  Filed 12/01/22  Page 157 of 216 PageID #: 988

CHARGE CONFERENCE                          502

1        THE COURT:  Right.

2        MR. SINGER:  From an uncover who was employed by the

3   DEA.

4        THE COURT:  Yes.  I don't think I need to --

5        MR. SINGER:  -- to investigate the defendant.

6        THE COURT:  Yeah.  I don't think I need to say that.

7   The Government, certainly, is going to make that argument,

8   because there was testimony that they did -- and I think,

9   Mr. Singer, you want to argue this too -- target your client

10  in particular, based on his advertisements.  But that's

11  argument.  So I don't need to say that.

12       MR. SINGER:  I get that.  My concern, as I read it,

13  is it sounds as though the specific reason that they were

14  employed by the Government was to investigate the defendant,

15  and that simply is not accurate.  That's part of their job,

16  conducting investigations.  They did investigate the

17  defendant, but it's a subtle difference.

18       THE COURT:  They have other responsibilities, okay.

19       So we'll say that you have heard testimony from an

20  undercover agent who was employed by the Drug Enforcement

21  Administration.

22       MS. KASSNER:  So the Government has no objection to

23  that.  I would just keep it plural because they sometimes were

24  on the phone, Special Agent Liefke and Special Agent O'Kain,

25  and when they were on the phone, Special Agent O'Kain was

AVERY ARMSTRONG - OCR

A-578

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 158 of 216 PageID #: 989

CHARGE CONFERENCE                                    503

1    acting uncover.  It's up to Your Honor --

2             THE COURT:  But to be clear, only O'Kain was the

3    undercover.  Liefke was his team member and did surveillance,

4    right?

5             MS. KASSNER:  Yes.  Except for when Special Agent

6    O'Kain called him on the phone, and said that comment, the

7    other three keys --

8             THE COURT:  He's not acting, really, as an

9    undercover or representing himself.  I don't want to confuse

10   the jury, because the only one who said I was working

11   undercover was O'Kain.

12            This strikes me as a very minor sentence.

13            MS. KASSNER:  Whatever Your Honor thinks is clearer.

14   It's not a legal objection, it's just whatever you think is

15   clearer.

16            THE COURT:  Let's just stick with the one because

17   really I think we're referencing O'Kain acting in this

18   undercover capacity.  I understand what you're saying that

19   Liefke played a part on the other end of the phone, but he

20   wasn't technically acting undercover.

21            And I actually don't know or don't remember if it

22   was testified to by O'Kain that the defendant could hear.

23            MS. KASSNER:  It was --

24            THE COURT:  It was, on speaker as opposed to --

25   because I know he heard the undercover as part of the

AVERY ARMSTRONG - OCR

A-579

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 159 of 216 PageID #: 990

CHARGE CONFERENCE                              504

1   conversation.

2          MS. KASSNER:  Special Agent O'Kain did say he

3   thought the defendant could hear.  I don't think that's really

4   that relevant.  I think the bigger part is how the jury

5   perceives the undercover.  I think it if you think it's easier

6   to say Special Agent O'Kain, that's fine.

7          THE COURT:  Or just one undercover.  Let's just

8   refer to the uncover in the singular.

9          Okay.  What else, Mr. Singer, about that paragraph

10  or anywhere else?

11         MR. SINGER:  Nothing else with regard to that

12  paragraph.

13         I will move to Page 15, letter R, evidence pursuant

14  to lawful procedure.  I object to that charge.  I think it's

15  unnecessary.  It's not an argument that has been or that I

16  intend to make on behalf of the defendant, and I think that

17  all it does is pats the Government on the back for following

18  rules.  I don't think the Court should be engaged -- there's

19  no need for the Court to give this instruction.  Why would

20  anybody think that there was anything improper about the

21  procedures used that the Government records matters, uses

22  undercover.  It's not an issue here and they highlight it

23  simply to say, Government, you did everything according to the

24  law, I don't think the Court should be taking sides in that

25  way.

A-580

CHARGE CONFERENCE                                    505

1           THE COURT:  All right.  You feel like it's an

2    attaboy?

3           MR. SINGER:  Yes.

4           THE COURT:  I'm not going to remove of that.  I

5    think it's good to avoid people's concerns about privacy and

6    whether or not the Government was allowed to do what they did.

7    So mostly, as a preventive measure, I'm going to give that

8    instruction, which is pretty standard and dispels any notion

9    or hidden concern the juror numbers might have about whether

10   the Government was spying on people unlawfully.

11          I mean, I understand that you're not going to

12   arguing it, but I think in this day and age, it's not

13   unrealistic to think that people do have that concern.  So I

14   overrule that objection, but you've preserved it.

15          MR. SINGER:  I will move to Page 21.

16          THE COURT:  All right.

17          MR. SINGER:  The second paragraph at the top that

18   begins, In order to sustain its burden of proof.

19          THE COURT:  Right.

20          MR. SINGER:  I object to the inclusion of that

21   paragraph.

22          I think the elements of the charge and the

23   description of those elements is sufficient to inform the jury

24   of what the Government is required to prove, and the examples

25   that the Court puts into this proposed charge, is -- should be

A-581

CHARGE CONFERENCE                                    506

1    argument by the Government and should not be part of the

2    Court's charge.

3           Not required that you make any express affirmative

4    statement to the defendant.  I mean, you're telling them that

5    what is required is that the defendant believed that the

6    property was the proceeds of illegal activity.  That's what

7    the element is, that's what the statute calls for, and that's

8    what the element is, and then to break that down further, to

9    say, well, the Government doesn't have to do this, but they

10   could do this, it's invading their province.  It's a place for

11   the Government -- that the Government can properly and

12   appropriately make argument about that.  But again, it's the

13   Court inserting itself into the issue, and this is truly one

14   of the critical issues in the case.  I don't think it's the

15   Court's job to do that.

16          THE COURT:  So I'm going to overrule that objection

17   also.  This particular instruction is similar to what is

18   instructed with respect to conspiracy, for example, where we

19   often say to the jury, conspiracies are often secretive,

20   there's rarely a written agreement, or words to that effect,

21   because the jury has never encountered these sort of matters

22   before, so illegal conspiracies are, by their nature, secret

23   which is one of the things they always tell the jury, but

24   rather, they can, as they often do in their formal life, infer

25   from circumstances and actions of people that some agreement

AVERY ARMSTRONG - OCR

A-582

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 162 of 216 PageID #: 993

CHARGE CONFERENCE                         507

1   has been reached.  I think this is very similarly.  And quite

2   honestly, I think in that paragraph, the only potentially

3   unnecessary or invasive, as you say, sentence, is the first

4   one, because the latter part of that paragraph really states

5   what they do need to know.  And I don't suggest to them

6   specifically what they consider, but I tell them that they

7   have -- that they should decide whether, from all the

8   circumstances, a reasonable person would make the inference

9   that the proceeds were from illegal activity.  But I think

10  it's important to dispel the notion that the jury might have

11  that somehow there has to be some express affirmation or

12  affirmative statement, as this instruction says, that hey,

13  this is proceeds of illegal activity.  So I do find it's akin

14  to other instructions we give to the jurors who don't normally

15  deal with, somewhat, illicit conduct that isn't spoken about

16  explicitly or overtly so that they understand that they can

17  still find that the defendant had the requisite knowledge,

18  even if it wasn't stated to him in express terms.

19          So I'm going to leave that in, but again, your

20  objection is noted.

21          MR. SINGER:  Well, can I ask the Court to, perhaps,

22  consider removing the first sentence, then and simply

23  instructing the jury that in order to sustain its burden of

24  proof on this element, and then jump to the second sentence,

25  the Government must prove that the law enforcement made the

AVERY ARMSTRONG - OCR

A-583

Case 1:19-cr-00386-PKC  Document 80  Filed 12/01/22  Page 163 of 216 PageID #: 994

CHARGE CONFERENCE                    508

1  defendant aware of circumstances from which a reasonable

2  person would infer and on and on, and that just takes the

3  first sentence out.  That is, informing the jury fully as

4  you've indicated what needs to be done here.

5          THE COURT:  No.  I mean that's, I guess, what I was

6  trying to say to you, that I think that first sentence would

7  be the potentially objectionable one, if there is one.  But I

8  said I think for the reasons I've said before is that because

9  this is an area that the jury is less familiar with, they may

10  well wonder whether or not it's required that the plaintiff

11  say -- plaintiff, sorry -- that the undercover say, I'm

12  involved in drug dealing and these are my proceeds.

13          So again, I think it is necessary, just as we do in

14  other context, especially when it comes to illegal

15  conspiracies, to say some kind of explicit expression of the

16  illegality is not necessary with respect to the proceeds.

17          So I am denying even that request.  Okay.  But

18  again, you have your objection.

19          MR. SINGER:  We've moved to Page 22.

20          THE COURT:  Mm hm.

21          MR. SINGER:  I scrolled pass myself.

22          The first full paragraph beginning, In determining

23  whether the defendant believed that the property.

24          I am objecting to that paragraph.  Again, I think it

25  is invading the province of the jury.  I think it's certainly

AVERY ARMSTRONG - OCR

A-584

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 164 of 216 PageID #: 995

CHARGE CONFERENCE                           509

1   appropriate for argument by the Government if they choose to

2   make that argument.  But I don't think it's for the Court to

3   inject itself into that issue.

4           THE COURT:  Right.  Now this is a little trickier

5   because I think it's really a legal question.  It's a

6   conscious avoidance instruction.

7           In other words, again, it's letting the jury know

8   that they may not necessarily have to find that he knew that

9   the proceeds were from narcotics trafficking, but rather,

10  whether or not he deliberately closed his eyes to it.  So if

11  you're objecting that the standard is not appropriate, namely

12  a conscious avoidance kind of standard, that, I would want to

13  see some case law on.  But I don't recall that this was

14  raised -- and let me take a quick look.  I know it was the

15  Government's proposed instruction.

16          This is an instruction that has been used before, to

17  be sure, in the case -- and it was approved by the Second

18  Circuit in United States versus *Nektalov*, N-E-K-T-A-L-O-V, 461

19  F.3d 309, a decision from 2006.  But it is the Conscious

20  Avoidance Doctrine.  So I don't know if you're objecting to

21  the application of that doctrine or simply how that's worded.

22  But the doctrine itself has been upheld as appropriate in

23  cases like this involving guilty knowledge.

24          So what are you arguing, Mr. Singer?

25          Do you believe that it's not appropriate to give a

AVERY ARMSTRONG - OCR

A-585

```
                        CHARGE CONFERENCE                    510
```

1   conscious avoidance instruction?

2          MR. SINGER:  Well, the element is not so much

3   knowledge, as what the defendant actually believed.  The

4   Government has to establish that the defendant actually

5   believed that the purported proceeds were from narcotics

6   trafficking.

7          THE COURT:  But do you have a case?  Because as I

8   said, *Nektalov* actually approved this kind of conscious

9   avoidance instruction.

10         MR. SINGER:  I do not have a case to present to the

11  Court at this time, no.

12         THE COURT:  All right.  So does the Government want

13  to be heard on this?

14         MS. KASSNER:  Very briefly, Your Honor.  The

15  Government is relying on the *Nektalov* case which was approved

16  by the Second Circuit in 2008.  And it deals specifically

17  with --

18         THE COURT:  I think it's 2006, but it doesn't

19  matter.

20         MS. KASSNER:  I think the original case was 2006,

21  but I believe -- regardless, Your Honor.  I think that it

22  talks about money, conducting financial transactions with the

23  proceeds of narcotics trafficking and deliberately and

24  consciously avoiding confirming that fact.  I think it's

25  almost identical to the situation we're discussing here.  So I

AVERY ARMSTRONG - OCR

A-586

CHARGE CONFERENCE                511

1   think it's appropriate to include it and I think it's

2   consistent with the current case law.

3          THE COURT:  Right.  Let me also note that *Nektalov*

4   made the point of saying this instruction would be appropriate

5   only when a defendant asserts the lack of some specific aspect

6   of knowledge required for conviction, and secondly, the

7   appropriate factual predicate for the charge exists.  IE, that

8   there is evidence such that a rational juror could reach that

9   conclusion beyond a reasonable doubt that the defendant was

10  aware of a high probability of the fact in dispute and

11  consciously avoided confirming the fact, and that is precisely

12  the situation we have here.  So I am going to include the

13  instruction based on *Nektalov* and the plain applicability of

14  that decision to this case and to the defense in this case.

15  So it's both as to the requirements for money laundering and

16  the defense that's being asserted here which is lack of

17  knowledge or belief.

18         MR. SINGER:  Okay.  So let me now dig into that

19  paragraph and get a bit pickier.

20         THE COURT:  All right.  Give it a go.

21         MR. SINGER:  The next to last sentence beginning,

22  however, if you find that the defendant actually believed that

23  the proceeds involved in the charge transactions were not the

24  proceeds of narcotics trafficking, he may not be convicted.

25             While that is a true statement, it is not

AVERY ARMSTRONG - OCR

A-587

Case 1:19-cr-00386-PKC  Document 80  Filed 12/01/22  Page 167 of 216 PageID #: 998

CHARGE CONFERENCE                                    512

1    sufficient.  It's not the defendant doesn't need to establish

2    that he actually believed that the proceeds were not the

3    proceeds of narcotics trafficking.  The Government has to

4    prove the opposite.  And so the way this is worded it suggests

5    that the defense has some burden of establishing that he

6    actually believed, I would suggest adding, however, if you

7    find that the defendant actually believed that the proceeds

8    involved in the charge transactions were not the proceeds of

9    narcotics trafficking, or if you are not convinced beyond a

10   reasonable doubt that he actually believed that the proceeds

11   involved were not the proceeds of narcotics trafficking, he

12   may not be convicted.  I think it more accurately states what

13   the law is otherwise --

                    (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

AVERY ARMSTRONG - OCR

A-588

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 168 of 216 PageID #: 999

```
                       Charge Conference                  513
```

1    (Continued.)

2              THE COURT:  Now, it misstates it.  The problem is

3    you are now making an affirmative requirement that you find

4    actually believed as opposed to consciously avoided.  That's

5    the whole point.  The paragraph says, If you find they

6    consciously avoided knowing the truth.  And I know that

7    knowledge and belief, there's some daylight in between them or

8    if you say that second part or I added that that would be very

9    confusing or directly conflicting with the first part.

10             Now, I understand what you're saying about that

11   particular sentence, the "however" sentence suggesting that

12   the defendant has an affirmative duty to prove that he

13   actually believed, but I think when read in context, it's

14   really trying to say you can find he had the requisite

15   knowledge based on conscious avoidance, but if you find that

16   he actually believed that the proceeds were not from narcotics

17   trafficking, you cannot convict him.

18             MR. SINGER:  Can't both things be true?  Can't you

19   actually believe and also a finding be made that you

20   consciously avoided which should have been obvious to you?

21             THE COURT:  No.

22             MR. SINGER:  If he avoided learning it and as a

23   result of consciously avoiding it, he actually believed --

24             THE COURT:  No, no.  You're thinking of consciously

25   avoiding as I put my fingers in my ears and pretend I don't

```
                   SN      OCR      RPR
```

A-589

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 169 of 216 PageID #: 1000

Charge Conference                          514

1   hear you, as opposed to he actually had reason to believe it

2   and he chose not to accept or -- I don't know how to explain

3   it, but there isn't really a difference between believing it

4   and consciously avoiding it.

5          In other words, conscious avoidance suggests that he

6   understood it to be true, but still acted with -- it's

7   interesting0.

8          MR. SINGER:  What if the jury is uncertain on this

9   issue.  What if the jury is uncertain on whether he

10  consciously avoided it.  This language would suggest that to

11  find the defendant not guilty you have to find that he

12  actually believed --

13         THE COURT:  Well, we can re-word it this way:

14  However, if you find that the Government has failed to prove

15  beyond a reasonable doubt that the defendant consciously

16  avoided -- now here is a tricky word, consciously avoided,

17  believing or -- consciously avoided and learning I guess is

18  the best way to say it that the proceeds involved in the

19  charged transactions were the proceeds of narcotics

20  trafficking he may not be convicted.

21         MS. KASSNER:  Your Honor, I will point out -- I'm

22  scratching my head because the sentences do appear earlier in

23  the paragraph.  It says, Guilty knowledge may not be

24  established by demonstrating the defendant was merely

25  negligent, foolish or mistaken.  However, if you find beyond a

SN       OCR       RPR

A-590

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 170 of 216 PageID #: 1001

Charge Conference                                515

1   reasonable doubt that the defendant acted with a conscious

2   purpose to avoid learning about the source of the proceeds

3   involved in the charged transactions, then this element may be

4   satisfied.

5            I feel like if we just reword that sentence and put

6   it in the negative and then also the negative, I'm not sure

7   what more we're adding if that makes sense.

8            THE COURT:  I understand what you're saying.  The

9   weird thing that has been made clear to me is the word

10  consciously avoiding because I -- conscious avoiding --

11  consciously avoiding learning about something to me suggests

12  something akin to putting your fingers in your ears as opposed

13  to hearing the words and still intellectually not wanting to

14  believe it or draw the conclusion that's obvious.  And that's

15  what I think conscious avoidance is about; because the

16  defendant deliberately closed his eyes to what would otherwise

17  have been obvious to him.

18           The Government is going to argue, yes, he heard the

19  undercover say all of these things that were indicative of the

20  drug -- the money being drug proceeds, yet he chose not to

21  believe it.  That's essentially what conscious avoidance

22  means.

23           That's why I'm saying, Mr. Singer, you can't

24  actually say he didn't believe it.  You can't actually say one

25  believes it yet consciously avoided it.  The point is if

A-591

Case 1:19-cr-00386-PKC  Document 80  Filed 12/01/22  Page 171 of 216 PageID #: 1002

Charge Conference                516

1   you're consciously avoiding it, you're refusing to believe it

2   in some way.

3           So that's why I think we can't add the sentence that

4   you want -- how about this:  However, if you find beyond a

5   reasonable doubt that the defendant acted with a conscious

6   purpose to avoid learning about or believing that the source

7   of the proceeds involved in the charged transaction -- wait,

8   that doesn't actually help them.  Wait a second.

9           MS. KASSNER:  I think the sentence before it really

10  does answer this, Your Honor; guilty knowledge may not be

11  established by demonstrating the defendant was merely

12  negligent, foolish or mistaken as to his belief.  We could add

13  that?  That's really the point.  It's saying it -- a mistaken

14  belief, you would not be guilty of conscious avoidance.  It's

15  if you -- after the conscious purpose to avoid learning, then

16  you are guilty I think?  Maybe it belongs there.  Guilty

17  knowledge may not be established by demonstrating that the

18  defendant was merely negligent, foolish or mistaken as to his

19  belief about the source of the proceeds, something like that.

20          THE COURT:  And then --

21          MS. KASSNER:  And then it would mirror the sentence

22  that follows because it says, to avoid learning about the

23  source of the proceeds.

24          So if we put that part in the sentence before maybe

25  we could strike the sentence that's been flagged later all

SN     OCR     RPR

A-592

```
                         Charge Conference                    517

 1   together.

 2          THE COURT:  Right, but I think then it creates a

 3   gross imbalance because there's really only one sentence that

 4   suggests a contrary narrative, if you will, because you have

 5   then three sentences dedicated to explaining how conscious

 6   avoidance could satisfy this element and only one phrase or

 7   one sentence that says how it wouldn't.  I do agree that we

 8   should say it was merely negligent, foolish or mistaken as to

 9   his belief, although it's really as to his nonbelief, isn't

10   it?

11          So why would you add the word believe to that

12   sentence?  Guilty knowledge may be not be established by

13   demonstrating that the defendant was merely negligence,

14   foolish or mistaken as to his belief.

15          MS. KASSNER:  Belief about the source of the

16   proceeds.

17          THE COURT:  Well, no, believe that the proceeds were

18   not from drug trafficking.  I don't actually even like that

19   sentence now that I'm looking at it further.  I do think maybe

20   we could change this a bit, at least to shorten it.  What I

21   would suggest almost is take out the sentence that begins

22   guilty knowledge and the next sentence -- because the learning

23   about part suggests to me that you just exempted yourself from

24   the room or something as opposed to -- I think what this does

25   really get at is he had all the evidence before him but chose
```

SN        OCR        RPR

A-593

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 173 of 216 PageID #: 1004

Charge Conference                          518

1   to ignore it as opposed to I left the room every time they

2   talked about something illegal.

3          So the conscious learning about it is poorly phrased

4   to me.  Or conscious avoidance of learning about something

5   because I think it suggests, like I said, a different concept

6   and then, maybe if we jump then to the next sentence -- if you

7   find beyond a reasonable doubt that he was aware of a high

8   probability that the charged transactions involved the

9   proceeds of narcotics trafficking, et cetera, et cetera and

10  acted with deliberate disregard.  And then we just have to

11  find a better sentence for the "however" sentence.  And then

12  end with that.  And delete the last sentence.  I think there's

13  almost too much discussion about an arguably watered down --

14          MR. SINGER:  And I would also --

15          THE COURT:  An arguably watered down knowledge

16  requirement.

17          Go ahead, Mr. Singer.

18          MR. SINGER:  I also think that narcotics trafficking

19  should be illegal narcotics trafficking.

20          THE COURT:  Well, narcotics trafficking is used

21  throughout and I think it's presumptively illegal.  I don't

22  think we have to keep saying that.  It's used in this entire

23  instruction.  You know, I don't think the jury for a moment

24  will be confused because we say earlier on that the specified

25  unlawful activity is narcotics trafficking.  That's what it

SN        OCR        RPR

A-594

Charge Conference                                519

1    is, what is alleged so I don't think there's going to be any

2    confusion on that.  I want a replacement sentence for the

3    however sentence:  However, if you find that the Government

4    has failed to prove beyond a reasonable doubt.  And then just

5    recite the same language that the defendant deliberately

6    closed his eyes to what would have been obvious to him, then

7    he may not be convicted or would have been obvious to a

8    reasonable person or something like that.

9          I think we need to address what is a legitimate

10   concern that the defendant has an obligation to prove that he

11   believed it or just maybe that he acted with conscious

12   avoidance.

13         We could say this:  However, if you find that the

14   Government has failed to prove by a preponderance of the

15   evidence that the defendant consciously avoided -- no, that

16   the defendant acted with conscious avoidance of the high

17   probability that the charged transaction involved the proceeds

18   of narcotics trafficking, he may not be convicted.  I think

19   that -- it's the flip side of the sentence beforehand.

20         Government?

21         MS. KASSNER:  So I'm having a little bit of a hard

22   time following what's in and what's out.

23         THE COURT:  So here is how it would work.  First

24   sentence in determining remains the same.  Next sentence

25   guilty knowledge comes out.  The next sentence after that,

SN       OCR       RPR

A-595

Case 1:19-cr-00386-PKC  Document 80  Filed 12/01/22  Page 175 of 216 PageID #: 1006

Charge Conference                                   520

1   however, if you find beyond a reasonable doubt comes out.  We

2   then jump down to the sentence if you find beyond a reasonable

3   doubt that the defendant was aware of a high probability that

4   the charged transactions involved the proceeds of narcotics

5   trafficking and that the defendant acted with deliberate

6   disregard of the facts, you may find that the defendant acted

7   with the belief necessary to satisfy this element.

8          However, if you find that the Government has failed

9   to prove beyond a reasonable doubt that the defendant acted

10  with conscious avoidance of the high probability that the

11  charged transactions involved the proceeds of narcotics

12  trafficking, you -- he may not be convicted.  And the only

13  hesitation I have is because obviously they could find that he

14  knew and this conscious avoidance stuff is not relevant so, I

15  would hope that they understand that if they find that he just

16  knew that this wouldn't undercut that finding.

17         But I think that that sort of balances out the

18  instruction and then we would delete the last sentence as well

19  just as unnecessary:  I mean we could word it shorter.  We

20  could say, failed to prove beyond a reasonable doubt that the

21  defendant closed his eyes to the high probability, et cetera,

22  et cetera.

23         MR. NAVARRO:  Your Honor, I had a little bit of a

24  hard time following it as well but one concern is that when

25  you read it just now you used the term conscious avoidance and

SN      OCR      RPR

A-596

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 176 of 216 PageID #: 1007

Charge Conference                    521

1    I'm not sure that term is defined above.

2          THE COURT:  That is true.  Consciously avoided.  We

3    could not do that.  That's why I suggest just maybe closed his

4    eyes to the high probability or we could say that the

5    defendant was not aware of the high probability.  So if the

6    Government has failed to prove beyond a reasonable doubt that

7    the defendant was aware of a high probability and then go from

8    there.

9          MR. NAVARRO:  Your Honor, would this make sense to

10   see this in writing and send you something later tonight with

11   the proposed language and we can resolve it tomorrow because

12   it is a little hard to follow on our end.

13         THE COURT:  I do not find it hard but then again I'm

14   thinking about it in my head.  We can do it very easily.  I

15   think I've landed on the last iteration which is that that

16   sentence which is now going to be the last sentence that

17   begins however, the one that Mr. Singer is concerned about;

18   the actually believed sentence, okay.  Instead of that, it

19   will read however, if you find that the Government has failed

20   to prove beyond a reasonable doubt that the defendant was

21   aware of a high probability that the charged transactions

22   involve the proceeds of narcotics trafficking -- so this is

23   mirroring the language in the sentence before -- then he may

24   not be convicted.

25         I mean, I left out the part about deliberately

A-597

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 177 of 216 PageID #: 1008

Charge Conference                                     522

1  disregarded, I guess.  That's what I would propose but if you

2  guys have another proposal, that's fine.

3          Mr. Singer.  I'm not sure if you're following --

4          MR. SINGER:  No, I am, Judge, I've objected to the

5  whole charge and I will wait to see the final language that

6  the Court puts together.

7          THE COURT:  Listen, we'll just put it into a revised

8  charge.  You'll have time to look at it in the morning and let

9  me know what you think.  We'll come up with something that

10 addresses the concern that Mr. Singer raises, but I know it

11 doesn't resolve your objection to this entire instruction, but

12 just to break this down into two parts which is if you're

13 objecting as I think you are, Mr. Singer and Ms. Sahli to the

14 conscious avoidance instruction overall.  I overrule that

15 objection based on *Nektalov*.

16          But if you're objecting to particular language in

17 the instruction, I am partially agreeing with you and trying

18 to come up with some other language and am going to propose a

19 revised version of this instruction so as not to suggest any

20 burden on the defendant to prove that he actually believed

21 that the proceeds were not from narcotics trafficking and also

22 to create a more balanced instruction that's also shorter.

23 Okay?

24          MR. SINGER:  Next, Your Honor, a very minor point on

25 page 23 --

SN       OCR       RPR

A-598

Charge Conference                              523

1      THE COURT:  So my law clerk actually has written it

2  out so we'll print it out for you and you can take a look and

3  we can discuss it tonight if you want.

4      Go ahead, Mr. Singer.

5      MR. SINGER:  On page 23, again this is very minor it

6  says, in order for you to find the defendant guilty of the

7  crime charged in Count Two, the Government must prove beyond a

8  reasonable doubt each of the following four elements but

9  there's only three.

