# 24-767-cr

## United States Court of Appeals

*for the*

### Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

MUSTAFA GOKLU, AKA Mustangy,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## APPENDIX
**Volume 4 of 5 (Pages A-768 to A-1023)**

MATTHEW BRISSENDEN
MATTHEW W. BRISSENDEN, P.C.
*Attorneys for Defendant-Appellant*
666 Old Country Road, Suite 501
Garden City, New York 11530
(516) 683-8500

CP COUNSEL PRESS        (800) 4-APPEAL • (333855)

**i**

# TABLE OF CONTENTS

|  | Page |
|---|---|
| District Court Docket Entries | A-1 |
| Complaint, dated May 5, 2019 | A-19 |
| Superseding Indictment, Filed on October 28, 2020 | A-33 |
| The Government's Requests to Charge, dated September 12, 2022, with Proposed Verdict Sheet Attached | A-38 |
| Defendant's Requests to Charge, dated September 12, 2022 | A-70 |
| Transcript of Jury Selection Held before of the Honorable Pamela K. Chen, dated October 3, 2022 | A-76 |
| Excerpts from Trial combined Opening through Verdict, Filed on December 1, 2022 | A-264 |
| Government Exhibit 501 | A-753 |
| Government Exhibit 502 | A-761 |
| Government Exhibit 503 | A-765 |
| Government Exhibit 504 | A-770 |
| Government Exhibit 505 | A-776 |
| Government Exhibit 506 | A-786 |
| Government Exhibit 507 | A-792 |
| Government Exhibit 901 | A-799 |

ii

|  | Page |
| --- | --- |
| Government Exhibit 902 | A-812 |
| Government Exhibit 903 | A-814 |
| Government Exhibit 904 | A-849 |
| Government Exhibit 906 | A-864 |
| Government Exhibit 907 | A-895 |
| Government Exhibit 909 | A-916 |
| Government Exhibit 1101 | A-928 |
| Jury Instructions, Filed on October 11, 2022 | A-929 |
| Verdict Form, dated October 11, 2022 | A-958 |
| Notice of Motion, by Defendant, for Judgment of Acquittal, dated November 10, 2022 | A-960 |
| Affirmation of Murray E. Singer, for Defendant, in Support of Motion, dated November 10, 2022 | A-961 |
| Government Memorandum of Law in Opposition to Defendant's Post-Trial Motion, dated December 5, 2022 | A-965 |
| Reply Affirmation of Murray E. Singer, for Defendant, in Further Support of Motion, dated December 12, 2022 | A-988 |
| Memorandum and Order, dated January 13, 2023 | A-990 |
| Sentencing Memorandum from Sabrina P. Shroff to the Honorable Pamela K. Chen, dated January 15, 2024 | A-999 |
| Transcript of First Sentencing Day held before the Honorable Pamela K. Chen, dated January 29, 2024 | A-1008 |

iii

**Page**

Excerpt from the Continued Sentencing Hearing
   held before the Honorable Pamela K. Chen, dated
   March 14, 2024 ........................................................ A-1054

Notice of Appeal, Filed on March 22, 2024 .............. A-1117

A-768



A-769



A-770



A-771



A-772



A-773



A-774



A-775



A-776



A-777



A-778



A-779



A-780



A-781



A-782



A-783



A-784



A-785



A-786



A-787



A-788



A-789



A-790



A-791



A-792



A-793



A-794



A-795



A-796



A-797



A-798



A-799

CASE NUMBER:          <u>United States v. Mustafa Goklu</u>, 19-CR-386 (S-1)

EXHIBIT NUMBER:       GX 901

DATE:                 8/28/2018

PARTICIPANTS:         Michael Goklu ("GOKLU")
                      Undercover Agent ("UC")

ABBREVIATIONS:

[Brackets]            Transcriber's notes

[U/I]                 Unintelligible words

[ph]                  Phonetic rendering



GOVERNMENT
EXHIBIT
**901**
19 CR 386 (S-1) (PKC)

A-800

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | What's going on, man? |
| GOKLU: | Michael |
| UC: | Pat |
| UC: | All good. |
| UC: | Okay. Where do you have it? |
| GOKLU: | I'm going to the CVS, come. |
| UC: | [U/I]. |
| GOKLU: | No, no, that's not all yours. |
| UC: | This? |
| GOKLU: | No, that's, that's… hold on, let me [U/I]. |
| UC: | Where is it? |
| GOKLU: | This one. |

A-801

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | [Laughs] You got too much of that lying around. Is this it? |
| GOKLU: | Yeah. Close the door, man, [U/I] the cops, we are not drug dealers, we're buying bitcoin. |
| | [Noise] |
| GOKLU: | Let me count it. I'm not sure its [U/I] |
| UC: | Oh, okay. |
| | [Voices overlap] |
| GOKLU: | Because I'm, I'm not sure it's [U/I] bleach. |
| UC: | Oh, okay. |
| GOKLU: | If is too much, I have a machine. |
| | [Beeping sound, pause] |
| UC: | Okay. |
| GOKLU: | Okay? |
| UC: | Yeah. |
| | [Pause] |
| GOKLU: | I need to pick up this guy. |

A-802

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| UC: | Stay here real quick. |
| GOKLU: | Thank you, it's [U/I]. |
| UC: | Perfect. |
| GOKLU: | Ten thousand. One twenty four. |
| | [Voices overlap] |
| UC: | Yeah, you gave me 5,000…so… |
| GOKLU: | [U/I]. |
| UC: | …so… I've got a… |
| GOKLU: | [U/I]. |
| UC: | What do you charge? |
| GOKLU: | Eight. |
| UC: | Eight. |
| GOKLU: | Right. |
| | [Voices overlap] |
| UC: | You charge at eight percent, all right, that's high |

A-803

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | [U/I]. |
| UC: | That's fine. |
| GOKLU: | Uh, uh, when you go deliver the bag shipping [U/I] charges after all the [U/I]. |
| UC: | I know, right? |
| GOKLU: | [U/I]. |
| UC: | Yeah. |
| GOKLU: | Seventy-five eighty. |
| UC: | Okay, I only, I only have, uh, point seven right now. Can… I'll give you back whatever. |
| GOKLU: | Okay, okay. |
| UC: | So, how much? |
| GOKLU: | Okay, then, tell me your coin, how much coin you have |
| UC: | So, it's point… uh, here, point seven zero four… |
| GOKLU: | Hold on, let me calculate |
| UC: | Yeah. |
| GOKLU: | [U/I] double check the other one. Is that three… [U/I] Okay. |

A-804

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Yeah, good? |
| GOKLU: | Okay. [U/I]. |
|  | [Pause] |
| GOKLU: | [U/I]. |
| UC: | All right. |
| GOKLU: | Seventy forty-five. |
| UC: | Yeah. Okay. |
| GOKLU: | [U/I]… Seven fifty [U/I], five, five, seven [U/I], four, five, [U/I], thirty, [U/I], 4,000 [U/I]. |
| UC: | Uh-hum. |
| GOKLU: | Four thousand… 18… I can give you 19. |
| UC: | What's that? |
| GOKLU: | Nineteen [U/I]. |
| UC: | Here you go. How much, uh, how much can you do at one time? |
| GOKLU: | [U/I] now I know I can do more. |
| UC: | Yeah? |

A-805

| NAME | ORIGINAL LANGUAGE |
|---|---|
| GOKLU: | That's fifty [U/I] |
| UC: | Yeah? Okay. How often can you do it? |
| GOKLU: | [U/I]. |
| UC: | Okay. Are you in Manhattan here? |
| GOKLU: | No, that's the problem. I don't want to come here, you know, these fucking malls all have the cameras. That's the other one that has cameras, two, three, five, they called me, "Hey, are you a drug dealer?" "No." |
| UC: | We can, I'm sure that… |
| GOKLU: | That, that's why I try to stay in, Queens. |
| UC: | Yeah, yeah. |
| GOKLU: | Ten minutes. |
| UC: | Yeah. |
| GOKLU: | You could take train from 42nd or somewhere down, 33? |
| UC: | Yeah, I'm downtown. |
| GOKLU: | Yeah, 47th is almost the second stop after Queens Plaza. |
| UC: | Okay. |

6

A-806

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Okay? We have a Starbucks, we can [U/I]. |
| UC: | Yeah. Okay, I mean, it'd be be… it'd be more convenient. Could we… you come in… do you work here? |
| GOKLU: | [U/I] if it's for more than 20, I don't have a problem. |
| UC: | Okay, I can definitely do more than twenty. |
| GOKLU: | Yeah. But it's...Manhattan I have to [U/I] But, I bring the machine it's another risk. [U/I] the machine. |
| | [Voices overlap] |
| UC: | Yeah. |
| GOKLU: | The fucking machine. |
| UC: | Yeah, yeah. |
| GOKLU: | That fucking thing is evidence that you're a drug dealer. |
| UC: | Well. [Laughs] |
| GOKLU: | [U/I]. |
| | [Voices overlap] |
| UC: | [Laughs] You know. I mean, it's just so… it's just kind of a pain in the ass. Well, I can probably do. We'll talk… |

7

A-807

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | [U/I]. |
| UC: | …we'll talk. Uh, you… |
| | [Voices overlap] |
| GOKLU: | I would need the black bag [U/I]. |
| UC: | Yeah, the other bag… |
| GOKLU: | [U/I]. |
| UC: | …the other bag, yeah. |
| GOKLU: | [U/I] any, any Uber drivers [U/I] nothing… |
| UC: | Yeah. |
| GOKLU: | …[U/I] that much money and stuff. [U/I]. Yeah, sorry, it's white |
| UC: | Uh, it would be good. |
| GOKLU: | Yeah, I should check. |
| UC: | All right, so… in about a week, I'll have a lot more to do. Is that good with you? |
| GOKLU: | Yeah. |
| UC: | Okay, well… |

A-808

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | I think September 6th or 7th…today's what…I'm sailing for the next 10 days. |
| UC: | Nice. Where are you going? |
| GOKLU: | I [U/I]. |
| UC: | Where… wherever. |
| GOKLU: | Hey, I [U/I] boat. [Laughs] |
| UC: | There you go. |
| GOKLU: | [Laughs] [U/I]. |
| UC: | Okay. All right, so you said, what? September what? |
| GOKLU: | I said September 6th, so it means 5… September 5, night, I try. |
| UC: | Okay. |
| GOKLU: | [U/I]. |
| UC: | Okay. So it will be either, it will be like right around that time or maybe a little bit after. |
| GOKLU: | Okay. I can come to the Manhattan. |
| UC: | [U/I] |
| GOKLU: | Do you want to meet night time? |

A-809

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Uh… |
| GOKLU: | Seven, eight, nine [U/I]. |
| UC: | I prefer not to. |
| | [Voices overlap] |
| GOKLU: | Yeah, I have a… |
| UC: | You know. |
| GOKLU: | …I have a [U/I] now that I plug here and put the machine, and the machine is checking money for you too. |
| UC: | Okay. |
| GOKLU: | They, they, you know, [U/I]… |
| UC: | Oh,  yeah,  yeah, yeah. |
| GOKLU: | …and they count the fake money. |
| UC: | Yeah. |
| GOKLU: | So I make sure because I'm getting, I'm getting money from somewhere something bad…who knows. |
| UC: | Yeah. |
| GOKLU: | Make sure that [U/I] money [U/I]. |

A-810

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Okay. So I'll probably have like 50 next time. |
| GOKLU: | How much? |
| UC: | Fifty. |
| GOKLU: | Five zero? |
| UC: | Yeah. |
| GOKLU: | Well, I can do it during two days. By the end of tomorrow I can get this. |
| UC: | Well, it would be like next, that week. |
| GOKLU: | Oh, you [U/I] either. |
| UC: | Huh? No, no, no, not yet. So I… |
| GOKLU: | Oh, you mean for [U/I]. |
| UC: | No, I, I just, uh, I have an online business. |
| GOKLU: | Oh. |
| UC: | So I, I'm getting money in |
| GOKLU: | Oh, okay, okay. |
| UC: | Okay? |

A-811

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Okay. |
| UC: | All right? |
| GOKLU: | Yeah. |
| UC: | Cool, so we'll be in touch. |
| GOKLU: | Thank you. |
| UC: | All right, thanks, Michael. |
| GOKLU: | Hey, man, good luck. |
| UC: | See you. |
| GOKLU: | [U/I] somehow I'm stuck to [U/I]. |
| UC: | Oh, it's all good, man. No, I was just right down the street. |
| GOKLU: | [U/I]. |
| UC: | All right, thanks. |
| GOKLU: | [U/I]. |
| | [Noise] |
| UC: | [Aside: All right, out of the car… walking northbound on 7th.] |

[END OF RECORDING]

A-812

CASE NUMBER:      <u>United States v. Mustafa Goklu</u>, 19-CR-386 (S-1)

EXHIBIT NUMBER:   GX 902

DATE:             9/21/18

PARTICIPANTS:     Michael Goklu ("GOKLU")

                  Undercover Agent ("UC")


ABBREVIATIONS:

[Brackets]        Transcriber's notes

[U/I]             Unintelligible words

[ph]              Phonetic rendering



GOVERNMENT
EXHIBIT
**902**
19 CR 386 (S-1) (PKC)

A-813

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| UM2: | Hey, buddy. |
| GOKLU: | Hey, how are you. |
| | [Unintelligible conversation] |
| | [END OF RECORDING] |

A-814

CASE NUMBER:          <u>United States v. Mustafa Goklu</u>, 19-CR-386 (S-1)

EXHIBIT NUMBER:       GX 903

DATE:                 11/27/18

PARTICIPANTS:         Michael Goklu ("GOKLU")
                      Undercover Agent ("UC")


ABBREVIATIONS:

[Brackets]            Transcriber's notes

[U/I]                 Unintelligible words

[ph]                  Phonetic rendering



GOVERNMENT
EXHIBIT
**903**
19 CR 386 (S-1) (PKC)

A-815

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| | [Noise, voices in the background] |
| UC: | How are you doing? |
| GOKLU: | Hey, good, how are you? |
| UC: | What's going on, man? Good? |
| | [Noise] |
| UC: | All good? |
| GOKLU: | The black, the black window scares me. |
| UC: | Oh, it scared you? [Chuckles] |
| | [Unintelligible conversation] |
| UC: | Better than… |
| | [Noise – voices in the background] |
| GOKLU: | Oh, shit! Where is the fucking phone? |
| UC: | What do you need? [Noise] Uh. What's going on, man? |
| GOKLU: | Good, how are you? |
| UC: | What are you looking for? |

A-816

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Something, it's just that I have a backup phone for, uh, wallet. |
| UC: | Oh, okay. |
| GOKLU: | Where the fuck is the [U/I]? |
| | [Noise] |
| GOKLU: | Look at this, okay? Crazy bitcoins, [U/I], I don't know where the fucking phone is. |
| | [Pause] |
| UC: | Uh! |
| GOKLU: | Okay. |
| UC: | Uh! |
| GOKLU: | This is going to be your wallet. [Noise] |
| UC: | Uh! |
| GOKLU: | Last time you had a different [U/I]. Was this one? |
| UC: | Yeah… That's the one. |
| GOKLU: | You can't go all 40? |
| UC: | Yeah, do you have…? Where do you…? What's in it, hundreds? |

A-817

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Yeah, all hundreds, yeah. |
| UC: | Okay. |
| GOKLU: | Good money. |
| | [Pause, noise] |
| UC: | Do you have the… do you have your counter here? |
| GOKLU: | Yeah, yeah. |
| | [Noise] |
| UC: | How you been? How was your Thanksgiving? |
| GOKLU: | Uh, not really good. |
| UC: | No? |
| GOKLU: | I was fucking sick in the bed. |
| UC: | You were sick last time I saw you. |
| GOKLU: | Yeah, man, this… [Beeping sound from money counter] fucking… I keep doing something on [U/I]. I should give up on the [U/I]. |
| UC: | [Laughs] So you couldn't get the full amount? |
| GOKLU: | I can give you some more tomorrow because bank is getting pissed when you… [Beeping sound] withdraw… when you |

3

A-818

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| | withdraw too much, they get pissed. |
| UC: | Uh. |
| | [money counter noise] |
| GOKLU: | Man, come on! |
| | [Noise, beeping sound] |
| GOKLU: | Shit! |
| | [Noise] |
| GOKLU: | Six hundred. |
| UC: | Okay. |
| GOKLU: | This machine checks out the fake so don't worry. |
| UC: | Um. |
| GOKLU: | [U/I]. |
| | [Noise, beeping sound throughout this segment] |
| GOKLU: | I, I need to change this, it runs better when [U/I]. |
| | [Pause] |
| GOKLU: | Hey, come on. Don't bullshit me. |

A-819

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
|  | [Pause] |
| GOKLU: | [U/I]. |
| UC: | Um. |
|  | [Noise throughout this segment] |
| GOKLU: | [U/I]. |
| UC: | [Clears throat] |
| GOKLU: | [U/I] do it more quickly. |
| UC: | Uh-hum. |
| GOKLU: | Yeah, maybe this plastic thing when it's cold, gets stuck. |
| UC: | Yeah. Working good now. |
| GOKLU: | This shit is going down crazy. I lost a lot of fucking money. |
| UC: | Yeah. |
| GOKLU: | There was somebody talking about two or three thousand. |
| UC: | That's no good. Do you…? What do you… keep it in bitcoin? |
| GOKLU: | I keep some, not really too much. I was keeping a lot, I get out after 12. I was lucky. |

5

A-820

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | That's good. |
| GOKLU: | I get out. |
| | [Noise] |
| GOKLU: | It was good decision. |
| | [Noise] |
| GOKLU: | But I wa… I'll, I'll buy it back. If it's good, ready 225 something, I'll start to buy. |
| | [Beeping sound] |
| GOKLU: | Fuck! [U/I]. |
| UC: | I, uh, I try to turn it into cash as soon as I get it. |
| GOKLU: | Really? |
| UC: | Yeah. |
| GOKLU: | A hundred |
| UC: | Okay. |
| GOKLU: | Do you want me to go one more, just one? |
| UC: | Yeah, one more time. |

A-821

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| | [Noise] |
| UC: | All right, so I have, um… |
| GOKLU: | Oh, this is the first time I'm going to use. |
| UC: | What's that? |
| GOKLU: | This new wallet. |
| UC: | Who is it? |
| GOKLU: | This is the first time I've used that's why you should first test it, test it with uh, 10, 20 dollars. Should I test? |
| UC: | Sure. |
| GOKLU: | Uh-uh. |
| UC: | What is it? |
| GOKLU: | Okay, so first, [U/I] three, seven, one, six. |
| UC: | Uh… okay. |
| GOKLU: | Seven, one, six, thirteen… three [U/I], no, wait. |
| UC: | Now, so I have… I have a little less. I have, uh, like thirty-nine five. I have 10.6513 bitcoin. |
| GOKLU: | Total? |

A-822

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Yeah. |
| GOKLU: | So let's go with that one. Yeah, the trouble is it's not going to be 40. |
| UC: | Yeah, it's a little less, it's like six… 550 less. |
| GOKLU: | Three, seven, one, six. Three, one, seven, six. How many bitcoin? Ten, six, four? |
| UC: | Ten, six, five, one, three. |
| GOKLU: | Ten, six, one, five, three times three seven one six times 092. Total is thirty six three hundred. |
| UC: | For what? What's .92? |
| GOKLU: | Yeah. It's 8 percent [U/I]. |
| | [Voices overlap] |
| UC: | Since, since… |
| GOKLU: | Or you do the calculations then. |
| UC: | …since we're… since we're doing more, can we…? Let's, uh, let's talk about that, because that's, that's quite a bit and you're making… |
| | [Voices overlap] |
| GOKLU: | Last time I lost money. |

A-823

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | …making me come out here to… |
| GOKLU: | Last time I buy you from 6 to 5, I sold for 5. |
| UC: | Yeah, you did give me a little extra. What's…? Let's do… since it's so much, what a…? |
| GOKLU: | [U/I] six, five hundred, okay? |
| UC: | Let's take it down to 3,000. |
| GOKLU: | Thirty-seven? Come on, man, let's go 6 percent then, because one percent is 300 in here, no, 350. |
| UC: | Yeah, it's six percent. |
| GOKLU: | Yeah, it's, it's seven. |
| UC: | Let's do six percent. |
| GOKLU: | No, no way. I'll lose money. [Chuckles] |
| UC: | You're not going to lose money, you make… |
| | [Voices overlap] |
| GOKLU: | Because bitcoins are crazy. |
| UC: | …you… |
| GOKLU: | Last time I get from you, well, the, the other two guys, I maybe lost |

A-824

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| | 10,000 dollars. |
| UC: | All right, well, let's, let's go seven percent then. But you're making me come out here twice too. |
| GOKLU: | Okay, thirty-six, six hundred, good? |
| UC: | Okay. |
| | [Voices overlap] |
| GOKLU: | Thirty-six, six hundred, which is me having to remove, thirty-six, six hundred. Thirty-six, six hundred. Forty minus thirty-six, six, zero, zero. Yeah, thirty-four. I'll [U/I] thirty-four. |
| UC: | Thirty-four? |
| GOKLU: | But you have to sign here. [Noise] I'm not sure if I have backup of this here. I don't think so. I'll doublecheck, ending with the YNM. |
| UC: | Uh-hum. |
| GOKLU: | Start with the 1P each. |
| UC: | Uh-hum. |
| GOKLU: | [U/I]. |
| UC: | Good. |
| | [Pause, noise] |

10

A-825

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| UC: | Did you get it? |
| GOKLU: | It's okay. |
| UC: | Are you going to be able to meet up more regularly? |
| GOKLU: | I can. |
| UC: | Yeah? Would you have more on hand to avoid [U/I] |
| GOKLU: | Yeah, I'm just fighting, I'm fucking fighting with this fucking bank. They keep calling me. |
| UC: | Okay. |
| GOKLU: | And I have… [Clears throat] I have, uh, [U/I]. [Noise] [U/I]. |
| | [Voices overlap] |
| UC: | What we talked about before, my business is picking up again, so I would… a lot… |
| GOKLU: | You need money, right? |
| UC: | …of bitcoins coming in and I turn it into cash as soon as possible. |
| GOKLU: | Really? |
| UC: | Yeah, I don't hold on to it. |
| GOKLU: | You really think it's a good decision? |

A-826

| NAME | ORIGINAL LANGUAGE |
|---|---|
| UC: | Well, I got… I have to pay people, so… they want it in cash. So… |
| | [Voices overlap] |
| GOKLU: | [Sighs] I cannot [U/I]… |
| UC: | I need... |
| GOKLU: | …how much money I can find tomorrow. Maybe I can find another 20, 30 tomorrow. |
| UC: | You can do another 30 tomorrow? |
| GOKLU: | Yeah. Because twenty-five [U/I]. There is some money paper fucking keep holding. |
| UC: | Huh? |
| GOKLU: | Assholes. Paypal holding a lot of money. If they… |
| UC: | Uh. |
| GOKLU: | …if… as soon as that's been released, I can take more. |
| UC: | [U/I] that? [U/I]. And then, in like, uh, a week or two I'll have 100 to do. |
| GOKLU: | A hundred thousand? |
| UC: | Yeah. |

A-827

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| | [Noise] |
| UC: | Okay. |
| GOKLU: | [U/I] I know I need [U/I] paper [U/I]. [U/I] nothing, but [U/I] for combination. |
| UC: | Uh-hum. |
| GOKLU: | A hundred… how much I've got in Paypal I think I got 80, 90. |
| UC: | Are you meeting with a lot of people on local bitcoins? |
| GOKLU: | No, not really. |
| UC: | No? |
| GOKLU: | Really, yeah. I have one other client. |
| UC: | Yeah? |
| GOKLU: | Yeah, they come overseas. They're stuck in here and those guys are rich. "Oh, shit, credit card is not good, I need money, you have 20." "Yes." [Chuckles] And most of them is [*sic*] from my own country, Turkish. |
| UC: | Yeah? |
| GOKLU: | Yeah. |
| UC: | So what do you got, it's like a bank for them? |

A-828

| NAME | ORIGINAL LANGUAGE |
|---|---|

**NAME**      **ORIGINAL LANGUAGE**

GOKLU: And a few of them, I told them, they have fucking money, why are they struggling with the fucking, uh, between TD Bank, Capital and uh, Coinbase. One of the guys, he bought 200,000 dollars, when it's only 250 dollars.

UC: Uh-hum.

GOKLU: So that guy I say, whatever you can, no problem.

UC: [Chuckles]

GOKLU: "Ten percent?" No, it's okay… Miners…a lot of hashrate is gone, you read that, right?

UC: What's that?

[Voices overlap]

GOKLU: Hashrate…a lot of hashpower

UC: Yeah.

GOKLU: …because of the [U/I]

UC: Yeah, [U/I],  yeah.

GOKLU: …they're fighting, it's BSB fucking. Bitcoins cash becomes [U/I].

UC: Because it's so, so low now, it doesn't make sense to mine it

GOKLU: Okay, now I trust you. The first I came [*sic*], I said, "How the hell do you know if the cops come out of fucking black." I said, "Oops!"

14

A-829

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | [Chuckles] |
| GOKLU: | It's not jail, it's not bad, but still they going to keep it two three days, keep your money. |
| UC: | Yeah. |
| GOKLU: | My partner is in judgement. |
| UC: | What happened? |
| GOKLU: | Uh, They caught him 50K. [Laughs] |
| UC: | Really? |
| GOKLU: | They take the money, but lawyers say probably they're going to take back like the 10 percent. |
| UC: | Where was that? |
| GOKLU: | I told him, "No deal at fucking Manhattan." Manhattan sucks. People ask me, "Can you come to Manhattan?" "No." |
| UC: | Uh, that was your partner? |
| GOKLU: | No, uh, yeah. Because actually they weren't tracking for bitcoins, they were tracking some idiot guy who buys and sells drugs. |
| UC: | Okay. |
| GOKLU: | Yeah, because they follow these guys almost always and one of the, the idiots sold or bought from him. So when they tracked him, |

A-830

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| | the drug guy, the cops said "Bingo, we caught something else." |
| UC: | You don't think they're, they're looking at you, do you? |
| GOKLU: | No, I don't think its... I mean, it's not a crazy big amount. |
| UC: | No. |
| GOKLU: | The only thing they can do, [Clears throat] they keep you the money in escrow until the judgement finishes. |
| UC: | Well. |
| GOKLU: | Or they can keep your bitcoins too. [Chuckles] |
| UC: | Either way, I don't want them around. |
| GOKLU: | Nah. Come on, [U/I] finish. You are coming from Jersey, right? No? |
| UC: | No, Manhattan. |
| GOKLU: | Manhattan? |
| UC: | Yeah. |
| | [Pause, noise] |
| GOKLU: | [U/I] they just blocked. Let's see. |
| UC: | Yeah, let's just kind of check it out. |

A-831

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Let me check, the line is blocked. |
| UC: | So, dude, I am kind of nervous about your friend. |
| | [Voices overlap] |
| GOKLU: | No, no, no, no. It's okay. They don't, they don't track me or him, they… |
| UC: | Yeah. |
| GOKLU: | …they were tracking the idiot fucking guy… and this thing has been one year almost… their fucking lawyer, almost he's going to get back money. [U/I]. |
| | [Pause] |
| UC: | It's on blockchain. |
| GOKLU: | Eighteen fifty… Yeah, it's on blockchain, but no, no, uh, no confirmation. Eighteen fifty… what time is it? It's going to be sixteen minutes… |
| UC: | Uh-hum. |
| GOKLU: | …one block. |
| | [Noise] |
| GOKLU: | Yeah, you, you see, block is slow. |
| UC: | Uh-hum. |

A-832

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | It's a mess, not [U/I]. Sorry, for this amount I have to wait. |
| UC: | Understandable. |
| | [Pause, noise] |
| UC: | So the police never looked at you, right? |
| GOKLU: | No, no, no. |
| UC: | Okay. |
| GOKLU: | This is [U/I], this has nothing to do, do with him. |
| UC: | Yeah. |
| GOKLU: | They, they just seized the money, get his ID, get ready to get money, bullshit, [U/I]. And they take money to the hand on the judge. Actually the judge is okay. He says, "If you pay 20 percent, as a tax, I'm going to release you" The lawyer said no. |
| UC: | Hum. |
| | [Pause] |
| GOKLU: | It's not even in here. [U/I]. [Noise] |
| UC: | So you'll let me know tomorrow if you can get it? |
| GOKLU: | Yeah. Okay, [U/I] maybe. |

18

A-833

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | But, uh, uh, it would definitely be this week, right? |
| GOKLU: | Yeah. |
| UC: | So I owe, I owe the four sixty. I need that pretty bad. |
| GOKLU: | Paypal may have some. I need to talk to them on [U/I] because [U/I] asked for the [U/I] twenty minutes, that she understands this is a big deal transferred for the boss. And I work with them, it's been maybe five years. I have maybe two, three million dollars, all the Paypal on eBay and they still block some of the money. "Oh, sorry, if refunds comes, what are we going to do?" They have already fucking connected it to the bank. |
| | [Pause] |
| UC: | Nothing? |
| GOKLU: | I got the latest block, as soon as I see the blocks… |
| | [Pause] |
| GOKLU: | That's the latest block in [U/I] time. Of course, it's London Time, I guess. Yeah. |
| UC: | Uh-hum. |
| GOKLU: | [U/I] see one block [U/I] long confusion. |
| | [Pause] |
| UC: | It's so slow now. |

A-834

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Yeah, the other one is twe… twenty-five minutes. I can see here. |
| UC: | Uh-hum. |
| GOKLU: | The first… before that one was [U/I] thirteen minutes. What? It's only been 21 minutes, it's almost here… Where did you get bitcoins? |
| UC: | Huh? |
| GOKLU: | You just invested years ago. |
| | [Voices overlap] |
| UC: | No, I have an online business so people pay… |
| GOKLU: | Pay you in bitcoins. |
| UC: | …in bit… in bitcoin. |
| GOKLU: | That's good too. |
| UC: | But I, I don't keep it in bitcoin, I just sell it. |
| GOKLU: | Much better than Paypal. I get, I keep getting sell on eBay. Miners. |
| UC: | Oh, okay. |
| GOKLU: | Yeah, and people pay… the people… people charge three percent, eBay asshole… eBay son-of-a-bitch. They charge you 10 percent. Even we made the mistake when I saw it said "Sponsorship," so they put your add in the front. A hundred and fifty dollars. Boom, I paid 50 dollars, then when you look at the |

