# 24-767-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

MUSTAFA GOKLU, AKA Mustangy,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## APPENDIX
## Volume 5 of 5 (Pages A-1024 to A-1117)

MATTHEW BRISSENDEN
*MATTHEW W. BRISSENDEN, P.C.*
*Attorneys for Defendant-Appellant*
666 Old Country Road, Suite 501
Garden City, New York 11530
(516) 683-8500

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ................................... A-1

Complaint, dated May 5, 2019.................................. A-19

Superseding Indictment, Filed on
  October 28, 2020 .................................................. A-33

The Government's Requests to Charge, dated
  September 12, 2022, with Proposed Verdict Sheet
  Attached................................................................... A-38

Defendant's Requests to Charge,
  dated September 12, 2022.................................... A-70

Transcript of Jury Selection Held before of the
  Honorable Pamela K. Chen, dated October 3,
  2022 ....................................................................... A-76

Excerpts from Trial combined Opening through
  Verdict, Filed on December 1, 2022 ..................... A-264

Government Exhibit 501.......................................... A-753

Government Exhibit 502.......................................... A-761

Government Exhibit 503.......................................... A-765

Government Exhibit 504.......................................... A-770

Government Exhibit 505.......................................... A-776

Government Exhibit 506.......................................... A-786

Government Exhibit 507.......................................... A-792

Government Exhibit 901.......................................... A-799

ii

|                                                                                                          | Page   |
|----------------------------------------------------------------------------------------------------------|--------|
| Government Exhibit 902                                                                                    | A-812  |
| Government Exhibit 903                                                                                    | A-814  |
| Government Exhibit 904                                                                                    | A-849  |
| Government Exhibit 906                                                                                    | A-864  |
| Government Exhibit 907                                                                                    | A-895  |
| Government Exhibit 909                                                                                    | A-916  |
| Government Exhibit 1101                                                                                   | A-928  |
| Jury Instructions, Filed on October 11, 2022                                                             | A-929  |
| Verdict Form, dated October 11, 2022                                                                     | A-958  |
| Notice of Motion, by Defendant, for Judgment of Acquittal, dated November 10, 2022                       | A-960  |
| Affirmation of Murray E. Singer, for Defendant, in Support of Motion, dated November 10, 2022            | A-961  |
| Government Memorandum of Law in Opposition to Defendant's Post-Trial Motion, dated December 5, 2022      | A-965  |
| Reply Affirmation of Murray E. Singer, for Defendant, in Further Support of Motion, dated December 12, 2022 | A-988  |
| Memorandum and Order, dated January 13, 2023                                                             | A-990  |
| Sentencing Memorandum from Sabrina P. Shroff to the Honorable Pamela K. Chen, dated January 15, 2024     | A-999  |
| Transcript of First Sentencing Day held before the Honorable Pamela K. Chen, dated January 29, 2024      | A-1008 |

iii

**Page**

Excerpt from the Continued Sentencing Hearing
    held before the Honorable Pamela K. Chen, dated
    March 14, 2024 ........................................................ A-1054

Notice of Appeal, Filed on March 22, 2024 .............. A-1117

A-1024

17

1   80 percent in, there's no point in my turning back now.  One

2   could also think, well, what am I supposed to say to this guy

3   who's telling me now that he got the money through drugs.

4   Right?

5              Drug dealers don't necessarily have the reputation

6   of being kind and gentle people.  Mr. Goklu may have very well

7   thought to himself, yikes, I'm not going to confront this guy

8   about drugs, I'm already halfway through this, I'm just going

9   to finish the course.

10             Of course, the Court is free to say that your

11  inference is a better one than mine.

12             THE COURT:  Well, let me say this.  I heard the

13  tapes and so you're at a slight disadvantage although,

14  obviously, you had the tapes available to you.  It's clear to

15  me the defendant was not concerned about the source of the

16  funds from all the conversations that I heard between him and

17  the undercover and some of the comments that he made in

18  general.

19             MS. SHROFF:  Fair enough, Your Honor, but that is

20  the argument on behalf of Mr. Goklu, that if he had known --

21  that the undercover chose not to make him knowledgeable about

22  a fact.

23             Look, it's an undercover.  It's clearly a tactical

24  decision between him and the United States Attorney setting up

25  the sting.  So if they wanted to have a clean record now and a

A-1025

18

1   clean record on appeal, they should have just told him from

2   day one that he was a drug dealer and that that's how he was

3   earning money.  In fact, maybe that would have changed the

4   entire course of the conversation between the two of them.

5   It's not for me to speculate here.

6           The Court is correct, I was not trial counsel below.

7   A secondhand listening of the tapes is not the same thing, but

8   I do believe that since it is the undercover who decided how

9   to impart knowledge of the drug dealing, the benefit should

10  inure to Mr. Goklu and not to the United States.

11          THE COURT:  I can tell you that I'm going to

12  consider that as well as the fact that the amount that was

13  transacted was driven by the government to some extent.

14  Obviously, the defendant was a willing partner but in my mind,

15  the value of the funds and the fact that the government was in

16  some way the driver of that as well as some of these

17  conversations is a factor I'm going to consider in deciding

18  whether a downward variance is appropriate.

19          So I am going to consider it but I don't think it's

20  a valid basis for lowering the guidelines level itself based

21  on the total value of the funds based on my reading of the

22  guideline range.  Although, I mean it's a perfectly valid

23  argument and one that caused me to scratch my head a bit, but

24  I don't think that that's a proper way to deal with that fact

25  or those facts.

A-1026

19

1      MS. SHROFF:  That's fine, Your Honor.  I did want to

2  add one point on basically the argument of sentencing

3  entrapment, I suppose is the phrase that is used.

4      I don't believe that the evidence shows Mr. Goklu as

5  driving the numbers.  I think the numbers are driven solely by

6  the undercover.  I don't think Mr. Goklu drives the numbers.

7      THE COURT:  Well, the word "drive" is a funny one.

8  I mean Mr. Goklu accepted it, right?  So, obviously, he

9  participates in it and he doesn't say I'd like to do less

10 necessarily and the evidence showed that there were large

11 amounts that he might have transacted with others based on

12 some of the cell phone or I guess online data that the

13 government was able to get.

14     None of those are being counted against him but

15 there certainly was enough other evidence that Mr. Goklu was

16 interested in large transactions and I recall, although the

17 government will correct me, that there, in fact, were some

18 conversations where Mr. Goklu suggested -- actually, I

19 don't -- I want to hear from the government on this.

20     I can't remember if Mr. Goklu said he couldn't do

21 certain amounts because he didn't have a certain cash flow or

22 the opposite, that he wanted larger amounts and invited them.

23 So Mr. Navarro will probably remember the transcript better.

24     MR. NAVARRO:  Yes, Your Honor.

25     There were -- certainly, the way the communications

A-1027

20

1   would normally go, the undercover would contact Mr. Goklu and
2   they would discuss an amount and Mr. Goklu would say I have
3   that or I don't.
4           Your Honor is correct, there was one instance where
5   Mr. Goklu said that he needed more time to get that amount.
6   And he also -- the government did put numbers out there but
7   Mr. Goklu did as well.  For instance, just to cite one
8   example, in the August 28, 2018 meeting, he indicated that,
9   Mr. Goklu did, that he could exchange --
10          THE COURT:  Go a little slower for the translator,
11  not the court reporter.  She's speedy.
12          MR. NAVARRO:  Thank you, Your Honor.
13          For example, on August 28, 2018, Mr. Goklu indicated
14  that he can exchange more than $5,000 every two or three days.
15  So it was a back and forth as to what amount was available to
16  Mr. Goklu in what time frame.
17          THE COURT:  Okay.
18          MS. SHROFF:  I just want to make sure, Mr. Goklu
19  never says this amount is too small for me to be bothered
20  with, I need a larger amount, and he never ever says I will
21  only do business with you if you up the ante.
22          THE COURT:  All of that is true but what was clear
23  to me, again, I remember this from the trial, is that he
24  obviously was eager to do as much as he could within the time
25  frame possible for him because he made money on these

A-1028

21

1    transactions.  So the testimony about I can do 5,000 every two

2    to three days is obviously both an invitation to give him

3    sums, certain sums or a volume of sums, but also an expression

4    of some limitation.  I understand that.

5           Don't get me wrong.  I don't recall him ever saying

6    I only do large amounts, but he did express certainly a

7    willingness to try to do a large volume even if it was in

8    smaller amounts because he was in the business of conversion,

9    converting money into bitcoin.

10          MS. SHROFF:  Right.  All I was saying is he doesn't

11   drive the numbers.  So to the extent you cross a sentencing

12   threshold in terms of loss amount or exceeding a certain loss

13   amount under, I don't want to call it loss amount but you know

14   what I mean, he doesn't drive that number.

15          So, for example, you see this in drug cases all the

16   time, right?  Two kilos is not worth it for me, you know.

17          THE COURT:  Slow down for your interpreter.

18          MS. SHROFF:  I want to start at a higher drug

19   number.  So all I was trying to say is he wasn't driving the

20   number.  That's what I meant by the word "drive."

21          THE COURT:  Understood.  And I do understand that.

22   I'm only quibbling with you about the semantics a little

23   because it takes two to tango, to use the expression.  Right?

24   So if the government suggests a number and Mr. Goklu accepts,

25   you know, you're right, he's not picking the number, but he's

A-1029

22

1  certainly not refusing it.  That's all I'm saying.  He was a
2  full partner in this, in these transactions.
3        Okay.  So we're actually still talking about the
4  enhancement.  The government should understand that I'm -- I
5  keep calling it enhancement.  The two level difference based
6  on the total value amount, I'm not inclined to adopt the
7  defense's argument to decrease by 47,000 the total value of
8  the transacted funds that are used to determine the
9  guidelines.
10       So the government doesn't need to argue anything
11 further unless you want to maybe just put, set forth the one
12 point you were making about Mr. Goklu's comments during the
13 first three transactions that suggested he knew.
14       MR. NAVARRO:  Your Honor, I think it's in the record
15 and Your Honor recalls the testimony.
16       He certainly was engaged in operational security and
17 counter surveillance to make sure that what he was doing was
18 not easily detected by law enforcement and there were his own
19 statements about being engaged in money exchanged, both him
20 and his business partner.  For example, he said his business
21 partner had been arrested for changing money for a drug
22 dealer.  He had suggested that there could be undercovers.
23 There could be cameras.  He said in one instance that he
24 didn't like to go to Manhattan because there were too many
25 cameras and police.  And he specifically said he would meet

A-1030

23

1    the UC in Manhattan only for transactions of $20,000 or more.

2            So, again, this goes to him driving the numbers.

3    That was on August 28, 2018.  And there are some other

4    instances that I can get to at the time of the 3553(a)

5    argument.

6            THE COURT:  All right.  So for the reasons that I

7    stated, albeit less articulate than I would like, I'm not

8    going to reduce the total value of the funds that were

9    transacted and should be considered in determining the

10   increase under 2B1.1 for the value of the funds.  So that will

11   remain the same.

12           Then as I said before, because I decreased the total

13   offense level by two, the applicable guidelines range is 41 to

14   51 months, and that would be my starting point for deciding on

15   an appropriate sentence in this case.

16           Are there objections to anything else in the

17   presentence report from the defense?

18           MS. SHROFF:  Yes, Your Honor.

19           I did want to note on paragraph 25, while I have,

20   unfortunately, no legal basis to object to the two point

21   enhancement because it is a conviction under 18 U.S.C. 1956, I

22   think there has been repeated arguments made that the entirety

23   of the conviction is under 1956.  So it seems unfair to not

24   just Mr. Goklu but any defendant because you're essentially

25   double counting.  You're including that in the base offense

A-1031

24

 1   level and then you're increasing that also with the two

 2   points.

 3              So I would ask the Court to consider that just the

 4   way you are going to consider the arguments I made in '23

 5   because it's a duplicative enhancement of two points.

 6              THE COURT:  Right.  I appreciate what you're saying.

 7   I've often puzzled over that myself.

 8              My assumption, and we can discuss this later, is

 9   that the guidelines, the guideline base offense level that's

10   applied here captures a whole bunch of different or applies to

11   a whole bunch of different financial crimes and that's why I

12   think they decided that a two level enhancement is warranted

13   for money laundering because it's considered more serious than

14   some of the other kinds of crimes like basic theft or things

15   like that.  I obviously am not on the Sentencing Commission

16   but that's my assumption based on how this is structured.

17              So it is an interesting question.  We can discuss

18   later how much weight I should give that argument in deciding

19   whether the guidelines overstate the seriousness of his crime

20   or whether there's some kind of double counting, but I would

21   not say that I can formally or decide, based on any case law

22   or otherwise, that it is really duplicative in some way or

23   double counting because I think the structure is such that the

24   applicable 2S1.1 guidelines does cover a range of different

25   financial crimes and that's maybe why the enhancement is

A-1032

25

1   appropriate from the Commission's perspective.

2           Let's put that aside for the moment because, as I

3   said before, the guidelines range that I've decided upon is 41

4   to 51 months based on a total offense level of 22 in criminal

5   history category I.  We can talk later about a variance when

6   we get to the 3553(a) factors.

7           Is there any other objection to anything else in the

8   presentence report?

9           MS. SHROFF:  Yes, Your Honor.

10          I had an objection on paragraph 48.  I object to the

11  sentence that starts with "of significance" which is three

12  lines from the bottom of that paragraph on 48.  I object to

13  any consideration at all given to this absurd dispute between

14  Mr. Goklu and the landlord.  It does not seem to have any

15  relevance in this case.

16          I also object to the extent that the Court has

17  considered the March 27th and the May 18, 2023 violations by

18  Pretrial Services.

19          THE COURT:  April, I think, but go ahead.

20          MS. SHROFF:  Okay.  So may I just expound on that

21  for a minute?

22          THE COURT:  You can but I'm going to, just to sort

23  of proceed in a more formal fashion.

24          I denied your prior objection about the double

25  counting with respect to the two level money laundering

A-1033

26

1  enhancement.  I'm not going to excise this sentence from the

2  Probation Department report and let's discuss this in the

3  context of the 3553(a) factors.

4       I do actually think it's relevant, how Mr. Goklu

5  acted post-arrest.  You've made the argument that he's been a

6  model citizen and, therefore, it's relevant to the need for

7  specific deterrence and his good character.  I disagree with

8  you on that because of this incident, but you can argue to me

9  that I've misconstrued what happened there but, remember, I

10 had to preside over a conference where he was alleged to have

11 violated the terms of his presentence release because he

12 wasn't following a state court order that required him to

13 allow the inspection.

14      So let's not get ahead of ourselves.  I just want to

15 finalize the presentence report and the guidelines.

16      I'm denying the request to remove this sentence from

17 paragraph 48 and you can argue to me that I shouldn't consider

18 what happened post-conviction and presentence with respect to

19 the landlord dispute but, so far, I'm advising you that I am

20 inclined to consider it and we can discuss that later.  It

21 doesn't affect the guidelines calculation however.

22      MS. SHROFF:  It does not, Your Honor.

23      THE COURT:  All right.  So anything else in the

24 presentence report?

