# 24-767-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

MUSTAFA GOKLU, AKA Mustangy,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

MATTHEW BRISSENDEN
MATTHEW W. BRISSENDEN, P.C.
*Attorneys for Defendant-Appellant*
666 Old Country Road, Suite 501
Garden City, New York 11530
(516) 683-8500

## **TABLE OF CONTENTS**

STATEMENT OF JURISDICTION……………………………………………1

ISSUES PRESENTED.....................................................................................1

STATEMENT OF FACTS...............................................................................4

SUMMARY OF ARGUMENT……………………………………………… 23

ARGUMENT....................................................................................................25

    I.     The Lower Court Abused Its Discretion
          In Failing to Excuse Prospective Juror 30 For Cause…………...25

    II.    The Lower Court Erred When It Amended Its Jury
          Instruction in Order to Blunt Defense Counsel's Closing
          Argument Concerning Count Two………………………………28

          A.    The Court's Corrective Charge Violated Rule
                  30 of the Federal Rules of Criminal Procedure…………...28

          B.    The Court's Charge Was Wrong as a Matter of Law…….30

    III.   The Evidence Was Legally Insufficient to Establish
          That the Defendant's Conduct in Paying Cash For
          Bitcoin Constituted an Unlicensed Money Transmitting
          Business………………………………………………………… 31

    IV.   Count Two of the Indictment Was Impermissibly
          Duplicitous Because it Charged The Defendant
          with Multiple, Separate Transactions…………………………... 37

    V.    The Court Committed Procedural Error at Sentencing,
          By Including the Proceeds of the First Three Meetings
          In the Total Value of Laundered Funds…………………………43

    VI.   The Lower Court Erred in Adopting Probation's
          Guidelines Calculation in Connection with Respect to
          Count Two……………………………………………………… 47

CONCLUSION……………………………………………………………48

i

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Dennis v. United States*, 339 U.S. 162, 70 S. Ct. 519 (1950)…………………25

*Dubin v. United States*, 143 S. Ct. 1557 (2023)………………………………36

*Harris v. Sullivan*, 968 F.2d 263 (2d Cir. 1992)……………………………... 31

*Kolender v. Lawson*, 461 U.S. 352, 103 S. Ct. 1855 (1983)…………………36

*Rosales-Lopez v. United States*, 451 U.S. 182,
101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981)……..…………………………… 25

*Skilling v. United States*, 561 U.S. 358 (2010)………………………………..36

*Thompson v. Altheimer & Gray*, 248 F.3d 621 (7th Cir. 2001)……………… 26

*United States v. Conley*, 826 F. Supp. 1536 (W.D. Pa. 1993)………………...39

*United States v. Cook*, 155 F. App'x 970 (9th Cir. 2005)……………………24, 25

*United States v. Crowe*, 563 F.3d 969 (9th Cir. 2009)………………………... 35

*United States v. Crozier*, 987 F.2d 893 (2d Cir. 1993)……………………… 28

*United States v. Darmand*, 3 F.3d 1578 (2d Cir. 1993)……………………… 41

*United States v. Eisen*, 974 F.2d 246 (2d. Cir 1992)…………………………..28

*United States v. Faiella*, 39 F.Supp. 3d 544 (S.D.N.Y. 2014)………………34, 35

*United States v. Gaskins*, 849 F.2d 454 (9th Cir. 1988)………………………29

*United States v. Gonzalez,* 214 F.3d 1109 (9th Cir. 2000)……………………27

*United States v. Harmon*, 474 F.Supp.3d 76 (D.D.C. 2020)…………………34

*United States v. James*, 239 F.3d 120 (2d Cir. 2000)…………………………28

*United States v. Kechedzian*, 902 F.3d 1023 (9th Cir. 2018)..................... 27

*United States v. Kramer*, 73 F.3d 1067 (11th Cir. 1996)......................... 38

*United States v. Lyles*, 593 F.2d 182 (2d Cir.),
cert. denied, 440 U.S. 972, 59 L. Ed. 2d 789, 99 S. Ct. 1537 (1979)............28

*United States v. Majors*, 196 F.3d 1206 (11th Cir. 1999......................... 38, 39

*United States v. Moran-Toala*, 726 F.3d 334 (2d Cir. 2013)..................... 30

*United States v. Moloney*, 287 F.3d 236 (2d Cir. 2002)...........................39

*United States v. Moreland*, 622 F.3d 1147 (9th Cir. 2010)....................... 35

*United States v. Nelson*, 277 F.3d 164 (2d Cir. 2002)...........................25, 26

*United States v. Nieves*, 58 F.4th 623 (2d Cir. 2023)............................ 25

*United States v. Oliver*, 766 F.2d 252 (6th Cir. 1985)........................... 29

*United States v. Prescott*, 42 F.3d 1165 (8th Cir. 1994)......................... 39

*United States v. Sithithongtham*, 192 F.3d 1119 (8th Cir. 1999)................. 26

*United States v. Stetkiw*, No. 18-20579,
2019 WL 417404 (E.D. Mich. 2019)................................................34

*United States v. Sturdivant*, 244 F.3d 71 (2d Cir. 2001)........................40, 41

*United States v. Torres*, 128 F.3d 38 (2d Cir. 1997)............................ 25

*United States v. Tourine*, 428 F.2d 865 (2d Cir. 1970),
cert. denied, 400 U.S. 1020, 91 S. Ct. 581, 27 L. Ed. 2d 631 (1971)............28

*United States v. Wander*, 601 F.2d 1251 (3d Cir. 1979)......................... 29

**Other Authorities**

FRCP Rule 29……………………………………………………………19, 35

Title 18 U.S.C. § 1346………………………………………………………..36

Title 18 U.S.C. § 1956………………………………………1, 4, 21, 37, 38, 42, 45

Title 18 U.S.C. § 1957…………………………………………………… 45

Title 18 U.S.C. § 1960…………………………...1, 2, 3, 4, 19, 24, 30, 31, 35, 36, 37, 47

Title 28 U.S.C. § 1291………………………………………………………...1

Title 31 U.S.C. § 5330…………………………………………………...31, 32

UNITED STATES DEPARTMENT OF JUSTICE, JUSTICE MANUAL,
§ 2101, *Money Laundering Overview* (2024)……………………...…………....39

U.S.S.C. § 2S1.1………………………………………..3, 20, 21, 24, 40, 44, 45, 47

U.S.S.C. § 2S1.3…………………………………………………………24, 47

U.S.S.C. § 4C1.1………………………………………………………21, 22

## STATEMENT OF JURISDICTION

Defendant-Appellant appeals from a judgment of conviction following trial on one count of Money Laundering and one count of Operating an Unlicensed Money Transmitting Business. Sentence was imposed by the Honorable Pamela K. Chen, United States District Judge for the Eastern District of New York, on March 14, 2024. Judgment was filed on March 21st, and the Defendant filed a timely Notice of Appeal the following day. This Court has jurisdiction pursuant to Title 28 U.S.C. § 1291.

## ISSUES PRESENTED

Mustafa Goklu advertised online, offering to pay cash for bitcoin. He was contacted by an undercover agent working for the DEA, who arranged a series of meetings over the course of eight months. During the early meetings, the agent said nothing regarding the province of the bitcoin being purchased by the Defendant. However, as their relationship progressed, the undercover agent began dropping hints – subtle at first, but then less so – that such bitcoin had been derived through the sale of controlled substances.

The Defendant was arrested and tried on one count of Money Laundering, in violation of 18 U.S.C. § 1956(a)(3), and one count of Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(b)(1)(A) and (B).

1

During jury selection, defense counsel challenged a prospective juror for cause, after the juror stated that he was partial towards law enforcement. Defense counsel's application was denied, and the prospective juror was ultimately seated.

In summation, defense counsel argued to the jury that the Defendant's conduct in paying cash for bitcoin did not constitute a money transmitting business under the elements of § 1960. Following this closing argument, the trial court criticized defense counsel for advancing what it believed to be an improper legal argument. It thereafter altered the jury charge to rebut this argument, informing the jury that "exchanging Bitcoin for U.S. currency can qualify as a transfer within the meaning of the statute."

Posttrial, defense counsel moved for a judgment of acquittal with respect to Count Two, arguing again that the evidence was legally insufficient to establish a violation of 18 U.S.C. § 1960. That motion was denied.

At sentencing, defense counsel argued that the court should not include the value of the early transactions in calculating the total value of the laundered funds, because such transactions took place before the agent had represented that the bitcoin was derived from specified unlawful activity. The district court rejected this argument, and aggregated the value of each and every transaction to calculate the Defendant's guidelines.

