# 24-767-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

MUSTAFA GOKLU, AKA Mustangy,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANT-APPELLANT

MATTHEW BRISSENDEN
MATTHEW W. BRISSENDEN, P.C.
*Attorneys for Defendant-Appellant*
666 Old Country Road, Suite 501
Garden City, New York 11530
(516) 683-8500

CP COUNSEL PRESS    (800) 4-APPEAL • (383383)

# **TABLE OF CONTENTS**

ARGUMENT.................................................................................. 1

I.      The Lower Court Abused Its Discretion
        In Failing to Excuse Prospective Juror 30 For Cause…………....1

II.     The Evidence Was Legally Insufficient to Establish
        That the Defendant's Conduct in Paying Cash for Bitcoin
        Constituted an Unlicensed Money Transmitting Business………4

III.    The Lower Court Erred When It Amended Its Jury
        Instruction in Order to Blunt Defense Counsel's
        Closing Argument Concerning Count Two……………………..11

IV.     The First Three Transactions Between Mr. Goklu and
        the Undercover Agent Did Not Constitute Violations of
        18 U.S.C. § 1956(a)(3), Because the Bitcoin Involved
        in Those Transactions Was Not "Represented to be the
        Proceeds of Specified Unlawful Activity"……………………... 14

        A.      Count Two Was Impermissibly Duplicitous …………… 15

        B.      The Lower Court Erred at Sentencing by Using
                The Proceeds from the First Three Transactions to
                Enhance the Defendant's Base Offense Level ………….. 16

CONCLUSION………………………………………………………… 18

# TABLE OF AUTHORITIES

## Cases

*United States v. Cooper*, No. 17-CR-296 (PKC),
2020 U.S. Dist. LEXIS 81672 (E.D.N.Y. May 8, 2020)……………………………...12

*United States v. Faiella*, 39 F.Supp.3d 544 (S.D.N.Y. 2014)………………………7

*United States v. Gonzalez*, 214 F.3d 1109 (9th Cir. 2000)…………………………..2

*United v. Harmon*, 474 F.Supp.3d 76 (D.D.C. 2020)……………………………8, 9

*United States v. Murgio*, 209 F.Supp.3d 698 (S.D.N.Y 2016)…………………...8, 9

*United States v. Nelson*, 277 F.3d 164 (2d Cir. 2002)………………………………2

*United States v. Ploof*, 464 F.2d 116 (2d Cir. 1972)……………………………1, 2

*United States v. Stetkiw*, 2019 U.S. Dist. LEXIS 16607
(E.D. Mich. Feb 1, 2019)…………………………………………………………7, 8, 9

*United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013)……………………………12

*United States v. Sturdivant*, 244 F.3d 71 (2d Cir. 2001)……………………………14

*United v. Towne*, 870 F.2d 88 (2d Cir. 1989)………………………………………1, 2

## Other Authorities

FinCEN Guidance, FIN-2013-G001 (March 18, 2013)………………………5, 9, 10

FRCP Rule 30……………………………………………………………………….. 11

Title 31 C.F.R. 1010.100……………………………..…………………………… 4, 5, 7, 8

Title 18 U.S.C. § 1956(a)(3)…………………………………………………………14, 17

Title 18 U.S.C. § 1960 ……………………………………………………4, 9, 10, 12

Title 31 U.S.C. § 5330 …………………………………………………………...4, 5

U.S.S.G. § 2S1.1(a)(2)…………………………………………………..15, 16, 17

## ARGUMENT

**Point I.     The Lower Court Abused Its Discretion
In Failing to Excuse Prospective Juror 30 For Cause**

In our principal brief, we argued that the lower court abused its discretion when it refused to excuse Juror 30 for cause, after he was unable to provide an unequivocal assurance of impartiality.  As previously described, that juror told the court that he was biased for two reasons – first, because of his relationships with individuals in law enforcement, and second, because of his strong feelings about white-collar crime.  At the outset, Juror 30 told the court he "might be affected," that he "honestly" and "really" didn't know if he could be impartial, and that he "was not sure."  A-121.  Pressed by the court, Juror 30 told the judge that he "guess[ed]" he would "try [his] best."  *Id.*  Thereafter, when he started to provide equivocal answers, Juror 30 was repeatedly cut off by the court and corrected with leading questions – oftentimes with the judge talking over the juror's answers:

