24-767
*United States v. Goklu*

# United States Court of Appeals
# for the Second Circuit

---

August Term 2025
Argued: February 9, 2026
Decided: April 7, 2026

No. 24-767

---

UNITED STATES OF AMERICA,

*Appellee*,

v.

MUSTAFA GOKLU, AKA MUSTANGY,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Eastern District of New York
No. 19-cr-00386
Pamela K. Chen, *Judge.*

---

Before: PARK and MERRIAM, *Circuit Judges*, and
MATSUMOTO, *District Judge.**

---

\* Judge Kiyo A. Matsumoto, of the United States District Court for
the Eastern District of New York, sitting by designation.

A jury convicted Mustafa Goklu of money laundering and operating an unlicensed money transmitting business based on a series of bitcoin-for-cash exchanges with an undercover officer. Goklu raises three challenges to his conviction: (1) The district court violated his right to an impartial jury by empaneling a juror who expressed a positive view toward law enforcement and a negative view toward financial crimes; (2) The evidence was insufficient to convict him of operating an unlicensed money transmitting business because a payment of cash for bitcoin is not "money transmitting"; and (3) The district court violated Rule 30 of the Federal Rules of Criminal Procedure by instructing the jury after Goklu's closing argument that exchanging bitcoin for cash can constitute "transferring funds." We reject all three challenges. The district court acted within its broad discretion to empanel a juror who said he would try his best to consider the evidence impartially. Moreover, Goklu's exchanges of bitcoin for cash constituted "money transmitting," so the district court did not abuse its discretion in giving this legally correct jury instruction.

Goklu also challenges his sentence. But he has finished serving his term of imprisonment, and he raises no challenge to his term or conditions of supervised release, so his sentencing challenges are moot. Accordingly, we **DISMISS** Goklu's appeal as moot in part and otherwise **AFFIRM** the judgment of the district court.

———————

MATTHEW BRISSENDEN, Matthew W. Brissenden, P.C., Garden City, NY, *for Defendant-Appellant*.

FRANCISCO J. NAVARRO, Assistant United States Attorney (Dylan A. Stern, Assistant United States Attorney, *on the brief*), *for*

2

Joseph Nocella, Jr., United States Attorney for the Eastern District of New York, Brooklyn, NY, *for Appellee*.

———————

PARK, *Circuit Judge*:

A jury convicted Mustafa Goklu of money laundering and operating an unlicensed money transmitting business based on a series of bitcoin-for-cash exchanges with an undercover officer. Goklu raises three challenges to his conviction: (1) The district court violated his right to an impartial jury by empaneling a juror who expressed a positive view toward law enforcement and a negative view toward financial crimes; (2) The evidence was insufficient to convict him of operating an unlicensed money transmitting business because a payment of cash for bitcoin is not "money transmitting"; and (3) The district court violated Rule 30 of the Federal Rules of Criminal Procedure by instructing the jury after Goklu's closing argument that exchanging bitcoin for cash can constitute "transferring funds." We reject all three challenges. The district court acted within its broad discretion to empanel a juror who said he would try his best to consider the evidence impartially. Moreover, Goklu's exchanges of bitcoin for cash constituted "money transmitting," so the district court did not abuse its discretion in giving this legally correct jury instruction.

Goklu also challenges his sentence. But he has finished serving his term of imprisonment, and he raises no challenge to his term or conditions of supervised release, so his sentencing challenges are moot. Accordingly, we dismiss Goklu's appeal as moot in part and otherwise affirm the judgment of the district court.

3

# I. BACKGROUND

A.    <u>Factual Background</u>

In 2018 and 2019, Goklu ran a business charging commission fees to exchange bitcoin for cash.  He advertised his business on localbitcoins.com, a website connecting bitcoin buyers and sellers.  In July 2018, the DEA began investigating Goklu after seeing his ads, which offered to exchange significantly larger amounts of bitcoin than others in the same area.

