# 24-767-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

-v.-

MUSTAFA GOKLU,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## PETITION FOR REHEARING OR REHEARING *EN BANC*

MATTHEW W. BRISSENDEN
MATTHEW W. BRISSENDEN, P.C.
*Attorney for Defendant-Appellant*
666 Old Country Road, Suite 501
Garden City, New York 11530
516-683-8500

# TABLE OF CONTENTS

PRELIMINARY STATEMENT………………………………………...1

STATEMENT OF FACTS..........................................................................1

ARGUMENT............................................................................................ 5

I.      Statutory and Regulatory Framework.......................................................5

II.     Discussion...................................................................................................8

       A.     The Phrase "By Any Means" Does Not Negate
The Requirement that a Transfer Be to "Another
Location"………………………………………………….. 9

       B.     The Department of Treasury Has Never Treated
In Person Cash Payments as Transmissions to Another
Location………………………………………………… 11

       C.     FinCEN's 2013 Guidance Merely Describes the
Outgoing Transmission of Bitcoin as Transmission
to Another Location; it Does Not Speak to the In-Person
Payment of Cash in Exchange to Bitcoin……………………… 13

       D.     To the Extent the Trial Record Contained Evidence
of Outgoing Transmissions of Bitcoin, that Was Not
the Focus of the Government's Case and Does Not
Render the Lower Court's Rule 30 Error Harmless……………. 14

CONCLUSION…………………………………………………….. 16

i

# TABLE OF AUTHORITIES

## Cases

*Bowen v. Yuckert*, 482 U.S. 137 (1987)…………………………………………...10

*Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597 (2013)…………………………….10

*Neder v. United States*, 527 U.S. 1 (1999)………………………………………..15

*United States v. Heyward*, 3 F.4th 75 (2d Cir. 2021)…………………………….15

*United States v. Goklu*, No. 24-767,
2026 U.S. App. LEXIS 9874(2d Cir. Apr. 7, 2026)……………………………..4, 9

## Other Authority

18 U.S.C. § 1956……………………………………………………………………2

18 U.S.C. § 1960……………………………………………………………………2, 5

31 CFR § 1010………………………………………………..1, 2, 4, 6, 7, 8, 10, 11, 12

31 CFR § 1022………………………………………………………………………...7

31 U.S.C. § 5313……………………………………………………………………6

31 U.S.C. § 5330……………………………………………………….1, 2, 4, 5, 6, 7, 8, 9, 10, 11, 16

Federal Register, Volume 76, No. 140, p. 43592 (July 21, 2011)…………………...7

FIN-2006-G006, Application of the Definition of Money Services Business to Certain Owner-Operators of Automated Teller Machines Offering Limited Service (December 3, 2007)………………………………………………………………..12

FIN–2013–G001, APPLICATION OF FINCEN'S REGULATIONS TO PERSONS ADMINISTERING, EXCHANGING, OR USING VIRTUAL CURRENCIES at p. 3 (Mar. 18, 2013)……………………………………………………………………….13, 14

## PRELIMINARY STATEMENT

The instant appeal hinged on the following legal question: whether the in-person payment of cash in exchange for bitcoin constitutes the transmission of funds or currency to "another location" for purposes of 31 U.S.C. § 5330(d)(2) and 31 CFR § 1010(ff)(5). A Panel of this Court held that it does, and accordingly, affirmed the Appellant's conviction.

For the reasons set forth below, we respectfully submit that the Panel's decision misapprehends the Department of Treasury's definition of "money transmission" and overlooks regulatory guidance clarifying that the direct payment of cash from a business to a customer does not constitute transmission to another location. In addition, it appears that the Panel may have erroneously relied upon the 2021 version of 31 U.S.C. § 5330, which was not in effect at the time of the alleged offense conduct. Accordingly, a Panel rehearing is warranted.

Moreover, because the Panel's decision would transform currently unregistered businesses – such as private ATM owners – into money transmission services, we respectfully submit that the instant petition involves questions of exceptional importance meriting *en banc* rehearing.

1

## STATEMENT OF FACTS

### I.      Trial

At trial, the Government adduced evidence that Mustafa Goklu personally met with an undercover agent and paid cash for bitcoin.  During these meetings (which took place in the Appellant's car), the undercover agent transferred bitcoin from his own electronic wallet into Goklu's; in exchange, Mr. Goklu handed the undercover agent cash.  Based on this conduct, Appellant was charged with Operating an Unlicensed Money Transmission Business in violation of 18 U.S.C. § 1960.[1]

The provisions controlling the registration of money transmitting businesses are set forth at 31 U.S.C. § 5330 and 31 CFR § 1010.  Here, the Government alleged that Goklu's conduct constituted a specific sub-type of "money transmitting business" under 31 U.S.C. § 5330(d)(2): a "money transmitting *service*."

Under § 5330(d)(2) and the operative regulations, a money transmission service involves *both* "the acceptance of currency, funds or value that substitutes for currency from one person *and* the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." 31 CFR Part 1010.100(ff)(5) (emphasis in the original).

---

[1]      Mr. Goklu was also charged with and convicted of money laundering in violation of 18 U.S.C. § 1956.  However, this Petition for Rehearing relates only to his conviction under 18 U.S.C. § 1960.

In summation, defense counsel argued that Mr. Goklu was not operating a money transmitting service or business because he did not transfer money to a third party or a remote location, as required by the statute. The trial court ruled that this argument was improper, and responded by providing the jury with a curative instruction that "exchanging Bitcoin for U.S. currency can qualify as a transfer within the meaning of the statute." Defense counsel objected to the altered jury charge and the Appellant was convicted.

## II.    Appeal

On Appeal, Mr. Goklu argued that the Government was required to prove that the Appellant (1) accepted currency, funds, or value that substituted for currency, and (2) subsequently transmitted such funds to *another location or person*. Appellant argued that his in-person payment of cash for bitcoin did not constitute money transmission under the statute, because such funds were not sent to another location or person. Appellant further argued that in light of these statutory elements, trial counsel's summation argument was proper, and that the trial court violated Rule 30 of the Federal Rules of Criminal Procedure by amending the jury charge after the fact to blunt counsel's argument.

The Government opposed Appellant's arguments, contending that the evidence satisfied the "dual requirements of acceptance and transmission," because Goklu "(1) accepted currency or funds in the form of Bitcoin from the U.C. and then

3

(2) participated in the transmission of Bitcoin through the blockchain from the U.C.'s cryptocurrency wallet to Goklu's." Govt. Brief at p. 32. Notably, prosecutors did not contend that Goklu's payment of cash constituted the transmission of funds to "another location."

## III.    Panel Decision

A Panel of this Court affirmed the Appellant's conviction. The Panel did not adopt the Government's reasoning; instead, it held that Goklu's in-person payment of cash for bitcoin constituted the transmission of funds to "another location" under the statute. The Panel reasoned that "[e]ven though this was not transmission to 'another person,' it *was* transmission to 'another location': at the start of the transaction, [the agent's] funds were in his cryptocurrency wallet, and afterwards, he held cash." *United States v. Goklu*, No. 24-767, 2026 U.S. App. LEXIS 9874, at *16 (2d Cir. Apr. 7, 2026).