10      THE COURT:  Okay, yes.  That was a change we made,

11  yes, three elements.  We've corrected that on page 23.

12  Anything else?

13      MR. SINGER:  On page 24 of the first element money

14  transmitting business.

15      THE COURT:  Is this different than what we already

16  fixed?

17      MR. SINGER:  Yes.

18      THE COURT:  Okay.

19      MR. SINGER:  A business -- the sentence the third

20  sentence, a business is a commercial enterprise that is

21  regularly carried on for a fee or profit.  I think that

22  accurately it is a commercial enterprise that is regularly

23  carried on for a profit.  A fee is one matter -- one manner in

24  which a company may have earned a profit, but there are others

25  and I think the correct definition is that it's a commercial

SN      OCR      RPR

A-599

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 179 of 216 PageID #: 1010

```
                        Charge Conference                    524
```

1   enterprise carried on for a profit and by adding "fee" to it

2   because the term "fee" is in the term money transmitting

3   business as well, I think you're adding --

4            THE COURT:  Redundancy.

5            MR. SINGER:  Well, it's a redundancy because yes,

6   fee is -- fee is one way that a company earns a profit.  There

7   are otherwise.  It can be by speculation.  It can be by

8   markups on goods that are being sold.  There's a variety of

9   ways to make a profit.  A fee is just one of them and you're

10  highlighting the one that's in your next definition and that's

11  relevant to the facts of this case.  And so I think it's

12  not -- it doesn't properly belong there.  It should read

13  simply it's a commercial enterprise that is regularly carried

14  on for a profit.

15           THE COURT:  Does the Government's object to removing

16  fee in that sentence?

17           MS. KASSNER:  Yes, Your Honor.  We're searching now

18  for the source of the definition, but I think that it's

19  misleading to say it's regularly carried on for a profit.  You

20  can lose money and still run a business.  I think it's

21  misleading and I think the term "fee," these were, I believe,

22  from the Sands instructions but also we're searching now to

23  see where in the United States Code this definition is from.

24           Your Honor, we're concerned it adds this extra

25  requirement that the Government shows in business was carried

```
              SN        OCR        RPR
```

A-600

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 180 of 216 PageID #: 1011

Charge Conference                    525

1   on for a profit or to make a profit.  I think it's misleading

2   and confusing for the jury.

3          MR. SINGER:  Well, the fact that a business is

4   attempting to make a profit doesn't necessarily mean that it's

5   going to, but a commercial enterprise is one that's operating

6   to make a profit.  That's the idea behind it.  It's not done

7   to earn a fee.  It's done to earn a profit.

8          MS. KASSNER:  I think the idea is that it charges

9   money for its services.  I think that's what the fee is

10  referring to.

11         THE COURT:  Honestly I think the only reason I would

12  consider removing it is because the next definition for money

13  transmitting involves charging a fee.  I don't know which way

14  it cuts it because it suggests to me that the jury is going to

15  have to address that issue no matter what.  But I do think

16  it's not entirely correct, Mr. Singer that a business should

17  be described -- I mean, I understand what you're saying that a

18  fee is one way to make a profit, but I don't know if it's

19  accurate to simply say businesses are operated to make a

20  profit and that's how you define a business.  It does

21  introduce some motion of intend to make money, you know,

22  about -- above your costs, I guess, and that's irrelevant for

23  this definition because even a failing business or even one

24  when -- the intent to actually make money is irrelevant to

25  whether it's a business or not and I think that's the most

SN      OCR      RPR

A-601

|  | Charge Conference | 526 |
|---|---|---|

1  salient part of this discussion because under the statute, you

2  know, I think in theory they don't care what your intent is in

3  running it.  The point is you conduct regularly something

4  that's commercial because you make people pay for the service.

5  You know, whether you do it to make a profit or because you

6  enjoyed money transmitting is not really what makes it a

7  business.

8  　　　　　MR. SINGER:  That is a definition of a business --

9  　　　　　THE COURT:  You say that, but I don't think the

10  statute defines it unfortunately.  Maybe people in business

11  don't anticipate making a profit.  That's why you say it's --

12  that defines a business, I'm not sure that's true.  What makes

13  something a commercial business?  It's certainly something

14  offered to the public and in exchange -- it could be a

15  bartering system, I guess, right and I think that was sort of

16  your point which is fee is not the only way one operates but

17  I'm not sure making a profit is the definition of a commercial

18  business.

19  　　　　　MR. SINGER:  Well, the Government's request to the

20  Court included this language a business is a commercial

21  enterprise that is regularly carried on for profit.

22  　　　　　THE COURT:  But fee for profit.

23  　　　　　MR. SINGER:  No, just fee.

24  　　　　　THE COURT:  No, fee was added by the Court at the

25  Government's request.

A-602

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 182 of 216 PageID #: 1013

Charge Conference                527

1          MS. KASSNER:  Your Honor, he's correct.

2          MR. SINGER:  For a profit on page 13 of their

3    requested changes.

4          THE COURT:  Government, should we take it out

5    because since at the time you didn't think it was necessary

6    either.

7          MS. KASSNER:  So, Your Honor, the defense is correct

8    in the Government's proposal it does say a business is a

9    commercial enterprise that is regularly carried on for a

10   profit.  I will say now that the topic has been raised,

11   though, I am concerned a bit about the confusion that's

12   possible if any argument is going to be made that because he

13   didn't profit, it's not a business.

14         THE COURT:  Again, its intent to profit or set up

15   for that purpose.  We're going to take out fee or from that.

16   I don't think quite honestly this matters at all.  The idea is

17   that it's a regularly carried out activity that has a

18   commercial purpose and I think you can argue to the jury that

19   clearly the defendant was trying to make money and a lot has

20   been made by your agents about how much more he charged than

21   other, more publicly available services like this.

22         So we're going to take out fee or in that

23   instruction.

24         Mr. Singer, anything else?

25         MR. SINGER:  I've run out.  That's it.

A-603

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 183 of 216 PageID #: 1014

Charge Conference                              528

1          THE COURT:  All right, good.  Fida, can we give

2    copies of that one instruction --

3          THE COURTROOM DEPUTY:  I did already.

4          THE COURT:  Folks, take a quick look at that and see

5    if that resolves the issue.  Although I note that the defense

6    still has their objection to it wholesale.

7          MS. KASSNER:  Your Honor, the Government reviewed

8    the proposed change to the paragraph on the top of page 22.

9    This looks fine from the Government's perspective.

10         THE COURT:  Okay.

11         Mr. Singer, aside from your standing objection to

12   the instruction as a whole about conscious avoidance.

13         MR. SINGER:  I would agree that this language is

14   better than the way it was originally draft testified.

15         THE COURT:  Are you objecting to the language at all

16   because you can preserve your objection.

17         MR. SINGER:  No, no.

18         THE COURT:  But you're still objecting to the

19   inclusion of a conscious avoidance in this instruction?

20         MR. SINGER:  Yes.

21         THE COURT:  I think that resolves everything.  We

22   will send out a track change revised version and a clean copy

23   so you can take a look and make sure we've transcribed

24   everything correctly.  As I said to the jury, you will start

25   your closings at 9:30 and then I will instruct them right

SN        OCR        RPR

A-604

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 184 of 216 PageID #: 1015

|  | Charge Conference | 529 |
|---|---|---|

1   afterwards and I imagine they'll get the case before noon.  Do

2   you have a sense of how long your summations will be?

3          MS. KASSNER:  I'm going to try to speak slow, Your

4   Honor, so I'm hoping maybe 45 or 50 minutes, but --

5          THE COURT:  Are you doing the initial closing and

6   rebuttal?

7          MS. KASSNER:  No, Your Honor.  Ms. Diouf is doing

8   the rebuttal so she can advise.

9          MS. DIOUF:  Of course it will be contingent on

10   defense counsel's closing, but probably not more than 20

11   minutes.

12          THE COURT:  You'll try to speak lower too.

13          MS. DIOUF:  Absolutely.

14          THE COURT:  Mr. Singer, do you have any estimate

15   now.

16          MR. SINGER:  How long was my opening?

17          THE COURT:  You said 20 minutes and it was about 20

18   minutes.

19          MR. SINGER:  That's all.

20          THE COURT:  I don't recall --

21          MR. SINGER:  30, 40 minutes, I would think that's.

22          THE COURT:  I would think at least.  Fair enough.

23   So I was trying to get some sense of when we'll expect the

24   jury to get the case.  Ms. Gonzalez will ask them what they

25   want for lunch and I will ask them assume they get the case

A-605

Charge Conference                    530

1   before lunch they can deliberate over lunch or not but they

2   have to agree on whether or not they want to do that.

3            MR. SINGER:  Is it your practice to provide a

4   written copy of the instructions to the jury?

5            THE COURT:  One issue, yes.  So let me explain what

6   is going to go back to the jury.  All of the exhibits that

7   have been admitted will go back to the jury along with a set

8   of the instructions, which I will tell them as I'm reading

9   them to them so they don't try to furiously try to take notes.

10           We will also project on the overhead, as crummy as

11  it is, the instructions as I read them so they can follow

12  along.  I will advise the jury as I did before or I will

13  remind them as you see in the instructions that they can have

14  portions of the transcript sent back to them.  I did tell

15  them, though, I think that any charts that you folks use in

16  closing and I don't know if you plan to that weren't admitted

17  as evidence won't go back with them.  The Government made the

18  request to have the indictment sent back to the jury and I'm

19  not going to do that.

20           I never do because as I tell them it's just a

21  charge.  It's not evidence and I recapitulate for them the

22  portions of the indictment that they need to know so you folks

23  had requested that in your jury charges.  Maybe that is a

24  leftover from someone else's charges.

25           MS. KASSNER:  I think that's a standard request,

A-606

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 186 of 216 PageID #: 1017

Charge Conference                     531

1    Your Honor, but we didn't focus on it so that's fine.

2           THE COURT:  You didn't have your heart set on it,

3    but I'm denying it anyway.  I think that's what we need to

4    know.  What will happen as soon as you're done closing and

5    before we send everything back to the jury, Ms. Gonzalez is

6    going to go over each side's exhibit list -- the defense

7    doesn't have one, and make sure you both agree on which

8    exhibits are admitted and what's going back to the jury.  You

9    will have to look at it and agree with her before she sends it

10   back.

11          MR. NAVARRO:  Your Honor, in light of the issue with

12   the projector, is it possible to on hand the hard copy to the

13   jurors and ask them not turn the page until you're ready?

14          THE COURTROOM DEPUTY:  I think it's only the

15   computer not the paper.

16          THE COURT:  You're talking about the jury charge?

17          MR. NAVARRO:  Yes.

18          THE COURT:  Fida is right it seems when we use the

19   ELMO and bad when we use the computer.

20          MR. NAVARRO:  When I put the stips on the ELMO the

21   first day it was difficult zoomed into even read them.  I can

22   try it now.

23          THE COURT:  Let's try it right now.  We'll go off

24   the record.

25          MR. SINGER:  How do you want to deal with the

SN      OCR      RPR

A-607

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 187 of 216 PageID #: 1018

Charge Conference                               532

1  transcripts -- not the transcripts, the recordings?

2          THE COURT:  Good question.  We do need to send back

3  a computer with them, a laptop.

4          We'll send a laptop back with them but somebody

5  should have it to a flash drive or a USB or CD.  I'll see if

6  we still have a CD player.  Can't you guys put it on to  a

7  flash drive.

8          MR. SINGER:  It's 2022.  It's hard to find a

9  computer with a disk drive.

10          MS. KASSNER:  In our office we are still a fan of

11  CDs but we will bring a flash drive.

12          THE COURT:  We're done.  We'll see you tomorrow.

13  You can leave your stuff here if you want.

14

15          (Matter adjourned.)

16                          - ooOoo -

17

18

19

20

21

22

23

24

25

SN       OCR       RPR

A-608

533

1                           I N D E X

2

3    WITNESS                                        PAGE

4      PATRICK O'KAIN,

5         CONTINUED DIRECT EXAMINATION

6         BY MS. KASSNER                            350

7         CROSS-EXAMINATION  BY MR. SINGER          372

8         REDIRECT EXAMINATION BY MS. KASSNER

9                                                   408

10       ALLAN LIEFKE                               415

11         DIRECT EXAMINATION BY MS. DIOUF          415

12         CROSS-EXAMINATION BY MR. SINGER          447

13         REDIRECT EXAMINATION BY MS. DIOUF        454

14     ROBERT TARWACKI

15       DIRECT EXAMINATION BY MS. KASSNER          458

16     THEODORE VLAHAKIS

17       DIRECT EXAMINATION BY MS. KASSNER          466

18                       E X H I B I T S

19

20    Government Exhibit 622                        351

      Government Exhibit 304                        369

21    Government Exhibit 104                        446

22

23

24

25

VB        OCR        CRR

A-609

535

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
      - - - - - - - - - - - - - X
 3
      UNITED STATES OF AMERICA,      : 19CR386(PKC)
 4                                   :
                 Plaintiff,          :
 5                                   :
                 -against-           : United States Courthouse
 6                                   : Brooklyn, New York
      MUSTAFA GOKLU,                 :
 7                                   :
                 Defendant.          : Friday, October 7, 2022
 8                                   : 9:00 a.m.
                                     :
 9                                   :
                                     :
10
      - - - - - - - - - - - - - X
11
             TRANSCRIPT OF CRIMINAL CAUSE FOR PRETRIAL CONFERENCE
12               BEFORE THE HONORABLE PAMELA K. CHEN
                      UNITED STATES DISTRICT JUDGE
13
                         A P P E A R A N C E S :
14
      For the Government: UNITED STATES ATTORNEY'S OFFICE
15                         Eastern District of New York
                           271 Cadman Plaza East
16                         Brooklyn, New York 11201
                      BY:  GILLIAN KASSNER, ESQ.
17                         MARIETOU E. DIOUF, ESQ.
                           FRANCISCO NAVARRO, ESQ.
18                         Assistant United States Attorneys

19    For THE DEFENDANT:   MURRAY E. SINGER, ESQ.
                           14 Vanderventer Avenue, Suite 147
20                         Port Washington, New York 11050
                      SAHLI LAW PLLC
21                         195 Broadway, 4th Floor
                           New York, New York  11211
22                    BY:EMILEE SAHLI, ESQ.