A-835

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| | details of the bill. "What the fuck? You charged 20 percent." "Yes, because it's promotion sales." |
| UC: | Uh. |
| GOKLU: | "Why the fuck you are not telling me before?" |
| UC: | How much do you sell them for? |
| GOKLU: | Right now it's, uh, how much was it? Four eighty [U/I], four seventy-nine [U/I], they keep changing the prices, [U/I]. |
| | [Voices overlap] |
| UC: | Do people still want them, even though, because the… |
| GOKLU: | Yeah, yeah, because some… |
| UC: | …[U/I]. |
| GOKLU: | Yeah, because some people are afraid of this. [U/I] in Florida, some man in Georgia… In Georgia the guy bought a lot. I think they paid only three cents per [U/I]. |
| UC: | Where go you get them? Do you ship… export them? |
| GOKLU: | Right now it comes from China. |
| UC: | Okay. |
| GOKLU: | But Trump motherfucker, I think it's going to make 25 percent extra in Customs, which is scary. |

A-836

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Uh. You might have, have to find a new business. |
| GOKLU: | Oh, yeah… But I have another business, we make those bags and export bags, which is printed back. |
| UC: | Oh. |
| GOKLU: | In Turkey and right now that's booming because of Chinese people add an extra 25 percent to the prices, so, [U/I]. |
| UC: | So you, you sell them in China? |
| GOKLU: | No,  here. |
| UC: | Here? |
| GOKLU: | It comes from Turkey. |
| UC: | Okay. |
| GOKLU: | Which is [why] don't pay 25 percent. Right now if the bill pass or passed, the Chinese import plastic bag is going to be extra 25 percent, which is [U/I], so I can put a better price. [U/I], come on! |
| UC: | Is that how you get the cash? |
| GOKLU: | Mostly. Yeah, that's my main business. |
| UC: | Okay. |
| GOKLU: | It's been 15 years I'm importing. I have a lot of samples right in the car. |

A-837

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| | [Pause] |
| GOKLU: | What year is that car? |
| UC: | I don't know, it's my buddy's. Do you like it? |
| GOKLU: | Yeah, it's a good car. |
| UC: | Yeah. |
| GOKLU: | Yeah. For womans [*sic*] with the kids, that's the best one. |
| UC: | [Chuckles] |
| GOKLU: | Because BMW is small, Volvo after Chinese got it, it sucks. Audi, Audi is okay, but… |
| UC: | It breaks down too much. |
| GOKLU: | Yeah, too much. So when you look [U/I] for ladies, that's the best one. |
| UC: | I'll let him know you said that, that's a lady's car. [Laughs] |
| GOKLU: | No, it's not lady's, but I know with the family and the kids because I had the same car years ago. |
| UC: | Yeah? |
| GOKLU: | A lot of people asked me, "Hey, can I see the back seat? Can I see this?" I [U/I] too many buyers from BMW [U/I] because BMW [U/I] is shit. |

A-838

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Still nothing? |
| GOKLU: | No, I keep refreshing, wait a second. I'm waiting for a house price crashing. Look, it's coming, it's working. |
| UC: | Why are you waiting for that? Are you going to buy a place? |
| GOKLU: | Yeah, I get, I get sick of this landlord every day in front of your house. |
| UC: | Uh. |
| GOKLU: | And prices are crazy. There's no house around here for less than one million. |
| UC: | You better hurry up, Amazon is getting in here. |
| | [Voices overlap] |
| GOKLU: | Long Island City, that's what I was looking for, the, the real estate motherfuckers, they heard it, they already have ten percent. |
| UC: | Yeah. |
| GOKLU: | They [U/I], but if Amazon doesn't come, Long Island City is fucking dead. |
| UC: | Yeah. |
| GOKLU: | Greenpoint was really famous... Oops! They fucked up because the train shut down three years. But still this area, still really [U/I], starts from here all the way to Woodside. |

A-839

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Yeah, I don't know this area too much… too well. |
| GOKLU: | It's really good. I searched all around New York. This is one of the best prices that are around because it's going to grow, [U/I] goes up. |
| UC: | I like to stay in Manhattan. |
| | [Noise] |
| GOKLU: | Because [U/I] the new generation, they don't want to buy cars. Wherever the trains go, prices are booming. [U/I]. |
| | [Pause] |
| UC: | [Sighs] |
| | [Voices overlap] |
| GOKLU: | Where do you sell online… |
| UC: | Huh? |
| GOKLU: | …eBay, Amazon or outside? |
| UC: | Outside. |
| GOKLU: | Outside? |
| UC: | Yeah. |

A-840

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Your own website? |
| UC: | Uh, sort of. |
| | [Noise] |
| GOKLU: | I know another, another, another young guy just, he looks just like you. He's in California right now. He picked up all bitcoins, sold everything to me, because he said, "I can't struggle too much, I need cash." And he's doing this licensed Marijuana thing in California. |
| UC: | He's doing what? |
| GOKLU: | Marijuana. |
| UC: | What's he doing? |
| GOKLU: | Marijuana, smoke, smoke. |
| UC: | Oh. |
| GOKLU: | It's legal. |
| UC: | Yeah. |
| GOKLU: | Yeah. you pay taxes. |
| UC: | Yeah. |
| GOKLU: | Crazy. |

A-841

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Yeah. I might know him. That's where I do most of my business. |
| GOKLU: | That's what you do? |
| UC: | A little bit, that's part of it down in California. |
| GOKLU: | Uh. I don't, I don't smoke, but this new thing like electronic cigarette pods. |
| UC: | [U/I]. |
| GOKLU: | Yeah, that's not 100 percent like regular [U/I], but still good. No smell nothing, you can smoke anywhere you want. |
| UC: | Those… people love those. |
| GOKLU: | I was… yeah, I was taking two of those to [U/I] with me, and I said, you know what? If dogs smell something [U/I], forget it. |
| UC: | Yeah. Don't travel with those. I… so… |
| | [Voices overlap] |
| GOKLU: | If the dogs come, they can't find that shit. I never open the package or something still there, they're able to smell it? |
| UC: | Uh, probably, I don't know. I wouldn't test it. [Laughs] |
| GOKLU: | I don't want to test too [*sic*]. Here it's okay, Turkey is bad. |
| UC: | Yeah? |

A-842

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Yeah, here it is… the judge is going to say, "What is this?" "Oh, I smoke for my own, I don't sell." "Okay, you're good, bye." But in Turkey, "Get over here, you're in jail for a fucking three years." And jail sucks. [Laughs] |
| UC: | How do you know? You've been there? |
| GOKLU: | [Laughs] I know. |
| UC: | [Laughs] |
| GOKLU: | I know somebody. [Laughs] Yes, he, he stayed six months, he said, "I'll never ever do anything wrong." [Noise] He stopped even smoking. Bitcoin guys, come on. This is why your price is fucking going down, you go [U/I] fighting, here we go. [U/I]. |
| UC: | How much could… did the guy from California give you? |
| | [Voices overlap] |
| GOKLU: | Uh… I transferred all his bitcoins. It was 9,000, he sold almost 100,000. That is… the, the, the kid still has maybe 200 bitcoins. He's still holding, not selling… |
| UC: | Yeah. And he sells weed, that's how he got it? |
| | [Voices overlap] |
| GOKLU: | No, no, no, he started with the bitcoin and, Airbnb. He was renting the house like this… |
| UC: | Uh-hum. |

A-843

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| | [Voices overlap] |
| GOKLU: | …the entire building… |
| UC: | Uh-hum. |
| GOKLU: | …and doing Airbnb. One three bedroom house, he makes 5,000 dollars a month. Crazy. |
| UC: | Yeah. |
| GOKLU: | And he made a lot of money. He invested in bitcoin, 2,000 was [U/I], yeah, he, he bought for 200 something dollars, [U/I], he was a smoker and [U/I] the business, he went to California. Now he's doing really good. I think right now the kid is worth more than five or six million dollars. |
| UC: | Not bad, not bad. |
| GOKLU: | And then he was one of the fir… as soon as they… California said, "Okay, we're going to regulate," he went there and bought some farms. |
| UC: | He's probably an associate. [Laughs] Where's he, in Northern, Northern California? |
| GOKLU: | Yeah, uh, no, uh, no, South. |
| UC: | South? |
| | [Voices overlap] |
| GOKLU: | So, forget his brand, all these famous, all these famous actresses, |

A-844

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| | big shots… |
| UC: | Yeah? |
| GOKLU: | …they buy from him.  Yeah. |
| UC: | Yeah? |
| GOKLU: | I think his [U/I] are good. What do you call for that, [U/I]? |
| UC: | Yeah. |
| GOKLU: | Yeah. |
| UC: | What is it? |
| GOKLU: | [U/I]. |
| UC: | I probably know him. |
| GOKLU: | This, this small [U/I] one. |
| UC: | Yeah. |
| GOKLU: | Which you put like an electronic cigarette when you smoke. |
| UC: | Yeah, yeah. What's his brand, though? Do you know? |
| GOKLU: | No, I [U/I]. He put the same logo in his head, what was it? [U/I]. |
| UC: | So he flew out here? |

A-845

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | He was here. |
| UC: | Oh, okay. |
| | [Voices overlap] |
| GOKLU: | He's young too, he's 25. He's 25 years old, six million dollars. |
| UC: | Yeah. |
| GOKLU: | He's a good guy... [U/I]… |
| UC: | [U/I]. |
| GOKLU: | …the block. Okay, that's good, but why, why no confirmation? |
| UC: | Uh. |
| GOKLU: | As soon as the block is found, we should have our own confirmation here. [U/I] take it all the time. |
| | [Pause] |
| GOKLU: | Look at this. Every mining pool is in China. That's too [U/I]. Sluspool China BTC Talk. China [U/I], China, bitcoin, Georgia, [U/I], China [U/I]. And they say it's decentralized, no. Most of these miners are in China. |
| UC: | Yeah. |
| GOKLU: | So if the Chinese government shuts down something, we're fucked up. Two days no confirmation, gotta wait. Okay, [U/I]. |

A-846

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | You're good? |
| GOKLU: | Yeah…. Okay. |
| UC: | [U/I], there we go. |
| GOKLU: | Yeah, yeah, yeah. |
| UC: | Got it. All right. |
| | [Voices overlap] |
| GOKLU: | As soon as I hear… |
| UC: | Well, let me know. |
| GOKLU: | Yeah. |
| UC: | And then… |
| GOKLU: | Uh, right now I'm going to talk to these people I'll try to see how much they can [U/I] tomorrow. |
| UC: | Okay. |
| | [Voices overlap] |
| GOKLU: | And of course, the banks… |
| UC: | And can you do like 100 more? |

32

A-847

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| GOKLU: | I can, yeah. |
| UC: | Like how soon? |
| GOKLU: | Three or four days. |
| UC: | Okay. All right. |
| GOKLU: | This would take little time, about three or four days, [U/I]. |
| | [Voices overlap] |
| UC: | Okay. I don't need it [U/I], I think it… |
| GOKLU: | If you [U/I] around here, I can do bitcoin too, no problem. |
| UC: | Yeah. Well, I'm in Manhattan, so… |
| GOKLU: | Yeah, that's… weekend no traffic, I can come too. |
| UC: | Okay. |
| GOKLU: | But just I don't want to count money in Manhattan. Manhattan sucks, man. |
| UC: | [U/I]. |
| | [Noise] |
| GOKLU: | Even you're staying in here, there is a fucking, uh, camera on the top. It's watching traffic, but… |

A-848

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Yeah. |
|  | [Voices overlap] |
| GOKLU: | …they're going to say, "What's going on there? Are these some drug guys?" |
| UC: | Well. [Laughs] |
| GOKLU: | [U/I] enough. |
| UC: | Well, I hope you're… I hope they're not looking at you. |
| GOKLU: | No, no, no, I'm good. Even they don't look the other guy too [*sic*] because they do understand he's not a drug guy… |
| UC: | Yeah. |
| GOKLU: | …he's just selling bitcoins. |
| UC: | All right. |
| GOKLU: | [U/I]. |
| UC: | Thank you, let me know. |
| GOKLU: | Okay. |
|  | [Noise] |
|  | [END OF RECORDING] |

34

A-849

CASE NUMBER:     <u>United States v. Mustafa Goklu</u>, 19-CR-386 (S-1)

EXHIBIT NUMBER:     GX 904

DATE:     12/11/18

PARTICIPANTS:     Michael GOKLU ("GOKLU")

Undercover Agent ("UC")

ABBREVIATIONS:

[Brackets]     Transcriber's notes

[U/I]     Unintelligible words

[ph]     Phonetic rendering



GOVERNMENT
EXHIBIT
**904**
19 CR 386 (S-1) (PKC)

A-850

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| | [Noise] |
| GOKLU: | [U/I]. |
| UC: | What's up, brother? |
| GOKLU: | Terrific. I'm [U/I]. |
| UC: | You know it. |
| GOKLU: | [U/I]. |
| UC: | Yeah. |
| | [Pause, noise] |
| GOKLU: | How much do you want? |
| UC: | Uh… let me see what I've got. |
| GOKLU | Yesterday I was in Manhattan 7 or 8, I've been texting [U/I] fucking late. |
| UC: | Yeah, I was, uh, I was busy last night anyway. |
| GOKLU: | Yeah. I have some [U/I]. |
| UC: | All right, I've got, uh, about 19,600, so 5…5.16. |
| GOKLU: | [U/I], last time I lost from your business because I saw less than, than you gave me. |
| UC: | [U/I]. |

A-851

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | This shit is going 10 percent up and down, I was losing fucking money. |
| | [Voices overlap] |
| UC: | That's why I offload |
| GOKLU: | Oh, and the other thing is, look at bitcoins, when it goes up, it's full of messages. "Hey, are you selling, are you selling? You have bitcoins?" |
| UC: | Yeah. |
| GOKLU: | No, no, no, fucking [U/I] bitcoins. |
| UC: | Yeah. |
| GOKLU: | And when it goes down, they want to sell it. |
| UC: | Yeah. |
| GOKLU: | [U/I] fucking [U/I]. |
| | [Noise throughout this segment] |
| GOKLU: | [U/I]. Three, three fifty. |
| UC: | Okay. |
| GOKLU: | [U/I]. |
| UC: | Okay. Three, three fifty. How much you have? How many, bitcoins? |

A-852

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Yeah. |
| UC: | Uh, five point eight six one nine four. |
| UM1: | Five point eight six? |
| GOKLU: | The rest is five dollars. Three, three, five, zero. |
| UC: | That's five, five point eight six? |
| GOKLU: | Give me five dollars, that's good. |
| UC: | [Laughs] |
| GOKLU: | It's… uh, you are, you are going to see, it's five dollars, five… |
| | [Voices overlap] |
| UC: | Yeah. |
| GOKLU: | …five, eight, you have the rest. |
| UC: | [U/I]. It's five point eight, six, one, nine, four. |
| GOKLU: | Oh, five, eight, all right, all right, all right. |
| UC: | Yeah. |
| GOKLU: | I, I told you… |

A-853

| NAME | ORIGINAL LANGUAGE |
|---|---|
| UC: | No, no, no. |
| GOKLU: | …telling the, the other digits. Five, eight… |
| UC: | Six, one, nine, four. |
| GOKLU: | Six, one, nine… five, three, three, five, zero. Nineteen six, three, seven. |
| UC: | Okay. |
| GOKLU: | [U/I] three. I give you… |
| UC: | Okay. |
| GOKLU: | …eighteen, two, sixty. |
| UC: | Okay. |
| GOKLU: | Eighteen, two, sixty. [U/I]. |
| | [Noise throughout this segment] |
| GOKLU: | What are you doing? [U/I]… I got it. Let's, let's count this first. Three ten. |
| UC: | It took you a while to get this. |
| GOKLU: | I have it. I, I was keeping maybe 120 cash. |
| | [Noise] |

4

A-854

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Why couldn't you do 20 last week then? |
| GOKLU: | I can do it, I can do it today, if you want to. |
| UC: | No, I just need the 20 now. |
| | [Noise throughout this segment, voices overlap] |
| UC: | But last week I, I needed to, uh, to get the rest of the 20. I had to go out to California to explain why I didn't have their 20 grand. But it's all good. Can you do…? |
| GOKLU: | [U/I]. |
| UC: | I didn't, I didn't see that, okay. |
| GOKLU: | [U/I] seven hundred. |
| UC: | Uh-hum. |
| GOKLU: | Nine… [U/I]… So, seven, seventeen. Eighteen two sixty. |
| UC: | How much again? |
| GOKLU: | Nine. |
| UC: | Nine thousand? |
| GOKLU: | Yeah. |
| UC: | Okay. |

A-855

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| GOKLU: | Shit! |
| | [Pause, noise throughout this segment] |
| UC: | That's a good idea. How do you do that? |
| | [Voices overlap] |
| GOKLU: | Get the sticker… |
| UC: | This one? |
| GOKLU: | The front one. |
| UC: | This one. |
| GOKLU: | Yeah… Thirty-nine fifty. |
| UM1: | One thousand? |
| UC: | Uh-hum. |
| GOKLU: | Eighteen, right? |
| UC: | Uh-hum. |
| GOKLU: | Two sixteen. [U/I]. |
| UC: | That's all 20s? |

A-856

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Yeah. |
| UC: | Did you fix your deal with PayPal? |
| GOKLU: | Huh? |
| UC: | You said you had a problem with PayPal. |
| GOKLU: | Still [U/I]. |
| UC: | Yeah? [U/I]. |
| GOKLU: | [U/I] sixty days, ninety days, why? For my security. You keep my fucking 500,000 dollars ninety days for my security? Fucking assholes! |
| | [Noise throughout this segment] |
| UC: | One eight, one eight B. |
| GOKLU: | One eight B and then ACTI. |
| UC: | Yeah. |
| GOKLU: | All right. |
| | [Pause] |
| UC: | [Sighs] I like working with you, but, uh, you know, last week you said that you had the 20 grand and it never came through. That causes me a few problems on my end. |

7

A-857

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Really? |
| UC: | Yeah. I get a lot of people to pay. They're not great people, but, uh, I'm going to have a lot of money coming in after the New Year's, 100 grand, can you do that? |
| GOKLU: | Yeah. |
| UC: | Yeah? |
| | [Voices overlap] |
| GOKLU: | I need time [U/I]. |
| UC: | How much? |
| GOKLU: | One day, two days. |
| UC: | How of… how often can you do it? |
| GOKLU: | For 100? |
| UC: | Yeah. |
| GOKLU: | I can do it every ten days. |
| UC: | Every ten days? Okay. Because my, my, uh, partner over there, we just got a shipment in, and we're doing really well. So it's going to be every week or so. |
| GOKLU: | Okay... I have cash money in fucking paper, I have something in shitty Bitfinex. Everything is stocked there. [Laughs] |

A-858

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | [U/I]? [Laughs] Do you have cash in there? |
| GOKLU: | It is bitcoins, but the [U/I] asking for paperworks, first they said it needed to be over 100,000. I said okay. "You need to be institution." Okay. |
| UC: | Uh-hum. |
| GOKLU: | You need… you don't have to be U.S. then I find some paperwork from Turkey, which is I own another company. |
| UC: | Yeah. |
| GOKLU: | And now they keep saying, this, this, this, "Fuck you, assholes, are you shitting with me?" |
| | [Noise throughout this segment] |
| GOKLU: | [U/I] fucking [U/I]. |
| | [Pause] |
| UC: | When, when can you do 100? |
| GOKLU: | When do you want? |
| UC: | Uh… Wednesday… Are you around the… not, not next week, but the week after? |
| GOKLU: | Okay. |
| UC: | It's like the week of Christmas. Will you be around? |

A-859

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | What's the date? The week after [U/I]? |
| UC: | Like, like the 27th or something. |
| GOKLU: | Twenty-five, 27th, okay, I'll try to make [U/I]. But when you say, let's say Wednesday, 100, Wednesday is 100. |
| | [Voices overlap] |
| UC: | Yeah, it would be… |
| GOKLU: | So… |
| UC: | Yeah, yeah, yeah. |
| GOKLU: | Yeah, five, down, seven, up, if, if you don't, doesn't [*sic*] come, it's going to cost me. |
| UC: | Yeah, yeah. |
| | [Pause, noise] |
| UC: | [Clears throat] |
| GOKLU: | [U/I]. |
| UC: | [U/I] goes through? |
| GOKLU: | [U/I] next time. |
| UC: | All right. Are you good for 100, for sure? |

A-860

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | In two weeks, yes. |
| UC: | Okay. |
| GOKLU: | For next week you still [U/I]. |
| | [Voices overlap] |
| UC: | No, I'm, I'm good, we're good on that I, uh… |
| GOKLU: | You're good two weeks right now? |
| UC: | Yeah. |
| GOKLU: | Okay. |
| UC: | I'll be good. This is my, uh… I'll be getting 100 either next week or the week after. |
| GOKLU: | Okay. |
| UC: | And then it will be pretty regular after that, like 100… |
| GOKLU: | [U/I]. |
| UC: | …maybe 200. It's not, it's not going to be like on the dot every week… |
| GOKLU: | All right. |
| UC: | …it's like depending on how much we sell, you know. |

A-861

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Okay. Okay. |
| UC: | All good? |
| GOKLU: | If you want, I have another 50. [Chuckles] |
| UC: | Right now? |
| GOKLU: | Yeah. |
| UC: | Uh. |
| GOKLU: | No, no, no, hold on. Another 20, 25. |
| UM1: | How much? |
| GOKLU: | Yeah, 25. What's today, Tuesday? Bank. [U/I] another 25, let me know. |
| UC: | Let me see. |
| GOKLU: | NYPD use people like this. |
| UC: | Huh? |
| GOKLU: | In Manhattan that… this is the way I don't go fucking Manhattan. Even a homeless I saw, he's working for NYPD. |
| UC: | You're kidding me? |
| GOKLU: | Yeah. Homeless! I don't know what they give him. |

A-862

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Yeah, I like coming out here a little bit better. |
| GOKLU: | [Chuckles] Let's see. This [U/I], he didn't come, I was waiting for someone, he didn't appear and [U/I]. Okay. |
| | [Noise] |
| GOKLU: | Twenty-two, [U/I]. |
| UM2: | [On the other side of the line: Hello.] |
| UC: | [Aside on the telephone: Yo, bro'.] |
| UM2: | [On the other side of the line: What's up, buddy?] |
| UC: | [Aside on the telephone: Uh, he says he can do another 20, if we need it now.] |
| UM2: | [On the other side of the line: Yeah? A hundred later?] |
| UC: | [Aside on the telephone: Yeah, he can, he can do the 100 later, but we could do 20 now, if we need it.] |
| UM2: | [On the other side of the line: All right. (U/I).] |
| UC: | [Aside on the telephone: What, the 20 or the…?  Oh, he, he has it right now.] |
| UM2: | [On the other side of the line: (U/I).] |
| UC: | [Aside on the telephone: But, uh… I don't know if it makes sense or we'd just do it when we get the… when we sell the other three keys. |

13

A-863

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| UM2: | [On the other side of the line: (U/I).] |
| UC: | [Aside on the telephone: Okay. All right, all right, later, man.] Uh, we're good for now. |
| GOKLU: | Okay. |
| UC: | Yeah. |
| GOKLU: | Okay, man, good luck. |
| UC: | Bye, dude. |
| GOKLU: | I'll see you next Tuesday. |
| UC: | I'll see you next time. |
| | [Pause, noise throughout this segment] |
| | [END OF RECORDING] |

A-864

CASE NUMBER:        <u>United States v. Mustafa Goklu</u>, 19-CR-386 (S-1)

EXHIBIT NUMBER:     GX 906

DATE:               01/24/2019

PARTICIPANTS:       Michael Goklu ("GOKLU")
                    Undercover Agent ("UC")

ABBREVIATIONS:

[Brackets]          Transcriber's notes

[U/I]               Unintelligible words

[ph]                Phonetic rendering



GOVERNMENT
EXHIBIT
**906**
19 CR 386 (S-1) (PKC)

A-865

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | What's up, man? |
| GOKLU: | Fine, man, how are you? |
| UC: | All right, how are you? |
| GOKLU: | Scary, man, it's every time… this, this place is not good. |
| UC: | Why? |
| | [Voices overlap] |
| GOKLU: | Every time someone here. Two fucking Ford black tinted car is there. [*sic*] |
| UC: | Where? |
| GOKLU: | This is Wendy's. I don't know, they're right there. I… it's been maybe 20 [U/I] long. Yeah. [U/I]. Okay, I have only 25 and actually I promised someone, uh, I'm going to give it to you. |
| UC: | Yeah, but you promised 100 to me. |
| | [Voices overlap] |
| GOKLU: | Yeah, but it was, I mean, it was two weeks ago, I… |
| UC: | A week. |

A-866

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | …the [U/I] is gone and… |
| UC: | [Sighs] |
| GOKLU: | …this business some… sometimes people come say, "Hey, you have, you have cash here, take it, go." |
| UC: | Yeah. |
| GOKLU: | But I'll try to find you more in a few days, okay? |
| UC: | Oh, man! |
| GOKLU: | Just 25, for you to count [U/I], ten, twenty, count this one, that's… I'm 100 percent sure. |
| UC: | Okay. |
| | [Pause, noise throughout this segment] |
| GOKLU: | [U/I]. |
| UC: | It's fine... Fresh ones, huh? |
| GOKLU: | Yes, I just… I get it from the Bank of America yesterday. Most banks become trouble, they keep calling, "Hey, where is the money coming from?" [U/I]. |
| UC: | Okay. |
| GOKLU: | Wow, it's going up, [Chuckles] 30 dollars. Three, five, seven, nine. Bitcoin this, all right? |

A-867

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| UC: | Huh? |
| GOKLU: | Bitcoin 70 dollars. |
| UC: | Is that Coinbase? |
| GOKLU: | Yeah. [U/I]. |
| UC: | Oh, man! [Clears throat] |
| GOKLU: | Twenty-five [U/I]. Three, five, seven, nine. It's regular 67, [U/I] six time eight. [U/I] zero eight… 754… I took all the money. Money I have 2,000 dollars in the bank, that's it. Actually I… okay, TD Bank… [U/I], you can go backside and put it in the machine. |
| UC: | I think we're good… Okay… All right. |
| GOKLU: | Good? [U/I]. |
| UC: | Yeah. |
| GOKLU: | [U/I] seven, six, nine, eight, eight. This is regular, five, one, zero, eight. Seven, five, four, eighteen, [U/I]. |
| UC: | What e… exchange rate do you use? |
| | [Voices overlap] |
| GOKLU: | I use Coinbase… |
| UC: | What uh, at what price? |

A-868

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| GOKLU: | …at the bank. |
| UC: | At what price? |
| GOKLU: | Eight. I told you, somebody give me only eight. There was somebody who took 50,000 for 10. |
| UC: | Fifty thousand for 10? |
| GOKLU: | Yeah, I, I, I'm full of bitcoins. I don't know how to get rid of this shit. Going to dollar something. I'm going to push to the coin base. It's crazy. Uh, they're going to text me… I don't think I can stop buying and selling, exchange is better. If something goes wrong, you act quickly. They keep exchanging [U/I], huh? |
| UC: | Nuh-nuh. |
| GOKLU: | [U/I] the same? |
| UC: | That's the one from last weekend… Oh, fuck! |
| | [Voices overlap] |
| GOKLU: | Yeah, first you need to read. |
| UC: | Yeah. |
| GOKLU: | Of course. [Chuckles] When you finish, let's double check the balance. [U/I] make a mistake, but, just to make sure. |
| UC: | Uh, that's, uh, I only have, uh, 25, no, would…? Yeah, we, we're going to have to take some off of those, uh, seven point one five nine four eight. |

A-869

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| GOKLU: | I am [U/I]… |
| UC: | Yeah. |
| GOKLU: | …weekend. We got it. Um… how much you have? Seven point… |
| UC: | One five nine… |
| GOKLU: | …one five nine. |
| UC: | …four eight. |
| GOKLU: | Okay. |
| UC: | Uh-hum. |
| GOKLU: | Oh, you give me back 1,540, no, 1,440, whatever. |
| UC: | Okay. |
|  | [Pause, noise] |
| UC: | You see it? |
| GOKLU: | [U/I]. |
| UC: | One thousand… four forty. |
| GOKLU: | Yeah, I'll use that one [U/I]. |

A-870

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| | [Pause, noise] |
| GOKLU: | Do you mind if I get… wait for [U/I] confirmation? |
| | [Voices overlap] |
| UC: | Uh-huh. Bro', so last time we talked, you said you could do 100 and I told people… |
| GOKLU: | I usually… |
| UC: | …that I'd have 100. |
| GOKLU: | …I usually have 100s, last, last two… from last week, because is go down or up [*sic*], I don't know why. Everybody was selling, everybody sold, nobody buyed [*sic*]. |
| UC: | Yeah. |
| GOKLU: | I just start [*sic*], but I'll try to find for you. How much do you… even… you can… some, but they want some more. |
| UC: | Yeah. |
| GOKLU: | They sell 1K, 2K, nobody sells 9K, 20K. I'll try to find it, okay? |
| UC: | When do you think you can? |
| GOKLU: | It's fucking… I have money in Turkey, if I withdraw that, it's going to take two or three days at least. |
| UC: | Okay. |

A-871

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| | [Voices overlap] |
| GOKLU: | All right? [U/I]. |
| UC: | Can you get it by next week? |
| GOKLU: | Yeah, I think. |
| UC: | All right. Let's, dude… because last time you said you could do 100 every other week. |
| GOKLU: | [Clears throat] |
| UC: | That's kind of what I'm looking for. |
| GOKLU: | Yeah, I can. |
| UC: | Okay. |
| GOKLU: | Usually I can, but these two weeks I got stuck with this… shit. Actually from… do you remember…? It was you, right? |
| UC: | What? |
| GOKLU: | Asking for 100s. |
| UC: | Yeah. |
| | [Voices overlap] |
| GOKLU: | For December 20… |

A-872

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Yeah. |
| GOKLU: | …it was ready. I kept maybe two weeks cash… |
| UC: | Yeah. |
| GOKLU: | …at home, 100,000. |
| UC: | Yeah. |
| GOKLU: | It's crazy. |
| UC: | Why didn't you save it for me? |
| GOKLU: | I didn't text you, I don't know why, I told you. Oh, I couldn't because too many this… I didn't know, I was keep looking [*sic*] to the WhatsApp. |
| UC: | Oh. |
| GOKLU: | Then I realized you're Signal. |
| UC: | Yeah. |
| GOKLU: | Look some of these, asking ca… cash. This guy keeps buying from me. He's asking 10K, so, no money. |
| UC: | Well, man, i… if you can get 100 every week, I should be your only freaking client, because it's steady coming in. |
| GOKLU: | Oh, oh, yeah. |

A-873

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| UC: | Because I've got… you have no idea how much money we have coming in. It's insane, it's insane. |
| GOKLU: | I know. |
| UC: | These college kids cannot get enough. |
| GOKLU: | Um. Hold on, check… uh, [U/I] information [U/I]… Actually, I'm exposing myself. |
| UC: | Huh? |
| | [Voices overlap] |
| GOKLU: | Because the [U/I] gets slow when you go search on browser… |
| UC: | Uh-hum. |
| GOKLU: | …actually you're exposing your rights. |
| UC: | You're exposing your what? |
| GOKLU: | So I'm visible right now. If something goes wrong, they can catch your history and say "Hey, let me see your wallet." |
| UC: | Oh. |
| GOKLU: | That's not going to happen. |
| UC: | What do you mean if something goes wrong? |