25      MS. SHROFF:  No, Your Honor.

A-1034

27

1          THE COURT:  Okay.  The government?

2          MR. NAVARRO:  No, Your Honor.

3          THE COURT:  So I'm adopting the presentence report

4  except with respect to the application of the November 2023

5  amendment.  So I think you should probably amend the report to

6  reflect the revised calculation.  Okay?

7          THE PROBATION OFFICER:  Will do.

8          THE COURT:  All right.  Now, let's turn to the

9  parties' written sentencing submissions and the 3553(a)

10  factors.

11          So I'll hear from you, Ms. Shroff.

12          MS. SHROFF:  Your Honor, let me just start with the

13  landlord because that's where we ended up.

14          THE COURT:  Yes.

15          MS. SHROFF:  Mr. Goklu may or may not have a firm

16  belief that his version of events with his landlord are the

17  appropriate one.  Okay?  The landlord clearly has reached out

18  to the United States government on a matter that does not

19  involve the government at all.

20          THE COURT:  Well, let me pause you for a second

21  because by the time it reached me, a state court order had

22  already been obtained.  So I obviously don't -- all I know as

23  to what happened before is that he was given notice that he

24  was supposed to appear in court on this issue of access for

25  inspection and he didn't appear.

28

1          What preceded all of that, I don't know, but reason

2   suggests to me or logic suggests to me that the landlord had

3   been brought to the point that she wanted or she felt she

4   needed to get some sort of court order to get Mr. Goklu to let

5   her inspector in so she can then start the process for selling

6   the apartment.

7          So all of those facts, and they were discussed at a

8   prior conference when Mr. Goklu was represented still by

9   former counsel, they were presented to me that he had been

10  extremely obstinate, difficult and obstructionist about

11  getting, letting the apartment be inspected.  Those are the

12  facts as represented to me and I have a state court order that

13  suggests the landlord was brought to the point of having or

14  pushed to the point of having to get a court order and then he

15  still didn't let the inspector in and that's why it came to

16  me.

17         So I'm not sure what part of those facts suggest

18  that he was acting in an appropriate way.  And you say his

19  version of the facts but I've never heard his version of the

20  facts.

21         MS. SHROFF:  But what I'm saying is his version of

22  the facts is not relevant to your criminal sentencing here and

23  it comes before the Court only because the landlord decided to

24  exploit what is hanging over Mr. Goklu's head which is a

25  criminal case, a prosecutor with the power of the federal

A-1036

```
                                                              29
 1   government who then was available to the landlord.  The
 2   landlord --
 3            MR. NAVARRO:  Well --
 4            THE COURT:  Hang on.
 5            Regardless of her motivation, you're arguing to me
 6   he's been a model citizen, right, and you want to use that
 7   fact or what you claim are those facts to get him a
 8   nonincarceratory sentence.  I have to look at all the facts.
 9            MS. SHROFF:  I don't think that's an appropriate
10   fact because landlord -- I could stand here and say landlords
11   are notorious for taking advantage of poor people.  I could
12   say landlords are notorious for riding over the rights of
13   immigrants.  I can say landlords can have a much easier time
14   getting a state court to issue an order.
15            If the Court is really going to rely on this, then I
16   think we do need a Fatico of what happened in state court.  So
17   if that is the government's position that how one deals with a
18   litigation in state court on the advice of counsel in state
19   court and how, whether or not one shows up for a court
20   appearance or not or allows an inspection or not, I do not
21   think that is relevant to this.
22            I haven't really said -- I do think that at
23   sentencing, it's correct, that anything and everything counts,
24   but one cannot say that he was obstreperous or he was
25   obstructionist with the landlord.  That is like the
```

A-1037

30

1   quintessential person who is a dominant force, always with

2   more money and always with more power.

3           THE COURT:  But hang on a second.  All she wanted to

4   do was to have him let an inspector come in and look at the

5   apartment.  Why is that -- there's been no counter narrative

6   presented to me that suggests he was acting reasonably or

7   based on some advice of counsel or notion that his rights were

8   being violated.

9           So all I have in front of me is a court order that

10  was dated January 17, 2023 and then complaints from the

11  landlord that were I don't think illegitimately sent to

12  Pretrial Services to say, Pretrial Services to say we

13  understand he's under supervision, can you do something to

14  help us get him to comply.  That's all they did.  And then

15  Pretrial Services thought it appropriate to bring it before

16  me.

17          I think all of that -- I don't find that that is

18  improper.  I sense the frustration of this landlord, and I

19  don't know what the underlying circumstances are and I'm

20  willing to listen to them, but I do have this court order that

21  says he has to allow for necessary repairs and remediation

22  work, I guess that's part of it, and to allow for

23  reinspection.

24          So if it comes to me then to say he's still not

25  allowing it, how do I not construe that as a failure to comply

A-1038

31

1   with a court order?

2           MS. SHROFF:  But, the, the very fact that we're

3   talking about it here, the very fact that they have the

4   audacity to call Pretrial --

5           THE COURT:  Well, how is that audacious?

6           MS. SHROFF:  It is audacious because they have a

7   whole -- it's a bullying tactic.  I'm shocked that this

8   landlord even has that audience.  If the landlord called me

9   about it, I would say, well, you know what, you have a state

10  court proceeding, go and enforce it.

11          THE COURT:  But how is that not a violation of his

12  pretrial release to not comply with a court order?

13          MS. SHROFF:  First of all, I don't think that --

14  honestly, I don't think that Mr. Goklu was ever aware that his

15  pretrial conditions included any such, any such order.  I do

16  not think, because these are --

17          THE COURT:  No.  No.  Wait.  You and I are talking

18  about two different things.  I'm not saying specifically in

19  his terms of release, he has to comply with this order, but it

20  is a court order.  It's directed, although weirdly it's

21  directed to someone named Mr. Gokly.

22          MS. SHROFF:  Exactly.

23          THE COURT:  I don't know if he was served with it.

24          MS. SHROFF:  Exactly.

25          THE COURT:  But hold on one second.  You're

A-1039

32

1   complaining simply that the landlord went to Pretrial Services
2   and said:  I understand he's under your supervision, can you
3   get us some help to get him to comply.  They did not say:  I
4   want you to bring this before the Judge.
5           I heard, I entertained both sides to tell me what
6   was going on.  I did not hear anything from your former
7   counsel saying this is unfair, he's being unfairly accused of
8   this.  He's -- I directed him to comply and then, thereafter,
9   he did.  What I have though in the runup to this is a record
10  that suggests he didn't comply.
11          MS. SHROFF:  He has --
12          THE COURT:  Hang on.
13          Again, if Mr. Goklu's lawyer wanted to say this is a
14  complete misunderstanding, I would have heard it, but I didn't
15  hear anything like that.  All I heard was, yes, he will comply
16  with it.
17          MS. SHROFF:  But, Your Honor, here's my point.  The
18  fact that a landlord would know that Mr. Goklu has a criminal
19  federal case, the fact that the landlord would then take steps
20  to find out who Pretrial is or who Probation is, and then to
21  call them up, and we're assuming that they said we want help.
22  Of course, that's what you would say, but basically what
23  you're doing is you're bullying somebody who has a federal
24  criminal case.  And I, frankly, don't understand why
25  Mr. Singer ever allowed this to happen.

A-1040

33

1          I have to say if I were the counsel at that time, I
2    would have simply said none of this is relevant here.  If
3    there is a court order that needs to be enforced in state
4    court, state court should go right ahead and give the landlord
5    whatever relief they wanted.  It is not, it is not upon us to
6    second guess whether or not a landlord is behaving
7    appropriately.  And guess what?  The landlord isn't behaving
8    appropriately.  This is precisely what the landlord wants.
9    The landlord wants this man out by any means and all means.
10   The best way to get him out is to write to his sentencing
11   judge or in some way get this issue before the sentencing
12   judge so the guy goes to prison.
13          So if the Court is going to consider this, then, I'm
14   sorry, I do believe we need a Fatico hearing on this point.
15          THE COURT:  I think we might need one.
16          Let me say this.  I don't know whether or not the
17   landlord was acting within her contractual authority based on
18   the lease to have Mr. Goklu leave.  I don't know.  All that
19   was presented to me was that he was not allowing individuals
20   to come in to either inspect the apartment or to repair it in
21   anticipation of her selling it.  That's how it was presented
22   to me.  That's the documentation I have before me.
23          I do not find there to be anything inappropriate or
24   improper or even distasteful about the landlord saying, I
25   understand he's under your supervision, and seeking some sort

A-1041

34

1   of help.  Now, I gather she did that even before she went to

2   or maybe it was after she got the court order.

3        So the bottom line is I don't think that that's

4   unduly heavy-handed.  She obviously was trying to use whatever

5   leaders there are in the legal system to see if she can get

6   him to comply.

7        My concern or the reason I think this is relevant is

8   because I have to consider whether or not he respects the law

9   and you argued to me that he is remorseful, that this was a

10   mistake and that he respects the law.  I have a court order

11   that was issued allegedly putting him on notice that he needed

12   to allow inspection and requiring it.

13        If there's some gap in the facts there, for example,

14   he never received a copy of this order or there's some other

15   miscommunication, I would be happy to hear that, but I do

16   think it's relevant for my consideration of whether or not

17   some -- the sentence has to achieve or promote specific

18   deterrence to get Mr. Goklu to respect the law and to abide by

19   court orders.  It's been represented to me, and I haven't

20   heard anything contrary to that, that this court order applied

21   to him, that he was on notice of it and that he failed to

22   comply with it.

23        MS. SHROFF:  Your Honor, then I think we do need a

24   Fatico on the point.

25        THE COURT:  I would prefer that, to be honest,

CMH    OCR    RDR    FCRR

A-1042

35

1  because I do consider it a significant fact since you're

2  arguing so strenuously for a nonincarceratory sentence when

3  his guidelines are high.

4        Now, I did indicate there are other factors I am

5  going to consider.  This will not come as any surprise to

6  anyone.  I'm not intending to sentence him within the

7  guidelines range.  I do think it overstates the seriousness of

8  the crime that he committed under the particular facts of this

9  case and for some of the reasons we discussed, but I'm not at

10  this time inclined to give him a nonincarceratory sentence for

11  the reasons that I've just said which is I'm concerned about

12  the need to have the sentence promote respect for the law by

13  Mr. Goklu and to deter him from any kind of future involvement

14  in crime.

15        You may think this is trivial, Ms. Shroff, or you

16  may think it should be dealt with otherwise, and I think you

17  seem to be suggesting to me that the facts are not what they

18  have been represented to me, all of that is relevant to me, so

19  I would like to schedule this for a Fatico.

20        The government and, hopefully, well, maybe working

21  with Pretrial, can get the landlord in here so that I can hear

22  what the actual circumstances were that gave rise to this

23  order and whether or not Mr. Goklu was ever put on notice of

24  it because it does have a different defendant's name.  I don't

25  know if Mr. Goklu is subletting this person or if that's an

A-1043

36

1  alias.  It has never been represented to me that Mr. Goklu has

2  an alias but the name happens to be Michael Gokly, G-O-K-L-Y.

3          MR. NAVARRO:  So, Your Honor, he does go by

4  "Michael."  In fact, Ms. Shroff references him as Michael in

5  her sentencing submission.  And the "Gokly" I'm going to

6  hazard a guess is probably just a typo or misspelling of the

7  name.  I don't think there's any dispute that we're talking

8  about the same person.

9          Nevertheless, the government is happy to go forward

10 with the <u>Fatico</u> hearing and bring in the appropriate witnesses

11 whoever that may be.

12         THE COURT:  Let's do that.  I know there's an

13 expression making a federal case out of something, but it is

14 important to me because it is the one I will say black mark,

15 if you will, in Mr. Goklu's post-arrest, post-conviction

16 conduct that does give me some pause about whether or not he

17 really respects the law and I'd like to get clarification on

18 this.

19         MS. SHROFF:  Your Honor, of course, I want to just

20 make clear, I, as an officer of the court, I, of course,

21 believe that court orders should be complied with.  I would

22 not in any way suggest that because it's a state court order,

23 he won't comply with it or a civil court order or even a

24 parking ticket.  Of course you should attend to these matters

25 because that's what the law requires us to do.

A-1044

37

```
 1          What I'm suggesting is, and I stand by this, for a
 2   landlord to reach out and call somebody who's supervising this
 3   human being when they know full well that they have a set of
 4   recourses available to them in state court, to me, that's just
 5   icky.  You're trying to bully that person because you know
 6   that they're worried about having a criminal case in federal
 7   court and you know that picking up the phone and calling
 8   somebody is going to scare the person who is about to be
 9   sentenced.
10          Look, if somebody called a judge about something
11   else I did somewhere else, of course that would be worrisome.
12   It's the same case here.  I didn't want the Court to think I
13   would think Mr. Goklu not complying with a court order would
14   be --
15          THE COURT:  Acceptable?
16          MS. SHROFF:  Yes.
17          THE COURT:  But to go back to your "icky" assessment
18   though or characterization, if somehow there were, there was
19   some suggestion that what was being sought through availing
20   themselves of the federal court process was heavy-handed or
21   unfair or something like that, I would be more receptive to
22   your argument, but this person was simply trying to get him to
23   comply with this court order which had a very simple
24   requirement that he allow someone to inspect the apartment or
25   come in for repairs.
```

A-1045

38

1    That, to me, is so basic.  It's like a parking

2   ticket.  If the parking authority came to me and said, Listen,

3   or a state court said he's in contempt of paying his parking

4   ticket, I too would think that that's relevant to me and it

5   happened to be that when I said comply afterwards, he

6   complied.

7    So the icky part, I think, is misplaced because what

8   is being sought here is simple compliance with a fairly

9   straightforward court order or obedience to the law.

10    MS. SHROFF:  We don't know that because Probation

11   has never said what the landlord asked for and all we know is

12   what -- you're imputing, most respectfully, some kind of good

13   will to the landlord which, given my, my interactions with

14   landlord, I would not think the landlord deserves such, such,

15   such a designation but, more importantly, regardless of what

16   they asked for, Mr. Goklu was brought before his sentencing

17   judge.  Imagine, imagine the heavy-handedness of it all

18   because that landlord has a lawyer, that landlord has an

19   entire state.  Is the state court so ill-equipped to grant

20   that landlord relief that they have to come to you?  It

21   doesn't seem proper, Your Honor.  I'm sorry.  The state court

22   is not without its own enforcement abilities.