2

In light of this factual background, the instant appeal raises the following issues:

1.    Did the lower court abuse its discretion in failing to excuse the prospective juror for cause?

2.    Did the lower court err when it altered its jury instructions following defense counsel's summations, in an effort to blunt Defendant's argument to the jury?

3.    Was the evidence legally sufficient to establish that the Defendant's conduct in paying cash for bitcoin amounted to an Unlicensed Money Transmitting Business in violation of 18 U.S.C. § 1960?

4.    Was Count One of the indictment impermissibly duplicitous, insofar as it charged multiple transactions under a single count of Money Laundering?

5.    Did the lower court commit procedural error in calculating the Defendant's Money Laundering guidelines, by including funds paid by the Defendant in the early transactions – before the Government's agent had represented that such funds constituted the proceeds of specified unlawful activity?

6.    Did the lower court commit procedural error in adopting the PSR's application of U.S.S.C. § 2S1.1 to Count Two, which charged a violation of 18 U.S.C. § 1960(b)(1)(A) and (B)?

3

## STATEMENT OF FACTS

### I. INVESTIGATION AND INDICTMENT

In July of 2018, the Drug Enforcement Agency began investigating an advertisement posted by an individual under the username "Mustangy" on a website called localbitcoins.com. The advertisement offered to purchase bitcoin for cash.

Undercover DEA agents arranged to meet with "Mustangy" – later revealed to be Mustafa Goklu – on seven occasions. At each meeting, the agent sold bitcoin for cash, while paying a transaction fee of seven or eight percent. At each subsequent meeting, the agent proposed to sell a larger denomination of bitcoin; by the final meeting, in late April of 2019, Mr. Goklu had bought $133,190 worth of bitcoin.

Mustafa Goklu was arraigned on May 6, 2019, pursuant to a criminal complaint charging him with Money Laundering. He was subsequently charged, by way of indictment, with one count of Money Laundering, in violation of 18 U.S.C. § 1956(a)(3)(B)2, and one count of Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(b)(1)(A) and (B).

The case was assigned to the Honorable Pamela K. Chen, and trial commenced on October 3, 2022.

## I.   TRIAL

### A.   Jury Selection

During jury selection, the trial court inquired whether any of the prospective jurors had any biases for or against law enforcement.  TR 30 (A-105).  Prospective Juror Number 30 ("Prospective Juror 30") raised his hand.  TR 45 (A-120).  When questioned by the court, Prospective Juror 30 indicated that most of his friends were in law enforcement and that he had a "positive outlook" towards police.  *Id*.  He also stated that he had strong feelings about financial crimes.  TR 46 (A-121).  Thereafter, the court repeatedly asked Prospective Juror 30 whether he could set aside his predispositions in order to be fair and objective.  *Id*.  In response, the juror repeatedly provided answers which were either negative or equivocal.  *Id*. at 46-48 (A-121-123).  After initially stating that he was "not sure" whether he could be impartial, and emphasizing that his "judgment might be affected by [his] life experience," Prospective Juror 30 subsequently told the court, "I guess I will try my best," and that he could "possibly" be fair.  *Id*.  Defense counsel moved to excuse for cause, but that application was denied.

After defense counsel had expended his peremptory challenges, Prospective Juror 30 was named as Alternate Juror Number 1.  TR 165 (A-240).  However, before the trial could commence, the person originally selected as Juror Number 5

informed the court that she could not serve and was excused. TR 178 (A-253). As a result, Prospective Juror 30 became Juror Number 12. TR 179 (A-254).

### B.    Trial Evidence

The Government began its case by calling DEA Special Agent Lilita Infante, an expert witness who provided background information concerning bitcoin and the ways in which cryptocurrency can be converted into cash. The witness testified that such transactions can occur on centralized exchanges, through online peer-to-peer exchanges, and *via* direct, in-person transactions. TR 215-221 (A-290 to A-296). Agent Infante explained that centralized exchanges require identity verification, but that peer-to-peer transactions may not. TR 222-223 (A-297 to A-298). She further testified that the fees associated with peer-to-peer transactions tend to be higher than the fees charged by centralized exchanges. TR 220-222 (A-295 to A-297). Agent Infante testified that in her experience, online drug dealers were often paid in cryptocurrency. Such persons, she testified, might want to use a peer-to-peer exchange, despite the higher transaction cost, due to the anonymity they provide. TR 223 (A-298).

Thereafter, the Government called DEA Agent Patrick O'Kain to testify about his interactions with the Defendant. Agent O'Kain testified that in 2018, he and his partner were investigating transactions facilitated through a website called localbitcoins.com, which matched up bitcoin buyers and sellers. TR 253 (A-328).

The agents, looking to complete a transaction in the New York area, focused on the profile of an individual operating under the username "Mustangy." The profile indicated a willingness to purchase up to $99,999 in bitcoin. TR 259 (A-334).

In July and August of 2018, Agent O'Kain used a messaging app to contact a number associated with the Mustangy profile, offering to sell $5,000 worth of bitcoin in exchange for cash. The Defendant responded.

Thereafter, between August of 2018 and April of 2019, Agent O'Kain met with the Defendant on seven occasions to sell bitcoin. The transactions took place in Mr. Goklu's car, in Manhattan and Queens. All but one of these meetings were recorded; the recordings and associated transcripts were entered into evidence at trial. *See* GX 901-909 (A-799 to A-927).

In broad strokes, these recordings captured the Defendant, a naturalized citizen from Turkey, speaking in broken and sometimes indecipherable English. On multiple occasions during these meetings, Mr. Goklu expressed a fear of law enforcement and surveillance. Those fears appeared to stem from the experience of an unnamed associate, who, according to Mr. Goklu, had his cash seized by police, and was forced to hire an attorney to get it back through civil proceedings. GX 903, p. 15-18 (A-829 to A-832). Mr. Goklu explained that police would treat his cash counting machine as presumptive evidence of drug dealing. GX 901, p. 7 (A-806).

However, he also disclaimed, on multiple occasions, any intention to engage in illegal activity. *See* TR 360; GX 507 (A-435; A-794).

The recordings show that Agent O'Kain did not, during their initial meetings, imply or hint that he, himself, was a drug dealer. Rather, those suggestions were introduced slowly, over time.

Hence, during the first two transactions – which took place on August 28th and September 21st, 2018 – Agent O'Kain made absolutely no allusion to being in the narcotics trade. The agent testified that he consciously avoided making such references during these initial meetings, because he believed it would be "completely out of character" for a drug dealer to "divulge the fact that they're a drug dealer during the first encounter." TR 284 (A-359).

As the relationship progressed, however, Agent O'Kain began dropping hints. Those hints started subtle, but grew increasingly overt over the course of the seven meetings. In the meantime, the Government sought to induce the Defendant's continued participation by offering to sell larger and larger denominations of bitcoin (resulting in larger fees for the Defendant).

Hence, while the first two transactions involved $4,620 and $6,750 respectively, by November of 2018, Agent O'Kain was asking the Defendant to purchase $60,000 of bitcoin. The Defendant demurred, explaining that he did not

have access to sufficient cash. Instead, Goklu told the agent that he could buy a maximum of $40,000. GX 503 (A-767).

The two met on November 27, 2018, at a Wendy's parking lot in Queens, exchanging 1.65127282 of bitcoin for $36,600 cash. TR 299; GX 1101 (A-374; A-928). At this meeting, the agent began subtly hinting, for the first time, that the funds were of an illicit province. In this regard, the agent told Mr. Goklu that his "business was picking up" and that he needed to turn bitcoins "into cash as soon as possible." When the Defendant questioned the wisdom of this, the agent told him, "I have people to pay, so . . . they want it in cash." GX 903, pp. 11-12 (A-825 to A-826). He indicated that he would be seeking to transfer another "hundred thousand" in a week or two.

Mr. Goklu expressed that he had been scared by the tinted windows of the agent's car. He further told the agent that "his partner" was "in judgment" because he had purchased bitcoin "from some idiot guy who buys and sells drugs." *Id*. at 15 (A-829). He explained that the police were keeping his friend's funds "in escrow until the judgment finishes." *Id*. at 16 (A-830). He also told the agents the police were not looking at him because "they do understand he's not a drug guy . . . he's just selling bitcoins." *Id*. at 34 (A-848).

As they waited for the transaction to go through, Goklu told the agent that his main business involved the sale of plastic bags. *Id*. at 22 (A-836). The two discussed

9

real estate prices and the merits of different car brands. *Id*. at 23-25 (A-837 to A-839). Goklu told the agent that he had a friend in California selling state-licensed marijuana. *Id*. at 26 (A-840). The agent responded by telling Goklu, "I might know him. That's where I do most of my business." *Id*. at 27 (A-841). When Goklu asked him if that's what he did, the agent responded cryptically: "A little bit, that's part of it down in California." *Id*.