> COURT: Can you do that? And put out of your mind any positive feelings you have had about law enforcement in general?
>
> JUROR: I mean, I don't know anything about this case, so I guess, like. . . .
>
> THE COURT: Okay. And that's something you think you can do?
>
> JUROR: Possibly.
>
> COURT: And can you view their testimony against all the other evidence that's submitted during the trial and decide whether to believe it or not?

1

JUROR: If it's presented in a neutral manner. Okay.

COURT: And can you put aside any feelings that you might have about your friends who lost money and just decide the facts in this case based on the evidence presented to you?

JUROR: Well –

COURT: This is obviously not a Madoff scheme, right?

JUROR: Okay.

COURT: So can you put that out of your mind?

JUROR: I believe so.

COURT: Okay. Do you feel confident about that?

JUROR: Like I said, I'll try my best.

Notably, Juror 30 *never* affirmatively answered that he felt "confident" in his ability to be impartial. Instead, he referred back to his earlier grudging answer, where he told the judge: "I guess I will try my best." A-121.

Nevertheless, the Government contends that the juror's final's response – that he would "try his best" – was sufficient to establish his unambiguous impartiality. In support of this contention, it cites to this Court's decisions in *United v. Towne*, 870 F.2d 88 (2d Cir. 1989) and *United States v. Ploof*, 464 F.2d 116 (2d Cir. 1972).

We respectfully disagree. As the Ninth Circuit wryly noted when faced with a similar fact pattern:

> Despite the government's best efforts to characterize the response "I'll try" as unequivocal, we cannot agree . . . If a parent asks a teenager whether he will be back before curfew, that parent is highly unlikely to find "I'll try" an adequate, satisfactory, or unequivocal response. Moreover, Camacho never deviated from that initial uncertain response despite the district court's repeated questioning.

*United States v. Gonzalez*, 214 F.3d 1109, 1113 n.5 (9th Cir. 2000).

This Court has similarly emphasized that even "a juror who [states they] could probably be fair and impartial should not be considered impartial, because probably is not good enough." *United States v. Nelson*, 277 F.3d 164, 202 (2d Cir. 2002). Here, Juror 30 "never even asserted that he could *probably* be impartial." *Id.* at 203.

The record in this case, read in toto, is more analogous to *Nelson* and *Gonzalez* than *Towne* or *Ploof*. *Towne*, in particular, is inapt because the prospective juror in that case was never even seated. *See United States v. Towne*, 870 F.2d at 885 ("it is well established that so long as the jury which was *ultimately selected* was fair and impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean that the sixth amendment was violated.").

*Ploof*, while closer to being on-point, is still distinguishable. The potential juror in that case merely stated a single time that his judgment "might" be affected based on the experience of a friend. However, upon being questioned by the Court, that juror immediately expressed a belief that his oath of impartiality would "do away with the might part." Hence, *Ploof* did not involve the type of protracted back-and-forth which occurred in this case. Here, Juror 30 told the court on no fewer than

3

*four* occasions that he doubted his ability to be impartial.  *See* A-121, line 2 ("I don't know honestly");  A-121, line 5 ("I really don't know");  A-121, line 13 ("I'm not sure");  A-121, line 16 ("I feel like my judgment might be affected by my life experiences.").  And these answers only shifted to a tepid, half-hearted pledge to "try" in response to persistent pressure from the court.  *See* A-121, line 22 ("I guess I will try my best"); A-122, line 13 ("Possibly"); A-123, line 3 ("I believe so."); A-123 ("Like I said, I'll try my best.").