Over the next eight months, undercover DEA agents arranged several exchanges with Goklu.  Special Agent Patrick O'Kain messaged Goklu on Signal—an encrypted chat application for smartphones—to set up a meeting to exchange O'Kain's bitcoin for cash.  They met in Manhattan and got into Goklu's car, where Goklu told the agent to "close the door, man, the cops, we're not drug dealers.  We're buying Bitcoin."  App'x at 354.  O'Kain understood that to mean that Goklu "was concerned about being identified by the cops."  *Id.*  O'Kain transferred about $5,000 worth of bitcoin from his cryptocurrency wallet to Goklu's, and Goklu then handed $4,620 in cash over to O'Kain, reflecting an 8% commission.

Agent O'Kain met Goklu repeatedly in the following months.  Each time, O'Kain transferred bitcoin to Goklu, who exchanged the value of the bitcoin in cash, minus his commission.  O'Kain initially told Goklu that the bitcoin came from an online business, but during their fourth meeting, O'Kain told him that it was from selling drugs.  Goklu continued meeting with O'Kain to exchange bitcoin for cash.

Although Goklu's transactions with O'Kain involved the agent transferring his bitcoin for cash, Goklu also conducted some transactions in which he sold his bitcoin to customers instead.  Goklu

obtained some of the cash that he exchanged with O'Kain from selling bitcoin to another customer.

Between August 2018 and January 2019, Goklu and O'Kain met six times, exchanging roughly $130,000 worth of bitcoin for cash. In April 2019, Goklu agreed to meet with O'Kain for a seventh time to exchange about $50,000 worth of bitcoin. But before they made the exchange, the monitoring DEA team arrested Goklu.

B.      Procedural History

In October 2020, the government filed a two-count superseding indictment against Goklu. Count One charged him with money laundering, in violation of 18 U.S.C. § 1956, and Count Two charged him with operating an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960. Goklu entered pleas of not guilty and proceeded to trial.

1.      *Voir Dire*

During voir dire, the district court asked prospective jurors if they had any positive or negative feelings toward law enforcement. After excusing multiple jurors for cause, the court held a sidebar with a prospective juror ("Juror 30").

Juror 30 explained that he works for New York City Parks, so he interacts with the Parks Police on a daily basis and has a "positive outlook towards police." App'x at 120. The court asked if he could be fair and objective despite his positive feelings about law enforcement. After saying he was not sure, Juror 30 agreed to "try [his] best." *Id.* at 121. When asked again whether he could evaluate law enforcement officer testimony impartially, he said that he could "[i]f it's presented in a neutral manner." *Id.* at 122.

5

Juror 30 also expressed some reluctance to serve on a jury in a case involving financial crimes because he has a friend who had been affected by Bernie Madoff's Ponzi scheme.  The court said that "[t]his is obviously not a Madoff scheme" and asked if he could put that out of his mind, to which Juror 30 said, "I believe so," and again said that he would "try [his] best."  *Id.* at 122-23.

Goklu moved to dismiss Juror 30 for cause.  But the district court denied the motion because the juror "said he would try his best and seems sincere about that."  *Id.* at 123.  So it concluded that "he can be objective at the end of the day."  *Id.*  Juror 30 was subsequently empaneled and served on the jury.

2.     *Jury Instructions*

At the charge conference, the district court adopted the government's instruction defining a "money transmitting business":

> A "money transmitting business" is a business which, for a fee, accepts currency, funds, or value that substitutes for currency for transfer within or outside the United States.  I instruct you that Bitcoin qualifies as "funds" under the statute.  The term "money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier.

App'x at 707; *see id.* at 570-75.

In his closing argument, defense counsel emphasized that "[a] money transmitting business is a business which for a fee accepts currency for transfer," and asked the jury to conclude "that the evidence does not prove beyond a reasonable doubt that [Goklu accepted] currency for transfer."  *Id.* at 646.  After this argument, the district court called for a sidebar before the government's rebuttal.

6

The court understood Goklu to be arguing, for the first time, that a defendant does not run a "money transmitting business" unless he accepts money for transfer *to a third party*. Over Goklu's objection, the district court added an additional instruction that "exchanging Bitcoin for U.S. currency can qualify as a transfer within the meaning of the statute." *Id.* at 655.

The jury found Goklu guilty on both counts.