The Panel sought to bolster this construction by drawing an analogy to a different category of "money transmitting business" subject to the registration requirements of § 5330: currency exchanges. As the panel noted, "many currency exchanges physically hand currency to a customer or recipient." *Id*. at *17. Hence, the Panel reasoned, an "in person transfer of cash" constitutes a "transmission of funds" under 30 U.S.C. § 5330(d)(2) and the regulatory definition set forth in 31 CFR Part 1010.100(ff)(5).

4

In light of this reasoning, the Panel held that Mr. Goklu's payment of cash to the undercover agent constituted the transmission of funds to another location sufficient to establish his operation of an unlicensed money transmission service. For the same reasons, the Panel held that the trial court's post-summation curative instruction was legally correct; accordingly, the court's supplemental charge did not violate FRCP Rule 30. *Id*. at *19-20.

## ARGUMENT

### I. Statutory and Regulatory Framework

18 U.S.C. § 1960 provides for a sentence of up to five years' imprisonment for anyone who knowingly conducts "an unlicensed money transmitting business." Section 1960 expressly references 31 U.S.C. § 5330, which defines the businesses that must register with the Secretary of Treasury. Section 5330(d), as written at the time of the Appellant's offense conduct, provided as follows:

> (d) DEFINITIONS.—For purposes of this section, the following definitions shall apply:
> (1) MONEY TRANSMITTING BUSINESS.—The term ''money transmitting business'' means any business other than the United States Postal Service which—
> > (A) provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system;
> > (B) is required to file reports under section 5313; and

5

(C) is not a depository institution (as defined in section 5313(g)).
(2) MONEY TRANSMITTING SERVICE.—The term ''money transmitting service'' includes accepting currency or funds denominated in the currency of any country and transmitting the currency or funds, or the value of the currency or funds, by any means through a financial agency or institution, a Federal reserve bank or other facility of the Board of Governors of the Federal Reserve System, or an electronic funds transfer network.

Hence, under this statutory framework, the term "money transmitting business" is a broad category encompassing several sub-categories of businesses including: (a) check cashing; (b) currency exchange; and (c) money transmitting services.

However, the statute also provides that no business of any type is subject to registration as a "money transmitting business" unless it is "required to file reports under" 31 U.S.C. § 5313. *See* § 5330(d)(1)(B). In turn, § 5313 delegates to the Secretary of the Treasury the authority to prescribe by regulation such reporting requirements.

Pursuant to this authority, the Treasury Department has adopted extensive regulations that control which businesses must file reports under § 5313 and register under § 5330. Importantly, it has adopted *different* registration and reporting requirements for "money transmitting services" versus "check cashing" and "currency exchange" businesses.

As noted above, 31 C.F.R. §1010.100(ff)(5) defines a money transmitter as one who accepts funds or currency and subsequently transmits such funds or

6

currency "*to another location or person*." This language was added by the Department of Treasury in 2011 to clarify the definition of "transmission." In the commentary adopting such language, the Department of Treasury noted:

> The regulatory definition of ''money transmission services'' also adds the phrase ''to another location or person.'' Although this phrase is not in the statutory definition of money transmitting service, it is implicit in the statutory definition's use of the word ''transmitting.'' Transactions involving the acceptance of currency from one person at one location and the return of that currency to that same person at the same location would not be considered a money transmission service. The addition of the phrase ''to another location or person,'' explicitly conveys this interpretation.

Federal Register, Volume 76, No. 140, p. 43592 (July 21, 2011).

This distinction is important because an entity that provides "money transmission services" to "another person or location" is, without qualification, a "money services business" that must register with FinCEN under 31 U.S.C § 5330 and 31 CFR § 1022.380. *See* 31 C.F.R. §1010.100(ff)(5) (defining "money services business" to include "money transmitter.").

Despite the somewhat confusing nomenclature of the statute, currency exchanges and check cashers are *not* money transmitters under this definition. While they may separately be subject to the registration requirements of § 5330, this does not at all hinge on the question of whether they are engaged in the "transmission of funds to another location" as that term is defined in 31 C.F.R. §§ 1010.100(ff)(1) and 1010.111(ddd).

7

Rather, a currency exchange qualifies as a "money services business" subject to registration where it "accepts the currency or other monetary instruments [or] funds . . . of one or more countries in exchange for the currency, or other monetary instruments [or] funds. . . . of one or more other countries in an amount greater than $1,000 for any other person on any day in one or more transactions, whether or not for same-day delivery." 31 C.F.R. §1010.100(ff)(1).

Similarly, a check casher is "[a] person that accepts checks . . . or monetary instruments . . . in return for currency or a combination of currency and other monetary instruments . . . in an amount greater than $1,000 for any person on any day in one or more transactions." 31 C.F.R. §1010.100(ff)(2).

## II. Discussion

Because the Panel's reasoning differed from the prosecution's, Appellant did not have an opportunity to address the proposition which lies at the heart of its ruling – *i.e.*, that the in-person payment of cash constitutes transmission of funds to "another location."

The Panel provided three rationales to support its interpretation of the phrase "another location." First, the Panel stated that 30 U.S.C. § 5330(d)(2) and 31 C.F.R. §1010.100(ff)(5) both refer to the transmission of funds "by any means." Such language, the panel reasoned, supports a broad construction of the phrase "another

8

location." *United States v. Goklu*, No. 24-767, 2026 U.S. App. LEXIS 9874, at *16 (2d Cir. Apr. 7, 2026).

Second, the Panel pointed out that currency exchanges "physically hand currency to a customer," but are nevertheless subject to the registration requirements of § 5330. *Id*. at *17. According to the Panel, this suggests that in-person cash payments constitute the transmission of funds to another location.

Third, the Panel cited to FinCEN's 2013 published guidance concerning the registration of virtual currency exchange. *Id*. at *18.

Finally, the Panel noted that "the jury also heard evidence that Goklu conducted trades in which he accepted cash and electronically transmitted bitcoin." *Id*. at *17. Hence, it concluded, "even if only the outgoing transmission of bitcoin constitutes transmission to another location, the jury heard evidence that Goklu's business involved both incoming and outgoing transmissions of bitcoin." *Id*. at *17-18.

We address each of contentions in turn.

A.    The Phrase "By Any Means" Does Not Negate
      The Requirement that a Transfer Be to "Another Location"

First, and contrary to the Panel's assertion, at the time of Appellant's conduct, 31 U.S.C. § 5330(d)(2) *did not* broadly "include[] transfers or transmissions of funds '*by any means*.'" *Id*. at *16 (emphasis added). Rather, its express statutory language was as follows:

9

The term ''money transmitting service'' includes accepting currency or funds denominated in the currency of any country and transmitting the currency or funds, or the value of the currency or funds, *by any means through a financial agency or institution, a Federal reserve bank or other facility of the Board of Governors of the Federal Reserve System, or an electronic funds transfer network.*

31 U.S.C. § 5330(d)(2) (2018) (emphasis added).

Hence, the applicable statute contained clear limiting language focusing upon traditional electronic and banking transfers. It appears that the Panel may have overlooked this applicable authority, citing instead to the 2021 version of 31 U.S.C. § 5330, which inserted the word "including" between the word "funds" and the phrase "by any means." Mr. Goklu's alleged conduct took place in 2018 and 2019, prior to this 2021 amendment.[2]

More importantly, the phrase "by any means" sheds no meaningful light on the pivotal phrase "another location." Admittedly, there are many ways of moving funds from one location to another. For instance, we do not dispute that it is possible

---

[2] While 31 C.F.R. § 1010.100(ff)(5)(i) *does* refer to the transmission "by any means," this language cannot trump the plain language of the statute as it existed at the time. *See Bowen v. Yuckert*, 482 U.S. 137, 178 (1987) ("interpretation of the statute as reflected in . . . regulation cannot supersede the language chosen by Congress."); *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 609 (2013) ("It is a basic tenet that "regulations, in order to be valid, must be consistent with the statute under which they are promulgated.").

to physically transfer cash to "another location" *via* a courier. The question, for purposes of this appeal, however, is what constitutes "*another location.*"

As set forth below, the Department of Treasury has never treated cash payments, made in face-to-face transactions between a business and its customer, as a transfer "to another location."