23
      Court Reporter:   SOPHIE NOLAN
24                      225 Cadman Plaza East/Brooklyn, NY 11201
                        NolanEDNY@aol.com
25    Proceedings recorded by mechanical stenography, transcript
      produced by Computer-Aided Transcription
```

SN        OCR        RPR

A-610

Jury Deliberations                                          536

1              (In open court.)

2              (The Hon. PAMELA K. CHEN, presiding.)

3              (Defendant present.)

4              (Jury enters the courtroom.)

5              THE COURT:  You may be seated, jurors.  Everyone may

6    be seated.

7              Good morning, ladies and gentlemen, and thank you

8    again for being so prompt and timely.

9              As I said yesterday we are going to hear summations

10   or closing arguments from the lawyers.  We'll start with the

11   Government.  Ms. Kassner.

12             MS. KASSNER:  Thank you, your Honor.

13             Members of the jury, good morning.

14             At the beginning of this trial Ms. Diouf told that

15   you the evidence would prove beyond a reasonable doubt that on

16   seven separate days the defendant, Mustafa Goklu, met a drug

17   dealer named Pat in his parked Mercedes Benz.  She told you

18   that in exchange for a hefty fee, the defendant took Pat's

19   drug money and converted it from Bitcoin into cash to conceal

20   what it was, who owned it, and where it came from.  But Pat

21   was an undercover agent with the DEA and the defendant's

22   transactions, his money laundering activities, were captured

23   on audio recordings.

24             Now that the trial is over, you've seen for

25   yourselves that that is exactly what the evidence in this case

Rivka Teich

A-611

Jury Deliberations                                    537

1   has shown.  You've also learned that the undercover agent was

2   not the defendant's only customer.  He owned and operated a

3   business under the name Mustangy Corp. U.S.A.  The defendant

4   was not legally authorized to provide the money transmitting

5   services that he was offering because he never registered his

6   business or obtained a license from New York state or federal

7   authorities as required by law.

8          The defendant faces two charges in this case.  Count

9   One charges him with money laundering.  Count Two charges him

10  with operating an unlicensed money transmitting business.

11         Now, as Judge Chen will instruct you, the burden

12  never shifts to a defendant in a criminal case.  It is always

13  on the Government to prove the defendant's guilt beyond a

14  reasonable doubt.  And the Government welcomes that burden.

15  So I want to take this opportunity to talk about everything

16  that you've seen and heard over the past few days and to walk

17  you through how that evidence proves both of these charges

18  beyond a reasonable doubt.

19         I'll note that when you're in the deliberation room,

20  you will have access to all the evidence in the case, that

21  includes the exhibits and the trial testimony.  One thing you

22  won't have is a copy of the slides that I'm about to go

23  through with you, but if you use the verdict sheet and follow

24  Judge Chen's instructions, you should be able to move through

25  the charges without much difficulty; especially in a case like

A-612

Jury Deliberations                                                  538

1   this, because while this is an important case, it's not a very

2   complicated one.

3              Let's start with Count One, money laundering.  In a

4   few minutes you'll hear from Judge Chen who will instruct you

5   on the law.  If anything that I say is different from what

6   Judge Chen says, listen to Judge Chen.  But I expect Judge

7   Chen will tell you that to establish the defendant committed

8   money laundering the Government needs to prove three things.

9              First, the defendant conducted or attempted to

10  conduct at least one financial transaction that affected

11  interstate or foreign commerce.

12             Two, that transaction involved property that law

13  enforcement represented and the defendant believed was

14  proceeds of, here, it's narcotics trafficking.

15             And three, that the defendant acted with the intent

16  to conceal or disguise the nature, location, source, ownership

17  or control of that property.

18             Let's start with that first element.  The question

19  is, did the defendant conduct at least one transaction that

20  affected interstate or foreign commerce in any way?  The

21  answer is yes.  This isn't really in dispute.  You've seen

22  tons of evidence of these transactions.  You listened to audio

23  recordings of the transactions as they happened in realtime,

24  and you heard from the agent who was there.

25             Based on those recordings and that testimony, you

A-613

Jury Deliberations                                    539

1    know that between August 2018 and April 2019 the defendant and

2    the agent met seven times either at a street corner in Midtown

3    Manhattan or a Wendy's or Starbucks in Sunnyside, Queens.  You

4    also saw and heard about how much the defendant exchanged for

5    the undercover agent on each of those days.  You saw at first

6    the numbers were under $5,000 worth of Bitcoin, but over time

7    the numbers got higher and higher until the defendant was

8    exchanging more than $20,000, then more than $30,000, finally

9    more than $40,000 worth of Bitcoin at a time.  He charged a

10   seven or 8 percent fee for each of these transactions.  And in

11   total, he exchanged more than $130,000 worth of Bitcoin for

12   the agent.

13            You also saw that in April 2019 the defendant met

14   the agent again and was in the middle of exchanging another

15   $50,000 worth of Bitcoin and offered to exchange another

16   $25,000 worth of Bitcoin but he wasn't able to complete those

17   transactions because he was arrested.

18            In addition to that testimony and those recordings,

19   you saw plenty of other evidence that these transactions

20   occurred.  You saw encrypted messages between the undercover

21   agent and the defendant setting up the terms and locations of

22   each of these deals.  You saw screenshots of confirmations

23   showing that that Bitcoin successfully made its way into the

24   defendant's crypto currency wallet.  You saw photographs of

25   the cash that the defendant handed the undercover agent in

A-614

Jury Deliberations                                    540

1    exchange for that Bitcoin.

2            Finally, you heard evidence that these transactions

3    all affected interstate and foreign commerce.  Here I expect

4    Judge Chen will tell you that all that is needed is that the

5    transaction affected interstate or foreign commerce in any way

6    or degree, no matter how small.  That requirement is met here

7    in multiple ways.

8            First, the defendant and the agent used blockchain

9    technology to carry out the transaction.  You heard from

10   crypto currency expert Special Agent Infante that the

11   blockchain is global, so every transaction on the blockchain

12   affects interstate and foreign commerce.

13           Second the defendant advertised his service on

14   LocalBitcoins.com, based in Finland overseas.

15           Finally, third, the defendant said on the recordings

16   that some of the cash that he provided to the agent came after

17   he wired that money from Turkey.  Based on all of this

18   evidence, the Government has overwhelmingly established the

19   first part of money laundering.

20           So I want to skip ahead to this third element.  The

21   relevant question here is, did the defendant intend for his

22   transactions to conceal the nature, source or ownership of

23   that Bitcoin?  The answer is yes.  You know this because

24   everything about these transactions was designed to be under

25   the and off the grid, to leave no trace behind.

Rivka Teich

A-615

Jury Deliberations                                          541

1          Recall the LocalBitcoins.com page, the thing that
2     attracted the attention of the DEA in the first place.
3     Special Agent Infante explained there are two ways to exchange
4     Bitcoin into cash primarily.  The first is through a
5     commercial exchange, like Coinbase, which is relatively quick
6     and easy to use.  You can access them on at application on
7     your phone or laptop from the privacy of your home.  And they
8     are also comparatively cheap.  Their fees were as low as under
9     2 percent.  But to use a commercial exchange, you had to
10    provide a name and a form of identification.
11         The other way to exchange Bitcoin into cash, was
12    through a peer-to-peer exchange, the kind of service the
13    defendant was offering here.  The defendant required people to
14    physically meet up with him in-person and his service was
15    expensive.  He charged fees of seven or 8 percent, which is
16    multiple times what Coinbase charged to do the exact same
17    transaction.  But unlike commercial exchanges, he didn't ask
18    for names, he didn't ask for IDs.  In exchange for those
19    higher fees, what the defendant offered his customers was the
20    ability to remain anonymous, to exchange tens or hundreds of
21    thousands of dollars at a time, no questions asked, and walk
22    away with cold, clean, untraceable cash.
23         Special Agent O'Kain told that you drug dealers who
24    operate on the Internet are usually paid in Bitcoin, but they
25    often have to convert it into cash to pay their suppliers.

A-616

Jury Deliberations                    542

1  Which means that businesses like the defendant's create a

2  market that make it easy for drug dealers to use their profits

3  to further their illegal businesses.  So right off the bat you

4  know the service the defendant was offering was designed to

5  appeal to a market of people who were looking to conceal or

6  disguise where their money, where their Bitcoin, was coming

7  from, including drug dealers.  That was the point.  And the

8  defendant knew that.  You can tell from the recordings.

9       For example, the undercover agent in January

10  explicitly told the defendant:  I definitely want to keep this

11  under the table.  The defendant responds:  Yeah, yes, I know.

12       In the same conversation, the defendant talks about

13  Coinbase and he explains why he can't use Coinbase for his

14  transactions.  He says:  I'm not touching the Coinbase.  I

15  can't touch the Coinbase.  And the defendant understands why.

16  He says:  As long as you don't pass $100,000 to the Coinbase,

17  they are not going to question you.  He knew that if you

18  exchange more than $100,000 in a given year on Coinbase, which

19  by the way the undercover agent was doing, Coinbase would

20  start asking questions, it would appear suspicious.  So the

21  defendant offered the agent an alternative so he could

22  exchange his Bitcoin without ever revealing it was drug money.

23       The defendant's intent to conceal the source of this

24  Bitcoin is also clear from how these transactions took place.

25  Take a step back and think about it.  How do these people

Rivka Teich

A-617

Jury Deliberations                                   543

1   communicate?  The agent and the defendant exchanged encrypted

2   messages the defendant periodically deleted his message

3   history so they can't be cited as evidence against him.  Where

4   did the undercover and the defendant meet to exchange all of

5   this money?  In the back of a parked Mercedes Benz usually in

6   a Wendy's or Starbucks parking lot in Queens.  Not in an

7   office, or a cafe, or an apartment or any other public place.

8   No, they meet up in a car with the doors, closed out of sight

9   of the street cameras and the police.

10          You saw that the defendant didn't linger.  His

11  meetings with the agent lasted just long enough for that

12  Bitcoin confirmation to go through, so they could go their

13  separate ways.

14          Finally, you heard the defendant exchange more than

15  $130,000 without ever knowing the agent's real name or having

16  any way to track him down if something went wrong.  This

17  secrecy was by design.  It was done so the defendant could

18  exchange dirty money and later deny that he knew it was dirty.

19          So now that we've talked about the defendant's

20  business, let's talk about his dealings with the agent.  What

21  the Government has to prove is the undercover agent

22  represented his Bitcoin came from selling drugs and the

23  defendant believed him or deliberately ignored the obvious.

24  So first question is, did the undercover agent say or indicate

25  his Bitcoin came from drug dealing?  The answer to that is

A-618

Jury Deliberations                    544

1    yes, he did.  You heard this in the recordings.

2          The agent told the defendant multiple times that his

3    money came mostly from selling pills to college kids,

4    including Adderall and Oxys, which he explained referred to

5    oxycodone.  As Judge Chen will instruct, Adderall and

6    oxycodone are both controlled substances under federal law.

7          Here are some examples of the agent's statements

8    from January 27 and April 30, 2019.  The agent explains that

9    his business partners are in California and he brings it back

10   to Manhattan.  He says:  That's what we do.  We do all that,

11   Adderall, Oxy, all that stuff.  He says:  The real money is in

12   the Adderall and the pills.  He offers:  I can get you some

13   Oxy, which he says is short for oxycodone.  And also offers

14   the defendant some Adderall and says:  That's what all the

15   college kids are taking.

16         The agent also told the defendant that he earned

17   some money selling marijuana, which he explained was illegal

18   to sell federally.  As Judge Chen will instruct you, marijuana

19   is also a controlled substance under federal law.  Like

20   Adderall and oxycodone, it's a narcotic.

21         Here is a discussion from April 30.  The agent and

22   the defendant are talking about marijuana farms in California.

23   The agent says:  Lots of farms out there.  Still risky,

24   though, my buddy got arrested the other day.  The defendant

25   asked:  Why is that?  The agent explains:  Still federally, I

Rivka Teich

A-619

Jury Deliberations                                         545

1    mean, he got arrested by the feds.  The agent later offers to

2    bring marijuana back to New York to give the defendant a cut

3    of the business if he's interested.

4            So you know that the agent said his Bitcoin was from

5    drug sales.  The remaining question is, did the defendant

6    believe the agent's Bitcoin came from selling drugs?  The

7    answer to that is, yes, he did.  How do you know?

8            Well, first of all, you know because that's what the

9    agent told him.  And the defendant had no problem hearing him

10   or understanding what he was saying.  He got it.  This

11   conversation is a great example of that.  The defendant

12   explicitly acknowledges that he understands selling marijuana

13   out of California is illegal.  In his own words:  Oh, you got

14   to be in California.  If you go out, it's trouble, right?  He

15   knows that one of the ways the agent is making his money is by

16   selling marijuana from California in New York.  But what does

17   the agent -- what does the defendant do right after this

18   conversation?  He agrees to exchange another $50,000 worth of

19   Bitcoin and offers to exchange another $25,000 more.  This

20   proves that the defendant knew the Bitcoin he exchanged was

21   drug money.

22           But the defendant is also guilty because in dealing

23   with the agent he knew there was a high probability that

24   Bitcoin came from drugs; but he deliberately ignored every red

25   flag he encountered.  Judge Chen will instruct you that

A-620

Jury Deliberations                    546

1    deliberately ignoring the obvious makes the defendant just as

2    guilty.  You can't just stick your head in the sand.  You

3    can't plug your fingers in your ears.  You cannot close your

4    eyes and ignore the obvious when it comes to drug proceeds.

5    But that is exactly what the defendant did, because what he

6    cared about was making money.

7         So let's take a look at some of the red flags the

8    defendant ignored.  First, look at the amount of money the

9    agent asked the defendant to exchange, money he said came from

10   shipments.  In December 2018 he said he might, the agent

11   might, need to exchange as much as $100,000 or $200,000 worth

12   of Bitcoin at a time, quote, "depending on how much we sell."

13   The following month he said:  You have no idea how much money

14   we have coming in.  It's insane.  It's insane.  These college

15   kids cannot get enough.

16        Again, where did the defendant agent meet to

17   exchange all this money?  In the back of a parked car, usually

18   behind a Wendy's or Starbucks in Queens.  The agent traveled

19   all the way from Manhattan to get there.  Normally if you're

20   exchanging that amount of money, tens or hundreds of thousands

21   of dollars, you do it in a public setting, you provide a form

22   of ID and your name, and you fill out paperwork.  People who

23   get that amount of money from legitimate sources do not

24   convert Bitcoin into cash in the back of a car in a Wendy's

25   parking lot.

Rivka Teich

A-621

Jury Deliberations                                        547

1          The agent also explained why he had to convert all

2     that Bitcoin.  He said:  I have people to pay.  He said:  They

3     are not great people.  He explained he was going back to

4     California to pay them.

5          Who physically carries hundreds of thousands of

6     dollars in cash and travels with it across the country so they

7     can pay people?  Drug dealers.

8          The agent also warned about what would happen if he

9     didn't get all that money to pay all his people.  On

10    January 24 he said:  Well, if I get seized with this I'm going

11    to get my fucking head chopped off or something.  He later

12    says:  Who's going to be shooting at us?  It's the guy back in

13    California that wants the rest of the hundred, that's who.

14         What kind of person gets shot for not paying the

15    people they owe money to on time?  Drug dealers.

16         Finally, perhaps the strongest evidence of the

17    defendant's belief that Bitcoin came from selling drugs, is

18    the defendant's own words.  The defendant's own statements

19    proves he knew that drug dealers often turned to people like

20    him to exchange their Bitcoin for cash, and that exchanging

21    drug money was illegal and could get him arrested.  In fact,

22    he explained that's exactly what happened to his own business

23    partner.  He says that his partner was arrested in Manhattan

24    after he was caught exchanging $50,000 worth of Bitcoin for a

25    drug dealer.  These are his words.  The defendant says:

A-622

Jury Deliberations                    548

1    Actually they weren't tracking for Bitcoin.  They were
2    tracking some idiot guy who buys and sells drugs.  Because
3    they follow these guys almost always, and one of the, the
4    idiot sold or bought from him.  So when they tracked him, the
5    drug guy, the cop said bingo we caught something else.
6          The defendant was terrified that what happened to
7    his partner would happen to him.  That the police would follow
8    a drug dealer and eventually catch and prosecute him for
9    laundering the drug money.  He betrayed this fear time and
10   time again.
11         You heard it when the defendant explained he refused
12   do business in Manhattan, which is where his partner got
13   caught.  Here he says:  I don't want to count money in
14   Manhattan.  Manhattan sucks, man.  Again, I told him no deal
15   at fucking Manhattan.  Manhattan sucks.  People ask me can you
16   come to Manhattan, no.
17         Then he explains:  In Manhattan, this is why I don't
18   go to fucking Manhattan.  Even a homeless I saw he's, working
19   for the NYPD.
20         Again and again the defendant talks about all the
21   cameras and police who might being looking for drug dealers
22   and find their way to him.
23         Here are more quotes:  Close the door, man, the
24   cops, we're not drug dealers.  We're buying Bitcoin.  Then he
25   says:  Even if you're staying in here there is a fucking

Rivka Teich

A-623

Jury Deliberations                                        549

1    camera on top.  It's watching traffic, but they are going to

2    say what is going on there.  Are these some drug guys?  Then

3    he explains:  I don't want to come here, these fucking malls

4    all have cameras.  They called me, hey, are you a drug dealer?

5    No.  That's why I try to stay in Queens.

6            The defendant also is afraid of cars with black

7    tinted windows because they might be the police.  Here he

8    talks about how the black windows scares me.  And he talks

9    about two fucking ford black tinted car is there.

10           The defendant also talks about all the ways the

11   police might build a case against him.  Here he talks about

12   searching for his Bitcoin wallet on his browser.  He says:

13   Actually I'm exposing myself.  I'm visible right now.  If

14   something goes wrong, they can catch your history and say hey

15   let me see your wallet.

16           Then the defendant also talks about his money

17   counter and the benefit and risks of using it.  On the one

18   hand he says he needs to make sure he's not getting money,

19   quote, "from somewhere, something bad, who knows," which shows

20   that he knows some of this money he's exchanging does not come

21   from legitimate sources.  But he also says having that counter

22   is a risk; in his own words:  The fucking machine, that

23   fucking machine is evidence that you're a drug dealer.

24           So again, the defendant is afraid of being caught in

25   the middle of laundering drug money because that's what he's

A-624

Jury Deliberations                    550

1  doing.  What all of this shows is the defendant believed the
2  Bitcoin he exchanged from the defendant was from drug dealing.
3  The fact that he deliberately ignored all the red flags that
4  he encountered, makes him just as guilty.
5          Together this all of this evidence proves the
6  defendant committed money laundering.
7          I want to turn to Count Two, operation of an
8  unlicensed money transmitting business.  I expect Judge Chen
9  will tell you that for this charge the Government has to prove
10  three things.
11          First, the defendant knowingly owned, controlled
12  managed, operated, et cetera, all or part of a money
13  transmitting business.
14          Two, that the defendant didn't have a license in New
15  York or failed to register with the Secretary of Treasury as
16  required.
17          And three that the business affected interstate and
18  foreign commerce.
19          Let's start with the first.  Element there is no
20  real dispute here.  You'll hear that a money transmitting
21  business is simply a business that transfers funds, including
22  Bitcoin, by any means in exchange for a fee.  That's exactly
23  what the defendant's business did.  He transferred Bitcoin
24  through cellphone application and transferred cash by hand in
25  exchange for a fee.

A-625

Jury Deliberations                          551

1          You know that the defendant owned or operated his

2     money transmitting business.  In fact, he went as far as to

3     incorporate that business, Mustangy on LocalBitcoins.com, but

4     he used the name Mustangy Corp. U.S.A. in his filing.  He

5     listed himself on some paperwork as the president of that

6     business.  He received mail for that business addressed to his

7     apartment in Sunnyside, Queens.  He maintained a corporate

8     bank account for that business.

9          And you learned that in addition into the agent, he

10    had other customers.  He even references to some of those

11    customers when he talked to the agent.  Here is one example of

12    that.  The undercover agent writes:  He needs cash fast.  And

13    the defendant says:  He has $25,000 today but that another

14    customer, who he calls the 8 percent guy, also wants it and

15    he'll give it that guy if the agent doesn't want it.

16         You also saw the defendant's messages with some his

17    other customers.  Many of them reference prior deals.  Here is

18    one example.  Someone, who says he's Asian guy with glasses

19    says:  We've dealt before at 10K and 20K and asked to do

20    another 65K.  Another example from a customer named Corey, who

21    described himself as the guy who met you at Starbucks all the

22    time, and asked to do another deal.  Another customer who

23    says, thanks for the easy trade the other day.  And expresses

24    interest in another Bitcoin transaction.

25         Finally, in some these messages the defendant

A-626

Jury Deliberations                                    552

1    himself refers to his business as my biz.  Here he says Amex

2    charged my business 4.75 percent.  The defendant himself

3    considered this a business.

4           You've also seen that the messages that the

5    defendant exchanged with his other customers were very similar

6    to the ones he exchanged with the agent.  They had the percent

7    that he charged, which was similar.  He also met everyone at

8    what was effectively his office, this Starbucks in Sunnyside,

9    Queens.  Here is an example of how he direct his current and

10   perspective customers to the same Starbucks where he met the

11   undercover.

12          Finally the defendant had a sufficient volume of

13   customers that he drove around with an electronic money

14   counter in his car.  He had a tool of the trade.  What this

15   shows is that he had everything he needed to run a business.

16          And the defendant's business operated like any

17   other.  He had advertisements on LocalBitcoins.com.  He had an

18   established rate of seven or 8 percent, depending on the

19   volume.  He had an office, which for him was the back of his

20   car outside of Starbucks in Queens.  He had a robust client

21   base.

22          Let's turn to the second element.  I don't think

23   this is in dispute.  Judge Chen will instruct you that under

24   New York law, people who exchange in the business of

25   transmitting money need to get a license from the New York

Rivka Teich

A-627

Jury Deliberations                                      553

1    State Department of Financial services.  But you all heard

2    testimony from Robert Tarwacki, of New York State Department

3    of Financial Services who told you that he conducted a

4    diligent search of New York State records, and confirmed the

5    defendant never registered himself or his business, or

6    obtained the required license to transmit money in New York.

7              Judge Chen will also tell you that under federal law

8    there is a separate requirement that money transmitting

9    businesses register with the United States Secretary of

10   Treasury within 180 days of the business being created or the

11   first transaction occurring.  But you heard testimony from

12   Theodore Vlahakis from the Department of Treasury who

13   confirmed he also conducted a diligent search and confirmed

14   that the defendant never registered himself or the business or

15   received a license from the United States Department of

16   Treasury.  You saw the official certifications showing the

17   results of those searches.

18             Finally, the last element is that the business

19   affected interstate or foreign commerce.  Again, I expect this

20   is not in dispute.

21             As you heard before, first, the defendant used

22   blockchain technology and Internet applications to conduct all

23   of these transactions.  And again, the blockchain is global,

24   which means any transaction that affects the blockchain

25   affects interstate and foreign commerce.

A-628

Jury Deliberations                          554

1          Second, you saw that at least some the defendant's

2     customers crossed state lines to meet the defendant to

3     exchange that Bitcoin for cash or cash for Bitcoin.  This is

4     just one example where a customer travels from New Jersey

5     across state lines to New York to finish that transaction.  So

6     the defendant's business affects interstate commerce in that

7     respect as well.

8          Viewed all together this evidence proves that the

9     defendant operated an unlicensed money transmitting business

10     and also committed money laundering.

11          Members of the jury, you will soon go back to

12     deliberate.  When you do, remember that what the judge brings

13     to this process is the authority of the court and the ability

14     to decide when and how a case proceeds.  What all of you bring

15     to this process, is your life experience and your common

16     sense.  You should use it, because that's what ensures that

17     cases are decided correctly.

18          Everyone is entitled to the presumption of

19     innocence.  Everyone is entitled to have their case heard

20     before a fair and impartial jury.  The defendant has had that.

21          But at the end of the day, the only thing that

22     matters is what the evidence says and where the evidence leads

23     you.  In this case, when you consider all the evidence and

24     apply your common sense, you will reach the only verdict

25     consistent with that evidence, the defendant is guilty on both

A-629

SUMMATIONS - MR. SINGER                555

1    counts.  Thank you.

2              THE COURT:  Thank you, Ms. Kassner.

3              Mr. Singer, your summation.  And we need you to wear

4    the microphone, if only for the interpreters.

5              MR. SINGER:  Understood.  May I proceed?

6              THE COURT:  You may.

7              MR. SINGER:  Good morning, folks.

8              During my opening statement to you I talked about

9    the issues that I expected were going to be the central and

10   tipping point issues in this case.  The issue with regard to

11   the money laundering charge, whether the Government can prove

12   that Michael Goklu believed that the Bitcoin being brought by

13   the undercover officer were the proceeds of illegal unlawful

14   narcotics transactions.  Whether his intent and purpose was to

15   conceal or disguise the source of that money, where it was

16   coming from.  And whether he was operating a money

17   transmitting business, as the judge will define it.  Those, in

18   fact, are the tipping points.  That's what I'm going to be

19   focusing on in my remarks this morning.

20             I submit to you that each one of those issues are

21   open to interpretation.  That the evidence is not at all clear

22   as the Government, the prosecutor, seems to suggest.  That

23   there is a great deal of question about what Mr. Goklu

24   believed.

25             And it's important to understand that that's the

Rivka Teich

A-630

SUMMATIONS - MR. SINGER                556

1    issue, what Mr. Goklu believed.  Not what the undercover
2    believed or remembered or what the undercover officer
3    interpreted.  Because you heard a lot of testimony about that.
4           The undercover said Mr. Goklu said XYZ to me and
5    this is what I believe that it meant.  Or this is the
6    information based on that, this is why I took whatever the
7    next steps are.  Essentially this is what I believe.
8           But it doesn't matter what the undercover officer
9    believes.  There is no element in the charge against Mr. Goklu
10   about what the prosecutors believe, or what inferences the
11   prosecutors draw from the evidence.  That's not the issue.
12          The issue isn't does federal law permit the sale of
13   marijuana.  That's not the issue.  The issue is, what
14   Mr. Goklu believed.
15          Because if Mr. Goklu believed that the proceeds,
16   that the Bitcoin that was being brought to him by the
17   undercover officer, if he believed that it was from some
18   lawful activity, then the Government hasn't proved their
19   charge.
20          Now, I stated it as an affirmative, Mr. Goklu
21   believed something, believed that the Bitcoin came from lawful
22   activity.  I'm going to discuss that, but that is not the
23   question for you as jurors.  The question for you as jurors
24   is, has the Government proved beyond a reasonable doubt that
25   he believed that it was the proceeds of unlawful activity.  I

Rivka Teich

A-631

SUMMATIONS - MR. SINGER                    557

1   submit to you that the evidence that you've seen in this case,

2   some of it just highlighted by the prosecutor, but that the

3   evidence brought to you in this case, you would be perfectly

4   reasonable and rational to determine and believe that

5   Mr. Goklu thought that this was coming from legal marijuana

6   farms and/or perhaps other sources, but certainly from legal,

7   tax-paying licensed marijuana farms in California; and not

8   from some illegal or unlawful narcotics activity, that that's

9   what his belief was.

10          There is evidence to support that; but as jurors

11  don't have to get there.  I submit that you could.  I'd argue

12  that you should.  But it's not necessary.

13          Because if as you think about it yourself as you

14  talk to each other back in the jury room, you come to a point

15  where, I'm not sure, then the prosecution hasn't proven an

16  essential element of the money laundering count and you have

17  to find Mr. Goklu not guilty of that count.  That's how this

18  works.

19          That is part and parcel of the presumption of

20  innocence.  Right.  The United States Government brings a

21  charge against an individual.  When the individual says, I

22  plead not guilty, that individual is saying:  Prove it.  You

23  made the accusation, prove it.

24          And your verdict is not guilty or innocent.  Your

25  verdict is guilty or not guilty.  Proven beyond a reasonable

Rivka Teich

A-632

SUMMATIONS - MR. SINGER                    558

1  doubt or not proven.  I submit to you they have not proven

2  this essential element.

3          Let's talk about sort of what the transactions were.

4  There are were seven of them, they met seven times.  Six

5  completed transactions, and an arrest before the seventh one

6  could be completed.

7          I've urged you in my opening to listen to the

8  recordings.  The recordings vary, their meetings vary from ten

9  to 11 minutes on the short side, up to 40 minutes on the long

10 side.  Each one of the recordings that you have, has some dead

11 air at the beginning before it gets to the conversation.

12 Because it had some recording devices on before the two of

13 them actually meet.  It picks up stuff that doesn't matter,

14 the only thing that matters is the conversation between the

15 two people.

16          I urge you to listen to these.  It can be perhaps a

17 little long and perhaps a little boring, but when you listen

18 to it, you get a flavor for what these interactions were about

19 and what Mr. Goklu was thinking about and doing.  Each one was

20 conducted essentially the same way.  We meet.  We talk the

21 cash.  We count of cash.  He uses a money counting machine not

22 because he's concerned where the money is coming from.  The

23 inability to see through and understand what they are talking

24 about is rather shocking.

25          You use a money counting machine that's got a sensor

Rivka Teich

A-633

SUMMATIONS - MR. SINGER                    559

1    on it that runs through because you're concerned that someone

2    may be feeding you counterfeit bills.  Not because you're

3    concerned about whether it's from a Craigslist sale or drug

4    transactions or anything else.  You're looking for, you're

5    concerned about counterfeit bills.  You've got people who will

6    pass counterfeit bills.  It's got nothing to do with this

7    case.

8            The Government thinks if he's got a money counter

9    the only possible explanation for anybody to have a money

10   counter in their car to conduct a transaction is because they

11   are a drug dealer.  Get an imagination.  There are so many

12   other things that go on in the world.

13           I guess if you're a prosecutor all you see is crime.

14   That's all you see, all you see is drug crimes, anything that

15   everybody does has got to be a drug crime.  Get an

16   imagination.

17           Think about it.  There are other things that people

18   engage in, other types of activity.  There are a lot of

19   Americans who, honest to God, want to be private.  Want to

20   conduct transactions without the police or the Government or

21   anybody else getting involved, or banks.  There are a lot of

22   Americans who don't want all their information to be going out

23   through social media accounts.  There are people that value

24   their privacy.

25           But somehow someone wants some privacy, doesn't want

A-634

SUMMATIONS - MR. SINGER                    560

1   to get the police involved, doesn't want to have their money

2   seized for a period of time, so the prosecutors' only possible

3   explanation is because it's drug dealing.  Again get an

4   imagination.  Open your mind a little bit.  There are other

5   things going on in the world.

6           So they get together.  They count the money.

7   Mr. Goklu is focused on the money.  He says both for me and

8   for you, because I want to make sure that the amounts are

9   correct.  This is the exchange rate.  This is the amount.

10  This is my fee.  This is how much cash I'm going to give you.

11  That's the first part of the transaction.

12          The second part of the transaction is the

13  transmission of the Bitcoin.  The only way for that to happen

14  is, first, the undercover officer initiates the trade from his

15  phone.  It's an app that goes through his wallet.  The details

16  of that are unimportant, but we know that it's initiated from

17  the undercover's phone and it goes to Mr. Goklu's phone.

18  You're doing a transaction, you make sure it's complete before

19  you walk away.

20          When you listen to these conversations, these

21  recordings, what you clearly pick up is that Mr. Goklu is

22  focused on his phone.  He's watching his phone.  He's

23  complaining about how long it is.  What is wrong with this

24  stuff.  And then the complaints go into everything else,

25  because he complains about a lot of things.  But he's clearly

A-635

SUMMATIONS - MR. SINGER                    561

1   watching the phone.

2          Some of the responses when the undercover officer

3   tries to initiate something, some of the responses are:  Why

4   is this taking so long.  Clearly he's looking at his phone.

5          He's not -- the prosecutors seem to think if two

6   people are sitting in a car and one person says something,

7   that it's just a given that the other person hears, is