A-874

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | I mean, let's say… let's say this one is seized, right? |
| UC: | Seized? |
| GOKLU: | Yeah. |
| UC: | Oh, like the police? |
| | [Voices overlap] |
| GOKLU: | Yeah. [U/I]. |
| UC: | You're worried about that? |
| GOKLU: | No, not really, but I, I keep checking, because who knows in New York! |
| UC: | [U/I]. |
| GOKLU: | Nothing happens. They would seize you money. It's happened to one guy I know. |
| UC: | Yeah, yeah, you told me that. |
| GOKLU: | But forget about that money. [Laughs] If they seize your money right now… |
| | [Voices overlap] |
| UC: | Boy, yeah, this would be gone. |

A-875

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | …it's gonna, it's go… it's gonna, it's gonna take one year to get your money back with a lawyer. |
| UC: | Well, if I get seized with this, I'm going to get my fucking head chopped off or something. |
| GOKLU: | Do you want more? No, you don't have it. |
| UC: | Well, I mean, I can trans… how much do you, how much is there? |
| GOKLU: | [Noise] Fifteen… fifteen… 28… [U/I] for you. |
| UC: | No, unless you can do 75 right now. If you can't do 100 every other week, do you… can you put me in touch with anyone that can. |
| GOKLU: | Yeah, I'll try. |
| UC: | I, I can still keep you in on, uh… |
| GOKLU: | Yeah. |
| UC: | …finder's fee. But I definitely want to keep this under the table, you know. |
| GOKLU: | Yeah. Yes, I know, no blocks again. [U/I]… What the fuck? Thirty-eight minutes, no block? |
| UC: | Why is it taking so long? |
|  | [Voices overlap] |

A-876

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Look, it's crazy. |
| UC: | You know… |
| GOKLU: | Nobody finds block in the same minute, [U/I] six minutes [U/I] especially to find out before he dies, something for this shit. |
| UC: | Yeah, no kidding. |
| GOKLU: | Fishy this whole thing, I'm 100 percent sure that guy hanged himself. |
| UC: | You think? |
| GOKLU: | Yeah. Because too many evidence. |
| UC: | So who did you give my 100 grand to? |
| GOKLU: | I usually buy on the exchange in Turkey and transfer money to here. Uh, let me ask my old friend. He keep buy house and he bought like six houses in last three years. |
| UC: | Uh-hum. |
| GOKLU: | So if the persons come, it's ready. Where is the money going? Out. |
| UC: | Uh-hum. |
| GOKLU: | [U/I]… But you're not in here, right? Usually. |
| | [Voices overlap] |

12

A-877

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | In Queens? |
| GOKLU: | [U/I], yeah… No, no, no, you're in California usually. |
| UC: | No, I live in New York. |
| GOKLU: | You live in New York? |
| UC: | So my business partners are in California, that's where we get our shit and I bring it back here, but I stay here, so I live in Lower Manhattan, so I'm always in Lower Manhattan. |
| GOKLU: | [U/I]. |
| UC: | Do you ever go into Manhattan? |
| GOKLU: | Yeah. I was there yesterday. |
| UC: | Oh, you were there? |
| GOKLU: | Yeah. |
| UC: | I could have met with you. |
| | [Voices overlap] |
| GOKLU: | I, I have a Kazakhstan girl on 43rd Street and… |
| UC: | You have what? |
| GOKLU: | Kazakhstan girl. |

A-878

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Yeah. |
| GOKLU: | …a girlfriend. She's not girlfriend, I don't know what the hell she is. |
| UC: | Where is she? |
| GOKLU: | She lives in 45 Street [U/I]. |
| UC: | She is your side piece? |
| GOKLU: | Yeah. |
| UC: | You're not from Kazakhstan, are you? |
| GOKLU: | No, no, [U/I] Istanbul. I, I, I have been there. Actually at the time I left I lived in Germany. |
| UC: | Okay. |
| GOKLU: | My family is still in Germany. |
| UC: | Did you ever go back? |
| GOKLU: | Yeah, I worked for Turkish Airlines in Germany 10 years… |
| | [Voices overlap] |
| UC: | Uh. |
| GOKLU: | …and my tickets are for 30 dollars. |

A-879

| NAME | ORIGINAL LANGUAGE |
|---|---|
| UC: | [Laughs] |
| GOKLU: | It's called buddy pass. |
| UC: | Yeah? |
| | [Voices overlap] |
| GOKLU: | If you find someone from United… |
| UC: | That, that you know? |
| GOKLU: | …if they put you under the list… |
| UC: | Yeah. |
| GOKLU: | You can fly anywhere around the world for 50 dollars… |
| UC: | Right. |
| GOKLU: | …60 dollars. It's a good trick. Find someone who works for a big… one of the big airlines more than 10 years… |
| UC: | Uh-hum. |
| | [Voices overlap] |
| GOKLU: | …pay him, let's say 2,000… |
| UC: | Uh-hum. |

A-880

| NAME | ORIGINAL LANGUAGE |
|---|---|
| GOKLU: | …okay? And tell him to put you on the list. Give you the password and code so you can buy online… |
| UC: | Uh-hum. |
| GOKLU: | …even for 3 or 400 dollars you get to fly [U/I]. The only thing is that there must be an empty seat to take you. Ninety percent, yes, they have it… What the fuck?... [Noise] Yes, block found, come on! [U/I] block found in here, this is not confirmed, it's taking a few seconds like this. But this one is on the block, let's put password "Chinese"… When I… maybe home I use S-9, I'm not driving anymore. I don't know what to do with this. Send them to Venezuela. Why is this… this crazy? As soon as they find the block, it should be confirmed, not just… [Noise] You, you trade too? You trade on exchange? |
| UC: | No. |
| GOKLU: | No? |
| UC: | No. I stay off the exchanges. |
| GOKLU: | [U/I], it's crazy. Too much stress, too much [U/I], too much time consuming… I never sell this, look. [Noise] [U/I] found one month ago… |
| UC: | Uh-hum. |
| GOKLU: | …five months ago here, 1936. This is London Time, I guess, yeah, [U/I]. |
| UC: | Uh-hum. |
| GOKLU: | But when you come here… what's that?... Something wrong… |

16

A-881

| NAME | ORIGINAL LANGUAGE |
|---|---|

[Noise] [Clears throat]

UC: So, I mean, seriously, I gotta, we gotta figure out logistics.

GOKLU: Oh, yeah, [U/I].

UC: Well, I, I gotta kind of… people… I gotta pay people, so I gotta tell them… I told them that I'd have the 100 this week. I was going to go back to California to pay them.

[Voices overlap]

GOKLU: Today is what? [U/I] Thursday?

UC: It's, uh, Thursday.

GOKLU: Today, Thursday, Thursday, Friday… Monday, Tuesday… probably I can do it by next week.

UC: The, the 75?

GOKLU: Hu… even though I don't know how much is in, in that exchange. I'll text you when I go home.

UC: All right…

GOKLU: In two hours.

[Voices overlap]

UC: …yeah… You know what I mean, though? It's like I can't… I, I gotta…

A-882

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | You know, I know, I don't… |
| UC: | …I, I have to be like… |
| GOKLU: | …I don't want you stuck too. |
| UC: | …somebody that I can rely on because it's, it's not, it's not like it's as simple as me just not having the money. |
| GOKLU: | When you are… yeah, when you are too much tight, throw in the different names up to… I mean, don't pass 100,000 dollars to the Coinbase, they're not going to question you. But one person, one year, no more than 99, they're not going to question you. |
| UC: | Well, I'm not touching the Coinbase. I can't touch the Coinbase. |
| GOKLU: | Me too, I, I, I'm already 300,000 dollars in Coinbase because of those [U/I]. I don't want to do more. Where the confirmation is? This is what? Fucking [U/I] find the fake block or what? [Noise]<br><br>[Pause] |
| UC: | Still nothing. |
| GOKLU: | It's crazy, I mean, sometimes it's called orphaned blocks. |
| UC: | Uh-hum. |
| GOKLU: | It's, it's not a real block. It's [U/I] they find a block and they recheck… |
| UC: | Uh-huh. |

A-883

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| GOKLU: | …it's not the real block they kicked. Maybe this is that… plus every ten minutes, usually… |
| UC: | [Clears throat] |
| GOKLU: | …[U/I] average, it finds a block. Look at this, it gets crazy again. What's going on? Jihan [ph] is fighting with someone again? |
| UC: | [Chuckles] |
| GOKLU: | [U/I].  [Noise] |
| UC: | [Clears throat] How did you find the Kazakhstan girlfriend? |
| GOKLU: | She was… I was going to Colombia with… through… I have a friend, a British professor in Colombia. |
| UC: | Yeah. |
| GOKLU: | So, she was going to the same school. |
| UC: | Okay. He was her professor? |
| GOKLU: | Yeah, he's really good. His name is Evan. He's good in one of the good… really good knowledge in the block chain. |
| UC: | Yeah? |
| GOKLU: | Yeah. |
| UC: | Where does he teach? |

19

A-884

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | He's at [U/I]. |
| UC: | Where? |
| GOKLU: | He's, he's a [U/I] actually, computer science. |
| UC: | Okay. |
| GOKLU: | But it's been years he's tracking… [Noise] This is really… |
| UC: | What do you think? |
| GOKLU: | But it's… if it was 5-10, I would go. But [U/I] 5-8 if something goes wrong, I'm dead. I just want a confirmation. Plus… plus September or… I don't remember, somebody take [*sic*] advantage of creating fake… wallets. It was possible with the one of the older version of… block chain. |
| UC: | Uh-huh. |
| GOKLU: | [U/I]. That was scary. |
| UC: | [Chuckles] |
| GOKLU: | That's the old person's attack. |
| UC: | Oh, Jesus! [Laughs] |
| | [Pause, noise] |
| GOKLU: | It's the [U/I] 2017, January, yeah, 24 hours, no block… Look, it's reading. |

20

A-885

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | [Coughs] |
| GOKLU: | New transaction. |
| UC: | Uh-hum. |
| GOKLU: | But [U/I] Turkey [U/I] wallet. |
| UC: | Yeah. |
| | [Voices overlap] |
| GOKLU: | It shows 1850, 1850, so you're cleared… |
| UC: | Uh-hum. |
| GOKLU: | …you're disblocked [*sic*]. |
| UC: | Uh-hum. |
| GOKLU: | One, two, three, which means three confirmations. Yes, yes, 1,000 per confirmation. When you go, the wallet you throw to me, just this one, is not coming. |
| UC: | [Clears throat] |
| GOKLU: | So if, if this is really, which is no way, an orphaned block, why your transaction is counting this and this one is not counting? Oops! [Noise]… In this one, do you have to wait, do you have to wait [Coughs] for a confirmation to send the money to another wallet? No. |

21

A-886

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| UC: | No. |
| GOKLU: | You can send 10, right? |
| UC: | Yeah. From, from my [U/I] wallet? |
| GOKLU: | Yeah. |
| UC: | Yeah. |
| GOKLU: | Let's see, I send… you send to me, without confirmation I can send it to someone right now. |
| UC: | Uh-hum. |
| GOKLU: | That's, that's when you risk it. |
| UC: | What wallet do you use? |
| GOKLU: | It's a regular block sheet. Uh. [Noise] |
| UC: | Uh. |
| GOKLU: | Uh. [Coughs] Something is happening, because I feel this [U/I] too many people was [*sic*] not able to see blocks and… |
| UC: | Uh-huh. |
| GOKLU: | …access the wallets. Did you [U/I] that? |
| GOKLU: | Nuh. |

A-887

| **NAME** | **ORIGINAL LANGUAGE** |
| --- | --- |
| GOKLU: | On Twitter? |
| UC: | Nuh-nuh. |
| GOKLU: | How do those people were saying, "Hey, I cannot access my wallet?" |
| UC: | [U/I]. |
| GOKLU: | [U/I]. [Noise] [Sighs] You guys have those new, what do you call? Electronic smoke pens? |
| | [Voices overlap] |
| UC: | Oh, yeah, yeah, yeah. |
| GOKLU: | You have those? The little ones? |
| UC: | Yeah. |
| GOKLU: | Why don't you give me one? |
| UC: | Do you want some? |
| GOKLU: | Yeah, [U/I]. |
| UC: | I didn't know you liked that shit. |
| | [Voices overlap] |
| GOKLU: | Sometimes [U/I]… |

A-888

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Yeah? |
| GOKLU: | …this girl smokes like [U/I]. |
| UC: | Yeah? |
| GOKLU: | Yeah. But I don't like it because I don't know. |
| UC: | I can bring you some. |
| GOKLU: | [U/I] is much better for me. |
| UC: | But this thing… |
| GOKLU: | That thing doesn't work for me. Alcohol works for me. |
| UC: | Yeah. |
| GOKLU: | When I, when I drink two Jacks, I'm in a better… Oh, my God, I'm sleeping good. |
| UC: | Yeah. |
| GOKLU: | When I drink that shit, I know you people feel high, you like it, me no. |
| UC: | No? |
| GOKLU: | I don't feel anything, plus I have to eat fucking everything, whatever I have at home. |

A-889

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | [Laughs] Yeah. |
| GOKLU: | That's crazy. |
| UC: | I got that, I can get you some Oxies, if you like that shit. |
| GOKLU: | What's Oxies? |
| UC: | It's like a, Oxycodone, that stuff. |
| GOKLU: | [U/I], don't bring those [U/I], bring just regular street things. |
| UC: | Oh, like uh, Adderall? That's what all the college kids are taking. |
| GOKLU: | Oh, the, the other thing I hope… I have… oh, no, this is [U/I]. The, the electronic side of that smoke… |
| UC: | Yeah. |
| GOKLU: | …it's [U/I], something [U/I], a brand like [U/I]. That shit at home, it doesn't work. I need one of them. Actually, I [U/I] maybe [U/I]. |
| | [Voices overlap] |
| UC: | You seriously, seriously want some of that? Because that's what we… |
| GOKLU: | Yeah. |
| UC: | …that's what we do. We do all that. |

25

A-890

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Just one for testing. |
| UC: | What, Adderall or the cigarettes or…? |
| GOKLU: | The… |
| UC: | I've got Adderall, Oxies, all that stuff. |
| GOKLU: | [U/I]. What was the name of the… uh, chemical name of that thing in the [U/I], TCH? |
| UC: | THC. |
| GOKLU: | THC. T-H-C. [U/I]. [Noise] Yeah, this is broken. I have this one… this pen is broken, I cannot [U/I]. |
| | [Voices overlap] |
| UC: | I'll bring you some. [Aside on the telephone: What's up, dude?... Uh, it's taking really long for the…] |
| GOKLU: | Do you want me to [U/I]? |
| UC: | [Aside on the telephone: …for the, uh, confirmations… Yeah…] |
| GOKLU: | [U/I]. |
| UC: | [Aside on the telephone: So, I'm going to be a little… No, no, I told you, he only has a hun… uh, 25… He says he is.] My, my buddy says he thought you were legit. |
| GOKLU: | [U/I]. |

A-891

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | [Aside on the telephone: Yeah…] |
| GOKLU: | [U/I]. |
| UC: | [Aside on the telephone: Uh, I think, hold on…] Uh, are you going to be able to get the money next week? |
| GOKLU: | Tuesday. |
| UC: | Tuesday. |
| GOKLU: | Or Wednesday. |
| UC: | [Aside on the telephone: Did you hear that, Tuesday or Wednesday?... Is that good?... Well, that's what I was told… Well, yeah, I know… and this will be the second fucking time… can you put him off?... Yeah… all right, homie, uh… yeah, I know, well, I'll be talking to you, I think, I think we, we're through… bye, dude… all right, later.] [Noise] |
| GOKLU: | What the hell? [U/I] I never [U/I] something like this in more than one year. |
| | [Pause, noise] |
| UC: | Dude. |
| GOKLU: | Is ten [U/I] to  you? |
| UC: | Huh? |
| GOKLU: | Ten, 10, 10K? |

A-892

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| UC: | No. |
| GOKLU: | Maybe I have 10K in the [U/I], I need to check. Yeah, this is small money, forget it. If I, if I [U/I]. |
| UC: | Yeah, anything like another 25 would be helpful, but anything shorter, that doesn't really matter. What do you think, man? I can't stay here all day. |
| GOKLU: | [U/I], yeah, but… it's crazy, I don't know what to say. Okay, [U/I] just the way it is. |
|  | [Voices overlap] |
| UC: | Yeah. I mean, if it doesn't come through, you know… |
| GOKLU: | Yeah. |
| UC: | …you don't go for it, right? |
| GOKLU: | Yeah, [U/I] I know, [U/I] was the Russian guy who do that to [U/I]. |
| UC: | Yeah. |
|  | [Laughter] |
| GOKLU: | [U/I]. |
| UC: | All right, uh, Tuesday or Wednesday? |
|  | [Voices overlap] |

A-893

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| GOKLU: | Yeah, I'll… |
| UC: | All right. |
| GOKLU: | …I'll text you tonight because when I go home, I'm in front of my computer, I'll see how much cash I have in the other side. |
| UC: | Yeah. |
| GOKLU: | That I can transfer to you. |
| UC: | All right. |
| GOKLU: | It's crazy, I can't… if I bring bitcoin, it doesn't [U/I], if I bring cash it takes fucking days, so that's why. |
| UC: | Okay. |
| GOKLU: | Okay? Good luck with this one. I'm sorry. |
| UC: | Uh, that happens. |
| GOKLU: | I tried to find you after last week, after my message, but I was… I kept searching on fucking WhatsApp, and I forgot… |
| | [Voices overlap] |
| UC: | Okay. |
| GOKLU: | …[U/I]. |

29

A-894

| **NAME** | **ORIGINAL LANGUAGE** |
|----------|----------------------|
| UC: | All right, dude. |
| GOKLU: | Okay. |
| UC: | Thanks, man. |
| GOKLU: | [U/I]. |
| | [Noise, pause] |
| | [END OF RECORDING] |

A-895

CASE NUMBER:        <u>United States v. Mustafa Goklu</u>, 19-CR-386 (S-1)

EXHIBIT NUMBER:     GX 907

DATE:               01/30/2019

PARTICIPANTS:       Michael Goklu ("GOKLU")

                    Undercover Agent ("UC")

ABBREVIATIONS:

[Brackets]          Transcriber's notes

[U/I]               Unintelligible words

[ph]                Phonetic rendering



GOVERNMENT
EXHIBIT
**907**
19 CR 386 (S-1) (PKC)

A-896

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Oh, shit! |
| | [Voices overlap] |
| GOKLU: | Man! |
| UC: | It's cold! |
| GOKLU: | [U/I]. |
| UC: | Fucking cold.  [U/I]. |
| GOKLU: | Where did you park? You parked? |
| UC: | No, I took the subway. That's where I wanted you to meet me. |
| GOKLU: | Oh, shit? [U/I]. |
| UC: | Yeah, and then I walked here. |
| | [Noise] |
| GOKLU: | Fucking shit this weather, wasn't it? |
| UC: | It's fucking horrible, man! |
| GOKLU: | Sorry, these two days I stuck [*sic*] with this guy, this keep, keeps me busy, big guy, so I drove, I drive for him, maybe 10 days. |

1

A-897

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| UC: | Oh, would… you drive for him? |
| GOKLU: | Yeah. |
| UC: | Is he one of your customers? |
| GOKLU: | Yeah, he was in [U/I]. |
| | [Voices overlap] |
| UC: | Yeah? |
| GOKLU: | I don't know where [U/I]. |
| UC: | Yeah? |
| GOKLU: | He says [U/I]. |
| UC: | You do the same thing with him? |
| GOKLU: | No. |
| UC: | Oh. |
| GOKLU: | I was, I, I… when he's in city, I drive for him. |
| UC: | Okay. |
| GOKLU: | Okay, how are we going to count this much money, man? You said 75. [Chuckles] |

A-898

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Okay. How much is it? |
| GOKLU: | This is… the partner, he has money, but he, he lives in Summer Hamptons, he's not coming. He do [*sic*] everything, small, [U/I], fucking shit. [Noise] Ten, okay? |
| UC: | Yeah. |
| | [Noise throughout this segment] |
| UC: | [Clears throat] |
| GOKLU: | Twenty… Twenty-five. [Yawns] [U/I]… 35. Look, okay, let's count [U/I]. |
| UC: | Yeah, let's [U/I]. |
| GOKLU: | [U/I] 50, [U/I] ten, thirty-six. [U/I]. That's 1,000, 1,000. [U/I] what, 7,500. [U/I] two times eight, [U/I] eight. [U/I] 75. Okay? |
| UC: | [U/I], again. |
| GOKLU: | This is 47… 4,700. |
| UC: | Okay. |
| GOKLU: | Twenty-eight. |
| UC: | Okay. |
| GOKLU: | Okay? |

3

A-899

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Okay. Give me another band, please. |
| GOKLU: | Yeah. Oh, shit, [U/I]. That's 7,500. |
| UC: | Okay. |
| | [Noise throughout this segment] |
| GOKLU: | Thirty-six, 7,500… Forty-three five, do you want me to give you another 500? [U/I], forget it, let's keep the change. |
| UC: | Yeah. |
| GOKLU: | Yeah. [U/I]. |
| UC: | All right. |
| GOKLU: | Thirty-three five. [U/I] put it in the bag? |
| UC: | [U/I], yeah, [U/I]. |
| GOKLU: | [U/I]. |
| UC: | It's 30, 30… 43.5, right? |
| GOKLU: | Yeah. |
| UC: | Okay. |
| | [Noise throughout this segment] |

4

A-900

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Forty-three fifty. [U/I] 3,000 [U/I] one, thirty-seven [U/I]. |
| UC: | What [U/I], what [U/I]? Eight. |
| GOKLU: | [U/I]. |
| UC: | [U/I] seven? |
| | [Voices overlap] |
| GOKLU: | Next time [U/I]… |
| UC: | Because, because you, because you don't… |
| GOKLU: | …believe me, I have a buyer. I bring money for you. |
| UC: | Well, you said that twice now, man. Come one, cut it down to seven and then I'll hook you up if you bring the rest of the 100. |
| GOKLU: | Let's keep this [U/I], it is good. Do you remember, you gave me for 39? I sold those [U/I]. |
| | [Voices overlap] |
| UC: | Are you going to come through next time… |
| GOKLU: | Yeah… |
| UC: | …when I have 100? |
| GOKLU: | …yeah, yeah. |

5

A-901

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Are you serious? |
| | [Voices overlap] |
| GOKLU: | You, you… okay, what I mean… I can't keep 100 for long time. I can keep for three days…. |
| UC: | Yeah. |
| GOKLU: | …up to three days |
| UC: | Yeah, but if you know I'm doing it. |
| GOKLU: | Uh, do you want any more for tomorrow or the next day? |
| UC: | Uh, yeah, I want the rest. A… another 30. |
| GOKLU: | You [U/I], you have another 30? |
| UC: | Yeah. |
| GOKLU: | I'll text you tomorrow. |
| UC: | Okay. |
| GOKLU: | I don't know where this motherfucker is. He has it. |
| UC: | Who? |
| GOKLU: | A lot of money. That idiot, my friend, maybe one time [U/I]. |

A-902

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Huh? Is he the… is he the money man? |
| GOKLU: | Yeah, he has the money. I have a lot of money with him, but lazy motherfucker is here, [U/I]. His job is hookers, [U/I]. |
| | [Pause, noise] |
| UC: | Uh, one three H. |
| GOKLU: | One three H. [U/I] the last time, that's why [U/I] a quote for a long time. |
| UC: | Why? |
| GOKLU: | Because you put the low fees, [U/I]. |
| UC: | [Laughs] |
| GOKLU: | This is why I always keep telling you how the hell the blocks, uh, keep going… |
| | [Voices overlap] |
| UC: | Yeah. |
| GOKLU: | …and this is not a pro, it's because he was lucky. |
| UC: | [U/I]. |
| GOKLU: | [U/I]. |

A-903

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| UC: | That's, that's like the best I gave you. |
| GOKLU: | Yeah. |
| UC: | So. All right. Point three. [Noise] Two, eight, seven [U/I]. |
| GOKLU: | No, no, forget it. |
| UC: | All right. |
| GOKLU: | [U/I]. [Noise] One, three, H-A-D, correct? |
| UC: | Yeah. |
| GOKLU: | B-G [U/I]. |
| UC: | Yeah. |
| GOKLU: | [U/I]. Until what time you're here? I mean, Friday will you still be here? |
| UC: | Yeah. |
| GOKLU: | Okay... If you don't [U/I] for a long confirmation, take the money, man, [U/I] life. |
| UC: | What's that, what's that? |
| GOKLU: | Take the money and [U/I]. |
| UC: | [Laughs] |

A-904

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | You need this? |
| UC: | No. |
| GOKLU: | This is plenty, how is this… is going to walk with this [U/I]? Seventy-fourth street, do you know that there is a pickup and taxi go to 31st Street, no? |
| UC: | I don't know. |
| GOKLU: | It's a whole bus stop [U/I]. [Noise] |
| UC: | [Clears throat] So this buddy of yours, can you come… put, put me in touch with him? He's the money guy. |
| GOKLU: | [Noise] Yeah, it's possible. |
| UC: | Yeah? |
| GOKLU: | I'll work with you, yeah. |
| UC: | Okay. |
| GOKLU: | But usually he is in Hamptons. |
| UC: | Okay. |
| GOKLU: | But these three or two days I keep texting him, "Hey, bring money, bring money, bring money, bring money." |
| | [Voices overlap] |

A-905

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| UC: | Because if you can't, you know, like if you can't get the 100. |
| GOKLU: | [U/I] or something [U/I]. |
| UC: | If you get that as backup, you know. |
| GOKLU: | Three hundred and fifty-five, 400 [U/I]. [Noise] |
| UC: | You know what I'm saying, though? If, if you can… if I needed and you, you don't have it, you could have somebody, a backup to, to talk to. |
| GOKLU: | At least three days before I tell you, "Hey, I only have this much." |
| UC: | Yeah, but that way I can still give you a cut for like a finder's fee if you, like if you put me in touch with him. |
| GOKLU: | [Pause] [U/I]. If you want it fast, as soon as you get confirmation, can you see? |
| UC: | Yeah, yeah. It just says "In progress," so it says "It's sent," but it, it doesn't like, uh, actually confirm it until it's like six times confirmed. |
| GOKLU: | No, no, no, I mean, when we see one confirmation, that's it. |
| UC: | Okay. |
| | [Pause, noise] |
| UC: | So you drive, you drive people? |

10

A-906

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Uh-hum. |
| UC: | How often do you do that? |
| GOKLU: | I have only three guys, three guys, that's it. |
| UC: | Okay. |
| GOKLU: | One, John McCain, he's dead. |
| UC: | John McCain? |
| GOKLU: | Yeah. Uh-huh. [Chuckles] |
| UC: | Like the…? |
| GOKLU: | This guy says he's [U/I]. |
| UC: | Really? |
| GOKLU: | Yeah. |
| UC: | What does he do? |
| GOKLU: | He owns, he owns a shopping mall. |
| UC: | Oh. You drove John McCain? |
| GOKLU: | Yeah, I did, man. He was [U/I], this man knows I need the money, I fucked up. |

A-907

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | How did you get hooked up with John McCain? |
| GOKLU: | I was working for a really expensive company. |
| UC: | Okay. |
| GOKLU: | So I told him, "Sir, can you [U/I]? Can you tell your secretary next time when you come to New York, come straight… send me email of your programs, so you don't have to… she don't have [*sic*] to [U/I]. Then we become friends and… good man. Chatty… They called him "Chief." As soon as he elected, you know, those [Noise] [U/I] always, they follow him. |
| UC: | Yeah. |
| GOKLU: | I said, "it's okay." And never, ever again [U/I]. |
| UC: | [Laughs] So this car is safe. No one is going to fuck with it? |
| GOKLU: | This… no, no, no, the other one is better. |
| UC: | Okay. |
| GOKLU: | The other one is in 61st because the other guy… I keep it in his garage. |
| | [Pause] |
| UC: | What does "Goklu" mean? [Clears throat] |
| GOKLU: | It's my surname. |

12

A-908

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Oh, it's your last name. |
| GOKLU: | [U/I] rescue, right? |
| UC: | [Chuckles] |
| | [Voices overlap] |
| GOKLU: | [U/I] on a plate and go around [U/I]. |
| UC: | [U/I]. |
| GOKLU: | I don't do it too much. You and the other three guys. Sometimes the people call me, I feel like it's not a clean guy, bye. |
| UC: | Yeah. |
| GOKLU: | Because they're going to follow him. [Noise] [U/I]. |
| UC: | Yeah. |
| GOKLU: | So, I know, if I go to the judge, I don't want to be in front of judge for some shit. |
| UC: | [Laughs] |
| GOKLU: | Bit… bitcoins is okay, okay, take my money, I don't know, [U/I] the penalty, [U/I], it's okay, but I don't want to deal with this fucking shitty guy. You know what I mean, right? |
| UC: | Yeah. |

A-909

| NAME | ORIGINAL LANGUAGE |
|---|---|
| GOKLU: | A dirty guy. You can [U/I] fucked up, that's a good one. Oh, this car, don't worry, it's bullet proof car. [Noise]  Bullet proof. |
| UC: | What is? |
| | [Voices overlap] |
| GOKLU: | If somebody tries to shoot us from outside, it's bullet… |
| UC: | It's bullet proof? |
| GOKLU: | Yeah, the bullet is not going to come. [Noise] |
| UC: | Who's going to be shooting at us? |
| GOKLU: | Uh. I don't… |
| UC: | Is the…? |
| GOKLU: | …[U/I]. |
| UC: | Is the guy who is back in California that wants the rest of the 100, that's who. [Chuckles] |
| GOKLU: | Once we did… He charges a lot of money [U/I], but I don't pay. The guy [U/I]. |
| UC: | That's good to know. No confirmation yet. I haven't checked. |
| GOKLU: | You are working, why, why you don't, don't use the regular [U/I] like [U/I] or blockchain, because those are easy. Those… I mean, those… what, what's the wallet? |

14

A-910

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | It's a PRD wallet. |
| GOKLU: | What? |
| UC: | PRD, P-R-D. |
| GOKLU: | Are you sure you guys [U/I]? |
| UC: | Yeah. |
| GOKLU: | [U/I]. |
| UC: | Oh, yeah. [U/I] all the time. |
| GOKLU: | I know how to [U/I]. Maybe you're right, [U/I] the order [U/I]. |
| | [Voices overlap] |
| UC: | When can you, uh, when can you do 100? We'll have another 100… |
| GOKLU: | No, first you need 30 or 100? |
| UC: | [U/I] need 30 like… |
| GOKLU: | This [U/I]. |
| UC: | …I need 30 by this weekend, before I go back to California, and then… |
| GOKLU: | Okay. |