23    If the landlord truly wanted follow the law, they

24   would have just gone back to the state court.  What they're

25   doing is they're saving themselves legal fees, they're cutting

39

1   out somebody that is not listening to them apparently, and
2   they're coming to you.  It's like going to the heavier parent.
3          THE COURT:  Well, let me just say this.  I think
4   you're focusing on the wrong actor here.  I don't necessarily
5   care whether the landlord was heavy-handed or not.  If
6   Pretrial Services was aware, however they were aware, that
7   Mr. Goklu was subject to this court order and was not
8   following it, they would report that to me, I think, and I
9   would want to know that for the very reasons we're discussing.
10          You're right, there may be extenuating or excusing
11   circumstances or justifications as to why he didn't show up
12   for court that day to contest the order or comply with it
13   because it had been outstanding for four months by the time it
14   came to me.  Fine, you could argue that with me, but the fact
15   of the order, however it ended up getting to Pretrial, is
16   something I want to know for purposes of sentencing.
17          So you can impugn the landlord's motivations or
18   their character or the heavy-handedness of how they went about
19   it.  Fine.  It's irrelevant.  That's irrelevant to me.  What's
20   relevant to me is I have what appears to be a valid court
21   order directing Mr. Goklu to allow the landlord into the
22   apartment for particular purposes and legitimate purposes:
23   Remedial repairs and also inspection.
24          If there's some back story that explains why he
25   didn't comply and why I should not infer that he doesn't

A-1047

40

 1   respect the law from that, you should tell me, but I don't

 2   need to get into any kind of character assassination or

 3   assessment with respect to the landlord and how they went

 4   about this.

 5           I actually am pleased that Pretrial Services did

 6   learn about it and there -- because I want to know all these

 7   things to figure out what kind of sentence is appropriate.

 8   It's very important to me.  So that's what I prefer to focus

 9   on.

10           What I'd like to have happen at this hearing is

11   some, an elicitation of the facts, whether Mr. Goklu knew

12   about this order, what gave rise to her going to get the

13   order, and the course of conduct between them relating to his

14   compliance with the order or the getting of the order or the

15   need for the order.  That's what matters to me.  I really

16   don't want to have this evidentiary hearing for you to beat up

17   on the landlord for talking to Pretrial Services because she

18   knew he was under supervision, again, unless you think it goes

19   to her bias in some way in terms of her testimony.  I guess

20   that could be something.

21           I assume you are going to attack her by saying:  You

22   wanted him out of your apartment because you heard he was a

23   convicted felon, something to that effect, and you were going

24   to use all measures and means to get him out of there

25   including making up that he didn't allow inspections.

41

1       If you want to attack her bias, I guess, in terms of

2 her reporting the facts, that's up to you, but it's not

3 relevant to me the method she used, the fact that she went to

4 Pretrial Services which you say is heavy-handed and icky, but

5 I think the fact of what happened is relevant to me, whether

6 or not Mr. Goklu respected the order or not is relevant to me,

7 whether or not he respected his landlord's request even to

8 allow the inspection before the order had to be obtained is

9 relevant to me, why he didn't show up, if you want to talk

10 about it, for the court date to tell his side of the story,

11 that's all relevant to me because it's about him, his

12 character, his likelihood of recidivating or his respect for

13 the law.

14       You're giving me a weary look but why aren't those

15 relevant?  I don't really understand why you're fighting it.

16 You acknowledge --

17       MS. SHROFF:  Because -- I'll tell you why.  I'm wary

18 because there is no recidivism issue with the landlord/tenant

19 dispute.  He hasn't -- how he dealt with the landlord has

20 nothing to do with his criminal case.  How he dealt with the

21 court order, should, if he wanted to appeal it, if he wanted

22 to ignore it, if he wanted to be held in contempt on it, it

23 still doesn't have anything to do with whether or not he's

24 ever going to break the law again.

25       THE COURT:  I disagree with you.  Everybody,

A-1049

42

1  including you, makes a big deal about how generous and good he

2  is.

3          MS. SHROFF:  And he is.  You can be generous and

4  good and still disagree with the judge of a landlord/tenant

5  court.

6          THE COURT:  That's fine, but if it's a reasonable

7  request and you're not being faithful to your agreement, you

8  have a lease agreement that requires certain things, that

9  shows disrespect for the law and it shows a lack of generosity

10 and common humanity.

11         If the landlord actually had a right to have an

12 inspector come in under the lease, whatever it says, and he

13 just flouted that, that is relevant to me.  That is someone

14 who shows disrespect for the law and for legal relationships

15 like your landlord/tenant relationship.  If you don't pay your

16 debts, that's also relevant.  Those are all things that go to

17 character that you are trying to argue positively to me to

18 show that he's not going to reoffend.  I would like to see the

19 full picture and I have this piece of fairly irrefutable

20 evidence that there was at least a court order and

21 circumstances that led the landlord to get a court order that

22 he didn't comply with for months.  So I would like to know

23 more about it.  That's all.  And what I'll make of it or how

24 much weight I'll give it remains to be seen.

25             So let's set a date for a hearing.  Let's say

A-1050

43

1  30 days from now.  Someone has to contact the landlord and

2  find out what her availability is.  She won't be pleased about

3  it but, Ms. Shroff, it will be some punishment for having gone

4  to the federal government.  She will have to come to federal

5  court and make her case about why Mr. Goklu was be

6  obstreperous or disobeying the lease and the court order.

7          THE CLERK:  March 6 at 11:30.

8          MR. NAVARRO:  That's fine for the government,

9  Your Honor.

10         THE COURT:  And for you, Ms. Shroff, and Mr. Goklu?

11         MS. SHROFF:  That should be fine.

12         MR. NAVARRO:  And that's for the evidentiary

13 hearing?

14         THE COURT:  Correct.

15         MR. NAVARRO:  We'll bring witnesses in.

16         THE COURT:  Obviously, if there are some issues that

17 I need to know about before then, certainly submit a letter,

18 because it may be that both of you talk to this person and you

19 agree that the facts are not what they appear or that this is

20 really a nonissue in which case you'll let me know.

21         Now, I haven't let the government speak much but I'm

22 assuming the government does think that this incident, however

23 you want to describe it, is relevant.

24         MR. NAVARRO:  Your Honor, for all the reasons that

25 you stated, we do agree that it's relevant to history and

A-1051

44

1   characteristics.  It's relevant to fashioning a sentence.  One

2   of the main things Your Honor has to do is to determine what

3   sentence is appropriate and one of the largest determinants of

4   that is how much trust is the Court willing to put that the

5   defendant will follow court orders.

6           Here we have a violation of a state court order

7   possibly, we'll get to the facts of that at the hearing, but

8   also a violation of the terms of release which say follow

9   state and local laws.  One of those is following court orders.

10  So I do agree it is relevant to Your Honor.

11          And I do -- you know, Ms. Shroff has said a lot on

12  the record about her speculation as to why the landlord did

13  things but the fact that they contacted law enforcement, to

14  me, that sounds like a landlord that wants to do things

15  legally and out in the open.

16          THE INTERPRETER:  A little slower, please.

17          THE COURT:  Let me apologize to the interpreter.  I

18  think I went a little too fast before as well.

19          Go ahead.

20          MR. NAVARRO:  I apologize.

21          That sounds like a landlord who wants to do things

22  legally and in the open as opposed to in the shadows as

23  Ms. Shroff suggests, but we can certainly sort that out via

24  testimony at the hearing.

25          THE COURT:  Let do that.

A-1052

45

1          Ms. Shroff, I'm not discounting your argument at all
2   and I'm happy to find out more about the facts.  Let me just
3   repeat this.  None of this was really explained to me before,
4   that there might actually be some factual dispute about what
5   gave rise to the court order.
6          I understand your bigger point that somehow what the
7   landlord did was inappropriate, but I'm not agreeing with you
8   on that.  I want to know what happened that gave rise both to
9   the court order and how Mr. Goklu responded to the order and
10  why he didn't show up in court if you want him or you want to
11  represent something about that.
12          MR. NAVARRO:  I will, Your Honor, but I do disagree
13  with the government's characterization that they called law
14  enforcement.  They didn't actually call law enforcement.  They
15  called the person who was supervising Mr. Goklu and the person
16  supervising -- you know what?  If the landlord really just
17  wanted to resolve the issue, they could have just called
18  Mr. Singer.
19          The landlord is not looking to resolve an issue.
20  The landlord is looking to put pressure on a man.  That is my
21  reading of the facts.  But more importantly, whatever is
22  important to the Court is what I will deem or I will try very
23  hard to address because that's, that's the most important
24  thing here.
25          THE COURT:  Okay.

A-1053

46

1          All right.  So we'll see you folks in March then and

2  like I said, if there are, if there is anything I need to know

3  or if there are any problems with proceeding on the next date,

4  let me know.  Okay?

5          MS. SHROFF:  Thank you, Your Honor.

6          MR. NAVARRO:  Thank you, Your Honor.

7          THE COURT:  Thank you, everyone.

8          So, folks, sorry.  Let me clarify one thing.

9          We'll have the evidentiary hearing and it is my hope

10  that I'll be able then to resume the sentencing at that time

11  so be prepared for that as well.  Thank you.

12          MR. NAVARRO:  Thank you, Your Honor.

13          MS. SHROFF:  Thank you, Your Honor.

14          (Matter concluded.)

15

16

17

18                    *     *     *     *     *

19

20  I certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.

21

22    /s/ Charleane M. Heading              February 14, 2024
   _____      _____
23      CHARLEANE M. HEADING                    DATE

24

25

CMH     OCR     RDR     FCRR

A-1054

1

```
 1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF NEW YORK
 2     -----------------------------x
                                  19-CR-386(PKC)
 3     UNITED STATES OF AMERICA,
                                  United States Courthouse
 4            Plaintiff,          Brooklyn, New York

 5            -against-           March 14, 2024
                                  2:00 p.m.
 6     MUSTA GOKLU,

 7            Defendant.

 8     -----------------------------x

 9        TRANSCRIPT OF CRIMINAL CAUSE FOR EVIDENTIARY HEARING
                         AND SENTENCING
10          BEFORE THE HONORABLE PAMELA K. CHEN
                 UNITED STATES DISTRICT JUDGE

11

12     APPEARANCES

13     For the Government:    BREON S. PEACE, ESQ.
                             UNITED STATES ATTORNEY
14                           Eastern District of New York
                             271 Cadman Plaza East
15                           Brooklyn, New York 11201
                             BY:  FRANCIS J. NAVARRO, ESQ.
16                           Assistant United States Attorney

17     For the Defendant:    LAW OFFICES OF SABRINA P. SHROFF
                             233Broadway
18                           New York, New York 10007
                             BY:  SABRINA P. SHROFF, ESQ.

19

20     Also Present:         MUSTAFA GOKLU, DEFENDAT
                             PROBATION OFFICER MALKO
21                           AJ ELTERMAN, INTERPRETER
                             GEORGE ESAYAN, INTERPRETER
22                           TAREVA TORRES, PARALEGAL
                             SPECIAL AGENT HUER, DEA

23

24     Court Reporter:       AVERY N. ARMSTRONG, RPR, NYRCR
                             Phone:  718-613-2419
25                           Fax:    718-613-2639
                             Email:  Aarm.edny@gmail.com
```

AVERY N. ARMSTRONG, RPR, NYRCR
OFFICIAL COURT REPORTER
Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

A-1055

```
                      PROCEEDINGS                    2

 1            (In open court.)

 2            THE COURTROOM DEPUTY:  Criminal cause for a Fatico

 3   hearing and sentencing, docket 19-CR-386, United States versus

 4   Goklu.

 5            Will the parties please state their appearances for

 6   the record, starting would the Government.

 7            MR. NAVARRO:  Good afternoon, Your Honor.

 8            Francisco Navarro for the United States, and with me

 9   is paralegal specialist, Tareva Torres.

10            PROBATION OFFICER MALKO:  Good morning, Your Honor.

11            Michelle Malko from probation.

12            THE COURT:  Okay.  Good afternoon to all of you.

13            MS. SHROFF:  Good afternoon, Your Honor.

14            For Mr. Goklu, sitting to my right, Sabrina Shroff.

15            THE COURT:  Good afternoon to both of you, as well.

16            We have, I think two interpreters here; is that

17   right?

18            THE INTERPRETER:  Yes, Your Honor.

19            THE COURT:  So let's have you both sworn in.

20            THE COURTROOM DEPUTY:  Please stand and raise your

21   right hands.

22            (Whereupon, the interpreters were sworn.)

23            MR. ESAYAN:  Yes, I do.

24            MS. ELTERMAN:  Yes, I do.

25            THE COURT:  Please state your appearances for the
```

A-1056

```
                        PROCEEDINGS                    3
 1   record, and the language you'll be interpreting.

 2          Ms. Elterman.

 3          MS. ELTERMAN:  Yes, DBA AJ Elterman for Turkish.

 4          MR. ESAYAN:  George Esayan, E-S-A-Y-A-N, Turkish.

 5          THE COURT:  Okay.  Good afternoon, again, to both of

 6   you.

 7          So as everyone knows, we're here for the resumption

 8   of the sentencing proceeding that we started almost a couple

 9   of months ago.  I just want to recap where we left off and

10   what we're going to do today before I sentence Mr. Goklu.  I

11   did go through my standard statements about the materials that

12   I have received and reviewed in preparation for sentencing and

13   initially, I did equipment that neither side wanted an

14   evidentiary hearing but that obviously has changed.  And we

15   did go through the guidelines calculation.

16          Just to remind everyone, I had decided that the

17   advisory guidelines range that will be my starting point is 41

18   to 51 months, and that's based on the defendant being in

19   Criminal History Category I, and having a total offense level

20   of 22.

21          Does anyone recall that differently?  And I will say

22   that I have a draft transcript.  So that's where I got that

23   from.

24          Government?

25          MR. NAVARRO:  Your Honor, that's correct.
```

A-1057

PROCEEDINGS                                    4

1          THE COURT:  Okay.  And Ms. Shroff.

2          THE INTERPRETER:  Sorry, Your Honor, the interpreter

3     has to interpret, and she has to hear her own voice at the

4     same time, and we have to keep -- your voice is not projecting

5     to the microphone, and it's impossible to hear it.

6          THE COURT:  Oh, I see.  So you want me to keep my

7     voice up?

8          THE INTERPRETER:  Up and into the microphone,

9     please.

10          THE COURT:  All right.  There's no head sets?

11          THE COURTROOM DEPUTY:  She has.

12          THE COURT:  Okay.  They're using headsets.

13          So I'm just confirming that everyone's recollection

14     that I had previously decided that the applicable guideline

15     range is 41 to 51 months, and that was at the prior

16     proceeding.

17          MS. SHROFF:  Your Honor, I'm sorry, I think I may

18     have missed asking the Court to apply 4C1.1.

19          THE COURT:  Four a zero offender?

20          MR. NAVARRO:  That was applied, Your Honor.  It was

21     originally -- the PSR was 51 to 63 months, I believe.

22          THE COURT:  Right.

23          MR. NAVARRO:  And then Your Honor applied the

24     zero-point offender, and all parties agreed that would take it

25     down to 41 to 51 months.

A-1058

PROCEEDINGS                                    5

1          THE COURT:  Right.

2          MS. SHROFF:  So I didn't see it on the PSR.  I

3   didn't know if the Court wanted to --

4          THE COURT:  I already -- hang on.

5          MS. SHROFF:  I don't have a draft transcript, so

6   that's why I apologize.

7          THE COURT:  I already asked the probation department

8   to note that change because the presentence report was issued

9   before the November 2023 amendments went into effect.  So

10  that's why, as the Government correctly stated, I did note

11  that he does qualify and that I confirmed with both parties

12  that there was no disagreement about that.  So he did get the

13  two-level offense decrease from being a zero-point offender,

14  and then I did ask probation to amend the presentence report

15  to reflect that.  So that's how we arrived at the 41 to

16  51-month advisory guideline range as the starting point.