On December 10th, the agent texted Mr. Goklu and asked to exchange an additional $20,000 in bitcoin. GX 504 (A-770). The next day, they met at the same Queens location. On this occasion, the agent leaned further into his cover story, alluding to his need to pay "not great people." TR 314 (A-389). He also purported to place a phone call to his business partner in Mr. Goklu's presence, during which he mentioned selling "keys." GX 904 p. 13 (A-862).

On January 18, 2019, the agent texted Mr. Goklu yet again, offering to sell $100,000 worth of bitcoin. After some back and forth, the Defendant represented that the most he could purchase was $25,000. GX 505 (A-781).

The resulting meeting took place on January 24, 2019. As the two men sat in Goklu's car, waiting for the electronic transaction to go through, the agent began making more explicit statements. As he testified at trial, "we start discussing actually where I am getting the money from for the first time." TR 330 (A-405). Again, the discussion began with an allusion to marijuana, with the agent telling Mr.

10

Goklu, "these college kids cannot get enough." GX 906, p. 9 (A-873). Goklu asked the agent if he could secure him an "electronic smoke pen" for his girlfriend. *Id*. at 23-24 (A-887 to A-888). The agent told him, "I got that," but also explained that he could obtain "oxies" and Adderall, because "that's what we do. We do all of that." *Id*. at 25 (A-889). Goklu declined, specifying that he was only interested in "THC." *Id*. at 26 (A-890).

At trial, the agent testified that he specifically segued from marijuana to prescription drugs because he wanted the Defendant to clearly understand that he was selling drugs *illegally*. TR 330-332 (A-405 to A-407). "I said that to – in the attempt to make it very clear that was my business, selling illegal drugs." TR 332 (A-407). Despite such statements, Mr. Goklu did not abort the transaction.

Four days later, the agent reached out again, asking to exchange the remaining $75,000 in bitcoin allegedly left over from the prior transaction. Mr. Goklu responded that he could only purchase $45,000 worth of cryptocurrency. GX 506 (A-788).

On January 30th, the two met on East 33rd Street in Manhattan. On this occasion, Goklu accepted 13.673287 bitcoin and paid $43,500 in cash. There was no substantive discussion of drug dealing; however, the agent did jokingly allude to getting shot at by "the guy who is back in California that wants the rest of the 100." GX 907, p. 14 (A-909).

11

Thereafter, no further contact occurred until April of 2019, when Agent O'Kain texted the Defendant and asked if he could exchange $100,000 in bitcoin. GX 507. Mr. Goklu again responded that he would transact no more than $49,999, writing:

> Dude i can do 49,999.00
>
> I m a bitcoin trader not a money laundering guy i refuse when i feel Bitcoin buyer is drug guy.. yep real i dont care of income i refused a lot because they look alike dirty thats why limited can give you rest next day what ever you want. No bad man here

GX 507 (A-794).

The Defendant and Agent O'Kain met for a final time on April 26, 2019. At the outset, he told Mr. Goklu that his business was booming. GX 909, p. 1-2 (A-917 to A-918). When Goklu expressed his understanding that the Agent was operating a cannabis farm, the Agent again clarified that he was also selling prescription drugs:

> UC: Yeah. I'm making tons of money, man.
>
> GOKLU: I need to go in that business with you.
>
> UC: Do you? Do you want in?
>
> GOKLU: A cut.
>
> UC: Do you want a cut?
>
> GOKLU: How much, how much is a [U/I]?
>
> UC: What do you mean?
>
> GOKLU: I mean… Cannabis farm.

12

UC: Oh. Well, that's… I don't make them as much with Cannabis, I, uh, I mean, I sell pounds of that in California, but, uh, the real money is in like, uh, the Adderall and the pills, [U/I].

GX 909, p. 2 (A-918).

Again, the agent explained at trial that his intention was to refocus the Defendant away from marijuana, in order to clearly signal the illegal nature of his operation.

> I wanted to make it clear to the defendant again that the money was not coming from just cannabis but also more of it was coming from Adderall and the other pills. The reason I said that was because based on the uncertain legalities of marijuana at the time in California I wanted to make sure that this money was coming from Adderall and other controlled substances.

TR 363-364 (A-438 to A-439).

This concern appears to have been well founded, as later in the conversation, Goklu expressed his surprise when the Agent informed him that marijuana was "federally" illegal and still "risky." GX 909, p. 6 (A-922). The purpose, Agent O'Kain testified, was "to let the defendant know that that marijuana was illegal federally because part of what the defendant believed I was selling was marijuana and I was letting him know that that is illegal as well." TR 365 (A-440).

Again, Mr. Goklu did not walk away from the transaction. To the contrary, he indicated that he would be able to purchase an additional $25,000 of bitcoin beyond the $50,000 which they had previously agreed to. TR 367 (A-442). At this

juncture, Agent O'Kain signaled to an arrest team that was waiting nearby, and agents swarmed the car to effectuate the Defendant's arrest. *Id.* As a result, no transaction actually occurred at this final meeting. TR 368 (A-443).

Following his arrest, Mr. Goklu was interviewed by DEA Special Agent Allan Liefke. During this interview, he admitted to buying bitcoin from other customers, but claimed that those transactions tended to be for smaller amounts. TR 426 (A-501). A subsequent search of his phone and messaging app revealed communication with other customers and potential customers. TR 427-435 (A-502 to A-510). Some of these communications referenced larger transactions of up to $65,000. TR 435 (A-510).

Finally, the Government called Robert Tarwacki, an investigator with the New York State Department of Financial Services, and Theodore Valahakis, a senior compliance officer with the Department of Treasury's Financial Crimes Enforcement Network. These witnesses testified in connection with Count Two, charging Goklu with the Operation of an Unlicensed Money Transmitting Business. Robert Tarwacki testified that the Defendant was not licensed to operate a money transmitting business in the State of New York. TR 462 (A-537). He also testified that such licensing requirement applies "to the exchange of cryptocurrency for cash." TR 459 (A-534).

Likewise, Theodore Vlahakis certified that the Defendant was not federally registered to operate a money transmitting business. He testified that under federal regulation, "money transmission is defined as the acceptance of currency funds or its equivalent from one person or the location and the transmission of the currency funds or its equivalent to another person or location by any means." TR 469 (A-544). He opined that this definition included the exchange of cryptocurrency for cash. *Id.*

## C. Proposed Jury Charge

Prior to trial, the Government proposed and the court adopted the following instruction concerning the definition of a "money transmitting business":

> A "money transmitting business" is a business which, for a fee, accepts currency, funds, or value that substitutes for currency for transfer within or outside the United States. I instruct you that Bitcoin qualifies as "funds" under the statute. The term "money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier.

TR 495-500 (A-570 to A-571).

Defense counsel did not object.

## D. Summations, Corrective Jury Charge, and Verdict

In summation, defense counsel argued that the Government had failed to prove that the Defendant believed and understood the bitcoin to represent the proceeds of illegal drug transactions. TR 565-572 (A-639 to A-646).

15

With respect to Count Two, defense counsel argued that the question before the jury was "whether he was operating a money transmitting business, as the judge will define it." TR 555 (A-629). Specifically, counsel argued:

> On the money transferring business, this is a matter of the language and I'm going to encourage you folks to listen carefully to the Judge as she gives the language of this charge and you're going to have the written charge with you in the jury room and you can look at the language as well. A money transmitting business is a business which for a fee accepts currency for transfer. That's the language that you're being given. And I submit to you that definition that the judge is giving to you and it's included in the instruction that Mr. Goklu is not operating a money transmitting business, that he is not -- that the evidence does not prove beyond a reasonable doubt that he is accepting currency for transfer.

> TR 572 (A-646).

Following defense counsel's summation, the trial court called a conference outside the jury's presence, in which it accused defense counsel of inappropriately advancing a legal argument:

> THE COURT: The reason I wanted to take a break before the rebuttal is I'm a little concerned, Mr. Singer, about the argument you made about the money transmitting charge. You specifically told the jurors to pay attention to the jury charge regarding the meaning of transfer. Now my concern is that you are suggesting some legal argument that quite honestly should have been raised, I think, during a motion to dismiss long before the trial, or during the jury charge conference because you are suggesting to the jury that what the Government alleges was illegal money transmitting, which is the exchange of Bitcoin for cash doesn't qualify as transferring funds or transmitting. And I have not heard that argument from you before, nor did we address it in the charges that I'm going to give. So you may point the jury to my definition of transferring but it doesn't really illuminate that issue and so I am concerned that you're setting them up to question the instruction on a legal theory. If

16

you thought that the Government had miss charged this case, namely that Bitcoin to cash transactions cannot be transferring under the money -- unlicensed money transmitting business statute you should have raised that before your closing argument and certainly before we settled on the charges. So I feel that you've raised this issue a bit late and I would like to make sure that the jury instruction actually does address this issue. Is there any legal argument to be made that changing Bitcoin to dollars does not constitute a transfer of funds that would require licensing or constitute money transmitting under the statute? Mr. Singer.