Because Juror 30 was incapable of providing unqualified assurance that his admitted biases would not affect his judgment, the lower court abused its discretion in refusing to excuse him for cause.

**Point II.      The Evidence Was Legally Insufficient to Establish
That the Defendant's Conduct in Paying Cash for Bitcoin
Constituted an Unlicensed Money Transmitting Business**

In our principal brief, we argued that the evidence was insufficient to establish a violation of 18 U.S.C. § 1960 for a simple reason – the Defendant did not "transmit" money or bitcoin to another place or person.  As a result, his alleged conduct – handing cash to an undercover agent in exchange for bitcoin – did not constitute a "money transmitting business" under the statute.

Throughout this case, the Government and lower court relied upon 31 U.S.C. § 5330 and 31 C.F.R. 1010.100 to define what constitutes a "money transmitting

4

business." § 5330 defines that term to include businesses which provide a variety of services, including "currency exchange" and "money transmitting services."

Notably, the Government has never argued that Mr. Goklu was providing "currency exchange." This is not an oversight, but a tacit concession that "currency exchange" is a narrowly defined term which applies only to "coin and paper money of the United States or any other country that is designated as legal tender . . ." 31 C.F.R. 1010.100(m); *see also* 31 C.F.R. 1010.100 (ff)(1). As FinCEN has expressly explained:

> A person must exchange the currency of two or more countries to be considered a dealer in foreign exchange. Virtual currency does not meet the criteria to be considered "currency" under the BSA, because it is not legal tender.

FinCEN Guidance, FIN-2013-G001 (March 18, 2013), p. 5.

Instead, prosecutors maintain that Mr. Goklu is covered by the statute because he was engaged in a "*money transmitting service*," as that term is defined by 31 U.S.C. § 5330(d)(2) and 31 C.F.R. 1010.100(ff)(5).

But as we have noted, these provisions expressly required the Government to prove that Goklu: (a) accepted currency or funds "from one person," and then (b) transmitted such currency or funds "to another location or person by any means." *See* 31 C.F.R. 1010.100(ff)(5). While the sale and outgoing transfer of bitcoin to another party might constitute a "transmission of funds" to another location or

person, there is no authority anywhere which holds that a *purchase* of bitcoin constitutes such transmission.

The Government offers no coherent or credible counterargument in its brief.

To start, prosecutors repeatedly emphasize that Mr. Goklu was buying bitcoin at prices below the prevailing market rate, effectively earning a commission or fee. *See* Govt. Brief at p. 31 ("Goklu did not merely buy Bitcoin for his own account; he ran a business . . . where he charged significant fees. . ."); *id*. at p. 33 ("[t]he problem with Goklu's argument is that he did not just pay cash for Bitcoin; rather, he operated a business to transmute Bitcoin into cash for a 7-8% fee. . ."). But this fact merely goes to the question of whether Goklu was operating a "business," which is not the issue raised on appeal. The question on appeal is whether the alleged business was a "money transmitting service," which transmitted funds to another place or person.

Here, prosecutors struggle to advance a cogent argument. They do not assert that Mr. Goklu – in purchasing bitcoin from the agent – transmitted bitcoin to another person or place. Instead, they adopt a strained circumlocution – arguing that Mr. Goklu "participated in the transmission of the Bitcoin" to *his own* cryptocurrency wallet. *Id*. at p. 32. But this is just a convoluted way of saying that Goklu *received* Bitcoin – the precise *opposite* of sending or transmitting.

Unsurprisingly, the Government is unable to cite to a single case which holds that a defendant's *receipt* of bitcoin constitutes his or her transmission of funds. In

fact, each and every case the Government cites involves a defendant-seller who was transmitting bitcoin to others.