### 3. *Sentencing*

At sentencing, the parties disputed which transactions the district court should use for purposes of determining the base offense level under the U.S. Sentencing Guidelines. Goklu argued that only the transactions that took place after O'Kain told Goklu he got bitcoin from selling drugs involved "laundered funds" for purposes of U.S.S.C. § 2S1.1(a)(2). But the district court accepted the government's argument that the value of the laundered funds included all transactions between Goklu and O'Kain, including the transactions before this disclosure. After calculating the Guidelines range to be 41 to 51 months, the district court varied downward and sentenced Goklu principally to 16 months of imprisonment, to be followed by two years of supervised release.

This appeal followed.

## II. DISCUSSION

### A. Impartial Jury

The Sixth Amendment guarantees the right to trial "by an impartial jury." U.S. Const. amend. VI. "An impartial jury is one capable and willing to decide the case solely on the evidence before it, or one comprising people who will conscientiously apply the law and find the facts." *United States v. Perez*, 387 F.3d 201, 204 (2d Cir.

2004) (cleaned up). When conducting voir dire, the district court must, "at a minimum, 'remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence.'" *United States v. Kelly*, 128 F.4th 387, 421 (2d Cir. 2025) (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981)). A juror should be removed if the district court concludes that he has "actual bias," that is, "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997). A district court can find actual bias if "the juror admits partiality" or if "the judge finds actual partiality based upon the juror's voir dire answers." *Id.*

In assessing impartiality, the trial court makes "determinations of demeanor and credibility that are peculiarly within a trial judge's province." *Id.* at 44. An "appellate court cannot easily second-guess the conclusions of the decisionmaker who heard and observed the [juror]." *Id.* (cleaned up). So we reverse a decision to empanel a juror "only if there is clear abuse of the district court's discretion." *United States v. Mensah*, 110 F.4th 510, 524 (2d Cir. 2024) (quotation marks omitted). "There are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empanel[]ing of a jury." *United States v. Ploof*, 464 F.2d 116, 118 n.4 (2d Cir. 1972).

Goklu argues that we should vacate his conviction because Juror 30 expressed doubts about his ability to be impartial and failed to state unequivocally that he could put aside those doubts. To be sure, Juror 30 initially said that he "honestly" did not know if he could be impartial because of his positive feelings about the Park Police and his negative feelings about financial crimes. App'x at 121. But after the district court reminded him of his oath, Juror 30 twice said that he would try his best. After their colloquy, the district court concluded

that Juror 30 could be impartial because "he said he would try his best and seems sincere about that." *Id.* at 123. The district court's assessment of the juror's sincerity is precisely the type of credibility determination to which we must defer absent a clear abuse of discretion. *See Torres*, 128 F.3d at 44.

Goklu points to our decision in *United States v. Nelson*, 277 F.3d 164 (2d Cir. 2002), which he claims supports his argument that probable impartiality "is not good enough." Appellant's Br. at 26 (quoting *Nelson*, 277 F.3d at 202). But the facts of *Nelson* are very different. In *Nelson*, the district court empaneled a juror who knew that defendant Nelson had been prosecuted and acquitted in state court for the same alleged conduct underlying the federal charges and explicitly "voiced his dissatisfaction with the State proceedings that resulted in defendant Nelson's acquittal." *Nelson*, 277 F.3d at 201. The juror in *Nelson* "never even asserted that he could *probably* be impartial." *Id.* at 203. And there, "the potential bias [did] not represent only a general state of mind but also a predisposition to believe in the guilt of one of the very defendants who [was] being tried." *Id.* at 202. We thus concluded that the juror should have been excused. By contrast, we have found no abuse of discretion when a district court empanels a juror who promises to do his best, as Juror 30 did here. *Ploof*, 464 F.2d at 118.

We thus conclude that the district court did not abuse its discretion in determining that Juror 30 "can be objective at the end of the day" and in declining to strike him for cause. App'x at 123.

B.      Unlicensed Money Transmitting Business

   1.      *Legal Standards*

Goklu argues that the evidence was insufficient to convict him of operating an unlicensed money transmitting business because his

conduct—paying cash for bitcoin in a face-to-face transaction—did not involve transmitting funds to another person or location. He frames this as a challenge to the sufficiency of the evidence, but the thrust of his argument is that his conduct was not "money transmitting" under 18 U.S.C. § 1960. "Whether [Goklu's] challenge is construed as a question of statutory interpretation or an attack on the sufficiency of the evidence, we review *de novo*." *United States v. Ho*, 984 F.3d 191, 204 (2d Cir. 2020).