B.       The Department of Treasury Has Never Treated
         In Person Cash Payments as Transmissions to Another Location

Treating in-person cash payments as the transfer of funds to "another location" would significantly expand the definition of "money transmission services" to include other types of businesses that are currently exempt from registration or subject to distinct registration requirements under 31 U.S.C. § 5330 and 31 C.F.R. § 1010.100.

Contrary to the Panel's decision, currency exchange businesses are *not* currently considered "money transmitting services." While it is true that both currency exchanges and check cashing businesses accept funds held in one medium/location (often digital accounts) and convert such funds into cash for a customer, the Department of Treasury has never claimed that this constitutes the transmission of funds to another location. To the extent these businesses are subject to registration, it is *not* because they are in the business of "transmitting funds to another location or person." Rather, some (but not all) currency exchange businesses must register under § 5330 because they meet a separate regulatory definition of

11

"money service businesses" under 31 C.F.R. §1010.100(ff)(1). *See also* 31 C.F.R. §1010.100(ff)(2), defining "check casher." While *all* "money transmitting services" must register with the Department of Treasury, currency exchange and check cashing businesses are only subject to registration if they meet the regulation's *de minimis* financial threshold.

Similarly, privately owned ATM machines are not considered money transmitters. Such businesses convert value held within digital accounts to cash through in-person transactions. These transactions are directly analogous to the ones at issue here: at the start of such transactions, funds are located in the customer's bank account; afterwards, he holds cash. Despite this, such businesses are not considered money transmission services by the Department of Treasury because "[t]he ATM is unable to transmit funds to third parties or to customer accounts at other financial intuitions." FIN-2006-G006, Application of the Definition of Money Services Business to Certain Owner-Operators of Automated Teller Machines Offering Limited Service (December 3, 2007). Contrary to the Panel's interpretation, the mere conversion of a customer's funds from a digital medium to cash medium does not constitute a transfer to "another location."

The Panel's decision misapprehends these carefully drawn distinctions. By characterizing the in-person payment of cash as the "transmission" of funds to another location, the Panel's decision would expand the definition of "money

12

transmitting services" to include businesses that are currently exempt from registration under the applicable Treasury Department Regulations, including private ATMs, as well as check cashing and currency exchange businesses that transact less than $1,000 per day. *See* 31 C.F.R. §1010.100 (ff)(1) & (2).

C.     FinCEN's 2013 Guidance Merely Describes the *Outgoing* Transmission of Bitcoin as Transmission to Another Location; it Does Not Speak to the In-Person Payment of Cash in Exchange to Bitcoin

The Panel cites to a 2013 FinCEN memorandum as supporting the contention that "an exchanger like Goklu 'that buys or sells convertible virtual currency for any reason is a money transmitter under FinCEN's regulations, unless a limitation to or exemption from the definition applies to the person.'" *Id.* at \*18, *citing* FIN–2013– G001, APPLICATION OF FINCEN'S REGULATIONS TO PERSONS ADMINISTERING, EXCHANGING, OR USING VIRTUAL CURRENCIES at p. 3 (Mar. 18, 2013).  But a careful reading of that memorandum demonstrates that FinCEN's guidance does not reach the conduct at issue here: paying cash in-person to buy bitcoin.  To the contrary, FinCEN's 2013 Guidance described two scenarios in which "an exchanger" engages in money transmission. The first involves the sale and outgoing transfer of cryptocurrency to a remote account.  The second involves the acceptance and transfer of cryptocurrency to a third party at the client's direction.  Hence, the memorandum states:

> FinCEN understands that the exchanger's activities may take one of two forms. The first form involves an exchanger (acting as a "seller" of

13

the convertible virtual currency) that accepts real currency or its equivalent from a user (the "purchaser") and transmits the value of that real currency to fund the user's convertible virtual currency account with the administrator. Under FinCEN's regulations, sending "value that substitutes for currency" to another person or to another location constitutes money transmission, unless a limitation to or exemption from the definition applies.16 This circumstance constitutes transmission *to another location*, namely from the user's account at one location (e.g., a user's real currency account at a bank) to the user's convertible virtual currency account with the administrator. It might be argued that the exchanger is entitled to the exemption from the definition of "money transmitter" for persons involved in the sale of goods or the provision of services. Under such an argument, one might assert that the exchanger is merely providing the service of connecting the user to the administrator and that the transmission of value is integral to this service. However, this exemption does not apply when the only services being provided are money transmission services.

The second form involves a *de facto* sale of convertible virtual currency that is not completely transparent. The exchanger accepts currency or its equivalent from a user and privately credits the user with an appropriate portion of the exchanger's own convertible virtual currency held with the administrator of the repository. The exchanger then transmits that internally credited value to third parties at the user's direction. This constitutes transmission *to another person*, namely each third party to which transmissions are made at the user's direction.

FinCEN Guidance, FIN-2013-G001 (March 18, 2013), p. 4.

Obviously, Mr. Goklu's conduct *vis-a-vis* the undercover agent did not fit under either of these scenarios.

D.  To the Extent the Trial Record Contained Evidence of Outgoing Transmissions of Bitcoin, that Was Not the Focus of the Government's <u>Case and Does Not Render the Lower Court's Rule 30 Error Harmless</u>

Finally, the Panel suggests that regardless of whether the payment of cash constitutes the transmission of funds to another location, the trial evidence was

14

legally sufficient to convict Goklu because of record evidence suggesting that Goklu, in some cases, accepted cash and transmitted bitcoin to his customers.

First, to the extent such evidence exists in the record, it is exceedingly slight, mostly based upon text communication between Goklu and unknown third parties recovered from Goklu's phone. The Government made no effort to substantiate or confirm that such transactions took place, or to even identify the persons involved; rather, the prosecution focused on Goklu's transactions with the undercover agent. And the agent never received a transmission from Goklu.

But even if the Court were to conclude that such sparse evidence is legally sufficient to sustain a conviction, it does not render the lower court's instructional error harmless. The jury here was improperly instructed, via the court's supplemental instruction, that Goklu's transactions with the undercover agent could qualify as a transfer within the meaning of the statute. Because this supplemental instruction misled the jury as to a critical element of the statute, it is the Government's burden to prove beyond a reasonable doubt that the Government did not rely on such conduct to convict Goklu. *Neder v. United States*, 527 U.S. 1, 18 (1999). In a case where the Government's entire focus was on the Appellant's purchase of bitcoin from the agent, it cannot demonstrate, beyond a reasonable doubt, that the jury did not rely on such conduct to convict. *See United States v. Heyward*, 3 F.4th 75, 83 n.7 (2d Cir. 2021) ("When . . . the jury has been presented

15

with several bases for conviction, one of which is invalid as a matter of law, and it is impossible to tell which ground the jury selected, the conviction must be vacated.").