8   listening, and processed it and isn't focused -- there is no

9   possibility that he's focused on anything else.  But when you

10  listen to the recordings, it's clear he's focused on other

11  things.

12         There is, I submit, a language issue.  Mr. Goklu

13  speaks English.  Obviously we've listened to him in the

14  recording.  He's got an accent.  It's clearly not his first

15  language.  He speaks English.  He can converse and do

16  transactions or whatever in English, but it's not his first

17  language.  If it's something important, he wants an

18  interpreter to assist him to make sure he's picking up

19  everything.  So it's partly the possibility that language came

20  into play.  A lot of what the undercover officer is using --

21  there is some slang things thrown in.  It's not simply a given

22  that Mr. Goklu would understand.

23         Does he understand it and process it and get what it

24  is that is being said?  That's part of it.  And part of it is,

25  is he hipped to the drug lingo?  The Government wants to have

Rivka Teich

A-636

SUMMATIONS - MR. SINGER                    562

1   it both ways here.  The undercover officer keeps saying, well,

2   you know drug dealers, people involved in drugs, know these

3   things.  And so if I said certain things, if I said keys,

4   well, people know that keys are involved in drugs.

5        Did every one of you know that?  Does everybody just

6   know these terms?  Does everybody just know what Oxy is?  Does

7   everybody just know what Adderall is?

8        Again, they start with the assumption that he's

9   involved, that Mr. Goklu, is involved in drugs; and,

10  therefore, understands what the undercover is saying when he

11  uses these terms.

12       But at the same time, at the very beginning of their

13  first meeting Mr. Goklu is violating the cardinal rule of

14  fight club, that you don't talk about fight club.  It may be a

15  reference that not everybody gets.  The idea is that, the

16  undercover expresses, that people who are involved in drugs --

17  buying, selling, the money part, whatever it is -- that people

18  involved in drugs don't talk about it.  Because that's just

19  not what you do.  Because you understand that what you're

20  involved with is illegal and so you don't talk openly about

21  it, you just don't.  You hint at it.  You work around the ends

22  if you're trying to get a point across, you hint it.

23       At their first meeting on the top of their first

24  meeting, when the undercover is getting into Mr. Goklu's car,

25  what is the first thing that Mr. Goklu says to him:  Come on,

Rivka Teich

A-637

SUMMATIONS - MR. SINGER                    563

1  man, close the door.  We're not drug dealers here.

2          He raises it immediately.  He violates the cardinal

3  rule.  If it's not violating the cardinal rule, what it

4  suggests is he's not even aware of such a thing.  He doesn't

5  know about this.

6          Is it possible, would it be reasonable to conclude

7  from that that he's not part of the drug world and, therefore,

8  doesn't know what things mean?  What you're supposed to say,

9  what you're not supposed to say?  Does he come into this with

10  no knowledge at all?  I submit that you could absolutely find

11  that from the evidence you've got here.

12          Why would somebody not use Coinbase?  Gee, the

13  prosecutors say why would Mr. Goklu be engaging in this

14  activity?  And why would customers be coming to him and not

15  use Coinbase, like it's the be-all and end-all.  Why not use

16  Coinbase, it's a lower fee?

17          I suppose they also argue that every check cashing

18  business in every neighborhood throughout New York City is

19  only for drug dealers?  People take their paychecks and go to

20  check cashing establishments who charge fees to cash the

21  paycheck.  You're giving part of your paycheck to a check

22  casher.  Is everybody who does that must be involved in drugs,

23  the money must be dirty?  Is it quick?  Is it easy?  Is it

24  necessary?  People pay fees for things all the time.  It

25  doesn't mean they are involved in this illegal activity.

Rivka Teich

A-638

SUMMATIONS - MR. SINGER                    564

1          And Coinbase, they tell you, it's quick and easy.
2     And then when you ask questions about it, it ain't so quick
3     and easy.  You have to set up an account.  You have to provide
4     various levels of verification.  Some people like privacy and
5     don't want to do that, but you have to set up the accounts,
6     you've got to go through the steps.
7          Once you get it set up, then you're there.  Then you
8     can conduct the transaction that way.
9          A couple of things came out from the testimony of
10    the crypto currency expert, Ms. Infante.  First we learned
11    that you link your Coinbase account to your bank account.  How
12    quickly does Coinbase send the money to your bank account?
13    You go with Bitcoin or go online, I got three Bitcoin here, I
14    want my cash.  Well, it gets sent electronically to your bank
15    account.  It goes through the same system that any other
16    transfers go through.  She acknowledges it can take several
17    days before the money hits your account.  So why might you not
18    use Coinbase?  Because it can take days, your money is sitting
19    for days.  They are getting the float.  Just like when you
20    write a check, somebody writes you a check, you deposit it in
21    your bank account, it takes several days before the money is
22    in your account to make use of it.  It's the same system.  So
23    it's not quick and easy.  It can take days before you get
24    access to your money.
25          And something else she acknowledges at the end,

A-639

SUMMATIONS - MR. SINGER                    565

1  Coinbase is not insured by the federal Government.  What does

2  that mean?  It means you've got money sitting in there for a

3  few days, it's not insured that if it disappears you're out of

4  luck.

5          Why might you not use Coinbase?  Because they are

6  not insured.  They could go out of business tomorrow and

7  you're out of luck.  There is reasons not to use them.

8          Whereas, in this transaction, within a half hour or

9  so you've got your cash and you walk away and you've got the

10 money.

11         Why would Mr. Goklu be trying to avoid the police?

12 The prosecutors make a big deal of this.  Well, the only

13 possible reason that their imagination allows for is that he

14 knows that he's involved in drug dealing and that's why he

15 doesn't want the police around.  Didn't they listen to the

16 recordings?  It's right in the recordings.  Mr. Goklu is

17 saying over and over again:  I'm not concerned about going to

18 jail.  That's not my concern.  I'm not concerned about going

19 to jail.  I'm not a drug dealer.  I'm not doing anything.

20         The police see a lot of money, they see a lot of

21 cash, they see a money counting machine.  The police who are

22 about law enforcement jump to conclusions.  They seize first,

23 and they ask questions later.  He doesn't want it to be

24 seized.  He doesn't want to go through the hassle of having

25 all this stuff taken from him.  He says, and expresses over

Rivka Teich

A-640

SUMMATIONS - MR. SINGER                    566

1    and over again, the belief that he's going to get it back.

2    He's not concerned about going to jail.  He's not concerned

3    about being charged with a crime.  Even when he talks about

4    the partner who got involved, the police are following some

5    drug guy.  It's not that he knows that a customer is involved

6    in selling drugs, it's just that the police come and grab you

7    and you don't know what the customer is involved in, and they

8    seize everything.  And then discover, or they know, the police

9    know, because they've been investigating the person, the

10   customer, they know that the person is involved in drugs.

11          The Government here, the prosecutors here, tell you

12   that you should assume that because it happened once to his

13   partner, that he should not -- that everybody out there is a

14   drug dealer.  That anybody he would be dealing with is a drug

15   dealer.  He should know that and believe that.

16          But it just doesn't follow.  When all you see is

17   crime; all you see is crime.  But there is other ways of

18   looking at and understanding what Mr. Goklu is thinking and

19   doing.

20          Each one of these transactions Mr. Goklu is making

21   money.  He's making his commission.  And the commission is

22   between seven and 8 percent.  Why would someone pay seven or

23   8 percent?  Well, Agent Infante told you that there is now

24   Bitcoin ATMs.  You can go to a ATM and exchange Bitcoin for

25   cash and pay up to 10 percent.  That was her testimony.  It

A-641

SUMMATIONS - MR. SINGER                    567

1    was on cross examination, of course, because the Government is

2    not going to bring that up, but it's part of her testimony.

3            Does anybody and everybody who goes to a Bitcoin ATM

4    and pay a fee to get their cash out a drug dealer?  Is that

5    what we are to conclude?

6            Because why would you do that?  You can exchange it

7    for a lot less.  Mr. Goklu expresses his belief to the

8    undercover officer.  He brings it up about the marijuana farms

9    in California.  He expresses his belief.  He tells the

10   undercover, and through him because it's recorded all of us,

11   what he believed.  And he says the words out loud:  It's a

12   licensed marijuana farm in California.

13           And the retired DEA agent comes in here and tells

14   you, gee, I don't know what the legal status of marijuana in

15   California is.  Really?  You believe that?

16           Mr. Goklu knows and believes that a cannabis farm in

17   California is legal.  He uses the term.  He's explaining it to

18   the undercover officer, it's legal, you pay taxes.  He

19   believes that a person operating a licensed cannabis farm in

20   California is operating a legal business, that's what he

21   expresses to the undercover officer.

22           And on April 30 when they get together, again this

23   is the seventh time they've gotten together, they are a little

24   more comfortable with each other and the conversation starts

25   with how is business right?  You get together with somebody,

Rivka Teich

A-642

SUMMATIONS - MR. SINGER                    568

1   how is business.  Oh, it's booming.  Then you make a
2   light-hearted comment back.  Well, your business is booming,
3   maybe I should get involved into that, maybe I should get
4   involved.  At that the undercover jumped at the opportunity.
5   You want a piece?  You want a cut?  It's like, do you,
6   Mr. Goklu, want to buy into my business?  Like, I can do that.
7   You can buy into my business.  And what does Mr. Goklu believe
8   his business is?  He asked how much; to get into a cannabis
9   farm?  A cannabis farm.
10              (Continued on next page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Rivka Teich

A-643

Singer - Closing Statement                    569

1   (continuing.)

2           MR. SINGER:  He wasn't always being recorded.  He

3   doesn't know it's an undercover officer.  That's what he

4   believed.  The undercover officer told you I tried over and

5   over again to try and get Mr. Goklu to ask me questions, to

6   say something.  I kept dropping hints, I got bad guys in

7   California, they want their cash.  They're going to cut my

8   head off.  They're going to do they're going to do that.  All

9   thighs problems I've got.  I've got to take care of this

10  business.  He raises it over and over again and time and time

11  again, Mr. Goklu goes right past him.  He does not respond and

12  if you listen to the recordings you hear it.  He does not

13  respond.  And if you listen to the recordings you understand

14  why because he's not listening to this.  He's focused on his

15  phone and waiting for the Bitcoin transaction to clear and the

16  government says, well, if you didn't -- if you didn't

17  understand, it's because he was deliberately burying his head

18  in the sand.

19          Do any of you really believe that Mr. Goklu is

20  burying his head in the sand and not listening.  That that's

21  what it is he knows what's being said and he is deliberately

22  avoiding hearing things, listen to those conversations.  That

23  is simply not the case and you will see it and understand that

24  from listening to their interactions.

25          So on the money laundering charges, as the

A-644

Singer - Closing Statement                570

1    prosecution pointed out, it requires under the second element
2    that the defendant, Mr. Goklu believed that the Bitcoin is
3    from unlawful narcotics activity and I submit to you as I said
4    before, it would be reasonable for you to conclude that he
5    believed that it was from legal marijuana activity, but, again
6    you don't have to get that from him the.  There is reason upon
7    reason upon reason to doubt that claim, what fluke believed it
8    to be the proceeds of unlawful activity.  Now, the intent and
9    purpose.  The intent to conceal or disguise the source of the
10   money.  They got together in August, August 28, 2018,
11   September 21 of 2018, November 27th of 2018, December 11th of
12   2018.  And they're conducting this transaction.  And three
13   those, the undercover officer never made clear, never said
14   anything about his Bitcoin coming from drug activity.  So
15   Mr. Goklu doesn't know who he is, doesn't know what his
16   business is.  The undercover hasn't even offer what his
17   business is, hasn't mentioned drugs, other than to say when
18   Mr. Goklu says it's a legal cannabis farm that pays taxes and
19   the undercover officer says to him, yeah that's a part of my
20   business too.  So the undercover tells him that he, too, is in
21   the legal marijuana business in California, but otherwise
22   there's no indication.  So what is Mr. Goklu's intent and
23   intended purpose on August 28 of 2018, is it to launder drug
24   money is it to conceal the source of the Bitcoin can why would
25   he have any incentive to do that.  There is no evidence that

A-645

Singer - Closing Statement                    571

1   he knew or anything -- or even should have known that there
2   was anything I don't know wrong with it and in the second
3   transaction and the third transaction he's making a fee.  He's
4   charging a fee and he's making money.  So why -- what's his
5   incentive or reason for doing the transaction?  Is it to help
6   the undercover officer conceal the source of the money?  Why?
7   There's no reason to.  There's no hint or suggestion or
8   statement that the money is illegal.  So, clearly that wasn't
9   Mr. Goklu's intent in the early transaction, but the
10  Government is here telling you, well, that became his purpose
11  by the end, did anybody say anything about that?  Did the
12  undercover say I need to get rid of this?  I need to clean it?
13  I need to get this out of my hands because I don't want
14  anybody to know where it's coming from?  He didn't say any of
15  those things.  And, in fact, the transactions operated, the
16  later ones, January 24, January 30th, operated in exactly the
17  same fashion as the first ones did.  There was nothing
18  different about this.  So where is there evidence because it
19  clearly didn't have the intent to conceal or disguise the
20  source of the money in the earlier transactions there's the
21  evidence that his intent and purpose changed by the end?
22  Nobody said or did anything any different.  Mr. Goklu is
23  making money, by conducting these transactions.  The
24  Government has not proven this intent to conceal or disguise
25  the source of the money.  It's simply not there.  Mr. Goklu

A-646

Singer - Closing Statement                    572

1    didn't know that it was coming from an illegal sours.  He

2    thought it was coming from a legal source.

3            Because of the evidence on those two elements that

4    the money laundering charge is lacking and again I submit to

5    you that you could find affirmatively that Mr. Goklu did not

6    have his beliefs and intentions but it's not necessary for you

7    as jurors to get there.  If you consider this and go I'm not

8    sure, maybe it's possible that what the Government says it's

9    true, but I'm not sure.  I'm not convinced beyond a reasonable

10   doubt.  By law you're required to find Mr. Goklu not guilty.

11   On the money transferring business, this is a matter of the

12   language and I'm going to encourage you folks to listen

13   carefully to the Judge as she gives the language of this

14   charge and you're going to have the written charge with you in

15   the jury room and you can look at the language as well.  A

16   money transmitting business is a business which for a fee

17   accepts currency for transfer.  That's the language that

18   you're being given.  And I submit to you under that definition

19   that the judge is giving to you and it's included in the

20   instruction that Mr. Goklu is not operating a money

21   transmitting business, that he is not -- that the evidence

22   does not prove beyond a reasonable doubt that he is accepting

23   currency for transfer.

24           Now, is he operating a business?  Well, you listen

25   to the recordings and you look through -- it wasn't shown to

A-647

Singer - Closing Statement                  573

1    you but it's all in evidence, all of this information that

2    they got off of his computer.  Mr. Goklu was a black car

3    driver, a taxi driver, driving a nice black Mercedes.  You've

4    seen the pictures of it.  He's a black car driver and, in

5    fact, in one of the recordings he's talking to the undercover

6    about the fact that one of his regular customers has been John

7    McCain, former senator some of you younger folks may not know

8    who John McCain is.  He ran for president in 2008.  He was a

9    prisoner of war during Vietnam.  He's generally regarded as an

10   American hero and he was a U.S. senator for many, many years.

11   And Mr. Goklu tells the officer, you know, he's got customers

12   he's driving that's why he is in different places all the time

13   and one of his customers is John McCain.

14        He's also got a business or engages to make money in

15   buying and telling these Bitcoin mining machines.  You may

16   have wondered why was I suggest the expert, agent Infante,

17   with the Bitcoin mining machines.  Well, these records are in

18   evidence and they're available if you want to see them.

19   There's a company in China called Bitname.  They manufacture

20   and sell machines that people use in an effort to mine Bitcoin

21   and the records that are -- that are in evidence show that

22   Mr. Goklu was sending -- wiring money, sending money to

23   Bitname for these machines.  These machines, the shipping

24   labels that you see that they point to, to show Mustangy Corp.

25   because because that's somehow mysterious.  Those shipping

Singer - Closing Statement

A-648

Singer - Closing Statement                574

1  labels that they show you are the machines being sent from
2  Bitname in China to Mr. Goklu and Mr. Goklu reselling those
3  machines on Ebay or PayPal and sending them -- the shipping
4  labels are sending the machines out.  That's a separate
5  business.  He's got a business driving.  He's got a business
6  buying and selling these mining machines and he has customers
7  that want to exchange cash and Bitcoin one way or the other
8  and here is something that I submit to you is significant, the
9  Government pulled up all of these Signal text messages that
10 Government Exhibit 228.  It's about 355 pages of text messages
11 they got off of Mr. Goklu's phone.  There was one customer,
12 one, in mid to late April of 2019 who says something about
13 washing money.  It's at the very end of the conversation after
14 they're calling each other names and Mr. Goklu is threatening
15 to report him to the police because he is a drug dealer and
16 the Government had -- they took all of his electronics out of
17 his home, right, they sat him down and questioned him while
18 agents are ripping his house apart and taking 20 or more
19 electronic devices.  They have all of this for years now, and
20 they reviewed all of it and they've got all of these text
21 messages and they've got bank records and everything else, all
22 of this information, is there a single reference directly or
23 indirectly to drugs in any of them, a single one?  No, not a
24 one.  Is that because Mr. Goklu knows that you don't talk
25 about it.  That's what they would have you believe.  He

A-649

Singer - Closing Statement                575

1  doesn't talk about it because he knows that you don't talk

2  about it, but at the same time he's talking about it in his

3  first meeting with the undercover officer, we're not drug

4  dealers.  They can't have it both ways.

5        So folks I encourage you with regard to the second

6  count, read that legal language, read it.  It's the key to the

7  second count, a money transmitting business needs to have a

8  license and all of these other requirements kick in only if

9  it's a money transmitting business and if under that

10  definition you're not convinced that what Mr. Goklu was doing

11  was a money transmitting business, then it's your

12  responsibility to find him not guilty of that count as well.

13  I've been talking for too long.  I'm going to sit down.  I

14  know you're tired of hearing from me.

15        I urge you folks, take what time you need, take your

16  time.  You're going to be surprised when you go back into the

17  jury room when you start talking to each other for the first

18  time about the case about how everybody looked at the same

19  thing and saw or heard a different thing.  It's always a

20  remarkable experience I'm told by jurors.  I've never had the

21  pleasure of sitting on a jury.  I would love to but I don't

22  think I'm going to be picked.  Listen to each other.  Talk to

23  each other.  If you need to listen to the recordings, listen

24  to the recordings.  Be mindful at the beginning of them you're

25  going to hear some dead air and you can skip forward and find

A-650

Proceedings                                      576

1   the place it starts.  It's probably two hours ten minutes or

2   all of it.  If you don't want to listen to all of them, take a

3   couple of shorter ones, listen to the first one.  Listen to

4   something in the middle.  Get a sense of what the interaction

5   is.  But I urge you to take your time and consider and live up

6   to your oaths as jurors to do justice fairly and impartially

7   and hold the Government to the burden of proof because if the

8   Government -- they brought the accusation, they started this

9   ball rolling and they brought the accusation and if their

10  evidence does not satisfy the burden of proof beyond a

11  reasonable doubt, don't hesitate to find Mr. Goklu not guilty

12  of both counts.  Thank you very much.

13          THE COURT:  Thank you very much Mr. Singer.

14          THE COURT:  Ladies and gentlemen, what I would like

15  to do is just take a short break before we hear from the

16  Government on rebuttal.  Let's make it ten minutes and be

17  ready to go a few minutes after 11 especially I know some

18  people may need a nature break.  We'll hear from the

19  Government right after you have return.  Keep an open mind and

20  don't talk about the case.

21          THE COURTROOM DEPUTY:  All rise.

22          (Jury exits.)

23          THE COURT:  Have a seat, everyone.  The reason I

24  wanted to take a break before the rebuttal is I'm a little

25  concerned, Mr. Singer, about the argument you made about the

A-651

Proceedings                                          577

1   money transmitting charge.  You specifically told the jurors

2   to pay attention to the jury charge regarding the meaning of

3   transfer.  Now my concern is that you are suggesting some

4   legal argument that quite honestly should have been raised, I

5   think, during a motion to dismiss long before the trial, or

6   during the jury charge conference because you are suggesting

7   to the jury that what the Government alleges was illegal money

8   transmitting, which is the exchange of Bitcoin for cash

9   doesn't qualify as transferring funds or transmitting.  And I

10  have not heard that argument from you before, nor did we

11  address it in the charges that I'm going to give.  So you may

12  point the jury to my definition of transferring but it doesn't

13  really illuminate that issue and so I am concerned that you're

14  setting them up to question the instruction on a legal theory.

15          If you thought that the Government had miss charged

16  this case, namely that Bitcoin to cash transactions cannot be

17  transferring under the money -- unlicensed money transmitting

18  business statute you should have raised that before your

19  closing argument and certainly before we settled on the

20  charges.  So I feel that you've raised this issue a bit late

21  and I would like to make sure that the jury instruction

22  actually does address this issue.  Is there any legal argument

23  to be made that changing Bitcoin to dollars does not

24  constitute a transfer of funds that would require licensing or

25  constitute money transmitting under the statute?  Mr. Singer.

A-652

Proceedings                                                578

1          SKWRAO:  I can cite to Second Circuit case law.

2          THE COURT:  But, okay.  Then why not make an

3    argument that this should have been dismissed and are you

4    referring to your jury charges or your proposed charges?

5    Because you didn't suggest any change to the language.

6          SKWRAO:  I was satisfied about the language and

7    thought that it accurately stated the element.

8          THE COURT:  But you are arguing -- is your argument.

9    You didn't spell this out for jury you said look closely at

10   the definition, is your argument at least to me but not

11   expressly to the jury that the transaction -- sorry, the

12   conversion of Bitcoin to money does not constitute a transfer

13   of funds that would require -- sorry, that constitutes money

14   transmitting and then requires a license if done as a

15   business.

16         SKWRAO:  I think that it requires transfer to

17   someone else.

18         THE COURT:  What do you mean someone else?  If

19   someone gives you a Bitcoin and they give you cash who else --

20         SKWRAO:  That is not a money transmitting business

21   in my view and I press expressed that to Your Honor at the

22   beginning of the case.

23         THE COURT:  But you never moved to dismiss this

24   count or have it briefed.  Am I missing something?  A legal

25   argument like that ought to have been raised before.  This has

Singer - Closing Statement

A-653

Proceedings                                              579

1  been the allegation all along.  Are you saying that you raised

2  this in the jury charge and I nus confess I don't remember you

3  raising this squarely during our conferences perhaps you

4  alluded to it but you never asked to brief a motion to dismiss

5  which would be the proper vehicle if you think the allegation

6  doesn't state a charge that violates -- that states facts,

7  that violate the statute, I feel and I'm concerned about a bit

8  of sandbagging here.  That's my concern.  You know, I guess

9  the question is how does the Government intend to argue this

10 on rebuttal because the instructions really don't lend any

11 support to either -- to help the jury I think on this issue.

12 I never defined what a transfer of funds means under the

13 statute in the instruction.

14        MS. KASSNER:  Yes, Your Honor, that's right.  This

15 is the very first time the Government is hearing this

16 argument.  Unless it was somehow missed which frankly -- the

17 Government was equally surprised when we heard that during the

18 closing argument.  You know, I agree this is really

19 unfortunate that it's coming to our attention now --

20        THE COURT:  Hold on one second I'm just remembering

21 now.  The Government submitted full blown jury instruction the

22 defense only submitted objection. I don't recall any objection

23 on the basis that the conduct doesn't constitute money

24 transmitting or a transfer is required or that I should advise

25 the jury that an actual transfer to a third party is requred

A-654

Proceedings                                    580

1   which is what you're suggesting Mr. Singer.  I think the

2   Government should be allowed to argue back which is P which is

3   why I wanted to take a break that to the extent that

4   Mr. Singer suggested that another transfer has to occur,

5   national government has to prove that the person who got the

6   cash here I guess the undercover was giving it to someone else

7   or gave it to someone else or that Mr. Goklu believed it was

8   going to be given to someone else.  That is not in the statute

9   per se and I don't think it's been litigated as to what the

10  word transfer means so I don't want the jury to be operating

11  under some misconception about the law that isn't fully

12  explicated in the jury charge they're going to get and I don't

13  want to tie the Governemnt's hands to be able to say that

14  that's just wrong as a matter of law.

15       MS. KASSNER:  Your Honor, I think the concern from

16  the Government -- there are two concerns.  I think what we

17  would really request is a curative instruction from Your Honor

18  because, I think what we don't want to do is heighten the

19  issue by having to do a lengthy explanation about why this is

20  transferring.  I think that in itself is going to draw red

21  flags and I think also we refer the jury to Your Honor for

22  legal matters.  I think that we really just -- we would ask

23  for a curative instruction that provides that exchanging

24  Bitcoin or cash or cash for Bitcoin maybe it could just be

25  that operating a money-transmitting business includes

A-655

Proceedings                                                581

1   exchanging Bitcoin for U.S. currency or U.S. currency for

2   Bitcoin.  I agree this is a legal argument.  I don't want to

3   be litigating a legal argument before the jury.

4            THE COURT:  What I would propose is adding language

5   to the first element of the money transmitting charge which is

6   on page entity four and it would be an additional sentence

7   which would say exchanging Bitcoin for U.S. currency can

8   qualify as a transfer within the meaning of the statute.  I

9   actually am concerned because we haven't had a chance to fully

10  explore this issue but that's really because the defense

11  hasn't raised this squarely as a legal question in any

12  context.

13           You may have mentioned it, Mr. Singer.  I do not

14  recall it.  The Government doesn't recall it, but mentioning

15  it in passing during a status conference doesn't qualify as

16  raising it properly so that we can resolve it and I'm going to

17  go out on a limb and say this is the Government's theory.  If

18  it turns out to be wrong legally I expect there could be some

19  plain error review of this because for now because we are in

20  the middle of closing statements, I'm going to make that

21  change to the jury charge which is to adding a sentence saying

22  exchanging Bitcoin for U.S. currency can qualify as a transfer

23  within the meaning of the statute.

24           MR. SINGER:  Your Honor, I can't object more

25  strongly.

Singer - Closing Statement

A-656

Proceedings                                               582

1          THE COURT:  You can, but the time is before now.

2          MR. SINGER:  Judge, I didn't make this legal

3    argument to the jury.  I said read the charge and the conduct

4    that's alleged doesn't make out the charge.

5          THE COURT:  You want to suggest that the word

6    transfer is the key here and so --

7          MR. SINGER:  I didn't highlight the word transfer.

8    I read the language that you had indicated that you were going

9    to charge the jury and I was satisfied with that because I

10   believed that I could make my argument to the jury based on

11   that.

12         THE COURT:  I am going to go back and look but the

13   plane suggestion to me is that you're suggesting transfer to a

14   third party and I think you used the word third party is

15   required.  I'm going to go back and look.  You're going to try

16   to get the jury to read this instruction which doesn't discuss

17   another transfer to someone else is required to require that

18   the cash then be transferred to someone else and it leaves

19   this ambiguity; one that we did not have to have.  We had a

20   charge conference.

21         If you -- and we had a discussion about what

22   argument you were going to make and not and I understand

23   you're not required to disclose exactly all of your arguments

24   but if I ended up, which I have now, given a charge that

25   doesn't really answer what you claim is a critical question

Singer - Closing Statement

A-657

Proceedings 583

1 about the money transmitting charge, that is a problem.  I

2 don't want to set up the jury to scratch their heads when

3 thinking what did the defense say about look at the meaning of

4 the word transfer in the charge.

5 MR. SINGER:  I didn't say that.

6 THE COURT:  You literally said look at the charge to

7 see how transfer is defined.

8 MR. SINGER:  No, I did not.

9 THE COURT:  I am going to go back and look.  I don't

10 want to misstate it.

11 What did you mean to suggest to the jury then,

12 Mr. Singer?  Read the language in the instruction, listen to

13 it and read it and you determine whether Mr. Goklu takes that

14 definition and I don't think it does.  That's what I said.

15 MS. KASSNER:  Your Honor, that's the problem.  I

16 think the question of whether this conduct qualifies as a

17 money transmitting business under that definition is a legal

18 question and so I think that implication was improper --

19 MR. SINGER:  First, it's a factual question for the

20 jury.  That's why we have given it to the jury to decide.

21 Otherwise, just direct a verdict on it.  The jury decides

22 that.  The jury decides whether the evidence supports the

23 accusation that -- they have to decide whether the facts that

24 have been established make out that element.  It's not for the

25 Court to tell them that what he did constitutes the element of

Singer - Closing Statement

A-658

Proceedings                                                    584

1   the crime.

2           THE COURT:  On the money transferring business, this

3   is a matter of the language and I'm going to encourage you

4   folks to listen carefully to the Judge as she defines the

5   language of this charge and you're going to have it before you

6   written down. A money transmitting business is a business

7   which for a fee accepts currency for transfer.  That's the

8   language that you're being given and I submit to you that

9   under the definition that the Judge is giving to you that

10  Mr. Goklu is not operating a money transmitting business; that

11  the evidence does not prove beyond a reasonable doubt that

12  he's accepting currency for transfer.

13          Accepting currency for transfer.

14          That's what I heard that made me think it's got to

15  be literally then transferred to someone else.  In other

16  words, the Government's theory is he accepted Bitcoin which is

17  currency for transfer to someone, like Western Union which you

18  did refer to, as I recall.  That is a misleading statement

19  about the law and so the Government ought to be able to say to

20  the jury, to the extent that you are thinking that some

21  other -- that Mr. Goklu then had to take the Bitcoin and give

22  it to someone else or that the customer had to take the cash

23  and give it to someone else, that is not what's required under

24  the statute.  That's what I'm addressing.

25          MR. SINGER:  I think you're reading too much into

Singer - Closing Statement

A-659

Proceedings                                                      585

1   that.  You're making inferences and assumptions about it and I

2   think it's for the jury to decide that.

3               THE COURT:  Mr. Singer, what exactly were you

4   arguing to the jury then?  Be candid.  What were you

5   suggesting?  Listen to whether he accepted currency for

6   transfer.  What did you want them to think?

7               MR. SINGER:  That's not what Mr. Goklu did.

8               THE COURT:  Right.  Why not?

9               MR. SINGER:  Because he didn't transfer the money.

10              THE COURT:  This is the problem.  Transfer what

11  money; the Bitcoin?

12              MR. SINGER:  Judge, the Second Circuit as far back

13  as 1999 has said that a money transmitting business receives

14  money from a customer and then for a fee paid by the customer

15  transmits that money  to a recipient.

16              THE COURT:  You know what, that may be a legitimate

17  argument to have made before we started this trial and before

18  I produced these jury charges.  It's a legal about whether

19  what the Government has alleged and has always alleged to be

20  the money transmitting crime is a crime.  I'm not saying you

21  might not have a legal argument, but the time to make it and

22  to then sandbag the jury and me, quite frankly, in terms of

23  the charges I was prepared to give, is not in the middle of

24  your closing.  That's my problem.

25              MR. SINGER:  I don't believe that I did that.  I'm

Singer - Closing Statement

A-660

Proceedings                                             586

1  sorry if the Court reads it that way.  I was satisfied with

2  the legal language that you were including in the charge.  I

3  asked the jury to read the language and to consider the

4  conduct that was alleged to determine whether the conduct made

5  that out.  That's what the jury's job is.

6         THE COURT:  Mr. Singer, you've known all along that

7  the Government's theory about the money transmitting business

8  was that he was converting Bitcoin into cash.  That's what

9  they alleged.  So the question then why would you not have

10 raised this issue earlier saying that I don't think that that

11 states a crime under the statute because it's not a transfer,

12 and the problem right now is that we're dealing with a legal

13 issue that I am not equipped to deal with in this moment and

14 I'm going to instruct the jury that the exchange of Bitcoin

15 into cash does constitute a transfer for the purposes of the

16 statute.  If it turns out to be wrong, you may have an

17 argument before the Court of Appeals, but my concern is that

18 this wasn't properly raised before trial.

19        Maybe you'll get plain error review of that if he's

20 convicted, but this -- it's about process for me more so now.

21        MR. SINGER:  You're directing a verdict after you

22 provided us with a charge, after I made my closing argument.

23 You're now going to give them an instruction that essentially