A-911

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | …and then in two weeks, I'll have 100. |
| GOKLU: | Okay, for 100 we'll text each other and for… what's today? For 30, I'll text you tomorrow. |
| UC: | Okay. When do you think you can get 100? |
| | [Voices overlap] |
| GOKLU: | Maybe I have 55 and I give you 30 that time… It would be… this is, you know, I'm, I'm still in the process. The money… this money I find from somewhere. The money I'm trying to get from exchange is still in process. |
| UC: | What money? |
| GOKLU: | They, they, they're asking for extra paperworks. |
| UC: | What money? |
| GOKLU: | I was going to throw in some exchange. |
| UC: | Okay. |
| GOKLU: | [Noise] So if that money [U/I], I'll tell you, because that money was 70 [U/I], 70 and… yeah. If that money comes, I'll call you. |
| UC: | You, you take it… you use the exchanges? |
| GOKLU: | No, this is in Turkey, the country Turkey. |
| UC: | Yeah. |

A-912

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| | [Voices overlap] |
| GOKLU: | Uh, it's… that's… I mean, you don't make too much trouble, but when they see 70, 80,000 dollars, straight going to out of country… |
| UC: | Yeah. |
| GOKLU: | …then they start to question. |
| | [Beeping sound] |
| UC: | [U/I]. |
| GOKLU: | What are you doing? Oh, no, no [U/I]. |
| UC: | [Clears throat] So how does your partner get the cash? |
| GOKLU: | Yes, Roman [ph], last week, I sent him someone. He got the cash in Hamptons and I sent bitcoins from here. |
| UC: | Okay. |
| GOKLU: | But I thought he was going to come next [U/I], "Oh, brother, today my mom is here, my father is [U/I]." The other thing is really, I don't want to come in the, I mean, like 100 in one time, can we do split? |
| UC: | Well, I'd rather do it all at once, just to get it done with because it's, it's a pain in the ass. |
| | [Voices overlap] |

A-913

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | It's that one is too much, man, with 100 bucks, if, if we get in trouble, we are both fucked up. [U/I] 40s is okay, 100… I told you, you don't tell me [U/I] working, that's [U/I]. |
| UC: | Nah. [Noise] [U/I], so, so, can you meet me down there, so I just hop on the subway? |
| GOKLU: | I can't move today, but if the guy came out in this weather, don't see me, [U/I]. |
| UC: | Oh, he's coming back? |
| GOKLU: | Yeah. And he was in a meeting and… [U/I], so I'm not lazy to go downtown… |
| UC: | Yeah, yeah. |
| GOKLU: | …because of this guy. |
| UC: | This takes forever. |
| GOKLU: | Let's see, maybe again they find blocks [U/I], you see, they find the block. [U/I] same thing. |
| UC: | Uh-hum. |
| GOKLU: | Because you need to setup, hold to pay regular fee or priority fee. |
| UC: | What's…? Yeah, this one doesn't have priority fee, it just have regular, regular or economy. I'll use a different wallet next time. |
| | [Voices overlap] |

A-914

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Look… they have a wallet here, uh, they have… |
| UC: | Yeah. |
| GOKLU: | …uh, twenty forty-five. |
| | [Telephone tone] |
| GOKLU: | Who is this? |
| [Time stamp: 0:30:17 – 0:31:49] | [Pause] |
| UC: | Still no confirmation. |
| GOKLU: | I don't… |
| UC: | Oh, wait, we've got one. |
| GOKLU: | Really? |
| UC: | Yeah. |
| GOKLU: | You got one? |
| UC: | Let me see. |
| GOKLU: | [U/I], yeah, again. Block [U/I]. You can't see? |
| UC: | Hold on, let me, let me make sure it's [U/I]. [Noise] Yeah. [U/I] confirmation. [Noise] |

19

A-915

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| GOKLU: | [U/I]. |
| UC: | Did you get it? |
| GOKLU: | I don't know, I can't see what they [U/I]. |
| UC: | All right, dude. |
| GOKLU: | [U/I]. |
| UC: | Call me or text me. |
| | [Noise] |
| GOKLU: | [U/I]. |
| UC: | Later. |
| | [Traffic noise] |
| UC: | That's not mine. |
| GOKLU: | Huh? |
| UC: | That's not mine. |
| GOKLU: | [U/I]. |
| | [END OF RECORDING] |

A-916

CASE NUMBER: <u>United States v. Mustafa Goklu</u>, 19-CR-386 (S-1)

EXHIBIT NUMBER: GX 909

DATE: 04/30/2019

PARTICIPANTS: Michael Goklu ("GOKLU")

Undercover Agent ("UC")

ABBREVIATIONS:

[Brackets] Transcriber's notes

[U/I] Unintelligible in English

[ph] Phonetic rendering



GOVERNMENT
EXHIBIT
**909**
19 CR 386 (S-1) (PKC)

A-917

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Yo! |
| GOKLU: | How've you been? |
| UC: | How are you? |
| GOKLU: | Good. How are you? |
| UC: | My friend is back in Cali. |
| GOKLU: | [Noise] [U/I], right? |
| UC: | Huh? |
| GOKLU: | [Laughs] I need to know you are on the car, [U/I]. |
| UC: | Okay, yeah, yeah, yeah. |
| | [Noise] |
| UC: | [Clears throat] How've you been? |
| GOKLU: | Good, how the hell is your business? [Noise] |
| UC: | Booming. |

A-918

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Really? |
| UC: | Yeah. I'm making tons of money, man. |
| GOKLU: | I need to go in that business with you. |
| UC: | Do you? Do you want in? |
| GOKLU: | A cut. |
| UC: | Do you want a cut? |
| GOKLU: | How much, how much is a [U/I]? |
| UC: | What do you mean? |
| GOKLU: | I mean… Cannabis farm. |
| UC: | Oh. Well, that's… I don't make them as much with Cannabis, I, uh, I mean, I sell pounds of that in California, but, uh, the real money is in like, uh, the Adderall and the pills, [U/I]. |
| GOKLU: | Fuck! [U/I]. [Noise] How much you want? |
| UC: | All of it. What do you got? |
| GOKLU: | Total five each. You want me to count all, one by one? |
| UC: | Yeah. Better safe than sorry, right? |
| GOKLU: | Huh? |

2

A-919

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | Better safe than sorry. |
| GOKLU: | Yeah. [Noise] Wo, wo, wo. |
| | [Noise] |
| UC: | You have a… is it just 50? |
| GOKLU: | This is 20,000 in 20s, the rest is 100s. |
| | [Voices overlap] |
| UC: | Okay. It's 50 total? When can you do the rest? When can… I need like, uh, well, I always need like 100. |
| GOKLU: | I have the money, but I'm scared from the 100s, man. |
| UC: | [Laughs] Come on. |
| GOKLU: | [U/I]. [Noise] I counted this two, three times, it's good, I know. |
| UC: | [Noise] Just run through one, uh, one of each of the stacks, just [U/I]. |
| GOKLU: | All right. Those are, those are mixed. Leave it there. |
| UC: | Okay. |
| GOKLU: | [Noise] Let me, let me, let me count that. [Beeping sound] Fuck you! I think this machine is working better when it gets warmer. [Noise] |

A-920

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | You gotta clean it too. I have to clean mine a ton. |
| GOKLU: | Really? |
| UC: | Yeah. The sensor just gets dust all over. |
| GOKLU: | [Beeping sound] All over again, shit! [U/I]. Putting these all together, [U/I]. [Noise] |
| UC: | There it goes. |
| GOKLU: | Two fifty. |
| UC: | Okay. |
| GOKLU: | This, this is five. |
| UC: | Thank you… Anything new? |
| GOKLU: | Nothing new. |
| UC: | Where do you get all this cash? |
| GOKLU: | I, I, I have a guy who takes bitcoins only. |
| UC: | Yeah? |
| GOKLU: | Okay. [U/I] from Bank too. [U/I], eBay, Amazon, in these miners shit, I lost a lot of money on this. |
| UC: | Why? |

4

A-921

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | On mining. |
| UC: | Oh, yeah, because of mining. |
| GOKLU: | [Noise] [U/I]. |
| UC: | Let me start, uh, sending it to you to save time. |
| GOKLU: | Oh, because I have more, I think, maybe. |
| UC: | Okay. |
| GOKLU: | [Beeping sound] Fuck you, man! Why is that? [U/I]. |
| UC: | Yeah. [Noise] So you, you want… [U/I] another [U/I] again. |
| GOKLU: | Yeah, [U/I]. |
| | [Voices overlap] |
| UC: | [Noise] Do you [U/I] on the business? Do you know anyone? It's, uh… who ones, uh… |
| GOKLU: | No. Just… |
| UC: | …who ones… weed, or pills, or… |
| GOKLU: | …somebody told me you can buy a farm in California to do Cannabis business. |
| UC: | Lots of farms out there. |

A-922

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| | [Noise] [Beeping sound] |
| UC: | Still risky, though. My buddy got arrested the other day. |
| GOKLU: | Really? |
| UC: | Yeah. |
| GOKLU: | Why is that? |
| | [Voices overlap] |
| UC: | Still federally… I mean, he got arrested by the Feds. |
| GOKLU: | Oh, you… |
| UC: | You know. |
| GOKLU: | …got to be in California. If you go out… |
| UC: | Yeah. |
| GOKLU: | …it's trouble, right? |
| UC: | Yeah. |
| GOKLU: | [Beeping sound – noise] Man. |
| UC: | It's good money, man. But if you know anyone, I could bring some back and you could, uh, you could get a cut, if you are interested. |

A-923

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | I don't understand, what are you going to sell? Just liquid smoke? |
| UC: | E… everything, you can turn it into liquid, you can sell it just like… |
| GOKLU: | Like that. |
| UC: | Like that. |
| GOKLU: | I know a guy, [U/I] interested. |
| UC: | Who? |
| GOKLU: | Look, [U/I] this, [U/I] one, two, three, four [U/I], 5,000 right? Yeah. |
| UC: | Yeap. |
| GOKLU: | Five thousand, hold on… The other thing is the exchanger. Sucks too. |
| UC: | The exchange rate? |
| GOKLU: | No, no, pushing… bitcoins to exchange and take it back. |
| UC: | Oh, yeah. |
| GOKLU: | If you see sit on bitcoin… remember from 6,500, just in two days it goes down to fucking 3,000? |
| UC: | Uh-hum. |
| GOKLU: | I lost 30 hundred bucks. |

A-924

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| UC: | Yeah. |
| GOKLU: | [Noise] Look, [U/I]. |
| UC: | I don't even bother with the exchanges, obviously. |
| GOKLU: | I made my, my money in exchange, not the business. You don't believe me? You and two or three guys, I don't do this too much. [Noise] This is 100s. |
| UC: | Hum. |
| | [Voices overlap] |
| GOKLU: | Here are the 20s. Five… |
| UC: | [U/I]. |
| GOKLU: | …here is 25… 20… 45… 45. This is… 100s. [Noise] Fifty… Here's 50, do you want more? |
| UC: | Hum. Do you have more? |
| GOKLU: | [Noise] [U/I]. This is 50 [U/I]. Oh, here is another 25, do you want? |
| UC: | Yeah. Let me see. |
| | [Voices overlap] |
| GOKLU: | This is small, forget it, it's 10 bucks. |

A-925

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| UC: | How much?... Uh, okay. Yeah. It would be… |
| GOKLU: | Do, do you want it? |
| UC: | Well, let me make… let me call my, uh, my guy.  How much, 25? |
| GOKLU: | Yeah. Total 75. |
| UC: | Two thousa… okay. |
| GOKLU: | That's 50. |
| UC: | Yeah. |
| GOKLU: | This is 25. [Noise] |
| UC: | [Aside on the telephone: Yo, can you send, uh, 25 more over?... Yeah… Se… 75 total… All right… You're good?] |
| UM1: | [On the other side of the telephone line: Yeah.] |
| UC: | [Aside on the telephone: All right.] |
| UM1: | [On the other side of the telephone line: Coming.] |
| UC: | [Aside on the telephone: Peace.] |
| UM1: | [On the other side of the line: All right.] |
| UC: | Okay, he, uh, he has to send [U/I], so it might take a second. |

9

A-926

| NAME | ORIGINAL LANGUAGE |
|------|-------------------|
| GOKLU: | Seventy-five. You want this? It's ten bucks. |
| | [Voices overlap] |
| UC: | Yeah. Uh, well, we will see, let's see how much he sends me. I don't know if he'll… |
| GOKLU: | [U/I]. |
| UC: | …if he'll cover it. [Noise] Do you have time to stick around for a minute? |
| GOKLU: | Okay, thank you very much. |
| | [Noise] |
| UC: | What the fuck! |
| UM2: | Get out of the car! |
| UM3: | Get out of the car, police! |
| UM4: | Get out of the car! |
| UM3: | Over here. |
| UM2: | Right here. Let's see, do you [U/I]? |
| UC: | No. |
| UM2: | Do you have any [U/I] at all? |

A-927

| **NAME** | **ORIGINAL LANGUAGE** |
|---|---|
| UC: | No. |
| UM3: | [U/I] here the whole time, okay? |
| UC: | Fuck! |
| GOKLU: | [U/I]. |
| UM2: | No weapons? |
| UC: | No. |
| | [END OF RECORDING] |

A-928

GOVERNMENT EXHIBIT
**1101**
19 CR 386 (S - 1) (PKC)

| Date | Bitcoin Provided to Defendant | Cash Provided to UC | Commission |
|------|-------------------------------|---------------------|------------|
| August 28, 2018 | 0.70453053 | $4620 | 8% |
| September 21, 2018 | 1.09687021 | $6750 | 8% |
| November 27, 2018 | 10.65127282 | $36,600 | 7% |
| December 11, 2018 | 5.86191089 | $18,260 | 7% |
| January 24, 2019 | 7.15946367 | $23,550 | 8% |
| January 30, 2019 | 13.67287 | $43,500 | 7% |
| **Total** | | $133,190 | |

A-929

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
UNITED STATES OF AMERICA,

            - against -

MUSTAFA GOKLU, a/k/a MUSTANGY

              Defendant.

-----------------------------------------------------X

**JURY INSTRUCTIONS**

19-CR-386 (PKC)

JURY INSTRUCTIONS



COURT'S
EXHIBIT NO. # 1
IDENTIFICATION/EVIDENCE
DKT.# 19CR386
DATE: 10/7/22

1

A-930

PAMELA K. CHEN, United States District Judge:

Ladies and gentlemen of the jury, now that you have heard all the evidence in the case as well as the arguments of the lawyers, it is my duty to give you instructions as to the law applicable in this case.  We are all grateful to you for the close attention you have given to this case thus far. I ask that you continue to do so as I give you these instructions.

As you know, the Defendant Mustafa Goklu is charged with money laundering and the operation of an unlicensed money transmitting business.  The Defendant has pleaded not guilty to all charges.

My instructions will be in three parts:

First, I will instruct you regarding the general rules that define and govern the duties of a jury in a criminal case such as this.

Second, I will instruct you as to the particular crimes charged in this case and the specific elements that the Government must prove with respect to each crime.

Third, I will give you some general rules regarding your deliberations.

A-931

## I.      GENERAL INSTRUCTIONS: ROLE OF THE COURT AND JURY

Let me start by restating our respective roles as judge and jury.

Your duty, as I mentioned in my opening instructions, is to find the facts from all of the evidence in this case. You are the sole judges of the facts, and it is for you and you alone to determine what weight to give the evidence, to resolve such conflicts as may have appeared in the evidence, and to draw such inferences as you deem to be reasonable and warranted from the evidence.

My role is to instruct you on the law. You must apply the law, in accordance with my instructions, to the facts as you find them. I remind you of your sworn obligation to follow the law as I describe it to you, whether you agree with it or not. You should not be concerned about the wisdom of any rule of law that I state. Regardless of any opinion you may have about what the law may be—or should be—it would be a violation of your oaths as jurors to base your verdict upon any other view of the law than the one given to you in these instructions.

If any of the lawyers have stated a legal principle that differs from any that I state to you in my instructions, you must be guided solely by what I instruct you about the law. You should not single out any one instruction as alone stating the law, but should consider my instructions as a whole.

Because it is your role—not mine—to determine the facts, I did not state or imply any view about how you should decide the facts of this case. You should not conclude from anything I have said or done during this trial, including these instructions, that I have any opinion about the facts or the merits of this case. For example, occasionally, I may have asked a witness or a lawyer questions. These questions were only intended for clarification or to expedite matters, and not to suggest any opinions on my part as to the verdict you should reach or whether any of the witnesses

3

A-932

may have been more credible than any other witness. You should attach no special significance to my questions simply because I asked them.

### A.     EQUALITY OF THE GOVERNMENT AND THE DEFENSE BEFORE THE COURT

The fact that the Government is prosecuting this case on behalf of the United States of America should not affect your evaluation of the evidence and facts before you. The Government is entitled to no greater consideration than the Defendant. By the same token, however, the Government is also entitled to no less consideration. All parties, whether the Government or individuals, are equal before the law are entitled to equal consideration.

### B.     NO SYMPATHY, FEAR, PREJUDICE, OR BIAS

It is your responsibility to decide the facts with complete fairness and impartiality and without any bias or prejudice or sympathy for any party. You must perform your duty as jurors with complete fairness and impartiality. You must carefully and impartially consider the evidence, follow the law as I give it to you, and reach a just verdict regardless of the consequences. The crucial question that you must ask yourselves as you sift through the evidence is: Has the Government proven the guilt of the Defendant beyond a reasonable doubt?

It is for you alone to decide whether the Government has met that burden to prove each element of the crime charged, solely on the basis of the evidence before you and the law as I charge you. If you should find that the Government has met its burden of proving the Defendant's guilt beyond a reasonable doubt, you may render a verdict of guilty without concern for sympathy or any other reason. On the other hand, if you have a reasonable doubt as to the Defendant's guilt, you should not hesitate because of sympathy, fear, prejudice, or bias for or against anyone to find the Defendant not guilty.

4

A-933

In reaching your decision as to whether the Government has sustained its burden of proof, you may not consider any personal feelings you may have about the Defendant's race, ethnicity, national origin, sex, or age, or that of any witness or anyone else involved in this case. All persons charged with a crime are entitled to the same presumption of innocence. The Government has the same burden of proof with respect to all persons. As with any other individual charged with a crime, the issue is whether the Government has met its burden of demonstrating each and every element of the offense beyond a reasonable doubt as to the Defendant.

C.     FUNCTION OF THE INDICTMENT AND WHAT IS NOT IN EVIDENCE

The Defendant has been charged in an Indictment with violating federal laws. The Indictment is merely a statement of the charges against the Defendant. The Indictment is not itself evidence nor does it create an inference of guilt. It is an accusation and nothing more.

D.     PRESUMPTION OF INNOCENCE AND BURDEN OF PROOF

As previously stated, the Defendant has entered a plea of not guilty as to all the charges against him in the Indictment. The Defendant is presumed to be innocent of the charges against him, and that presumption alone, unless overcome, is sufficient to acquit him. The legal presumption of innocence remains in force until such time, if ever, that you as a jury are satisfied that the Government has proven the guilt of the Defendant as to each element of any particular crime charged beyond a reasonable doubt.

The Government alone bears the burden to prove the Defendant's guilt as to each element of the charges beyond a reasonable doubt. The law never imposes upon a Defendant in a criminal case the burden or duty of calling any witness or producing any evidence. Your task in deliberations is not to decide between guilt and innocence; it is to decide between guilty and not guilty based on the evidence or lack of evidence. Indeed, the presumption of innocence alone requires you to acquit the Defendant of the charge you are considering unless you are unanimously

5

A-934

convinced that the Government has met its burden to prove that he is guilty of that charge beyond a reasonable doubt.

### E.   REASONABLE DOUBT

You may be wondering what is "reasonable doubt." The words almost define themselves. It is doubt based upon reason and common sense. It is a doubt that a reasonable person has after carefully weighing all of the evidence or lack of evidence. It is a doubt that would cause a reasonable person to hesitate to act in a matter of the highest importance in his or her life. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his own affairs.

A reasonable doubt is not caprice or whim. It is not speculation or suspicion. It is not an excuse to avoid the performance of an unpleasant duty. And it is not sympathy. The law does not require that the Government prove guilt beyond all possible doubt: proof beyond a reasonable doubt is sufficient to convict.

If, after fair and impartial consideration of all the evidence, you are satisfied beyond a reasonable doubt of the guilt of the Defendant as to a particular charge, you should find Defendant guilty of that charge. On the other hand, if after fair and impartial consideration of the evidence or lack of evidence concerning a particular charge, you have a reasonable doubt as to the Defendant's guilt, you must find the Defendant not guilty of the charge.

### F.   PUNISHMENT

Under your oath as jurors, you are not to consider the question of the possible punishment the Defendant may receive if he is convicted. The duty of imposing a sentence, if necessary, rests exclusively on me. You cannot allow consideration of the punishment that may be imposed upon the Defendant, if he is convicted, to influence your verdict in any way, or to enter into your

6

A-935

deliberations in any sense. Your duty as jurors is to weigh the evidence in this case and to determine whether or not the Defendant is guilty beyond a reasonable doubt, solely upon the basis of the evidence before you.

### G.    THE DEFINITION OF EVIDENCE AND MEANING OF OBJECTIONS

I will now talk to you about what evidence is and how you should consider it.

You must determine the facts in this case based solely on the evidence presented, and those inferences which can reasonably be drawn from the evidence presented. The evidence in this case includes the sworn testimony from the witnesses and documentary exhibits that have been received in evidence by me, and the stipulations between the parties.

As I explained at the beginning of the case, certain things are not evidence and you should disregard them in deciding what the facts are in this case:

- As I already instructed you, the Indictment is not evidence.

- The arguments and statements of the lawyers, including the opening statements and closing arguments of the lawyers, are not evidence. If anything the lawyers said about the evidence in their statements or arguments conflicts with your own memory of the evidence, it is your recollection that governs.

- Objections to questions or exhibits are not evidence. Also, statements that attorneys make while objecting to questions and exhibits are not evidence. The lawyers have a duty to their clients to object when they believe something is improper under the rules of evidence. You should not be influenced by any such objection. If I sustained an objection, you must ignore the question or exhibit and must not try to guess what the answer might have been, or the exhibit might have contained. If I overruled an objection, treat the answer or exhibit like any other.

7

A-936

- Anything you may have seen or heard outside the courtroom is not evidence.

- Any testimony or exhibit that has been excluded, stricken, or that you have been instructed to disregard is not evidence.

- Transcripts of audio recordings are not evidence. During the trial, you heard audio recordings and received written transcripts to aid you in listening to these recordings. The transcripts themselves are not evidence. Therefore, you may only consider what you heard and understood the contents of the recording to be. If you perceived a difference between the recording and the transcript, you must rely only on what you heard because the transcripts are not evidence.

- Anything I have said or done during these proceedings is not evidence, or any indication, as to the Defendant's innocence or guilt.

## H.   DIRECT AND CIRCUMSTANTIAL EVIDENCE

As I mentioned in my opening instructions, there are, generally speaking, two types of evidence: direct and circumstantial. You may use both types of evidence in reaching your verdict in this case. There law makes no distinction between the weight to be given to these two types of evidence, and it is for you to give weight to any such evidence as your see appropriate. You must base your verdict on a reasonable assessment of all of the evidence in the case.

**Direct evidence** is testimony from a witness about something he or she knows by virtue of his or her own senses—something he or she has seen, felt, touched, tasted, or heard.

**Circumstantial evidence**, on the other hand, is proof of a chain of circumstances that point to the existence or nonexistence of certain facts. A simple example of circumstantial evidence is as follows: Suppose you came to court on a day when the weather was clear, sunny, and dry. However, after several hours in the courtroom where there are no windows, you observe a person

8

A-937

come in wearing a wet raincoat and another person shaking a wet umbrella. Without you ever looking outside, you would not have direct evidence that it rained, but you might infer from these circumstances that while you were sitting in court, it rained outdoors.

That is all there is to circumstantial evidence. On the basis of reason, experience, and common sense, you infer the existence or nonexistence of a fact from one or more established facts.

You are permitted to draw, from the facts that you find to have been proved, such reasonable inferences as would be justified in light of your experience. Inferences are deductions or conclusions that reason and common sense lead you, the jury, to draw from the facts that have been established by the evidence in the case. Use your common sense in drawing inferences; however, you are not permitted to engage in mere guesswork or speculation.

There are times when differing inferences may be drawn from facts, whether proved by direct or circumstantial evidence. Perhaps the Government asks you to draw one, and the Defendant ask you to draw another. It is for you, and you alone, to decide what inferences you will draw. Whether based on direct or circumstantial evidence, or upon the logical, reasonable inferences drawn from such evidence, you must be satisfied of the guilt of the Defendant beyond a reasonable doubt before you may convict.

No significance should be attached to the fact that a document, other exhibit, or witness testimony was introduced by one party rather than by the other. Any party is entitled to the benefit of any evidence tending to establish its contentions, even though such evidence may have come from witnesses or documents introduced by another party.

## I.     WITNESS CREDIBILITY

In deciding what the facts are in this case, you must consider all of the evidence that has been offered and must decide which testimony to believe and which testimony not to believe. You

A-938

are the sole judges of credibility of the witnesses and the weight their testimony deserves. There is no one single way to determine credibility. In your daily lives, you make such decisions regularly. The same standards, as well as your common sense, should guide you here.

Your determination of the issue of credibility very largely must depend upon the impression that a witness made upon you as to whether or not that witness was telling the truth or giving you an accurate version of what occurred. You may choose to disbelieve all, or part, of any witness's testimony. In deciding whether and to what extent to believe a witness's testimony, you may consider any number of factors, including the following:

- The witness's opportunity to see, hear, and know about the events he or she described;

- The witness's ability to recall and describe those things accurately;

- The witness's way of testifying—was the witness candid and forthright or did the witness seem as if he or she was hiding something, being evasive, or suspect in some way;

- How the witness's testimony on direct examination compared with how the witness testified on cross-examination;

- The reasonableness of the witness's testimony in light of all of the other evidence in the case;

- Whether the witness had any possible bias, any relationship to a party, any motive to be untruthful, or any possible interest in the outcome of the trial; and

- Whether the witness's testimony was contradicted by his or her other testimony, by what that witness said or did on a prior occasion, by the testimony of other witnesses, or by other evidence.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit such testimony. In weighing the effects of an inconsistency, you should consider whether it relates to an important fact or an unimportant detail, and whether, in your view, the inconsistency results from an innocent error or an intentional falsehood. If you find that any statement made by a witness on the stand is false, in whole or in

A-939

part, you may disregard the particular part you find to be false or you may disregard his or her entire testimony as not worthy of belief.

In evaluating the credibility of the witnesses, you should take into account evidence that the witness who testified may benefit in some way from the outcome of this case. Such an interest in the outcome creates a motive on the part of the witness to testify falsely, and may sway the witness to testify in a way that advances his own interests. Therefore, if you find that any witness whose testimony you are considering may have an interest in the outcome of this trial, then you should bear that factor in mind when evaluating the credibility of his or her testimony and evaluate it with great care. This is not to suggest that every witness who has an interest in the outcome of a case will testify falsely. There are many people, who, no matter what their interest in the outcome of a case may be, would not testify falsely. It is for you to decide, based on your own perceptions and common sense, to what extent, if at all, the witness's interest has affected or colored his or her testimony.

## J.    TESTIMONY OF THE DEFENDANT

### 1.    RIGHT NOT TO TESTIFY

The Defendant did not testify in this case. Under the Constitution, the Defendant has no obligation to testify or to present any other evidence because it is the Government's burden to prove his guilt beyond a reasonable doubt. You may not attach any significance to the fact that the Defendant did not testify. Nor may you draw any adverse inference against the Defendant because he did not take the witness stand. In your deliberations in the jury room, you may not consider this decision against the Defendant in any way.

## K.    TESTIMONY OF LAW ENFORCEMENT OFFICERS

During the trial, you heard testimony from law enforcement officers. The fact that a witness is or was employed as a law enforcement official does not mean that his or her testimony

11

A-940

is deserving of more or less consideration or greater or lesser weight than that of an ordinary witness. It is for you to decide, after weighing all the evidence and in light of the instructions I have given you about the factors relevant to determining the credibility of any witness, whether to accept the testimony of a law enforcement witness, and what weight, if any, it deserves.

### L.      STIPULATIONS OF FACT

A stipulation is an agreement among the parties that a certain fact is true. The attorneys for the Government and the attorneys for the Defendant have entered into a number of stipulations concerning facts that are relevant to this case. As you may recall, those were read into the record during the trial. When the attorneys on both sides stipulate and agree as to the existence of a fact, you must accept the stipulation as evidence, and regard that fact as proved.

### M.      INTERVIEWED WITNESSES

During the course of trial, you heard testimony that the attorneys interviewed witnesses when preparing for the trial. You must not draw any unfavorable inference from that fact. On the contrary, attorneys are obliged to prepare their case as thoroughly as possible and in the discharge of that responsibility properly interview witnesses in preparation for the trial.

### N.      SUMMARY EVIDENCE

Some exhibits were admitted into evidence in the form of charts and summaries. Those charts and summaries were admitted in order to save the time of reviewing voluminous records and to avoid inconvenience. You should consider these charts and summaries the same way you would any other evidence.

However, the charts and summaries used in closing arguments are not in evidence unless specifically admitted into evidence. These charts and summaries were shown to you in order to make the evidence more meaningful and to aid you in considering the evidence. They are no better than the documents upon which they are based, and are not themselves independent evidence.

A-941

Therefore, you are to give no greater consideration to these charts or summaries than you would give to the evidence upon which they are based. It is for you to decide whether the charts, schedules, or summaries correctly present the information contained in the testimony and in the exhibits on which they were based. You are entitled to consider the charts, schedules, and summaries if you find they are of assistance to you in analyzing the underlying evidence.

### O.   UNDERCOVER AGENTS

You have heard testimony from an undercover agent who was employed by the Drug Enforcement Administration. Sometimes the Government uses undercover agents who may conceal their true identities in order to investigate suspected violations of the law. There is nothing improper or illegal about the Government using these techniques, so long as the Defendant's rights are not violated, and the Defendant has not claimed that his rights were violated in this case. Indeed, certain types of evidence would be extremely difficult to detect without the use of undercover agents and informants. Whether or not you approve of the use of an undercover agent to detect unlawful activities is not to enter into your deliberations in any way.

### P.   PARTICULAR INVESTIGATIVE TECHNIQUES

You are instructed that there is no legal requirement that the Government use any specific investigative techniques or pursue every investigative lead to prove its case. As I have said before, your concern is to determine whether or not, based on the evidence admitted at trial, or the lack of evidence, the Defendant's guilt has been proven beyond a reasonable doubt.