17          And then we started to get into a discussion about

18  the Section 3553(a) factors and that's when we decided that a

19  *Fatico* hearing was warranted because I expressed my view that

20  this incident relating to Mr. Goklu's landlord or former

21  landlord trying to gain entrance into the apartment to make

22  repairs in preparation for sale of the apartment and Mr. Goklu

23  not cooperating with that process, necessitating the landlord

24  getting a housing court or state court order, that he had to

25  comply with, but it still got raised with me as not being

A-1059

PROCEEDINGS                                          6

1    complied with yet.  And that was prior to sentencing.

2          So Ms.  Shroff, you took issue with that and

3    thought -- and suggested that there might be some factors that

4    played into why Mr. Goklu was not being as cooperative as I

5    thought he should be.  You obviously still are going to argue

6    that it isn't relevant to his sentencing, but I expressed a

7    contrary view.  So that's why we're here today.  First, to

8    have a *Fatico* hearing, and we should get started with that

9    because we have a witness who has been called in today for

10   that purpose, so I want to get that person on the stand and

11   let them leave as soon as possible.  And then we'll go on from

12   there to finish the discussion about the 3553(a) factors and

13   I'll sentence Mr. Goklu at that time.

14         MS. SHROFF:  That's fine, Your Honor.  I just wanted

15   to note my objection to this witness because this witness does

16   not have any relevant testimony.  As to the *Fatico* hearing,

17   the issue wasn't whether or not he was cooperating with her,

18   the issue was whether or not she had a lawful order and a

19   contempt finding because the issue for the Court was that

20   whether or not Mr. Goklu had violated a court order.

21         THE COURT:  Hang on a second.  I'm stopping you for

22   a second because I view this issue as a little broader than

23   you do.  There was court order, but there's also a general

24   notion that you trying to say Mr. Goklu, since his arrest, has

25   been a model citizen.  To me, that has a lot of aspects to it,

A-1060

PROCEEDINGS                                    7

1   and one of them is complying with a contract.  For example, if

2   it's a lease.  And certainly complying with a court order.

3   And like I said, I don't know when he was made aware of the

4   court order or the circumstances giving rise to it.  I

5   obviously, had a little bit more of a window into, that having

6   looked at some of the 3500 material and the exhibits that have

7   been provided to me for today's hearing.  But to me, all of

8   that goes to your argument that I should be lenient because he

9   has demonstrated, since his arrest, that he is someone who

10  respects the law and complies with his legal requirements.  So

11  that could be a contract such as a lease and it could be a

12  court order.

13          So I don't want to you have any misconception about

14  why I still think it's relevant for me to consider this fact.

15  I didn't want a hearing because I was already aware of what

16  had been presented to me as the circumstances, and I saw a

17  copy of the state court order.  But you were contesting

18  whether or not -- obviously, you're contesting the relevance,

19  but I'm telling you I think it's relevant.  But you were also

20  suggesting that there were some other facts relating to the

21  situation that I should know about.  And that's why we're

22  having a hearing.

23          MS. SHROFF:  Your Honor, while I make the argument,

24  could I ask the witness to step out?

25          THE COURT:  All right.  So Ms. O'Neill, is it?

A-1061

```
                        PROCEEDINGS                    8

 1          If you don't mind taking a step right outside and

 2     having a seat for a moment.

 3          MS. SHROFF:  Your Honor, I just wanted to -- two

 4     things.  One, if I look at you oddly, it's because I've lost

 5     my glasses and I didn't want to ask for any adjournment

 6     because I was on trial the last time, so I'm perfectly capable

 7     of proceeding.  But to the extent --

 8          THE COURT:  You're squinting.

 9          MS. SHROFF:  Yes, because I cannot see that far.

10     That's number one.

11          Number two, it is the defense's position that the

12     interaction between a landlord and a tenant is not indicative

13     of how good or bad a person is or how nice a person is or how

14     remorseful a person is or whether the person is likely to be a

15     recidivist for the crimes that he has not been convicted of.

16     That's number one.

17          Number two, yes, I did understand the hearing to be

18     more limited to the fact of whether or not somebody had

19     disrespected the law and violated a court order, ignored a

20     court order, and I think the 3500 material makes clear that

21     there is no contempt finding on the Court order.  The Court

22     order is not in Mr. Goklu's correct name, and there is really

23     the most antagonistic of relationships between the two

24     individuals.

25          THE COURT:  That's what you said to me before was
```

A-1062

```
                              PROCEEDINGS                    9

 1    relevant, and I didn't have that information before me when I
 2    saw the court order.  And I'm not tamping my consideration to
 3    whether or not there was a contempt finding.  I was concerned
 4    from the outset -- and I think I made it clear -- that
 5    Mr. Goklu was so uncooperative that the landlord had to go get
 6    a court order to gain entry into the apartment that she should
 7    have been able to get without going to court.
 8            MS. SHROFF:  That may be.  But that's not an issue
 9    that is of the same caliber as, one, somebody violating a
10    lawful court order and, two, it is -- I still don't believe
11    this witness has any relevant testimony to give on that
12    particular issue.
13            And on the first issue, the fact that these two
14    individuals have a completely and truly contentious
15    relationship, that throughout the pendency of the lease, she
16    had her own lawyer and he had his own lawyer, and yet, this
17    woman continued to text him, interact with him, without
18    counsel on either side, it's --
19            THE COURT:  Ms. Shroff, let's have this discussion
20    later, because I have a witness who, at great inconvenience to
21    herself, has been brought in here for this matter, and I'd
22    like to hear from her.  I understand, and you've preserved
23    your argument about your belief that this is not relevant.
24            I've already told you that I think, as the
25    sentencing judge, that it's relevant for me understand or take
```

A-1063

PROCEEDINGS                                    10

1   into account what was presented to me before, but that you now

2   say has surrounding facts that dimmish the relevance, if

3   any --

4        MS. SHROFF:  I've never said she had relevant

5   testimony.  I don't think that the testimony is why I asked

6   for a *Fatico*.  I asked for a *Fatico* because I don't think the

7   Government has any evidence that he disobeyed a lawful court

8   order and nor is there any contempt finding which is what she

9   accuses of him doing.

10       THE COURT:  Well, to be clear, you actually attacked

11  her saying that she was weaponizing the probation department

12  against him in a way that was improper, and I told you then

13  that I didn't think her conduct in that regard was improper at

14  all, and that that wasn't a consideration for me.  But then

15  you said also that there was this historic antagonistic

16  relationship which could then explain why she behaved the way

17  she did and got a court order.

18       I thought that was relevant because, as I said to

19  you before and I'm saying again now, I believe that if he was

20  resisting lawful requests by his landlord to get into the

21  apartment to make repairs so she could sell the apartment --

22  and I could see it went on more months -- that to me, is

23  relevant.  You can continue to argue with me that you don't

24  think it is, but I'm trying to put you on notice that I do

25  think it is, and that's why I said if you want to have a

A-1064

```
                      PROCEEDINGS                    11
 1   hearing to bring out all the surrounding facts so that you can
 2   argue as robustly as you can that I shouldn't consider this
 3   incident at all, that's what I said you can do and that's why
 4   we're here.
 5             MS. SHROFF:  I understand the Court's ruling is
 6   adverse to Mr. Goklu.  But I don't believe that this witness
 7   has the relevant testimony to offer.
 8             THE COURT:  All right.
 9             MS. SHROFF:  And we would object to her being
10   called.
11             THE COURT:  Understood.  You've preserved your
12   objection.
13             So let's go ahead and have Ms. O'Neill come back
14   into the courtroom, and then let's go ahead and call her so
15   she can get on her way.
16             So Ms. O'Neill, if you'll come up to the witness
17   stand.  I'm going to swear new.  So remain standing for just
18   one moment.
19             (The witness takes the stand.)
20             THE COURTROOM DEPUTY:  Please raise your right hand.
21             (The witness was sworn and/or affirmed in by the
22   courtroom deputy.)
23             THE WITNESS:  Yes.
24             THE COURTROOM DEPUTY:  Have a seat.  I'm going to
25   ask that you speak directly into the microphone, and it's
```

A-1065

Witness testimony (pages 12-144) omitted

A-1066

```
                        PROCEEDINGS                      145

 1   to the Government?

 2             THE WITNESS:  Sure.  Thank you.

 3             (The witness steps down.)

 4             THE COURT:  All right.  So now, let's reset and get

 5   back to the task at hand.  I'm going to hear from the parties,

 6   starting with the defense, about an appropriate sentence and

 7   how I should consider the 3553(a) factors.  So Ms. Shroff, you

 8   can begin.

 9             Why don't you go back to your seat over there at

10   counsel table.

11             MS. SHROFF:  Okay, Your Honor.  Could I just ask

12   that Government Exhibit 8 -- before I forget.

13             MR. NAVARRO:  No objection, Your Honor.  It's the

14   affidavit and the exhibits.

15             THE COURT:  Okay.  So Government's Exhibit 8 is

16   admitted as part of the sentencing hearing.

17             (Government Exhibit 8, was received in evidence.)

18             THE COURT:  All right.  So Ms. Shroff --

19             MS. SHROFF:  I just want to direct the Court to

20   paragraph seven.

21             THE COURT:  Okay.

22             MR. NAVARRO:  And, Your Honor, and just to clarify

23   for the record --

24             MS. SHROFF:  Could I just finish, please?

25             MR. NAVARRO:  I'm sorry.  I didn't mean to
```

A-1067

```
                         PROCEEDINGS                      146
 1   interrupt.

 2            THE COURT:  Go ahead.

 3            MS. SHROFF:  So paragraph seven reads that -- it's

 4   the middle of the paragraph where she says, I immediately

 5   notified the defendant and requested access, and the defendant

 6   refuses to speak with me.

 7            As the Court knows that she never mentions anything

 8   about him texting and being responsive to her.  So I think

 9   that's a particular obfuscation, especially when she's giving

10   a statement of an affidavit under oath.  And then she mentions

11   that -- or give me access to make these repairs.  And the

12   mortgage loan commitment in this transaction is not

13   open-ended, it will expire on January 23rd.  Once this

14   happens, I lose my million-dollar deal.

15            Of course, the text from the Government exhibit

16   itself shows that he -- and she testified that she spoke to

17   him countless number of times, he texted her about this, and

18   even though the Court thinks that he should have -- I take

19   that back.

20            I'm just saying that the record reflects that he

21   texted with her back and forth, and she never mentions that in

22   her affidavit.

23            THE COURT:  Okay.  I'm not particularly concerned

24   about the affidavit and her testimony on this issue, per se.

25   But that's actually the kind of question you might have asked
```

A-1068

PROCEEDINGS                                    147

1   her while she was on the stand.  I mean, in other words, if

2   you think there's something inconsistent or incomplete about

3   her affidavit, I would have preferred if someone had asked

4   her, How did this affidavit get prepared --

5           MS. SHROFF:  She signed --

6           THE COURT:  No.  But, meaning, you know, we all know

7   that lawyers typically prepare these, so I don't know if she

8   was the one who decided what the contents of this would be and

9   how much detail would go into it.  So --

10          MS. SHROFF:  Much like a plea agreement, she read

11  it, she signed it, she had it notarized.  And she's a very,

12  very involved human being in her desire to make that millions

13  of dollars.  Despite having three attorneys, she has taken the

14  laboring -- or in communicating with a represented person, she

15  has been -- I prefer to not use the word aggressive, but she

16  seems to have taken a fairly aggressive stand when dealing

17  with Mr. Goklu involving other people.  So I think it's a very

18  fair conclusion for the Court to draw that she read every word

19  of an affidavit drafted in her native language and that she

20  signed.

21          THE COURT:  All right.  I'll hear from the

22  Government on it.  I don't see there being a large conflict

23  between what she said in her affidavit and what she testified

24  to.  But I've seen the text, and so I know what the back and

25  forth was.  So yeah --

A-1069

```
                        PROCEEDINGS                    148

  1          MR. NAVARRO:  The Government's position is similar.

  2   I think there's also a question of whether she's referring to,

  3   at the moment in time that this was written, as opposed to a

  4   course of conduct.  And so we don't have any further

  5   submission on that.

  6          The one thing that I did want to note for the record

  7   is I'm unclear regarding Exhibits 4, 5, and 6, which are the

  8   three e-mails that were used during the cross.  I think for

  9   the sake of completeness, we should just have them admitted.

 10   There's no jury here.  And so Government Exhibit 7, which is

 11   the timeline, would be the only document that would not be

 12   admitted from the Government's exhibit list.

 13          THE COURT:  All right.  That -- I think that's fine.

 14   I haven't focused on this timeline, and it's not particularly

 15   relevant because I think at the break, I told you what are the

 16   two most salient facts I got from this exercise we've been

 17   going through for the last three hours.  But I'll hear from

 18   you all on that, and I will admit Exhibits 4, 5, and 6.

 19          MR. NAVARRO:  Yes.  And to clarify --

 20          MS. SHROFF:  Actually, is the Court admitting them

 21   over my objection?

 22          THE COURT:  Well, you reference some of these,

 23   especially number 6.  You focused on her e-mails to Bianca

 24   Carter and the prosecutor.

 25          You don't want that in?
```

A-1070

PROCEEDINGS                                    149

1          MS. SHROFF:  No.  They don't bear relevance on the

2   issue.

3          THE COURT:  Well, I think they do actually because

4   this goes directly to what happened after I said, immediately

5   give access, and then -- I mean, I think you're trying to

6   argue that it shows how aggressive Ms. O'Neill was being

7   because she wouldn't give him until the following Thursday.  I

8   think the Government's position is this shows exactly what she

9   tried to do, Ms. O'Neill tried to do after getting the order

10  from me --

11         MS. SHROFF:  No.  I'm trying to show that she is a

12  self-serving person who's not exactly truthful.  That's what

13  I'm trying to show.

14         THE COURT:  Okay.  But why don't you want to admit

15  this exhibit then?  This is the one you --

16         MS. SHROFF:  Because it --

17         THE COURT:  I'm going to admit it because I do think

18  it's relevant, but you don't want to argue based on it, even

19  though you questioned her about it, it's fine.  That's your

20  choice.  I do think all of this is relevant, so I'll allow in

21  4, 5, and 6, as well.  These are the e-mails from Ms. O'Neill

22  to the prosecutors and to pretrial.

23         MR. NAVARRO:  Thank you, Your Honor.

24         (Government Exhibits 4, 5, and 6, were received in

25  evidence.)