DEFENSE COUNSEL: I can cite to Second Circuit case law.

THE COURT: But, okay. Then why not make an argument that this should have been dismissed and are you referring to your jury charges or your proposed charges? Because you didn't suggest any change to the language.

DEFENSE COUNSEL: I was satisfied about the language and thought that it accurately stated the element.

THE COURT: But you are arguing -- is your argument. You didn't spell this out for jury you said look closely at the definition, is your argument at least to me but not expressly to the jury that the transaction -- sorry, the conversion of Bitcoin to money does not constitute a transfer of funds that would require -- sorry, that constitutes money transmitting and then requires a license if done as a business.

DEFENSE COUNSEL: I think that it requires transfer to someone else.

THE COURT: What do you mean someone else? If someone gives you a Bitcoin and they give you cash who else –

DEFENSE COUNSEL: That is not a money transmitting business in my view and I expressed that to Your Honor at the beginning of the case.

THE COURT: But you never moved to dismiss this count or have it briefed. Am I missing something? A legal argument like that ought to have been raised before.

TR 576-578 (A-650 to A-652).

As a result, Judge Chen proposed an additional, corrective instruction that "exchanging Bitcoin for U.S. currency can qualify as a transfer within the meaning of the state." TR 581 (A-655). Defense counsel objected, arguing that he was entitled to make an argument based on the court's original instruction. "I read the language that you had indicated that you were going to charge the jury and I was satisfied with that because I believed that I could make my argument to the jury based on that." TR 582 (A-656). Counsel further argued that the question of whether Mr. Goklu's venture constituted a "money transfer business" was a factual one for the jury to resolve:

> it's a factual question for the jury. That's why we have given it to the jury to decide. Otherwise, just direct a verdict on it. The jury decides that. The jury decides whether the evidence supports the accusation that -- they have to decide whether the facts that have been established make out that element. It's not for the Court to tell them that what he did constitutes the element of the crime."

TR 583-584 (A-657 to 658).

The court overruled defense counsel's objection.

On rebuttal summation, the Government took full advantage of the court's corrective charge, telling the jury:

> defense counsel talked to you about the definition of a money transmitting business. And this is important: To the extent that the defense counsel suggested that what the defendant was doing wasn't a transfer, Judge Chen will instruct you that exchanging Bitcoin for cash is a transaction.

And you heard from the Department of Financial Services and the Department of Treasury, those two witnesses, who told you that a money transmitting business includes people who regularly exchange Bitcoin for cash.

TR 591 (A-665).

The following day, the jury returned a verdict of "guilty" with respect to both counts.  TR 672; ECF 72 (A-746; A-958).

## III.   POST TRIAL MOTIONS

Post trial, defense counsel submitted a written motion pursuant to FRCP Rule 29, arguing that the evidence was legally insufficient to establish that the Defendant was operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960.  In particular, counsel argued that the statute required the Government to prove that the Defendant accepted currency for transmittal or transfer to another recipient or location.  ECF 77 (A-960).

The Government opposed Defendant's motion, arguing that 18 U.S.C. § 1960 reaches the payment of cash for bitcoin.  ECF 82 (A-965).

On January 13, 2023, the lower court denied Defendant's motion.  In doing so, the district court did not reach the underlying legal question – *i.e.*, whether the Defendant's conduct in paying cash for bitcoin satisfied the statute.  Instead, the court characterized defense counsel's motion as in improper challenge to the court's

corrective charge. The court accordingly denied Defendant's motion as "procedurally improper." *See* ECF 85 (A-990).

## IV. SENTENCING

### A. Presentence Investigation Report

Prior to sentencing, Probation issued its Presentence Investigation Report. It determined that the applicable Sentence Guideline for both counts of conviction was U.S.S.C. § 2S1.1(a)(2). Pursuant to that guideline, Probation determined the Defendant's base offense level to be "8 plus the number of offense levels from the table in §2B1.1 corresponding to the value of the laundered funds."

To determine the value of laundered funds, Probation used the cumulative total of the cash paid by Mr. Goklu over the course of his seven meetings, as summarized in the below chart.

| Date of Meeting | Funds Paid |
|---|---|
| 8/28/18 | $4,620 |
| 9/21/18 | $6,750 |
| 11/27/18 | $36,600 |
| 12/11/18 | $18,260 |
| 1/24/19 | $23,550 |
| 1/30/19 | $43,500 |
| 4/26/19 | $0 |
| **TOTAL** | **$133,190**[1] |

---

[1] This calculation was taken directly from GX 1101, the Government's summary chart introduced at trial. It contains a minor mathematical error, as the sum of these figures is actually $133,280, *not* $133,190. This error does not affect the Guidelines calculation.

Based upon this figure of $133,190, Probation calculated a base offense level of sixteen (8 + 8). It further enhanced the Defendant's offense level by six levels under § 2S1.1(b)(1), because it found that Mr. Goklu knew the laundered funds were the proceeds of narcotics trafficking, and another two levels pursuant to § 2S1.1(b)(2)(B), because the Defendant was convicted under 18 U.S.C. § 1956. This yielded a total offense level of 24. Because the Defendant had no criminal history, Probation calculated an advisory sentencing range between 51 and 63 months' imprisonment. PSR p. 14.

### B. Defense Sentencing Submission

In a submission dated January 16, 2024, defense counsel argued that Mr. Goklu should benefit from the two level, "zero-point offender" reduction under U.S.S.C. § 4C1.1. ECF 97 (A-1002).

Additionally, counsel argued that Probation had erred by including the currency exchanged during the first three meetings – before the agent represented that he was selling illicit drugs. Counsel argued that the "amounts from those three transactions – totaling $47,970, or a third of the $133,190 at issue (*see* GX 1101) – should not be included by the Court when it considers Mr. Goklu's offense, or which it calculates the guidelines range and/or the forfeiture number applicable to Mr. Goklu." *Id*. at p. 6 (A-1004).

21

### C.     Sentencing

Sentencing commenced on January 29, 2024, and continued on March 14th.
Judge Chen accepted that Mr. Goklu was entitled to a two-level reduction under
U.S.S.C. § 4C1.1, but otherwise adopted the PSR and the sentencing calculation
contained therein.  1/29/24 Sentencing Transcript, pp. 23-25 (A-1030 to A-1032).

In doing so, the court rejected counsel's arguments about the value of
laundered funds for two reasons.  First, it argued that as a matter of law, the
Guidelines permitted the court to consider the total value of the transactions so long
as the Defendant knew that some portion represented the proceeds of illegal activity.

> the way I read the guidelines provision, it isn't necessary that all the
> funds were proceeds of illegal activity for them to be counted and for
> the level to be raised, but that if any of the funds were proceeds of illegal
> activity.  So therefore, I read the guidelines as covering all of the funds
> that were transacted as part of the crime because . . . [s]ome of them at
> least the defendant knew were proceeds of illegal activity after the UC
> . . . effectively told the defendant that he was a drug dealer . . .

*Id*. at 14 (A-1021).

Second, the court appeared to suggest that it could conclude, based on a
preponderance of the evidence, that the Defendant believed the funds from the first
three transactions were "proceeds of illegal activity" even prior to the agent's
representations, based upon the Defendant's willingness to continue such
transactions even after express representations were made:

based on the defendant's conversations with the undercover in the first three, with respect to the first three transactions, he suggested that he either believed or was willfully blind to the fact that these were proceeds of illegal activity.

So it would be reasonable for the jury to infer that the defendant had reason to believe and also at least was willfully blind to the fact that he was laundering illegal money, but I think that was very clear once the undercover told him and the defendant then continued to launder money for the undercover, sort of bolstering the notion that he believed it before but just didn't care. So I think that that is a very reasonable inference from the evidence . . .

*Id*. at 13-14 (A-1020 to A-1021).

Accordingly, the lower court found a total offense level of 22. Given the Defendant's lack of criminal history, this yielded an advisory Guidelines range of 41 to 51 months' incarceration. *Id*. at 25 (A-1032).

On March 14, 2024, the court sentenced Mr. Goklu to 16 months' incarceration, and two years' supervised release.

## SUMMARY OF ARGUMENT

The lower court abused its discretion when it failed to grant defense counsel's motion to excuse Prospective Juror 30 for cause. Because the empanelment of Prospective Juror 30 violated the Defendant's Sixth Amendment right to an impartial jury, his conviction should be vacated.