Hence, *United States v. Faiella*, 39 F.Supp.3d 544 (S.D.N.Y. 2014) – a case which the Government describes as "uncannily like Goklu's" – involved a defendant who "received cash deposits from his customers and then, after exchanging them for Bitcoins, transferred those funds to the customers' accounts on Silk Road." Notably, the court specifically focused upon the outgoing transfer "to a third-party agent, Silk Road." *Id*. at 546. It was this outgoing transfer to a *third-party* agent, the court asserted, which satisfied 31 C.F.R. 1010.100(ff)(5)'s definition of money transmission services – *i.e*., "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency *to another location or person by any means* . . . .". *Id*. at fn. 3 (emphasis in the original). "Thus, the court [found] that in sending his customers' funds to Silk Road, Faiella 'transferred' them to others for a profit." *Id.* at 546.

Similarly, *United States v. Stetkiw*, 2019 U.S. Dist. LEXIS 16607 (E.D. Mich. Feb 1 2019) involved the defendant's sale and outgoing transmission of bitcoin. In that case, the court found the definition of 31 C.F.R. 1010.100(ff)(5) to be satisfied by the transmission of bitcoin "to another location" (as opposed to a third party). As the court explained:

7

a typical Bitcoin purchase from Stetkiw involved Stetkiw electronically transferring the Bitcoins to the purchaser's Bitcoin address or account after the purchaser pays Stetkiw the value of the Bitcoins plus a commission/fee.

This falls within the plain meaning of "transferring funds on behalf of the public *by any and all means*," such that Stetkiw's Bitcoin transactions constitute "money transmitting" under 18 U.S.C. § 1960(b)(2). Specifically, Stetkiw is a "money transmitter" — and his transfer of Bitcoin to the virtual accounts of purchasers constitutes money transmitting — because his transactions were "transmission[s] of . . . funds . . . *to another location*." *See* 31 C.F.R. § 1010.100(ff)(5)(i)(A) ("acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency *to another location* or person by any means").

*United States v. Stetkiw*, No. 18-20579, 2019 U.S. Dist. LEXIS 16607, at *4-5 (E.D. Mich. Feb. 1, 2019) (emphasis in original).

*United States v. Murgio*, 209 F.Supp.3d 698 (S.D.N.Y 2016), also cited by the Government, related to the prosecution of Coin.mx, a "seller of bitcoins" which "transmitted bitcoins to another location or person for its customers." *Id*. at 710-711.

Likewise, in *United v. Harmon*, 474 F.Supp.3d 76 (D.D.C. 2020), the D.C. Circuit held that a defendant was operating a money transmitting business based upon his *outgoing* transmission of bitcoin. That case involved a bitcoin "tumbler" who helped route bitcoin between parties and locations in a manner intended to obscure the source of such funds. The court found that Harmon's outgoing transmission of client funds to remote parties and accounts (in exchange for a fee)

fit comfortably within the definition of a money transmitting service, because Harmon was sending his customer's funds to *both* third parties and *also* other locations. *Id.* at 103-107;

In short, none of these cases hold that a defendant who buys or accepts bitcoin has engaged in a transmission of funds "to another location or person."

Finally, the Government's counterintuitive construction of § 1960 is not supported by FinCEN's "Guidance" memorandum. To the contrary, that Guidance dramatically undercuts the Government's position, because all of the examples provided by FinCEN entail the *outgoing* transmission of cryptocurrency to either: (a) a different location or (b) a third party.

Hence, FinCEN's 2013 Guidance provides two scenarios in which "an exchanger" engages in money transmission – the first involves the sale and transfer of cryptocurrency to a remote account (as described in *Stetkiw* and *Murgio*). The second involves the acceptance and transfer of cryptocurrency to a third party at the client's direction (as described in *Harmon*). Hence, the memorandum states:

> FinCEN understands that the exchanger's activities may take one of two forms. The first form involves an exchanger (acting as a "seller" of the convertible virtual currency) that accepts real currency or its equivalent from a user (the "purchaser") and transmits the value of that real currency to fund the user's convertible virtual currency account with the administrator. Under FinCEN's regulations, sending "value that substitutes for currency" to another person or to another location constitutes money transmission, unless a limitation to or exemption from the definition applies.16 This circumstance constitutes transmission **to another location**, namely from the user's account at

one location (e.g., a user's real currency account at a bank) to the user's convertible virtual currency account with the administrator. It might be argued that the exchanger is entitled to the exemption from the definition of "money transmitter" for persons involved in the sale of goods or the provision of services. Under such an argument, one might assert that the exchanger is merely providing the service of connecting the user to the administrator and that the transmission of value is integral to this service. However, this exemption does not apply when the only services being provided are money transmission services.

The second form involves a *de facto* sale of convertible virtual currency that is not completely transparent. The exchanger accepts currency or its equivalent from a user and privately credits the user with an appropriate portion of the exchanger's own convertible virtual currency held with the administrator of the repository. The exchanger then transmits that internally credited value to third parties at the user's direction. This constitutes transmission ***to another person***, namely each third party to which transmissions are made at the user's direction.

FinCEN Guidance, FIN-2013-G001 (March 18, 2013), p. 4.

Obviously, Mr. Goklu's conduct *vis-a-vis* the undercover agent did not fit under either of these scenarios.

In short, the Government has failed to explain how Mr. Goklu's purchase and acceptance of bitcoin could constitute the transmission of funds to a remote location or third party, and it has cited no decisional, statutory, or regulatory authority which would support its tortured reading of 18 U.S.C. § 1960.[1]  Because the Government

---

[1]    This Court should not be swayed by the Government's insistence that the law "must accommodate" an infinitely flexible reading of the statute in order to reach conduct like the Defendant's, despite the lack of applicable authority.  § 1960 is not the only tool in the prosecution's toolbox; to the extent there is a valid concern that individuals may knowingly buy bitcoin from criminals, such conduct falls easily within the reach of existing money laundering statutes, as this case demonstrates.

failed to prove such an outgoing transmission, its trial evidence did not establish that Mr. Goklu was engaged in an unlicensed money transmission business.

**Point III.    The Lower Court Erred When It Amended Its Jury Instruction in Order to Blunt Defense Counsel's Closing Argument Concerning Count Two**

Even if there had been legally sufficient evidence to support Count Two (there was not), Mr. Goklu's conviction under that Count would still need to be set aside due to instructional error and the lower court's violation of FRCP Rule 30.

Given the above law, trial counsel was <u>completely</u> within his rights to argue that Mr. Goklu's conduct did not constitute a money-transmitting business under the statute. And the lower court erred in altering its jury charge to suggest that such argument was without merit.

To the extent that a district court may deviate from Rule 30 of the Federal Rules of Criminal Procedure in order to correct a misleading summation, that is *not* what happened here. Counsel properly relied upon the language of the agreed-upon jury instruction to argue that prosecutors had failed to prove an essential element of the offense. And as set forth above, that argument was not just well-founded – it was *spot on*, because Mr. Goklu did not transmit the agent's funds to another location or person, as required by the statute.

Prosecutors continue to complain that they were prejudiced by counsel's failure to alert them to this evidentiary deficiency at an earlier juncture. While it

11

may well be true that they failed to anticipate the argument, the blame for that lack of foresight falls squarely on the Government, not defense counsel. Prosecutors chose to charge Mr. Goklu under § 1960. It was *their* obligation to understand the law they were invoking, and to produce evidence sufficient to satisfy every element. And it certainly was not defense counsel's job to assist them in that endeavor.