2. *Statutory Framework*

18 U.S.C. § 1960(a) provides that "[w]hoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both." The statute defines "money transmitting" to include "transferring funds on behalf of the public by any and all means." *Id.* § 1960(b)(2). As relevant here, an "unlicensed money transmitting business" includes a money transmitting business that "fails to comply with the money transmitting business registration requirements" under 31 U.S.C. § 5330 or its implementing regulations. *Id.* § 1960(b)(1)(B). Goklu was not federally registered to operate a money transmitting business. He argues, however, that his conduct was not "transferring funds" and did not trigger the federal licensing requirements.[1] We thus turn to § 5330 and its implementing regulations for the relevant registration requirements.

Section 5330 requires any person who owns or controls a "money transmitting business" to register that business with the Secretary of the Treasury. 31 U.S.C. § 5330(a)(1-2). This statute

---

[1] Goklu was also charged with operating a money transmitting business that failed to comply with state licensing requirements, but he addresses only the federal licensing prong on appeal.

10

defines "money transmitting business" to include a business that provides "check cashing, currency exchange, or money transmitting or remittance services." *Id.* § 5330(d)(1)(A).[2] At the time of Goklu's conduct, "money transmitting services" included "accepting currency or funds denominated in the currency of any country and transmitting the currency or funds, or the value of the currency or funds, by any means." *Id.* § 5330(d)(2).

The government may establish a violation of § 1960 by proving that a defendant failed to comply with the registration requirement under § 5330 itself, or by proving that a defendant failed to comply with the registration requirement in the regulations implementing § 5330. *See* 18 U.S.C. § 1960(b)(1)(B). The Financial Crimes Enforcement Network ("FinCEN") of the U.S. Treasury Department has promulgated regulations requiring a "money services business" to register with it. 31 C.F.R. § 1022.380. This registration requirement applies to a "money transmitter"—*i.e.*, a "person that provides money transmission services"—which include the "acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." *Id.* § 1010.100(ff)(5)(i)(A). Although we do not simply import this definition into § 1960's definition of "money transmitting," *see United States v. Mazza-Alaluf*, 621 F.3d 205, 210 (2d Cir. 2010), we conclude that a business providing "money transmission services" as defined

---

[2] Under this statute, a business is a money transmitting business only if it provides the services described above and is required to file reports under 31 U.S.C. § 5313. *Id.* § 5330(d)(1)(A-B). The parties do not raise § 5313's reporting requirements in this appeal, and Goklu's lawyer said it was "fine" for the district court to define "money transmitting business" without reference to § 5313. App'x at 574.

11

by the regulations is "transferring funds" and is thus engaged in "money transmitting" within the meaning of § 1960.

In light of the foregoing, if the evidence was sufficient to show that Goklu was a money transmitter within the meaning of § 5330's implementing regulations, then it was sufficient to satisfy § 1960. Our inquiry thus turns on whether the evidence showed that Goklu's business involved the acceptance of currency, funds, or value from one person and the transmission of currency, funds, or other value to another location or person by any means. 31 C.F.R. § 1010.100(ff)(5)(i)(A).

3.    *Application*

Under this statutory scheme, a business exchanging virtual currency for real currency through the purchase or sale of bitcoin provides money transmission services and is thus a money transmitting business subject to FinCEN's registration requirements.[3] We base this conclusion on the ordinary meaning of the statutory and regulatory text, which accords with FinCEN's interpretive guidance.

To start, bitcoin qualifies as "funds." Bitcoin is a decentralized digital currency that can be used for peer-to-peer transactions. It is stored in a digital wallet and can be transferred to another wallet without any bank intermediaries. "[B]itcoin can be and is used as a currency to make sales and purchases and, therefore, nicely fits the definition of 'funds.'" *United States v. Freeman*, 147 F.4th 1, 13 (1st Cir. 2025) (collecting cases). Goklu does not contend otherwise.

Goklu argues that he did not provide money transmission services because his transactions with Agent O'Kain involved no transfer or transmittal "to another location or person by any means." 31 C.F.R. § 1010.100(ff)(5)(i)(A). We disagree.