## CONCLUSION

Because the Panel's decision overlooks key limiting language included in the 2018 version 31 U.S.C. § 5330, and because its novel interpretation of the phrase "another location" is inconsistent with the current regulatory framework, panel rehearing is appropriate. Moreover, because the Panel's broad construction of § 5330(d)(2) would expand the statute in a way that contravenes the complex regulatory framework created by the Department of Treasury, and would require the registration of businesses not currently subject to such requirements, this petition raises a question of exceptional importance meriting *en banc* rehearing.

Dated:  Garden City, New York
    May 18, 2026

           Respectfully submitted,

           MATTHEW W. BRISSENDEN, P.C.

     By: /s/ Matthew W. Brissenden
        Matthew W. Brissenden
        *Counsel for Mustafa Goklu*
        666 Old Country Road, Suite 501
        Garden City, NY 11530
        (516) 683-8500

16

# CERTIFICATE OF COMPLIANCE

As counsel of record to Defendant-Appellant, I hereby certify that this Petition complies with the type - volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. I am relying upon the word count of the word-processing system (Microsoft Word) used to prepare the brief, which indicates that 3,563 words appear in the Petition.

By: /s/ Matthew W. Brissenden
Matthew W. Brissenden
*Counsel for Defendant-Appellant*
666 Old Country Road, Suite 501
Garden City, NY 11530
(516) 683-8500

Exhibit A

# *United States v. Goklu*

United States Court of Appeals for the Second Circuit

February 9, 2026, Argued; April 7, 2026, Decided

No. 24-767

**Reporter**
2026 U.S. App. LEXIS 9874 *; 173 F.4th 16; 2026 LX 173932; 2026 WL 932952

UNITED STATES OF AMERICA, Appellee, v. **MUSTAFA GOKLU**, AKA MUSTANGY, Defendant-Appellant.

**Prior History:** **[*1]** Appeal from the United States District Court for the Eastern District of New York. No. 19-cr-00386. Pamela K. Chen, Judge.

A jury convicted **Mustafa Goklu** of money laundering and operating an unlicensed money transmitting business based on a series of bitcoin-for-cash exchanges with an undercover officer. **Goklu** raises three challenges to his conviction: (1) The district court violated his right to an impartial jury by empaneling a juror who expressed a positive view toward law enforcement and a negative view toward financial crimes; (2) The evidence was insufficient to convict him of operating an unlicensed money transmitting business because a payment of cash for bitcoin is not "money transmitting"; and (3) The district court violated *Rule 30 of the Federal Rules of Criminal Procedure* by instructing the jury after **Goklu**'s closing argument that exchanging bitcoin for cash can constitute "transferring funds." We reject all three challenges. The district court acted within its broad discretion to empanel a juror who said he would try his best to consider the evidence impartially. Moreover, **Goklu**'s exchanges of bitcoin for cash constituted "money transmitting," so the district court did not abuse its discretion in giving this legally correct **[*2]** jury instruction.

**Goklu** also challenges his sentence. But he has finished serving his term of imprisonment, and he raises no challenge to his term or conditions of supervised release, so his sentencing challenges are moot. Accordingly, we DISMISS **Goklu**'s appeal as moot in part and otherwise AFFIRM the judgment of the district court.

*United States v. Goklu, 2023 U.S. Dist. LEXIS 6792, 2023 WL 184254 (E.D.N.Y., Jan. 13, 2023)*

## LexisNexis® Headnotes

Criminal Law & Procedure > ... > Challenges for Cause > Bias & Impartiality > Actual & Implied Bias

Criminal Law & Procedure > ... > Challenges to Jury Venire > Bias & Prejudice > Right to Unbiased Jury

Criminal Law & Procedure > Juries & Jurors > Disqualification & Removal of Jurors > Bias

Criminal Law & Procedure > ... > Challenges to Jury Venire > Bias & Prejudice > Appellate Review

Criminal Law & Procedure > ... > Challenges to Jury Venire > Fair Cross Section Challenges > Sixth Amendment Guarantee

*HN1* **Bias & Impartiality, Actual & Implied Bias**

The U.S. Const. amend. VI guarantees the right to trial by an impartial jury. U.S. Const. amend. VI. An impartial jury is one capable and willing to decide the case solely on the evidence before it, or one comprising people who will

2026 U.S. App. LEXIS 9874, *2

conscientiously apply the law and find the facts. When conducting voir dire, the district court must, at a minimum, remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence. A juror should be removed if the district court concludes that he has "actual bias," that is, the existence of a state of mind that leads to an inference that the person will not act with entire impartiality. A district court can find actual bias if the juror admits partiality or if the judge finds actual partiality based upon the juror's voir dire answers.

Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion

Criminal Law & Procedure > ... > Challenges to Jury Venire > Bias & Prejudice > Appellate Review

Criminal Law & Procedure > Juries & Jurors > Challenges for Cause > Judicial Discretion

Criminal Law & Procedure > ... > Challenges for Cause > Appellate Review > Standards of Review

Criminal Law & Procedure > Juries & Jurors > Voir Dire > Appellate Review

### *HN2* **Standards of Review, Abuse of Discretion**

In assessing impartiality, the trial court makes determinations of demeanor and credibility that are peculiarly within a trial judge's province. An appellate court cannot easily second-guess the conclusions of the decisionmaker who heard and observed the juror. An appellate court reverses a decision to empanel a juror only if there is clear abuse of the district court's discretion. There are few aspects of a jury trial where an appellate court would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empaneling of a jury.

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > Sufficiency of Evidence

Governments > Legislation > Interpretation

Evidence > Weight & Sufficiency

### *HN3* **De Novo Review, Sufficiency of Evidence**

Whether a challenge is construed as a question of statutory interpretation or an attack on the sufficiency of the evidence, the court reviews de novo.

Criminal Law & Procedure > ... > Racketeering > Money Laundering > Elements
Banking Law > ... > Criminal Offenses > Money Laundering > Elements

Criminal Law & Procedure > ... > Smuggling > Currency Smuggling > Penalties

### *HN4* **Money Laundering, Elements**

18 U.S.C.S. § 1960(a) provides that whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than five years, or both. The statute defines "money transmitting" to include transferring funds on behalf of the public by any and all means. 18 U.S.C.S. § 1960(b)(2). An "unlicensed money transmitting" business includes a money transmitting business that fails to comply with the money transmitting business registration requirements under 31 U.S.C.S. § 5330 or its implementing regulations. 18 U.S.C.S. § 1960(b)(1)(B).

2026 U.S. App. LEXIS 9874, *2

Banking Law > Types of Banks & Financial Institutions > Money Services Businesses

### *HN5* Types of Banks & Financial Institutions, Money Services Businesses

31 U.S.C.S. § 5330 requires any person who owns or controls a money transmitting business to register that business with the Secretary of the Treasury. 31 U.S.C. § 5330(a)(1-2). This statute defines money transmitting business to include a business that provides check cashing, currency exchange, or money transmitting or remittance services. 31 U.S.C.S. § 5330(d)(1)(A).