24 directs a verdict and I don't think it's fair or appropriate.

25        THE COURT:  No I'm not you're making an argument

Singer - Closing Statement

A-661

Proceedings                              587

1    that I'm hearing for the first time.  I'm trying to advise the

2    jury coherently on a legal argument that you're essentially

3    making to them about what constitutes transfer.  It should at

4    a minimum be addressed in the jury charges or raised as an

5    issue.  What you did is you put it in front of the jury

6    without giving either me or the Government a chance to address

7    the legal argument that you're making.  That's pure and

8    simple.  You have acknowledged that you're trying to argue to

9    the jury that the conversion of Bitcoin to cash does not

10   constitute a transfer because the money --

11           MR. SINGER:  It doesn't -- it doesn't make what

12   Mr. Goklu did a money transmitting business.

13           THE COURT:  Because it doesn't mean he transferred

14   currency.  That's what you argued to them and that's the

15   problem I have.  Now, I guess the Government can come back and

16   say he transferred currency because he gave it to the Bitcoin

17   owner.

18           MS. KASSNER:  I don't think that's sufficient Your

19   Honor.  Frankly, I agree that the fact that -- we have never

20   heard this argument before.  We certainly could have presented

21   the evidence differently if we knew that this was an issue.  I

22   think this is a secondary issue, but the fact that the portion

23   of the jury instructions that defense counsel cited also refer

24   to accpeting currency for transfer and left no explanation --

25   the Government raised its concern about that, but I think

Singer - Closing Statement

A-662

Proceedings                                           588

1  hopefully the Court's actual instructions addressed that

2  already.

3          THE COURT:  Let's do this:  Mr. Singer, you have

4  your objection.  I am going to add the language, one sentence

5  in the money transmitting business instruction on page 24 that

6  exchanging Bitcoin for U.S. currency can qualify as a transfer

7  within the meaning of the statute and then the Government make

8  its argument, but given will the circumstances and the late

9  disclosure of this legal theory, the legal insufficiency of

10  the alleged conduct, I feel that I have to just make a choice.

11          I suspect the other choice is to leave it alone and

12  see if the jury is confused.  That's the other way to deal

13  with it in which case I would instruct them that it qualifies,

14  but I don't think it makes sense.  Either the Government is

15  right that this is a viable theory or not, which if they're

16  wrong, then they'll lose on appeal if it's not a viable theory

17  and I've incorrectly instructed the jury.  And that's what I'm

18  going to do.

19          You have your objection, Mr. Singer.

20          MR. SINGER:  Thank you.

21          MS. DIOUF:  Your Honor, I was going to preview the

22  language on rebuttal.  So to the extent that defense counsel

23  has suggested that another transfer to a third party is

24  required for this count, that is not the law.  It's not in the

25  statute.  In fact, Judge Chen will instruct you on that.

Singer - Closing Statement

A-663

Rebuttal - Diouf                                    589

1          THE COURT:  Yes, fine.

2          MR. SINGER:  I will note my objection now to that

3    argument.

4          THE COURT:  You can, absolutely.

5          (Recess taken.)

6          THE COURT:  Mr. Singer, I did want to address your

7    argument that I'm directing the verdict by adding this

8    instruction.  I don't think that that's correct because I do

9    say you can find it qualifies.  I'm not directing them or

10   telling them that they must find it qualifies which is

11   different from how other terms are defined in the instructions

12   or other instructions which say if you find the following, you

13   should convict him or you should not convict him.

14         So I think in that regard trying to add qualifying

15   language to address what I think will be a significant point

16   because of your argument during summation and to make clear to

17   the jury that they can find that the Bitcoin-to-cash

18   conversion qualifies as a transfer.  So just to make that

19   clear on the record.  We're going to get the jury now.

20         My law clerk is incorproationting that last change.

21   What you'll get is a track change version of what's changed

22   from yet to now and a clean version after the summations

23   because I will ask you to quickly let me know if the

24   instructions as revised are fine.

25         (Jury enters.)

Singer - Closing Statement

A-664

Rebuttal - Diouf                        590

1          THE COURT:  Please be seated, everyone.  My

2    apologies, ladies and gentlemen.  It took longer than I

3    thought.  So I didn't mean to keep you in the room for longer

4    than I said, but we are now ready to hear the rebuttal

5    statement of the Government.

6          Ms. Diouf, You may proceed.

7          MS. DIOUF:  Members of the jury, you heard my

8    colleague, Ms. Kassner, talk about the evidence today.  You

9    heard my colleague Ms. Kassner talk about the evidence today

10   and I'm not going to repeat what she said.  I just want to

11   take a few more minutes of your time to talk about what

12   defense counsel has told you.  Now, the Government has the

13   burden of proving its case beyond a reasonable doubt and we

14   embrace that burden, but when defense counsel makes arguments

15   about the evidence the Government presented, you should think

16   through those arguments and see if they actually make sense in

17   light of all of the evidence you have seen in this trial and

18   rather than focusing on what actually happened.  Defense

19   counsel is asking you to use your imagination, but you don't

20   need to because you have evidence.

21         I want to start with Count Two.  Defense counsel is

22   asking you to conclude that soliciting customers through an

23   online advertisement and meeting them sometimes multiple times

24   to exchange Bitcoin for a fee is not a business.  Members of

25   the jury, you know what a business is.  The defendant charged

A-665

Rebuttal - Diouf                          591

1   a fee.  He exchanged money multiple times and the defendant

2   himself calls it a business.  And defense counsel talked to

3   you about the definition of a money transmitting business.

4   And this is important: To the extent that the defense counsel

5   suggested that what the defendant was doing wasn't a transfer,

6   Judge Chen will instruct you that exchanging Bitcoin for cash

7   is a transaction.

8           And you heard from the Department of Financial

9   Services and the Department of Treasury, those two witnesses,

10  who told you that a money transmitting business includes

11  people who regularly exchange Bitcoin for cash.  And defense

12  counsel says a lot of things; okay, he talked about how the

13  defendant drove around John McCain.  That's not relevant.  The

14  defendant had a money transmitting business.  This was not a

15  single, isolated transaction.  It's something he did

16  regularly.  That's it.  Welcome to Count One.

17          Now let's talk about money laundering.  Defense

18  counsel says that the defendant believed the Bitcoin he was

19  exchanging from the undercover came from lawful activity.

20  Well -- and that it wasn't from illegal drug sales.  Let's

21  take a step back and walk through a few things.  Let look at

22  what the defendant heard, what he did, what choices he made,

23  what he believed.  Let's look at the December 2018 meeting

24  between the defendant and the undercover.  They meet, they

25  start transacting.  They agree upon $20,000.  The undercover

Singer - Closing Statement

A-666

Rebuttal - Diouf                           592

1   tells the defendant that his inability to meet with him the
2   week before caused problems for the undercover and his
3   business.  The undercover has a lot of people to pay and
4   they're not great people.  The undercover asked the defendant
5   if he can exchange $100,000 in January, in the new year.  The
6   defendant has a choice here.  What does he do?  He responds,
7   okay, and he offers to launder $50,000 more for the undercover
8   in that same meeting.

9           On January 4, 2019 they meet again.  The undercover
10  says he has insane amounts of money coming in.  These college
11  kids can't get enough.  The undercover offers the defendant
12  oxycodone.  The defendant responds, don't bring those, just
13  bring regular street things, which by the way shows that even
14  if he didn't know exactly what oxycodone was, he knew it's
15  some kind of a drug.  Also Adderall, oxycodone, pills.  That
16  is not drug lingo.  He understands it.

17          Again, the defendant has a choice and what does he
18  do?  He agrees to meet the undercover again and launder more
19  of his drug money.  A few days later January 30th, the
20  defendant tells the undercover that he does not want to
21  convert $100,000 at a time.  He asks the undercover if they
22  can split the transaction.  The defendant says because with
23  100 if we get in trouble, we are both fucked up.  40 is okay.
24  The defendant isn't saying I won't launder $100,000 for you.
25  No he's saying $100,000 at one time is too much.  Let's break

Singer - Closing Statement

A-667

Rebuttal - Diouf                                593

1  it up.  Why?  To conceal where this money is coming from, to

2  launder it.

3          Defense counsel argues that the defendant didn't

4  know the undercover's business is illegal.  Well, let's look

5  at what else the undercover tells the defendant.  He tells the

6  defendant he's worried about people he knows in California

7  shooting at them in the car.  He tells the defendant he's

8  worried about having his head chopped off if he doesn't pay

9  people on time.  The people he works for arent' good people.

10  Does this sound like a legal business to you?  What type of a

11  person is worried about being killed by their colleagues?

12  Drug dealers.

13          And the defendant has a choice here too, but what

14  did he do?  He continued to launder the undercover's Bitcoin

15  and look at how the defendant describes his business partners.

16  He told the undercover that one of his partners was caught

17  laundering money for a drug dealer.  He told the undercover

18  that one of his partners gets money whose job is hookers.

19  He's a pimp.  And the defendant talks about the money counter.

20  The defendant tells the undercover he has a money counter in

21  case he is getting money from somewhere bad.  People who get

22  money from legitimate sources don't need to worry about

23  counterfeit bills.

24          And defense counsel's also argues that someone might

25  use the defendant's service because it's faster and more

A-668

Rebuttal - Diouf                                    594

1   convenient about cabe.  Nothing about the defendant's service
2   is quick or convenient.  Just look at the messages between the
3   defendant and the undercover.
4          Even after they had a relationship it took days,
5   days, to set up a meeting and sometimes when the undercover
6   got there, the defendant didn't have the agreed-upon amount.
7   And defense counsel talks about check cashing businesses and
8   Paychex, and how that's fast and convenient.  Yeah, they are.
9   But you know what they also have?  Your name on the paycheck.
10          The defendant's type of service wasn't cheap, it
11  wasn't fast, it wasn't reliable and it certainly wasn't
12  convenient.  And defense counsel also talks about how Coinbase
13  is insured.  Exchanging Bitcoin for cash in the back of a
14  parked car in a Wendy's parking lot is certainly not insured.
15  Legitimate exchangers do not operate out of Starbucks and a
16  Wendy's parking lot.  It's dangerous.
17          The only reason to use a service like the
18  defendant's is to conceal where the money was coming from and
19  who would do that?  Drug dealers.  And defense counsel makes a
20  big deal about the fact that the undercover agent didn't
21  explicitly talk about drugs at first and that the transactions
22  before that aren't illegal, but that doesn't matter.  And this
23  is really important, the only thing the Government needs to
24  prove that once, just once, the defendant knew that the money
25  he was converting came from illegal drug proceeds and that the

Singer - Closing Statement

A-669

Rebuttal - Diouf                                595

1    defendant did it anyway.

2           Judge Chen will instruct you that one way of knowing

3    is closing your eyes to what's around you.  That's enough for

4    the defendant to be guilty.  We just went over what the

5    defendant knew before the December and January transactions

6    and let's look at what the defendant definitely knew leading

7    up to the last transaction when he was arrested.  Let's look

8    at the text exchange between the undercover and the defendant

9    that took place in April 2019 and this is Government Exhibit

10   507 at page three.

11          (Exhibit published.)

12          MS. DIOUF:  April 22nd.  Pat tells the defendant he

13   needs $100,000.  The defendant responds with a speech.  I'm

14   not a money laundering guy.  The defendant is saying, I'm

15   worrying about being accused of money laundering if I exchange

16   that amount of money for you.  He knows the undercover is a

17   drug dealer, but he didn't walk away.  He responds: I can do

18   only $49,999.  This is a very specific amount.  Why?  Not

19   because he thought he wasn't laundering that amount of money,

20   but he didn't think he would get caught laundering a lower

21   amount.

22          The defendant is saying he knows what money

23   laundering is and is aware that people use his service to

24   launder money and conceal where it came from.  That was on

25   April 22, 2019.  And, now, let's look at Government Exhibit

Singer - Closing Statement

A-670

Rebuttal - Diouf                    596

1    228, the defendants signal messages at page 12.

2              (Exhibit published.)

3         MS. DIOUF:  This is message thread 12.  This thread

4    starts a few days after the defendant's speech to the

5    undercover.  This is on April 26th.  While the defendant is

6    arranging to meet the undercover, he's negotiating yet another

7    transaction with someone else who he also thinks is a drug

8    teller.  Remember what happens in this thread?  Let's skip

9    ahead to page 20 in this Government Exhibit.

10             (Exhibit published.)

11        MS. DIOUF:  The deal goes south.  They're fighting.

12   They're insulting each other.  Out of nowhere the defendant

13   says, I'll report you to NYPD.  I'm contacted by NYPD to mark

14   drug dealers.  You will be reported son of a bitch.  How does

15   the customer respond?  Let's look at page 21 of this exhibit:

16   Good luck.  You don't have my name.  All you have is my burner

17   cellphone number.

18             The defendant knows that people use his service to

19   remain anonymous, to conceal where their money is coming from.

20   And let's look at the last page of this thread, page 22 of

21   this exhibit.  This is why I split my transactions, you fool.

22   I did eight transactions, all over 3,000 and still got to wash

23   another 29K.  Only a matter of time before you snitch on the

24   wrong person and get killed.

25             These are the types of people that the defendant is

A-671

Rebuttal - Diouf                                597

1   meeting in the parking lots of Wendy's and Starbucks.  He

2   knows that people use his business to launder drug money.  He

3   knows they use services like his to hide where their money is

4   coming from.  And, four days later, he meets the undercover to

5   launder their agreed-upon $49,999.  They get into the

6   defendant's car.  They start counting cash.  The defendant

7   asks how's business.  It's booming.  The undercover tells him

8   his real money is not from marijuana, but from Adderall and

9   pills.  The defendant responds.  He asks more about the

10  undercover's marijuana business.  The undercover tells him

11  it's risky; that his buddy was arrested by the feds just the

12  other day and the defendant responds: He says, oh, you got to

13  be in California.  You go out, it's trouble, right?

14          The defendant knows the undercover's business is

15  illegal and the defendant has another choice here.  What

16  choice does he make?  He offers to launder another $25,000 and

17  the defendant would have finished that deal except he was

18  arrested.

19          As jurors, the most important skill you bring with

20  you to this courtroom is your common sense.  Does defense

21  counsel's claim that the defendant didn't know he was

22  converting drug money make sense?  It doesn't.  I submit to

23  you that the evidence establishes beyond a reasonable doubt

24  that the defendant knew he was laundering drug money.  As I

25  said, Judge Chen will instruct you that one type of knowing is

A-672

Rebuttal - Diouf                                                    598

1  closing your eyes to what's happening.  And that means the

2  defendant is guilty.

3         The defendant is charged with money laundering and

4  operating a money remitting business without a license and I

5  submit that is what we have proved beyond a reasonable doubt.

6  Defendant's counsel wants you to imagine away the overwhelming

7  evidence in this case.

8         At the beginning of this trial I stood before you

9  and I told you that there will come a time when I wil ask you

10 to return the only verdict that is consistent with the

11 evidence and your common sense.  That is where we are now.  We

12 ask that you find the defendant, Mustafa Goklu, guilty.  Thank

13 you.

14         THE COURT:  Thank you, very much.  Have a seat.  So

15 ladies and gentlemen, we're going to take and I promise, a

16 five-minute break because we need to get copies of the jury

17 instructions here in front of us.  So we'll give you five

18 minutes and so rather than have you sit here we'll let you go

19 back to the jury room, but as soon as you come back out I will

20 instruct you on the law and you can begin your deliberations.

21 Bear with us another minute and thank you.  Don't talk about

22 the case.

23         THE COURTROOM DEPUTY:  All rise.

24         (Jury exits.)

25         THE COURT:  Quickly take a look at the red line

Singer - Closing Statement

A-673

Rebuttal - Diouf                                    599

1  version and let us know if there are any issues.  Everyone now

2  has a track change version as well as a clean version and I've

3  asked the parties to let me know if the current version is

4  fine for reading to the jury.

5           And noting the defense's objection to the language I

6  added about transfer.

7           MR. SINGER:  This is consistent -- these

8  instructions are consistent with the discussions that we had

9  of yesterday's part of the charge conference and this morning.

10 The objections that I previously noted about yesterday and

11 today stand, but otherwise I believe that this reflects the

12 rulings of the Court.

13          THE COURT:  Thank you, Mr. Singer.

14          MS. KASSNER:  This looks fine from the Government's

15 perspective.

16          THE COURT:  So we're going to go ahead and get the

17 jury.

18          (Pause in proceedings.)

19          (Jury enters.)

20          THE COURT:  Please be seated everyone.  I'm sure,

21 ladies and gentlemen, that you've now figured out that five

22 minutes in the courtroom is the like the last two minutes of a

23 basketball game.  It lasts a whole longer than the actual

24 time.  Thank you for your patience.

25          I'm going to now instruct you on the law.

Singer - Closing Statement

A-674

Rebuttal - Diouf                                        600

1          Fida, I will give you a minute.

2          We're going to project it on the overhead so you can

3    follow along.  As I said to you earlier or actually I didn't,

4    I don't think, you will get a copy of the written instructions

5    for your deliberations so you don't need to worry about

6    writing down everything that's in these instructions but

7    obviously if you want to take notes you can do so.

8          All right.  Ladies and gentlemen -- I'm going to dim

9    the lights which everyone if everyone promises to stay awake.

10         Ladies and gentlemen of the jury, now that you have

11   heard all of the evidence in the case as well as the arguments

12   of the lawyers, it is my duty to give you instructions as to

13   the law applicable in this case.  We have are all grateful to

14   you for the close attention you have given to this case thus

15   far.  I ask that you continue to do so as I give you these

16   instructions.

17         As you know, the defendant Mustafa Goklu is charged

18   with money laundering and the operation of an unlicensed money

19   transmitting business.  The defendant has pleaded not guilty

20   to all charges, my instructions will be in three parts.

21   First, I will instruct you regarding the general rules that

22   define and govern the duties of a jury in a criminal case such

23   as this.

24         Second, I will instruct you as to the particular

25   crimes charged in this case and the specific elements that the

A-675

Rebuttal - Diouf                                         601

1   Government must prove with respect to each crime.  Third, I

2   will give you some general rules regarding your deliberations.

3   First, general instructions, role of the Court and jury.

4

5              (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Singer - Closing Statement

A-676

JURY CHARGE                                                    602

1  (Continuing)

2          THE COURT:  Let me start by restating our respective

3  roles as judge and jury.  Your duties, as I mentioned in my

4  opening instructions, is to find the facts from all the

5  evidence in this case.  You are the sole judges of the facts

6  and it is for you and you alone to determine what weight to

7  give the evidence to resolve such conflicts as may have

8  appeared in the evidence and to draw such inferences as you

9  deem to be reasonable and warranted from the evidence.

10         My role is to instruct you on the law.  You must

11 apply the law in accordance with my instructions to the facts

12 as you find them.  I remind you of your sworn obligation to

13 follow the law as I describe it to you whether you agree with

14 it or not.  You should not be concerned about the wisdom of

15 any rule of law that I state regardless of any opinion you may

16 have about what the law may be or should be, it would be a

17 violation of your oaths as jurors to base your verdict upon

18 any other view of the law than the one given you to in these

19 instructions.

20         If any of the lawyers have stated a legal principle

21 that differs from any that I state to you in my instructions,

22 you must be guided solely by what I instruct you about the

23 law.  You should not single out any one instruction as alone

24 stating the law, but consider my instructions as a whole.

25 Because it is your role, not mine, to determine the facts.  I

Shernelle Griffith

A-677

JURY CHARGE                                                603

1    did not state or imply any view about how you should decide

2    the facts of this case.  You should not conclude from anything

3    I have said or done during this trial, including these

4    instructions, that I have an opinion about the facts or the

5    merits of this case.

6            For example, occasionally I may have asked a witness

7    or a lawyer questions.  These questions were only intended for

8    clarification to expedite matters and not to suggest any

9    opinions on my part as to the verdict you should reach or

10   whether any of the witnesses may have been more credible than

11   any other witnesses.  You should not attach -- you should

12   attach no special significance to my question simply because I

13   asked them.

14           A.:  The quality of the Government and the Defense

15   Before the Court.

16           The fact that the Government is prosecuting this

17   case, on behalf of the United States of America, should not

18   affect your evaluation of the evidence and tasks before you.

19   The Government is entitled to no greater consideration than

20   the defendant.  By the same token, however, the Government is

21   entitled to no less consideration.  All parties, whether the

22   Government or individuals, are equal before the law and are

23   entitled to equal considerations.

24           I think there is an and missing there.

25           B.:  No Sympathy, Fear, Prejudice or Basis.

Shernelle Griffith

A-678

JURY CHARGE                                    604

1          It is your responsibility to decide the facts with

2   complete fairness and impartiality and without any bias or

3   prejudice or sympathy for any party.  You must perform your

4   duties as jurors with complete fairness and impartiality.  You

5   must carefully and impartially consider the evidence.  Follow

6   the law as I've given it to you, or as I give it to you, and

7   reach a just verdict regardless of the consequences.  The

8   crucial question you must ask yourselves as you sit through

9   the evidence is, has the Government proven the guilt of the

10  defendant beyond a reasonable doubt.

11         It is fair for you alone to decide -- sorry.  It is

12  for you alone to decide whether the Government has met the

13  burden to prove each element of the crime charge solely on the

14  basis of the evidence before you and the law as I charge us.

15  If you should find that the Government has met its burden of

16  proving the defendant's guilt beyond a reasonable doubt, you

17  may render a verdict of guilty without concern for sympathy or

18  any other reason.

19         On the other hand, if you have a reasonable doubt as

20  to the defendant's guilt, you should not hesitate because of

21  sympathy, fear, prejudice, or basis for or against anyone to

22  find the defendant not guilty.  In reaching your decision as

23  to whether the Government has sustained the burden of proof,

24  you may not consider any personal feelings you may have about

25  the defendant's race, ethnicity, national origin, sex or age

A-679

JURY CHARGE                                    605

1    or that of any witness or anyone else involved in this case.

2    All persons charged with a crime are entitled to the same

3    presumption of innocence.  The Government has the same burden

4    of proof with respect to all persons.

5           As with any other individual charged with a crime,

6    the issue is whether the Government has met its burden of

7    demonstrating each and every element of the offense beyond a

8    reasonable doubt as to the defendant.

9           C.:  Function of the Indictment and What Is Not In

10   Evidence.

11          The defendant has been charged in an indictment with

12   violating federal laws.  The Government -- the indictment is

13   merely a statement of the charges against the defendant.  The

14   indictment is not itself evidence.  Nor does it create an

15   inference of guilt.  It is an accusation and nothing more.

16          D.:  The Presumption of Innocence and Burden of

17   Proof.

18          As previously stated, the defendant has entered a

19   plea of not guilty as to all the charges against him in the

20   indictment.  The defendant is presumed to be innocent of the

21   charges against him.  And that presumption alone, unless over

22   come, is sufficient to acquit him.  The legal presumption of

23   innocence remains in force until such time, if ever, that you

24   as a jury is satisfied that the Government has proven the

25   guilt of the defendant as to each element of any particular

Shernelle Griffith

A-680

JURY CHARGE                          606

1    crime charged beyond a reasonable doubt.

2           The Government alone bears the burden to prove the

3    defendant's guilt as to each element of the charges beyond a

4    reasonable doubt.  The law never imposes upon a defendant in a

5    criminal case the burden or duty of calling any witnesses or

6    producing any evidence.  Your task in deliberations is not to

7    decide between guilty and innocence, it is to decide between

8    guilty and not guilty based on the evidence or lack of

9    evidence.

10          Indeed, the presumption of innocence alone requires

11   you to acquit the defendant of the charge you are considering

12   unless you are unanimously convinced that the Government has

13   met its burden to prove that is he guilty of the charged

14   beyond a reasonable doubt.

15          Now, let me pause for one moment.  Just because, as

16   I often say, the trip is always faster when you know where you

17   are going.  So we have 29 pages in total to get through and we

18   are now on Page 6.  So for those of you that like to count

19   pages, we have about 23 to go.

20          E.:  Reasonable Doubt.

21          You maybe wondering what is reasonable doubt.  The

22   words almost define themselves.  It is doubt based upon reason

23   and common sense.  It is a doubt that a reasonable person has

24   after carefully weighing all of the evidence or lack of

25   evidence.  It is a doubt that would cause a reasonable person

A-681

JURY CHARGE                           607

1  to hesitate to act in a matter of the highest importance in

2  his or her life.

3         Proof beyond a reasonable doubt must therefore be

4  proof of such a convincing character that a reasonable person

5  would not hesitate to rely and act upon it in the most

6  important of his own affairs.  A reasonable doubt is not

7  caprice or whim.  It is not speculation or suspicion.  It is

8  not an excuse to avoid the performance of an unpleasant duty.

9  And it is not sympathy.

10         The law does not require that the Government prove

11  guilt beyond all possible doubt.  Proof beyond a reasonable

12  doubt is sufficient to convict.  If after fair and impartial

13  consideration of the evidence you are satisfied beyond a

14  reasonable doubt of the guilt of the defendant as to a

15  particular charge, you should find defendant guilty of that

16  charge.  On the other hand, if after fair and impartial

17  consideration of the evidence or lack of evidence concerning a

18  particular charge, you have a reasonable doubt as to the

19  defendant's guilt, you must find the defendant not guilty of

20  the charge.

21         F.:  Punishment.

22         Under your oaths as jurors, you are not to consider

23  the question of the possible punishment the defendant may

24  receive if he is convicted.  The duty of imposing a sentence,

25  if necessary, rest exclusively on me.  You cannot allow

A-682

JURY CHARGE                                608

1    consideration of the punishment that may be imposed upon the

2    defendant, if he is convicted, to influence your verdict in

3    any way or to enter into your deliberations in any sense.

4    Your duties as jurors is to weigh the evidence in this case

5    and to determine whether or not the defendant is guilty beyond

6    a reasonable doubt solely upon the basis of the evidence

7    before you.

8            G.:  The Definition of Evidence and Meaning of

9    Objections.

10           I will now talk to you about what evidence is and

11   how you should consider it.  You must determine the facts in

12   this case based solely on the evidence presented and those

13   inferences which can be reasonably drawn from the evidence

14   presented.  The evidence in this includes the sworn testimony

15   from the witnesses and documentary exhibits that have been

16   received in evidence by me and the stipulations by the

17   parties.

18           As I explained at the beginning of the case, certain

19   things are not evidence and you should disregard them in

20   deciding what the facts are in this case.  As I have already

21   instructed, the indictment in this case is not evidence.  The

22   arguments and statements of the lawyers, including the opening

23   statements and closing arguments of the lawyers, are not

24   evidence.  If anything the lawyers said about the evidence in

25   their statements or arguments conflicts with your own memory

Shernelle Griffith

A-683

JURY CHARGE                                     609

1  of the evidence, it is your recollection that governs.

2  Objections to questions or exhibits are not evidence.  Also

3  statements that attorneys make while objecting to questions

4  and exhibits are not evidence.

5         The lawyers have a duty to their clients to object

6  when they believe something is improper under the rules of

7  evidence.  You should not be influenced by any such objection.

8  If I sustained an objection, you must ignore the question or

9  exhibit, and must not try to guess what the answer might have

10  been or the exhibit might have contained.  If I overruled an

11  objection, treat the answer or exhibit like any other.

12         Anything you may have seen or heard outside of the

13  courtroom is not evidence.  Any testimony or exhibit that has

14  been excluded, stricken, or that you have been instructed to

15  disregard is not evidence.  Transcripts of audio recordings is

16  not evidence, as I told during the trial.  During the trial

17  you heard audio recordings and received written transcripts to

18  aid you in listening to these recordings.  The transcripts

19  themselves are not evidence.  Therefore, you may only consider

20  what you heard and understood the contents of the recording to

21  be.  If you perceived the difference between the recording and

22  the transcript, you must rely only on what you heard because

23  the transcripts are not evidence.

24         Finally, anything I have said or done during these

25  proceedings is not evidence or any indication as to the

Shernelle Griffith

A-684

JURY CHARGE                                         610

1  defendant's innocence or guilt.

2          H.:  Direct and Circumstantial Evidence.

3          As I mentioned in my opening instructions, there are

4  generally speaking two types of evidence, direct and

5  circumstantial.  You may use both types of evidence in

6  reaching your verdict in this case.  The law makes no

7  distinction between the weight to be given to these two types

8  of evidence and it is for you to give weight to any such

9  evidence as you see appropriate.  You must base your verdict

10  on a reasonable assessment of the all of the evidence in the

11  case.

12          Direct evidence is testimony from a witness about

13  something he or she knows by virtue of his or her own senses.

14  Something he or she has seen, felt, touched, tasted, or heard.

15  Circumstantial evidence on the other hand is proof of a chain

16  of circumstances that point to the existence or nonexistence

17  of certain facts.

18          A simple example of circumstantial evidence is as

19  follows:  Suppose you came to court on a day when the weather

20  was clear, sunny and dry.  However, after several hours in the

21  courtroom where there are no windows, you observe a person

22  come in wearing a wet raincoat and another person shaking a

23  wet umbrella.  Without you ever looking outside you would not

24  have direct evidence that it rained, but you might infer from

25  these circumstances that while you were sitting in court it

Shernelle Griffith

A-685

JURY CHARGE                    611

1    rained out doors.  That is all there is to circumstantial

2    evidence.

3         On the basis of reason, experience, and common

4    sense, you infer the existence or nonexistence of a fact from

5    one or more established facts.  You are permitted to draw from

6    the facts that you find to have been proved such reasonable

7    inferences as would be justified in light of your experiences.

8    Inferences are deductions or conclusion that reason and common

9    sense lead you, the jury, to draw from the facts that have

10   been established by the evidence in this case.  Use your

11   common sense in drawing inferences.

12        However, you are not permitted to engage in mere

13   guesswork or speculation.  There are times when different

14   inferences maybe drawn from the facts whether proved by direct

15   or circumstantial evidence.  Perhaps the Government asked you

16   to draw one and the defendant asked you to draw another.  It

17   is for you and you alone to decide what inferences you will

18   draw, whether based on a -- whether based on direct or

19   circumstantial evidence or upon the logical, reasonable

20   inferences drawn from such evidence, you must be satisfied of

21   the guilt of the defendant beyond a reasonable doubt before

22   you may convict.

23        No significance should be attached to the fact that

24   a document or other exhibit or witness testimony was

25   introduced by one party rather than by the other.  Any party

Shernelle Griffith

A-686

JURY CHARGE                                612

1    is entitled to the benefit of any evidence tending to

2    establish its contentions, even though such evidence may have

3    come from witnesses or documents introduced by another party.

4            I.:  Witness Credibility.

5            In deciding what the facts are in this case, you

6    must consider all of the evidence that has been offered and

7    must decide which testimony to believe and which testimony not

8    to believe.  You are the sole judges of credibility of the

9    witnesses and the weight their testimony deserves.  There is

10   no one single way to determine credibility.

11           In your daily lives you make such decisions

12   regularly.  The same standards, as well as your common sense,

13   should guide you here.  Your determination of the issue of

14   credibility very largely must depend upon the impression that

15   a witness made upon you as to whether or not that witness was

16   telling the truth or giving an accurate -- giving you an

17   accurate version of what occurred.

18           You may choose to disbelieve all or part of any

19   witnesses testimony.  In deciding and to what extent to

20   believe a witnesses testimony, you may consider any number of

21   factors, including the following:

22           The witness's opportunity to see, hear, and know

23   about the events he or she described.  The witness's ability

24   to recall and describe those things accurately.  The witness's

25   way of testifying.  Was a witness candid and forthright or did

Shernelle Griffith

A-687

JURY CHARGE                              613

1   the witness seem if he or she was hiding something, being

2   evasive, or suspect in some way.  How the witness's testimony

3   on direct examination compared with how the witness testified

4   on cross examination.  The reasonableness of the witnesses

5   testimony in light of all the other evidence in this case.

6   Whether the witness had any possible bias, any relationship to