### Q.   EXPERT WITNESSES

You have heard the testimony of expert witnesses in this case. Ordinarily, witnesses are restricted to testifying concerning matters of fact. There are occasions, however, when there is some technical or other specialized area of knowledge that will assist the jury in deciding a disputed fact. On those occasions, a witness who is specially qualified by training, knowledge,

A-942

experience, or education may be called to testify about some evidence or facts in issue in the form of an opinion. Your role in judging credibility applies to experts as well as to other witnesses. You should judge this testimony in the same way that you judge the testimony of any other witness. The fact that such a person has given an opinion does not mean that you are required to accept it. In weighing the testimony, you should consider the factors that generally bear upon the credibility of a witness as well as the expert witness's education, training and experience, the soundness of the reasons given for the opinion and all other evidence in the case. You should consider the expert opinions which were received in evidence in this case and give them as much or as little weight as you think they deserve. If you should decide that the opinion of an expert was not based on sufficient education, experience, or sufficient data, or if you should conclude that the trustworthiness or credibility of an expert is questionable for any reason, then you may disregard the opinion of the expert. Furthermore, if the opinion of the expert was outweighed, in your judgment, by other evidence in the case, then you might disregard the opinion of the expert entirely or in part. On the other hand, if you find the opinion of an expert is based on sufficient data, education, training and experience, and the other evidence does not give you reason to doubt the expert's conclusions, you would be justified in placing great reliance on the expert's testimony.

## R.    EVIDENCE PURSUANT TO LAWFUL PROCEDURE

You have heard testimony that interactions between law enforcement agents and the Defendant were audio recorded. In addition, you have seen evidence obtained pursuant to a search of a cellular telephone and laptop computer. You have also seen evidence obtained pursuant to hidden recording devices. This evidence was obtained lawfully. The use of these procedures to gather evidence is perfectly lawful and the Government has the right to use such evidence in this case. The wisdom of the law and law enforcement policies and procedures are not your

A-943

concern.  Your job is only to decide whether the Government has proved that the Defendant committed the crime charged in the Indictment.

### S.    LIMITING INSTRUCTION

You have seen and heard evidence that relates to activities and transactions that the Defendant conducted with individuals other than the undercover law enforcement agent, including text message communications between the Defendant and other individuals, testimony about surveillance conducted of the Defendant's interactions with other individuals, and the Defendant's statements about his transactions with other individuals.  You are to consider such evidence only with respect to Count Two, which charges the Defendant with the crime of operating an unlicensed money transmitting business.  However, to the extent that any of the Defendant's communications with other individuals relate to a concern of being detected by law enforcement you may properly consider such communications with respect to both Count One, charging the Defendant with money laundering, as well as Count Two.

## II.    INSTRUCTIONS RELATING TO THE ALLEGED CRIMES

I will now turn to the second part of my instructions and instruct you as to the legal elements of the criminal counts the Government has alleged.

### A.    VENUE

Venue refers to the location of the charged crimes.  As to each of the charged crimes, you must consider whether any act in furtherance of the crime occurred within the Eastern District of New York.  The Eastern District of New York encompasses Brooklyn, Queens, and Staten Island in New York City, and Nassau and Suffolk Counties on Long Island.  To establish that venue for a charged crime is appropriate in the Eastern District of New York, the Government must prove that some act in furtherance of the crime occurred in this District.  The Government need not prove

A-944

that the crime was committed in this District or that the Defendant himself was present in this District.

I note that on this issue—and only on this issue—the Government need not prove venue beyond a reasonable doubt, but only by a preponderance of the evidence. A "preponderance of the evidence" means simply to prove that the fact is more likely true than not true. The Government must prove that it is more likely than not that some act in furtherance of the charge you are considering occurred in the Eastern District of New York. If the evidence appears to be equally balanced, or if you cannot say upon which side it weighs heavier, you must resolve this question against the Government. Let me stress, the preponderance of the evidence standard applies only to the question of venue. As I have instructed you, the Government alone must prove all other elements of the crimes charged beyond a reasonable doubt.

### B.    DATES APPROXIMATE

The Indictment charges "in or about" and "on or about" and "between" certain dates. The proof need not establish with certainty the exact date of an alleged offense. It is sufficient if the evidence establishes beyond a reasonable doubt that an offense was committed on a date reasonably near the dates alleged.

### C.    KNOWLEDGE AND INTENT

Because each count in the Indictment implicates the concepts of knowledge and intent, I will instruct you at the outset about these principles.

As a general rule, the law holds persons accountable only for conduct they intentionally engage in. Thus, before you can find a Defendant guilty, you must be satisfied that the Defendant was acting knowingly and intentionally.

A-945

### 1.     Knowingly

A person acts "knowingly" when he acts intentionally and voluntarily, and not because of ignorance, mistake, accident, or carelessness.  Whether a defendant acted knowingly may be proven by his words and conduct and by all of the facts and circumstances surrounding the case.

### 2.     Intentionally

A person acts "intentionally" when he acts deliberately and purposefully.  That is, a defendant's acts must have been the product of his conscious, objective decision rather than the product of a mistake or an accident.

These issues of knowledge and intent require you to make a determination about the Defendant's state of mind, something that rarely can be proven directly.  A wise and careful consideration of all the circumstances of the case may, however, permit you to make such a determination as to the state of mind of the Defendant.  Indeed, in your everyday affairs you frequently are called upon to determine a person's state of mind from his or her words and actions in a given circumstance.  You are asked to do the same here.

### D.     THE CHARGES IN THE INDICTMENT

The Defendant Mustafa Goklu is formally charged in an Indictment.  As I instructed you at the beginning of this case, an Indictment is a charge or accusation.  You will not be provided a copy of the Indictment during your deliberations because the Indictment is merely a statement of the charges and is not itself evidence.

The Indictment in this case contains two separate counts against the Defendant.  You must, as a matter of law, consider each count of the Indictment separately, and you must return a separate verdict for each count. Count One of the Indictment charges the Defendant with Money Laundering.  The Second Count in the Indictment charges the Defendant with operating an unlicensed money transmitting business.

17

A-946

Whether you find Mr. Goklu guilty or not guilty as to one should not affect your verdict as to the other charged.

\*      \*      \*

I will now explain to you the law that applies to each count of the Indictment

### E.      COUNT ONE: MONEY LAUNDERING

Count One of the Indictment charges the Defendant with money laundering.  Specifically, it reads as follows:

> On or about and between August 28, 2018 and April 30, 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the Defendant MUSTAFA GOKLU, also known as "Mustangy," together with others, did knowingly and intentionally conduct and attempt to conduct one or more financial transactions in and affecting interstate and foreign commerce, to wit: the transfer and delivery of United States currency, which transactions involved property represented by a law enforcement officer and by another person at the direction of, and with the approval of, a Federal official authorized to investigate violations of Title 18, United States Code, Section 1956, to be the proceeds of specified unlawful activity, to wit: narcotics trafficking, in violation of Title 21, United States Code, Sections 841 and 846, and to be property used to conduct and facilitate such specified unlawful activity, with the intent to conceal and disguise the nature, location, source, ownership and control of property believed to be the proceeds of such specified unlawful activity.

Count One charges the Defendant with violating Title 18, United States Code, Section 1956(a)(3)(B), provides, in relevant part:

> Whoever, with the intent . . . to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity. . . conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be [guilty of a crime]. For purposes of this paragraph . . . [the] term "represented" means any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section.

18

A-947

To prove the crime of money laundering, the Government must establish beyond a reasonable doubt each of the following three elements:

First, that the Defendant conducted or attempted to conduct a financial transaction that affected interstate or foreign commerce in any way or degree;

Second, that the transaction involved property represented by a law enforcement officer, and believed by the Defendant, to be the proceeds of specified unlawful activity; and

Third, that the Defendant acted with the intent to conceal or disguise the nature, location, source, ownership, or control of the property.

**First Element – Financial Transaction**

The first element the Government must prove beyond a reasonable doubt is that the Defendant conducted or attempted to conduct a financial transaction that affected interstate or foreign commerce in any way or degree.

The term "conducts" includes initiating, concluding, or participating in initiating, or concluding a transaction.

A "transaction" includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition of property.

The term "financial transaction" means a transaction which itself affects interstate or foreign commerce in any way or degree, and which involves (a) a movement of funds by wire transfer or other similar means, (b) a monetary instrument such as cash, check, money order, or any other negotiable instrument, or (c) a transfer of title to any real property, vehicle, vessel, or aircraft.

I want to define "interstate or foreign commerce" for you now.  The term "interstate or foreign commerce" means commerce between any combination of states, territories, or possessions

19

A-948

of the United States, or between the United States and a foreign country. You must find that the transaction affected interstate commerce in some way, however minimal.

**Second Element – Involving Property Represented as Proceeds of Specified Unlawful Activity**

The second element that the Government must prove beyond a reasonable doubt is that the transaction the Defendant conducted, or attempted to conduct, involved property represented by a law enforcement officer, and believed by the Defendant, to be the proceeds of specified unlawful activity.

For the purposes of this section, a law enforcement officer includes federal law enforcement officers and any other person acting under the direction or with the approval of a federal official authorized to investigate or prosecute money laundering. I instruct you that for purposes of this case the individual known as "Patrick O'Kain," who testified during this trial, was a law enforcement officer during the time period charged in the Indictment.

The term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity. Proceeds can be any kind of property, not just money.

In order to sustain its burden of proof on this element, the Government is not required to prove that the law enforcement officer made an express affirmative statement to the Defendant that the property involved was the proceeds of unlawful activity, in this case, narcotics trafficking. Instead, the Government must prove that the law enforcement officer made the Defendant aware of circumstances from which a reasonable person would infer that the property was the proceeds of illegal activity, and that the Defendant believed that the property was the proceeds of illegal activity. You should consider all of the evidence in determining whether the Government has satisfied this standard.

20

A-949

The term "specified unlawful activity" is simply a list of crimes set forth in the money laundering statute. In this case, the Indictment charges the "specified unlawful activity" of narcotics trafficking. I instruct you that narcotics trafficking means the manufacture, importation, receiving, concealment, buying, selling or otherwise dealing in a controlled substance or listed chemical under the Controlled Substance Act. I also instruct you that marijuana, oxycodone, and Adderall are controlled substances under the Controlled Substances Act. I further instruct you that narcotics trafficking is a "specified unlawful activity" for the purposes of the crime charged.

The Government is not required to prove that the property actually was the proceeds of some form of specified unlawful activity, in this case, narcotics trafficking. The Government is not required to prove that any narcotics trafficking actually took place, or that the property in the charged transactions actually constituted proceeds of narcotics trafficking. To sustain its burden of proof on this element, the Government is required to prove that the charged transactions involved property that was represented to the Defendant to be the proceeds of narcotics trafficking, and that the Defendant believed that the property was the proceeds of narcotics trafficking.

In determining whether the Defendant believed that the property was the proceeds of narcotics trafficking, you may consider whether the Defendant deliberately closed his eyes to what would otherwise have been obvious to him. If you find beyond a reasonable doubt that the Defendant was aware of a high probability that the charged transactions involved the proceeds of narcotics trafficking, and that the Defendant acted with deliberate disregard of the facts, you may find that the Defendant acted with the belief necessary to satisfy this element. However, if you find that the Government has failed to prove beyond a reasonable doubt that the Defendant was aware of a high probability that the charged transactions involved the proceeds of narcotics trafficking, he may not be convicted.

A-950

**Third Element - Intent to Conceal or Disguise**

The third element the Government must prove beyond a reasonable doubt is that the Defendant acted with the intent to conceal or disguise the nature, location, source, ownership, or control of the property. Here, Bitcoin is the alleged property.

To satisfy this element, the Government must prove that the Defendant knew of the purpose of the particular transaction in issue, and that he intended that the transaction conceal or disguise the nature, location, source, ownership, or control of the property in question. I previously instructed you about the definitions of knowingly and intentionally, and the same definitions apply here.

**F.     COUNT TWO: OPERATION OF AN UNLICENSED MONEY TRANSMITTING BUSINESS**

Count Two charges the Defendant with the crime of operating an unlicensed money transmitting business.

Specifically, it reads as follows:

> On or about and between August 28, 2018 and April 30, 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the Defendant MUSTAFA GOKLU, also known as "Mustangy," together with others, did knowingly conduct, control, manage, supervise, direct and own all and part of an unlicensed money transmitting business affecting interstate and foreign commerce, to wit: a digital currency exchange business, which (a) operated without an appropriate money transmitting license in the State of New York, where such operation is punishable as a misdemeanor and a felony under New York State law; and (b) failed to comply with the money transmitting business registration requirements under Title 31, United States Code, Section 5330 and the regulations prescribed thereunder.

Count Two charges the Defendant with violating Title 18, United States Code, Section 1960(a), which provides, in relevant part:

> Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be [guilty of a crime].

22

A-951

In order for you to find the Defendant guilty of the crime charged in Count Two, the Government must prove beyond a reasonable doubt each of the following three elements:

First, that the Defendant knowingly controlled, conducted, managed, supervised, directed, or owned all or part of a money transmitting business;

Second, that either the money transmitting business was not licensed, and operated in a state where the business was required to be licensed, or the business failed to register as required with the Secretary of the Treasury; and

Third, that the money transmitting business affected interstate or foreign Commerce.

I will now instruct you in more detail on each of these three elements.

**First Element - Money Transmitting Business**

The first element the Government must establish beyond a reasonable doubt is that Defendant knowingly controlled, conducted, managed, supervised, directed, or owned all or part of a "money transmitting business." The Government is not required to prove that the Defendant did all the things in that list, but only that he did any one of them. In order for you to evaluate this element, let me define the following terms for you. A "business" is a commercial enterprise that is regularly carried on for profit. Thus, a single isolated transmitting of money is not a business under this definition. A "money transmitting business" is a business which, for a fee, accepts currency, funds, or value that substitutes for currency for transfer within or outside the United States. I instruct you that Bitcoin qualifies as "funds" under the statute. The term "money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier. Exchanging Bitcoin for U.S. currency can qualify as a "transfer" within the

A-952

meaning of the statute.   The terms "conducted," "controlled," "managed," "supervised," "directed," or "owned" have their ordinary meanings.

A single isolated transmission of money is not a business under this definition. It is for you to determine whether the quantity and nature of the transmittals convert the transactions into a business.

To prove that the Defendant conducted, controlled, managed, supervised, directed, or owned the money transmitting business, the Government must establish that the Defendant was involved in the management of the business and was not merely an employee of that business.

To satisfy this element, the Government must prove that the Defendant knowingly controlled, conducted, managed, supervised, directed, or owned the money transmitting business. The Government must establish that Defendant was involved in the management of the business and was not merely an employee of that business.  I previously instructed you as to the definition of knowingly, and the same definition applies here.

### Second Element – Unlicensed Money Transmitting Business

The second element the Government must prove beyond a reasonable doubt is that the money transmitting business the Defendant conducted was unlicensed.  An unlicensed money transmitting business is a money transmitting business which is either: (1) operating in a state without a required license where operation without a license was punishable as a misdemeanor or felony under state law, or (2) not registered as required with the United States Secretary of the Treasury.  To satisfy this element, the Government needs to prove beyond a reasonable doubt only that the money transmitting business was unlicensed in one of these respects.  However, in order to convict on this count, you must be unanimous that the Government proved beyond a reasonable doubt that at least one or the other of these two conditions was satisfied.

24

A-953

I will now explain these two licensing requirements.  Let me start with the state licensing requirement.  The Government can satisfy this element by showing that the Defendant operated his business without a required license in a State where such operation was punishable as a misdemeanor or felony under State law.  I instruct you that the term "State" includes any State of the United States.  Therefore, New York is a "State."  The only State at issue in this trial is New York.  I instruct you that the laws of the State of New York require that any person who engages in the business of receiving money for transmission or of transmitting money to be licensed as a money transmitter by the New York State Department of Financial Services.  I also instruct you that New York law also makes engaging in such a business without a license punishable as a felony or a misdemeanor, depending on factors that are not relevant here.

Let me now turn to the licensing requirement under the laws of the United States with the Secretary of the Treasury.  Federal law requires certain money transmitting businesses to register with the Secretary of the Treasury within 180 days after the business was established.  Specifically, this registration requirement applies to any money transmitting business, foreign or domestic, that engages in money transmitting functions in the United States.

It is for you to determine whether the money transmitting business in this case was licensed as required by law.

To prove this element, the Government must prove that Defendant knew that the business was unlicensed.  The Government does not have to prove that the Defendant knew that New York law or federal law required the business to be licensed.  The Government does not need to show that Defendant knew that it is a crime under New York law to operate a money transmitting business without a license.  I previously instructed you as to the definition of knowingly, and the same definition applies here.

25

A-954

### Third Element – Interstate Commerce

The third element the Government must prove beyond a reasonable doubt is that the money transmitting business affected interstate or foreign commerce. Interstate or foreign commerce simply means the movement of goods, services, money, or individuals between states or between the United States and a foreign state or nation. The Government must prove that the money transmitting business affected interstate or foreign commerce in any manner, no matter how minimal. It is not necessary for the Government to prove that the acts of the Defendant himself affected interstate or foreign commerce so long as the acts of the money transmitting business had such effect. In addition, it is not necessary for the Government to show that the Defendant actually intended or anticipated that his actions would have an effect on interstate or foreign commerce. Finally, the Government is not required to prove that the Defendant knew he was affecting interstate or foreign commerce.

\*      \*      \*

## III.   CLOSING INSTRUCTIONS

I have now outlined for you the rules of law applicable to this case, the process by which you weigh the evidence and determine the facts, and the legal elements that must be proved beyond a reasonable doubt. In a few minutes you will retire to the jury room for your deliberations. I will now give you some general rules regarding your deliberations. Keep in mind that nothing I have said in these instructions is intended to suggest to you in any way what I think your verdict should be. That is entirely for you to decide.

A-955

By way of reminder, I instruct you once again that it is your responsibility to judge the facts in this case from the evidence presented during the trial and to apply the law as I have given it to you, and your verdict must be based solely on this evidence and law, not on anything else.

### A.    FOREPERSON

For your deliberations to proceed in an orderly fashion, you must have a foreperson.  The custom in this courthouse is for Juror No. 1 to act as the foreperson.  However, if, when you begin deliberations, you decide that you want to elect another foreperson, you are entitled to do so.  The foreperson will be responsible for signing all communications to the court and for handing them to the Deputy Marshal during your deliberations, but, of course, his or her vote is entitled to no greater weight than that of any other juror.

### B.    COMMUNICATION WITH THE COURT

It is very important that you not communicate with anyone outside the jury room about your deliberations or about anything touching on this case.  There is only one exception to this rule.  If it becomes necessary during your deliberations to communicate with me, you may send a note, through the Deputy Marshal, signed by your foreperson.  No member of the jury should attempt to communicate with me except by a signed writing, and I will never communicate with any member of the jury on any subject touching upon the merits of the case other than in writing, or orally here in open court.

### C.    RIGHT TO SEE EXHIBITS AND READ TESTIMONY

Your recollection governs.  Nobody else's.  If, in the course of your deliberations, your recollection of any part of the testimony should fail, or you should find yourself in doubt concerning my instructions to you on the law, you may request that a witness's or witnesses' testimony, or portions thereof, be sent back to you in the jury room.  If during your deliberations you want to see any of the exhibits that are not already available to you in the jury room, you may

A-956

request that as well.  You may make all these requests by a note to the Deputy Marshal.  I suggest, however, that you be specific to avoid receiving testimony or exhibit that you do not want or need. Describe as best and precisely as you can what you want to hear and please be patient because it sometimes takes a while to find the testimony or exhibit in the record.

### D.     DELIBERATIONS AND UNANIMOUS VERDICT

Your duty is to reach a fair conclusion from the law as I have given it to you and the evidence that has been presented in this case.  This duty is an important one.  When you are in the jury room, listen to each other, and discuss the evidence and issues in the case amongst yourselves. It is the duty of each of you, as jurors, to consult with one another, and to deliberate with a view toward reaching agreement on a verdict, if you can do so without violating your individual judgment and conscience.  While you should not surrender conscientious convictions of what the truth is and of the weight and effect of the evidence, and while each of you must decide the case for yourself and not merely acquiesce in the conclusion of your fellow jurors, you should examine the issues and the evidence before you with candor and frankness, and with proper deference to, and regard for, the opinions of your fellow jurors.

You should not hesitate to reconsider your opinions from time to time and to change them if you are convinced they are wrong.  However, do not surrender an honest conviction as to the weight and effect of the evidence simply to arrive at a verdict.  The decision you reach must be unanimous; you must all agree.

When you have reached a verdict, simply send me a note signed by your foreperson that you have reached a verdict.  Do not indicate what the verdict is.  In no communication with the Court should you give a numerical count of where the jury stands in its deliberations.

Remember in your deliberations that the Government's charges against the Defendant are no passing matter.  The parties and the Court rely upon you to give full and conscientious

28

A-957

deliberation and consideration to the issues and evidence before you.  By so doing, you carry out

to the fullest your oaths as jurors—to well and truly try the issues of this case and render a true

verdict.

A-958

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

MUSTAFA GOKLU, a/k/a Mustangy,

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - X

**VERDICT FORM**
**19-CR-386**

We, the jury find as follows:

**COUNT ONE: MONEY LAUNDERING**

As to the Defendant Mustafa Goklu:

    Guilty ____✓____        Not Guilty _____

**COUNT TWO: OPERATION OF AN UNLICENSED MONEY TRANSMITTING BUSINESS**

As to the Defendant Mustafa Goklu:

    Guilty ____✓____        Not Guilty _____

a.    If you find Defendant Mustafa Goklu guilty on Count Two, indicate whether you unanimously find that the Government has proved beyond a reasonable doubt that Defendant conducted, controlled, managed, supervised, directed, or owned all or part of an unlicensed money transmitting business, which:

    i.  Operated without an appropriate money transmitting license in the State of New York:

        Yes ____✓____        No_____

    ii.  Failed to comply with the federal money transmitting business registration requirements:

        Yes ____✓____        No_____



COURT'S
EXHIBIT NO. T-2
IDENTIFICATION/EVIDENCE
DKT.# 19CR386
DATE: 10/7/22

A-959

Dated:   Brooklyn, New York
         October 11th , 2022

FOREPERSON

A-960

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA,                    :        NOTICE OF MOTION

      -against-                               :        IND. NO. 19-CR-386 (PKC)

MUSTAFA GOKLU,                               :

     Defendant.                             :

----------------------------------------------------------------x

     PLEASE TAKE NOTICE, that upon the annexed affirmation of MURRAY E. SINGER, ESQ., and the prior proceedings herein, the undersigned will move this Court for a Judgment of Acquittal pursuant to F.R.C.P. Rule 29 as to count two, charging Operation of an Unlicensed Money Transmitting Business under 18 U.S.C. §1960(a), on the ground that the evidence presented at trial was not legally sufficient to support this charge, and for such other and further relief as the Court may deem just and proper.

Dated: Port Washington, New York
     November 10, 2022

                                           Respectfully yours,

                                           MURRAY E. SINGER
                                           Attorney for Defendant
                                           14 Vanderventer Ave.
                                           Suite 147
                                           Port Washington, NY  11050
                                           O - (516) 869-4207
                                           C - (516) 662-4950
                                           msingerlaw@gmail.com

                                           EMILEE SAHLI
                                           Attorney for Defendant
                                           195 Broadway, 4th Floor
                                           Brooklyn, NY 11211
                                           O - 347-378-8132

TO: AUSA Gillian Kassner by ECF               Emilee@sahlilaw.com

A-961

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA,       :     AFFIRMATION

       -against-       :     IND. NO. 19-CR-386 (PKC)

MUSTAFA GOKLU,       :

       Defendant.       :

----------------------------------------------------------------x

     MURRAY E. SINGER, an attorney duly admitted to practice law in the Eastern District of New York, affirms under penalty of perjury as follows:

     1.  I, along with Emilee Sahli, am the attorney of record for the defendant, Mustafa Goklu. As such I am fully familiar with the facts of this case.

     2.  This Affirmation is made in support of defendant's Motion for a Judgment of Acquittal pursuant to F.R.C.P. Rule 29 as to count two, charging Operation of an Unlicensed Money Transmitting Business under 18 U.S.C. §1960(a), on the ground that the evidence presented at trial was not legally sufficient to support this count.

     3.  Defendant was tried before this Court in October, 2022 under indictment number 19-CR-386.  The indictment charged two counts, Money Laundering under 18 U.S.C. §1956 and Operation of an Unlicensed Money Transmitting Business under 18 U.S.C. §1960.  Defendant was convicted after trial of both counts.

     4.  By this motion, defendant contends that the evidence failed to establish that his conduct constituted a money transmitting business as opposed to either a currency exchange business or some other form of money service business.

1

A-962

5.  The evidence at trial established that defendant met seven times with an undercover officer.  At six of those meetings, defendant gave U.S. currency to the undercover officer in exchange for bitcoin.  Defendant charged a fee of either 7% or 8% to conduct the exchanges.  At the seventh meeting, a similar exchange was discussed and put in motion, but defendant was arrested before the exchange could be completed.

6.  The issue presented to the Court in this motion is whether defendant's conduct constitutes a money transmitting business.  We contend that it does not.

7.  New York Banking Law §641 states that "[n]o person shall . . . engage in the business of receiving money for transmission or transmitting the same, without a license."  The Financial Crimes Enforcement Network (FINCEN), a division of the United States Treasury Department, includes a money transmitting business in a list of Money Services Businesses that also includes a "currency dealer or exchanger."  See https://www.fincen.gov/money-services-business-definition.  A business that exchanges money or currency is not the same thing as a business that transmits money or currency.

8.  United States v. Velastegui, 199 F.3d 590 (2d Cir. 1999) concerned an agent of a money transmitting business who collected money from customers and sent them directly to people in a foreign country without going through the licensed business.  The Court began its discussion by defining a money transmitting business.  "A money transmitting business receives money from a customer and then, for a fee paid by the customer, transmits that money to a recipient in a place that the customer designates, usually a foreign country."  Id. at 592.  The Second Circuit addressed the issue again in United States v. Banki, 685 F.3d 99 (2d Cir. 2012).  Banki involved transactions that passed through an informal system known as "hawala".  The Second Circuit again defined a money

2

A-963

transmitting business and quoted the above definition from Velastequi.  Id. at 114.

9.   The Fourth and Ninth Circuits have adopted the same definition.  In United States v. Talebnejad, 460 F.3d 563, 565 (4th Cir. 2006), the Fourth Circuit, citing Velastegui, stated that "[a] money transmitting business is one that, for a fee, accepts currency for transfer within or outside the United States through foreign currency exchanges and financial institutions."  In United States v. Singh, 995 F.3d 1069, 1077 (9th Cir. 2021), the Ninth Circuit, also citing Velastegui, stated that "[a] money transmitting business receives money from a customer and then, for a fee paid by the customer, transmits that money to a recipient in a place that the customer designates[.]"  See United States v. Mazza-Alaluf, 607 F.Supp.2d 484, 489-490 (S.D.N.Y. 2009)("The Second Circuit has noted that under section 1960, '[a] money transmitting business receives money from a customer and then, for a fee paid by the customer, transmits that money to a recipient in a place that the customer designates, usually a foreign country.' United States v. Velastegui, 199 F.3d 590, 592 (2d Cir.1999)"; United States v Murgio, 209 F.Supp.3d 698, 711 (S.D.N.Y. 2016)(on motion to dismiss before Judge Nathan, "both parties acknowledge[d]" that transmission of bitcoins "to another location or person for its customers" would establish a business as a money transmitting business, and the government argued that defendant's company "did more than just sell bitcoins 'to customers in two-party transactions.'").

10.   Viewing the evidence in the light most favorable to the government, the evidence established that Mr. Goklu operated a currency exchange business, not a money transmitting business.  To be a money transmitting business, Mr. Goklu had to accept currency (here, bitcoin) for transfer.  Mr. Goklu's receipt of bitcoin cannot both be for transfer and constitute the transfer itself.  To merge the two, we submit, would be contrary both to the law as discussed above, and to a natural

3

A-964

understanding of the language.

11.  Defendant now seeks a Judgment of Acquittal as to count two pursuant to Rule 29 of the

Federal Rules of Criminal Procedure for the reasons set forth above.

Dated:  Port Washington, New York
        November 10, 2022


                                            ___/s/_____
                                            MURRAY E. SINGER

4

A-965

FJN:GK/MED
F. #2018R01809

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

   UNITED STATES OF AMERICA

       - against -                   Docket. No. 19-CR-386 (PKC)

   MUSTAFA GOKLU,
     also known as "Mustangy"

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X


MEMORANDUM OF LAW IN OPPOSITION
TO THE DEFENDANT'S POST-TRIAL MOTION


BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Gillian A. Kassner
Marietou E. Diouf
Assistant U.S. Attorneys
   (Of Counsel)

A-966

<u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ................................................................................................... 1

I.   Relevant Procedural Background ............................................................... 1

II.  The Government's Case as to Count Two ................................................. 2

ARGUMENT ....................................................................................................... 7

I.   The Court Should Deny the Defendant's Motion for a Judgment of Acquittal on Count Two 7

A.  Applicable Law ................................................................................... 7

B.  The Trial Evidence Proved Beyond a Reasonable Doubt that the Defendant is Guilty of Operating an Unlicensed Money Transmitting Business as Charged in Count Two ......... 9

CONCLUSION .................................................................................................... 19

i

A-967

TABLE OF AUTHORITIES

**CASES**

Kyles v. Chester, 457 F. App'x 780 (10th Cir. 2012).................................................. 12

United Staets v. Singh, 995 F.3d 1069 (9th Cir. 2021)................................................ 17

United States v. $215,587.22 in United States Currency, 306 F. Supp. 3d 213 (D.D.C. 2018) ... 13

United States v. Banki, 685 F.3d 99 (2d Cir. 2012).......................................... 13, 16, 17

United States v. Budovsky, No. 13 Cr. 368 (DLC), 2015 WL 5602853 ..................................... 10

United States v. Delco Wire & Cable Co., 772 F. Supp. 1511 (E.D. Pa. 1991).......................... 12

United States v. E-Gold, Ltd, 550 F. Supp. 2d 82 (D.D.C. 2008) ......................................... 10, 13

United States v. Faiella, 39 F. Supp. 3d 544 (S.D.N.Y. 2014) ....................................... 16

United States v. Guadagna, 183 F.3d 122 (2d Cir. 1999).................................................. 8

United States v. Harmon, 474 F. Supp. 3d 76 (D.D.C. 2020) ......................................... 13, 15

United States v. Klein, 913 F.3d 73 (2d Cir. 2019) .................................................. 8, 9

United States v. Martoma, 894 F.3d 64 (2d Cir. 2017) ................................................. 8

United States v. Monica, 295 F.2d 400 (2d Cir. 1961).................................................... 8

United States v. Murgio, 209 F. Supp.3d 698 (S.D.N.Y) ................................................ 17

United States v. Pugh, 945 F.3d 9 (2d Cir. 2019) ................................................... 9

United States v. Rosa, 17 F.3d 1531 (2d Cir. 1994) ................................................... 9

United States v. Stetkiw, No. 18-20579, 2019 WL 417404, at *1 (E.D. Mich. Feb. 1, 2019) ..... 18

United States v. Talebnejad, 460 F.3d 563 (4th Cir. 2006) ........................................... 17

United States v. Velastegui, 199 F.3d 590 (2d Cir. 1999)................................................ 16, 17

Weaver v. Graham, 450 U.S. 24 (1981) ............................................................... 12

**STATUTES**

18 U.S.C. § 1956(a)(3)(B) ......................................................................... 1, 2

18 U.S.C. § 1960.......................................................................... 1, 3, 2, 10, 11, 12, 17

31 U.S.C. § 310(b)(2) .............................................................................. 13

31 U.S.C. § 5330.............................................................................. 13, 20

31 U.S.C. §§ 321(b), 5318 ......................................................................... 13

New York Banking Law § 641 ....................................................................... 12

A-968

**REGULATIONS**

31 C.F.R. § 1010.100(ff)(5)(i) ........................................................................ 14, 15, 16, 17

31 C.F.R. § 1022.380(a)(1) ................................................................................. 13

Dep't of the Treasury FinCEN, *Guidance on the Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies*, FIN-2013-G001 (March 17, 2013)..................................................................................................................17

Dep't of the Treasury FinCEN Guidance, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001, at 13–14 (May 9, 2019) .................................................................................................................. 17

Treasury Order 180-01, Financial Crimes Enforcement Network, 67 Fed. Reg. 64697-01 (Oct. 21, 2002) ........................................................................................................ 13

William M. (Mac) Thornberry National Defense Authorization Act of 2021, Pub. L. No. 116-283, 134 Stat. 3388, 4552–53 (Jan. 1, 2021) ........................................................ 12

A-969

The government respectfully submits this memorandum of law in opposition to the defendant's post-trial motion for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29").