A-1071

```
                        PROCEEDINGS                    150

1            MR. NAVARRO:  Thank you, Your Honor.  And I just

2    wanted to clarify, we're not seeking the admission of 7.  I

3    simply marked that for the purposes of refreshing

4    recollection.

5            THE COURT:  That's fine.

6            MR. NAVARRO:  Thank you.

7            THE COURT:  Okay.  All right.

8            So let me hear from you, Ms. Shroff, on an

9    appropriate sentence overall now.  I feel we've certainly let

10   the tail wag the dog.

11           MS. SHROFF:  So here's the thing about Mr. Goklu, he

12   is not a particularly easy person, okay --

13           THE COURT:  I'm not sure what that means, but okay.

14           To live with?

15           MS. SHROFF:  Some people are easy, some people are

16   not easy.  I think I fall into the same category, so I think

17   that's the way it goes.  You know, some of us are just not

18   easy.  I think that the person may have a good heart, they may

19   have good intentions, but they're not easy people.

20           THE COURT:  Okay.

21           MS. SHROFF:  Mr. Goklu has a confluence of facts

22   that exacerbate what is enate in him, and I think maybe that

23   is what came out post-pandemic through what happened at his

24   home.  So I just for a minute, I understand the Court's

25   thinking.  I really do understand it.  And I appreciate the
```

A-1072

PROCEEDINGS                                    151

1    Court having laid it out so that I can try and address it

2    more.

3         Mr. Goklu is arrested.  Having a federal case

4    against you is a whole lot of stress, first of all.  Then

5    there's the pandemic, okay.  Then he has a young child whose

6    health isn't great.  I want the Court to take this as a given,

7    that as an officer of the Court, I'm telling you that last

8    week, the child was operated on for an ear problem in Turkey,

9    and that is why no family member is here today.  I got a video

10   of him in the hospital, so I feel very comfortable telling the

11   Court that I think it's accurate.  So that's what I wanted to

12   tell you.

13        And it is within this context that this -- all of

14   this unfolds.  Mr. Goklu is under the impression that if he

15   doesn't have a stable home, his bail will be revoked, which is

16   a fairly rational inference to draw.  And he has no other

17   place to go because, by that point, he's working as an Uber

18   driver, he's supporting his wife, his son, and the family of

19   the brother who passed away.

20        THE COURT:  But he had a lawyer.  He could have

21   asked him about this, because I'm a little concerned that his

22   statement, which was, I cannot leave here because I have this

23   Court case, is inaccurate.  I mean, he can live wherever he

24   wants to.  He can't leave the jurisdiction.  But he could have

25   talked to his lawyer if that was an issue, to say, They want

A-1073

PROCEEDINGS                          152

1    me out, what's going to happen to my criminal case?  But he

2    took it upon himself to basically tell the landlord, I can't

3    leave because of my criminal case.

4         MS. SHROFF:  No.  He couldn't leave because of his

5    criminal case because he had nowhere to go, he had no money.

6    He had no place to go at all.  He has no other place to get a

7    lease.  He has no other place -- no money to rent another

8    place.  He has no other place to go.  So he would be basically

9    telling pretrial, I have no other place to live.

10        THE COURT:  But it's okay that he stays and doesn't

11   pay rent then?

12        MS. SHROFF:  He does try to pay rent.  He borrows,

13   he begs from other people, and he tries to make rent.  The

14   person who tried to lend him the money, but doesn't have

15   enough to give a first -- and you have to remember what

16   timeframe this is.  This is right after the pandemic.  The

17   rent is sky high in New York.  Everybody's looking to move.

18   Everybody wants that second home --

19        THE COURT:  We're talking about April 2022, and

20   later now.  But I mean, if he has money, he can borrow from

21   people.  The question is, can he live somewhere?  And when he

22   makes the statement to her that, because of my court case, I

23   have to live here, that's not really accurate.

24        MS. SHROFF:  It is accurate.  It's not his native

25   language.  What he's telling her is, I can't be homeless.  I

AVERY N. ARMSTRONG, RPR, NYRCR
OFFICIAL COURT REPORTER

A-1074

PROCEEDINGS                                              153

1   have a federal case.  If I am homeless, I will have no bail,

2   and I will be remanded.  That's what Mr. Goklu is trying to

3   communicate.  Mr. Goklu isn't saying, Oh, you know, I can

4   afford first and last month's rent and deposit somewhere else.

5   I can easily go get an apartment, but you know what, I've just

6   decided to make this lady miserable, so I just won't move.

7   That is not Mr. Goklu's situation.  What Mr. Goklu's situation

8   is, barely making it, having a federal case, and not having

9   another option, and not having any real mental frame that he

10  is disregarding --

11          THE COURT:  Let's go back, though.  Then, explain

12  the two court orders.  I mean, there's the state court order.

13          Why didn't he allow access?

14          There's a court order that says you have to allow

15  her in so she can do repairs.

16          MS. SHROFF:  So I think that the reason Mr. Goklu

17  doesn't allow it is because he doesn't want to be evicted, and

18  once all of that is done, he will be evicted, and that's the

19  whole problem.  He has no other place to go.  So once he's

20  evicted, it's all over for him and his family.

21          THE COURT:  That doesn't make any sense.  The order

22  just says, "Let them in to do repairs."  You would think he'd

23  want repairs.

24          MS. SHROFF:  No.  The only reason she want repairs

25  is because she wants to ready the house for resale.  And once

A-1075

PROCEEDINGS                                        154

1    the house is ready for resale --

2              THE COURT:  That's her right, though.

3              MS. SHROFF:  It is her right.  I'm just trying to

4    explain to you that this isn't flowing from malice, it's

5    flowing from desperation, having a federal case, and wanting

6    not to be remanded.  It doesn't show a person who needs to be

7    jailed because he needs specific deterrence about not

8    following a court order.

9              THE COURT:  And how about when I say, you have to

10   give immediate access, and then he says, No, I can't do it on

11   Monday, how about Thursday or some other day because I work?

12   And when I specifically said to him, You have to do it

13   immediately, and this is after that other court order, and

14   this is after a long amount of time, and this is after it has

15   to be brought before me.

16             I mean, at some point, his justifications of, I'm

17   desperate, my interest matter more than everyone else's are

18   concerning, because that's the kind of logic that makes people

19   not follow rules and not follow the law.  You can justify

20   anything because you need it.  And that is a problem.

21             MS. SHROFF:  It's not his interest.  He's not just

22   thinking about himself.  He has a child in that house.

23             THE COURT:  But he didn't -- no, he didn't in May of

24   2023, and that's the question I want to ask you.  Because this

25   is one thing that's unclear to me.  It seems to me his wife

A-1076

PROCEEDINGS                                    155

1   moved to Turkey at some point and took the child with them.

2   You just said the child got operated on in Turkey.  My

3   understanding, his wife, at some point, and this is what I

4   want you to clarify for me, went to Turkey to take care of her

5   own sister who is ill, and I think, took the child with her.

6   So I don't know if I -- I don't think it's accurate that when

7   he ignored my order in May of 2023, his family was still

8   living there.  But be that as in may, it still doesn't justify

9   it.

10            That's my issue.  You keep resisting the premise.

11  Desperation doesn't mean you can violate the law.  We see

12  people all the time who are financially desperate.  Yes, it's

13  a consideration.  I agree with you.  It's better than greed,

14  which is why he performed the other crimes, in my opinion, and

15  we'll get to that in a minute.  But financial desperation does

16  mitigate, to some extent, the seriousness of the crime.

17            But we're talking about a person who was already in

18  the system, who knew he was going to get sentenced, who then

19  gets a state court order saying, You have to just allow us in

20  to do repairs.  So, I mean, yes, so she could sell it, as

21  she's entitled to do.  But he can't resist that because he

22  needs a place to stay.  This other person has a right.  He

23  can't just say, My rights matter more than yours, my

24  desperation of not wanting to go to jail means I could ignore

25  a state court order and then ignore a federal court order.

A-1077

PROCEEDINGS                          156

1          MS. SHROFF:  There's no evidence at all in this
2     record that he received that state court order.  She doesn't
3     hire a professional process server.  She has a friend whom she
4     characterized --

5          THE COURT:  She said she hired a professional --

6          MS. SHROFF:  According to her, that's not the person
7     who -- if I could just finish.

8          THE COURT:  Yeah.  Go ahead.

9          MS. SHROFF:  She said -- she never said that the
10    prosecutor put that order on the door.  I asked her
11    specifically, and she said the guy sitting right there, my
12    friend, my cousin, my family member, my everything, and the
13    guy never took the stand, and they could have put him on, and
14    they never said that under oath.  That's number one --

15         THE COURT:  Wait, wait -- no, no, no.  Allow me to
16    finish.  She said that was one of the ways.  The posting on
17    the door is not considered service.  She said, I used a
18    process server.  She didn't say, I used that, I used that guy
19    as a process servicer.

20         MS. SHROFF:  And let me say this:  This is a
21    person -- and I would call her a very aggressive person who is
22    going after her million dollar sale.  Absolutely, I stand by
23    that --

24         THE COURT:  But that's within her right.  You
25    begrudge her for wanting to sell her property.

*AVERY N. ARMSTRONG, RPR, NYRCR*
*OFFICIAL COURT REPORTER*

A-1078

PROCEEDINGS                                      157

1          MS. SHROFF:  I'm an assistant federal defender.  I

2    always will be, in my head, until the day I die.  To me, I

3    would never remand somebody for a million dollar sale.  That's

4    just not my mindset.  I don't function that way.  But what I'm

5    still -- I still am trying to make the same argument here.

6    She kept records.  She kept records.  She kept a timeline.

7    She documented everything.  Look at all of this evidence that

8    the Government gave you.

9          Where is proof of service of the order?  The one

10   thing -- the one thing on which --

11         THE COURT:  Wait a minute.  Are you representing

12   that your client never knew about this court order?

13         MS. SHROFF:  My client has repeatedly, apparently

14   through text and -- I think some of the texts bear this out,

15   although the dates don't match.  My client's position has

16   always been that his mail was repeatedly stolen and mishandled

17   at that apartment --

18         THE COURT:  Are you representing to me as an officer

19   of the Court, that his story is that he never got it, and that

20   even though he had lawyers and the lawyers were talking to

21   each other, he never knew that he was subject to this eviction

22   order -- or not eviction -- yeah, access order?

23         MS. SHROFF:  As best I know, the lawyer that he had

24   communicated to the lawyer that she had that if a court order

25   misspelt or misstated a person's name, it could not be

*AVERY N. ARMSTRONG, RPR, NYRCR*
*OFFICIAL COURT REPORTER*

A-1079

PROCEEDINGS                                  158

1   effected --

2           THE COURT:  So he had it, but he --

3           MS. SHROFF:  No, no, no.  He had -- the discussion

4   about the order follows after you brought him in and

5   reprimanded him.  And may I just remind this Court, most

6   respectfully, that by then, what had happened was, when he was

7   brought in, I believe this was a phone appearance by

8   Mr. Goklu.  Mr. Singer had just been replaced by new counsel.

9   I was the new counsel.  I did not have docketed in my calendar

10  that phone appearance.  And I recall him being -- him being

11  added on to that phone appearance at the very last minute.

12  I --

13          THE COURT:  You're wrong.  It was an in-person

14  appearance on May 4th.  The appearances -- you were here with

15  Ms. Kassner.  I'm looking at the docket entry.  It's a minute

16  entry on May 4th.  You were here, Ms. Kassner was here,

17  Mr. Goklu was here because he's on bond.  We discussed the

18  fact that he refused to grant the landlord access to the

19  apartment.

20          MS. SHROFF:  Your Honor, it was on phone.

21          MR. NAVARRO:  Your Honor --

22          MS. SHROFF:  It was by phone.  The interpreter who

23  is present in court today recalls that the appearance was by

24  telephone.

25          What happened is you put it on the docket, neither

*AVERY N. ARMSTRONG, RPR, NYRCR*
*OFFICIAL COURT REPORTER*

A-1080

PROCEEDINGS                              159

1   he nor I were aware of it, I was recently assigned.  I think

2   the interpreter --

3              THE COURT:  I'm wagging my head because I had a

4   memory of being in court, and that's how it was reported --

5              MS. SHROFF:  You were in court, we were not in

6   court.  You, absolutely, were in court.  The interpreter was

7   in court.  Mr. Goklu and I were on the phone.

8              MR. NAVARRO:  Your Honor, I actually have the

9   transcript in front of me.  I think I could bring some

10  clarity.  According to the transcript from May 4th, it says,

11  "Appearances for the Government, Ms. Kassner, in person.  For

12  the defendant, Sabrina Shroff" -- it does say "Present by

13  phone."  And then the very first line of the transcript, it

14  does say, "Defendant present by phone."

15             THE COURT:  All right.  So I stand corrected.

16             But does it make a difference?

17             MS. SHROFF:  Yes.  Because what happened was -- and

18  this is my feeling, that what happened is, I did not have a

19  detailed conversation with Mr. Goklu before that appearance

20  when the Court chastised him for this.  I should have been the

21  one who should have been able to tell the Court why that

22  order -- why that order had not properly been received by

23  Mr. Goklu or what his lawyer had said or what had transpired

24  before then.  None of that was flushed out to the Court at

25  that time.

AVERY N. ARMSTRONG, RPR, NYRCR
OFFICIAL COURT REPORTER

A-1081

PROCEEDINGS                                160

1          THE COURT:  Nor did Mr. Singer flesh it out.

2          MS. SHROFF:  Right.  But that is so -- Mr. Singer

3   and I should be punished for that.  What I'm saying is, we did

4   not have a good grasp on that and nor, in fact, I really

5   clearly remember telling Mr. Goklu, Please be quiet, this is

6   not relevant to your case.

7          THE COURT:  Let me just say this, because I'm having

8   some trouble accepting your argument, because it seems to me

9   that you're arguing that Mr. Goklu did not tell the lawyer --

10  tell his landlord, or that he told his landlord he could not

11  move because he had to be there until October, right?  And --

12  well, actually, I don't know if that's related to this access

13  order.  The date of that was April 2022, and by then -- let's

14  see, the order was issued January 2023.  So it's still your

15  claim that somehow he never got a copy of this order --

16          MR. NAVARRO:  I'm saying that --

17          THE COURT:  -- until after I brought him into court,

18  until we had that court hearing?

19          MS. SHROFF:  And it's not hearsay -- I know you say

20  that it was hearsay, but she, the witness who testified,

21  states and repeats the argument that Mr. Goklu is under the

22  misimpression, whether he got it from his housing court lawyer

23  or anywhere else, that an order issued in the wrong name is

24  nevertheless valid.

25          So if somebody says --

AVERY N. ARMSTRONG, RPR, NYRCR
OFFICIAL COURT REPORTER

A-1082

```
                        PROCEEDINGS                    161
 1            THE COURT:  But can I quibble with you?  How is that
 2    not hearsay?
 3            MS. SHROFF:  She writes it down herself.  She
 4    repeats, I think in one of the e-mails that she sent to the
 5    Government.
 6            THE COURT:  No.  But my point is, somebody has to
 7    tell her that that is his misimpression and, therefore, I have
 8    to accept the truth of whoever told her that.
 9            MS. SHROFF:  No, no, no.  I apologize.  I apologize.
10            What she's recounting is his understanding.
11            THE COURT:  Yeah.  But how could she possibly know
12    his understanding?
13            MS. SHROFF:  Because he told her.
14            THE COURT:  Right.  But you don't get to introduce
15    his self-serving statements about what his mindset is.  That's
16    all I'm saying --
17            MS. SHROFF:  But they introduced all of her
18    self-serving statements, which were written by her lawyer's
19    direction telling her how to sound, how to behave, how to not
20    be rude.
21            THE COURT:  But those are just verbal actions.  And
22    so it is not offered for its truth, per se.  It's like, this
23    is what I said to him.  I don't want to quibble with you
24    what's hearsay and not hearsay.  What you're offering up is
25    clearly hearsay and barred by the rules.
```

A-1083

PROCEEDINGS                                  162

1      But I'm not getting hung up on that.  I'm going to

2  accept, for the moment, that you're alleging, I think, that he

3  never got it, at least until after we had this May 4, 2023,

4  hearing.  If he got it, he didn't think it applied to him

5  because it's misspelled or wasn't valid against him because

6  it's misspelled.  You realize there's a contradiction between

7  those two things.