Alternatively, the Defendant's conviction should be vacated because the lower court erred when it instructed the jury – in the wake of defense counsel's summation – that "exchanging Bitcoin for U.S. currency can qualify as a transfer

23

within the meaning of the state." This corrective charge was erroneous for two reasons: (a) because it violated Rule 30 of the Federal Rules of Criminal Procedure; and (b) because it was wrong as a matter of law.

Indeed, the evidence in this case was insufficient to establish that Mr. Goklu was operating a money transmitting business, because he was not in the business of accepting funds for the purpose of transmitting such funds to another person or place.

The money laundering count of the indictment was duplicitous, insofar as it charged multiple, discreet transactions under a single count. Moreover, the Defendant was prejudiced because the early transactions were not represented by the agent "to be the proceeds of specified unlawful activity." Despite this, such transactions were treated as part of the offense of conviction for purposes of calculating the Defendant's sentence.

Finally, the lower court erred to the extent that it adopted the PSR, which stated that U.S.S.C. § 2S1.1 was the applicable guideline for the Defendant's offense of conviction under 18 U.S.C. § 1960. Because Mr. Goklu was convicted under 18 U.S.C. § 1960(b)(1)(A) and (B), the applicable guideline was U.S.S.C. § 2S1.3.

## **ARGUMENT**

**Point I.     The Lower Court Abused Its Discretion
In Failing to Excuse Prospective Juror 30 For Cause**

"The Supreme Court has recognized that the voir dire process plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." *United States v. Nieves*, 58 F.4th 623, 631 (2d Cir. 2023), *citing Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981) (plurality opinion). Hence, when impaneling a jury, a "trial court has a serious duty to determine the question of actual bias." *Dennis v. United States*, 339 U.S. 162, 168, 70 S. Ct. 519, 521 (1950).

"Actual bias is bias in fact -- the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997). While judges are afforded discretion in making such determinations, the Supreme Court has emphasized that "the trial court must be zealous to protect the rights of an accused." *Dennis,* 339 U.S. at 168. As a result, "doubts about the existence of actual bias should be resolved against permitting the juror to serve, unless the prospective panelist's protestation of a purge of preconception is positive, not pallid." *United States v. Nelson*, 277 F.3d 164, 202 (2d Cir. 2002).

In this case, Prospective Juror 30 told the court at the outset that he "honestly" did not know if he could be impartial. The district court repeatedly sought to

rehabilitate his answers, but the juror never provided a positive affirmation of his ability to be impartial.  Rather, he initially repeated that he was "not sure," before tepidly telling the judge, "I guess I will try my best."  TR 46 (A-121).  Asked *again* if he could put aside his predictions, the prospective juror responded "possibly." And when the judge asked him if he felt confident in his ability to do so, he offered nothing more than a repetition of his earlier, equivocal statement: "[l]ike I said, I'll try my best."  TR 48 (A-123).

We respectfully submit that under these circumstances, the trial court abused its discretion in not granting defense counsel's motion to dismiss for cause.  As this Court has noted, "a juror who could 'probably' be fair and impartial should not be considered impartial, because 'probably' is not good enough." *United States v. Nelson*, 277 F.3d 164, 202 (2d Cir. 2002), *citing United States v. Sithithongtham*, 192 F.3d 1119, 1121 (8th Cir. 1999).  In *Nelson*, this Court vacated the defendant's conviction based upon the court's empaneling of a juror who similarly equivocated, telling the judge that he "would like to think" of himself as fair and objective, while also confessing that he "honestly . . . [didn't] know" whether he could be impartial. 277 F.3d at 200.  Other circuits have similarly vacated convictions where prospective jurors expressed doubts about their partiality and were unable to provide unequivocal assurance of fairness.  *See Thompson v. Altheimer & Gray*, 248 F.3d 621, 627 (7th Cir. 2001) (When . . . the record contains no assurances that . . .

prospective juror can exercise a judgment unclouded by that [prejudicial] belief, the verdict cannot stand."); *United States v. Gonzalez,* 214 F.3d 1109, 14 (9th Cir. 2000) ("When a juror is unable to state that she will serve fairly and impartially despite being asked repeatedly for such assurances, we can have no confidence that the juror will lay aside her biases or her prejudicial personal experiences and render a fair and impartial verdict.").

Indeed, in *United States v. Kechedzian*, 902 F.3d 1023, 1029 (9th Cir. 2018), the Ninth Circuit had occasion to consider an almost identical fact pattern, where a prospective juror told the judge that she "might be able to put aside" her bias, that she "would want to put my personal stuff aside, but I honestly don't know if I could," and that she would "try to be fair." *Id*. at 1029. As the Ninth Circuit explained: "we reject any argument that Juror # 3's final response— 'I would try to be fair' —is an unequivocal statement of impartiality. As we noted in *Gonzalez*, a response of 'I'll try' is not an unequivocal statement."

Similarly, Prospective Juror 30's statement in this case: "*I guess I'll try my best*," was not sufficient to overcome his earlier expression of bias. Because the empanelment of Prospective Juror 30 violated the Defendant's Sixth Amendment right to an impartial jury, his conviction should be vacated.

**Point II.** **The Lower Court Erred When It**
**Amended Its' Jury Instruction in Order to Blunt**
**Defense Counsel's Closing Argument Concerning Count Two**

A.     The Court's Corrective Charge Violated
Rule 30 of the Federal Rules of Criminal Procedure

Rule 30 of the Federal Rules of Criminal Procedure requires a district court to inform the parties before closing arguments as to its rulings on requested jury instructions. The rule is intended to "afford the parties an opportunity to frame their closing remarks in light of the court's subsequent legal instructions." *United States v. Eisen*, 974 F.2d 246, 256 (2d. Cir 1992), *citing United States v. Lyles*, 593 F.2d 182, 186 (2d Cir.), cert. denied, 440 U.S. 972, 59 L. Ed. 2d 789, 99 S. Ct. 1537 (1979); *United States v. Tourine*, 428 F.2d 865, 868-69 (2d Cir. 1970), cert. denied, 400 U.S. 1020, 91 S. Ct. 581, 27 L. Ed. 2d 631 (1971). "If the judge, as the result of further meditation or research, decides to alter the contents of a previously agreed upon charge, the judge must inform counsel accordingly before they sum up, so that counsel can be heard in objection or otherwise." *United States v. James*, 239 F.3d 120, 126 (2d Cir. 2000).

This Court has warned that a district court's deviation from the requirements of Rule 30 "is fraught with peril." *Id*. at 126. "If the Rule is violated, reversal is required where the defendant can show that he was substantially misled in formulating his arguments or otherwise prejudiced." *Eisen*, 974 F.2d at 256*, see also United States v. Crozier*, 987 F.2d 893, 900 (2d Cir. 1993).

28

Such prejudice does not require a showing that the supplemental instruction was legally incorrect – rather, the question is whether counsel "was unfairly prevented from arguing his or her defense to the jury or was substantially misled in formulating and presenting arguments." *United States v. Gaskins*, 849 F.2d 454, 458 (9th Cir. 1988) (reversal mandated where district court elected to provide an aiding and abetting instruction after defendant's summation); *United States v. Cook*, 155 F. App'x 970, 970 (9th Cir. 2005) (same); *United States v. Wander*, 601 F.2d 1251, 1262-63 (3d Cir. 1979) ("Whether the actual instruction reflects a better statement of the law is irrelevant. It is the court's failure to advise counsel of its ruling prior to closing argument, not the soundness of that ruling, which violated Rule 30 and prejudicially affected counsel's summation."); *United States v. Oliver*, 766 F.2d 252, 254 (6th Cir. 1985) (reversal mandated where defense counsel expressly tailored his closing argument to address the government's failure to prove a particular element, but court subsequently omitted that element from its instructions.).

In the instant case, the lower court unambiguously violated the mandate of Rule 30. Moreover, defense counsel was plainly prejudiced, because the court's supplemental charge was expressly designed to blunt the effectiveness of his argument on summation.

In short, defense counsel was entitled to rely upon the express language of the jury charge that was proposed by the Government and adopted by the court prior to

29

summation.  The Government does not get to tweak such instructions after the fact, in order to address arguments that it did not foresee in advance.  As such, this court should order a new trial.

B.    The Court's Charge Was Wrong as a Matter of Law

Alternatively, even if the lower court did not violate Rule 30, the Defendant would still be entitled to a new trial because, for the reasons set forth at length in Point II, the charge was legally incorrect.  Contrary to the court's reading, 18 U.S.C. § 1960 requires evidence that a defendant accepted funds or currency for the purposes of transfer or transmitting the funds to another place or party.  As such, the lower court was wrong to instruct the jury that as a matter of law, the Defendant's conduct in merely "exchanging Bitcoin for U.S. currency" could qualify as a transfer within the meaning of the statute.