In this regard, the lower court's suggestion that counsel acted improperly in failing to file a pre-trial motion to dismiss was similarly misplaced. *See* A-651 to A-653. The indictment in this case was not a "speaking indictment." Rather, it simply repeated the language of the statute verbatim – which was all that was needed to survive a pretrial sufficiency challenge. *See* A-34. As the Government is fond of pointing out, "to satisfy the pleading requirements of Rule 7(c)(1), an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013). Given this standard, a pretrial motion to dismiss on sufficiency grounds would have been not just futile, but borderline frivolous, and certainly would have been denied by Judge Chen. *See United States v. Cooper*, No. 17-CR-296 (PKC), 2020 U.S. Dist. LEXIS 81672, at *9 (E.D.N.Y. May 8, 2020) (Judge Chen observing that "conspicuously absent from the Federal Rules of Criminal Procedure . . . is an analogue for summary judgment under Federal Rule of Civil Procedure 56, so that although a judge may dismiss a civil complaint

12

pretrial for insufficient evidence, a judge generally cannot do the same for a federal criminal indictment.").

Defense counsel did his job. He understood the elements of the statute, obtained a jury instruction which adequately conveyed that law, and then used that instruction to argue the sufficiency of the Government's evidence. Under these circumstances, prosecutors were not entitled to a last-minute change of those instructions to fix the gaping hole in their case – especially where their theory (and the revised charge) was simply wrong. At the time, Judge Chen warned the Government that it was taking a risk in pressing for this advantage – that she had insufficient time to research the issue, and that an incorrect charge would likely warrant a reversal:

> Either the Government is right that this is a viable theory or not, which if they're wrong then they'll lose on appeal if it's not a viable theory and I've incorrectly instructed the jury.

> A-662.

Having elected to take this gamble in order to secure a conviction, the Government should not now be heard to complain when Mr. Goklu's conviction under Count Two is set aside.

**Point IV.    The First Three Transactions Between Mr. Goklu and the Undercover Agent Did Not Constitute Violations of 18 U.S.C. § 1956(a)(3), Because the Bitcoin Involved in Those Transactions Was Not "Represented to be the Proceeds of Specified Unlawful Activity"**

In order to establish money laundering under the "sting" provision of 18 U.S.C. § 1956(a)(3), the Government must prove that its undercover agent *represented* the funds in question to be "proceeds of specified unlawful activity." Regardless of what a defendant subjectively believes, the Government cannot make out a violation of § 1956(a)(3) in the absence of such representations.

Here, the Government concedes that no such representations were made by the undercover agent during his first three interactions with Mr. Goklu. Nevertheless, at sentencing, the district court included the dollar value of those transactions as part of the Defendant's offense conduct.

In our principal brief, we argued that this was error for two reasons. First, the indictment was duplicitous, insofar as it charged multiple transactions under a single count, thereby obscuring the basis of the jury's verdict, as well as the insufficiency of the evidence as it related to the first three transactions. *See* Appellant's Brief at Point IV, *citing United States v. Sturdivant*, 244 F.3d 71 (2d Cir. 2001). Alternatively, we argued that, regardless of duplicity, the lower court erred at sentencing by including the dollar value of those initial transactions in its Guidelines' calculation. *Id*. at Point V.

14

In response, the Government argues that the indictment was not impermissibly duplicitous, because the Defendant was properly convicted of a single, "unified scheme" encompassing each and every transaction. Prosecutors further argue that the court acted appropriately in punishing the Defendant for the initial three transactions, notwithstanding the lack of "representations" concerning the source of such funds. Specifically, the Government argues that even in the absence of such representations, Goklu could be criminally liable for these transactions under a theory of "willful ignorance." Alternatively, prosecutors assert that it does not matter whether Goklu committed *any* crime during those initial meetings, because, they claim, the court was permitted to include non-criminal funds when calculating the Defendant's base offense level under U.S.S.G. § 2S1.1(a)(2). As set forth below, none of these arguments have merit.

A.    Count Two Was Impermissibly Duplicitous

The indictment here was duplicitous, making it impossible to discern the basis of the jury's verdict. Contrary to the Government's assertion, the jury was not required to find that each and every transaction was part of a single, "unified scheme." In fact, the court's charge merely required the jury to find a *single* financial transaction involving "property represented by a law enforcement officer . . . to be the proceeds of specified unlawful activity." A-948. And the verdict form provides

no indication as to *which* transaction or transactions the jury actually relied upon. A-958.