---

[3] Goklu does not claim to fall under any of the six exemptions from "money transmitter" in 31 C.F.R. § 1010.100(ff)(5)(ii).

12

In each transaction, Agent O'Kain transferred bitcoin to Goklu, who handed O'Kain cash representing the value of that bitcoin minus a commission. *See supra* at 4-5. Goklu accepted funds (bitcoin) from O'Kain and transmitted currency to him representing the value of the funds. And both ends of the transaction involved the movement of funds to another location. When O'Kain transferred bitcoin to Goklu, he electronically moved funds from his bitcoin wallet to Goklu's. *See United States v. Gilboe*, 684 F.2d 235, 238 (2d Cir. 1982) (recognizing that often, "[e]lectronic signals . . . are the means by which funds are transported" (interpreting 18 U.S.C. § 2314)). Goklu then transmitted the remaining value of O'Kain's funds back through a physical transfer of cash. Even though this was not transmission to "another person," it was transmission to "another location": at the start of the transaction, O'Kain's funds were in his cryptocurrency wallet, and afterwards, he held cash. Goklu's business thus transferred funds, and satisfies the regulatory definition of a money transmitter. *See* 31 C.F.R. § 1010.100(ff)(5)(i)(A).

Goklu's argument that an in-person transfer of cash is not a transfer or transmission of funds is inconsistent with the statutory and regulatory text, and in any event misreads the record.

First, physically moving cash is a "means" of transferring or transmitting funds to another location. Nothing in the statutes or regulations exempts the physical transfer of cash from the definition of money transmission. On the contrary, each authority expressly includes transfers or transmissions of funds by "any means." 31 U.S.C § 5330(d)(2); 31 C.F.R. § 1010.100(ff)(5); *see also* 18 U.S.C. § 1960(b)(2) (defining money transmitting to include transferring funds "by any and all means"). And the statutes confirm that a physical transfer of cash is a "means" by which funds may be transmitted; for example, § 1960 lists "courier" as one way a business can engage in money transmitting and § 5330 describes a business that provides "currency exchange" services as a money transmitting

business.  Couriers and many currency exchanges physically hand currency to a customer or recipient.

Second, in any event, the jury also heard evidence that Goklu conducted trades in which he accepted cash and electronically transmitted bitcoin.  In particular, Goklu obtained the cash he transferred to O'Kain from different customers who bought bitcoin.  Goklu's profile on localbitcoins.com also shows that he sold bitcoin for cash.  The government argued in closing that "at least some of the defendant's customers crossed state lines to meet the defendant to exchange that Bitcoin for cash or cash for Bitcoin."  App'x at 628.  And Goklu never argued otherwise.  Instead, he admitted that he had customers who "want[ed] to exchange cash and Bitcoin one way or the other."  *Id.* at 648.  So even if only the outgoing transmission of bitcoin constitutes transmission to another location, the jury heard evidence that Goklu's business involved both incoming and outgoing transmissions of bitcoin.

Finally, our conclusion that Goklu operated a "money transmitting business" is consistent with FinCEN's guidance.  FinCEN treats "a person engaged as a business in the exchange of virtual currency for real currency, funds, or other virtual currency" as an "*exchanger*."  U.S. Dep't of Treasury, FinCEN, FIN–2013–G001, Guidance: Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies 2 (Mar. 18, 2013) [https://perma.cc/4YSK-JJ37].  Goklu, whose business was exchanging bitcoin and cash, was thus an exchanger.  And an exchanger like Goklu "that buys or sells convertible virtual currency for any reason *is* a money transmitter under FinCEN's regulations, unless a limitation to or exemption from the definition applies to the person."  *Id.* at 3.  FinCEN's guidance thus aligns with the natural reading of the statutory and regulatory text, and confirms that Goklu's conduct constituted money transmission.

Goklu's business of exchanging bitcoin and cash falls squarely within the statutory and regulatory definitions of a money

transmitting business.[4]  By accepting bitcoin and transmitting cash, he engaged in the transfer of funds "by any . . . means," as contemplated by 18 U.S.C. § 1960.  And his conduct was "money transmission," which subjected him to FinCEN's registration requirements.  *See* 31 C.F.R. § 1010.100(ff)(5).  Accordingly, the evidence was sufficient to sustain his conviction under § 1960.