Banking Law > Types of Banks & Financial Institutions > Money Services Businesses

### *HN6* Types of Banks & Financial Institutions, Money Services Businesses

Under 31 U.S.C.S. § 5330, a business is a money transmitting business only if it provides the services described in the statute and is required to file reports under 31 U.S.C.S. § 5313. 31 U.S.C.S. § 5330(d)(1)(A-B).

Criminal Law & Procedure > ... > Racketeering > Money Laundering > Elements
Banking Law > ... > Criminal Offenses > Money Laundering > Elements

Banking Law > Types of Banks & Financial Institutions > Money Services Businesses

### *HN7* Money Laundering, Elements

The government may establish a violation of 18 U.S.C.S. § 1960 by proving that a defendant failed to comply with the registration requirement under 31 U.S.C.S. § 5330 itself, or by proving that a defendant failed to comply with the registration requirement in the regulations implementing 31 U.S.C.S. § 5330. 18 U.S.C.S. § 1960(b)(1)(B). The Financial Crimes Enforcement Network of the U.S. Treasury Department has promulgated regulations requiring a money services business to register with it. 31 C.F.R. § 1022.380. This registration requirement applies to a money transmitter, that is, a person that provides money transmission services, which include the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means. 31 C.F.R. § 1010.100(ff)(5)(i)(A). Although the court does not simply import this definition into 18 U.S.C.S. § 1960's definition of money transmitting, a business providing money transmission services as defined by the regulations is transferring funds and is thus engaged in money transmitting within the meaning of 18 U.S.C.S. § 1960.

Criminal Law & Procedure > ... > Racketeering > Money Laundering > Elements
Banking Law > ... > Criminal Offenses > Money Laundering > Elements

Banking Law > Types of Banks & Financial Institutions > Money Services Businesses

### *HN8* Money Laundering, Elements

To start, bitcoin qualifies as "funds." Bitcoin is a decentralized digital currency that can be used for peer-to-peer transactions. It is stored in a digital wallet and can be transferred to another wallet without any bank intermediaries. Bitcoin can be and is used as a currency to make sales and purchases and, therefore, nicely fits the definition of "funds".

Criminal Law & Procedure > ... > Racketeering > Money Laundering > Elements

Banking Law > ... > Criminal Offenses > Money Laundering > Elements

Banking Law > Types of Banks & Financial Institutions > Money Services Businesses

### [HN9](#) Money Laundering, Elements

Nothing in the statutes or regulations exempts the physical transfer of cash from the definition of money transmission. On the contrary, each authority expressly includes transfers or transmissions of funds by any means. 31 U.S.C.S. 5330(d)(2); 31 C.F.R. 1010.100(ff)(5). The statutes confirm that a physical transfer of cash is a "means" by which funds may be transmitted; for example, 18 U.S.C.S. § 1960 lists "courier" as one way a business can engage in money transmitting and 31 U.S.C.S. § 5330 describes a business that provides currency exchange services as a money transmitting business. Couriers and many currency exchanges physically hand currency to a customer or recipient.

Criminal Law & Procedure > Trials > Jury Instructions > Objections

Criminal Law & Procedure > Trials > Jury Instructions > Requests to Charge

### [HN10](#) Jury Instructions, Objections

Fed. R. Crim. P. 30 requires that the court inform the parties of its ruling on their proposed jury instructions before closing argument. Fed. R. Crim. P. 30(b). If a supplemental charge is legally correct, the district court enjoys broad discretion in determining how, and under what circumstances, that charge will be given.

Constitutional Law > The Judiciary > Case or Controversy > Mootness

Criminal Law & Procedure > Sentencing > Appeals > Appealability

Criminal Law & Procedure > Sentencing > Supervised Release

Criminal Law & Procedure > Appeals > Remand & Remittitur

### [HN11](#) Case or Controversy, Mootness

An appellate court has an independent obligation to ensure that developments in the case have not rendered the appeal moot. An appeal from a prison sentence is typically moot when the sentence has been completed. Although a defendant's release from prison will not necessarily moot his sentencing challenges if he remains under supervision at the time of his appeal, such challenges remain live only if there is more than a remote and speculative possibility that the district court could or would impose a reduced term of supervised release were the appellate court to remand the matter.

**Counsel:** MATTHEW BRISSENDEN, Matthew W. Brissenden, P.C., Garden City, NY, for Defendant-Appellant.

FRANCISCO J. NAVARRO, Assistant United States Attorney (Dylan A. Stern, Assistant United States Attorney, on the brief), for Joseph Nocella, Jr., United States Attorney for the Eastern District of New York, Brooklyn, NY, for Appellee.

2026 U.S. App. LEXIS 9874, *2

**Judges:** Before: PARK and MERRIAM, Circuit Judges, and MATSUMOTO, District Judge[*].

**Opinion by:** PARK

# Opinion

PARK, *Circuit Judge*:

A jury convicted **Mustafa Goklu** of money laundering and operating an unlicensed money transmitting business based on a series of bitcoin-for-cash exchanges with an undercover officer. **Goklu** raises three challenges to his conviction: (1) The district court violated his right to an impartial jury by empaneling a juror who expressed a positive view toward law enforcement and a negative view toward financial crimes; (2) The evidence was insufficient **[*3]** to convict him of operating an unlicensed money transmitting business because a payment of cash for bitcoin is not "money transmitting"; and (3) The district court violated *Rule 30 of the Federal Rules of Criminal Procedure* by instructing the jury after **Goklu**'s closing argument that exchanging bitcoin for cash can constitute "transferring funds." We reject all three challenges. The district court acted within its broad discretion to empanel a juror who said he would try his best to consider the evidence impartially. Moreover, **Goklu**'s exchanges of bitcoin for cash constituted "money transmitting," so the district court did not abuse its discretion in giving this legally correct jury instruction.

**Goklu** also challenges his sentence. But he has finished serving his term of imprisonment, and he raises no challenge to his term or conditions of supervised release, so his sentencing challenges are moot. Accordingly, we dismiss **Goklu**'s appeal as moot in part and otherwise affirm the judgment of the district court.

## I. BACKGROUND

A. Factual Background

In 2018 and 2019, **Goklu** ran a business charging commission fees to exchange bitcoin for cash. He advertised his business on localbitcoins.com, a website connecting bitcoin buyers and sellers. In July **[*4]** 2018, the DEA began investigating **Goklu** after seeing his ads, which offered to exchange significantly larger amounts of bitcoin than others in the same area.

Over the next eight months, undercover DEA agents arranged several exchanges with **Goklu**. Special Agent Patrick O'Kain messaged **Goklu** on Signal—an encrypted chat application for smartphones—to set up a meeting to exchange O'Kain's bitcoin for cash. They met in Manhattan and got into **Goklu**'s car, where **Goklu** told the agent to "close the door, man, the cops, we're not drug dealers. We're buying Bitcoin." App'x at 354. O'Kain understood that to mean that **Goklu** "was concerned about being identified by the cops." *Id.* O'Kain transferred about $5,000 worth of bitcoin from his cryptocurrency wallet to **Goklu**'s, and **Goklu** then handed $4,620 in cash over to O'Kain, reflecting an 8% commission.