7   a party, any motivate to be untruthful, or any possible

8   interest in the outcome of the trial.  And whether the

9   witness's testimony was contradicted by his or her other

10  testimony by what that witness said or did on a prior

11  occasion, by the testimony of other witnesses or by other

12  evidence.

13          Inconsistencies or discrepancies in the testimony of

14  a witness or between the testimony of different witnesses may

15  or may not cause you to discredit such testimony.  In weighing

16  the effects of an inconsistency, you should consider whether

17  it relates to an important fact or an unimportant detail.  And

18  whether in your view, the inconsistency results from an

19  innocent error or an intentional falsehood.  If you find that

20  any statement made by a witness on the stand is false in whole

21  or in part, you may disregard the particular part you find to

22  be false or you may disregard his or her entire testimony as

23  not worthy of belief.

24          In evaluating the credibility of the witnesses, you

25  should take into account evidence that the witness who

Shernelle Griffith

A-688

JURY CHARGE                    614

1   testified may benefit in the some way from the outcome of this
2   case.  Such an interest in the outcome creates a motivate on
3   the part of witness to testify falsely and may sway the
4   witness to testify in a way that advances his own interest.
5   Therefore, if you find that any witness whose testimony you
6   are considering, may have an interest in the outcome of the
7   trial, then you should bear that factor in mind when
8   evaluating the credibility of his or her testimony and
9   evaluate it with great care.
10          This is not to suggest that ever witness who has an
11  interest in the outcome of the case will testify falsely.
12  There are many people who no matter what their interest in the
13  outcome of a case maybe would not testify falsely.  It is for
14  you to decide based on your own perceptions and common sense
15  to what extent, if at all, the witness's interest has affected
16  or colored his or her testimony.
17          J.:  Testimony of the Defendant Right Not To
18  Testify.
19          The defendant did not testify in this case.  Under
20  the Constitution, the defendant has no obligation to testify
21  or to present any other evidence because it is the
22  Government's burden to prove his guilt beyond a reasonable
23  doubt.  You may not attach any significance to the fact that
24  the defendant did not testify.  Nor may you draw any adverse
25  inference against the defendant because he did not take the

Shernelle Griffith

A-689

JURY CHARGE                               615

1   witness stand.  In your deliberations, in the jury room, you

2   may not consider this decision against the defendant in any

3   way.

4           K.:  Testimony of Law Enforcement Witnesses or

5   Officers.

6           During the trial you heard testimony from law

7   enforcement officers.  The fact that a witness is or was

8   employed as a law enforcement official does not mean that his

9   or her testimony is deserving of more or less consideration or

10  greater or lesser weight then that of any ordinary witness.

11          It is for you decide after weighing all the

12  evidence, and in light of the instructions I have given you

13  about the factors relevant to determining the credibility of

14  any witness, whether to accept the testimony of a law

15  enforcement witness and what weight, if any, it deserved.

16          I.:  Stipulations of Fact.

17          A stipulation is an agreement among the parties that

18  a certain fact is true.  The attorneys for the Government and

19  the attorneys for the defendant have entered into a number of

20  stipulations concerning facts that are relevant to this case.

21  As you may recall, those were read into the record during the

22  trial.  When the attorneys on both sides stipulate and agree

23  as to the existence of a fact, you must accept the stipulation

24  as evidence regard that fact as proved.

25          M.:  Interviewed Witnesses.

Shernelle Griffith

A-690

JURY CHARGE                                    616

1          During the course of the trial you heard testimony

2    that the witnesses interviewed -- that the attorneys

3    interviewed witnesses when preparing for the trial.  You Must

4    not draw any unfavorable inference from that fact.  On the

5    contrary, attorneys are obliged to prepare their cases

6    thoroughly as possible and in the discharge of that

7    responsibility, properly interview witnesses in preparation

8    for the trial.

9          N.:  Summary Evidence

10         Some exhibits were admitted into evidence in the

11   form of charts and summaries.  Those charts and summaries were

12   admitted in order to save the time of reviewing voluminous

13   records and to avoid inconvenience.  You should consider these

14   charts and summaries the same way you would any other

15   evidence.  However, the charts and summaries used in closing

16   arguments are not in evidence unless specifically admitted

17   into evidence.  These charts and summaries were shown to you

18   in order to make the evidence more meaningful and to aid you

19   in considering the evidence.  They are no better than the

20   documents upon which they are based and are not themselves

21   independent evidence.

22         And let me just say, because those charts or the

23   PowerPoint, for example, used during the Government's

24   summation is not evidence.  It will not be sent back to you

25   along with the evidence to the jury room for your

Shernelle Griffith

A-691

JURY CHARGE                           617

1  deliberations.

2          Therefore, you are to give no greater consideration

3  to these charts or summaries than you would give to the

4  evidence upon which you are based.

5          And let me just say, also, there are some charts or

6  summaries that were introduced and those you can consider as

7  evidence.

8          It is for you to decide whether the charts,

9  schedules, or summaries correctly present the information

10 contained in the testimony and in the exhibits on which they

11 were based.  You are entitled to consider the charts,

12 schedules, and summaries if you find that they are of

13 assistance to you in analyzing the underlining evidence.

14         O.:  Undercover Agents.

15         You have heard testimony from an undercover agent

16 who is employed by the Drug Enforcement Administration.

17 Sometimes the Government uses undercover agents who may

18 conceal their true identities in order to investigate

19 suspected violations of the law.  There's nothing improper or

20 illegal about the Government using those techniques, so long

21 as the defendant's rights are not violated.  And the defendant

22 has not claimed that his rights were violated in this case.

23         Indeed certain types of evidence would be extremely

24 difficult to detect without the use of undercover agents and

25 informants.  Whether or not you approve of the use of an

A-692

JURY CHARGE                    618

1    undercover agent to detect unlawful activities is not to enter

2    into your deliberations in any way.

3                P.:  Particular Investigative Techniques.

4                You are instructed that there is no legal

5    requirement that the Government used any specific

6    investigative techniques or pursued every investigative lead

7    to prove its case.  As I have said before, your concern is to

8    determine whether or not based on the evidence admitted at

9    trial or the lack of evidence the defendant's guilt has been

10   proven beyond a reasonable doubt.

11               Expert Witnesses.

12               You have heard the testimony of -- and I think it

13   was an expert witness in this case.  Ordinarily, witnesses are

14   restricted to testifying concerning matters of fact.  There

15   are occasions, however, when there is some technical or other

16   specialized area of knowledge that will assist the jury in

17   deciding a disputed fact.  On those occasions, a witness who

18   is specially qualified by training, knowledge, experience, or

19   education, maybe called upon to testify about some evidence or

20   facts in issue in the form of an opinion.

21               And for you page counters, we are up to 14.  So we

22   are more than halfway through.

23               Your role in judging credibility applies to experts

24   as well as other witnesses.  You should judge this testimony

25   in the same way you judge the testimony of any other witness.

Shernelle Griffith

A-693

JURY CHARGE                    619

1   The fact that such a person has given an opinion does not mean

2   that you are required to accept it.  In weighing the

3   testimony, you should consider the factors that generally bear

4   upon the credibility of a witness as well as the expert

5   witness education, training, and experience.  The soundness of

6   the reasons given for the opinion and all other evidence in

7   the case.  You should consider the expert opinions which were

8   received in evidence in this case and give them as much or

9   little weight you think they deserve.

10          If you should decide that the opinion of an expert

11  was not based on sufficient education, experience, or

12  sufficient data, or if you should conclude that the trust

13  worthiness or credibility of an expert is questionable, for

14  any reason, then you may disregard the opinion of the expert.

15  Furthermore, if the opinion of the expert was outweighed in

16  your judgment by other evidence in the case, then you must

17  disregard the opinion of the expert entirely or in part.  On

18  the other hand, if you find the opinion of an expert is based

19  on sufficient data, education, training, and experience, and

20  the other evidence does not give you reason to doubt the

21  expert's conclusions, you would be justified in placing gray

22  line on the experts testimony.

23          R.:  Evidence Pursuant to Lawful Procedure.

24          You have heard testimony that interactions between

25  law enforcement agents and the defendant were audio recorded.

Shernelle Griffith

A-694

JURY CHARGE                                620

1    In addition, you have seen evidence obtained pursuant to a

2    search of a cellular telephone and laptop computer.  You have

3    also seen evidence obtained pursuant to hidden recording

4    devices.

5            I'm going to pause for a moment.

6            Government, is that correct, that there was such

7    evidence?

8            MS. KASSNER:  Yes, Your Honor.

9            THE COURT:  Okay.  Sorry.

10           This evidence was obtained lawfully.  The use of

11   these procedures to gather evidence is perfectly lawful and

12   the Government has the right -- of course, that's true.  I'm

13   so sorry.  I was thinking about it in a different context in

14   terms of hidden recording devices.  That is, of course,

15   correct.  The use of these procedures to gather evidence is

16   perfectly lawful and the Government's has a right to use such

17   evidence in this case.

18           The wisdom of the law and law enforcement policies

19   and procedures are not your concern.  Your job is to -- is

20   only to decide whether the Government has proved that the

21   defendant committed the crime charged in the indictment or the

22   crimes charged in the indictment.

23           S.:  Limiting Instructions.

24           You have seen and heard evidence that relates to

25   activities and transactions that the defendant conducted with

Shernelle Griffith

A-695

JURY CHARGE                                    621

1   individuals other than the undercover law enforcement agent,

2   including text message communications between the defendant

3   and other individuals.  Testimony about surveillance conducted

4   of the defendant's interactions with other individuals and the

5   defendant's statements about his transactions with other

6   individuals.  You are to consider such evidence only with

7   respect to Count two, which charges the defendant with a crime

8   of operating an unlicensed money transmitting business.

9           However, to the extent that any of the defendant's

10  communications with other individuals relate to a concern of

11  being detected by law enforcement, you may properly consider

12  such communications with respect to both Count one, charging

13  the defendant with money laundering as well as Count two.

14          Okay.  Part II:  Instructions Relating to the

15  Alleged Crimes.

16          I will now turn to the second part of my

17  instructions and instruct you as to legal elements of the

18  criminal counts the Government has alleged.

19          A.:  Venue.

20          Venue refers to the location of the charged crimes.

21  As to each of the charged crimes, you must consider whether

22  any act in furtherance of the crime occurred within the

23  Eastern District of New York.  The Eastern District of New

24  York encompasses Brooklyn, Queens, and Staten Island in New

25  York City, and Nassau and Suffolk Counties on Long Island.  To

A-696

JURY CHARGE                                    622

1   establish a venue for a charged crime is appropriate in the

2   Eastern District of New York, the Government must prove that

3   some act in furtherance of the crime occurred in this

4   district.

5          The Government need not prove that the entire crime

6   was committed in this district or that the defendant, himself,

7   was present in this district.  I note that on this issue and

8   only on this issue, the Government need not prove venue beyond

9   a reasonable doubt, but only by a preponderance of the

10  evidence.

11         A preponderance of the evidence means simply to

12  prove that the fact is more likely true than not true.  The

13  Government must prove that it is more likely than not that

14  some act in furtherance of the charge you are considering

15  occurred in the Eastern District of New York.  If the evidence

16  appears to be equally balanced or if you cannot say upon which

17  side it weighs heavier, you must resolve this question against

18  the Government.

19         Let me stress, the preponderance of the evidence

20  standard applies only to the question of venue.  As I have

21  instructed you, the Government alone must prove all other

22  elements of the crimes charged beyond a reasonable doubt.

23         B.:  Dates Approximate.

24         The indictment charges in or about and between

25  certain dates, the proof need not establish with certainty the

Shernelle Griffith

A-697

JURY CHARGE                                    623

1    exact date of an alleged offense.  It is sufficient if the

2    evidence establishes beyond a reasonable doubt that an offense

3    was committed on a date reasonably near the dates alleged.

4              C.:  Knowledge and Intent.

5              Because each count in the indictment implicates the

6    concepts of knowledge and intent, I will instruct you at the

7    outset about these principles.  As a general rule, the law

8    holds persons accountable only for conduct they intentionally

9    engaged in.  Thus, before you can find a defendant guilty, you

10   must be satisfied that the defendant was acting knowingly and

11   voluntarily.

12             Knowingly:

13             A person acts knowingly when he contacts

14   intentionally and voluntarily and not because of ignorance,

15   mistake, accident, or carelessness.  Whether a defendant acted

16   knowingly may be proven by his words and conduct and by all of

17   the facts and circumstances surrounding the case.

18             II.:  Intentionally.

19             A person acts intentionally when he acts

20   deliberately and purposefully.  That is, a defendant's acts

21   must have been the product of his conscious objective decision

22   rather than the product of a mistake or an accident.

23
               (Continued on the following page.)
24

25


                         Shernelle Griffith

A-698

Charge of the Court                               624

1    (Continuing.)

2              THE COURT:  These issues of knowledge and intent

3    require you to make a determination about the defendant's

4    state of mind, something that rarely can be proven directly.

5    A wise and careful consideration of all the circumstances of

6    the case may, however, permit you to make such a determination

7    as to the state of mind of the defendant.

8              Indeed, in your every day affairs you are frequently

9    called upon to determine a person's state of mind from his or

10   her words and actions in a given circumstance.  You are asked

11   to do the same here.

12             D, the charges in the indictment.  The defendant,

13   Mustafa Goklu, is formally charged in an indictment.  As I

14   instructed you at the beginning of this case, an indictment is

15   a charge or accusation.  You will not be provided a copy of

16   the indictment during your deliberations because the

17   indictment is merely a statement of the charges and is not

18   itself evidence.  The indictment in this case contains two

19   separate counts against the defendant.  You must as a matter

20   of law consider each count of the indictment separately and

21   you must return a separate verdict for each count.

22             Count One of the indictment charges the defendant

23   with money laundering.  The second count in the indictment

24   charges the defendant with operating an unlicensed money

25   transmitting business.  Whether you find Mr. Goklu guilty or

SN        RPR        OCR

A-699

Charge of the Court                    625

1  not as to one should not affect your verdict as to the other

2  charge.  Remove the D from charged.

3          I will now explain to you the law that applies to

4  each count of the indictment.  Count One, money laundering,

5  Count One of the indictment charges the defendant with money

6  laundering, specifically it reads as follows:  On or about and

7  between August 28, 2018 and April 30, 2019, both dates being

8  approximate and inclusive within the Eastern District of New

9  York and elsewhere, the defendant Mustafa Goklu, also known as

10  Mustangy together with others did knowingly and intentionally

11  conduct and attempt to conduct one or more financial

12  transactions in and affecting interstate and foreign commerce

13  to wit:  The transfer and delivery of United States currency

14  which transactions involve property represented by a law

15  enforcement officer and by another person at the direction of

16  and with the approval of a federal official authorized to

17  investigate violations of Title 18 United States Code section

18  1956 to be the proceeds of specified unlawful activity; to

19  wit:  Narcotics trafficking in violation of Title 21, United

20  States Code sections 841 and 846 and to be property used to

21  conduct and facilitate such specified unlawful activity with

22  the intent to conceal and disguise the nature, location,

23  sours, ownership and control of property believed to be the

24  proceeds of such specified unlawful activity.

25          Count One charges the defendant with violating Title

SN        RPR        OCR

A-700

Charge of the Court                    626

1    18 United States Code section 1956-A-3-B which provides in

2    relevant part whoever with the in extent to disguise the

3    nature, location, source, ownership or control of property

4    believed to be the proceeds of specified unlawful activity

5    conducts or attempts to conduct a financial transaction

6    involving property represented to be the proceeds of specified

7    unlawful activity or property used to conduct or facilitate

8    specified unlawful activity shall be guilty of a crime.

9           For purposes of this paragraph, the term represented

10   means any representation by a law enforcement officer or by

11   another person at the direction of or with the approval of a

12   federal official authorized to investigate or prosecute

13   violations of this section.  To prove the crime of money

14   laundering, the Government must establish beyond a reasonable

15   doubt each of the following three elements:  First, that the

16   defendant conducted or attempted to conduct a financial

17   transaction that affected interstate or foreign commerce in

18   any way or degree.  Second, that the transaction involved

19   property represented by a law enforcement officer and believed

20   by the defendant to be the proceeds of specified unlawful

21   activity.  And, third, that the defendant acted with the

22   intent to conceal or disguise the nature, location, source,

23   ownership or control of the property.

24          The first element, financial transaction.  The first

25   element the Government must prove beyond a reasonable doubt is

SN        RPR        OCR

A-701

Charge of the Court                    627

1    that the defendant conducted or attempted to conduct a

2    financial transaction that affected interstate or foreign

3    commerce in any way or degree.  The term conducts includes

4    initiating, concluding or participating in initiating or

5    concluding a transaction.  A transaction includes a purchase,

6    sale, loan, pledge, gift, transfer, delivery or other

7    disposition of property.

8           The term financial transaction means a transaction

9    which itself affects interstate or foreign commerce in any way

10   or degree and which involves, A, a movement of funds by wire

11   transfer or other similar means, B, a monetary instrument such

12   as cash check money order or any other negotiable instrument.

13   Or, C, a transfer of title to any real property, vehicle,

14   vessel or aircraft.

15          I want to define interstate or foreign commerce for

16   you now.  The term interstate or foreign commerce means

17   commerce between any combination of states of the United

18   States or between the United States and a foreign country.

19   You must find the transaction affected interstate commerce in

20   some way, however minimal.  The second element:  Involving

21   property represented its proceeds as specified unlawful

22   activity.  The second element that the Government must prove

23   beyond a reasonable doubt is that the transaction the

24   defendant conducted or attempted to conduct involved property

25   represented by a law enforcement officer and believed by the

SN      RPR      OCR

A-702

Charge of the Court                    628

1  defendant to be the proceeds of specified unlawful activity.

2  For the purposes of this section, a law enforcement officer

3  includes federal law enforcement officers and any other person

4  acting under the direction or with the approval of a federal

5  official authorized to investigate or prosecute money

6  laundering.

7         I instruct you that for purposes of this case, the

8  individual known as Patrick O'Kain, who testified during this

9  trial, was a law enforcement officer during the time period

10  charged in the indictment.  The term proceeds means any

11  property derived from or obtained or retained directly or

12  indirectly through some form of unlawful activity including

13  the gross receipts of such activity.  Proceeds can be any kind

14  of property, not just money.

15         In order to sustain its burden of proof on this

16  element, the Government is not required to prove that the law

17  enforcement officer made an express affirmative statement to

18  the defendant that the property involved was the proceeds of

19  unlawful activity, in this case narcotics trafficking.

20  Instead, the Government must prove that the law enforcement

21  officer made the defendant aware of certain circumstances from

22  which a reasonable person would infer that the property was

23  the proceeds of illegal activity and that the defendant

24  believed that the property was the proceeds of illegal

25  activity.  You should consider all of the evidence in

SN      RPR      OCR

A-703

Charge of the Court                    629

1    determining whether the Government has satisfied this

2    standard.  The term specified unlawful activity is simply a

3    list of crimes set forth in the money laundering statute.  In

4    this case, the indictment charges the specified unlawful

5    activity of narcotics trafficking I instruct you that

6    narcotics trafficking means the manufacture, importation,

7    receiving, concealment, buying, selling or otherwise dealing

8    in a controlled substance or listed chemical under the

9    Controlled Substance Act.

10             I also instruct you that marijuana, oxycodone and

11   Adderall are controlled substances under the Controlled

12   Substances Act.  I further instruct you that narcotics

13   trafficking is a specified unlawful activity for the purposes

14   of the crime charged.  The Government is not required to prove

15   that the property actually was the proceeds of some form of

16   specified unlawful activity in this case, narcotics

17   trafficking.  The Government is not required to prove that any

18   narcotics trafficking actually took place or that the property

19   in the charged transactions actually constituted proceeds of

20   narcotics trafficking.  To sustain its burden of proof on this

21   element, the Government is required to prove that the charged

22   transactions involved property that was represented to the

23   defendant to be the proceeds of narcotics trafficking and that

24   the defendant believed that the property was the proceeds of

25   narcotics trafficking.

A-704

Charge of the Court                                 630

1          In determining whether the defendant believed that

2   the property was the proceeds of narcotics trafficking, you

3   may consider whether the defendant deliberately closed his

4   eyes as to what otherwise would have -- as to what otherwise

5   would have been obvious to him.  If you find beyond a

6   reasonable doubt that the defendant was aware of a high

7   probability that the charged transactions involved the

8   proceeds of narcotics trafficking and that the defendant acted

9   with deliberate disregard of the facts, you may find that the

10  defendant acted with the belief necessary to satisfy this

11  element.

12          However, if you find that the defendant has failed

13  to prove beyond a reasonable doubt that the defendant was

14  aware of a high probability that the charged transactions

15  involved the proceeds of narcotics trafficking he may not be

16  convicted.

17          Third element, attempt to conceal or disguise and

18  we're on page 22, everyone, out of 29.

19          The third element the Government must prove beyond a

20  reasonable doubt is that the defendant acted with the intent

21  to conceal or disguise the nature, location, source, ownership

22  or control of the property.  Here, Bitcoin is the alleged

23  property.  To satisfy this element, the Government must prove

24  that the defendant knew of the purpose of the particular

25  transaction in issue and that he intended that the transaction

SN        RPR        OCR

A-705

Charge of the Court                631

1  conceal or disguise the nature, location, source, ownership or

2  control of the property in question.  I have previously

3  instructed you about the definitions of knowingly and

4  intentionally and the same definitions apply here.

5          F, Count Two, operation of an unlicensed money

6  transmitting business.  Count Two charges the defendant of

7  with the crime of operating an unlicensed money transmitting

8  business, specifically it reads as follows:  On or about and

9  between August 28, 2018 and April 30, 2019, both dates being

10 approximate and inclusive, within the Eastern District of New

11 York and elsewhere, the Defendant MUSTAFA GOKLU, also known as

12 "Mustangy," together with others, did knowingly conduct,

13 control, manage, supervise, direct and own all and part of an

14 unlicensed money transmitting business affecting interstate

15 and foreign commerce, to wit:  A digital currency exchange

16 business, which (a) operated without an appropriate money

17 transmitting license in the State of New York, where such

18 operation is punishable as a misdemeanor and a felony under

19 New York State law; and (b) failed to comply with the money

20 transmitting business registration requirements under Title

21 31, United States Code, Section 5330 and the regulations

22 prescribed thereunder.

23          Count Two charges the Defendant with violating Title

24 18, United States Code, Section 1960(a), which provides, in

25 relevant part:  Whoever knowingly conducts, controls, manages,

A-706

Charge of the Court                          632

1   supervises, directs, or owns all or part of an unlicensed

2   money transmitting business, shall be guilty of a crime.  In

3   order for you to find the Defendant guilty of the crime

4   charged in Count Two, the Government must prove beyond a

5   reasonable doubt each of the following three elements:

6           First, that the Defendant knowingly controlled,

7   conducted, managed, supervised, directed, or owned all or part

8   of a money transmitting business; Second, that either the

9   money transmitting business was not licensed, and operated in

10  a state where the business was required to be licensed, or the

11  business failed to register as required with the Secretary of

12  the Treasury; and Third, that the money transmitting business

13  affected interstate or foreign Commerce.

14          I will now instruct you in more detail on each of

15  these three elements.  First element, money transmitting

16  business.

17          The first element the Government must establish

18  beyond a reasonable doubt is that Defendant knowingly

19  controlled, conducted, managed, supervised, directed, or owned

20  all or part of a "money transmitting business."

21          The Government is not required to prove that the

22  Defendant did all the things in that list, but only that he

23  did any one of them.  In order for you to evaluate this

24  element, let me define the following terms for you.  A

25  "business" is a commercial enterprise that is regularly

SN        RPR        OCR

A-707

Charge of the Court                    633

1  carried on for profit.  Thus, a single isolated transmitting

2  of money is not a business under this definition.  A "money

3  transmitting business" is a business which, for a fee, accepts

4  currency, funds, or value that substitutes for currency for

5  transfer within or outside the United States.  I instruct you

6  that Bitcoin qualifies as "funds" under the statute.  The term

7  "money transmitting" includes transferring funds on behalf of

8  the public by any and all means including but not limited to

9  transfers within this country or to locations abroad by wire,

10 check, draft, facsimile, or courier. Exchanging Bitcoin for

11 U.S. currency can qualify as a transfer within the meaning of

12 the statute.

13        The terms "conducted," "controlled," "managed,"

14 "supervised," "directed," or "owned" have their ordinary

15 meanings.  A single isolated transmission of money is not a

16 business under this definition.  It is for you to determine

17 whether the quantity and nature of the transmittals convert

18 the transactions into a business.

19        To prove that the Defendant conducted, controlled,

20 managed, supervised, directed, or owned the money transmitting

21 business, the Government must establish that the Defendant was

22 involved in the management of the business and was not merely

23 an employee of that business.

24        To satisfy this element, the Government must prove

25 that the Defendant knowingly controlled, conducted, managed,

SN      RPR      OCR

A-708

Charge of the Court                                   634

1   supervised, directed, or owned the money transmitting

2   business.  The Government must establish that Defendant was

3   involved in the management of the business and was not merely

4   an employee of that business.  I previously instructed you as

5   to the definition of knowingly, and the same definition

6   applies here.

7           Second Element, Unlicensed Money Transmitting

8   Business.  The second element the Government must prove beyond

9   a reasonable doubt is that the money transmitting business the

10  Defendant conducted was unlicensed.  An unlicensed money

11  transmitting business is a money transmitting business which

12  is either: (1) operating in a state without a required license

13  where operation without a license was punishable as a

14  misdemeanor or felony under state law, or (2) not registered

15  as required with the United States Secretary of the Treasury.

16  To satisfy this element, the Government needs to prove beyond

17  a reasonable doubt only that the money transmitting business

18  was unlicensed in one of these respects.  However, in order to

19  convict on this count, you must be unanimous that the

20  Government proved beyond a reasonable doubt that at least one

21  or the other of these two conditions was satisfied.

22          I will now explain these two licensing requirements.

23  Let me start with the state licensing requirement.  The

24  Government can satisfy this element by showing that the

25  Defendant operated his business without a required license in

SN        RPR        OCR

A-709

Charge of the Court                    635

1  a State where such operation was punishable as a misdemeanor

2  or felony under State law.  I instruct you that the term

3  "State" includes any State of the United States.  Therefore,

4  New York is a "State."  The only State at issue in this trial

5  is New York.  I instruct you that the laws of the State of New

6  York require that any person who engages in the business of

7  receiving money for transmission or of transmitting money to

8  be licensed as a money transmitter by the New York State

9  Department of Financial Services.  I also instruct you that

10  New York law also makes engaging in such a business without a

11  license punishable as a felony or a misdemeanor, depending on

12  factors that are not relevant here.

13        Let me start with the state licensing requirement.

14  The Government can satisfy this element by showing that the

15  defendant operated his business without a required license in

16  a state or such operation was punishable as a misdemeanor or

17  felony under state law.  I instruct you that the term state

18  includes any state of the United States.  Therefore, New York

19  is a state, in case you didn't know that.  The only state at

20  issue in this case is New York.

21        I instruct you that the laws of the State of New

22  York require that any person who engages in the business of

23  receiving money for transmission or of transmitting money to

24  be licensed as a money transmitter by the New York State

25  Department of Financial Services.  I also instruct you that

SN      RPR      OCR

A-710

Charge of the Court                                    636

1  New York law also makes engaging in such a business without a
2  license punishable as a felony or a misdemeanor, depending on
3  factors that are not relevant here.
4          Let me now turn to the licensing requirement under
5  the laws of the United States with the Secretary of the
6  Treasury.  Federal law requires certain money transmitting
7  businesses to register with the Secretary of the Treasury
8  within 180 days after the business was established.
9  Specifically this registration requirement applies to any
10 money transmitting business, foreign or domestic, that engaged
11 in money transmitting functions in the United States.  It is
12 for you to determine whether the money transmitting business
13 in this case was licensed as required by law.
14         To prove this element, the Government must prove
15 that Defendant knew that the business was unlicensed.  The
16 Government does not have to prove that the Defendant knew that
17 New York law or federal law required the business to be
18 licensed.  The Government does not need to show that Defendant
19 knew that it is a crime under New York law to operate a money
20 transmitting business without a license.  I previously
21 instructed you as to the definition of knowingly, and the same
22 definition applies here.
23         The third element the Government must prove beyond a
24 reasonable doubt is that the money transmitting business
25 affected interstate or foreign commerce.  Interstate or

SN        RPR        OCR

A-711

Charge of the Court                           637

1   foreign commerce simply means the movement of goods, services,

2   money, or individuals between states or between the United

3   States and a foreign state or nation.  The Government must

4   prove that the money transmitting business affected interstate

5   or foreign commerce in any manner, no matter how minimal.  It

6   is not necessary for the Government to prove that the acts of

7   the Defendant himself affected interstate or foreign commerce

8   so long as the acts of the money transmitting business had

9   such effect.  In addition, it is not necessary for the

10  Government to show that the Defendant actually intended or

11  anticipated that his actions would have an effect on

12  interstate or foreign commerce.

13          Finally, the Government is not required to prove

14  that the Defendant knew he was affecting interstate or foreign

15  commerce.

16          All right, closing instructions, part three.  I have

17  now outlined for you the rules of law applicable to this case,

18  the process by which you weigh the evidence and determine the

19  facts, and the legal elements that must be proved beyond a

20  reasonable doubt.  In a few minutes you will retire to the

21  jury room for your deliberations.  I will now give you some

22  general rules regarding your deliberations.  Keep in mind that

23  nothing I have said in these instructions is intended to

24  suggest to you in any way what I think your verdict should be.

25  That is entirely for you to decide.

SN      RPR      OCR

A-712

Charge of the Court                                    638

1          By way of reminder, I instruct you once again that

2    it is your responsibility to judge the facts in this case from

3    the evidence presented during the trial and to apply the law

4    as I have given it to you, and your verdict must be based

5    solely on this evidence and law, not on anything else.

6          I will turn to the role of the foreperson.  For your

7    deliberations to proceed in an orderly fashion, you must have

8    a foreperson.  The custom in this courthouse is for Juror No.

9    1 to act as the foreperson.  However, if, when you begin

10   deliberations, you decide that you want to elect another

11   foreperson, you are entitled to do so. The foreperson will be

12   responsible for signing all communications to the court and

13   for handing them to the Deputy Marshal during your

14   deliberations, but, of course, his or her vote is entitled to

15   no greater weight than that of any other juror.

16          Communication with the Court.  It is very important

17   that you not communicate with anyone outside the jury room

18   about your deliberations or about anything touching on this