## PRELIMINARY STATEMENT

On October 18, 2022, following a week-long trial, a jury convicted the defendant Mustafa Goklu of money laundering, in violation of 18 U.S.C. § 1956(a)(3)(B), and operation of an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960(a).  The defendant now moves under Rule 29 for the Court to overturn the jury's guilty verdict as to the 18 U.S.C. § 1960(a) charge based on his assertion that the government failed to prove that the business the defendant operated qualified as a money transmitting business.  The defendant's motion relies on a faulty legal premise and ignores significant inculpatory evidence and reasonable inferences that the jury could have drawn from such evidence.  Accordingly, the Court should deny the defendant's motion and the jury's verdict as to the 18 U.S.C. § 1960(a) charge should stand.

## BACKGROUND[1]

I.    Relevant Procedural Background

On October 28, 2020, a grand jury sitting in the Eastern District of New York returned a Superseding Indictment (the "Indictment") charging the defendant with: (1) money laundering, in violation of 18 U.S.C. § 1956(a)(3)(B) (Count One) and (2) operation of an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960(a) (Count Two).  See ECF No. 28.

---

[1] References to the trial transcript are referred to as "Tr." References to government exhibits admitted at trial are referred to as "GX."

1

A-970

Jury selection began on October 3, 2022.  The government presented its case-in-chief on October 3, 4, and 6, 2022.  At the close of the government's case, defense counsel made a Rule 29 motion, which Your Honor denied.  See Oct. 6, 2022 Tr. 484:22-489:15.  The defendant did not present a case.  See id. 493:13-14.  On October 7, 2022, Your Honor submitted the case to the jury following summations by the parties and the jury charge.  See Oct. 7. 2022 Tr. 643:6-8.  On October 11, 2022, the jury unanimously found the defendant guilty on both counts of the Indictment.  See ECF No. 72.

II.    The Government's Case as to Count Two

Because the defendant challenges the sufficiency of the evidence as to only Count Two, the government sets forth the central evidence supporting this charge below.[2]

Count Two of the Indictment alleged that between August 28, 2018 and April 30, 2019, the defendant knowingly and intentionally conducted, controlled, managed, supervised, directed and owned all and part of an unlicensed money transmitting business affecting interstate and foreign commerce; in particular, a digital currency exchange business which operated without an appropriate money transmitting license in the State of New York and which failed to comply with federal money transmitting registration requirements.  ECF No. 28.

In order to prove a violation of 18 U.S.C. § 1960(a), the government was required to establish that the defendant (1) knowingly controlled, conducted, managed, supervised, directed, or owned all or part of a money transmitting business; (2) that either the money transmitting business was not licensed, and operated in a state where the business was required to be licensed,

---

[2]    During its case-in-chief, the government introduced testimony from five witnesses and admitted more than 100 exhibits.  The evidence cited herein is only a summary of certain evidence supporting the relevant counts and does not include all the trial evidence that supported these counts.

2

A-971

or the business failed to register as required with the Secretary of Treasury; and (3) the money transmitting business affected interstate or foreign commerce.  See Oct. 7, 2022 Tr. 632:6-13.[3]

At trial, the government presented substantial evidence of all three requisite elements.  The evidence included, among other things, witness testimony; business records; audio recordings of some of the defendant's transactions; cryptocurrency transfer records; photographs of U.S. currency provided by the defendant; the defendant's encrypted communications with past, current, and prospective digital currency exchange customers; an electronic money counter; and records confirming the results of official searches conducted by relevant New York State and federal authorities.

The evidence collectively established that during the charged time period, the defendant owned and operated a peer-to-peer digital currency exchange business.  The defendant advertised his business under the name "Mustangy" on localBitcoins.com, where he offered to meet up with customers in person at various locations in New York and New Jersey and exchange up to $99,999 worth of Bitcoins ("BTC")[4] into U.S. currency for a fee.  GX 401.  The defendant also offered to exchange large sums of U.S. currency into Bitcoin for a fee.  See id.[5]

---

[3] The defendant agreed that these elements are the proper elements of a 18 U.S.C. § 1960(a) charge.  See, e.g., ECF Nos. 58 & 61.

[4] Bitcoin is a digital currency (also known as cryptocurrency) that can be used as a substitute for fiat currency (i.e., currency created and regulated by a government).  See Oct. 3, 2022 Tr. 212:14-24.  Bitcoin transactions are recorded on a public ledger called the block chain, which is accessible via an internet connection.  See id. at 217:9-13.

[5] Individuals can acquire Bitcoin in a number of ways, including through a centralized or commercial exchange, such as Coinbase, or through a peer-to-peer exchange, such as the service the defendant offered.  See Oct. 3, 2022 Tr. 218:20 – 219:4.  Commercial exchanges typically have an identity verification process, which requires users to provide a driver's license, social security number, date of birth, real name, and proof of address.  See id. 219:13-21.  By contrast,

3

A-972

Business records admitted during trial established that the defendant was the owner and operator of his digital currency exchange business.  Among other things, the defendant formally incorporated his business into a corporation under New York Law, Mustangy Corp. USA. GX 104.  The defendant received mail for the business at his apartment in Sunnyside, Queens and listed himself as the president of Mustangy Corp. USA on official paperwork.  See, e.g., GX 217 & 715.  The defendant also maintained a corporate bank account for Mustangy Corp. USA.  GX 763.

Evidence presented at trial also revealed that the defendant's business had a robust client base.  One of the defendant's customers was an undercover agent with the Drug Enforcement Administration ("DEA") (the "UC").  From August 2018 through April 2019, the defendant met up with the UC on seven occasions, during which he exchanged $133,190 worth of Bitcoin into cash though six separate transactions.[6]  See GX 501 – 505, 801 – 804, 806, 807, 809, 1101.  The transactions all took place in the defendant's parked Mercedes-Benz at various locations in Manhattan and Queens, New York.  See id.  During each transaction, the UC transferred Bitcoin from the UC's cryptocurrency wallet to the defendant's cryptocurrency wallet[7], after which the

_____

many peer-to-peer exchanges do not require users to provide identifying information.  See id. 222:21-223:4.

[6] During the seventh meeting on April 30, 2019, the defendant was in the middle of exchanging approximately $50,000 worth of Bitcoin, and had offered to exchange $20,000 more, but he was arrested before he completed the transaction.  See GX 809.

[7] The UC testified that he "would open up [his] cryptocurrency wallet" and "[t]he defendant would open up his cryptocurrency wallet and his QR code," after which the UC "would pull up the amount [he] wanted to send to [the defendant's] QR code and that would populate the recipient's address in [his] phone."  Oct. 3, 2022 Tr. 281:2-7.  The UC then hit "send" and the Bitcoin would be transferred to the defendant's Bitcoin address through the blockchain.  Id. 281:6-7.

4

A-973

defendant retained a seven or eight percent commission fee, used an electronic money counter to count the remaining amount in cash, and provided the cash to the UC.  See id.  The UC audio recorded the transactions.[8]  GX 801 – 804, 806, 807, 809.

In addition to the UC, the defendant's business had dozens of other customers.  The defendant mentioned some of his other customers to the UC during their recorded transactions and in encrypted communications.  See, e.g., GX 906 ("There was somebody who took 50,000 for 10" […] "This guy keeps buying from me.  He's asking 10K so, no money."); GX 505 ("I have 8% guy ready will give him if you don't want it.").  The defendant also exchanged encrypted messages with his current and prospective customers, some of which the government admitted into evidence at trial.  GX 228.  In the messages, the defendant and his customers discussed past, ongoing, and future Bitcoin transactions.  Id.  The defendant completed many of the transactions in a similar manner and during the same general timeframe as his transactions with the UC.  Id.

Evidence presented during the trial demonstrated that the defendant obtained the funds that he used to carry out his Bitcoin exchanges from a variety of sources.  For example, the defendant obtained some of the money from his business partner—a man based in the Hamptons who also exchanged Bitcoin for U.S. currency.  See, e.g., GX 903 ("My partner is in judgment ... [t]hey caught him 50K … they weren't tracking for Bitcoins, they were tracking some idiot guy who buys and sells trugs'"); GX 907 ("He has the money. I have a lot of money with him." […] But usually he is in Hamptons … But these three or two days I keep texting him, 'Hey, bring money, bring money, bring money.'").  The defendant also obtained funds by transferring money

---

[8] As a result of technical issues, the audio recording for the September 21, 2018 transaction ended prematurely after the UC and the defendant exchanged greetings.  See Oct. 4, 2022 Tr. 296:8-13.

5

A-974

from his other accounts, some of which were located in Turkey.  See GX 803 ("I can give you some more tomorrow because bank is getting pissed when you withdraw … too much."); GX 806 (stating the defendant got the cash he gave the UC "from the Bank of America yesterday" and explaining, "I usually buy on the exchange in Turkey and transfer money to here … I have money in Turkey, if I withdraw that, it's going to take two or three days at least.").  Finally, the defendant obtained some of the cash that he used to buy Bitcoin from his sale of Bitcoin to other customers.  See, e.g., GX 909 ("UC: Where do you get all this cash?  Goklu:  I have a guy who takes Bitcoins only").  Former DEA Special Agent Allan Liefke testified that he observed one instance where this occurred during his surveillance of the defendant in January 2019.   Oct. 6, 2022 Tr. 425:4-13.  Specifically, Mr. Liefke testified that he observed the defendant meet up with a woman in Manhattan who had "what looked to be a weighted bag" containing U.S. currency, and that after the defendant and the woman parted ways, the defendant subsequently "advised the undercover agent that he had $25,000 to do a deal the next day."  Id.

During the trial, representatives of state and federal authorities testified that, based on their training and experience, a digital currency exchange business, such as the business the defendant operated, qualified as a money transmitting business under both New York State and federal laws and regulations.  Robert Tarwacki, a criminal investigator at the New York State Department of Financial Services, testified that the licensing requirements to engage in the business of transmitting money in the State of New York applied to individuals engaged in the exchange of cryptocurrency for cash.  Oct. 6, 2022 Tr. 459:7-23.   He further testified that individuals who engage in a business of exchanging Bitcoin for cash for a fee in New York State are required to obtain a license.  Id. 459:24-460:13.  Theodore Vlahakis, a compliance officer at the U.S. Department of Treasury Financial Crimes Enforcement Network ("FinCEN"), likewise

A-975

testified that a digital currency exchange business qualified as a money transmitter under federal laws and regulations. Id. 466:8 – 482:6. Specifically, Mr. Vlahakis stated that a money transmitter "is an entity that is engaged in money transmission. And money transmission is defined as the acceptance of currency[,] funds, or its equivalent from one person [or location] and the transmission of the currency[,] funds, or its equivalent to another person or location by any means," and specified that the definition included "somebody that engages in the business of exchanging cryptocurrency, specifically Bitcoin, for cash." Id. 469:8-15.

Mr. Tarwacki and Mr. Vlahakis additionally testified respectively that the defendant never obtained a license from the State of New York or registered his business with the U.S. Department of Treasury as required by law. Oct. 6, 2022 463:9 – 464:7, 479:17 – 482:2; see also GX 101 – 103.

<u>ARGUMENT</u>

I.    <u>The Court Should Deny the Defendant's Motion for a Judgment of Acquittal on Count Two</u>

The defendant moves under Rule 29 for the Court to overturn the jury's unanimous verdict and enter a judgment of acquittal on Count Two, contending that the government's evidence was insufficient on this count as a matter of law. As set forth below, the defendant misstates the relevant law. Moreover, he ignores significant evidence and reasonable inferences that the jury was permitted to draw from that evidence. Contrary to the defendant's contentions, the jury's verdict as to Count Two was well supported by the trial evidence, and the defendant's motion should be denied.

A.    <u>Applicable Law</u>

"If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal pursuant to Federal Rule of Criminal Procedure 29(c), but it may do so only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a

7

A-976

reasonable doubt." United States v. White, 7 F.4th 90, 98 (2d Cir. 2021) (internal quotation marks omitted). "A conviction must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," and the evidence must be viewed "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." Id. (internal quotation marks omitted) (emphasis in original). "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (quoting United States v. White, 673 F.2d 299, 301 (10th Cir. 1982)).

Thus, a defendant challenging a jury's guilty verdict "bears a heavy burden." United States v. Martoma, 894 F.3d 64, 72 (2d Cir. 2017), cert. denied, 139 S. Ct. 2665 (2019) (internal quotation marks omitted). In assessing a Rule 29 motion under this standard, a reviewing court must consider the evidence as a whole, not in isolation. United States v. Klein, 913 F.3d 73, 78 (2d Cir. 2019). This is so because "each fact may gain color from others." Guadagna, 183 F.3d at 130 (citing United States v. Monica, 295 F.2d 400, 401 (2d Cir. 1961)).

In addition to resolving any issue regarding witness credibility in the government's favor, the Court must leave to the jury the task of choosing among permissible competing inferences that can be drawn from the evidence. See, e.g., United States v. Pugh, 945 F.3d 9, 19 (2d Cir. 2019). In deciding which inferences to draw, the jury is entitled to use its common sense, Klein, 913 F.3d) at 79, and "[t]he fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences not drawn were not available or were not reasonable," United States v. Rosa, 17 F.3d 1531, 1542 (2d Cir. 1994).

8

A-977

B.    The Trial Evidence Proved Beyond a Reasonable Doubt that the Defendant is Guilty of Operating an Unlicensed Money Transmitting Business as Charged in <u>Count Two</u>

In his motion, the defendant does not dispute that he owned and controlled a peer-to-peer digital currency exchange business, that he did not license his business with New York State authorities or register his business with the Unite States Secretary of Treasury, and that his business affected interstate and foreign commerce. <u>See</u> Def. Mot. The defendant limits his motion to a single argument: that his digital currency exchange business did not qualify as a money transmitting business because exchanging Bitcoin for cash does not constitute "transmitting" currency or funds. Def. Mot. at 2-3.[9] The defendant is incorrect.

1.    Relevant Statutes and Regulations Establish that A Digital Currency <u>Exchange Business Is a Money Transmitting Business</u>

Title 18, United States Code, Section 1960 establishes criminal liability for anyone who "knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business." 18 U.S.C. § 1960(a). Section 1960 broadly defines the term "money transmitting" to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." 18 U.S.C. § 1960(b)(2). The statute states that a business is an "unlicensed money transmitting business" if it is "a money transmitting business which affects interstate or foreign commerce in any matter or degree," 18 U.S.C. § 1960(b)(1), and

A.    "is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under state law;"

B.    fails to comply with the "registration requirements under section 5330 of Title 31, United States Code, or regulations prescribed under such section;"

---

[9] The defendant does not dispute that Bitcoin qualify as "funds" under the unlicensed money transmitting statute. <u>See</u> Oct. 6, 2022 Tr. at 349:2-9.

9

A-978

C.  "otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity."

18 U.S.C. § 1960(b)(1)(A), (B) & (C).

"In order to be guilty of a violation of Section 1960 . . . an entity must first, as a prerequisite, be a business that engages in 'money transmitting' as so defined in Section 1960(b)(2)," and "in addition . . . a defendant must also either operate without a state license, fail to comply with the registration requirements of Section 5330, or otherwise transmit funds that the defendant knows were derived from or intended to support an unlawful activity."  United States v. E-Gold, Ltd, 550 F. Supp. 2d 82, 90 (D.D.C. 2008); see also United States v. Budovsky, No. 13 Cr. 368 (DLC), 2015 WL 5602853, at *6 (S.D.N.Y. Sept. 23, 2015) (describing statutory scheme of Section 1960).

The Indictment charged the defendant under the (A) and (B) provisions of 18 U.S.C. § 1960(b)(1), and asserted that he failed to adhere to the state licensing and federal registration requirements.  The (A) provision of 18 U.S.C. § 1960(b)(1) relies on the application of New York State law, which provides, in relevant part, that "[n]o person shall . . . engage in the business of receiving money for transmission or transmitting the same, without a license."  New York Banking Law § 641.

The (B) provision of 18 U.S.C. § 1960(b)(1) refers expressly to 31 U.S.C. § 5330, the Bank Secrecy Act ("BSA"), which provided at the time of the offense conduct:

(1)  Money transmitting business.—The term "money transmitting business" means any business other than the United States Postal Service which—

(A) provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments *or any other person who engages as a business in the transmission of funds, including any person who engages as*

10

A-979

> *a business in an informal money transfer system* or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system;
>
> […]
>
> (2)  Money transmitting service.—The term "money transmitting service" includes accepting currency or funds denominated in the currency of any country and transmitting the currency or funds, or the value of the currency or funds, *by any means* through a financial agency or institution, a Federal reserve bank or other facility of the Board of Governors of the Federal Reserve System, or an electronic funds transfer network.

31 U.S.C. § 5330(d) (2017) (emphasis added).[10]  Money transmitting businesses are required to register with the Secretary of the Treasury. 31 U.S.C. § 5330(a).

The Secretary of the Treasury is authorized by Congress to promulgate regulations under the BSA and to delegate duties and powers within the Treasury Department.  See 31 U.S.C. §§ 321(b), 5318.  One of the regulations prescribed under § 5330 is 31 C.F.R. § 1022.380, which requires "money services businesses" ("MSBs") to "register with FinCEN," a division of the Treasury Department. 31 C.F.R. § 1022.380(a)(1); see Treasury Order 180-01, Financial Crimes Enforcement Network, 67 Fed. Reg. 64697-01 (Oct. 21, 2002) (delegating authority to administer the BSA to FinCEN).  See also 31 U.S.C. § 310(b)(2) (delineating the duties and powers of the Director of FinCEN).  Subsection (e) of that regulation is explicit that 18 U.S.C. § 1960 is "a

---

[10] The statute was recently amended to import certain regulatory definitions into the statute. See the William M. (Mac) Thornberry National Defense Authorization Act of 2021, Pub. L. No. 116-283, 134 Stat. 3388, 4552–53 (Jan. 1, 2021).  18 U.S.C. § 1960 refers expressly to violation of the regulations prescribed under § 5330; accordingly, the amendment does not affect the legality of the defendant's conduct or present any ex post facto concerns in this case. See Weaver v. Graham, 450 U.S. 24, 29 (1981); Kyles v. Chester, 457 F. App'x 780, 783 (10th Cir. 2012); United States v. Delco Wire & Cable Co., 772 F. Supp. 1511, 1515 (E.D. Pa. 1991). Operating an unregistered Bitcoin exchanger was a crime pursuant to 18 U.S.C. § 1960(a) in 2018 and 2019, and it remains illegal today.  For clarity, the government addresses the operative statute and regulations at the time of the offense conduct in 2018 and 2019.

A-980

criminal penalty for failure to comply with the registration requirements of 31 U.S.C. § 5330 or this section." Further, "[m]oney services business" is defined in the regulations as including a "[m]oney transmitter." 31 C.F.R. § 1010.100(ff)(5).

A "[m]oney transmitter" is:

(A) A person that provides money transmission services. The term "money transmission services" means the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency *to another location or person by any means*. "Any means" includes, but is not limited to, through a financial agency or institution; a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System, or both; an electronic funds transfer network; or *an informal value transfer system*; or

(B) *Any other person engaged in the transfer of funds.*

31 C.F.R. § 1010.100(ff)(5)(i) (emphasis added).

While these provisions contain multiple definitions related to "money transmitting," courts have generally construed them together, and broadly. See United States v. Banki, 685 F.3d 99, 113 (2d Cir. 2012) ("Section 1960 defines 'money transmitting' broadly[.]"); United States v. Harmon, 474 F. Supp. 3d 76, 101 (D.D.C. 2020) ("'[M]oney transmitting[]' . . . is broadly defined at § 1960(b)(2)." (first alteration in original)); United States v. $215,587.22 in United States Currency, 306 F. Supp. 3d 213, 219 (D.D.C. 2018) (noting that "[c]ourts have broadly construed the definition of both a 'money transmitting business' and a 'financial institution'"); United States v. E-Gold, Ltd., 550 F. Supp. 2d 82, 92 n.10 (D.D.C. 2008)("[T]here is virtually no substantive difference, nor did Congress intend there to be a substantive difference, between the terms 'money transmitting' in Section 1960 and 'money transmitting business' in Section 5330."); id. at 96 (citing statutory language as well as legislative history to confirm "the inclusiveness of the term 'money transmitting business' under Section 5330").

12

A-981

2.    The Government Proved the Defendant Operated a Money Transmitting Business

The government provided ample evidence at trial from which the jury could infer that the defendant operated a business engaged in money transmitting.  The defendant's business activities clearly qualify him as a "money transmitter" because there is no dispute that the defendant's business transferred Bitcoin in exchange for cash and cash in exchange for Bitcoin, and therefore engaged in "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means," including through "an informal value transfer system."  31 C.F.R. § 1010.100(ff)(5)(i).  As FinCEN stated in its 2013 guidance, "an administrator or exchanger [of virtual currency] is an MSB under FinCEN's regulations, specifically, a money transmitter, unless a limitation to or exemption from the definition applies to the person."  Dep't of the Treasury FinCEN, *Guidance on the Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies*, FIN-2013-G001 (March 17, 2013) (hereinafter "2013 FinCEN Guidance"), at 4; see also 31 C.F.R. § 1010.100(ff)(5)(i); 18 U.S.C. § 1960(b)(2) ("'[M]oney transmitting' includes transferring funds on behalf of the public by any and all means . . ."); 31 U.S.C. § 5330(d) (2017) (money transmitting can include transferring).

The operative phrase is transmission "to another location or person by any means." 31 C.F.R. § 1010.100(ff)(5)(i).  In furtherance of his business, the defendant necessarily transferred funds to other locations and people.  As FinCEN and the Harmon court, among others, have recognized, and as Special Agent Lilita Infante of the DEA testified at trial, Bitcoin is held at an "address" on the blockchain, somewhat akin to an account, and digital currency exchangers like

13

A-982

the defendant send the Bitcoin to a different blockchain address as part of every transaction. 474 F. Supp. 3d at 103–09 ("FinCEN's analysis implicitly rejects defendant's position that the Bitcoin blockchain is a single location such that transfer between addresses on the blockchain is not transmission between locations. FinCEN's position is persuasive."); see also Oct. 3, 2022 Tr. 217:9–13. Accordingly, the transfer of Bitcoin from one address to another constitutes a means of transmission "to another location." And where a different person controls the receiving address, the same transaction can be said to transfer the Bitcoin "to another . . . person." See, e.g., Harmon, 474 F. Supp. 3d at 103 ("[C]ourts in other criminal cases have held that § 1960(b)(1)(B) reaches unlicensed operations reaping a commission from exchanging traditional for digital currency."); id. at 104 (rejecting argument that exchanging was not transmission because moving Bitcoin between addresses amounted to "transmission between locations" and sending Bitcoin to another person was "transmission between parties").

Department of Treasury guidance codifies this broad interpretation of a transmission of funds "to another location or person by any means." 31 C.F.R. § 1010.100(ff)(5)(i). "[A] person is an exchanger and a money transmitter if the person accepts such de-centralized convertible virtual currency from one person and transmits it to another person as part of the acceptance and transfer of currency, funds, or other value that substitutes for currency." 2013 FinCEN Guidance, at 5; accord Dep't of the Treasury FinCEN Guidance, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001, at 13–14 (May 9, 2019) (hereinafter "2019 FinCEN Guidance"), *available at* https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf (stating that "[t]he 2013 VC Guidance also clarified that FinCEN interprets the term 'another location' broadly" to include

14

A-983

"transmission from [a] person's account at one location (e.g., a user's real currency account at a bank) to the [same] person's [Convertible Virtual Currency (CVC)] account with the exchanger");[11] see also United States v. Faiella, 39 F. Supp. 3d 544, 546-47 (S.D.N.Y. 2014) (observing that the defendant who ran a virtual currency exchange "clearly qualifie[d] as a 'money transmitter' for purposes of Section 1960" as FinCEN "issued guidance specifically clarifying that virtual currency exchangers constitute 'money transmitters' under its regulations.").

This conclusion also consistent with the trial testimony of representatives from FinCEN and the New York State Department of Financial Services, who both stated that exchanging Bitcoin for cash constituted money transmitting under New York State and federal law. See Oct. 6, 2022 Tr. at 468:18–469:17; Id. at 459:7–460:13.

Accordingly, the defendant's direct Bitcoin exchange transactions with the UC and his other customers all involved the requisite movement of money from one location to another to qualify as the transmission of money.

The cases cited by the defendant do not yield a different conclusion. See Def. Mot. at 3–5. The defendant primarily relies on two cases, United States v. Velastegui, 199 F.3d 590, 592 (2d Cir. 1999), and United States v. Banki, 685 F. 3d. 99 (2d Cir. 2012), to support the defendant's narrow construction of the term "money transmitting business." In Velastegui, the Court stated, as general background, "[a] money transmitting business receives money from a customer and then, for a fee paid by the customer, transmits that money to a recipient in a place

_____

[11] Although the 2019 FinCEN Guidance post-dates the offense conduct here, it expressly did "not establish any new regulatory expectations or requirements. Rather, it consolidate[d] current FinCEN regulations, and related administrative rulings and guidance issued since 2011, and then applie[d] these rules and interpretations to other common business models involving CVC engaging in the same underlying patterns of activity." Id. at 1.

15

A-984

that the customer designates, usually a foreign country." In Banki, the Court recited the same description of a "money transmitting business," citing Velastegui. 685 F. 3d. 113. In both cases, the Court did not consider the issue of whether certain actions undertaken by the defendants constituted transmissions of money or funds. The Court also did not cite any statutory authority for its description of a "money transmitting business" or otherwise suggest the description was intended to be exclusive or carry precedential weight; to the contrary, the use of the word "usually" indicated that the Court was merely giving an example for explanatory purposes. Furthermore, both Valastegui and Banki predated the use of digital currency exchange services. Accordingly, the Court in both cases had no opportunity to consider the effect of its language on transactions in which Bitcoin is transferred from one crypto-currency wallet to another and paid for in cash.[12][13]

Indeed, courts that have considered the issue of whether exchanging digital currency for cash constitutes transferring funds have rejected the defendant's position. For example, in United States v. Stetkiw, No. 18-20579, 2019 WL 417404, at *1 (E.D. Mich. Feb. 1, 2019), the Court addressed a case similar to the defendant's where "a typical Bitcoin purchase

---

[12] The defendant's citations to United States v. Talebnejad, 460 F.3d 563, 565 (4th Cir. 2006) and United Staets v. Singh, 995 F.3d 1069, 1077 (9th Cir. 2021) are likewise inapposite because, like Banki those cases cite to the same description of a money transmitting business set forth in Velastegui without ever considering the issue of whether the exchange of digital currency for cash constitutes a transfer of funds.

[13] The defendant also cites to cites to United States v. Murgio, 209 F. Supp.3d 698 (S.D.N.Y) in support of his position, noting that the Court on a motion to dismiss observed that "'both parties acknowledge[d]' that transmission of Bitcoins 'to another location or person for its customers' would establish a business as a money transmitting business, and the government argued that defendant's company "did more than just sell Bitcoins 'to customers in two-party transactions.'" Id. at 711. However, neither the government nor the Court in Murgio ever stated that selling Bitcoins to customers in a two-party transaction would not constitute money transmitting.

16

A-985

from [the defendant] involved [the defendant] electronically transferring the Bitcoins to the purchaser's Bitcoin address or account after the purchaser pa[id] [the defendant] the value of the Bitcoins plus a commission/fee" and held that such conduct fell "within the plain meaning of 'transferring funds on behalf of the public *by any and all means*,' such that [the defendant's] Bitcoin transactions            constitute[d]            'money transmitting' under 18 U.S.C. § 1960(b)(2)." 2019 WL 417404, at *2 (emphasis in original). The Court further noted that its holding was consistent with guidance promulgated by FinCEN. Id.

In sum, the defendant in advocating for his position misreads the plain language of 18 U.S.C. § 1960, 31 U.S.C. 5330 and FinCEN's 2013 interpretative guidance,[14] which make clear that a business that offers digital currency exchange services constitutes a money transmitting business under 18 U.S.C. § 1960(b)(2).

Finally, even if the Court were to conclude that isolated two-party Bitcoin exchanges were insufficient to constitute transmissions of funds, the trial record nonetheless reflects myriad examples of ways in which the defendant's business still transmitted funds within the meaning of the statute by moving both Bitcoin and cash in sequential transfers from their sources to his customers. Every transaction that the defendant completed required the movement of both Bitcoin and cash to and from multiple different locations and/or persons. For example, the government presented evidence that the defendant undertook the following acts which all required transfers of funds:

---

[14] The defendant also cites a page on FinCEN's website that lists "money transmitting business" separate from "currency dealer or exchanger." Def. Mot. at 3 (citing https://www.fincen.gov/money-services-business-definition). However, the web page does not support the defendant's position, particularly as it specifies that a money services business "includes any person doing business… *in one or more* of the following capacities."