8          MS. SHROFF:  I realize what?

9          THE COURT:  A contradiction.  I mean, he either got

10  it or he didn't get it around the time it was issued, but I

11  think --

12          MS. SHROFF:  No.  You could get it.  You could go to

13  your lawyer, your lawyer could say, Listen, you can fight it,

14  it's not in the right name, they have to issue it in the right

15  name.  And you believe your lawyer.  That's what happens.

16          THE COURT:  But your first argument is he didn't get

17  it at the time it was issued back in January 2023, so

18  therefore, I shouldn't find that he was willfully ignoring it.

19          MS. SHROFF:  I don't think he got it in January of

20  2023.

21          THE COURT:  How about this:  When she, the landlord

22  is telling him, I have a court order here, and it requires you

23  to give me access, he doesn't comply to that?

24          MS. SHROFF:  Right.  It's not in his name.  If

25  somebody issued an order and say to me, Sabrina Scruff, show

AVERY N. ARMSTRONG, RPR, NYRCR
OFFICIAL COURT REPORTER

A-1084

PROCEEDINGS                                      163

1    up, and my lawyer tells me, It's to Scruff, you don't have to

2    show up until it's your real name --

3              THE COURT:  Then your defense is, he knew about it,

4    his lawyer told him about it, but then his lawyer somehow told

5    him he didn't have to comply.

6              MS. SHROFF:  Yes --

7              THE COURT:  Where is the evidence of that?

8              MS. SHROFF:  That's what -- that's literally what is

9    recited back from her.  Even if she thinks that that's a

10   cockamamy explanation, she believes it enough to tell him that

11   that is wrong.  She is savvy enough to not have her lawyer

12   tell the other lawyer.  She tells him that that's a cockamamy

13   understanding, and there's no way for you to disregard that

14   order just because it's in another name.

15             THE COURT:  And?  He disregards it --

16             MS. SHROFF:  Therefore, it's not self-serving --

17             MR. NAVARRO:  Your Honor, if I could just say one

18   thing --

19             THE COURT:  I understand.

20             MR. NAVARRO:  -- it's not like the order was in the

21   name of Mickey Mouse, it was in the name of the person who's

22   on the lease, right?  Michael Gokly, where the U looks like a

23   Y.  So there's certainly more here than if it's just in some

24   random name.

25             THE COURT:  You know what, folks, we are definitely

AVERY N. ARMSTRONG, RPR, NYRCR
OFFICIAL COURT REPORTER

A-1085

PROCEEDINGS                                      164

1   descending into, like, a swamp or a pit.  It's a bottomless
2   pit.  This is really not the main issue.  Let's get off of
3   this.
4          For what it's worth, I will give you the fact that
5   right now, I don't have quite enough evidence to find that he
6   necessarily, willfully, violated the state court order.  I am
7   concerned about the fact that, albeit, by phone, I told him he
8   had to immediately comply on May 4th, 2023, when he knows he's
9   going to be sentenced relatively soon or at least should
10  believe that, and still decides that he's going to determine
11  when this inspection happens.  I'm concerned about that lack
12  of respect for the law.  At that point, he should be
13  complying.  And this isn't about getting evicted.  It's --
14  although I get your argument, it's anything that helps this
15  person who wants to legitimately make a million dollars on her
16  property, anything that she does to try to exercise her lawful
17  ownership rights to sell it, he shouldn't allow it because
18  he's desperate.  I just don't accept that reasoning.
19          MS. SHROFF:  I understand that, Your Honor.  But I'm
20  not saying that he thinks he shouldn't allow it.  I'm just
21  saying that is the failure of the human nature at play.
22  That's what it is.
23          THE COURT:  But that's the kind of failure of human
24  nature that causes people to commit crime or violate the law
25  because they're desperate.  And I don't want -- this is what

A-1086

PROCEEDINGS                                  165

1    I'm concerned about is recidivism, respect for the law.  Has

2    he gotten or learned anything from this experience?  And it

3    doesn't seem to me he has.  That's my concern.

4            MS. SHROFF:  Your Honor, he's been out on bail all

5    this time.  He has been working, he has never once violated

6    any prescription on his conduct.  He hasn't opened any new

7    bank account.  He hasn't reverted back to the alleged -- the

8    underlying facts of this case.  He hasn't gone back to

9    cryptocurrency.  He's been nothing but trying to support his

10   child and his wife.  He has family that he has tried to

11   support --

12           THE COURT:  Let's talk about the other 3553(a)

13   factors.  Tell me about the crime and why he shouldn't receive

14   a guidelines sentence.  That's what I want to know about.

15           MS. SHROFF:  Your Honor, I apologize.  But I don't

16   have much to add to my sentencing submission on that

17   particular issue.

18           I argued about -- I don't want -- I don't want to

19   revisit it, because I know that you've read it all, as to why

20   his sentencing guidelines do not correctly reflect, because

21   the first transaction, there is no indication whatsoever that

22   in the first transaction, he's told about the drug dealing.

23           By the way, you should know that Mr. Singer ran into

24   me this morning and chastised me for not having that argument

25   with you before today.  But that is the argument on the

A-1087

PROCEEDINGS                                          166

1   guideline range itself, and to note that a non-incarceratory

2   sentence would not be substantively unreasonable.

3            THE COURT:  Well, you haven't lost the document yet.

4   And I think I said --

5            MS. SHROFF:  All right.  I thought you ruled against

6   me the last time.

7            THE COURT:  Oh, no.  I did rule against you in terms

8   of calculating the guidelines.  But what I think I said was I

9   would likely consider it in terms of the variance, and that

10  that what sort of the issue.  I think it's more properly

11  categorized as a, does the guideline range overstate the

12  seriousness?  But I tend to try to calculate the guidelines

13  faithfully and technically correct.  Okay.

14           So let me just make sure I don't have any questions

15  for you before you sit down because I did want to clarify,

16  because you argued to some extent, family circumstances.

17  Where has his wife been living for the last four years or, at

18  least, since his arrest? because there's a lot of

19  inconsistencies.  The presentence report suggest that she was

20  on maternity leave or has been on maternity leave for, it

21  would seem, three years, because the report was in 2023, and

22  she gave birth in 2020, and was currently -- at least at the

23  time of the presentence report -- in Turkey caring for her

24  sister or maybe that came from your letter, and then staying

25  at the sister's home and getting $1,000 a month in benefits.

A-1088

PROCEEDINGS                                    167

1   And then she mentioned however, that she came back from Turkey

2   in May of 2019, when Mr. Goklu was arrested.  So I don't know

3   if she was living in Turkey then or just visiting.  I just

4   want to understand a little bit about the actual family

5   circumstances.

6              MS. SHROFF:  So I think, according to Mr. Goklu, his

7   wife goes back and forth.  She travels back and forth between

8   the United States and Turkey.

9              THE COURT:  And takes the child with her?

10             MS. SHROFF:  I think -- so I don't believe that the

11  child always went back with her.

12             THE COURT:  And where is she now?

13             MS. SHROFF:  She's back in Turkey.  And I can

14  show -- may I just -- because I want to make sure -- if the

15  Court needs to see the video about the child --

16             THE COURT:  No, no.  I accept your representation.

17             MS. SHROFF:  So she's back in Turkey because he had

18  surgery on -- I have to pull up the date.

19             THE COURT:  Is she living with her sister?

20             MS. SHROFF:  I don't know where she's living.

21             So she's not living with her sister now.  She's in

22  Istanbul.  And she's trying to make sure that she is putting

23  in enough hours to keep a job that she has in Istanbul, and

24  then, apparently --

25             THE COURT:  That's the other question I wanted to

A-1089

PROCEEDINGS                                    168

1    ask you, because in her letter that she submitted with her

2    sentencing submission, she said she asked to relocate to the

3    New York office of Turkish Airlines.

4              MS. SHROFF:  She's trying to relocate to the New

5    York office so that she can keep the same job.  But as of now,

6    the only job that she has is the one where she's able to work

7    out of Istanbul.

8              THE COURT:  And how long has she had that job?

9              MS. SHROFF:  So she's worked for Turkish Airlines,

10   apparently, for about 16 years.  But the job, as of now, is

11   Istanbul-based, so she had to go back so as to not lose the

12   job.

13             THE COURT:  So she can continue to work and live

14   with her relatives, or somewhere, and take care of her child

15   in Turkey?

16             MS. SHROFF:  Yes.  No, she's living alone.  But,

17   yes, that's correct.  And the child just had surgery, I think

18   two days ago, three days ago?

19             Two days ago.  He sent me a text with the

20   information --

21             THE COURT:  You don't need to show me the surgery.

22   I take your representation.  I want to ask probation for one

23   second.

24             Is there any proof of Mr. Goklu filing tax returns

25   from 2016 on?  There's a reference in paragraph 64 to -- he

AVERY N. ARMSTRONG, RPR, NYRCR
OFFICIAL COURT REPORTER

A-1090

PROCEEDINGS                                        169

1    says he's filed tax returns for every year he was required to,

2    but to date, he had not provided any of his income tax

3    returns.

4              MS. MALKO:  Sadly, the IRS and the New York City

5    department of taxation no longer --

6              THE COURTROOM DEPUTY:  I'm sorry.  Could you use

7    the -- microphone?

8              MS. MALKO:  Sadly, the IRS, nor the New York State

9    department of taxation provide us with any type of

10   verification anymore, and the defendant did not provide any

11   tax returns.  So we are not aware whether or not he filed tax

12   returns during --

13             THE COURT:  Ms. Shroff, has he been paying his taxes

14   as he represents?  And why didn't you provide copies to the

15   probation department?

16             MS. SHROFF:  Your Honor, it didn't not occur to me

17   to attach them.  But he says he can -- if the Court wants, he

18   can go down and get his phone.  They're on his phone.

19             THE COURT:  He has them photographed on his cell

20   phone?

21             MS. SHROFF:  Your Honor, he says they're on his

22   Google Drive.

23             THE COURT:  I understand that.

24             Okay.  You know what?  We are just going to let that

25   issue go.  I mean, it's clear to me that he over time has made

AVERY N. ARMSTRONG, RPR, NYRCR
OFFICIAL COURT REPORTER

A-1091

PROCEEDINGS                                      170

1    a fair amount of money, at least up until recently, perhaps up

2    until the pandemic, okay.  And would have been required to pay

3    taxes.  No question about that, I assume.  You know what?

4    Let's move on.  I'm not going to worry myself about that.

5          All right.  So does the Government want to be heard?

6          MR. NAVARRO:  Very briefly, Your Honor.  I'm aware

7    of the late hour.

8          I think we'll rely on our sentencing submission for

9    the underlying crime, which, again, is money laundering and

10   unlicensed money remitting.  As Your Honor noted, we've gotten

11   away from that.  And suffice to say, the recordings at trial,

12   and the defendant's disregard for the law shows, even more now

13   than after the verdict, that he knew what he was doing.  He

14   deliberately ignored red flags.  He knew he was creating a

15   market for drug dealers.  He said on one of the recordings

16   that his partner had been arrested for doing the same conduct

17   in Manhattan.  He said over and over that he wanted to take

18   all kinds of operational security steps, like, be away from

19   Manhattan, be away from cameras.  All of that fits in with the

20   testimony we've heard today.  That he simply thinks whatever

21   he wants to do is more important than the law.

22          And there's one other thing that came out today,

23   Your Honor, that testimony and the text message referencing

24   the encounter with NYPD where he allegedly broke into the

25   garage.  Under the terms of his release, he's required to

A-1092

```
                           PROCEEDINGS                    171
 1   report all contact with law enforcement to pretrial services.
 2   And I don't want to say definitively because the pretrial
 3   services officer is not here.  But I've been on the case since
 4   the beginning, I certainly do not remember any reporting about
 5   an encounter with NYPD.
 6           And, Your Honor, given this background, the Court
 7   can place very little trust in him to follow the law, because
 8   he should.  Rather, he's the type of defendant that has to be
 9   made to follow the law via other means, and that in this case
10   means incarceration, Your Honor.  And so we reiterate our
11   request for a guidelines sentence of 41 to 51 months.
12           THE COURT:  All right.
13           MR. NAVARRO:  Thank you.
14           THE COURT:  Mr. Goklu, you have a right to make a
15   statement.
16           Would you like to say anything at this time?
17           MS. SHROFF:  Your Honor, may I just have one minute?
18           THE COURT:  Sure.
19           MS. SHROFF:  Because I wanted to make sure that two
20   facts were clear.
21           I'm not sure that an NYPD officer asking you about
22   what's going on with entry into a garage is police contact,
23   but I don't want to belabor that.
24           THE COURT:  Yeah.  I'm not going to put any weight
25   on that.
```

A-1093

PROCEEDINGS                                        172

1          MS. SHROFF:  Okay.  And I just wanted to reiterate

2    one point.  To the extent that the Government says, as it did

3    now, we really moved away from the underlying conduct, right?

4    Guess what?  So did Mr. Goklu, assuming that he's not going to

5    win on appeal and this conviction will stand, he will be a

6    felon for the rest of his life.  And I don't know of a single

7    person in this room who would think that a felony conviction

8    is not a horrible punishment for a human being to have.

9          So one, every felony conviction -- it destroys your

10   life.  It destroys your options.  I think that even in -- just

11   in terms of the harm you bring upon your children, his child

12   is relatively young.  But there is a certain stigma that every

13   child grows up with when your family member is a felon.

14          This witness even testified that just even being

15   indicted, let alone being a convicted felon, which I think is

16   an oxymoron in some ways and completely redundant, but that is

17   punishment.  And I think sometimes most of us who practice in

18   federal court, because we're used to the length of sentences,

19   forget that a felony conviction can really derail what is a

20   life, more so in case of a younger defendant which is not

21   before this Court.  But I still think that there is some

22   amount of real harm that flows to Mr. Goklu from that fact

23   itself.

24          And with that, I'll just speak to Mr. Goklu for one

25   minute, and then we can stop.

A-1094

PROCEEDINGS                                                  173

1          (A recess was taken.)

2          MS. SHROFF:  Your Honor, Mr. Goklu does not wish to

3    make a statement.