This Court has held that "instructional error is harmless only if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Moran-Toala*, 726 F.3d 334, 344 (2d Cir. 2013). The Government cannot meet that burden here, where the court's impromptu, post summation instruction, not only misstated the law, but dramatically undercut the core of Goklu's defense.

**Point III.    The Evidence Was Legally Insufficient to Establish
That the Defendant's Conduct in Paying Cash For
Bitcoin Constituted an Unlicensed Money Transmitting Business**

18 U.S.C. § 1960 provides for a sentence of up to five years imprisonment for anyone who knowingly conducts "an unlicensed money transmitting business."  The statute defines "money transmitting" to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."

It is well established that statutory terms should ordinarily be afforded their common, everyday meaning.  *Harris v. Sullivan*, 968 F.2d 263, 265 (2d Cir. 1992).  Any lay person reading this statute would understand it to apply to individuals or entities in the business of accepting currency or funds, for the purpose of transferring or transmitting such funds to another place or person.  On its face, it has no obvious application to a person in the business of buying bitcoin to hold in their own account.

In fact, the law is entirely in accord with this common sense, everyday reading of the statute. § 1960 expressly references 31 U.S.C. § 5330, pertaining to the "registration of money transmitting businesses," and the "regulations prescribed under such section."   At the Government's suggestion, the district court in this case expressly turned to the definitions contained within § 5330 and its regulations to define the term "money transmitting business."

In particular, the version of § 5330 in effect at the time of the offense provided that a "money transmitting business" includes a "money transmitting . . . service," which in turn is defined to include "accepting currency or funds denominated in the currency of any country and transmitting the currency or funds, or the value of the currency or funds, by any means through a financial agency or institution, a Federal reserve bank or other facility of the Board of Governors of the Federal Reserve System, or an electronic funds transfer network."

Notably, this definition has two core elements: (1) the acceptance of currency or funds; <u>and</u> (2) the subsequent transmission of such funds through a bank, electronic network, or other financial institution.  The "means" specified in § 5330 make it clear that the statute is describing a transmission to a remote party or location.

Likewise, the 2018 version of 31 CFR Part 1010, the regulations promulgated by the Secretary of Treasury to implement § 5330, defines "money transmission services" as follows:

> The term "money transmission services" means the acceptance of currency, funds, or other value that substitutes for currency from one person *and* the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means.

31 CFR Part 1010.100(ff)(5) (emphasis in the original).

This is the express language which the court used to define "money transmitting business" for the jury.  *See* TR 633 (A-704).  Notably, the regulation

itself highlights the word "*and*," emphasizing the dual requirements of acceptance and transmission.

More importantly, these same regulations *expressly* define what it means to "transfer" or "transmit" funds.

Hence, 31 CFR Part 1010.100(ddd) defines "transmittal of funds" as:

> A series of transactions beginning with the transmittor's transmittal order, made for the purpose of making payment to the recipient of the order. The term includes any transmittal order issued by the transmittor's financial institution or an intermediary financial institution intended to carry out the transmittor's transmittal order. The term transmittal of funds includes a funds transfer. A transmittal of funds is completed by acceptance by the recipient's financial institution of a transmittal order for the benefit of the recipient of the transmittor's transmittal order. . .

Similarly, 31 CFR Part 1010.100(w) defines "funds transfer" as:

> The series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. The term includes any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order. A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order. . .

Both definitions require a "series of transactions" whereby money is deposited by a "transmittor" or "originator" and subsequently routed to a "recipient" or "beneficiary." It is crystal clear that such definitions do not encompass the simple act of paying cash for bitcoin.

33

In its post-trial motions, the Government sought to resist this conclusion by citing district court cases which, it claimed, stood for the proposition that "exchanging digital currency for cash constitutes transferring funds . . ." ECF 82 at pp. 14-16 (A-982 to A-984), *citing United States v. Harmon*, 474 F.Supp.3d 76 (D.D.C. 2020), *United States v. Faiella*, 39 F.Supp. 3d 544 (S.D.N.Y. 2014), *United States v. Stetkiw*, No. 18-20579, 2019 WL 417404 (E.D. Mich. 2019).

But the facts of those cases are clearly distinguishable. For instance, *Harmon* involved a defendant operating a bitcoin "tumbler" – a service which, for a fee, accepted bitcoin from various sources on the dark web, mixed it up, and sent it back out to designated recipients "in a manner which was designed to conceal and obfuscate the source or owner of the bitcoins." *Id*. at 82. This business model, involving both the incoming receipt and outgoing transmission of funds, fits easily into the definition of a money transmitting service.

*Faiella* and *Stetkiw*, while being somewhat closer to home, both involved the outgoing transmission of bitcoin – a fact which was essential in each case to the court's finding of "money transmitting." *See United States v. Stetkiw*, No. 18-20579, 2019 U.S. Dist. LEXIS 16607, at *5 (E.D. Mich. Feb. 1, 2019) (holding that Stetkiw's "transfer of Bitcoin to the virtual accounts of purchasers constitutes money transmitting – because his transactions were transmission[s] of . . . funds . . . to another location."); *see also United States v. Faiella*, 39 F. Supp. 3d 544, 546

(S.D.N.Y. 2014) ("the Government alleges that Faiella received cash deposits from his customers and then, after exchanging them for Bitcoins, transferred those funds to the customers' accounts on Silk Road . . . These were, in essence, transfers to a third-party agent, Silk Road . . . Thus, the Court finds that in sending his customers' funds to Silk Road, Faiella 'transferred' them to others for a profit.").

We are unaware of any case – and the Government has to date cited none – which holds that a Defendant's in-person payment of cash for bitcoin constitutes a "money transmitting business."[2]

Indeed, if this Court were to accept the Government's expansive interpretation of the statute, it is difficult to perceive where the limits of liability would end. Although the Government's focus here was cash-for-bitcoin, there is nothing inherent in 18 U.S.C. § 1960 which would limit the Government's expansive gloss

---

[2] The lower court – perhaps recognizing that the Government's authority was not on point – sought to avoid the issue altogether by declining to rule on the substance of the Defendant's Rule 29 motion. The district court's refusal to rule on the issue was, in and of itself, an abuse of discretion. The Defendant's post-trial motion was an entirely appropriate invocation of FRCP Rule 29 – counsel asked the court to assess the sufficiency of evidence adduced in connection with Count Two. We are unaware of any authority from this Circuit which holds that a district court may simply decline to address the merits of a Rule 29 motion because it disagrees with counsel's construction of the underlying statute. The lower court cited no such authority in its ruling. Moreover, the Ninth Circuit authority which the lower court *did* cite – *United States v. Crowe*, 563 F.3d 969, 972, fn. 5 (9th Cir. 2009) and *United States v. Moreland*, 622 F.3d 1147, 1166 (9th Cir. 2010) – does not stand for this proposition. Rather, those cases merely hold that a defendant does not preserve his objection to a jury charge by raising it, for the first time, in a Rule 29 motion.

to that scenario. Consider, for instance, the local coin dealer who pays his customers in cash for coins and bullion at favorable exchange rates. Under the Government's definition, such a person is in the business accepting currency or other value that substitutes for currency, and "transferring funds" by paying cash in exchange. As such, he would be subject to five years imprisonment for operating an "unlicensed money transmitting business."

If the Court believes that application of 18 U.S.C. § 1960 to such an individual would be absurd, we agree. But it is worth noting that to reach this hypothetical, we simply swapped out bitcoin for actual coin; if "transferring funds" includes handing cash to a customer, the Government's logic applies equally to both scenarios.

As the Supreme Court has explained, "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 1858 (1983). And the doctrine of constitutional avoidance holds that courts should decline to adopt a statutory interpretation which would render a law unconstitutionally vague. *See Skilling v. United States*, 561 U.S. 358, 405-406 (2010) (declining to adopt construction of 18 U.S.C. § 1346 which would render the statute impermissibly vague); *Dubin v. United States*, 143 S. Ct. 1557, 1572 (2023) (avoiding construction that would give federal aggravated

identity theft statute "incongruous breadth" and noting a "concern that a fair warning should be given to the world in language that the common world will understand of what the law intends to do if a certain line is passed.").

This is precisely such a situation, because the Government's sweeping construction of 18 U.S.C. § 1960 bears no resemblance to the actual words of the statute, and if adopted, would stretch the reach and meaning of the statute's plain language well beyond its breaking point.

**Point IV.   Count Two of the Indictment Was Impermissibly Duplicitous Because it Charged The Defendant with Multiple, Separate Transactions**

The indictment in this case charged multiple financial transactions – taking place over the course of eight months – under a single count of money laundering. By combining multiple, distinct transactions under a single count, the Government was able to obscure the weakness of the trial evidence as it related to the early transactions.