Had the jury been required to consider the transactions individually, it could not have convicted Mr. Goklu based upon his conduct at the first meetings, where the agent did not expressly or *even implicitly* represent such funds to be the proceeds of specified unlawful activity. Under the circumstances, such transactions were not even criminal, much less part of a "unified scheme."

B. The Lower Court Erred at Sentencing by Using The Proceeds from the First Three Transactions to Enhance the Defendant's Base Offense Level

Because no crime occurred during the first three meetings between Goklu and the agent, the lower court erred in using the proceeds from these transactions to enhance the Defendant's Base Offense Level under U.S.S.G. § 2S1.1(a)(2).

Prosecutors have essentially conceded that the agent did not represent such funds to be the proceeds of specified unlawful activity. Contrary to the Government's suggestion, this evidentiary hole cannot be patched over by reference to theories of "willful ignorance" or "conscious avoidance." Those theories focus on a defendant's subjective *mens re* – permitting a jury to infer that he or she acted *knowingly*. But as we have explained, the issue here does not relate to Mr. Goklu's subjective *mens re*. The evidence was insufficient as to the first three transactions because the agent never represented such funds "to be the proceeds of specified

16

unlawful activity."  And in the absence of such representations, there could be no crime under § 1956 (a)(3), regardless of what Goklu thought or suspected.

Which brings us to the Government's fallback position – it's alternative assertion that the court could enhance Mr. Goklu's sentence based upon funds that were *not* proceeds of illegal activity.  Govt. Brief at p. 59.  Prosecutors claim that this position is supported by U.S.S.G. § 2S1.1(a)(2), which directs a sentencing court to consider "the value of the laundered funds" – a phrase the Government broadly interprets to encompass both criminal and non-criminal funds.

This Court should reject the Government's reading of § 2S1.1(a)(2), because it is contrary to the plain language of the Guidelines Commentary, and would punish non-culpable conduct.  Application Note 1 to § 2S1.1 expressly defines "laundered funds" as the "funds . . . involved in the transaction . . . in violation of 18 U.S.C. § 1956."  Hence, if a transaction is *not* "in violation of 18 U.S.C. § 1956," the associated funds are not "laundered funds."

This obvious result is reinforced by Application Note 3(B), which *expressly* directs sentencing courts to exclude from their calculation monies which are not "criminally derived funds" – a term which, for purposes of 18 USC § 1956(a)(3), means "funds . . . represented by a law enforcement officer . . . to be derived from conduct constituting a criminal offense."  *See* Application Note 1.

Because the agent in this case did not represent that the proceeds from the first three transactions were "derived from . . . a criminal offense," such funds were neither "laundered funds" nor "criminally derived funds," and clearly should not have been used to enhance the Defendant's base offense level.

## **<u>CONCLUSION</u>**

Based upon the foregoing, the Appellant respectfully seeks an order vacating his judgment of conviction, and granting such further and additional relief as the Court deems just and proper.

Dated:        Garden City, New York
                July 11, 2025

                                    Respectfully submitted,
                            By:    <u>/s/ Matthew W. Brissenden</u>
                                    Matthew W. Brissenden, P.C.
                                    *Counsel for Mustafa Goklu*
                                    666 Old Country Road, Suite 501
                                    Garden City, NY 11530
                                    516-683-8500

## <u>CERTIFICATE OF COMPLIANCE</u>

As counsel of record to Defendant-Appellant, I hereby certify that this brief complies with the type - volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  I am relying upon the word count of the word-processing system (Microsoft Word) used to prepare the brief, which indicates that 4,298 words appear in the brief.

By:    <u>/s/ Matthew W. Brissenden</u>
Matthew W. Brissenden, P.C.
*Counsel for Mustafa Goklu*
666 Old Country Road, Suite 501
Garden City, NY 11530
516-683-8500

19