C.      <u>Federal Rule of Criminal Procedure 30</u>

Goklu next argues that the district court violated Federal Rule of Criminal Procedure 30 by instructing the jury, after his closing argument, that "[e]xchanging Bitcoin for U.S. currency can qualify as a transfer."  App'x at 707.  Rule 30 requires that the court inform the parties of its ruling on their proposed jury instructions before closing argument.  Fed. R. Crim. P. 30(b).  But "[i]f a supplemental charge is legally correct, the district court enjoys broad discretion in determining how, and under what circumstances, that charge will be given."  *United States v. Civelli*, 883 F.2d 191, 195 (2d Cir. 1989).

In light of our conclusion above that exchanging bitcoin for U.S. currency can qualify as transferring funds, the district court did not abuse its "broad discretion" in changing the jury instruction after

---

[4] Our conclusion does not mean, as Goklu suggests, that § 1960 applies "to a person in the business of buying bitcoin *to hold in their own account*."  Appellant's Br. at 31 (emphasis added).  Goklu never argued that he carried out these transactions to obtain bitcoin for his own account.  He made money by providing exchange services to customers in return for a commission.  That Goklu also exchanged his own bitcoin for cash with other customers underscores the fact that the object of his business was charging customers for exchanges, not obtaining bitcoin.  As applied to him, Goklu thus cannot show that the statute "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Concepcion*, 139 F.4th 242, 248 (2d Cir. 2025) (quotation omitted).

15

Goklu's closing argument. Goklu suggested for the first time in his closing remarks that the jury must find a transfer to a third party to convict him under § 1960. In response, the district court gave the legally correct curative instruction that "[e]xchanging Bitcoin for U.S. currency can qualify as a transfer within the meaning of the statute." App'x at 707. This was not an abuse of discretion.

D.    <u>Sentencing Challenges</u>

Finally, Goklu argues that he was improperly sentenced based on all of his financial transactions with Agent O'Kain, even though O'Kain first told Goklu that his bitcoin came from drug dealing during their fourth transaction. First, Goklu claims that the indictment was impermissibly duplicitous because it charged multiple transactions under a single count of money laundering. He contends that he was prejudiced because "both Probation and the court treated the early transactions as part of the offense of conviction" even though the jury did not render a verdict for each transaction. Appellant's Br. at 40. Second, he claims that the district court committed procedural error at sentencing by improperly including the value of the first three transactions when determining the "value of the laundered funds" as part of its Guidelines calculation. *Id.* at 43-44 (quoting U.S.S.G. § 2S1.1(a)(2)). The remedy he seeks for both purported errors is a remand for resentencing.

We need not address these arguments because Goklu's challenges to his term of imprisonment are moot. "While the Government has failed to argue that [Goklu's] appeal should be dismissed as moot, we have an independent obligation to ensure that developments in the case have not rendered the appeal moot." *United States v. Williams*, 475 F.3d 468, 479 (2d Cir. 2007). An appeal from a prison sentence is typically moot when the sentence has been

16

completed. *See United States v. Simmons*, 150 F.4th 126, 134-35 (2d Cir. 2025). "Although a defendant's release from prison will not necessarily moot his sentencing challenges if he remains under supervision at the time of his appeal, such challenges remain live only if there is more than a remote and speculative possibility that the district court could or would impose a reduced term of supervised release were we to remand the matter." *Id.* at 134 (quotation marks omitted).

Goklu has completed his term of imprisonment and is now serving his two-year term of supervised release. But his sentencing challenges on appeal address only his prison sentence, not his term or conditions of supervised release. Goklu does not suggest that the district court's calculation of the value of the laundered funds affected his sentence of supervised release, nor does he ask us to reduce his term of supervision. "Given the lack of a challenge to [Goklu's] term of supervision, it would be quite strange for us to conclude that a live controversy exists as to that issue." *Id.* at 135 (quotation marks omitted).

## III. CONCLUSION

We have considered Goklu's remaining arguments and find them to lack merit. For these reasons we dismiss Goklu's appeal in part as moot and otherwise affirm the judgment of the district court.

17