Agent O'Kain met **Goklu** repeatedly in the following months. Each time, O'Kain transferred bitcoin to **Goklu**, who exchanged the value of the bitcoin in cash, minus his commission. O'Kain initially told **Goklu** that the bitcoin came from an online business, but during their fourth meeting, O'Kain told him that it was from selling drugs. **Goklu** continued meeting **[*5]** with O'Kain to exchange bitcoin for cash.

Although **Goklu**'s transactions with O'Kain involved the agent transferring his bitcoin for cash, **Goklu** also conducted some transactions in which he sold his bitcoin to customers instead. **Goklu** obtained some of the cash that he exchanged with O'Kain from selling bitcoin to another customer.

---

[*] Judge Kiyo A. Matsumoto, of the United States District Court for the Eastern District of New York, sitting by designation.

Between August 2018 and January 2019, **Goklu** and O'Kain met six times, exchanging roughly $130,000 worth of bitcoin for cash. In April 2019, **Goklu** agreed to meet with O'Kain for a seventh time to exchange about $50,000 worth of bitcoin. But before they made the exchange, the monitoring DEA team arrested **Goklu**.

B. Procedural History

In October 2020, the government filed a two-count superseding indictment against **Goklu**. Count One charged him with money laundering, in violation of *18 U.S.C. § 1956*, and Count Two charged him with operating an unlicensed money transmitting business, in violation of *18 U.S.C. § 1960*. **Goklu** entered pleas of not guilty and proceeded to trial.

1. *Voir Dire*

During voir dire, the district court asked prospective jurors if they had any positive or negative feelings toward law enforcement. After excusing multiple jurors for cause, the court held a sidebar with a prospective **[*6]** juror ("Juror 30").

Juror 30 explained that he works for New York City Parks, so he interacts with the Parks Police on a daily basis and has a "positive outlook towards police." App'x at 120. The court asked if he could be fair and objective despite his positive feelings about law enforcement. After saying he was not sure, Juror 30 agreed to "try [his] best." *Id.* at 121. When asked again whether he could evaluate law enforcement officer testimony impartially, he said that he could "[i]f it's presented in a neutral manner." *Id.* at 122.

Juror 30 also expressed some reluctance to serve on a jury in a case involving financial crimes because he has a friend who had been affected by Bernie Madoff's Ponzi scheme. The court said that "[t]his is obviously not a Madoff scheme" and asked if he could put that out of his mind, to which Juror 30 said, "I believe so," and again said that he would "try [his] best." *Id.* at 122-23.

**Goklu** moved to dismiss Juror 30 for cause. But the district court denied the motion because the juror "said he would try his best and seems sincere about that." *Id.* at 123. So it concluded that "he can be objective at the end of the day." *Id.* Juror 30 was subsequently empaneled **[*7]** and served on the jury.

2. *Jury Instructions*

At the charge conference, the district court adopted the government's instruction defining a "money transmitting business":

> A "money transmitting business" is a business which, for a fee, accepts currency, funds, or value that substitutes for currency for transfer within or outside the United States. I instruct you that Bitcoin qualifies as "funds" under the statute. The term "money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier.

App'x at 707; *see id.* at 570-75.

In his closing argument, defense counsel emphasized that "[a] money transmitting business is a business which for a fee accepts currency for transfer," and asked the jury to conclude "that the evidence does not prove beyond a reasonable doubt that [**Goklu** accepted] currency for transfer." *Id.* at 646. After this argument, the district court called for a sidebar before the government's rebuttal. The court understood **Goklu** to be arguing, for the first time, that a defendant does not run a "money transmitting business" unless he accepts **[*8]** money for transfer *to a third party*. Over **Goklu**'s objection, the district court added an additional instruction that "exchanging Bitcoin for U.S. currency can qualify as a transfer within the meaning of the statute." *Id.* at 655.

The jury found **Goklu** guilty on both counts.

3. *Sentencing*

At sentencing, the parties disputed which transactions the district court should use for purposes of determining the base offense level under the U.S. Sentencing Guidelines. **Goklu** argued that only the transactions that took place after O'Kain told **Goklu** he got bitcoin from selling drugs involved "laundered funds" for purposes of *U.S.S.C. § 2S1.1(a)(2)*. But the district court accepted the government's argument that the value of the laundered funds included all transactions between **Goklu** and O'Kain, including the transactions before this disclosure. After calculating the Guidelines range to be 41 to 51 months, the district court varied downward and sentenced **Goklu** principally to 16 months of imprisonment, to be followed by two years of supervised release.

This appeal followed.

## II. DISCUSSION

A. Impartial Jury

*HN1* The *Sixth Amendment* guarantees the right to trial "by an impartial jury." *U.S. Const. amend. VI*. "An impartial jury is one capable and willing to decide the case **[*9]** solely on the evidence before it, or one comprising people who will conscientiously apply the law and find the facts." *United States v. Perez, 387 F.3d 201, 204 (2d Cir. 2004)* (cleaned up). When conducting voir dire, the district court must, "at a minimum, 'remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence.'" *United States v. Kelly, 128 F.4th 387, 421 (2d Cir. 2025)* (quoting *Rosales-Lopez v. United States, 451 U.S. 182, 188, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981)*). A juror should be removed if the district court concludes that he has "actual bias," that is, "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Torres, 128 F.3d 38, 43 (2d Cir. 1997)*. A district court can find actual bias if "the juror admits partiality" or if "the judge finds actual partiality based upon the juror's voir dire answers." *Id.*

*HN2* In assessing impartiality, the trial court makes "determinations of demeanor and credibility that are peculiarly within a trial judge's province." *Id. at 44*. An "appellate court cannot easily second-guess the conclusions of the decisionmaker who heard and observed the [juror]." *Id.* (cleaned up). So we reverse a decision to empanel a juror "only if there is clear abuse of the district court's discretion." *United States v. Mensah, 110 F.4th 510, 524 (2d Cir. 2024)* (quotation marks omitted). "There are few aspects of a jury trial where we would be less inclined **[*10]** to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empanel[]ing of a jury." *United States v. Ploof, 464 F.2d 116, 118 n.4 (2d Cir. 1972)*.

**Goklu** argues that we should vacate his conviction because Juror 30 expressed doubts about his ability to be impartial and failed to state unequivocally that he could put aside those doubts. To be sure, Juror 30 initially said that he "honestly" did not know if he could be impartial because of his positive feelings about the Park Police and his negative feelings about financial crimes. App'x at 121. But after the district court reminded him of his oath, Juror 30 twice said that he would try his best. After their colloquy, the district court concluded that Juror 30 could be impartial because "he said he would try his best and seems sincere about that." *Id.* at 123. The district court's assessment of the juror's sincerity is precisely the type of credibility determination to which we must defer absent a clear abuse of discretion. *See Torres, 128 F.3d at 44*.