19   case.  There is only one exception to this rule.  If it

20   becomes necessary during your deliberations to communicate

21   with me, you may send a note, through the Deputy Marshal,

22   signed by your foreperson.  No member of the jury should

23   attempt to communicate with me except by a signed writing, and

24   I will never communicate with any member of the jury on any

25   subject touching upon the merits of the case other than in

A-713

Charge of the Court                                        639

1   writing, or orally here in open court.

2       C. Right to see exhibits and read testimony.  Your

3   recollection governs.  Nobody else's. If, in the course of

4   your deliberations, your recollection of any part of the

5   testimony should fail, or you should find yourself in doubt

6   concerning my instructions to you on the law, you may request

7   that a witness's or witnesses' testimony, or portions thereof,

8   be sent back to you in the jury room.  If during your

9   deliberations you want to see any of the exhibits that are not

10  already available to you in the jury room, you may request

11  that as well.

12      You may make all these requests by a note to the

13  Deputy Marshal.  I suggest, however, that you be specific to

14  avoid receiving testimony or exhibit that you do not want or

15  need.  Describe as best and precisely as you can what you want

16  to hear and please be patient because it sometimes takes a

17  while to find the testimony or exhibit in the record.

18      Deliberations and unanimous verdict.  Your duty is

19  to reach a fair conclusion from the law as I have given it to

20  you and the evidence that has been presented in this case.

21  This duty is an important one.  When you are in the jury room,

22  listen to each other, and discuss the evidence and issues in

23  the case amongst yourselves.  It is the duty of each of you,

24  as jurors, to consult with one another, and to deliberate with

25  a view toward reaching agreement on a verdict, if you can do

A-714

Charge of the Court                    640

1  so without violating your individual judgment and conscience.

2  While you should not surrender conscientious convictions of

3  what the truth is and of the weight and effect of the

4  evidence, and while each of you must decide the case for

5  yourself and not merely acquiesce in the conclusion of your

6  fellow jurors, you should examine the issues and the evidence

7  before you with candor and frankness, and with proper

8  deference to, and regard for, the opinions of your fellow

9  jurors.

10       You should not hesitate to reconsider your opinions

11  from time to time and to change them if you are convinced they

12  are wrong.  However, do not surrender an honest conviction as

13  to the weight and effect of the evidence simply to arrive at a

14  verdict.  The decision you reach must be unanimous; you must

15  all agree.

16       When you have reached a verdict, simply send me a

17  note signed by your foreperson that you have reached a

18  verdict.  Do not indicate what the verdict is.  In no

19  communication with the Court should you give a numerical count

20  of where the jury stands in its deliberations.

21       Remember in your deliberations that the Government's

22  charges against the Defendant are no passing matter.  The

23  parties and the Court rely upon you to give full and

24  conscientious deliberation and consideration to the issues and

25  evidence before you.  By so doing, you carry out to the

SN        RPR        OCR

A-715

Charge of the Court                641

1  fullest your oaths as jurors—to well and truly try the issues

2  of this case and render a true verdict.

3          So if you will give me a moment I want to see the

4  lawyers at sidebar

5          (Sidebar held outside of the hearing of the jury.)

6          THE COURT:  So let me turn first to the Government,

7  anything that I misread or need to correct from the jury

8  instructions as I read them to the jury?

9          MS. DIOUF:  I did notice one thing actually.  So, on

10  page 22, I believe you might have said the defendant instead

11  of the Government.  I'm trying to find the actual page.  It's

12  on 20 would be at the bottom.  That's what I heard.

13          THE COURT:  So which sentence.

14          MS. DIOUF:  The last sentence however, if you find

15  that the Government has failed to prove beyond a reasonable

16  doubt that the defendant was aware of a high probability.

17          THE COURT:  So I read that the defendant has failed

18  to prove.

19          MS. DIOUF:  I thought I heard you say defendant.

20          THE COURT:  I will make sure that I.

21          MR. SINGER:  I think you did, but I think it is

22  clear from reading along and when the next sentence --

23          THE COURT:  Does anyone want --

24          MR. SINGER:  I don't have any request that you

25  correct it.

SN        RPR        OCR

A-716

Charge of the Court                              642

1          MS. KASSNER:  That's fine.  We just wanted to note

2    it for the record.

3          THE COURT:  Maybe I will make a general note that if

4    for some reason I read something incorrectly they obviously

5    have the written instructions in front of them.

6          Any objection to any instructions as read to the

7    jury?

8          MR. SINGER:  No.

9          THE COURT:  All right.  So we're going to send this

10   back there.  There were some small typographical errors that

11   I'm not going to fix because they're not consequential.

12          (End sidebar.)

13          THE COURT:  Ladies and gentlemen, thank you for your

14   patience.  Now we're going to let you retire for your

15   deliberations.  We're going to call for the if U.S. Marshal to

16   be sworn.  Your lunch will be arriving right about now and you

17   can deliberate while you have your lunch or not, but you must

18   decide amongst yourselves unanimously whether you're going to

19   do that because obviously everybody has to be involved in the

20   deliberations with the exception of our first alternate we're

21   going to keep you here but separate from the rest of the jury.

22   Things can happen it's possible that you may be called upon to

23   deliberate, so obviously the same rules apply to you that you

24   cannot speak to anyone about the case.  The jurors obviously

25   now can discuss the case with each other during deliberations.

A-717

Charge of the Court                        643

1   Let's have the marshal come forward.

2        THE COURTROOM DEPUTY:  Do you solemnly swear or

3   affirm that you will keep the jurors sworn in this cause

4   together in some private and convenient place and shall let no

5   one speak to them nor shall you speak to them without

6   direction of the Court.

7        THE MARSHAL:  Yes, I do.

8        (U.S. Marshal, sworn.)

9        THE COURT:  The jury will now retire for their

10  deliberations and we will have the alternate remain here.

11  Have a good lunch, everyone.

12       THE COURTROOM DEPUTY:  All rise.

13       (Jury exits to begin deliberations at 12:55 p.m.)

14       THE COURT:  So our first alternate will be taken to

15  a separate room.  I hope you feel special because you get a

16  private room and sadly you have to have lunch by yourself.

17       (Alternate juror exits courtroom.)

18       THE COURT:  Everyone have a seat. When Ms. Gonzalez

19  comes back we'll mark the jury instructions as Court Exhibit

20  Number 1, the verdict sheet as Court Exhibit Number 2.  We

21  will send those back to the jury to the extent that they want

22  to use their lunch break to start deliberating, but then we

23  will very quickly assemble all the exhibits and you will

24  coordinate with Ms. Gonzalez to make sure that everybody

25  agrees on the list that goes back as well as the exhibits that

SN      RPR      OCR

A-718

Charge of the Court                    644

1    are being sent back, okay?

2            Then after that you are obviously free to get lunch

3    but leave your cellphones with us should we get a note and

4    don't leave the building.  That would be my recommendation.

5            So the record is clear, my law clerk is also handing

6    you the verdict sheet which we've now removed the reference to

7    draft on it, but it's the same one that was circulate

8    testified a couple of days ago.

9            (Pause in proceedings.)

10           (Court Exhibit 1 jury instructions received in

11   evidence.)

12           (Court Exhibit 2 verdict sheet received in

13   evidence.)

14           (Luncheon recess taken.)

15

16

17

18

19

20

21

22

23

24

25

A-719

Jury Deliberations                                    645

1        (Time noted 3:56 p.m.)

2        (Court Exhibit 3, received in evidence.)

3        THE COURT:  So, we have a note which has been marked

4   as Court Exhibit 3 and it reads: "Hello.  May we have the

5   transcript from the first two witnesses?  Patrick O'Kain" and

6   it's spelled L-O-L-E-T-T-A.  "Thank you!"  Signed by the

7   foreperson.  So clearly Patrick O'Kain was the first witness

8   and the second one --

9        MR. SINGER:  Lilita Infante.

10        THE COURT:  Right.  So, folks --

11        MR. SINGER:  The answer would be yes.

12        THE COURT:  But rather than bringing them out here

13   we're just going to send the transcripts back to them once you

14   folks agree on what can go back.  You should pull all of the

15   sidebars and you should also redact testimony that was

16   excluded, if anything, a sustained objection, for example.

17        Do you folks have a computer copy?

18        MS. DIOUF:  Your Honor, we've already prepared

19   redacted transcripts, or Bridget did it for us.

20        THE COURT:  So show the original and the redacted

21   version to Mr. Singer and see if they agree to your

22   redactions.

23        MS. DIOUF:  Yes, Your Honor.

24        THE COURT:  Do you have an original copy, Mr. Singer

25   of the transcript with you?

SN        RPR        OCR

A-720

Jury Deliberations                    646

1          MR. SINGER:  Yes.  I have the e-mail with the

2     transcript.

3          THE COURT:  I am not going to tell you how to double

4     check them, but you may want to read the entire transcripts

5     yourself to see if other portions should be redacted or you

6     can focus on what the Government redacted and see if that's

7     okay with you.

8          (Pause in proceedings.)

9          THE COURT:  If there's no dispute I'm going to go

10    back upstairs.

11         MS. KASSNER:  There's no dispute.

12         MR. SINGER:  We're good.  We've identified them.

13         THE COURT:  Once you folks are done with the

14    redactions and agree upon them, they will be sent back to the

15    jury and Fida I think we marked them as Court Exhibits.

16    Ms. Gonzalez will note which Court Exhibits they are.  I also

17    wanted to note that while I am here that after the jury

18    instructions and verdict sheet were sent back to the jury, the

19    parties also reviewed the exhibits that were being sent back

20    to the jury and agreed upon those; is that correct from the

21    Government's perspective?

22         MS. DIOUF:  Yes it is, Your Honor.

23         THE COURT:  Mr. Singer, you agreed on which exhibits

24    would go back.

25         MR. SINGER:  Yes.

SN      RPR      OCR

A-721

Jury Deliberations                                      647

1          THE COURT:  I will leave you folks to it.

2          (Time noted:  4:15 p.m.)

3          (Pause in proceedings.)

4          (Time noted:  4:43 p.m.)

5          THE COURT:  So we've received another note from the

6    jury which has been marked as Court Exhibit 5.

7          (Court Exhibit 4 received in evidence.)

8          (Court Exhibit 5 received in evidence.)

9          THE COURT:  It says, "The jury has reached a verdict

10   on Count Two but are undecided on Count One.  We are at a

11   standstill on Count One and haven't made any progress."

12          I note that we have yet to send them back the

13   transcripts that they had requested in their earlier note so

14   my proposal is that I bring them out here and explain to them

15   that we've received both of their notes now and I would like

16   them to go back and continue their deliberations on Count One

17   with the benefit of the transcripts that they had requested,

18   but took us a while to put together and I had or I think it

19   makes sense to give them kind of a general *Allen*-type charge

20   which in full it reads, "I am going to ask you to resume your

21   deliberations in an attempt to reach a verdict.  As I have

22   told you, each of you must agree in order to return a verdict.

23   While you are entitled to your own opinions, you should

24   consult with one another and listen carefully to each other.

25   As you deliberate, each of you should not hesitate to

SN        RPR        OCR

A-722

Jury Deliberations                 648

1    reexamine your own views and your own opinions.  If you're

2    convinced that another opinion is correct, that doesn't mean

3    you should surrender an honest conviction, but it does mean

4    that your consideration of the evidence should be in

5    consultation with your fellow jurors."

6          Does anyone have any problem with me saying that to

7    the jury?

8          MS. KASSNER:  No objection, Your Honor.

9          MR. SINGER:  I think it's too early.

10         THE COURT:  You say just send it back.

11         MR. SINGER:  They've been deliberating for less than

12   four hours.  I say send them back and say keep working on it.

13         THE COURT:  I can certainly save this *Allen* charge

14   for later.  So let's have them out here and we have the

15   transcripts and we'll send those back to them when they

16   return.

17         THE COURT:  It's marked as Court Exhibit 4.

18         THE COURT:  Does anyone have a problem with

19   Ms. Gonzalez handing it to the foreperson?

20         MS. KASSNER:  No objection.

21         MR. SINGER:  No objection.

22         THE COURT:  Court Exhibit 4.

23         (Jury enters at 4:46 p.m.)

24         THE COURT:  So we received your last two notes.  So

25   your first note requested the transcript from the first two

A-723

Jury Deliberations                        649

1   witnesses, Patrick O'Kain and a person you identified as

2   Loletta but we think is Ms. Infante or Agent Infante.  So that

3   has been compiled for you and my apologies that it took some

4   time but we had to make some redactions.

5           Your second note reads, "The jury has reached a

6   verdict on Count Two but are undecided on Count One.  We are

7   at a standstill on Count One and haven't made any progress."

8           So what I would like to do is I'm going to send you

9   back to deliberate further with respect to Count One

10  especially now that you have the benefit of the transcripts

11  that you had requested, but that you haven't yet received.  So

12  Ms. Gonzalez is going to hand the transcript, which has been

13  marked as Court Exhibit 4 to our foreperson and I ask you to

14  return to your deliberations and resume deliberations on Count

15  One.  All I will say is you haven't really been deliberating

16  all that long in the scheme of things so I would like you to

17  go and give it a try to see if you can reach a unanimous

18  verdict.  So, thank you everyone.

19          THE COURTROOM DEPUTY:  All rise.

20          (Jury exits to continue deliberations at 4:48 p.m.)

21          THE COURT:  Thank you, everyone.  You can resume

22  what you were doing before but stay close by.

23          MR. SINGER:  Judge.  Do you have a sense on how late

24  you want to stay this evening?

25          THE COURT:  I am willing to let the jury stay as

SN       RPR       OCR

A-724

Jury Deliberations                                    650

1   late as they want to.  If they don't send a note out by

2   5:30 -- I'm going to just let them continue to deliberate but

3   I expect as we get close to 5:30 they may send a note out

4   asking whether they can continue or whether they can go home

5   but my inclination is to let them keep going.

6           THE COURT:  Thank you.

7           MS. KASSNER:  Thank you, Your Honor.

8           (Recess taken.)

9           (Time noted:  5:53 p.m.)

10          (Alternate juror enters.)

11          THE COURT:  Have a seat, Mr. Chang.

12          Here is what we're going to do.  It's well past 5:30

13  and the jury is still deliberating.  We're going to let you go

14  home because at this point even if, and this would be very,

15  very unlikely you were needed to substitute tonight, I would

16  probably tell the jury to come back on Tuesday rather than go

17  later.  So we're going to let you go home but you are still

18  our alternate and so you still need to observe all the rules.

19  Don't talk to anybody about the case because there hasn't been

20  a verdict yet and don't do any research and I guess keep an

21  open mind unless and until you are put into the jury to start

22  deliberating, but we will need you back here on Tuesday again.

23          But I am sorry to do this to you, but you serve a

24  very important role to ensure that we get a verdict in the

25  unlikely event that we lose one of our jurors and given that

SN        RPR        OCR

A-725

Jury Deliberations                              651

1   the deliberations may carry over to Tuesday, that possibility

2   obviously grows greater, right, because we're talking about a

3   three-day break.  So we want you back here as well on Tuesday

4   by 9:30 and bring some things to occupy your time because you

5   will be sitting in a room again by yourself until we know

6   whether or not we need you, all right?

7           So, thank you again for your service and your

8   patience.  I know it's a difficult position to be in, but

9   trust me you are serving a tremendous service just by being

10  here and being willing to serve as our alternate.  Again,

11  don't talk to anyone about the case.  It's still open.  Okay,

12  have a wonderful weekend.

13          THE ALTERNATE JUROR:  Will there be any circumstance

14  such that I would not be coming at 9:30 or is 9:30 100

15  percent?

16          THE COURT:  We will advise you if for some reason

17  because the injury is still deliberating if they get a verdict

18  tonight you will get a call saying you don't need to come at

19  all.  It's possible we will have a late start so the expected

20  time if you are coming in on Tuesday would be 9:30.  That's

21  what you're asking about, right?

22          THE ALTERNATE JUROR:  So if it concludes today, I

23  will get a call over the weekend.

24          THE COURT:  Yes, not to come in at all, but if you

25  don't get any call come in on Tuesday and be here by 9:30.

SN      RPR      OCR

A-726

Jury Deliberations                    652

1   Thank you so much.

2           THE ALTERNATE JUROR:  Please leave a message.

3           THE COURT:  We have your cell number from the time

4   from the subway.

5           THE ALTERNATE JUROR:  I also sent an e-mail.

6           THE COURT:  And we have that.  Thank you.  Have a

7   good weekend.

8           (Alternate juror exits the courtroom.)

9           THE COURT:  It's 5:56.  As I said, before we have

10  not gotten any further notes from the jury.  So I assume

11  they're continuing to deliberate.  As I said, I'm not going to

12  bring them out here to find out what they want to do or how

13  long they want to stay.

14          MS. KASSNER:  The Government would ask for a partial

15  verdict whenever they're next out.

16          THE COURT:  Mr. Singer, I can give them the

17  instruction on that, that the import of that is that they can

18  give their partial verdict, but that that portion is final and

19  cannot be revisited and then they can continue to deliberate

20  on the count, which is one that they're still considering.

21  Mr. Singer?

22          MR. SINGER:  I would oppose that.  There's no need

23  for it.  Again, they have not been deliberating that long and

24  I don't see any need or reason to just jump and grab something

25  because they said they have a verdict on one count.  Let them

A-727

Jury Deliberations                               653

1   continue to deliberate.  What's the point?

2           THE COURT:  Well, I mean it does create the record

3   and finalize their one verdict and the case law supports

4   accepting a partial verdict.  It doesn't stop them from

5   continuing to deliberate.  Is there concern that once they

6   announce the one verdict they will throw their hands up and

7   say we don't want to decide the remaining count?

8           MR. SINGER:  I don't know what effect it will have

9   and I understand you can find case law to support many things

10  but it's not necessarily the right thing to do under the

11  circumstances and I don't understand the reason for it.  If

12  they've reached a point where they said we've not reached a

13  verdict certainly I understand taking a partial, but to do it

14  now four or five hours in, I just don't understand what the

15  rush is.

16          THE COURT:  Ms. Kassner, is there any reason not to

17  just simply wait especially because I anticipate at this point

18  they may not come up for a little while now.  I don't think

19  they're going to be wanting to stick around to tell us what

20  their verdict is on Count One if they haven't resolved

21  everything.

22          MS. KASSNER:  I think the main reason is a practical

23  one, Your Honor.  We have a three-day weekend ahead of us and

24  I think we're all aware that sometimes people get sick,

25  sometimes things come up and so our thought is if they have

SN       RPR       OCR

A-728

Jury Deliberations                                      654

1  reached a unanimous verdict on one count, it may be pragmatic

2  to have the verdict that they've certain of and just have it

3  recorded.

4         THE COURT:  It raises an interesting question; I

5  suppose what if one of the jurors does not come back on

6  Tuesday, a verdict on one count will have already been

7  rendered and then the jury can reconvene with the alternate to

8  decide the other count.  That is a legitimate practical reason

9  to get the verdict on the record as to the count they've

10  already resolved.

11         MR. SINGER:  Actually, I thought you were going to

12  say that's a very practical reason not to get the verdict on

13  the record at this point because if one of the 12 was not able

14  to continue and you substituted the alternate in, you would be

15  instructing them to start over.

16         THE COURT:  No.  Only on the open count.

17         MR. SINGER:  Then you would have verdict on the two

18  counts by two different juries.

19         THE COURT:  I do not think it's prohibited under the

20  rules.  I think it's a reason to take a partial verdict.  We

21  have a fully constituted, legitimate jury that reached a

22  unanimous decision on Count Two.  We can take that verdict and

23  therefore guard against the possibility that a juror doesn't

24  come back on Tuesday.

25         MR. SINGER:  But then you've got -- then you would

A-729

Jury Deliberations                        655

1   have -- and if the newly constituted jury with the alternate

2   were to deliberate then on a two-count indictment in one

3   trial, you would have two verdicts by different juries.

4          THE COURT:  I understand that.  You can say it

5   again.  I still understand it.

6          MR. SINGER:  I just don't understand.

7          THE COURT:  I do not understand if there's any legal

8   infirmity of that, is what I'm saying.  I understand what the

9   situation could be.  The question is and I don't know if

10  anyone knows the answer, but I am going to take a look at this

11  with my law clerk now if there's any legal impediment to doing

12  that whether that would be improper as you said have verdicts

13  on different counts in the indictment rendered by different

14  constituted juries because of the absence or replacement of a

15  juror.  I don't think that that's unusual and if I can take a

16  partial verdict I assume that's the logical implication is

17  that that's nothing improper about that.

18         MS. KASSNER:  Your Honor, we'll take a look as well.

19  We haven't confronted this in our personal experience.  I

20  think the other concern is the Government has thought about

21  what if there's not just one juror out, but two jurors?  We

22  only have one alternate.  We risk not having a verdict at all.

23         THE COURT:  Let's do this.  Everyone sort of take

24  some time to research this very quickly while we can:  We'll

25  come right back if we find an answer.

SN        RPR        OCR

A-730

Jury Deliberations                                          656

1          (Judge exits.)

2          (Time noted 6:02 p.m.)

3          (Court Exhibit 6 received in evidence.)

4          (Judge enters:  Time noted 6:31 p.m.)

5          THE COURT:  So, I don't know if the Government or

6     defense has come up with any case law on the particular issue

7     of whether or not I can take a partial verdict from the jury

8     but still direct them and -- still direct them to deliberate

9     and give them *Allen* charge let me tell but what this note says

10    which has been marked as Court Exhibit 6.  It says, "The jury

11    is still" -- I can't read this.  I think it's maybe apart on a

12    verdict -- "still split on a verdict for Count Number One.

13    After deliberating and reviewing evidence, all jurors are

14    remaining with their position and decision on the verdict."

15          Now, obviously I can give them an *Allen* charge

16    because I have yet to do that.  I can give them an *Allen*

17    charge, that's clear and have them come back on Tuesday.  The

18    question remains that I can tell them that they have the

19    option of delivering a partial verdict on the counts that

20    they're resolved on, but that would be final.

21          I can also tell them to continue to deliberate on

22    Tuesday.  Now, I will note that it was brought to my attention

23    that Judge Dearcy Hall in one of her cases took a partial

24    verdict but did not let the jury deliberate as to the other

25    count or counts as to the same defendant.  However, I found a

SN        RPR        OCR

A-731

Jury Deliberations                                    657

1    decision by Judge Buchwald, where, and this is *U.S. versus*
2    *Colombo*, it's reported at 2007 Westlaw 2438391, from August
3    27, 2007 where it appears that Judge Buchwald did take a
4    partial verdict and that deliberations continued, but I want
5    to double check and make sure I'm right about that.
6             MR. SINGER:  Judge, I found one case from the
7    Seventh Circuit in 2014 where the where a partial verdict was
8    taken and an alternate was substituted in and the Court
9    reversed that and sent it back for a new trial.
10            THE COURT:  Well, I mean that's a second question.
11   So I do tend to agree with you that even though other than the
12   case you cite which obviously I think does support that
13   proposition, even though I haven't found anything that holds
14   exactly that, namely if you have verdicts on two separate
15   counts by two separately constituted juries, that may be
16   problematic.  It seems to me at a minimum we should avoid
17   that.  But, there's two ways to view that.  One is I can
18   accept a partial verdict now, let them continue to deliberate,
19   but if the same jury does not return in full on Tuesday, then
20   that's the end of the deliberations, they cannot continue to
21   deliberate on the open count which would mean that there's no
22   possibility that they could return a verdict either way on
23   Count One, which seems to be the one that they're still
24   deadlocked on.
25            That -- you know, it's really up to the parties, but

SN        RPR        OCR

A-732

Jury Deliberations                                    658

1    I think I would not if we didn't have all the 12 jurors back

2    on Tuesday substitute the alternate and have them continue to

3    deliberate on an open count if I took a partial verdict today.

4    I think that would be dangerous to do, but I think it's still

5    possible to take a partial verdict, let them continue

6    deliberating, and then see what happens on Tuesday and I don't

7    think it would be infirm if they then returned.  If it was the

8    same jury returned a verdict after an *Allen* charge then on

9    Count One.  The only thing I will say is this, I have not yet

10   advised the jury about the option of a partial verdict which I

11   would have to do now and send them back to the jury room to

12   tell me if they wanted to give me a partial verdict

13   understanding that they still would be required to deliberate

14   and understanding that their verdict on Count Two would be

15   final.

16         What does the Government think?

17         MS. KASSNER:  The Government would prefer to ask the

18   jury if they are willing to exchange a partial verdict today

19   with the understanding that Your Honor -- that if for some

20   reason somebody in the three-day weekend doesn't return next

21   week and the jury composition would be different, we

22   understand that Your Honor then may not instruct them to

23   reconvene on Count One --

24         THE COURT:  No, here is the option that I'm

25   proposing.  I give them *Allen* charge and advise them of the

SN        RPR        OCR

A-733

Jury Deliberations                    659

1  option of returning a partial verdict, right, because I want

2  to make clear to them that returning a partial verdict doesn't

3  avoid them having to return on Tuesday.  I won't say what

4  happens if everyone doesn't return on Tuesday, but you

5  understand I will not allow them to deliberate on the open

6  count.

7          MS. KASSNER:  I fully understand.  We would prefer

8  that you go ahead and do exactly that.

9          THE COURT:  Mr. Singer, what's your preference?

10          MR. SINGER:  The opposite.  My request is it's now

11  6:38 p.m.  I would ask that Your Honor send the jurors home

12  for the weekend, have them come back on Tuesday morning.  You

13  can either give them an *Allen* charge now or give them an *Allen*

14  charge when they return on Tuesday morning and let them

15  continue to deliberate.  If they are going to be permitted to

16  continue to deliberate then I don't understand the necessity

17  or the propriety of taking a partial verdict now.

18          So my request is to simply send them home for the

19  weekend give them an Allen charge either now or on Tuesday

20  morning.

21          THE COURT:  Well, it might avoid a retrial if we

22  don't get a full jury back or enough jurors back on Tuesday,

23  the Government may decide not to retry the case if there's

24  only one verdict.

25          MS. KASSNER:  Your Honor, the Government's concern

SN      RPR      OCR

A-734

Jury Deliberations                          660

1    here is we're in the middle of both, you know, an ongoing

2    COVID pandemic which -- I think the bottom line is we're all

3    wearing masks because we recognize that it's possible that

4    people could be infected and if one juror tests positive I

5    don't know what would happen to our jury next week.  In

6    addition, there's also flu season.  I think we just believe it

7    would be practical to at least inform the jury of their option

8    if they desire to provide a partial verdict under the

9    circumstances.

10        THE COURT:  All right.  I am going to do that

11   because this is a somewhat unusual time.  I will make the

12   observation that even though I have required the jurors to be

13   masked in this courtroom, my understanding is that they're not

14   doing that in the jury room.  So our efforts to try to keep

15   them safe are only half the battle, quite honestly.  They've

16   obviously taken it upon themselves to be unmasked in a much

17   smaller room than here.  I'm going to bring them out, advise

18   them of the option of a partial verdict, if they want to

19   deliver one today, but advise them they still have to come

20   back on Tuesday to continue their deliberations and I will

21   give them further instructions on Tuesday regarding the

22   continuation of those and then see what they want to do.  I

23   won't give them the *Allen* charge until Tuesday.

24        MR. SINGER:  Can I clarify, you're going to ask them

25   if they want to render a partial verdict, you'll send them

SN      RPR      OCR

A-735

Jury Deliberations                      661

1   back to determine yes or no, but otherwise tell them they're
2   going to be going only either way?
3          THE COURT:  Yes, I can tell them that they can ask
4   to render a partial verdict today or Tuesday.  I will still
5   give them that option if they want to do that.  They don't
6   have to make a decision now or do it now but that is an option
7   available to them, but they still have to come back in any
8   event on Tuesday.
9          I will note further for the record that the jury has
10  been deliberating or at least out to deliberate since 1:00.
11  We don't know whether they deliberated during the lunch break.
12  We don't know how long that was if they decided not to
13  deliberate but it's now about 6:30.  So at a maximum they've
14  been deliberating for about five and a half hours and that
15  would be the maximum.  If they stopped for lunch, it would be
16  some time less than five and a half hours.
17          (Jury enters at 6:41 p.m.)
18          THE COURT:  Ladies and gentlemen of the jury, I
19  received your most recent note indicating that the jury is
20  still, and I think the word is "split" on a verdict for Count
21  Number One.  After deliberating and reviewing evidence all
22  jurors are remaining with their position and decision on the
23  verdict.  So, I brought you out here to tell you a few things.
24  One is that you have the option available to you to render
25  what is called a partial verdict.

SN       RPR       OCR

A-736

Jury Deliberations                                   662

1          In an earlier note you had suggested that you might
2   have reached unanimity as to Count Two but not to Count One.
3   You don't need to tell me or confirm that one way or the other
4   but if you wanted to you had the option of delivering a
5   unanimous verdict that you have reached unanimity on.
6   However, that decision would be final and you could not then
7   change it or take it back or modify it.  And also it will not
8   eliminate the requirement that I am now about to impose that
9   you come back on Tuesday and resume your deliberations.
10          Now it's my intent on Tuesday when you are all back
11  here to meet very briefly with you, with the parties and give
12  you some very brief further instructions with respect to the
13  resumption of your deliberations and so I want you all to
14  think about what you would like to do with respect to
15  delivering a partial verdict, which you can do today or you
16  can do at any point.  It doesn't have to be today, knowing
17  that you will have to return on Tuesday in any event.  And my
18  apologies if it takes some time, but I want to be sure that I
19  have given ou a full opportunity to reach if you can a
20  unanimous verdict on both counts.
21          Let me let you go back now.  Talk amongst yourselves
22  let me know what you want to do with respect to today and with
23  respect to a partial verdict if you want to do that today or
24  at any point.  And obviously if you decide if you want to
25  defer the decision of course that is an option as well.  After

SN          RPR          OCR

A-737

Jury Deliberations                                          663

1    that, you will be free to go home but have to return on

2    Tuesday and start your deliberations at 9:30.  So, again,

3    we'll let you go now and thank you everyone.

4              (Jury exits at 6:45 p.m.)

5              THE COURT:  All right.  So let's give them a few

6    minutes and see what they say.

7              (Pause in proceedings.)

8              (Time noted 6:50 p.m.)

9              THE COURT:  So we have the next note from the jury,

10   which is Exhibit Number 7.

11             (Court Exhibit 7, received in evidence.)

12             THE COURT:  We will defer and continue deliberations

13   on Tuesday.  On Tuesday we will read both verdicts, signed by

14   the foreperson.  I'm going to have Fida tell the marshals that

15   they can leave and hopefully they'll be back at 9:30.  This

16   means you all can go home as well.  Have a good weekend.

17             Another note, Exhibit Number 8.

18             (Court Exhibit 8, received in evidence.)

19             THE COURT:  The jury asks do they leave the evidence

20   in the jury room and I told the marshal to tell them yes as

21   opposed to taking it home.

22             (Time noted:  6:55 p.m.)

23   (Matter adjourned until Tuesday, October 11, 2022, 9:30 a.m.)

24                         - ooOoo -

25

SN        RPR        OCR

A-738

664

1          <u>I N D E X</u>

2   <u>E X H I B I T S</u>

3       Court Exhibit 1 jury instructions        644

4       Court Exhibit 2 verdict sheet            644

5       Court Exhibit 3                          645

6       Court Exhibit 4                          647

7       Court Exhibit 5                          647

8       Court Exhibit 6                          656

9       Court Exhibit 7                          663

10      Court Exhibit 8                          663

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VB        OCR        CRR

A-739

665

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      : 19-CR-00386(PKC)
                               :
                               :
                               :
        -against-              : United States Courthouse
                               : Brooklyn, New York
                               :
                               :
MUSTAFA GOKLU,                 : Tuesday, October 11, 2022
                               : 9:00 a.m.
            Defendant.         :

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
BEFORE THE HONORABLE PAMELA K. CHEN
UNITED STATES DISTRICT JUDGE, and a Jury

A P P E A R A N C E S :

For the Government: BREON PEACE, ESQ.
                    United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
                 BY: GILLIAN KASSNER, ESQ.
                    MARIETOU DIOUF, ESQ.
                    FRANCISCO J. NAVARRO, ESQ.
                    Assistant United States Attorneys

For the Defendant:    MURRAY E. SINGER, ESQ.
                    14 Vanderventner Avenue
                    Suite 212
                    Port Washington, New York 11050
                 BY: MURRAY E. SINGER, ESQ.

For the Defendant:    SAHLI PLLC
                    195 Broadway
                    4th Floor
                    New York, New York 11211
                 BY: EMILEE SAHLI, ESQ.

Court Reporter:  VICTORIA A. TORRES BUTLER, CRR
225 Cadman Plaza East / Brooklyn, NY 11201
VButlerRPR@aol.com
Proceedings recorded by mechanical stenography; transcript produced by Computer-Aided Transcription.

A-740

|                     | Proceedings                              666 |
|---|---|