17

A-986

- transmitted U.S. currency from various bank accounts and used those funds to purchase Bitcoin from customers, see, e.g., GX 803 (discussing transfers of funds from bank accounts); GX 806 (discussing transferring funds from a Bank of America account and accounts in Turkey);

- transmitted Bitcoin from online exchanges to his cryptocurrency wallet prior to transmitting it onward to his customers' cryptocurrency wallets, see, e.g., GX 228 at 77-78 (discussing pulling cryptocurrency out of Bitfinex, an online digital currency exchange, to fund a transaction);

- obtained cash from his partner to purchase Bitcoin from customers, see, e.g., Oct. 6, 2022 Tr. at 356:16-23, GX 909 (discussing obtaining money from business partner in the Hamptons); and

- received cash from customers from the sale of Bitcoin and subsequently used that cash to purchase Bitcoin from other customers, see, e.g., Oct. 6, 2022 Tr. at 425:4-13; GX 909 (discussing obtaining cash from a customer who "takes Bitcoins only"); see generally GX 228.

The facts established at trial show that the defendant regularly completed multiple transfers of both Bitcoin and U.S. currency to support his two-party Bitcoin exchange business. Each of these transfers involved a different location (i.e., a different Bitcoin address on the blockchain, or a different bank account) and/or a different person. Consequently, the defendant's business was engaged in transmitting funds.

The government presented ample evidence for a reasonable jury to find Goklu guilty under 18 U.S.C. § 1960(a). The defendant's motion to overturn the guilty verdict on Count Two should be denied.

18

A-987

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully submits that the Court should deny the defendant's post-trial motion for a judgment of acquittal as to Count Two.

Dated:    Brooklyn, New York
             December 5, 2022

                                           Respectfully submitted,

                                           BREON PEACE
                                         UNITED STATES ATTORNEY
                                         Eastern District of New York
                                         271 Cadman Plaza East
                                         Brooklyn, New York 11201

By:         _____/s/_____
                    Gillian A. Kassner
                    Marietou E. Diouf
                    Assistant United States Attorneys
                    (718) 254-7000

A-988

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | REPLY AFFIRMATION |
| -against- | : | IND. NO. 19-CR-386 (PKC) |
| MUSTAFA GOKLU, | : | |
| Defendant. | : | |

----------------------------------------------------------------x

     MURRAY E. SINGER, an attorney duly admitted to practice law in the Eastern District of New York, affirms under penalty of perjury as follows:

     1.  I, along with Emilee Sahli, am the attorney of record for the defendant, Mustafa Goklu. As such I am fully familiar with the facts of this case.

     2.  This Reply Affirmation is made in response to the prosecution's response, dated December 5, 2022, opposing defendant's Motion for a Judgment of Acquittal pursuant to F.R.C.P. Rule 29.

     3. The prosecution disagrees with the definition of a "money transmitting business" provided by the Second Circuit, and adopted by two other Circuits.  They dismiss the Second Circuit's decision as lacking "statutory authority" or "precedential weight".  What they fail to provide is any appellate authority to support the expansive definition of "money transmitting business" they are asking this Court to adopt.  Because there is none.  Instead, the prosecution states that "courts" (plural) have rejected the defendant's position, and then cite to but a single District Court case from the Eastern District of Michigan that was never considered on appeal.

1

A-989

4. Nor does the prosecution point to a single transaction by Mr. Goklu where he accepted currency for *transfer*. As stated in our motion, Mr. Goklu's receipt of bitcoin cannot both be *for transfer* and constitute the transfer itself. To merge the two, we submit, would be contrary both to the law as discussed in our motion, and to a natural understanding of the language.

5. Defendant now seeks a Judgment of Acquittal as to count two pursuant to Rule 29 of the Federal Rules of Criminal Procedure for the reasons set forth above and in our motion dated November 10, 2022.

Dated: Port Washington, New York
        December 12, 2022

_____/s/_____
MURRAY E. SINGER

2

A-990

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA

        - against -

MUSTAFA GOKLU, a/k/a MUSTANGY,

              Defendant.

-------------------------------------------------------x

<u>**MEMORANDUM & ORDER**</u>
19-CR-386 (PKC)

PAMELA K. CHEN, United States District Judge:

      On October 28, 2020, Defendant Mustafa Goklu, a/k/a Mustangy, was indicted in a two-count Superseding (S-1) Indictment ("Indictment") on charges of money laundering and operating an unlicensed money transmitting business, in violation of 18 U.S.C. § 1956(a)(3)(B) and § 1960(a), respectively.  (Dkt. 28.)  He was convicted of both counts following a jury trial, and now moves under the Federal Rule of Criminal Procedure 29 for acquittal on the charge of operating an unlicensed money transmitting business in Count Two of the Indictment.  (*See* Dkt. 77.)  In reality, however, Defendant's motion does not challenge the sufficiency of evidence introduced at trial, but instead challenges the Court's instructions to the jury on the elements of the Section 1960(a) violation that he was convicted of in Count Two.  The Court accordingly denies Defendant's motion as procedurally improper.

## BACKGROUND

**I.    Procedural History**

      On October 28, 2020, Defendant was charged with money laundering in violation of 18 U.S.C. § 1956(a)(3)(B) (Count One), and the operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a) (Count Two), to both of which he pleaded not guilty. (Dkt. 28; 11/12/2020 Docket Entry.)  In sum and substance, the Indictment alleged that between 2018 and 2019, Defendant engaged in a series of transactions converting cryptocurrencies,

1

A-991

including Bitcoin that an undercover agent represented to Defendant were narcotics-trafficking proceeds, into United States dollars. (*See generally* Dkts. 1, 28.)

Trial took place between October 3 and 11, 2022. (Dkts. 78–81.) As to Count Two of the Indictment, the Court instructed the jury, in relevant part, that: "'[a] money transmitting business' is a business which, for a fee, accepts currency, funds, or value that substitutes for currency for transfer within or outside the United States." (Dkt. 71, at 23; *see also* Def.'s Proposed Jury Instr., Dkt. 58, at 5 ("A 'money transmitting business' is a business that, for a fee, accepts currency for transfer within or outside the United States.").)[1]  Notably, neither in the parties' proposed requests to charge nor at the charge conference was there any discussion about the meaning of the term "transfer[]" in 18 U.S.C. § 1960(b)(2).[2]

During summations, however, defense counsel Murray E. Singer made the following argument to the jury regarding Count Two:

> **Mr. Singer**: On the money transferring business, *this is a matter of the language* and I'm going to encourage you folks to listen carefully to the Judge as she gives the language of this charge and you're going to have the written charge with you in the jury room and you can look at the language as well. ["]A money transmitting business is a business which for a fee accepts currency for transfer.["]  That's the language that you're being given.  And I submit to you under that definition that the [J]udge is giving to you and it's included in the instruction that Mr. Goklu is not operating a money transmitting business, that he is not -- that the evidence does not prove beyond a reasonable doubt that *he is accepting currency for transfer. . .*

---

[1] This instruction was based on the parties' proposed requests to charge (Dkts. 56, 58) and following the charge conference held on October 6, 2022, at which the parties were permitted to make objections or proposals regarding the jury instructions, and to present arguments about the same. (*See* Dkt. 80, at 494–532.)

[2] The statute reads: "[T]he term 'money transmitting' includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier[.]"

2

A-992

.[3] So folks I encourage you with regard to the second count, read that legal language, read it.

(Dkt. 81, at 572:11–23, 575:5–6 (emphases added).)   The Court excused the jury before the

Government's rebuttal argument to address an issue with the defense:

> **The Court**:  The reason I wanted to take a break before the rebuttal is I'm a little concerned, Mr. Singer, about the argument you made about the money transmitting charge.  You specifically told the jurors to pay attention to the jury charge regarding the meaning of transfer.  Now my concern is that you are suggesting some legal argument that quite honestly should have been raised, I think, during a motion to dismiss long before the trial, or during the jury charge conference because you are suggesting to the jury that what the Government alleges was illegal money transmitting, which is the exchange of Bitcoin for cash[,] doesn't qualify as transferring funds or transmitting.  And I have not heard that argument from you before, nor did we address it in the charges that I'm going to give.[4]

(*Id.* at 576:23–577:11.)

In response to defense counsel's claim that he had not been making a legal argument to the

jury about the meaning of transfer and that he had not "highlight[ed] the word transfer" (*id.* at

582), the Court engaged in the following exchange with defense counsel:

> **The Court**: [reading from the defense summation] ["]Accepting currency for transfer.["]  That's what I heard that made me think it's got to be literally . . . transferred to someone else.  In other words, the Government's theory is he accepted Bitcoin which is currency for transfer to someone, like Western Union which you did refer to, as I recall.  That is a misleading statement about the law and so the Government ought to be able to say to the jury, to the extent that you are thinking . . . that Mr. Goklu then had to take the Bitcoin and give it to someone else or that the customer had to take the cash and give it to someone else, that is not what's required under the statute.  That's what I'm addressing.

---

[3] Though less apparent from the written transcript, it was clear to the Court from defense counsel's oral presentation that he was attempting to focus the jury on the "transfer" element of the offense—a suspicion borne out by the colloquy that followed, *see infra*.

[4] Though defense counsel maintained that he had "expressed" the view to the Court that exchanging cash for Bitcoin did not constitute a money transmitting business "at the beginning of the case," it is undisputed that Defendant never moved to dismiss the Section 1960 charge on that or any other basis and that the "transfer" issue was not raised in connection with the jury instructions to be given at trial.

3

A-993

**Mr. Singer**: I think you're reading too much into that. You're making inferences and assumptions about it and I think it's for the jury to decide that.

**The Court**: Mr. Singer, what exactly were you arguing to the jury then? Be candid. What were you suggesting? ["]Listen to whether he accepted currency for transfer.["] What did you want them to think?

**Mr. Singer**: That's not what Mr. Goklu did.

**The Court**: Right. Why not?

**Mr. Singer**: *Because he didn't transfer the money*. . . . [T]he Second Circuit as far back as 1999 has said that a money transmitting business receives money from a customer and then for a fee paid by the customer transmits that money to a recipient.

**The Court**: . . . [T]hat may be a legitimate argument to have made before we started this trial and before I produced these jury charges. . . . [The] time to make [this argument] and to then sandbag the jury and me, quite frankly, in terms of the charges I was prepared to give, is not in the middle of your closing. . . .

(Dkt. 81, at 584:13–585:24 (emphasis added).) Overruling Defendant's objection, the Court declined to allow the defense theory—that a Section 1960 charge requires a transfer to someone other than the payor of "the currency"—to proceed to the jury. The Court then supplemented the jury instructions to include: "Exchanging Bitcoin for U.S. currency can qualify as a 'transfer' within the meaning of the statute." (Dkt. 71, at 23–24.) On October 11, 2022, the jury returned guilty verdicts as to both counts of the Indictment. (Dkt. 72.)

## II.   Defendant's Rule 29 Motion

On November 10, 2022, Defendant filed the present motion pursuant to Federal Rule of Criminal Procedure 29. (*See* Dkt. 77.) Defendant's motion centers on his view that the case law requires that a Section 1960 "transfer" be to someone other than the person who paid the currency to the defendant. Defendant argues that "the evidence failed to establish that his conduct constituted a money transmitting business" because it did not show that Defendant transferred the Bitcoin he received from the undercover agent and other customers to other parties. (*See id.* ¶¶ 4, 6, 9–10 ("To be a money transmitting business, Mr. Goklu had to accept currency (here, bitcoin)

4

A-994

for *transfer*." (emphasis in original)[5].)  Rather, Defendant contends, "viewing the evidence in the light most favorable to the government, the evidence established that Mr. Goklu operated a currency exchange business, not a money transmitting business." (*Id*. ¶ 10.)

In its response, the Government contests Defendant's interpretation of the relevant statute and the case law.  (Dkt. 82.)  The Government argues that "Section 1960 broadly defines the term 'money transmitting' to include 'transferring funds on behalf of the public by any and all means'[,]" thus noting, in effect, that the statute does not specify that the transfer of funds must be to a person other than the person who provided the funds to the alleged money transmitter.  (Dkt. 82, at 9.)  The Government also points out that 31 U.S.C. § 5330, which is expressly referenced in Section 1960, defines "money transmitting business" broadly to include businesses that provide, *inter alia*, currency exchange services.  (*Id*. at 10 (citing 31 U.S.C. § 5330(d)(1) ("The term 'money transmitting business' means any business . . . which [] provides . . . currency exchange[.]").

In his brief in Reply, Defendant focuses entirely on the meaning of the word "transfer" in Section 1960.  (Dkt. 84.)

## STANDARD OF REVIEW

Rule 29(c) allows challenges to a guilty verdict where "the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(c); *see also United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972) (Friendly, J.) ("[The question is] whether upon the evidence, giving full play to the

---

[5] The Court notes that Defendant goes on to argue here that "Mr. Goklu's receipt of bitcoin cannot both be *for transfer* and constitute the transfer itself." (Dkt. 77, ¶ 10 (emphasis in original).) This argument, however, mischaracterizes the Government's theory, which was that Defendant's payment of cash to the customers after receiving Bitcoin from them was the transfer, not that Defendant's mere receipt of Bitcoin from his customers was the transfer. (Dkt. 81, at 550 ("You'll hear that a money transmitting business is simply a business that transfers funds, including Bitcoin, by any means in exchange for a fee.  That's exactly what the defendant's business did.  He transferred Bitcoin through cellphone application and transferred cash by hand exchange for a fee.").)

5

A-995

right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt."); *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (district court's Rule 29 decision reviewed *de novo*). Thus, Rule 29(c) is not an open-ended opportunity to relitigate unfavorable rulings, contest jury instructions, or advance new legal theories. *See United States v. Levy*, No. 11-CR-62 (PAC), 2013 WL 3832718, at *3, *3 n.2 (S.D.N.Y. July 15, 2013) (denying Rule 29(c) motion where "argument [did] not address the sufficiency of the evidence[,]" but instead attempted to challenge the government's "novel" legal theory and "rehash certain jury instruction arguments as to why [defendant's] activities should not be considered illegal as a matter of law."); *United States v. Velentzas*, No. 91-CR-384 (DRH), 1993 U.S. Dist. LEXIS 5193, *3 (E.D.N.Y. April 19, 1993) (denying Rule 29 motion that "effectively [asked] for a reconsideration of certain evidentiary rulings made at trial," and noting that "such arguments [were] more appropriate for appeal, while the arguments to be made in connection with a Rule 29 motion [should] relate to the sufficiency of the evidence." (collecting authorities)); *see also United States v. Dawkins*, 999 F.3d 767, 780–81, 781 n.12 (2d Cir. 2021) (reviewing for plain error when "defendants moved for judgments of acquittal under Rule 29[], [but] did not challenge the sufficiency of the evidence" of the matters considered on appeal); *accord* 2A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 466 (4th ed. 2022) (noting that evidentiary insufficiency is the "only [] ground for a motion for a judgment of acquittal."). Specifically, "[a] Rule 29 motion . . . is not the proper vehicle for raising an objection to jury instructions." *United States v. Crowe*, 563 F.3d 969, 972 n.5 (9th Cir. 2009); *see also United States v. Moreland*, 622 F.3d 1147, 1166 (9th Cir. 2010) (same); *United States v. Huber*, 243 F. Supp. 2d 996, 1001 (D.N.D. 2003) ("[Defendant] argues

A-996

that the Court erred in denying three of his requested jury instructions . . . [but] this argument does not provide the proper basis for a Rule 29 motion."), *aff'd*, 404 F.3d 1047 (8th Cir. 2005).[6]

## DISCUSSION

Defendant's motion falls outside the narrow confines of Rule 29.  It is not a sufficiency-of-the evidence challenge; rather, it seeks to challenge the Court's interpretation of Section 1960(a) and the meaning of "transfer[]" in the statute.  In his motion, Defendant discusses the evidence presented at trial only fleetingly, and his motion papers are entirely devoid of any detailed discussion of trial testimony and exhibits, or any citation to the record whatsoever.  (*See generally* Dkts. 77, 84.)  Instead, Defendant focuses almost entirely on a selective presentation of case law and regulations that purportedly support his theory about the meaning of "transfer[]" in Section 1960—which the Court expressly rejected after the defense summation.  (*See* Dkt. 77, ¶¶ 7–10; Dkt. 84, ¶¶ 3–4; Dkt. 81, at 585–86.)  In arguing that "the evidence failed to establish that [Defendant's] conduct constituted a money transmitting business as opposed to either a currency exchange business or some other form of money service business" (Dkt. 77, ¶ 4), Defendant never acknowledges the Court's explicit instruction to the jury that the exchange of Bitcoin for cash could constitute money transmitting, and omits any discussion of whether the trial evidence was

---

[6] Notably, Defendant did not bring a motion pursuant to Federal Rule of Criminal Procedure 33, seeking a new trial.  *See United States v. Serrano*, 224 F. Supp. 3d 248, 255 (S.D.N.Y. 2016) (granting a Rule 33 motion and ordering a new trial based on erroneous jury instructions); *accord United States v. Bustamante*, 972 F.2d 349 (6th Cir. 1992) ("Matters that a district court may consider under Rule 33 include perceived errors or confusion resulting from the jury instructions." (collecting authorities)).  However, for the reasons discussed *infra* fn. 7, the Court is doubtful that a Rule 33 motion would have fared any better than Defendant's present Rule 29 motion.  *See United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) ("Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'") (citing *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)); *see also id*. at 133 (reviewing district court's Rule 33 decision for abuse of discretion).

7

A-997

sufficient to prove *that* conduct. Defendant instead argues that the evidence failed to show that his conduct constituted money transmitting as *he* believes—and argued belatedly and unsuccessfully—it should be defined, *i.e.*, as requiring a "transfer" of funds to someone other than the payor.

This is not a proper Rule 29 argument, but is an attempt to end run the procedural requirements of challenging the Court's interpretation of Section 1960(a) and its instructions to the jury on that crime. *See Levy*, 2013 WL 3832718 at *3 (denying Rule 29(c) motion that did not argue sufficiency of the evidence, but instead attempted to "rehash certain jury instruction arguments as to why [defendant's] activities should not be considered illegal as a matter of law."); *Velentzas*, 1993 U.S. Dist. LEXIS 5193 at *3 (denying Rule 29 motion and noting that arguments effectively seeking "reconsideration of certain evidentiary rulings made at trial" were "more appropriate for appeal, while the arguments to be made in connection with a Rule 29 motion [should] relate to the sufficiency of the evidence." (collecting authorities)); *United States v. Rabbani*, No. 08-CR-118 (RJA), 2009 WL 1272276, at *2 n.1 (W.D.N.Y. May 7, 2009) ("The defendant also argues in his [Rule 29] motion that this Court erred in failing to give [certain instruction to the jury, but the] Court finds it unnecessary to address that argument because it is not a proper basis for granting a Rule 29 motion." (citing authorities)).

The Court accordingly denies Defendant's motion as procedurally improper.[7]

---

[7] The Court notes that even had it considered Defendant's argument that money transmitting under Section 1960 requires a transfer to a "third party" who is not the payor of funds, it would have rejected it. First, the term "transfer" is not so restricted in Section 1960 and, in fact, it is undefined. In this Circuit, a statutory term is generally "interpreted as taking [its] ordinary, contemporary, common meaning." *Harris v. Sullivan*, 968 F.2d 263, 265 (2d Cir. 1992) (citing *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Transfer means "[a]ny mode of disposing of or parting with an asset or an interest in an asset, including a gift, the payment of money, release, lease, or creation of a lien or other encumbrance." *See Transfer*, Black's Law Dictionary (11th ed. 2019). Thus, nothing on the face of the statute suggests that a transfer of funds from a defendant

8

A-998

## CONCLUSION

For the reasons stated herein, Defendant's Rule 29 motion is denied in its entirety as procedurally improper.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: January 13, 2023
Brooklyn, New York

---

back to his customer does not qualify as a "transfer" for Section 1960 purposes. Second, contrary to Defendant's argument, this Circuit's case law does not compel a different conclusion. Defendant relies on the following sentence from *United States v. Velastegui*: "[a] money transmitting business receives money from a customer and then, for a fee paid by the customer, transmits that money to a recipient in a place that the customer designates, usually a foreign country." (Dkt. 77, ¶ 8 (citing *United States v. Velastegui*, 199 F.3d 590, 592 (2d Cir. 1999); *see also* Dkt. 77, ¶ 8 (citing *United States v. Banki*, 685 F.3d 99, 114 (2d Cir. 2012) (citing *Velastegui*)).) There is no indication in *Velastegui* or any other decision, that this explanation, which appears in the "Background" section of *Velastegui*, was intended to define the universe of conduct that qualifies as money transmitting under Section 1960. Nor does this statement from *Velastegui* suggest that a "customer" cannot be the "recipient" of the funds, as occurs with currency exchange businesses, which qualify as money transmitting services under 31 U.S.C. § 5330, which is referenced in Section 1960(b)(1). Finally, Defendant's interpretation of the statute would create a regulatory lacuna: Section 5330 would require currency exchange businesses to be licensed, but Section 1960 would attach no penalty for their failure to do so because such businesses are not engaged in "transfers." Thus, for these reasons and those stated in the Government's Opposition (Dkt. 82), were the Court to consider Defendant's argument about the proper interpretation of Section 1960, it would have rejected that argument.

9

A-999

**SABRINA P. SHROFF**
ATTORNEY AT LAW

80 BROAD STREET, 19TH FLOOR
NEW YORK, NEW YORK 10007
TELEPHONE: (646) 763-1490

January 15, 2024

**BY ECF**
Honorable Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

_**United States v. Mustafa Goklu**_, **19 Cr. 386 (PKC)**
**(Mr. Goklu's Sentencing Letter to the Court)**

Dear Judge Chen:

Michael (Mustafa) Goklu respectfully submits this Sentencing Memorandum in advance of his sentencing in this matter. For the reasons discussed below, Mr. Goklu respectfully requests that he be sentenced to a non-incarceratory sentence of three years of supervised release.

Mr. Goklu was convicted of operating an unlicensed money transmitting business and, as a part of that business, laundering the proceeds of narcotics trafficking. Specifically, between August 28, 2018 and April 30, 2019, ran a one-man operation in which he would convert Bitcoin to dollars, or dollars to Bitcoin, for a small fee. _See_ Presentence Investigation Report ("PSR") ¶¶ 14-15.

This is Mr. Goklu's first and only offense. Since his arrest on May 6, 2019, 56 months ago, Mr. Goklu has not reoffended, and will not reoffend. He found work as an app-based driver and cook and lived quietly in Queens with his wife, Tugba, and his three-year-old son, Can. Despite the financial difficulty and stresses he has experienced as a new father trying to support his family – being a driver and a cook were both professions massively and negatively impacted by the COVID pandemic and attendant social restrictions – Mr. Goklu has remained entirely law-abiding. There is no better evidence of his lack of future risk than his behavior since 2019.

For this reason, and the others set forth herein, the Court should sentence Mr. Goklu to the requested non-guidelines sentence of three years supervised release. Such a sentence best accords with the parsimony principle that guides federal sentencing and is a proper and sufficient sentence for him.

## BACKGROUND

**Michael Goklu**[1]

Michael (Mustafa) Goklu was born on June 2, 1972, in Goklu, Turkey. PSR ¶ 44. His father, Ahmet, who worked as a teacher, died in 1996 in a car accident. _Id._ His mother, Pervin Halima, a homemaker aged 70, lives with Michael's brother, Mehmet, in Germany. _Id._ Michael is the oldest of seven children. His siblings all reside in Turkey or Germany, and they variously work as teachers, or in construction, or in textiles. _Id._ ¶ 45. Despite the geographic distance, Michael

---

[1] Mr. Goklu legally changed his name to Michael in 2014, upon becoming a U.S. citizen.

A-1000

Hon. Pamela K. Chen                                    January 15, 2024
United States District Judge                                      Page 2

remains close with his family. Indeed, he is so ashamed by his arrest and conviction, and concerned about the effect the news may have on his mother who is in poor health, that he has not yet told most of his family about his legal situation and upcoming sentencing.

Michael grew up middle class in a solid and loving home. He attended school, made good grades, and attended college in Turkey, graduating with a Bachelor of Science degree, in business management, from Anadolu University in Eskisehir, Turkey in 2003. PSR ¶¶ 46, 56-59. In 2008, he legally immigrated to the United States in search of better economic opportunity, settling in Queens, New York. *Id.* ¶ 49. In New York, he began working full-time as a limo driver, a position he held until his arrest, and for a brief time sold electronics on eBay. *Id.* ¶¶ 62-63. Eventually, he began supplementing his income by exchanging bitcoins and dollars for others in exchange for a fee, the offense for which he faces sentencing. *See id.* ¶¶14-15. Since his arrest and release, he has worked as a driver for Door Dash and Uber Eats and as a cook at Captain's Cafe Bar and Grill in Manhattan. *Id.* ¶¶ 60-61. During the COVID pandemic, Michael was unable to work because of the social restrictions imposed in New York City, so he and his family had no choice but to survive as best they could on $750/month in unemployment benefits. *Id.* ¶ 61.

In 2013, Michael married the one true love of his life, Tugba Gunduz, after a 14-year relationship. They have been together for more than 23 years. PSR ¶ 47; *see also* Letter from Tugba Goklu to Court ("Tugba Letter") (attached as part of **Exhibit A** to the sentencing letter).[2] Tugba works in the code-share department of Turkish Airlines., although she is on leave as she is taking care of her eldest sister, who is dying of uterine cancer.  PSR ¶ 47. In 2020, after years of trying and miscarriage, Michael and Tugba welcomed their son Can into the family. Can, a rambunctious and happy three-year-old toddler, is the apple of his father's eye.

Michael is a "kind and loving person" (PSR ¶ 48) who is deeply regretful for the consequences his actions have visited upon his family. He started transmitting money for others to help make more for his family and save enough for a down payment on a house. He now realizes that, in trying to support his family, he placed them at risk instead. Tugba does not speak English very well and is dependent upon Michael to manage matters and help navigate things outside the house. PSR ¶ 48. Can is just three years old and faces having to grow up in the next years without the help and support of his father. Plainly, any imprisonment would wreak havoc upon them. As Tugba explains:

> Michael's TLC license has been stripped, and there are no more cars for Black Taxi licenses. He has lost ten years' worth of served and faithful customers. We cannot survive in the United States without Michael. My son is in pre-k school and sometimes I have to take him to my work as the day care closes at 5:30 p.m. and I work until 11:30 p.m. If I start the day at 5:30 p.m. then I work until 8:30 a.m. and then I have to take him to office. My mother is 89 years old and cannot help me.
>
> We are drained to zero all our life savings. Michael's mother has cancer and she needs surgery. My sister also has uterine cancer and I am exhausted. The only

---

[2] Letters in support from Michael's family and friends are attached as **Exhibit A** for the Court's ready reference.

A-1001

Hon. Pamela K. Chen                                                    January 15, 2024
United States District Judge                                                    Page 3

person who can support me is Michael and I am very worried that he will not be with me to raise his son.

Tugba Letter at 2; *accord id.* at 1 ("Our lives will become very difficult without him, so I ask you not to send him to jail. I've already faced challenges as a single mom, changing houses three times in the last 18 months, and managing a job that requires 24-hour availability as I work for Turkish Airlines.").

Beyond his wife and child, Michael's situation has harmed his extended family as well. As the eldest son, Micheal has always been looked at to guide and lead his family, a responsibility that only increased with the unexpected and untimely passing of his father. *See, e.g.*, Letter from Michael's sister, Canan Goklu ("Canan Letter") (Ex. A) ("It was Michael who had to be responsible as that is our culture and he selflessly dedicated himself to supporting our family."); Letter from Michael's sister, Nevin Goklu Balci to Court ("Nevin Letter") (Ex. A) ("He [Michael] was kind of my father when we lost our father at traffic accident. … He was the one work long hours and spent all money to our education in both Germany and Turkey."). Michael has extended that sense of responsibility and concern to all those around him. As Tugba relates:

> During the time my brother had cancer, Michael did all he could for him and his family. Michael would talk to the doctors and the hospital staff and find out what was going on with my brother. He would rally my brother's friends to go and visit him and support him. When my brother was in a lot of pain, Michael searched for medicine that would help and save my brother. It did not work; My brother died when he was 35 years old.

Tugba Letter at 1. In addition, despite their straightened financial circumstances, Michael and his wife continue to "help anyone around us that need help." *Id.* For example, they shop and cook and run all the errands for Lia, their 102-year-old neighbor. *Id.*; *see also* Letter from friend and neighbor Soner Ozkan ("Soner Letter") (Ex. A) (discussing the help Michael provides himself and others, like Lia).

Soner Ozkan is a friend and neighbor who writes the Court to "provide you with some insights into his character" and how "losing his help will effect [Soner's] life also." Soner Letter at 1. As he recounts:

> I have a kidney failure and in dialysis everyday basis, Michael did a lot for me. First time when come to US at [beginning] Michael Helped me for almost everything, Getting a license, buying a car for working putting me on the road, setp [sic] by step from green card to to my us citizenship, I know it is not only me he help several common friends also, I'm having some sort help from [him] also today, Going to hospital and during my hard days due to my illness.

*Id.* Soner ends his letter by speaking of Michael's positive future as a responsible and contributing member of society:

> I firmly believe that Michael deeply regrets any actions that may have led to his current situation. He is committed to making amends and learning from this experience to become

A-1002

Hon. Pamela K. Chen                                              January 15, 2024
United States District Judge                                              Page 4

> a better person. It is my sincere hope that Your Honor will consider these aspects of
> Michael's character when making decisions regarding his case. I believe in his capacity
> for positive change and rehabilitation, and I am confident that he will emerge from this
> experience as a more responsible and contributing member of society.

*Id.* at 2. Soner's words are echoed by Michael's sisters, Nevin and Canan. *See* Nevin Letter at 1-2; Canan Letter at 1.

As the foregoing demonstrates, Michael is at heart a kind, giving, and sensitive person. Sentencing him to jail will not only harm his wife and child, but will harm his extended family, neighbors, and community, each of whom have been helped without hesitation by Michael in the past.

If sentenced to supervised release, Michael will – just as he has in the last four plus years – continue to obey the law and support his family, friends, and neighbors the best he can. What he will never do again is look for a shortcut, and further risk those he loves:

> Michael works tirelessly, putting in at least 12-20 hours a day, 6-7 days a week as
> an Uber driver. Sometimes, he even sleeps in his car for a few hours between late
> fare drops from NYC and early airport pickups. Despite the challenges, he is a
> hardworking person who dedicates himself to providing for his family.

Tugba Letter at 1. Plainly, Michael has learned his lesson, and the Court should permit him to continue working hard and providing for his family outside of prison.

**The Instant Offense and Mr. Goklu's**
**Objection to the Guidelines Calculation**

Mr. Goklu was convicted of one count of money laundering, in violation of 18 U.S.C. § 1956(a)(3)(B), and one count of operating an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960(a). See PSR ¶¶ 1-3.