4          THE COURT:  So I've considered the relevant

5    sentencing factors set forth by Congress in Title 18, United

6    States Code, Section 3553(a), which includes the advisory

7    guideline range of 41 to 51 months, to ensure that I impose a

8    sentence that is sufficient, but not greater than necessary,

9    to comply with the purposes of sentencing.  Those purposes

10   include the need for the sentence to reflect the seriousness

11   of the crime, to promote respect for the law, to provide just

12   punishment for the offense, to deter criminal conduct by

13   Mr. Goklu, as well as others who would seek to engage in this

14   type of crime, and to protect the public from future crime by

15   Mr. Goklu.

16         I've also considered the nature and circumstances of

17   the offense he committed and his personal history and

18   characteristics.  So let me explain my consideration of these

19   factors in more detail.

20         First of all, the seriousness of the crime.  While

21   perhaps on the surface, a financial crime like this may not

22   seem serious, it actually is because it facilitates the

23   laundering of criminal proceeds from other very serious crimes

24   such as drug dealing or robbery.  In this particular case, I

25   do recall at the trial that the undercover spoke openly about

A-1095

PROCEEDINGS                                    174

1   being a drug trafficker.  And it was clear to Mr. Goklu, based

2   on the tapes that were played and the jury obviously found the

3   same, that Mr. Goklu knew that he was transacting business and

4   essentially washing money for people who were engaged in

5   criminal activity, and that he was converting it into --

6   either from BitCoin or into BitCoin.  I'm now actually trying

7   to remember which way it went.  But he was basically

8   transferring the money that was presented to him, I think into

9   BitCoin.

10          MR. NAVARRO:  That's right, Your Honor.  And vice

11  versa, Your Honor.  There was testimony of both.  The

12  undercovers were providing BitCoin, he was providing cash.

13  There was evidence at trial that he was doing the other way

14  around, as well.

15          THE COURT:  Right.  And so it is that kind of crime

16  that facilitates and makes possible other crimes.  So it's not

17  an inconsequential crime, and it's not a crime without -- that

18  doesn't harm our society.  So it does warrant punishment, just

19  punishment.  And it certainly warrants a sentence that

20  promotes general deterrence.  In other words, letting other

21  people know that they cannot transact these BitCoin

22  conversions for people that they know are engaged in criminal

23  activity, that is a crime, and it will be punished as such.

24          Moreover, the defendant, at that time, as far as I

25  can tell, was simply motivated by greed and not by financial

A-1096

PROCEEDINGS                    175

1   desperation, as he's obviously claiming since his arrest.  By

2   his own report, at the time he was engaged or started this

3   BitCoin conversion business, he was making $16,000 a month,

4   and that was at the time of his arrest.  He claimed he was

5   making 8,000 from being a limo driver and 8,000 from selling

6   electronics on eBay.  That's about $150,000 a year, gross.

7   And this comes from the presentence report at paragraph 62.

8           And, as I said before, having heard the video

9   recordings of the transactions between the undercover and

10  Mr. Goklu during trial, it's clear to me that Mr. Goklu knew

11  full well that he was laundering drug proceeds for this

12  undercover and proceeds of other criminal activity, and that

13  he spoke about it very casually without any hesitation or

14  moral compunction about what he was doing.  As the Government

15  said, what was clear from the evidence at trial was that he

16  was simply worried about getting caught, just as had happened

17  to his business partner, and that he did take measures like

18  meeting on the street, in the middle of a busy street, to

19  transact this business so that he could be -- so he could feel

20  more secure that they would not be detected.

21          He also expressed a willingness to transact large

22  quantities in messages with other clients.  So this was a real

23  business Mr. Goklu was pursuing without regard to the fact

24  that he really was enabling criminals to launder their money

25  and to convert it into other kind of currency.

A-1097

PROCEEDINGS                                    176

1          So I do find that there's a need to send a message

2     of specific deterrence to Mr. Goklu because he certainly was

3     someone, at the time, who committed this crime, motivated --

4     who was motivated by easy money and by large amounts of money,

5     money that was not really necessary for him to maintain a

6     decent lifestyle because he was already making a good salary

7     through other means.

8              Now, I've obviously made much, and we've had -- and

9     truly it has become the tail wagging the dog -- this series of

10    events relating to the apartment he was living in.  I'm not

11    putting much weight on that.  At the end of the day, I do

12    understand that these kinds of landlord-tenant disputes happen

13    all the time and that there's sometimes arguments on both

14    sides about whether the eviction is proper or fair or, as the

15    defense argues here, something that would have really uniquely

16    adversely affected Mr. Goklu because of the fact that he might

17    have been rendered homeless at a time when he needed to have a

18    stable residence while he stared down this prosecution.  So I

19    understand and I've considered the defense's argument after a

20    fairly lengthy factual probing of all of the circumstances.

21    But, as I said before, I still have a concern.  And it's

22    really based on my interactions with Mr. Goklu in the context

23    of my case, where eventually, this whole dispute over simply

24    getting access to the apartment had to be brought to my

25    attention.  And it was presented to me as a failure to comply

AVERY N. ARMSTRONG, RPR, NYRCR
OFFICIAL COURT REPORTER

A-1098

PROCEEDINGS                                    177

1   with a prior court order, a state court order.

2          Perhaps, less significant now in my mind than it was

3   back then because of potential misunderstanding or bad legal

4   advice about how it didn't apply to Mr. Goklu because of the

5   misspelling.  But even this notion that somehow he would not

6   try to facilitate someone else's sale of their apartment and

7   their property, legitimately, is really not conduct evincing

8   good character or, as the defense has tried to portray,

9   someone who respects other people's rights or interests and,

10  to some extent, the law.  And I am troubled by the fact that

11  when I said, Immediately make or give access to that apartment

12  to the landlord, Mr. Goklu, in the face of my order, after all

13  of that -- other legal proceedings or all the other legal

14  proceedings and warnings that he had gotten, still decided to

15  make it difficult or at least did not make it easy.  Now, I

16  understand the inspection happened within a couple of weeks or

17  less of my order.  But, again, when we're talking about

18  character, when we're talking about personal characteristics,

19  I am not confident that Mr. Goklu is not someone who still

20  thinks that his interests matter more than other people's

21  interests, someone's significant property interest, a million

22  dollars, certainly something he can appreciate, matters to

23  people, and the law and court orders.

24          I still have that concern.  I have not put a lot of

25  weight on it after a very thorough explication of this whole

A-1099

```
                         PROCEEDINGS                    178

  1   situation.  And I think the defense has done some good work in

  2   terms of undercutting some of the significance I found before

  3   when I was presented with a state court order that seemed

  4   pretty clearly to have been ignored.  At this point, I have

  5   some reason to question whether or not that is exactly the

  6   situation.  But I still think that the bottom line explanation

  7   of Mr. Goklu didn't want to help his landlord try to sell her

  8   apartment because it would mean he would be rendered homeless

  9   is not a sign of someone who takes or cares about or respects

 10   the interests of others above his or others' rights above his,

 11   because clearly the landlord had the right to do exactly what

 12   she wanted to do after his lease expired two years earlier or

 13   three years earlier.

 14            So that's why I think this episode does not reflect

 15   well on Mr. Goklu's character, and his potential for future

 16   violations of law in ways that will serve his interest, he

 17   thinks, or maybe if he feels desperate.  I still feel like

 18   he's someone who cares more about himself and his family than

 19   he does about other peoples' rights or following the law

 20   faithfully or promptly or fully.

 21            And then, as I said before, general deterrence has

 22   to be served here because this is the type of crime that can

 23   go on very easily undetected.  And individuals who decide to

 24   get involved in this -- and I have to believe it's only going

 25   to grow because of the ubiquitous nature of BitCoin and other
```

A-1100

PROCEEDINGS                                    179

1   cryptocurrency, they have to understand that this is a crime,

2   and that you'll go to jail for it if you commit this type of

3   money laundering.

4           Now, on the other side of balance sheet, there are

5   clearly factors that weigh in favor of a non-guidelines

6   sentence or a below-guidelines sentence.  I do agree that the

7   magnitude of the value that was determined in part by the

8   Government because of the undercover "driving," as the word

9   that was used last time, driving the transactions to some

10  extent, although, as I said last time, it does take two to

11  tango, and Mr. Goklu was a very willing participant, and he

12  was willing to accept these amounts.  But the value of

13  $133,000, which is what the UC decided he would try to

14  transact with Mr. Goklu, certainly is the basis being used for

15  the guidelines, and could be argued to overstate, to some

16  extent, the seriousness of the crime to which he was actually

17  convicted since, since obviously, no criminal proceeds were

18  actually laundered.

19          That's a tricky argument, and I don't embrace it too

20  much, because the bottom line is for Mr. Goklu's point of

21  view, he was laundering $133,000 in criminal proceeds or at

22  least some portion of it.  Maybe not the first couple of

23  transactions, but certainly the bulk of it.  But I do think

24  the guidelines overstate the seriousness to an extent of

25  Mr. Goklu's criminal activity.  And I know the Government

A-1101

PROCEEDINGS                                    180

1   cited other conversations that he had with potential clients.

2   But the Government has to acknowledge that the amounts are

3   unclear in terms of what was actually transacted.  I know a

4   reasonable rational argument could be made that I should still

5   consider those in terms of how serious Mr. Goklu's activities

6   were.  But I'm somewhat loathed to do that without more proof

7   about what he actually did, as opposed to some of the

8   suggestions about what he was willing to do or might have

9   done.

10         So I've really focused on the amounts that were

11  transacted by the undercover, which is what the guidelines are

12  based on.  And I still find that it overstates the seriousness

13  of the crime.  And I say this, in part, because this crime is

14  relatively new.  I think partly because of the arrival of

15  BitCoin on the horizon.  And so I don't know if it's as

16  obvious to people when they do it, but what they are doing

17  really is a crime.  It's no defense, I realize, but it does

18  give me some pause about how serious a punishment is warranted

19  or how severe a punishment is warranted.  So I factored that

20  in.

21         I would say this:  I've considered the family

22  circumstances that were set forth in the defense submission.

23  I do, and I have considered the fact that Mr. Goklu, up until

24  his arrest, was the main provider for his wife and infant

25  child.  But that's why I asked the questions about what the

AVERY N. ARMSTRONG, RPR, NYRCR
OFFICIAL COURT REPORTER

A-1102

PROCEEDINGS                                   181

1   wife's situation is now.  I don't find that that's an

2   extraordinary enough factor because it seems to me she has a

3   job, she has a place to live, and she seems to have family,

4   both his and hers, who can help provide support for her and

5   her child and presumably help her take care of her -- of their

6   child during any period of incarceration of Mr. Goklu.

7              And then the last thing is, I have not considered

8   Mr. Goklu's decision not to make a statement or express any

9   remorse.  I understand that he always asserted his innocence.

10  He was, of course, convicted after trial.  I presume he wants

11  to appeal and is not going to acknowledge that he committed

12  the crime, obviously.  It is a little disconcerting that he

13  doesn't, at least, express any remorse about the type of crime

14  that he's alleged to have committed.  But again, I know, I

15  don't want to punish him for any kind of strategic decision

16  he's making about preserving his right to not incriminate

17  himself in any way.

18             So that's my consideration of the factors, and after

19  assessing the particular facts and circumstances of this case,

20  and in light of the relevant Section 3553(a) factors, I am

21  sentencing Mr. Goklu to a substantially downwardly varied

22  sentence of 16 months incarceration, to be followed by

23  two years of supervised release with a financial reporting

24  condition.

25             The parties should have gotten the sentencing

*AVERY N. ARMSTRONG, RPR, NYRCR*
*OFFICIAL COURT REPORTER*

A-1103

PROCEEDINGS                                    182

1    recommendation of the probation department, being that that

2    did occur, right?

3              THE COURTROOM DEPUTY:  Yes.

4              THE COURT:  And I'll confirm the Government got it?

5              MR. NAVARRO:  Yes, Your Honor.

6              THE COURT:  And also, Ms. Shroff, you got it before

7    today?

8              MS. SHROFF:  Yes, Your Honor.  Your courtroom deputy

9    did provide it to me.

10             THE COURT:  Okay.  And so that financial reporting

11   condition will be the one that is set forth in the sentencing

12   recommendation -- or maybe -- actually, I don't know if it was

13   set forth --

14             THE COURTROOM DEPUTY:  It was not.

15             THE COURT:  So this is the requirement:  Upon

16   request, the defendant shall provide the U.S. Probation

17   Department with full disclosure of his financial records,

18   including commingled income, expenses, assets and liabilities,

19   to include yearly income tax returns, with the exception of

20   the financial accounts reported and noted within the preset

21   report.

22             The defendant is prohibited from maintaining and/or

23   opening any additional individual and/or joint checking,

24   savings, or other financial accounts for either personal or

25   business reasons, without the knowledge and approval of the

A-1104

PROCEEDINGS                                    183

1    U.S. Probation Department.

2           The defendant shall cooperate with the probation

3    officer in the investigation of his financial dealings and

4    shall provide truthful monthly statements of his income and

5    expenses.  The defendant shall cooperate in the signing of any

6    necessary authorization to release information forms

7    permitting the U.S. Probation Department access to his

8    financial information and records.

9           I will also add, since I don't know the answer to

10   the question of whether he has complied with his tax return

11   requirement, that if it's determined that he has failed to pay

12   taxes that were required for any year, from the date of the

13   offense, which is 2018, I think, it is, to the date of his

14   incarceration, that he will make up for any shortfall in that

15   regard and file any return and pay any penalty that is

16   required.

17          I'm imposing these conditions because the nature of

18   the crime he committed was a financial one, and I want to

19   enable the probation department to be able to monitor his

20   future compliance with all rules and regulations relating to

21   financial activities and to determine that he's not

22   reoffending.

23          Any objection to both of those requirements?  Both

24   the financial reporting and then also making up any tax

25   returns he hasn't filed?

AVERY N. ARMSTRONG, RPR, NYRCR
OFFICIAL COURT REPORTER

A-1105

PROCEEDINGS                                              184

1        MR. NAVARRO:  No objection by the Government.

2        THE COURT:  Ms. Shroff.

3        MS. SHROFF:  Your Honor, I'm sorry, I apologize.

4   Could you just -- what did you say about the tax returns?

5        THE COURT:  That if it is determined that he

6   actually has failed to pay any tax returns from the time of

7   his offense, which was -- let me get the exact dates.

8        That would be the year 2018.  So from the tax year

9   2018, on, if he's failed to file any returns he's supposed to,

10  that he'll comply with whatever he has to do to make up for

11  the failure to supply or submit those returns, including any

12  penalties that he has to pay --

13       MS. SHROFF:  I don't object.

14       THE COURT:  -- as directed by the IRS.

15       MS. SHROFF:  No.  I have no objection to that.  But

16  I'm happy to either file the tax returns if you want or send

17  the Court a letter saying, I've received and reviewed the tax

18  returns, whichever way the Court wishes --

19       THE COURT:  Well, I don't need to see any.  If he's

20  correct and he's filed everything, then I don't think there's

21  going to be an issue.  I'm only saying if it's determined by

22  the IRS that he's failed to, then he's got to comply with any

23  direction to make up for any failure to file.

24       And then confirming that you're not objecting to the

25  financial reporting requirement?