18 U.S.C. § 1956(a)(3) requires evidence that the property involved in the transaction was "represented to be the proceeds of specified unlawful activity."  But no such representations were made in connection with the first three transactions in this case.   Indeed, Agent O'Kain acknowledged as much during his cross examination:

> Q:   And when you first met with Goklu on -- Mr. Goklu on August 28th of 2018, you didn't tell him that you were selling drugs?

37

A:    Correct.

Q:    Or that your business was selling drugs and the BitCoin that you were seeking to exchange was from the sale of drugs; is that right?

A:    That's correct.

Q:    And you didn't tell him that on September 21st of 2018, correct?

A:    That's correct.

Q:    And you didn't tell him that in November of 2018; did you?

A:    I did not.

Q:    And you started to hint at it a little bit in December -- on December 11th of 2018?

A:    Yes.

Q:    And that was the first time?

A:    Correct.

TR 383 (A-458).

A number of courts – including the Eleventh and Eight Circuits – have held that 18 U.S.C. § 1956 is not a continuous offense. As a result, these courts hold that each illicit transaction should be charged under a separate count, in order to avoid the problem of duplicity. *See United States v. Kramer*, 73 F.3d 1067, 1072 (11th Cir. 1996) ("The statutory language and legislative history indicate that each transaction or transfer of money constitutes a separate offense."); *United States v. Majors*, 196

F.3d 1206, fn. 14 (11th Cir. 1999) ("Money laundering is not a continuing offense.");
*United States v. Prescott*, 42 F.3d 1165 (8th Cir. 1994); *United States v. Conley*, 826
F. Supp. 1536 (W.D. Pa. 1993); *see also* UNITED STATES DEPARTMENT OF JUSTICE,
JUSTICE MANUAL, § 2101, *Money Laundering Overview* (2024) (advising U.S.
Attorneys that "each transaction should be charged in a separate count. Charging
multiple financial transactions in a single count is duplicitous.").

The Second Circuit has taken a slightly different approach, holding that
multiple transactions can *potentially* be charged together under a single money
laundering count, "provided that each act is part of a unified scheme." *United States
v. Moloney*, 287 F.3d 236 (2d Cir. 2002). However, the facts of *Moloney* are
instructive: the defendant in that case was a Ponzi scheme operator charged with
fraud and money laundering. The money laundering count related to the "interest"
payments made by Moloney to promote his fraud – conduct which this Court
described as "individual acts . . . part of a single, unified scheme." *Id*. at 241.

Those facts stand in stark contrast to the instant case, where the Defendant
was *not* involved in the underlying unlawful activity which allegedly generated the
funds, and was not clearly informed at the outset of the case that he was dealing in
illicit funds. In short, there could be no single, "unified scheme" joining each and
every transaction, where the agent did not even represent that the funds in question

were the proceeds of specific unlawful activity until the fourth meeting. Under these facts, Count One of the indictment was impermissibly duplicitous.

Moreover, the Defendant was prejudiced by this duplicity at sentencing, because, notwithstanding the insufficiency of the evidence, both Probation and the court treated the early transactions as part of the offense of conviction for purposes of calculating the total "value of the laundered funds" under U.S.S.C. § 2S1.1(a)(2).

In this regard, the instant case closely resembles *United States v. Sturdivant*, 244 F.3d 71 (2d Cir. 2001), where this Court found that a defendant was prejudiced at sentencing by a duplicitous indictment. The defendant in *Sturdivant* was charged with two separate crack sales in a single substantive count under 21 U.S.C. § 841. The jury did not make any specific finding as to whether it was convicting the defendant of one or both transactions. Nevertheless, at sentencing, the district court amalgamated the amount of crack to calculate the defendant's offense level and minimum sentence.

On appeal, this Court reversed. As it explained:

An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be "a separate count for each offense," and 2) the defendant is prejudiced thereby. The relevant policy considerations guiding a court's determination of whether a defendant was actually prejudiced by a duplicitous indictment include: avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice,

providing the basis for appropriate sentencing, and protecting against double jeopardy in subsequent prosecutions.

*United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001).

This Court further held that the prejudice prong of this analysis is satisfied where a district court aggregates conduct charged under a duplicitous count in order to sentence the defendant:

> While defendant has not demonstrated prejudice based on a lack of notice or double jeopardy concerns, defendant would be harmed by a sentence based on the assumption that the jury convicted him for participation in both the Afternoon Transaction and the Evening Transaction. Such a sentence would not properly take into account "the uncertainty of whether a general verdict of guilty concealed a finding of guilty as to one crime and a finding of not guilty as to another." *See Margiotta*, 646 F.2d at 733. The government itself concedes the existence of this uncertainty inherent in the verdict, agreeing that "we may not know which one (or if both) of the transactions the jury agreed upon unanimously."
>
> Notwithstanding this uncertainty, it appears that the district court treated defendant as if he had been convicted of both crimes charged in the duplicitous indictment.

*Id*. at 77.

Notably, this Court vacated the defendant's sentence, despite the Government's contention that the issue was unpreserved. As it explained:

> defense counsel's failure to recognize and object to this error is immaterial. To the extent that the court sentenced defendant on the assumption that he was convicted for conduct for which the jury may not have reached a unanimous verdict, such sentence constitutes plain error reviewable on appeal even absent timely objection.

*Id*. at 77, *citing United States v. Darmand*, 3 F.3d 1578, 1581 (2d Cir. 1993).

41

That is precisely what happened here. Indeed, if anything, the prejudice was *more* acute in this case, because the trial evidence in connection with the first three transactions was *legally insufficient* to convict Mr. Goklu of money laundering. While the Government argued, at sentencing, that the trial court could *presume* the Defendant's guilt in these early transfers, based upon his furtive conduct and a general awareness that criminals utilize such services, this evidence – standing on its own – was patently insufficient to sustain a conviction under 18 U.S.C. § 1956(a)(3). That is because the statute includes both *mens rea* and *actus reus* elements. To sustain their burden of proof, the Government was required to adduce evidence: (a) that the Defendant acted with an intent to conceal or disguise the nature of property believed to be the proceeds of specified unlawful activity; <u>and</u> (b) he conducted a financial transaction involving property which was *represented* by a law enforcement officer to be the proceeds of such specified unlawful activity.

We seriously doubt that generalized evidence concerning the Defendant's wariness of law enforcement would be sufficient to demonstrate the requisite *mens rea – i.e.*, an intent to conceal or disguise the proceeds of specified unlawful activity. However, even if it were, such evidence *still* would not satisfy the *actus reus* element of the offense – *i.e.*, that the Defendant undertook a transaction involving property which was <u>represented by law enforcement</u> to be the proceeds of illegal activity.

That is because Agent O'Kain admitted in this case that he made no such representations in connection with the first three transactions. TR 383 (A-458).

In *Sturdivant*, this Court held that the proper remedy, under such circumstances, is a remand for resentencing. It directed the district court in that case to treat the offense of conviction as reaching only the smallest transaction covered by the count. While it indicated that the lower court *could* potentially consider the other transactions as "relevant conduct," it also emphasized that such findings would need to be in keeping with the Guidelines, and could not merely be presumed based on the offense of conviction. *Sturdivant*, 244 F.3d at 80.

**Point V.    The Court Committed Procedural Error at Sentencing, By Including the Proceeds of the First Three Meetings In the Total Value of Laundered Funds**

Alternatively, and regardless of whether this Court concludes that the indictment was duplicitous, the lower court committed procedural error at sentencing when it included the money exchanged during the first three transactions within its Guidelines calculation.

As noted above, the lower court appeared to suggest two different rationales for doing so. First it held that, as a matter of law, the Guidelines did not require "that all the funds were the proceeds of illegal activity for them to be counted. . ." 1/29/24 Sentencing Transcript at p. 14 (A-1021). Second, the court appeared to suggest that it could find, by a preponderance of the evidence, that the Defendant knew or

43

suspected the transactions involved "illegal money" even before the agent made any representations. *Id.* at 13-14 (A-1020 to A-1021).

We respectfully submit that neither the legal nor factual rationale for the enhancement can be justified here.

To begin with, the lower court appeared to be conflating the provisions of U.S.S.C. §§ 2S1.1(b)(1) and 2S1.1(a)(2) when it claimed that, as a matter of law, "the requirement under the literal language of the provision is that *any* of the funds were proceeds of illegal activity and not necessarily all of the funds." *Id*. at 13 (emphasis added).

U.S.S.C. § 2S1.1(b)(1) provides a six-level enhancement where a defendant knows or believes that "*any* of the laundered funds were the proceeds of . . . an offense involving the . . . distribution of a controlled substance." (emphasis added).