**Goklu** points to our decision in *United States v. Nelson, 277 F.3d 164 (2d Cir. 2002)*, which he claims supports his argument that probable impartiality "is not good enough." Appellant's Br. at 26 (quoting *Nelson, 277 F.3d at 202*). But the facts of *Nelson* are very different. In *Nelson*, the district court empaneled **[*11]** a juror who knew that defendant Nelson had been prosecuted and acquitted in state court for the same alleged conduct underlying the federal charges and explicitly "voiced his dissatisfaction with the State proceedings that resulted in defendant Nelson's acquittal." *Nelson, 277 F.3d at 201*. The juror in *Nelson* "never even asserted that he could *probably* be impartial." *Id. at 203*. And there, "the potential bias [did] not represent only a general state of mind but also a predisposition to believe in the guilt of one of the very defendants who [was] being tried." *Id. at 202*. We thus concluded that the juror should have been excused. By contrast, we have found no abuse of discretion when a district court empanels a juror who promises to do his best, as Juror 30 did here. *Ploof, 464 F.2d at 118*.

We thus conclude that the district court did not abuse its discretion in determining that Juror 30 "can be objective at the end of the day" and in declining to strike him for cause. App'x at 123.

B. Unlicensed Money Transmitting Business

1. *Legal Standards*

**Goklu** argues that the evidence was insufficient to convict him of operating an unlicensed money transmitting business because his conduct—paying cash for bitcoin in a face-to-face transaction—did not involve transmitting **[\*12]** funds to another person or location. He frames this as a challenge to the sufficiency of the evidence, but the thrust of his argument is that his conduct was not "money transmitting" under *18 U.S.C. § 1960*. *HN3* "Whether [**Goklu**'s] challenge is construed as a question of statutory interpretation or an attack on the sufficiency of the evidence, we review *de novo*." *United States v. Ho, 984 F.3d 191, 204 (2d Cir. 2020)*.

2. *Statutory Framework*

*HN4* *18 U.S.C. § 1960(a)* provides that "[w]hoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both." The statute defines "money transmitting" to include "transferring funds on behalf of the public by any and all means." *Id. § 1960(b)(2)*. As relevant here, an "unlicensed money transmitting business" includes a money transmitting business that "fails to comply with the money transmitting business registration requirements" under *31 U.S.C. § 5330* or its implementing regulations. *Id. § 1960(b)(1)(B)*. **Goklu** was not federally registered to operate a money transmitting business. He argues, however, that his conduct was not "transferring funds" and did not trigger the federal licensing requirements.[1] We thus turn to *§ 5330* and its implementing **[\*13]** regulations for the relevant registration requirements.

*HN5* *Section 5330* requires any person who owns or controls a "money transmitting business" to register that business with the Secretary of the Treasury. *31 U.S.C. § 5330(a)(1-2)*. This statute defines "money transmitting business" to include a business that provides "check cashing, currency exchange, or money transmitting or remittance services." *Id. § 5330(d)(1)(A)*.[2] At the time of **Goklu**'s conduct, "money transmitting services" included "accepting currency or funds denominated in the currency of any country and transmitting the currency or funds, or the value of the currency or funds, by any means." *Id. § 5330(d)(2)*.

*HN7* The government may establish a violation of *§ 1960* by proving that a defendant failed to comply with the registration requirement under *§ 5330* itself, or by proving that a defendant failed to comply with the registration requirement in the regulations implementing *§ 5330*. *See* *18 U.S.C. § 1960(b)(1)(B)*. The Financial Crimes Enforcement Network ("FinCEN") of the U.S. Treasury Department has promulgated regulations requiring a "money services business" to register with it. *31 C.F.R. § 1022.380*. This registration requirement applies to a "money transmitter"—*i.e.*, a "person that provides money transmission services"—which include the "acceptance of **[\*14]** currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." *Id. § 1010.100(ff)(5)(i)(A)*. Although we do not simply import this definition into *§ 1960*'s definition of "money transmitting," *see* *United States v. Mazza-Alaluf, 621 F.3d 205, 210 (2d Cir. 2010)*, we conclude that a business providing "money transmission services" as defined by the regulations is "transferring funds" and is thus engaged in "money transmitting" within the meaning of *§ 1960*.

---

[1] **Goklu** was also charged with operating a money transmitting business that failed to comply with state licensing requirements, but he addresses only the federal licensing prong on appeal.

[2] *HN6* Under this statute, a business is a money transmitting business only if it provides the services described above and is required to file reports under *31 U.S.C. § 5313*. *Id. § 5330(d)(1)(A-B)*. The parties do not raise *§ 5313*'s reporting requirements in this appeal, and **Goklu**'s lawyer said it was "fine" for the district court to define "money transmitting business" without reference to *§ 5313*. App'x at 574.

In light of the foregoing, if the evidence was sufficient to show that **Goklu** was a money transmitter within the meaning of *§ 5330*'s implementing regulations, then it was sufficient to satisfy *§ 1960*. Our inquiry thus turns on whether the evidence showed that **Goklu**'s business involved the acceptance of currency, funds, or value from one person and the transmission of currency, funds, or other value to another location or person by any means. *31 C.F.R. § 1010.100(ff)(5)(i)(A).*

3. *Application*

Under this statutory scheme, a business exchanging virtual currency for real currency through the purchase or sale of bitcoin provides money transmission services and is thus a money transmitting business subject to FinCEN's registration requirements. **[*15]** [3] We base this conclusion on the ordinary meaning of the statutory and regulatory text, which accords with FinCEN's interpretive guidance.

*HN8* To start, bitcoin qualifies as "funds." Bitcoin is a decentralized digital currency that can be used for peer-to-peer transactions. It is stored in a digital wallet and can be transferred to another wallet without any bank intermediaries. "[B]itcoin can be and is used as a currency to make sales and purchases and, therefore, nicely fits the definition of 'funds.'" *United States v. Freeman, 147 F.4th 1, 13 (1st Cir. 2025)* (collecting cases). **Goklu** does not contend otherwise.

**Goklu** argues that he did not provide money transmission services because his transactions with Agent O'Kain involved no transfer or transmittal "to another location or person by any means." *31 C.F.R. § 1010.100(ff)(5)(i)(A)*. We disagree.

In each transaction, Agent O'Kain transferred bitcoin to **Goklu**, who handed O'Kain cash representing the value of that bitcoin minus a commission. *See supra* at 4-5. **Goklu** accepted funds (bitcoin) from O'Kain and transmitted currency to him representing the value of the funds. And both ends of the transaction involved the movement of funds to another location. When O'Kain transferred bitcoin to **Goklu**, he electronically moved funds from his **[*16]** bitcoin wallet to **Goklu**'s. *See United States v. Gilboe, 684 F.2d 235, 238 (2d Cir. 1982)* (recognizing that often, "[e]lectronic signals . . . are the means by which funds are transported" (interpreting *18 U.S.C. § 2314*)). **Goklu** then transmitted the remaining value of O'Kain's funds back through a physical transfer of cash. Even though this was not transmission to "another person," it was transmission to "another location": at the start of the transaction, O'Kain's funds were in his cryptocurrency wallet, and afterwards, he held cash. **Goklu**'s business thus transferred funds, and satisfies the regulatory definition of a money transmitter. *See 31 C. F.R. § 1010.100(ff)(5)(i)(A).*

**Goklu**'s argument that an in-person transfer of cash is not a transfer or transmission of funds is inconsistent with the statutory and regulatory text, and in any event misreads the record.