```
 1              (In open court.)

 2              (Judge PAMELA K. CHEN is in the courtroom.)

 3              MS. KASSNER:  Your Honor, is the Allen charge going

 4     to be -- we would request that it be with respect to Count 1,

 5     I'm not sure if that's your intention or not.

 6              THE COURT:  I will make it clear.

 7              (Jury enters at 9:43 a.m.)

 8              THE COURT:  Please be seated, everyone.

 9              Good morning, Ladies and Gentlemen of the Jury.  It

10     is good to see you again and thank you once more for being

11     ever-prompt.  I hope you had a nice relaxing long weekend.

12              As you recall, when we broke last week I had

13     received several notes from you, one of which indicated that

14     you were still split on a verdict for Count Number One and

15     that, after deliberation and reviewing evidence, the jurors

16     all remained with their position and decision on the verdict

17     as to Count Number One.

18              I did send you back to continue to deliberate and

19     then later, I did ask you whether or not you wanted to give a

20     partial verdict to the extent that you had reached a unanimous

21     verdict on Count 2, as indicated by one of your other notes,

22     or wait until this week to deliver both verdicts together, and

23     you opted to do that; which is, to come back and deliberate

24     further as to Count Number One and then deliver both verdicts

25     at the same time.
```

A-741

Proceedings                                          667

1      So I want to give you a very, a relatively brief

2  instruction with respect to your ongoing deliberations as to

3  Count Number One.

4      As you know, this case was carefully tried by the

5  parties and it is eminently desirable that you reach a

6  unanimous verdict, if you can, without any of you violating

7  your individual conscience and judgment.

8      I am going to suggest a few thoughts to you, which

9  you may wish to consider in your deliberations and I am going

10  to ask you to go back and continue your deliberations with

11  these thoughts in mind.  Of course, these thoughts are not

12  meant to exclude from your consideration the evidence in the

13  case and the instructions I have previously given you.  As I

14  told you in the original jury charge, your verdict must be

15  based upon the evidence presented at trial and upon the

16  instructions previously given to you.

17      As you know, this case is an important one for all

18  of the parties.  It involved time and effort in preparation on

19  the part of both the Government and the defendant, as well as

20  the time of the Court and for you, who are serving on this

21  jury.  If you fail to agree on a verdict, the case remains

22  open and undecided.  There is no reason to believe that the

23  case will be tried any better or more exhaustively at some

24  future date than it has been before you.  There is no reason

25  to believe that the case will ever be submitted to twelve

A-742

Proceedings                                      668

1    jurors more intelligent, more impartially chosen or more

2    competent to decide it than you.

3              As I said, it is wholly desirable to reach a verdict

4    if you possibly can.  Of course, by pointing out the

5    desirability of reaching a verdict here and your duty to do so

6    if you possibly can, I am not suggesting that any of you

7    should surrender a conscientious belief as to where the truth

8    lies or as to the weight and effect of all of the evidence

9    just to reach a verdict.

10             However, while each of you must decide the question

11   for yourself and not merely acquiesce in the conclusions of

12   your fellow jurors, I think you ought to examine the issues

13   here with candor, and frankness, and with proper deference and

14   regard for the opinions of one another, which is what I had

15   said during the original jury instructions.

16             You should listen to each other's views and not

17   hesitate to change your opinion if you conclude that another

18   person is correct.

19             Now, that does not mean that you should give up any

20   conscientious views that you hold.  In the end, each of you

21   must make your own decision, but it is your duty, after full

22   deliberation here, to agree, if you can do so, without

23   violating your individual conscience and judgment.  Of course,

24   if after further deliberations, you conscientiously believe

25   that you are unable to reach a unanimous verdict, we will

VB        OCR        CRR

A-743

Proceedings                                    669

1   respect your decision.

2           So I am going to suggest you work a little bit

3   longer in that spirit and atmosphere which I have just

4   suggested to you, all right?

5           So, thank you again, and we do appreciate your

6   conscientiousness in this regard.  We will let you resume your

7   deliberations.

8           Thank you.

9           THE COURTROOM DEPUTY:  All rise.

10          (Jury exits at 9:48 a.m.)

11          THE COURT:  Have a seat, everyone.

12          So I know, Ms. Kassner, you were saying just before

13  the jury came out, that you had wanted me to focus them on

14  Count Number One, which is the one that they are still

15  un-unanimous on.

16          And I did, in the beginning, orient them in that

17  regard, but I did not want to overemphasize that because the

18  truth is, they are allowed, if they want to, to change their

19  verdict on Count 2.  I was not going to suggest that to them,

20  given their note, but it is not for me to tell them how to

21  reach their verdict and whether to continue to debate both

22  counts if they choose to do so.  I just recapitulated for them

23  what they had expressed to us in the notes in giving them this

24  Allen charge.

25          All right, so I am going to ask the criminal folks

VB      OCR      CRR

A-744

Proceedings                                        670

1   to cede the tables to our colleagues in the civil case.

2           Do not go very far.  We have your cell phone numbers

3   in case we get another note from the jury.

4           Thanks everyone.

5           (Recess taken.)

6

7           (Continued on following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VB        OCR        CRR

A-745

Proceedings                                                      671

1   (Continuing.)

2              (In open court; Jury not present.)

3              (Jury returned a note at 10:30 a.m.)

4         THE COURT:  So we have another note, and it's been

5   marked as Court Exhibit Number 9.  It reads simply, the jury

6   has reached a verdict.  So we're going to have the jury come

7   out here and announce their verdict.

8              And let me say this while we're waiting for them to

9   assemble, it's my practice to go back and speak with the jury

10  after they have concluded their deliberations and reached a

11  verdict.  And I don't talk to them, of course, about the case,

12  but I just ask them generally about their experience and

13  answer any questions they have, as a general matter, never

14  touching on the case at all.

15             The other thing I do tell them is that it's possible

16  that the parties might approach them, but that they're free to

17  answer or not answer or speak to or not speak to the parties.

18        THE COURTROOM DEPUTY:  Ready?

19        THE COURT:  Yes.

20             (Alternate juror enters at 10:33 a.m.)

21        THE COURT:  Good morning.  How are you?

22        THE ALTERNATE JUROR:  Good morning.

23        THE COURTROOM DEPUTY:  All rise.

24             (Jury enters the courtroom at 10:34 a.m.)

25        THE COURT:  Please be seated, everyone.

A-746

Verdict                                                     672

1          Welcome back, ladies and gentlemen of the jury.  We

2    have received your last note which indicates that you've

3    reached a verdict.  I will ask the foreperson to hand the

4    verdict sheet to my deputy.

5          THE COURTROOM DEPUTY:  Thank you, ma'am.

6          THE COURT:  All right.  So madam foreperson, I'm

7    going to hand the verdict back to you, and if you wouldn't

8    mind standing for a moment so you can announce the verdict,

9    I'll ask you the questions, and then you'll let me know what

10   the verdict is.

11         With regard to Count One which charges the defendant

12   with money laundering, as to the defendant, Mustafa Goklu,

13   guilty or not guilty?

14         THE FOREPERSON:  Guilty.

15         THE COURT:  As to Count Two, operation of an

16   unlicensed money transmitting business, regarding the

17   defendant Mustafa Goklu, guilty or not guilty?

18         THE FOREPERSON:  Guilty.

19         THE COURT:  Now, if you found that he's guilty of

20   Count Two, you need to indicate whether you unanimously found

21   that the defendant has proved beyond a reasonable doubt that

22   defendant conducted, controlled, managed, supervised,

23   directed, or owned all or part of an unlicensed money

24   transmitting business which operated without an appropriate

25   money transmitting license in the State of New York.

A-747

|                           Verdict                           673 |

1          Yes or no?

2          THE JURY:  Yes.

3          THE COURT:  Okay.  And then failed to comply with

4    the federal money transmitting business registration

5    requirements; yes or no?

6          THE JURY:  Yes.

7          THE COURT:  All right.  Thank you very much, madam

8    foreperson.  You may have a seat.  We'll retrieve the verdict

9    form from you.

10          So let me turn first to the Government.

11          Would you like to have the jury polled?

12          MS. KASSNER:  No, Your Honor.

13          THE COURT:  The defense?

14          MR. SINGER:  Yes, please.

15          THE COURT:  Okay.  So Juror Number 1, is that your

16    verdict?

17          JUROR NUMBER 1:  Yes.

18          THE COURT:  Juror Number 2, is that your verdict?

19          JUROR NUMBER 2:  Yes.

20          THE COURT:  Juror Number 3, is that your verdict?

21          JUROR NUMBER 3:  Yes.

22          THE COURT:  Juror Number 4, is that your verdict?

23          JUROR NUMBER 4:  Yes.

24          THE COURT:  Juror Number 5, is that your verdict?

25          JUROR NUMBER 5:  Yes.

A-748

Verdict                                                    674

1          THE COURT:  Juror Number 6, is that your verdict?

2          JUROR NUMBER 6:  Yes.

3          THE COURT:  Juror Number 7, is that your verdict?

4          JUROR NUMBER 7:  Yes.

5          THE COURT:  Juror Number 8, is that your verdict?

6          JUROR NUMBER 8:  Yes.

7          THE COURT:  Juror Number 9, is that your verdict?

8          JUROR NUMBER 9:  Yes.

9          THE COURT:  Juror Number 10, is that your verdict?

10          JUROR NUMBER 10:  Yes.

11          THE COURT:  Juror Number 11, is that your verdict?

12          JUROR NUMBER 11:  Yes.

13          THE COURT:  Juror Number 12, is that your verdict?

14          JUROR NUMBER 12:  Yes.

15          THE COURT:  All right.  Thank you very much, ladies

16   and gentlemen of the jury.  That completes your jury service.

17   You have my thanks, and I know the parties' thanks for your

18   attention and diligence in this matter.

19          I'm going to excuse you now to go back to the jury

20   room, but I am going to come back and just speak to you very

21   briefly, not about the case, but just about your overall

22   experience, and I'll answer any questions you have, not

23   relating to the case, and also receive any feedback that you

24   have for us on how we could do these things better.  So I'll

25   see you in just a few moments, and I'll ask you to remain in

A-749

Proceedings                                                        675

1   the jury room just until I come back there.

2            Thank you, everyone.

3            THE COURTROOM DEPUTY:  All rise.

4            (Jury exits the courtroom at 10:38 a.m.)

5            THE COURT:  So I'm going to go back, as I said.  You

6   can probably leave these tables, and as I mentioned to you

7   before, I'll let the jury know that you may or may not be

8   approaching them, but that they have the right to speak to you

9   or not to speak to you as they choose.  I'll need you folks,

10  though, to remain for a few minutes to discuss any post trial

11  briefing if there's going to be any.

12           MR. SINGER:  Yes.

13           THE COURT:  Okay.  And I have a gift of appreciation

14  for that.

15           (Judge PAMELA K. CHEN exits the courtroom.)

16           (Pause in the proceedings.)

17           (Judge PAMELA K. CHEN enters the courtroom.)

18           THE COURT:  So thank you, everyone, for being

19  patient.

20           Mr. Singer, do you intend to file anything?

21           MR. SINGER:  Yes, I do, intend to file post-trial

22  motions.

23           THE COURT:  All right.  How much time do you need?

24           MR. SINGER:  If I could have a month, I would

25  appreciate that.  I've just got a lot of catching up with

Avery N. Armstrong, RPR
Official Court Reporter

A-750

Proceedings                                                676

1   other things to do.

2          THE COURT:  That's fine.  So let's take a quick look

3   at the calendar.

4          So did you have a date in mind, Mr. Singer?

5          MR. SINGER:  Do you want the case on the calendar

6   or --

7          THE COURT:  What do you mean?

8          MR. SINGER:  Well, we'd be meeting or are we just

9   picking a date --

10         THE COURT:  Well, first of all, just pick a date for

11  you to file, then a response, and then we can set a date for

12  oral arguments.

13         MR. SINGER:  November 10th, Judge?

14         THE COURT:  Okay.  Fine.

15         And then the Government, do you want more than two

16  weeks or do you want --

17         MS. KASSNER:  Two weeks is Thanksgiving, Your Honor.

18  So we'd probably just ask for, if possible, another week, just

19  to, sort of, handle that holiday.

20         THE COURT:  Absolutely.  Do you want -- why don't I

21  give you until either the 2nd or the 5th of December.  The 2nd

22  is a Friday, the 5th is a Monday.

23         MS. KASSNER:  Either one is fine, Your Honor.

24         THE COURT:  All right.  Why don't we make it

25  December 5.  I know that the holidays often involve travel.

A-751

Proceedings                                    677

1          And then, if you want to file a reply, you can,

2     Mr. Singer.  How about I give you just a week, until

3     December 12, if you want to file a reply.  You don't have to.

4          MR. SINGER:  That's fine.  Thank you.

5          THE COURT:  What we ought to do then is how about we

6     schedule for the 15th or the 16th, oral argument.  And I'm not

7     saying necessarily I'll need to hear any.  But certainly, we

8     should set a control date for it.

9          I'm looking at my calendar.

10          How about we make that the -- yeah, maybe let's make

11     it for the Friday in the afternoon, at 2:00.

12          MR. SINGER:  Actually, that's -- that Friday

13     afternoon is a problem for me.  I could do it in the morning

14     if Your Honor is available.

15          THE COURT:  I'm not, unfortunately.  I have -- right

16     now, I have a sentencing on in the morning.

17          MR. SINGER:  Any time of the Thursday the 15th is

18     fine for me.

19          THE COURT:  Why don't we do that then.  How about we

20     make it late afternoon.  I've got a sentencing at 2:00 on the

21     15th.

22          Why don't we make it at 4:00.  Is that --

23          MR. SINGER:  That's fine.

24          MS. KASSNER:  That works, Your Honor.

25          THE COURT:  So December 15, at 4:00 p.m.  Okay.

A-752

```
                     Proceedings                    678

 1        So I'm going to now excuse everybody.  I don't know,

 2   like I said, if you want to try to talk to the jurors.  I

 3   think they may have already left, but the trial has been

 4   concluded.  The jury, obviously has rendered their verdict,

 5   and then I'll hear from the parties and resolve any post-trial

 6   motions by mid December.

 7        All right.  Thank you, everyone.  As I said before,

 8   the case was well tried, and the jury has obviously just made

 9   their decision the way they saw fit.  Thank you, everyone.

10        MR. NAVARRO:  Thank you, Judge.

11        MR. SINGER:  Thank you, Your Honor.

12        MS. KASSNER:  Thank you, Your Honor.

13        MR. NAVARRO:  Your Honor, the evidence that's in the

14   back.

15        THE COURT:  Oh, yes.  So you could go back to

16   retrieve the evidence.

17        SPEAKER FR:  The agent's going to go back to

18   retrieve that.

19        THE COURT:  Okay.

20        So folks on the criminal case, I have to ask you

21   guys to leave only because I need to have the civil litigants

22   to come back.

23        (Whereupon, the matter was concluded.)

24                *    *    *    *    *

25
```

A-753



A-754



A-755



A-756



A-757



A-758



A-759



A-760



A-761



A-762



A-763



Starbucks
46-09 Queens Blvd, Sunnyside, NY 11104
(718) 472-5215

https://goo.gl/maps/9MhkQar8h452
THU 5:20 PM

I dont know if i can make it out there tonight. Can you do tomorrow morning like 11?
THU 5:21 PM

Afyer 12.00pm tomorrow i can at same place 7 train is 20min to here
THU 5:22 PM

Do you mean Queens tomorrow or the same place as last time?
THU 5:23 PM

Queens sorry trafiic way carzy those days in and out manhattan takes forever
THU 5:24 PM

No problem. Ill text you when im on my way. Ill leave here around 12

Signal message

A-764



A-765



A-766



A-767