The government and Probation's guidelines calculation arrive at Total Offense Level of 24. PSR ¶¶ 21-36; Govt. Sentencing Letter [ECF Docket No. 91] at 3. They also recognize that this is Mr. Goklu's only offense and that he has zero criminal history points, resulting in Criminal History Category of I. PSR ¶¶ 37-42; Govt. Sentencing Letter at 3. Taken together, this results in a guidelines range of 51 to 63 months' imprisonment, with an additional one to three years of supervised release. *Id.* ¶¶ 71, 74. The government requests a sentence within that guidelines range.

While Mr. Goklu asks for a non-guidelines sentence, the Court should be aware that the guidelines range calculated by the government and Probation is incorrect and too high.

*First*, the November 1, 2023, edition of the Guidelines Manual created a retroactive reduction in the offense level for zero-point offenders like Mr. Goklu whose offense did not involve any of the specified aggravating factors set forth in that section – *e.g.*, violence, use of a weapon, terrorism, sexual offense. *See* U.S.S.G. § 4C1.1. Mr. Goklu is eligible for such a reduction and, as a result, the Total Offense Level calculated by the government should be reduced by two points, from 24 to 22. In turn, this reduces the applicable guidelines range to 41 to 51 months' imprisonment, instead of 51 to 63 months.

A-1003

Hon. Pamela K. Chen                                          January 15, 2024
United States District Judge                                         Page 5

*Second*, the government and probation increase the base offense level by six points because Mr. Goklu purportedly "knew the laundered funds were the proceeds of narcotics trafficking." PSR ¶ 24. The undercover agent, however, provided the monies at issue to Mr. Goklu (totaling $133,190) in "six separate transactions." *Id.* ¶ 13. The government's proof at trial showed that transactions one to three with the agent, Mr. Patrick O'Kain, did not involve any discussion of, or reference to, those monies being narcotics proceeds. Agent Okain testified as follows:

Q    Now, in the text, the Signal text messages that you sent to Mr. Goklu [to set up the first transaction], you never indicated to him that that's who you were [an online drug dealer] and what you were doing [selling drugs in exchange for bitcoin], correct?

A    Well, I --

Q    Did you ever tell him that you were selling drugs directly?

A    Yes.

Q    In the text messages?

A    No, not in the text messages.

Q    Okay. So nothing ever came up in the text messages?

A    No.

Q    And when you first met with Goklu on -- Mr. Goklu on August 28th of 2018, you didn't tell him that you were selling drugs?

A    Correct.

Q    Or that your business was selling drugs and the BitCoin that you were seeking to exchange was from the sale of drugs; is that right?

A    That's correct.

Q    And you didn't tell him that on September 21st of 2018, correct?

A    That's correct.

Q    And you didn't tell him that in November of 2018; did you?

A    I did not.

Q    And you started to hint at it a little bit in December -- on December 11th of 2018?

A    Yes.

Q    And that was the first time?

A-1004

Hon. Pamela K. Chen                                             January 15, 2024
United States District Judge                                              Page 6

A    Correct.

* * *

Q    Well, I'll state it affirmatively. There was no information that you had provided to
     Mr. Goklu in those first four conversations that would lead him to believe that the
     BitCoin had been obtained from selling illegal drugs; isn't that correct?

A    Yeah. Not necessarily.

Q    Not necessarily?

A    He would -- I think if you could state that a different way. Well, I guess, I did not
     specifically state anything about drugs during those interactions, that's correct.

10/6/22 Trial Tr. at 382:17-383:21; 384:3-12 (attached hereto as **Exhibit B**).

The Agent expressly agreed and testified that Mr. Goklu had not been provided any information
before or during those initial three transactions "that would lead him to believe that the BitCoin
had been obtained from selling illegal drugs." 10/6/22 Trial Tr. at 384:3-12. Accordingly, the
amounts from those three transactions – totaling $47,970, or over a third of the $133,190 at issue
(*see* GX 1101) – should not be included by the Court when it considers Mr. Goklu's offense, or
when it calculates the guideline range and/or the forfeiture number applicable to Mr. Goklu.[3]

## ARGUMENT

For the reasons discussed below, the appropriate sentence here is a non-guidelines sentence of
three years supervised release.

### A.    The Legal Standards for Sentencing

In selecting a sentence, this Court takes as its "lodestar the parsimony clause of 18 U.S.C. §
3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). That provision directs
sentencing courts to "'impose a sentence sufficient, but not greater than necessary, to comply with'
the factors set out in 18 U.S.C. § 3553(a)(2)," i.e., "proportionality, deterrence, incapacitation, and
rehabilitation." *Id.; see also, e.g.,* Pepper v. United States, 562 U.S. 476, 493 (2011); *Dean v.
United States*, 137 S. Ct. 1170, 1175 (2017); *United States v. Ministro-Tapia*, 470 F.3d 137, 142
(2d Cir. 2006).

In determining such a sentence, the sentencing court must consider the United States Sentencing
Guidelines, the nature and circumstances of the offense, the history and characteristics of the

---

[3] Application note 3 to U.S.S.G. § 2S1.1 states, in relevant part, that "[i]n a case in which a
transaction, financial transaction, monetary transaction, transportation, transfer, or transmission
results in the commingling of legitimately derived funds with criminally derived funds, the value
of the laundered funds, for purposes of subsection (a)(2), is the amount of the criminally derived
funds, not the total amount of the commingled funds[.]"

A-1005

Hon. Pamela K. Chen                                             January 15, 2024
United States District Judge                                                 Page 7

defendant, the need for the sentence imposed to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. *Id.* § 3661.

While the sentencing guidelines comprise one factor for this Court to consider, they are only one such factor, and "truly are advisory.'" *Douglas*, 713 F.3d at 700 (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)). This Court "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also Nelson v. United States*, 555 U.S. 350, 352 (2009). Here, an individualized assessment of the record facts, the § 3553(a) factors, and application of the overarching parsimony clause that guides federal sentencing, all support the requested non-guidelines sentence of three years supervised release.

**B.**   **The § 3553(a) Factors Strongly Support a Non-Guidelines Sentence of Three Years Supervised Release**

The sentencing goals of specific deterrence and rehabilitation support the requested non-guidelines sentence. Prior to this offense, Michael Goklu had no criminal history. *See* PSR ¶¶ 37-42. And, after his arrest and release in 2019 for the instant offense, Michael Goklu committed no other crime. As the Probation Department concedes: "The supervising Pretrial Services Officer advised that the defendant [Mr. Goklu] has complied with all Court-ordered conditions of release." *Id.* ¶ 6. This history demonstrates both Mr. Goklu's essential law-abiding nature and that he has been specifically deterred and poses no risk of any future criminal offense.

Unable to point to any continuing criminal activity of any kind, or any violation of the conditions of his release, in the last four plus years (approximately 56 months), the government desperately points to two things in a failed effort to contend that prison time is needed to specifically deter Mr. Goklu. First, the government points to a civil dispute between Mr. Goklu and his landlord arising from the landlord's attempts to improperly evict the Goklu family and violate the covenant of quiet enjoyment that is part of every rental agreement in New York. Govt. Letter at 4. Second, the government contends Mr. Goklu must be jailed because he exercised his fundamental, constitutional right to a trial. *Id.* Both these contentions are meritless on their face. If anything, the fact that the government can point to nothing else, and is reduced to making such empty arguments, conclusively demonstrates that Mr. Goklu is specifically deterred. There is no better evidence that Mr. Goklu has been specifically deterred and poses no risk of any future offense than his model behavior since May 2019 (and zero history points before his arrest in this matter). Moreover, and in any event, Congress properly has recognized that "imprisonment is *not* an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a) (emphasis added). Here, correction and rehabilitation are best addressed not by incarcerating Mr. Goklu, but by allowing him to remain outside prison where he can continue being a positive influence in his community.

In addition to specific deterrence and rehabilitation, the sentencing goals of incapacitation/punishment and general deterrence also strongly support the requested sentence.

A-1006

Hon. Pamela K. Chen                                              January 15, 2024
United States District Judge                                            Page 8

The sentencing goal of punishment is sufficiently met here by the three years of supervised release. In this regard, the United States Supreme Court expressly has recognized that supervised release "is not merely 'letting an offender off easily,'" and involves "substantial restrictions on freedom" that effectively deters and punishes in its own right. *Gall*, 552 U.S. at 48-49. Further, in addition to the three years of supervised release, the Court should bear in mind the "broad range of collateral consequences" Mr. Goklu now faces because of his conviction. *See* PSR ¶ 84 (listing some of those collateral consequences). Indeed, Michael already has suffered a material collateral consequence unique to his individual circumstances. Specifically, the Taxi and Limousine Commission (TLC) has stripped Michael of his TLC license, meaning he may no longer work as a limousine/black car driver and has lost over ten years' worth of hard-won experience and faithful customers. *See* Tugba Letter (Ex. A) at 2.

Likewise, the sentencing goal of general deterrence is also met here, as the requested sentence is sufficient to generally deter others who are considering committing the same offense for which Mr. Goklu was arrested. Studies have shown that it is the arrest that best deters, not the length of the sentence. *See, e.g.,* Valerie Wright, *The Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, 5-6 (2010), available at http://www.antoniocasella.eu/nume/Wright_2010.pdf. Mr. Goklu's neighbors and associates saw him arrested, have seen him suffer the emotional and mental stress resulting from these proceedings, and will see him having to live under substantial restrictions on freedom during his time in supervised release. Under these circumstances, prison time will not provide any greater general deterrence than the three years of supervised release respectfully proposed.

Finally, the Court should consider the undisputed harm prison time will cause to Mr. Goklu's friends and family, and particularly to his three-year-old Can. *See* PSR ¶ 85 (recognizing that Mr. Goklu's "incarceration may likely cause emotional distress in the defendant minor child's life"); Govt. Letter at 4 (acknowledging that Mr. Goklu "had a child after his arrest and that any period of incarceration would pose a hardship for his family"). For several reasons, including the fact that Tugba does not speak English, Tugba and Can are particularly and extraordinarily dependent, financially and emotionally, on Michael. Any interaction with the outside world – for example, doctor appointments for Can or arranging for Can's daycare and schooling – requires Michael's physical presence in their lives. As Tugba explains in her letter (Ex. A), there is no one who can step in if Mr. Goklu is absent and supply the necessary financial and emotional support she and Can require. The extraordinary harm his family will suffer should Mr. Goklu be sentenced to prison further supports a non-incarceratory sentence for him. *See, e.g., United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997) (upholding departure from guidelines sentence where defendant provided substantial support for two children and defendant's wife spoke limited English).

For each of these reasons, sentencing Mr. Goklu to three years of supervised release is sufficient, but not greater than necessary, to meet the sentencing goals, and fully accords with the parsimony principle underlying federal sentencing.

## CONCLUSION

An individualized assessment of the § 3553(a) factors in this case (and the parsimony principle) strongly support a non-guidelines sentence of three years supervised release. Accordingly, Mr. Goklu respectfully requests that the Court impose that sentence upon him.

A-1007

Hon. Pamela K. Chen                                          January 15, 2024
United States District Judge                                          Page 9


Respectfully submitted,

/s/Sabrina P. Shroff
Counsel to Mr. Michael Goklu

SPS/
Exhibits A-B

cc: All counsel of record (by ECF)

A-1008

1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2

 3    - - - - - - - - - - - -    X

 4   UNITED STATES OF AMERICA,    :   19-CR-386(PKC)

 5
           -against-             :   United States Courthouse
 6                                   Brooklyn, New York

 7   MUSTAFA GOKLU,               :
                                     January 29, 2024
 8          Defendant.            :   10:00 o'clock a.m.

 9    - - - - - - - - - - - -    X

10                      TRANSCRIPT OF SENTENCING
11               BEFORE THE HONORABLE PAMELA K. CHEN
                    UNITED STATES DISTRICT JUDGE.
12

13   APPEARANCES:

14
     For the Government:        BREON PEACE
15                              United States Attorney
                                BY: FRANCISCO J. NAVARRO
16                              Assistant United States Attorney
                                271 Cadman Plaza East
17                              Brooklyn, New York

18
     For the Defendant:         SABRINA P. SHROFF, ESQ.
19                              80 Broad Street, 19th Floor
                                New York, New York
20

21
     Court Reporter:            Charleane M. Heading
22                              225 Cadman Plaza East
                                Brooklyn, New York
23                              (718) 613-2643

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.
```

CMH     OCR     RDR     FCRR

A-1009

2

| | |
|---|---|
| 1 | THE CLERK:  Criminal cause for a sentencing, docket |
| 2 | 19-CR-386, United States versus Mustafa Goklu. |
| 3 | Will the parties please state your appearances for |
| 4 | the record starting with the government. |
| 5 | MR. NAVARRO:  Good morning, Your Honor.  Francisco |
| 6 | Navarro for the United States. |
| 7 | THE PROBATION OFFICER:  Good morning, Your Honor. |
| 8 | Brian Woo for Probation. |
| 9 | MR. TURTON:  And Jamie Turton for Probation.  Good |
| 10 | morning. |
| 11 | THE COURT:  Good morning to all of you.  You may |
| 12 | remain seated during proceedings. |
| 13 | MS. SHROFF:  Good morning, Your Honor.  On behalf of |
| 14 | Mr. Mr. Goklu, who is standing to my right, Sabrina Shroff. |
| 15 | Also present in court in support of Mr. Goklu is his friend is |
| 16 | the gentleman in the coat and his wife and his child. |
| 17 | THE COURT:  Good morning to all of you.  And you may |
| 18 | remain seated as well, Mr. Goklu. |
| 19 | MR. NAVARRO:  Your Honor, there is one thing that I |
| 20 | would like to approach on and have a sidebar conversation if |
| 21 | we could. |
| 22 | THE COURT:  Okay.  So let's just do one thing before |
| 23 | we do that.  Let's swear in our interpreter. |
| 24 | MR. NAVARRO:  I'm sorry, Your Honor. |
| 25 | (The interpreter was sworn by the clerk.) |

A-1010

```
                        Sidebar                        3
 1          THE INTERPRETER:  Seyhan Sirtalan, S-I-R-T-A-L-A-N,
 2   Turkish interpreter.
 3          THE COURT:  Good morning to you as well.
 4          So everyone remain seated except for I'll have Ms.
 5   Shroff join the government here at sidebar.
 6          (The following occurred at sidebar.)
 7          MR. NAVARRO:  Your Honor, my only concern is that we
 8   are here for a sentencing and we have a child in the
 9   courtroom.  It's the defendant's daughter, I believe.
10          MS. SHROFF:  Son.
11          MR. NAVARRO:  Son, I'm sorry.  I apologize.  And the
12   bottom line is I don't want to traumatize the child.  She
13   appears to be old enough to at least understand some of what's
14   going on.
15          MS. SHROFF:  It's a he.
16          MR. NAVARRO:  I'm sorry.  I keep saying that.
17          THE COURT:  Yes.  Okay.  So he.  It's really up to
18   the defendant.
19          MS. SHROFF:  Your Honor, it is an extremely
20   paternalistic thing for the government to say that a father
21   doesn't know what's good for the child.  I know that the
22   child, first of all, does not speak English and, second of
23   all, if the government is that concerned about the welfare of
24   the child, perhaps they should have agreed to a sentence of
25   probation.
```

CMH          OCR          RDR          FCRR

A-1011

4

1          THE COURT:  The bottom line is I'm allowing the

2     defendant and his wife to make the decision about the child

3     being present.  The child has been have quiet so far and that

4     really my only concern is that if the child disrupts the

5     proceedings, we'll reconsider.  I understand what you're

6     saying but I'm going to allow the defendant to make his own

7     decision about having his child present.

8          MR. NAVARRO:  Thank you, Your Honor.

9          THE COURT:  Okay.

10         (In open court; sidebar ends.)

11         THE COURT:  So we are here for sentencing as

12    everyone is aware.  Let me start off by putting a few things

13    on the record.

14         The defendant was convicted on October 11, 2022 at

15    the conclusion of a trial of money laundering and operating an

16    unlicensed money transmitting business in violation of

17    18 U.S.C. 1956(a)(3)(B) and 18 U.S.C. 1960(a), respectively.

18         I have received and reviewed in preparation for

19    sentencing the following.  The Probation Department's

20    presentence report dated March 29, 2023 which was accompanied

21    by a sentencing recommendation, which the parties should have

22    received a copy of, recommending a sentence of 36 months'

23    custody to be followed by two years of supervised release.

24    And actually, I guess -- I apologize.  The sentencing

25    recommendation was dated March 28, 2023 but the presentence

A-1012

5

1   report is dated March 29, 2023.

2          So my deputy was just advising me that the parties

3   have not received a copy of the sentencing recommendation.  I

4   did change my practice sometime after March of 2023 to provide

5   those to the parties and so that's why this wasn't provided to

6   you because the sentencing was delayed for some time after the

7   presentence investigation report was produced.

8          So what I am going to do is my deputy is going to

9   give a copy of the recommendation to both sides now.  Take a

10  minute to review it.  Let me know when you are ready to

11  proceed, Ms. Shroff and Mr. Navarro, after you've had a chance

12  to review it.

13         MS. SHROFF:  Thank you, Your Honor.

14         THE COURT:  Let me just note while the parties are

15  reviewing that, as everyone knows, it's not a statutory

16  requirement that the parties receive the sentencing

17  recommendation of the Probation Department and the practice

18  varies in this courthouse, but I had recently adopted the

19  practice of some of my colleagues of providing that to the

20  parties before sentencing.

21         (Pause.)

22         MR. NAVARRO:  The government is ready, Your Honor.

23  I understand they have an interpreter.

24         THE COURT:  Yes.  I'll give them as much time as

25  they need.

CMH      OCR      RDR      FCRR

A-1013

6

1          (Pause.)

2          MS. SHROFF:  Thank you, Your Honor.

3          THE COURT:  Okay.  All right.  You've had enough

4    time to review this sentencing recommendation?

5          MS. SHROFF:  I have, Your Honor.  What I did is I

6    read it myself, I summarized it and then used the interpreter

7    to communicate what Probation had done.

8          THE COURT:  Thank you very much, Ms. Shroff.  I

9    appreciate that.

10          So I'll go back to identifying those documents I've

11    received and reviewed for sentencing.

12          As I mentioned earlier, the presentence report which

13    was prepared or issued on March 29, 2023 as well as this

14    sentencing recommendation that the parties have just received

15    which is dated March 28, 2023, as I said before, recommends a

16    sentence of 36 months' custody to be followed by two years of

17    supervised release.

18          I have also received the defense sentencing

19    submission dated January 15, 2024 which includes several

20    letters of support and the government's sentencing submission

21    dated March 27, 2023.  So, obviously, that was more

22    contemporaneous with the Probation Department's report.

23          I have also considered Pretrial Services memoranda

24    dated March 27, 2023 and May 18, 2023, both of which relate to

25    the defendant's dispute with his landlord regarding

A-1014

7

1  inspections of the apartment where the defendant lived at the

2  time.

3          Now, is there anything else I should have from the

4  government?

5          MR. NAVARRO:  No, Your Honor.  The only thing I

6  note, I believe the government's sentencing memo was April 27,

7  2023.

8          THE COURT:  Okay.  If I didn't say that, I meant to.

9  Thank you.  Yes, that is the correct date.

10          Should I have anything else from you, Ms. Shroff?

11          MS. SHROFF:  No, Your Honor, not from me.

12          THE COURT:  Okay.  Ms. Shroff, have you and your

13  client reviewed and discussed the presentence report and then,

14  of course, the sentencing recommendation that we just provided

15  to you?

16          MS. SHROFF:  Yes, Your Honor.  I discussed the

17  presentence report with Mr. Goklu.  I informed him of the

18  objections I plan to make on his behalf including the 4C1

19  amendment to the United States Sentencing Guidelines.

20          THE COURT:  Yes.

21          MS. SHROFF:  And I shared with him the PSR as well

22  as my sentencing submission on his behalf.

23          THE COURT:  All right.  And then you had an

24  opportunity to review, albeit in a somewhat more summary

25  fashion, the sentencing recommendation?

A-1015

8

1    MS. SHROFF:  Yes, Your Honor.  I apologize.  I

2  forgot to list it.

3    THE COURT:  No problem.

4    Is either party seeking an evidentiary hearing about

5  any issue relating to sentencing?

6    MR. NAVARRO:  No, Your Honor.

7    THE COURT:  Ms. Shroff?

8    MS. SHROFF:  Your Honor, only to the extent the

9  Court would disagree with the argument made in my sentencing

10 submission that for some of the transactions, and the trial

11 testimony made clear, so I don't think there's a need for a

12 Fatico, that Mr. Goklu was never advised by the undercover

13 that the transactions for August 28th of 2018 and up until

14 December 11th of 2018, Mr. Goklu was unaware of how the

15 undercover was purportedly making a living.

16    THE COURT:  Right.  Let me say this.  I obviously

17 presided over the trial and saw and heard the testimony.  So

18 as far as I'm concerned, there's no dispute about the facts

19 upon which you relied for that objection.

20    Does the government disagree with that?

21    MR. NAVARRO:  Your Honor, I agree insofar as the

22 testimony at trial was that the undercover did not explicitly

23 say what business he was involved in until several meetings

24 in, however, the government argued to the jury and the jury

25 was instructed on willful blindness and also the defendant's

A-1016

9

1  own statements, prior to the undercover saying, I sell drugs,

2  the defendant's own statements indicated that he knew he was

3  dealing with drug dealers.

4         THE COURT:  So there could be argument that's

5  preserved by both sides about the inference to be drawn from

6  that statement for purposes of sentencing, and Ms. Shroff has

7  obviously objected to the enhancement applying to the full

8  value of the funds that the undercover transacted with

9  Mr. Goklu, but the facts themselves are not in dispute.

10        In other words, the testimony that was given is not

11  in dispute and then you can argue the inference from that in a

12  moment as well as you can obviously argue your objection to

13  the two level enhancement -- I'm sorry -- to the enhancement

14  applying to the full amount or at least the value then being

15  lowered, I guess, with respect to the actual -- let me back

16  up.  Not an enhancement but, rather, what the value should be

17  for purposes of calculating the guidelines.  That's what

18  you're arguing.

19        In other words, you're arguing for a reduction of

20  two levels, in a sense, because if I deducted 47,970 from

21  133,190, that would bring it below the $95,000 threshold at

22  which the two level enhancement applies.

23        MS. SHROFF:  That's correct, Your Honor.

24        THE COURT:  Okay.  Yes, that argument is clear to

25  me.  The testimony is what it is.  There's no dispute about

A-1017

10

 1   what the agent, undercover, rather, testified to, and then

 2   I'll hear your argument about that in a moment.

 3           So with that, do you wish to have a <u>Fatico</u> hearing

 4   or an evidentiary hearing on any other fact relating to

 5   sentencing?

 6           MR. NAVARRO:  No, Your Honor.

 7           THE COURT:  Okay.  Let's turn now to the calculation

 8   of the guidelines.

 9           Then let me also confirm with the government, there

10   are no victims in this case, correct?

11           MR. NAVARRO:  That's correct, Your Honor.

12           THE COURT:  All right.  The Probation Department, as

13   everyone knows, has calculated a total offense level of 24.

14   That's based on the calculations set forth in paragraphs 21 to

15   36 of the presentence report.  They've also calculated a

16   criminal history category of I, because the defendant is a

17   zero point offender as that term is now used

18   post-November 2023.

19           The defendant has made two objections and Ms. Shroff

20   has alluded to them already.

21           The first objection, I agree with and I don't think

22   there's really much dispute but I'll hear from the government

23   if they disagree.  Under the November 2023 guidelines which

24   or, rather, the November 2023 amendment to the guidelines

25   which Probation couldn't have applied back when they issued

CMH      OCR      RDR      FCRR

A-1018

11

1   the PSR because that was back in April 2023, the defendant is

2   entitled to a two level reduction as a zero point offender.

3   His crime is not one that disqualifies him so, therefore,

4   because he has no criminal history points, he should qualify

5   for that two level reduction.

6           Does the government or Probation disagree with that?

7           MR. NAVARRO:  The government agrees.

8           THE PROBATION OFFICER:  Probation agrees.

9           THE COURT:  Okay.  Now, I'll note that the Probation

10  Department didn't address that issue in their April 2023

11  report and, Ms. Shroff, as far as I can tell, you didn't make

12  your objections to the guidelines calculation to Probation

13  such that they would have generated an amendment as typically

14  happens but, rather, you raised your objections I think for

15  the first time to me in the sentencing memorandum.

16          Is that correct?

17          MS. SHROFF:  That's correct, Your Honor.  I

18  apologize.  I should have looped Probation in but I did

19  briefly confer with Probation in the courtroom and given the

20  fact that they concur, I'm hoping that my error will not have

21  any consequence.

22          THE COURT:  It's not an error.  I'm just noting it

23  because I don't like it to seem as if the Probation Department

24  failed to file an amendment to the report which is typically

25  the way it goes and that's typically in response to some

CMH      OCR      RDR      FCRR

A-1019

                                                                    12

1    objection.  So that was all just by way of explaining how this

2    played out.  No one's really at fault here.  These are new

3    amendments that are being applied on a case-by-case basis.

4            So I am going to apply the amendment to grant a two

5    level reduction to Mr. Goklu with respect to his total offense

6    level.  So that brings his total offense level down to 22 and

7    his applicable guidelines range in criminal history category I

8    to 41 to 57 months.  So I'll adopt that as an initial matter.

9            Now, the defendant's second objection I think

10   requires perhaps a little more discussion, but let me explain

11   to the parties my preliminary conclusion regarding it.

12           While I think Ms. Shroff makes a good point

13   regarding the undercover operation that happened with respect

14   to Mr. Goklu, and the fact that the agent did not explicitly

15   say that he was a drug dealer in the first three transactions

16   or conversations that they had, I don't think that that is a

17   basis to alter the guidelines or lower the guidelines based,

18   as I said before, on a decrease in the overall value of the

19   funds that were transacted as part of the crime but, rather, I

20   think of it as a factor for me to consider in assessing

21   whether a downward variance is appropriate because the

22   guidelines overstate the seriousness of the crime.

23           The reason I don't think it qualifies to lower the

24   guidelines range is because -- well, there are two reasons.

25           One is there was information obviously provided to

A-1020

13

1  the defendant after the third transaction which made it clear

2  that the UC was purporting to be a drug dealer and that all of

3  the funds he had provided were drug proceeds, yet the

4  defendant continued to convert the undercover's alleged drug

5  proceeds or purported drug proceeds into bitcoin thereafter.

6  So certainly the jury had ample reason to find that

7  he was willingly and knowingly money laundering and running an

8  unlicensed money transmitting business but, secondly, the

9  requirement under the literal language of the provision is

10  that the enhancement applies if the defendant knew or believed

11  that any of the funds were proceeds of illegal activity and

12  not necessarily all of the funds.

13  So I think the argument is twofold.  The government

14  alluded to the first part of it which is that based on the

15  defendant's conversations and then the later conversation --

16  sorry -- based on the defendant's conversations with the

17  undercover in the first three, with respect to the first three

18  transactions, he suggested that he either believed or was

19  willfully blind to the fact that these were proceeds of

20  illegal activity.

21  So it would be reasonable for the jury to infer that

22  the defendant had reason to believe and also at least was

23  willfully blind to the fact that he was laundering illegal

24  money, but I think that was very clear once the undercover

25  told him and the defendant then continued to launder money for

CMH    OCR    RDR    FCRR

A-1021

14

1   the undercover, sort of bolstering the notion that he believed

2   it before but just didn't care.  So I think that that is a

3   very reasonable inference from the evidence which is

4   undisputed based on the undercover's testimony.

5           Secondly, the way I read the guideline provision, it

6   isn't necessary that all the funds were proceeds of illegal

7   activity for them to be counted and for the level to be

8   raised, but that any of the funds were proceeds of illegal

9   activity.  So, therefore, I read the guidelines as covering

10  all of the funds that were transacted as part of the crime

11  because at least some of them were proceeds of illegal

12  activity or, rather -- let me back that up.  Some of them at

13  least the defendant knew were proceeds of illegal activity

14  after the UC told the, effectively told the defendant that he

15  was a drug dealer and dealing in illegal marijuana or growing

16  illegal marijuana.

17          So for both of those reasons, I think this

18  guideline, the guideline should not be changed by lowering the

19  amount of the value of the funds from 130-some-thousand to

20  something below 95,000.

21          I'll hear from you, Ms. Shroff, if you'd like to be

22  heard further and then, of course, I'll hear from the

23  government.

24          MS. SHROFF:  Your Honor, by the language, you mean

25  the language in 2B1.1, correct?

A-1022

15

1         THE COURT:  Correct.

2         MS. SHROFF:  So I wanted to address this matter

3    hopefully by starting with the verdict form because I don't

4    think the verdict form asked the jury to consider each

5    transaction.  Right?  So I mean that was up to the government

6    and defense counsel below, but given the language and the

7    testimony that was elicited, and I mainly rely on Mr. Singer's

8    cross because there was no redirect on that point, and I think

9    those pages are attached as an exhibit, 346 onward, it's

10   pretty clear what the undercover is testifying to.

11        Then he says at the end, on 384:  Well, I guess I

12   did not specifically state anything about drugs during those

13   interactions, that's correct.

14        And then Mr. Singer asked a followup question and

15   the undercover says again that that's correct.

16        So to the extent that Mr. Goklu, and I'm just

17   assuming this for purposes of the verdict because the verdict,

18   of course, was one of guilt --

19        THE COURT:  Can we back up for one minute though

20   because I probably misspoke.

21        It isn't necessary for the jury to have made the

22   finding.  I guess I was trying to say that I think the jury

23   reasonably could have thought that.  The bottom line is I need

24   to find by a preponderance that the defendant knew or believed

25   that some part of the funds that are being counted as part of

CMH      OCR      RDR      FCRR

A-1023

16

1    the value of the funds were proceeds of illegal activity and

2    I'm saying based on my assessment of that evidence, I too

3    found that he at least believed that the funds were proceeds

4    of illegal activity because everything about the course of

5    conduct, especially the fact that he didn't, when actually

6    told explicitly about the undercover's purported marijuana

7    growing activities, didn't say, Oh, I don't want to engage in

8    this conduct anymore.

9           So, obviously, it's temporarily removed in a way but

10   to me, it is indicative of the defendant's belief as to the

11   prior transactions because he didn't express any inclination

12   or hesitation about continuing to engage with the UC and

13   convert his money into bitcoin.

14          So I should have been a little clearer.  I should

15   not have focused on the jury, what the jury could have found

16   or not found, but I'm just saying that's even a level beyond

17   what I need to find which is preponderance.

18          MS. SHROFF:  Your Honor, I'm happy to address that.

19          Let's just say, hypothetically, that the undercover

20   approaches somebody in January 1st and says, you know, nothing

21   about drug proceeds until three months later, and in the span

22   of those three months, somebody has undergone several

23   transactions with the undercover.

24          It is just as likely an inference that one might say

25   to oneself, I've gone down this road already, I'm already

CMH      OCR      RDR      FCRR