A-1106

PROCEEDINGS                                              185

1          MS. SHROFF:  I'm not, Your Honor.

2          THE COURT:  Okay.  All right.  I intend to remand

3    Mr. Goklu today.  I think he's had sufficient time to prepare

4    himself because of the extensive number of delays of

5    sentencing and the fact that we had a prior sentencing

6    proceeding.

7               Is there any reason not to require him to start

8    serving his sentence now?

9          MS. SHROFF:  Yes, Your Honor.  I think the Court is

10   very familiar with the recent rulings both from the Southern

11   and Eastern District of New York about the conditions at the

12   MDC.  Judge Furman, from the *United States versus Chavez*

13   recently addressed those --

14         THE COURT:  Judge Furman recently addressed those in

15   Chavez, C-H-A-V-E-Z, I think.

16         MS. SHROFF:  Right.  I don't want to belabor that

17   point because I see -- I know that --

18         THE COURT:  I'm aware of that.

19              So you're asking him to be allowed to surrender?

20         MS. SHROFF:  I am, Your Honor.  I also think it

21   makes a gigantic difference as to where he will be designated

22   if he is designated while he's outside, as opposed to if he's

23   surrendering at the MDC.  I have literally no objection if the

24   Government wants to make steps to get him expeditedly

25   designated.  I'm not looking to prolong the time out.  But I

A-1107

PROCEEDINGS                                186

1  am really very desperately looking to not have him go to the

2  MDC and not having been located at a facility that is far

3  worse simply because he is remanded.

4          THE COURT: Let me ask you the question:  Where is

5  he living now?

6          MS. SHROFF:  I actually don't know.  Could I?

7          THE COURT:  Yeah, why don't you? because there's

8  this whole thing about him being homeless.

9          MS. SHROFF:  He rents a room from a friend.  Also,

10  his son just had surgery, Your Honor, a day ago.

11          And I know --

12          THE COURT:  You're going to ask me to let him travel

13  to Turkey?

14          MS. SHROFF:  No, I'm not.  I understand -- I am not

15  asking for that.  But I do think that it makes a difference if

16  he's able to, at least, be present at all hours of the day

17  through phone and Facetime with his child.  I do think that is

18  an important thing to be able to do in this day and age of

19  technology.  And I also note again that he has not done any

20  criminal activity since his release.

21          And, finally, Your Honor, the delays have been mine.

22  It was my trial schedule in D.C. and then before Judge Casale.

23  And I do want to note that Judge Casale has asked -- told me

24  that I am able to tell the judge -- I was never supposed to be

25  that involved in that case.  The lead lawyer had some kind

AVERY N. ARMSTRONG, RPR, NYRCR
OFFICIAL COURT REPORTER

A-1108

```
                          PROCEEDINGS                      187

 1    of myo --

 2             THE COURT:  Myocardial issue.

 3             MS. SHROFF:  Right.

 4             THE COURT:  Okay.  We don't need to talk about that.

 5             All right.  Is the Government objecting to letting

 6    Mr. Goklu surrender at his designated facility?

 7             MR. NAVARRO:  We are, Your Honor.  We believe remand

 8    now is appropriate, particularly in light of the repeated

 9    instances of Mr. Goklu simply not being able to follow court

10    directives to the letter of law.  There's no reason to think

11    that will change now.  He also remains a Turkish citizen and

12    is a risk of flight to that country from which extradition is

13    virtually impossible.

14             THE COURT:  Has he surrendered his passport?

15             MR. NAVARRO:  I believe he has surrendered his

16    passport, Your Honor.  But that's certainly -- there are

17    certainly ways around that.

18             THE COURT:  His Turkish passport or -- he doesn't

19    have a U.S. passport, I gathered?

20             MR. NAVARRO:  Your Honor, my understanding is that

21    he has surrendered whatever passports he has.  However,

22    pretrial services is not here, so I cannot confirm that.

23             THE COURT:  Let me ask probation.

24             Are you aware of his current -- you wouldn't know

25    that, it would be pretrial services.
```

A-1109

PROCEEDINGS                                   188

1          MS. MALKO:  Sorry, Your Honor.

2          THE COURT:  I'm a little concerned because there was

3   a representation that the reason he tried to thwart

4   Ms. O'Neill selling her place is because he would be rendered

5   homeless.  Clearly, that has not happened, and he's not

6   homeless.  He already has a place to stay.

7          MS. SHROFF:  That was the clear worry at the time

8   when his wife and his children were here that they would all

9   three have no place to live.  He has since left that

10  apartment.  He is renting a room at 21-1 Astoria, Queens on

11  81-16 58th Avenue.

12         THE COURT:  Did he report this change of address to

13  pretrial services?

14         MR. GOKLU:  Yes (in English).

15         THE COURT:  So they know about it?

16         MS. SHROFF:  Yes, Your Honor.

17         THE COURT:  Who's his officer?

18         MR. GOKLU:  Carlson.

19         THE COURT:  Amanda Carlson?

20         MS. SHROFF:  Mr. Carlson.

21         THE COURT:  Amanda.  Isn't it a woman?

22         MS. MALKO:  Yes.

23         MS. SHROFF:  Yes.

24         THE COURT:  Okay.  All right.

25         MR. NAVARRO:  Your Honor, I would just add just to

A-1110

PROCEEDINGS                                      189

1   close the loop on this.  The fact that his wife and son are

2   now in Turkey gives him even more incentive to flee.  There's

3   basically nothing tying him to the district anymore.

4          MS. SHROFF:  They only went there because of the

5   surgery.  It wasn't planned.  It wasn't like they planned to

6   go back to Turkey.  The child needed the operation.  They

7   couldn't afford to do it here so she went back.  If the

8   Government is hinging all of this on his wife and son

9   returning, then, you know, that is a very huge burden to place

10  on the wife to say, Choose between your husband and your son.

11         THE COURT:  Well, I don't actually think that's why

12  she went there, according to what I've read.  She went there

13  because her job is in Istanbul, and also because her sister

14  needed care.  That's what I've read in your submission.

15         MS. SHROFF:  She would never have left right now

16  while the sentence was pending, she would have stayed, and she

17  would have been here if it was in any way going to impact this

18  Court's decision on a remand.  The reason she left

19  precipitously is because of the operation.

20         THE COURT:  But she's not coming back because of her

21  job and because of the family support, I assume.

22         Well, there's nowhere for her to live now, right?

23  Because the whole point is he is living in a room.

24         MS. SHROFF:  No, Your Honor.  I think that the plan

25  was that she would bring the child back before he would have

A-1111

PROCEEDINGS                                          190

1    to surrender so the child could see him.

2              THE COURT:  And where are they going to live?

3              MS. SHROFF:  I think they are going to live in the

4    one -- in the rooms that he's rented, and the pretrial is -- I

5    think they have -- I don't know if they have conducted a home

6    visit or not, but I can double check.

7              Ms. Carlson did a home visit yesterday, he informs

8    me.

9              THE COURT:  Listen, I understand the concerns that

10   the Government raises.  But at the end of the day, I probably

11   have greater concerns about the conditions at the MDC.  I just

12   think it's a place right now that should not be overloaded in

13   any way.  There are some serious staffing issues, which have

14   been documented in different decisions, including, of course,

15   Judge Furman's.

16             I'm certainly not castigating the Bureau of Prisons.

17   I think they're dealing with a serious issue, an intractable

18   issue about staffing, and that obviously isn't from lack of

19   trying to fix it.  But it exists, and I think it has

20   consequences.  I also don't think, at this point, that

21   Mr. Goklu is as great a risk of flight as the Government

22   fears.  I think, actually, he's attempted in many ways to try

23   to stay in the United States with his family.  But, but for

24   the, I think, difficult financial circumstances, and the fact

25   that his wife had to go back and work in Istanbul, I think

AVERY N. ARMSTRONG, RPR, NYRCR
OFFICIAL COURT REPORTER

**A-1112**

PROCEEDINGS                                          191

1    they probably all would be here.  So I haven't sensed that

2    Mr. Goklu has tried to flee.  And it seems to me he should

3    have done it before today if he was serious about that when

4    his wife was there earlier.

5            So I'm going to allow him to surrender.  I don't

6    find that the risk of flight is great enough, at this point,

7    to cause me concern that he won't surrender because,

8    obviously, he understands that he'll never be able to come

9    back here if he leaves or if he's found.  He will certainly

10   suffer much greater consequences by not surrendering and will

11   be in jail for much longer.  So the same conditions should

12   apply.  I think he's allowed to work.

13           THE COURTROOM DEPUTY:  It's the same pretrial

14   condition until he surrenders?

15           THE COURT:  So his pretrial conditions will continue

16   as they are until he surrenders.

17           Fida, we should put a date on it, though.

18           So he'll surrender on --

19           THE COURTROOM DEPUTY:  How long do you want to give?

20           THE COURT:  I think two months.

21           So we'll set it for two months from now.  He's got

22   to surrender at the designated facility.

23           MS. SHROFF:  So, Your Honor, I do want to

24   anecdotally note that another client of mine, it took 90 days

25   to get designation.  And for that client, we specifically

*AVERY N. ARMSTRONG, RPR, NYRCR*
*OFFICIAL COURT REPORTER*

A-1113

PROCEEDINGS                                            192

1    called Grand Query, and it still took them 90 days.

2              THE COURT:  Well, if it doesn't happen, you'll let

3    me know.

4              MS. SHROFF:  Yes, Your Honor.

5              THE COURT:  And we'll get an extension.

6              Also, I have to be clear, there are two counts of

7    conviction, I believe, counts one and two.  And the sentence

8    is the same, 16 months on each to run concurrently.  And the

9    superseding S1 indictment.  And then the two years of

10   supervised release is the same on both, but obviously, that

11   will run concurrently.

12             Oh, actually, I didn't finish off the rest of the

13   conditions.

14             A fine.  We have not addressed the question of a

15   fine.  I do not believe Mr. Goklu is able to pay a fine.

16             Does the Government have a different view of that

17   situation?

18             MR. NAVARRO:  No objection to that, Your Honor.

19             THE COURT:  Okay.  Restitution is not required in

20   this case as I understand it.  I am imposing the special

21   assessment in total of $200, which is 100 for each count of

22   conviction.

23             And then there's no forfeiture being sought here; is

24   that right?

25             MR. NAVARRO:  That's right, Your Honor.

AVERY N. ARMSTRONG, RPR, NYRCR
OFFICIAL COURT REPORTER

A-1114

PROCEEDINGS                                          193

1          THE COURT:  Okay.  So those are all the conditions.

2          Now, Mr. Goklu, let me advise you about your right

3     to appeal.

4          Under some circumstances, you may have the right to

5     appeal your conviction and/or your sentence.  Any notice of

6     appeal must be filed within 14 days of the filing of an entry

7     of a judgment, which should happen within the next few days,

8     or within 14 days of the filing of a notice of appeal by the

9     Government if the Government chooses to appeal the sentence

10    that I just imposed.

11         If you request to file an appeal, the Clerk will

12    prepare and file a notice of appeal on your behalf, and if you

13    cannot afford to pay for the cost of an appeal or for

14    appellate counsel, you can ask to have the filing fee waived

15    and to have court-appointed counsel for your appeal.

16         Do you understand your right to appeal?

17         MR. GOKLU:  Yes (in English).  Yes, Your Honor (in

18    English).

19         THE COURT:  All right.  Anything else to address at

20    this time?

21         MR. NAVARRO:  Just the surrender date, Your Honor.

22    I'm not sure we got a --

23         THE COURT:  Yes.  Okay.

24         THE COURTROOM DEPUTY:  The defendant shall surrender

25    for service of sentence at the institution designated by the

AVERY N. ARMSTRONG, RPR, NYRCR
OFFICIAL COURT REPORTER

A-1115

PROCEEDINGS                                          194

1    BOP before 2:00 p.m. on May 14, 2024.

2              THE COURT:  Are you seeking any recommendation as to

3    any facility, Ms. Shroff?

4              MS. SHROFF:  Your Honor, just to the extent that the

5    Court can recommend that he be allowed to be placed in a

6    facility close to New York.  And I'm assuming that the Court

7    would not entertain a request from me to impose a sentence of

8    a year and a day and the remaining four-month period on home

9    arrest.

10             THE COURT:  No.

11             MS. SHROFF:  Thank you, Your Honor.

12             THE COURT:  Thank you everyone.  I don't think -- is

13   there an underlying indictment that needs to be dismissed, I

14   guess?

15             MR. NAVARRO:  Yes, Your Honor.  The Government moved

16   to dismiss the underlying original indictment.

17             THE COURT:  Thank you.

18             Hang on one second.

19             Ms. Gonzalez as always, raises a very good point.

20   You want me to say, as close to New York as possible, but not

21   the MDC.

22             MS. SHROFF:  Oh, yeah.  No, no, not the MDC.

23             MR. NAVARRO:  No objection.

24             THE COURT:  Yes.

25             (Whereupon, the matter was concluded.)
                     *    *    *    *    *

AVERY N. ARMSTRONG, RPR, NYRCR
OFFICIAL COURT REPORTER

A-1116

195

1                                I N D E X

2    WITNESS                              PAGE

3    LAURA O'NEILL

4    DIRECT EXAMINATION    BY MR. NAVARRO      12

5    CROSS-EXAMINATION     BY MS. SHROFF       55

6    CROSS-EXAMINATION     BY MS. SHROFF       94

7

8                              E X H I B I T S

9    GOVERNMENT                           PAGE

10   1                                    18

11   2                                    28

12   3                                    32

13   8                                    145

14   4, 5, and 6                          149

15

16

17

18

19

20

21

22

23

24

25

*AVERY N. ARMSTRONG, RPR, NYRCR*
*OFFICIAL COURT REPORTER*

A-1117

Criminal Notice of Appeal - Form A

# NOTICE OF APPEAL

**United States District Court**

Eastern District of New York

Caption:

United States of America v.

Mustafa Goklu

Docket No.: 19 Cr. 00386 (PKC)

Pamela K. Chen

(District Court Judge)

Notice is hereby given that Mustafa Goklu appeals to the United States Court of Appeals for the Second Circuit from the judgment ____, other | ✔ conviction

(specify)

entered in this action on _____.

(date)

This appeal concerns: Conviction only |___|    Sentence only |___|    Conviction & Sentence | ✔ |    Other |___|

Defendant found guilty by plea |    | trial | ✔ | N/A |    .

Offense occurred after November 1, 1987?    Yes | ✔ |    No |    |    N/A |    |

Date of sentence: March 14, 2024    N/A |___|

Bail/Jail Disposition: Committed | ✔ |    Not committed |    |    N/A |    |

Appellant is represented by counsel?    Yes ✔ | No |    |    If yes, provide the following information:

Defendant's Counsel: Sabrina P. Shroff

Counsel's Address: 80 Broad Street, 19th Floor

New York, New York 10007

Counsel's Phone: 646 763 1490

Assistant U.S. Attorney: Francisco Navarro

AUSA's Address: 225 Cadman Plaza East

Brooklyn, New York

AUSA's Phone: 718 254 7000

*SPS*

Signature