But such language is nowhere to be found in § 2S1.1(a)(2), which simply directs the court to calculate the "value of the laundered funds." To the contrary, the commentary clearly indicates that a sentencing court should distinguish between illicit and non-illicit funds when making this calculation:

> In a case in which a transaction, financial transaction, monetary transaction, transportation, transfer, or transmission results in the commingling of legitimately derived funds with criminally derived funds, the value of the laundered funds, for purposes of subsection (a)(2), is the amount of the criminally derived funds, not the total amount of the commingled funds. . .

U.S.S.C. § 2S1.1 Application Note 3(B).

44

As a result, the court clearly erred when it suggested that, as a matter of law, it could reflexively include all transactions as part of the offense conduct, so long as the Defendant believed that "some" of those transactions involved tainted funds.

Alternatively, to the extent that the court was suggesting that it could find, based upon a preponderance of the evidence, that the first three transactions involved "laundered funds," this finding is belied by the record. Pursuant to U.S.S.C. § 2S1.1 Application Note 1, "*Laundered funds* means the property, funds, or monetary instrument involved in the transaction, financial transaction, monetary transaction, transportation, transfer, or transmission in violation of 18 U.S.C. § 1956 or § 1957."

In this case, because the funds in question were *not actually* derived from criminal activity, potential liability exists only under 18 U.S.C. § 1956(a)(3). And that subsection has a number of specific elements that were not fulfilled as to the first three transactions.

To begin with, and contrary to the lower court's reasoning, it is not sufficient under subsection (a)(3) to generally believe or suspect that the funds in question "represent[] the proceeds of *some form* of unlawful activity." *Compare* 18 U.S.C. §§ 1956(a)(1) and (a)(3). Rather, under subsection (a)(3), the target of a law enforcement sting operation must specifically believe that funds derived from "*specified* unlawful activity" – that is to say, a limited class of statutorily delineated offenses. *See* 18 U.S.C. § 1956(c)(7) (defining "specified unlawful activity"). As a

45

result, it was not sufficient to find that the Defendant *generally* believed that he was dealing in funds that were "proceeds of illegal activity" or "illegal money." *See* 1/29/24 Sentencing Transcript at pp. 13, 14, 16 (A-1011-1021; A-1023). We respectfully submit that generalized evidence concerning the Defendant's wariness of law enforcement was insufficient to establish that he believed the funds in question derived *specifically* from the limited class of offenses described in § 1956(c)(7).

Second, and regardless of the Defendant's subjective belief, there can be no criminal liability under § 1956(a)(3) unless a Government agent actually *represented* that the funds in question were "the proceeds of specified unlawful activity." As argued above in Point III, the agent in this case conceded that such representations were not made until the fourth transaction.

In short, the evidence in this case did not make out the elements of money laundering under § 1956(a)(3), with respect to the first three transactions. As a result, the lower court abused its discretion by including these transactions within its Guidelines calculation.

**Point VI.     The Lower Court Erred in Adopting Probation's
Guidelines Calculation in Connection with Respect to Count Two**

Although it did not affect the Defendant's sentence, in the event of a sentencing remand, we note that the PSR erroneously calculated the Defendant's guidelines with respect to Count Two.

In particular, Probation asserted that U.S.S.C. § 2S1.1 was the applicable guideline for the Defendant's offense of conviction under 18 U.S.C. § 1960(a).  As a result, it determined that the Defendant's offense level under Counts One and Two were identical.

This was incorrect, because Mr. Goklu was convicted under 18 U.S.C. § 1960(b)(1)(A) and (B).  The Sentencing Guidelines provide that § 2S1.1 is the applicable guideline "only with respect to unlicensed money transmitting businesses as defined in 18 U.S.C. § 1960(b)(1)(C)."  *See* U.S.S.C. § 2S1.1 Commentary.  The applicable guideline for § 1960(b)(1)(A) and (B) is § 2S1.3.  Even assuming Mr. Goklu is responsible for the full value of the $133,190, his total offense level under this section would be no more than sixteen.

Accordingly, the extent that the lower court adopted the PSR, this calculation was in error.

## **CONCLUSION**

Based upon the foregoing, the Appellant respectfully seeks an order vacating

his judgment of conviction.

Dated:      Garden City, New York
              November 4, 2024

                              Respectfully submitted,
By:  /s/ Matthew W. Brissenden
          Matthew W. Brissenden, P.C.
          *Counsel for Mustafa Goklu*
          666 Old Country Road, Suite 501
          Garden City, NY 11530
          516-683-8500

## <u>CERTIFICATE OF COMPLIANCE</u>

As counsel of record to Defendant-Appellant, I hereby certify that this brief complies with the type - volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  I am relying upon the word count of the word-processing system (Microsoft Word) used to prepare the brief, which indicates that 11,265 words appear in the brief.

By:    <u>/s/ Matthew W. Brissenden</u>
Matthew W. Brissenden, P.C.
*Counsel for Mustafa Goklu*
666 Old Country Road, Suite 501
Garden City, NY 11530
516-683-8500

# SPECIAL APPENDIX

i

## TABLE OF CONTENTS

**Page**

Judgment, dated March 14, 2024 ............................... SPA-1

AO 245B (Rev. 10/13/2021)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
### Eastern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA <br> v. <br> MUSTAFA GOKLU | **JUDGMENT IN A CRIMINAL CASE** <br><br> Case Number:  1:19-cr-00386 (PKC) <br><br> USM Number:  91604-053 <br><br> Sabrina Shroff, CJA <br> Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☑ was found guilty on count(s)    1 and 2 of the Superseding Indictment (S-1)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC § 1956(a)(3)(B) | Money Laundering | 4/30/2019 | 1 (S-1) |
| 18 U.S.C. § 1960(a) | Operation of an Unlicensed Money Transmitting Business | 4/30/2019 | 2 (S-1) |

     The defendant is sentenced as provided in pages 2 through ____7____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)   underlying Indictment        ☑ is   ☐ are dismissed on the motion of the United States.

     It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

3/14/2024
Date of Imposition of Judgment

s/Hon. Pamela K. Chen
Signature of Judge

Pamela K. Chen, United States District Judge
Name and Title of Judge

3/21/2024
Date

SPA-2

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __2__ of __7__

DEFENDANT:   MUSTAFA GOKLU
CASE NUMBER:   1:19-cr-00386 (PKC)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

sixteen (16) months.

☑ The court makes the following recommendations to the Bureau of Prisons:
a facility as close to the New York City Metropolitan area as possible, but not the MDC Brooklyn.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

    ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑ before 2 p.m. on ___5/14/2024_____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

SPA-3

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page __3__ of __7__

DEFENDANT:   MUSTAFA GOKLU
CASE NUMBER:   1:19-cr-00386 (PKC)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

two (2) years.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☑ The above drug testing condition is suspended, based on the court's determination that you
       pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of
       restitution. *(check if applicable)*
5.  ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as
       directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you
       reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached
page.

SPA-4

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | Judgment—Page | 4 | of | 7 |

DEFENDANT: MUSTAFA GOKLU
CASE NUMBER: 1:19-cr-00386 (PKC)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines based on your criminal record, personal history and characteristics, and the nature and circumstances of your offense, you pose a risk to another person (including an organization), the probation officer, with prior approval of the Court, may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk..
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

SPA-5

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3D — Supervised Release

DEFENDANT: MUSTAFA GOKLU                                      Judgment—Page    5    of    7
CASE NUMBER: 1:19-cr-00386 (PKC)

## SPECIAL CONDITIONS OF SUPERVISION

1. Upon request, the defendant shall provide the U.S. Probation Department with full disclosure of his financial records, including co-mingled income, expenses, assets and liabilities, to include yearly income tax returns. With the exception of the financial accounts reported and noted within the presentence report, the defendant is prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial accounts, for either personal or business purposes, without the knowledge and approval of the U.S. Probation Department. The defendant shall cooperate with the Probation Officer in the investigation of his financial dealings and shall provide truthful monthly statements of his income and expenses. The defendant shall cooperate in the signing of any necessary authorization to release information forms permitting the U.S. Probation Department access to his/her financial information and records.

2. If determined by the IRS that the defendant has failed to pay taxes that were required for any year from the date of his offense, 2018, to the date of his incarceration, the defendant will make up for any shortfall and shall file any return and pay any penalty that is required.

SPA-6

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___6___ of ___7___

DEFENDANT: MUSTAFA GOKLU
CASE NUMBER: 1:19-cr-00386 (PKC)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

    ☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

SPA-7

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page   7   of   7

DEFENDANT:  MUSTAFA GOKLU
CASE NUMBER:  1:19-cr-00386 (PKC)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☑ Lump sum payment of $ ___200.00___ due immediately, balance due

       ☐ not later than _____ , or
       ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

B ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
       _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
       _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
       term of supervision; or

E ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
       imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.