First, physically moving cash is a "means" of transferring or transmitting funds to another location. *HN9* Nothing in the statutes or regulations exempts the physical transfer of cash from the definition of money transmission. On the contrary, each authority expressly includes transfers or transmissions of funds by "any means." *31 U.S.C § 5330(d)(2)*; *31 C.F.R. § 1010.100(ff)(5)*; *see also 18 U.S.C. § 1960(b)(2)* (defining money transmitting to include transferring funds "by any and all means"). And the statutes **[*17]** confirm that a physical transfer of cash is a "means" by which funds may be transmitted; for example, *§ 1960* lists "courier" as one way a business can engage in money transmitting and *§ 5330* describes a business that provides "currency exchange" services as a money transmitting business. Couriers and many currency exchanges physically hand currency to a customer or recipient.

Second, in any event, the jury also heard evidence that **Goklu** conducted trades in which he accepted cash and electronically transmitted bitcoin. In particular, **Goklu** obtained the cash he transferred to O'Kain from different customers who bought bitcoin. **Goklu**'s profile on localbitcoins.com also shows that he sold bitcoin for cash. The government argued in closing that "at least some of the defendant's customers crossed state lines to meet the defendant to exchange that Bitcoin for cash or cash for Bitcoin." App'x at 628. And **Goklu** never argued otherwise. Instead, he admitted that he had customers who "want[ed] to exchange cash and Bitcoin one way or the other." *Id.*

---

[3] **Goklu** does not claim to fall under any of the six exemptions from "money transmitter" in *31 C.F.R. § 1010.100(ff)(5)(ii)*.

at 648. So even if only the outgoing transmission of bitcoin constitutes transmission to another location, the jury heard evidence that **Goklu**'s business involved **[\*18]** both incoming and outgoing transmissions of bitcoin.

Finally, our conclusion that **Goklu** operated a "money transmitting business" is consistent with FinCEN's guidance. FinCEN treats "a person engaged as a business in the exchange of virtual currency for real currency, funds, or other virtual currency" as an "*exchanger.*" U.S. Dep't of Treasury, FinCEN, FIN—2013—G001, Guidance: Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies 2 (Mar. 18, 2013) [https://perma.cc/4YSK-JJ37]. **Goklu**, whose business was exchanging bitcoin and cash, was thus an exchanger. And an exchanger like **Goklu** "that buys or sells convertible virtual currency for any reason *is* a money transmitter under FinCEN's regulations, unless a limitation to or exemption from the definition applies to the person." *Id.* at 3. FinCEN's guidance thus aligns with the natural reading of the statutory and regulatory text, and confirms that **Goklu**'s conduct constituted money transmission.

**Goklu**'s business of exchanging bitcoin and cash falls squarely within the statutory and regulatory definitions of a money transmitting business.[4] By accepting bitcoin and transmitting cash, he engaged in the **[\*19]** transfer of funds "by any . . . means," as contemplated by *18 U.S.C. § 1960*. And his conduct was "money transmission," which subjected him to FinCEN's registration requirements. *See 31 C.F.R. § 1010.100(ff)(5).* Accordingly, the evidence was sufficient to sustain his conviction under *§ 1960*.

C. *Federal Rule of Criminal Procedure 30*

**Goklu** next argues that the district court violated *Federal Rule of Criminal Procedure 30* by instructing the jury, after his closing argument, that "[e]xchanging Bitcoin for U.S. currency can qualify as a transfer." App'x at 707. ***HN10*** *Rule 30* requires that the court inform the parties of its ruling on their proposed jury instructions before closing argument. *Fed. R. Crim. P. 30(b)*. But "[i]f a supplemental charge is legally correct, the district court enjoys broad discretion in determining how, and under what circumstances, that charge will be given." *United States v. Civelli, 883 F.2d 191, 195 (2d Cir. 1989)*.

In light of our conclusion above that exchanging bitcoin for U.S. currency can qualify as transferring funds, the district court did not abuse its "broad discretion" in changing the jury instruction after **Goklu**'s closing argument. **Goklu** suggested for the first time in his closing remarks that the jury must find a transfer to a third party to convict him under *§ 1960*. In response, the district court gave the legally correct curative instruction **[\*20]** that "[e]xchanging Bitcoin for U.S. currency can qualify as a transfer within the meaning of the statute." App'x at 707. This was not an abuse of discretion.

D. Sentencing Challenges

Finally, **Goklu** argues that he was improperly sentenced based on all of his financial transactions with Agent O'Kain, even though O'Kain first told **Goklu** that his bitcoin came from drug dealing during their fourth transaction. First, **Goklu** claims that the indictment was impermissibly duplicitous because it charged multiple transactions under a single count of money laundering. He contends that he was prejudiced because "both Probation and the court treated the early transactions as part of the offense of conviction" even though the jury did not render a verdict for each transaction. Appellant's Br. at 40. Second, he claims that the district court committed procedural error at sentencing by improperly including the value of the first three transactions when determining the "value of the

---

[4] Our conclusion does not mean, as **Goklu** suggests, that *§ 1960* applies "to a person in the business of buying bitcoin *to hold in their own account.*" Appellant's Br. at 31 (emphasis added). **Goklu** never argued that he carried out these transactions to obtain bitcoin for his own account. He made money by providing exchange services to customers in return for a commission. That **Goklu** also exchanged his own bitcoin for cash with other customers underscores the fact that the object of his business was charging customers for exchanges, not obtaining bitcoin. As applied to him, **Goklu** thus cannot show that the statute "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." ***United States v. Concepcion, 139 F.4th 242, 248 (2d Cir. 2025)*** (quotation omitted).

laundered funds" as part of its Guidelines calculation. *Id.* at 43-44 (quoting *U.S.S.G. § 2S1.1(a)(2)*). The remedy he seeks for both purported errors is a remand for resentencing.

We need not address these arguments because **Goklu**'s challenges to his term of imprisonment **[\*21]** are moot. "While the Government has failed to argue that [**Goklu**'s] appeal should be dismissed as moot, we have an independent obligation to ensure that developments in the case have not rendered the appeal moot." *United States v. Williams, 475 F.3d 468, 479 (2d Cir. 2007).***HN11** An appeal from a prison sentence is typically moot when the sentence has been completed. *See United States v. Simmons, 150 F.4th 126, 134-35 (2d Cir. 2025)*. "Although a defendant's release from prison will not necessarily moot his sentencing challenges if he remains under supervision at the time of his appeal, such challenges remain live only if there is more than a remote and speculative possibility that the district court could or would impose a reduced term of supervised release were we to remand the matter." *Id. at 134* (quotation marks omitted).

**Goklu** has completed his term of imprisonment and is now serving his two-year term of supervised release. But his sentencing challenges on appeal address only his prison sentence, not his term or conditions of supervised release. **Goklu** does not suggest that the district court's calculation of the value of the laundered funds affected his sentence of supervised release, nor does he ask us to reduce his term of supervision. "Given the lack of a challenge to [**Goklu**'s] term of supervision, it would be **[\*22]** quite strange for us to conclude that a live controversy exists as to that issue." *Id. at 135* (quotation marks omitted).

### III. CONCLUSION

We have considered **Goklu**'s remaining arguments and find them to lack merit. For these reasons we dismiss **Goklu**'s appeal in part as moot and otherwise affirm the judgment of the district court.

---

**End of Document**